## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND
### (Southern Division)

|  |  |  |
|---|---|---|
| **PLASTERERS' LOCAL UNION NO. 96 PENSION PLAN,** *et al.,* | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | C.A. No. PJM 06 CV 338 |
| | ) | |
| **v.** | ) | |
| | ) | |
| **HAROLD PERRY,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

### TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF UNDISPUTED FACTS ..........................................................2

III.    STANDARD OF REVIEW ...................................................................................25

        A.      General Summary Judgment Standard...................................................25

        B.      It is Proper For the Court to Grant Summary Judgment on Whether a Party
                Breached its Fiduciary Duties Under ERISA .......................................25

        C.      It is Proper for the Court to Grant Partial Summary Judgment Regarding
                Only Certain Amounts of Damages Alleged in a Party's Complaint....................26

        D.      It is Proper for the Court to Grant Partial Summary Judgment Regarding
                Only Certain Time Periods Alleged in a Party's Complaint ................................26

IV.     DEFENDANTS WERE UNDISPUTEDLY FIDUCIARIES UNDER ERISA ...............27

V.      DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY FAILING TO
        DIVERSIFY THE PLAN'S INVESTMENTS.................................................................28

        A.      The Defendants Breached Their Fiduciary Duties By Failing to Maintain a
                Diversified Investment Portfolio.............................................................28

        B.      The Defendants Cannot Establish That Their Failure to Diversify Was
                Prudent ......................................................................................................29

        C.      For the Three-Year Period Ending December 31, 2005, the Plan and its
                Participants Were Damaged By Defendants' Breach in Failing to Diversify
                the Plan's Assets in an Amount of $432,960.62 ......................................30

VI.     THE DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY FAILING
        TO ACT PRUDENTLY ...........................................................................................31

        A.      ERISA Fiduciaries Have a Duty to Act Prudently................................31

        B.      Defendants Breached Their Fiduciary Duty to Act Prudently by Failing to
                Maintain a Diversified Portfolio and Prudent Investment Strategy......................32

        C.      The Defendant Trustees Breached Their Fiduciary Duty to Act Prudently
                By Failing to Oversee and Monitor the Performance of Defendant Perry
                and Mr. Scholar........................................................................................33

        D.      Defendants Breached Their Fiduciary Duty By Failing to Ensure
                Defendant Perry Was Covered By Fiduciary Insurance .........................35

VII.   DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY
       IMPROPERLY TRANSFERRING PLAN ASSETS TO CONTRIBUTING
       EMPLOYERS, INCLUDING ENTITIES CONTROLLED BY THE
       DEFENDANT TRUSTEES ................................................................................35

       A.   Defendants Improperly Returned Plan Assets to Contributing Employers
            in 1994 ............................................................................................................35

       B.   Defendants Violated the Anti-Inurement Provision of Section 403(c)(1) of
            ERISA .............................................................................................................36

       C.   Defendants Breached their Fiduciary Duty By Failing to Use Plan Assets
            Solely for the Exclusive Purposes Permitted Under ERISA ..............................36

       D.   Defendants Breached Their Fiduciary Duties By Causing the Plan to Enter
            into Prohibited Transactions Under ERISA.......................................................37

       E.   Defendants Breached Their Fiduciary Duties By Causing the Plan to
            Return Assets to Entities Controlled by Defendant Trustees................................38

       F.   By Engaging in these Prohibited Transactions, Defendants' Damaged the
            Plan and its Participants in an Amount of $335,224...............................................39

VIII.  DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY FAILING TO
       ACT IN ACCORDANCE WITH THE PLAN'S GOVERNING DOCUMENTS ...........40

       A.   ERISA Requires Fiduciaries to Act in Accordance with the Plan's
            Governing Documents .....................................................................................40

       B.   The Defendants Failed to Act in Accordance With Plan Documents By
            Returning Funds to Contributing Employers.........................................................41

       C.   The Defendants Failed to Act in Accordance with Plan Documents by
            Failing to Meet With the Requisite Frequency to Ensure Proper Oversight .........41

       D.   The Defendants Failed to Act in Accordance With the Plan Documents by
            Allowing an Incomplete Board of Trustees to Operate without a Quorum...........42

IX.    PLAINTIFFS ARE ENTITLED TO RELIEF FOR THE DEFENDANTS'
       PROHIBITED TRANSACTIONS .................................................................................42

       A.   Plaintiffs' Action for Recovery Is Not Barred by a Statute of Limitations
            Because Defendants Concealed Their Prohibited Transactions ............................42

       B.   Alternatively, the Damages Caused By Defendants' Prohibited Transaction
            May Be Recovered Based Upon the Defendants' Failure to Remedy Their
            Past Breaches ..................................................................................................44

X.      EACH OF THE DEFENDANTS IS JOINTLY AND SEVERALLY LIABLE ...............46

XI.     PLAINTIFFS ARE ENTITLED TO RECOVER THEIR ATTORNEYS' FEES
        AND COSTS INCURRED IN BRINGING THIS ACTION ............................................47

XII.    CONCLUSION.............................................................................................................50

## **TABLE OF AUTHORITIES**

**Cases**

American Med. Sec., Inc. v. Larsen, 31 F. Supp. 2d 502 (D. Md. 1998) ..................................... 49

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ........................................................... 25

Arens v. DeFries, No. WN-93-1796, 1994 U.S. Dist. LEXIS 20726(D. Md. Aug. 19, 1994)..... 37

Batchelor v. Oak Hill Med. Group, 870 F.2d 1446 (9th Cir. 1989) ...................................... 33

Bidwill v. Garvey, 943 F.2d 498 (4th Cir. 1991) .......................................................... 31

Bouchat v. Balt. Ravens Football Club, 346 F.3d 514 (4th Cir. 2003)........................................ 26

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...................................................... 25

Chao v. Malkani, 216 F. Supp. 2d 505 (D. Md., 2002) ......................................................... 25

Chao v. Moore, No. AW-99-1283, 2001 U.S. Dist. LEXIS 9012, 26 Employee Benefits Cas.
(BNA) 2033 (D. Md. June 15, 2001) ..................................................................... 41

Chao v. Rhoades, No. 1:04CV00854, 2006 U.S. Dist. LEXIS 19887 (M.D.N.C. Apr. 13, 2006)47

Child-Olmsted v. Loyola College, No. CCB-04-3559, 2005 U.S. Dist. LEXIS 7523, 34
Employee Benefits Cas. (BNA) 2665 (D. Md. Apr. 28, 2005)................................................. 39

Davidson v. Cook, 567 F. Supp. 225 (E.D. Va. 1983) ...................................................... 47

Difelice v. U.S. Airways, Inc., 497 F.3d 410 (4th Cir. 2007).................................................. 28

DiFelice v. US Airways, Inc., 235 F.R.D. 70 (E.D. Va. 2006)................................................... 33

Doe v. Blue Cross Blue Shield, of Md., Inc., 173 F. Supp. 2d 398 (D. Md. 2001)...................... 32

Dzinglski v. Weirton Steel Corp., 875 F.2d 1075 (4th Cir. 1989)................................................ 40

Elmore v. Cone Mills Corp., 6 F.3d 1028 (4th Cir. 1993)............................................................ 31

Elmore v. Cone Mills Corp., No. 6:88-3258-17, 1991 U.S. Dist. LEXIS 13583 (D.S.C. Sep. 18,
1991) ........................................................................................................ 47

Essex v. Randall, No. DKC 2003-3276, 2005 U.S. Dist. LEXIS 3942, 35 Employee Benefits
Cas. (BNA) 1389 (D. Md. Mar. 15, 2005)................................................................. 50

Fort Halifax Packing Co. v. Coyne, 482 U.S. 1(1987) ................................................... 39

Gadsden v. Fripp, 330 F.2d 545 (4th Cir. 1964)................................................................. 26

Goettee v. Comm'r, 192 Fed. Appx. 212 (4th Cir. 2006) ........................................... 26

Imgarten v. Bellboy Corp., 383 F. Supp. 2d 825 (D. Md. 2005)................................................. 26

Jani v. Bell, No. WDQ-04-1606, 2005 U.S. Dist. LEXIS 44331 (D. Md. Nov. 7, 2005) ........... 48

iv

Johannssen v. Dist. No. 1 - Pacific Coast Dist., MEBA Pension Plan, No. AMD 96-2355, 1997
    U.S. Dist. LEXIS 14351(D. Md. Aug. 8, 1997) ...................................................... 28

Justin G. v. Board of Educ. of Montgomery County, 148 F. Supp. 2d 576 (D. Md. 2001) ......... 27

Kowalewski v. Detweiler, 770 F. Supp. 290 (D. Md. 1991) ....................................................... 31

Kress v. Food Emplrs. Labor Rels. Ass'n, 285 F. Supp. 2d 678 (D. Md. 2003).......................... 40

Laborers' Dist. Council Health & Welfare Trust Fund No. 2 v. Comet Contr., LLC, No. RWT 03-
    2196, 2006 U.S. Dist. LEXIS 55968, 39 Employee Benefits Cas. (BNA) 1685 (D. Md. July
    25, 2006) ................................................................................................................. 27

Leigh v. Engle, 727 F.2d 113 (7th Cir. 1984) ............................................................................ 33

Makar v. Health Care Corp., 872 F.2d 80 (4th Cir. 1989)............................................................ 27

Marks v. Watters, 322 F.3d 316 (4th Cir. 2003) ........................................................................ 36

Mary Helen Coal Corp. v. Hudson, 235 F.3d 207 (4th Cir. 2000) ................................................ 36

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ................................... 25

Meyer v. Berkshire Life Ins. Co., 128 F. Supp. 2d 831 (D. Md. 2001)......................................... 42

Meyer v. Berkshire Life Ins. Co., 250 F. Supp. 2d 544 (D. Md. 2003).......................................... 32

Mid Atl. Med. Servs., LLC v. Sereboff, 407 F.3d 212 (4th Cir. 2005) ........................................ 48

NARDA, Inc. v. R.I. Hosp. Trust Nat'l Bank, 744 F. Supp. 685 (D. Md. 1990).......................... 27

O'Neil v. Marriott Corp., 538 F. Supp. 1026 (D. Md. 1982) ...................................................... 36

Pension Benefit Guar. Corp. v. Baker, No. Y-97-4372, 1999 U.S. Dist. LEXIS 20715 (D. Md.
    Jan. 25, 1999).......................................................................................................... 25

Phelps v. CT Enters., 194 Fed. Appx. 120 (4th Cir. 2006).......................................................... 36

Provident Life & Accident Ins. Co. v. Cohen, 423 F.3d 413 (4th Cir. 2005).............................. 28

Quesinberry v. Life Ins. Co., 987 F.2d 1017 (4th Cir. 1993) ...................................................... 48

Ransom v. Telecredit Serv. Corp., No. 91-897, 1992 U.S. Dist. LEXIS 22738(D. Md. Feb. 5,
    1992) ....................................................................................................................... 26

Raymond B. Yates, M. D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1 .............................. 39

Reich v. King, 861 F. Supp. 379 (D. Md. 1994)......................................................................... 28

Reich v. King, 867 F. Supp. 341 (D. Md. 1994)......................................................................... 32

Reich v. Walter W. King Plumbing & Heating Contr., 98 F.3d 147 (4th Cir. 1996).................. 28

Richman v. Aetna Life Ins. Co., No. 92-1149, 1992 U.S. App. LEXIS 20949(4th Cir. Aug. 31,
    1992) ....................................................................................................................... 44

<u>Rodriguez v. MEBA Pension Trust</u>, 956 F.2d 468 (4th Cir. 1992) ................................ 48

<u>Scardelletti v. Bobo</u>, 897 F. Supp. 913 (D. Md. 1995) ................................................ 32

<u>Scardelletti v. Bobo</u>, No. JFM-95-52, 1997 U.S. Dist. LEXIS 14498 (D. Md. Sep. 8, 1997)...... 26

<u>Shade v. Panhandle Motor Serv. Corp.</u>, No. 95-1129, 1996 U.S. App. LEXIS 16703 (4th Cir.

    July 11, 1996)..................................................................................... 25

<u>Smith v. Sydnor</u>, 184 F.3d 356 (4th Cir. 1999) ......................................................... 44

<u>Tatum v. R.J. Reynolds Tobacco Co.</u>, 392 F.3d 636 (4th Cir. 2004) ........................... 32

<u>Trustees of Pressmen Local 72 Industry Pension Fund v. Judd & Detweiler, Inc.</u>, 736 F. Supp.

    1351 (D. Md. 1988) ............................................................................. 28

<u>White v. Sun Life Assur. Co.</u>, 488 F.3d 240 (4th Cir. 2007)....................................... 40

<u>Wood v. Commissioner</u>, 955 F.2d 908 (4th Cir. 1992) .............................................. 37

**Statutes**

29 C.F.R. § 2550.404c-1(f)(8) ............................................................................... 33

29 U.S.C. § 1002(14)(C) ...................................................................................... 38

29 U.S.C. § 1002(2) ............................................................................................. 3

29 U.S.C. § 1002(21)(A) ...................................................................................... 27, 28

29 U.S.C. § 1002(37)(A) ....................................................................................... 3

29 U.S.C. § 1003(a)(2).......................................................................................... 3

29 U.S.C. § 1103(c)(1) .......................................................................................... 36

29 U.S.C. § 1104(a)(1)(A) ..................................................................................... 36

29 U.S.C. § 1104(a)(1)(B) ..................................................................................... 31, 32, 33

29 U.S.C. § 1104(a)(1)(C) ..................................................................................... 28

29 U.S.C. § 1104(a)(1)(D) ..................................................................................... 40

29 U.S.C. § 1105(a)(3).......................................................................................... 44

29 U.S.C. § 1106(a)(1)(D) ..................................................................................... 37, 38

29 U.S.C. § 1106(b)(1) ......................................................................................... 39

29 U.S.C. § 1109 ................................................................................................. 45, 46, 47

29 U.S.C. § 1109(a) ............................................................................................. 47

29 U.S.C. § 1113.................................................................................................. 42, 45, 46

29 U.S.C. § 1132(a)(2).......................................................................................... 45, 46

29 U.S.C. § 1132(g).............................................................................................. 40, 47

29 U.S.C. §§ 1001 ................................................................................................................... 1

ERISA § 3(2) ........................................................................................................................... 3

ERISA § 3(37)(A) .................................................................................................................... 3

ERISA § 3(21)(A)(iii) ............................................................................................................ 28

ERISA § 4(a)(2) ...................................................................................................................... 3

ERISA § 404(a)(1)(A) ........................................................................................................... 36

ERISA § 404(a)(1)(B) ........................................................................................................... 31

ERISA § 404(a)(1)(D) ........................................................................................................... 40

ERISA § 409 .................................................................................................................... 45, 46

ERISA § 409(a) ...................................................................................................................... 47

ERISA § 413(1)(B) ................................................................................................................ 46

ERISA § 502(a)(2) ........................................................................................................... 45, 46

ERISA § 502(g) ............................................................................................................... 40, 47

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................. 26

Fed. R. Civ. P. 56(c) ............................................................................................................. 25

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Southern Division)

|  |  |  |
|---|---|---|
| PLASTERERS' LOCAL UNION NO. 96 PENSION PLAN, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. PJM 06 CV 338 |
| v. | ) ) ) | |
| HAROLD PERRY, *et al.*, | ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I. INTRODUCTION

This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq. Defendants Donald A. Molnar ("Molnar"), James S. Lertora ("Lertora"), Edgar Pepper ("Pepper"), and Ronald L. Beddow ("Beddow")[1] were Trustees, and therefore fiduciaries, to the Plasterers' Local Union No. 96 Pension Plan (the "Plan") at relevant times between 1994 and 2005. Harry C. Perry ("Perry") was the Plan Administrator, and a fiduciary, to the Plan at relevant times between 1994 and 2005.[2]

From 1994 to 2005, Defendants breached their fiduciary duties to the Plan and its participants in a plethora of ways. First, Defendants breached their fiduciary duties by failing to maintain the Plan's investments in a diversified portfolio, and failing to ensure the Plan's assets were invested diversely in accordance with ERISA's requirements. Second, Defendants

---

[1]    Collectively, Defendants Molnar, Lertora, Pepper and Beddow shall be referenced as the "Defendant Trustees".

[2]    Collectively, Defendant Perry and Defendant Trustees shall be referenced as the "Defendants".

1

breached their fiduciary duties to act prudently by failing to maintain a diversified portfolio, failing to properly monitor and oversee Defendant Perry and Mr. Scholar's actions, and failing to ensure Defendant Perry carried fiduciary insurance.  Third, Defendants breached their fiduciary duties by improperly transferring plan assets to contributing employers, thereby constituting prohibited transactions under ERISA.  Fourth, Defendants breached their fiduciary duties to act in accordance with the governing plan documents by returning funds to contributing employers in violation of the plain terms of the Plan document, failing to meet with the requisite frequency as outlined in the Plan documents, and permitting an incomplete Board of Trustees to make governing decisions regarding the Plan.  Defendants actions, individually and collectively, unquestionably amount to a flagrant breach of their fiduciary duties to act prudently with respect to the Plan.

Accordingly, Plaintiffs, the Plasterers' Local Union No. 96 Pension Plan (the "Plan"), Cherie Pleasant and James Miller as trustees, on behalf of the Plan (collectively, the "Plaintiffs") respectfully move this Court for partial summary judgment based upon the Defendants' numerous breaches of their fiduciary duties to the Plan.  As result of Defendants egregious fiduciary breaches to the Plan, Plaintiffs are entitled to recover $432,960.62, plus interest, as damages for the three-year period ending December 31, 2005 based upon the Defendants' failure to diversify the Plan's assets.  Moreover, Plaintiffs are entitled to recover $335,224, plus interest, based upon the Defendants' improper distributions of Plan assets to contributing employers of the Plan in 1994, as well as the Plaintiffs' attorneys' fees and costs incurred in bringing this action.

## II. STATEMENT OF UNDISPUTED FACTS

Plaintiffs respectfully submit this Statement of Undisputed Facts in support of its Motion for Partial Summary Judgment:

**Plasterers' Local Union No. 96 Pension Plan**

1.       Plaintiffs, the Plasterers' Local Union No. 96 Pension Plan (the "Plan"), Cherie Pleasant and James Miller as trustees, on behalf of the Plan (collectively, the "Plaintiffs") filed their Complaint (the "Complaint") in this action on February 9, 2006.  See generally, Complaint, Docket Entry 1.

2.       The Plan is a pension plan as that term is defined in § 3(2) of ERISA, 29 U.S.C. § 1002(2).  See Complaint at ¶ 1.

3.       The Plan is operated as a multiemployer plan as that term is defined in ERISA § 3(37)(A), 29 U.S.C. § 1002(37)(A).  See Complaint at ¶ 1.

4.       As the Plan is maintained by the Plasterers' Local Union No. 96, it is subject to the provisions of ERISA. ERISA § 4(a)(2), 29 U.S.C. § 1003(a)(2).  See Complaint at ¶ 1.

5.       Section 11.1(a) of the Plan defines the Plan Administrator as the individual responsible for "[t]he administration of the Plan."  (Ex. 1, Plasterers' Local Union No. 96 Pension Plan at p. 25).

**Defendants**

6.       Defendant Harry C. Perry became administrator to the Plan in 1973.  (Ex. 2, Deposition of Harry C. Perry ("Perry Dep.") at p. 12:17-22).

7.       Defendant Donald A. Molnar became a Trustee of the Plan in the late 1960s. Defendant Molnar resigned as a Trustee "[p]robably sometime in the '80s."  Defendant Molnar was reappointed as a Trustee to the Plan in the late 1980s.  (Ex. 3, Deposition of Donald A. Molnar ("Molnar Dep.") at pp. 11:16 - 12:14).

8.       Defendant James S. Lertora also served as a Trustee to the Plan, though he does not recall when he started. Defendant Lertora became a trustee after Defendant Perry became Plan Administrator.  (Ex. 4, Deposition of James S. Lertora ("Lertora Dep.") at pp. 20:6 - 22:22).

9.     Defendant Edgar Pepper became a Trustee of the Plan in approximately 1991.
(Ex. 5, Deposition of Edgar Pepper ("Pepper Dep.") at p. 27:9-18).

10.     Defendant Ronald L. Beddow became a Trustee of the Plan in approximately
1992.  (Ex. 6, Deposition of Ronald L. Beddow ("Beddow Dep.") at pp. 11:16 - 12:2).

11.     Sam D. Scholar became legal counsel to the Plan in approximately 1986.[3]  (Ex. 7,
Deposition of Sam D. Scholar ("Scholar Dep.") at pp. 24:22 - 27:17).

12.     Lee Wagner has been Defendant Perry's administrative assistant since the 1960s.
(Perry Dep. at p. 16:16-22).

### Defendants Failed to Diversify the Plan's Investment Portfolio

13.     The IRS form 5500 submitted by Defendant Perry for the year 1994 shows that
92.7% of Plan assets ($914,235 of $986,235) were invested in CDs due to mature in 1995.  The
remaining 7.3% of Plan assets ($72,125) were held in bonds.  (Ex. 8, 1994 Annual Return Report
of Employee Benefit Plan at Financial Schedules attachment).

14.     A snapshot of the Plan's investments provided by Banc of America, as of
September 30, 2005, shows that $1,391,529.18 of the Plan's investments were invested in U.S.
Treasury bills.  (Ex. 9, Banc of America Investment Services, Inc. Portfolio Snapshot for 9/1/05
to 9/30/05).  This would constitute 78.8% of the $1,766,581.00 total value of Plan assets as of
December 31, 2004 and 65.8% of the $2,115,063.00 total value of Plan assets as of December
31, 2005.  (Ex. 10, Defendant Perry's Chart of Actual and Hypothetical Returns).

15.     An agenda for a Board of Trustees meeting scheduled for September 12, 1995
noted that "it is becoming difficult to find banks in which the Funds do not already have the

---

[3]     Mr. Scholar was previously a Defendant in this action, however, he was dismissed from this case on March
13, 2007.

Federally insured limit."  Based upon this concern, there was a "[s]uggestion that part of this money be invested in staggered one and two year term Treasury bills as certificates mature." (Ex. 11, Agenda for Joint Meeting of Operative Plasterers Local Union No. 96 Pension and Welfare Fund Trustees:  Proposed Date – September 12, 1995).

16.    Defendant Perry made this suggestion to invest Plan assets in staggered one and two year term Treasury bills as certificates mature.  (Perry Dep. at p. 308:9-20; Molnar Dep. at pp. 119:9 - 120:18).

17.    While the September 12, 1995 meeting did not actually take place on that date, Defendant Perry's suggestion to invest Plan assets in staggered one and two year term Treasury bills as certificates mature did eventually come before the Board of Trustees.  (Molnar Dep. at p. 120:9-11).

18.    At a Board of Trustees meeting on November 9, 1995, "[t]he Trustees unanimously adopted a resolution to authorize investing the Funds in staggered one and two year Treasury bills as well as federal insured certificates of deposit."  Defendants Lertora, Pepper, and Molnar were present at this meeting.  (Ex. 12, Minutes of the Board of Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for November 9, 1995).

19.    Defendant Perry invested in Treasury bills based upon "an offbeat remark at one of the meetings that somebody suggested" that was not reduced to writing in the minutes.  (Perry Dep. at pp. 121:4 - 123:12).

20.    Defendant Molnar understood that the investment of Plan assets exclusively in Treasury Bills constituted an undiversified portfolio. (Molnar Dep. at pp. 148:5 - 149:4).

21.     Defendant Molnar testified that, had Defendant Perry advised Defendant Molnar that ERISA required the Trustees to select a diversified portfolio, he "would have been in favor of diversifying the investment." (Molnar Dep. at p. 149:5-15).

22.     Defendant Lertora also testified that he "would have been more mouthy about how it was" invested had he been aware of ERISA's requirement to select a diversified portfolio. (Lertora Dep. at p. 159:7-17).

23.     Defendant Pepper believed that it was his role to simply go with the previous investment strategy. Defendant Pepper had no problem with the undiversified investment strategy. (Pepper Dep. at pp. 226:19 - 227:5; 239:9 - 240:19).

24.     Defendant Perry never advised the Trustees that ERISA required Plan assets to be invested in a diversified portfolio. (Molnar Dep. at p. 147:11-15; Pepper Dep. at pp. 133:21 - 134:3).

25.     Defendant Perry invested the Plan assets only in short-term CDs on behalf of the Plan because the Trustees "wanted short term only. That was their wish." (Perry Dep. at p. 119:3-8).

26.     The Defendants "never asked [Mr. Scholar] for legal advice about investment strategies," or ERISA's requirements relating to fiduciary duties in investing ERISA plan assets. (Scholar Dep. at pp. 195:11-16; 149:1-9).

27.     The Defendants did not maintain a statement of investment policy for the Plan. (Perry Dep. at p. 58:13-20; Molnar Dep. at p. 26:3-20; Lertora Dep. at pp. 88:5 - 89:9; Pepper Dep. at pp. 52:17 - 53:4).

28.     As of December 31, 2002, the Plan assets were valued at $1,674,827. (Ex. 10, Defendant Perry's Chart of Actual and Hypothetical Returns).

29.     If $1,674,827 had been invested on January 1, 2003 in a mix of 50% S&P 500 and 50% Lehman aggregate, then that investment would be worth $2,548,023.62 on December 31, 2005.  (Ex. 13, Deposition of Michael Cairns ("Cairns Dep.") at pp. 113:4 - 115:6).

30.     The actual value of the Plan's assets on December 31, 2005 was $2,115,063.00. (Ex. 10, Defendant Perry's Chart of Actual and Hypothetical Returns).

## Defendant Perry Lacked Qualifications to be Plan Administrator and the Defendant Trustees Failed to Monitor Defendant Perry's Actions

31.     The Defendant Trustees never reviewed Defendant Perry's qualifications to be Plan Administrator.  The Defendant Trustees also never considered seeking competitive bids to determine whether there were other potential plan administrators who might be better qualified than Defendant Perry.  The Defendant Trustees were not aware that the Plasterers' Funds were the only employee benefit plans Defendant Perry administered.  (Molnar Dep. at pp. 15:13 - 17:9; Pepper Dep. at pp. 29:17 - 31:11).

32.     The Defendant Trustees did not provide Defendant Perry with any directions regarding the type of assets that he should invest in on behalf of the Plan.  (Molnar Dep. at p. 28:10-17).

33.     The Defendant Trustees never put in writing instructions for Defendant Perry's investment activities.  (Molnar Dep. at p. 121:1-4).

34.     Defendant Lertora thought Defendant Perry had discretion to purchase CDs as Plan investments "[b]ecause it was done.  [The trustees] didn't go to the bank.  I don't know if he or [Ms. Wagner] did it, went out and bought the stuff.  I don't have a clue."  Defendant Lertora testified that it did not matter to him how it was done "[a]s long as it was invested."  (Lertora Dep. at p. 95:2-16).

7

35.    Defendant Pepper was "not sure really if [Defendant Perry] did or didn't" have responsibilities with respect to the investment of plan assets.  (Pepper Dep. at p. 40:13-16).

36.    The Defendant Trustees were unaware what Defendant Perry was paid for serving as Plan Administrator.  The Defendant Trustees were unaware whether or not Defendant Perry had a written agreement with the Plan.  (Molnar Dep. at pp. 18:2 - 19:6; Lertora Dep. at pp. 29:5 - 31:19;  Pepper Dep. at pp. 32:9 - 33:17).

37.    The Defendant Trustees did nothing to supervise Defendant Perry's responsibilities as Plan Administrator.  The Trustees "didn't take any specific action in [the] Plan" as "[t]hey didn't participate in anything except that [which] was brought before them by" Defendant Perry and Ms. Wagner.  (Perry Dep. at pp. 85:20 - 86:14).

38.    Upon taking his position as Plan Administrator to the Plan, Defendant Perry did not review the records he received from his predecessor to assure they were complete. Moreover, Defendant Perry did not review the Plan documents to see if the Trustees complied with the terms of the Plan documents because he believed that he "didn't have anything to do with the Plan documents" and instead was simply "doing the custodial duties" of his predecessor. (Perry Dep. at pp. 132:5 - 133:13).

39.    Defendant Perry did not know about ERISA after its passage in 1974.  (Perry Dep. at p. 19:12-19).

40.    Defendant Pepper did not know that Defendant Perry was a fiduciary under ERISA.  (Pepper Dep. at p. 224:3-16).

41.    Defendant Perry did not know that ERISA imposed requirements on his responsibilities at Plan Administrator, believing that "it never had anything to do with [his]

responsibilities" and that he "had nothing to do with ERISA" because ERISA "was a legal

matter, if anything, not an accounting matter." (Perry Dep. at pp. 19:20 - 21:6)

42.     When "there was a need to have a plan change or explanation," Defendant Perry

would have Ms. Wagner "prepare information for the trustees' consideration." However, Ms.

Wagner did not have any expertise in dealing with ERISA-covered plans nor did Defendant

Perry suggest that Ms. Wagner attain education or attend seminars to keep up with the

developments in administration of such ERISA-covered plans. Defendant Perry did not believe

that Ms. Wagner needed any education on ERISA-covered plans because he believed that "[s]he

was pretty well savvy to what the Plan was as it was" based upon "[t]here [being] no complaints

from the trustees." (Perry Dep. at pp. 71:5 - 75:15).

### Mr. Scholar Lacked Qualifications to be Legal Counsel to the Plan

43.     Mr. Scholar became Plan legal counsel because his predecessor "pushed it off on"

Mr. Scholar. Mr. Scholar's predecessor was too busy to handle the responsibilities of the Plan's

legal counsel. Mr. Scholar's predecessor did not formally introduce Mr. Scholar to the Trustees.

The Trustees did not receive any notification that Mr. Scholar was appointed Plan legal counsel.

(Scholar Dep. at pp. 24:22 - 29:13).

44.     Mr. Scholar was simply introduced to the Trustees by Defendant Perry or Ms.

Wagner as: "This is our new lawyer. That's all [the trustees] knew about it." Defendant Lertora's

thought this was "[f]ine with [him]." (Lertora Dep. at pp. 25:14 - 26:6).

45.     The Trustees did not review Mr. Scholar's credentials to be counsel. (Molnar

Dep. at p. 24:7-10; Lertora Dep. at pp. 30:8 - 31:4; Pepper Dep. at p. 34:1-11).

46.     The Defendant Trustees did not know that the Plasterers' Funds were the only

employee benefit plans to which Mr. Scholar provided legal advice. None of Defendant Trustees

ever inquired as to Mr. Scholar's qualifications to be legal counsel to the Plan.  (Molnar Dep. at pp. 24:7 - 25:9; Pepper Dep. at pp. 34:12 - 35:5).

47.     The Defendant Trustees never voted on whether or not to retain Mr. Scholar as legal counsel to the Plan. (Lertora Dep. at p. 26:11-14).

48.     The Defendant Trustees never considered obtaining an independent legal opinion to verify the accuracy of the legal advice that Mr. Scholar provided to the Plan.  (Molnar Dep. at pp. 32:20 - 33:3; Lertora Dep. at p. 32:2-12).

49.     The Defendant Trustees did not know whether Mr. Scholar had a written agreement with the Plan and what Mr. Scholar was paid by the Plan for his role as legal counsel. (Lertora Dep. at pp. 31:20 - 32:1, 168:10-20; Pepper Dep. at pp. 43:10 - 44:4).

50.     When asked as to whether it is permissible to return plan assets to a contributing employer under ERISA, Mr. Scholar stated that he did not "feel [he] can make an opinion about that" because, in his opinion "I don't think I've got the necessary background.  I'm not an ERISA lawyer," despite the fact that he represented such an ERISA-covered plan for over 20 years. Defendant Scholar also acknowledged being "[n]ot specifically" familiar with the anti-inurement provision of ERISA.  (Scholar Dep. at pp. 176:1 - 178:15; 232:11-13).

51.     In an April 8, 1991 letter threatening to withdraw from the Plasterers' Funds, Mr. Cornelius J. Coakley ("Coakley") claimed to be a "single employer" despite contributing to the multiemployer Plan.  (Ex. 14, Letter from Cornelius J. Coakley to Sam D. Scholar dated April 8, 1991 ("April 8, 1991 Letter")).

52.     In responding to whether a contributing employer to a multiemployer fund can ever be a single employer with respect to that fund, Mr. Scholar, former counsel to a

multiemployer fund, acknowledged that he had "limited knowledge" on the subject. (Scholar Dep. at p. 112:9-16).

### Defendant Perry Failed to be Covered By Fiduciary Insurance

53.     Defendant Perry "didn't have fiduciary insurance, as such," believing that his accounting insurance would cover him.  He never reviewed his policy to determine whether it would cover fiduciary acts.  (Perry Dep. at pp. 342:6 - 344:12).

54.     The Defendant Trustees never asked Defendant Perry if he carried fiduciary insurance.  (Perry Dep. at pp. 344:13 - 345:5; Molnar Dep. at pp. 111:19 - 112:3; Pepper Dep. at pp. 217:17 - 218:13).

### Defendants' Improperly Distributed Plan Assets to Contributing Employers in 1994

55.     At a Board of Trustees meeting on January 25, 1994, "[t]he Trustees unanimously approved the disposition of funds as outlined in worksheets provided by the Administrator." Defendants Lertora, Pepper, and Molnar were present for this meeting. (Ex. 15, Minutes of the Board of Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for January 25, 1994).

56.     One week later, on February 1, 1994, Defendant Perry wrote to certain contributing employers to advise them that "[i]t has been determined that certain contributions made by you to the Plasterer's Pension Plan cannot be credited to the plan participants because of ineligility (sic) and, in line with Internal Revenue Service plan guidelines such funds are required to be returned to the contributing contractor." (Ex. 16, Documents Related to the 1994 Distribution of Plan Assets to Contributing Employers at pp. 2, 6, 12, 17, 22, 23, 30, 31, 34, 39, 46, 47, 51, 55, 60, 64).

57.     On February 10, 1994, Ms. Wagner wrote to Defendants Lertora and Molnar stating that "[a]s approved by the Trustees of the Pension Fund at the January 25, 1994 meeting, we have written to each contractor who has a refund of contributions due from the Plan.  We have issued checks for those contractors who have returned the required W-9 form.  We are enclosing a copy of the W-9 form together with any correspondence received, and the checks for your signature."  (Ex. 16, Documents Related to the 1994 Distribution of Plan Assets to Contributing Employers at p. 59).

58.     Beginning on or after February 10, 1994, the Defendants caused the Plan to send checks to contributing employers.  The checks were made out to the employer-contractors and were signed by Defendants Lertora and Molnar.  (Ex. 16, Documents Related to the 1994 Distribution of Plan Assets to Contributing Employers at pp. 4-5, 8-9, 14-16, 20-21, 26-29, 33, 36-37, 41-42, 43-44, 49-50, 53-54, 57-58, 62-63).

59.     Among the recipients of the 1994 distributions of Plan Assets were Defendant Lertora, who personally signed a check to his company, James S. Lertora, Inc., and Defendant Pepper, on behalf of his employer John H. Hampshire, Inc. (Ex. 16, Documents Related to the 1994 Distribution of Plan Assets to Contributing Employers at pp. 26-29, 57-58).

60.     Coakley received three checks for forfeited contributions between February 10, 1994 and July 26, 1994, totaling $79,573.38.  (Ex. 16, Documents Related to the 1994 Distribution of Plan Assets to Contributing Employers at 14-18).

61.     Regarding the check made out to James S. Lertora, Inc., Defendant Lertora testified that he "[s]igned it to myself."  Defendant Lertora was a majority shareholder of James S. Lertora, Inc., with his wife holding the remaining ownership interest.  (Lertora Dep. at pp. 140:5 - 142:5).

62.     Defendant Lertora does not recall asking any questions regarding why he was signing so many checks to contributing employers on behalf of the Plan.  (Lertora Dep. at p. 149:4-6).

63.     Despite this, Defendant Lertora's thought the money that was returned to employers "[m]aybe [] should have been more.  I don't even know if they sent me everything I was due."  (Lertora Dep. at p. 229:5-20).

64.     Defendant Molnar understood that the Defendants were returning money to contributing employers from Plan assets.  (Molnar Dep. at pp. 103:9 - 104:5).

65.     Defendant Molnar testified that he would not have signed checks returning Plan assets to contributing employers unless the Board of Trustees had authorized such disbursements.  (Molnar Dep. at pp. 118:19 - 119:5).

66.     Defendant Perry never advised the Trustees that this return of assets to contributing employers constituted a prohibited transaction under ERISA or directly contrary to the terms of the Plan documents.  (Molnar Dep. at pp. 145:10-21; 141:6-142:18).

67.     Defendant Perry never advised the Trustees to initiate an action to recoup the funds that were distributed to contributing employers.  (Pepper Dep. at pp. 153:14 - 154:11).

68.     As stated in Defendant Perry's February 1994 letters, the employer-contributor recipients of the letters were sent copies of Internal Revenue Service Form 1099-MISC on January 30, 1995, for the purpose of reporting the refunds as income.  (Ex. 16, Documents Related to the 1994 Distribution of Plan Assets to Contributing Employers at pp. 1, 65-72)

69.     According to the Funds' audit report for the year ending December 31, 1994, approximately $121,000 were returned to contractors during 1994.  (Ex. 17, Independent Auditors' Report dated June 2, 1995).

70.     This was not the first time that distributing Plan assets to contributing employers had arisen.  On January 10, 1990, Mr. Scholar gave his opinion that, under the Plan, "forfeitures must be used to reduce employer contributions.  The plan does not now specify how this is to be carried out.  You should give the specific employer the benefit of the forfeiture in the following year."  (Ex. 18, Letter from Sam D. Scholar to Defendant Perry dated January 10, 1990 ("January 10, 1990 Letter")).

71.     Defendant Perry did not have a contrary opinion to Mr. Scholar's January 10, 1990 letter.  (Perry Dep. at 162:17 - 163:2).

72.     On February 20, 1991, Mr. Scholar gave his opinion that the Plan "is a multi-employer plan in which the union members have asked the employer to pay a portion of their wages into a union pension and welfare fund instead of directly to the employee as wages.  This is not a fringe benefit.  It is the employee's money that in a sense is put into a forced savings account."  He further gave his opinion that "[t]he best way to insure that the union member does not lose ownership of his wage contributions to these plans is to have immediate 100% vesting in the plan."  (Ex. 19, Letter from Sam D. Scholar to Defendant Perry dated February 20, 1991 ("February 20, 1991 Letter")).

73.     Defendant Perry "agree[d] with [Mr. Scholar's] assessment" and "accepted the letter as written."  Defendant Perry did nothing to determine the inconsistency between Mr. Scholar's January 10, 1990 and February 20, 1991 Letters.  Defendant Perry stated that he would have forwarded those inconsistent letters to the Trustees.  (Perry Dep. at pp. 181:6-13, 433:9 - 436:17; 441:2-13).

74.     On April 8, 1991, Cornelius J. Coakley, president of C.J. Coakley Co., Inc. ("Coakley") wrote to Mr. Scholar, with a copy sent to Defendant Perry, stating that if Mr.

Scholar's plan to adopt immediate vesting was "implemented, C.J. Coakley Co., Inc., will terminate its participation in this plan." (Ex. 14, April 8, 1991 Letter).

75.    Defendant Molnar viewed the April 8, 1991 letter as a threat from Coakley. (Molnar Dep. at p. 62:10-20).

76.    Defendant Perry viewed the April 8, 1991 letter as a "[b]ullish threat." (Perry Dep. at pp. 186:5 - 189:9).

77.    On May 17, 1991, Carol L. Doyle, Coakley's assistant controller, informed Defendant Perry that they had "deducted C.J. Coakley's portion of refunds due contractors for [1987 and 1988] from [their] April 1991 Pension and Welfare payments due Local 96." This resulted in a deduction of $6,644.06 to the Pension Fund for April 1991 and $18,684.62 to the Welfare Fund. Coakley also advised that $12,797.76 was still due in refunds for 1987-1988 and that amount would be withheld from their contributions to the funds for May 1991. (Ex. 20, Letter from Carol L. Doyle to Plasterers Local #96 dated May 17, 1991 ("May 17, 1991 Letter")).

78.    On May 20, 1991, Defendant Perry informed the Trustees that Coakley had "applied not only the Pension Fund Contribution for the month of April, but also the Welfare Fund Contribution, against the alleged monies due him for forfeited Pension Fund Contributions on his employees from 1987 and 1988." (Ex. 21, Letter from Defendant Perry to Trustees of Operative Plasterers Local Union No. 96 Pension and Welfare Funds dated May 20, 1991 ("May 20, 1991 Letter")).

79.    Defendant Molnar recognized that Coakley was unilaterally withholding money that was otherwise due to the Plan despite the fact that the Trustees had not made a decision on the matter. (Molnar Dep. at pp. 67:3 - 68:15).

15

80.     The Defendant Trustees did not discuss whether legal action should be initiated against Coakley for withholding these contributions despite the fact that Defendant Molnar understood that failing to contribute was not allowed and that the collective bargaining agreement, which he negotiated, was an enforceable agreement.  (Molnar Dep. at pp. 69:18 - 72:19; Pepper Dep. at pp. 82:11 - 83:4).

81.     The May 20, 1991 letter was the only action Defendant Perry took on the May 17, 1991 letter from Ms. Doyle and Defendant Perry did not confront Ms. Doyle because he believed her to be a "[c]onfrontational person."  Defendant Perry's thought Mr. Coakley "decided on his own to take a remedy, and that was it."  (Perry Dep. at pp. 195:18 - 196:2; 190:12 - 191:6).

82.     On June 17, 1991, Ms. Doyle again wrote to Mr. Perry to notify him that "[t]he balance of $12,797.76 . . . has been deducted from [Coakley's] May 1991 Pension and Welfare payments due the Plasterer's Local 96."  (Ex. 22, Letter from Carol L. Doyle to Plaster's Local 96 dated June 17, 1991 ("June 17, 1991 Letter")).

83.     Defendant Perry took no action regarding the June 17, 1991 Letter from Ms. Doyle, except Ms. Wagner sent a letter to the Trustees advising the Trustees of Coakley's actions.  (Ex. 23, Letter from Lee P. Wagner to Trustees of Operative Plasterers Local Union #96 Pension and Welfare Funds dated July 2, 1991 ("July 2, 1991 Letter")).

84.     Defendant Perry did "[n]othing [else] of consequence that [he] could delineate" and did not suggest to the trustees that counsel should be brought in to file an action to collect amounts due nor did he address the situation by speaking with Mr. Scholar.  (Perry Dep. at pp. 197:18 - 202:10).

85.     To make up for the fact that Coakley had "appropriated" Welfare Fund contributions to obtain the refunds believed owed to Coakley from the Pension Fund, the agenda

16

for the Plan's July 23, 1991 meeting included a "[r]esolution to transfer funds from the Pension

Fund to Welfare Fund to replace those Welfare Fund contributions appropriated by Coakley as a

credit to his expected Pension Fund forfeit refunds." (Ex. 24, Joint Meeting Agenda Operative

Plasterers Local Union No. 96 Pension and Welfare Funds for July 23, 1991).

86.     Defendant Perry and Ms. Wagner created the agenda for the July 23, 1991

meeting. Coakley's action was referred to as an appropriation in the agenda because, in

Defendant Perry's view, it was "exactly the action taken by Mr. Coakley. He had arbitrarily

made a decision to take the funds. That's appropriation." Yet, despite this view of Coakley's

actions, Defendant Perry did "[n]o more than [he] did when [Coakley] took the first amount of

money, which was referred to Mr. Scholar who referred it to the trustees." (Perry Dep. at pp.

204:15 - 205:2; 206:18 - 210:11).

87.     Defendant Perry believed that the "[a]ppropriate response [to Coakley's

appropriation] was to have a meeting and have a resolution to have the trustees approve it."

Defendant Perry believed he "did not" have an obligation to seek to initiate litigation because he

was only a "custodial fiduciary" of the Plan. Defendant Perry's view was that it was "not for

[him] to cure" Coakley's actions because "[i]t's up to the lawyer to sue to get the money back"

and that "[i]t would be the trustees' decision to . . . instruct the . . . attorney[] to sue for

recovery." Defendant Perry believed that other than "certain duties to make records[ and] reflect

their participation in the plan," that he "had no other duties to protect" the participants' and

beneficiaries' interests. (Perry Dep. at pp. 215:1 - 217:22; 233:13 - 234:21).

88.     Defendant Lertora stated that "nothing was explained" to the Trustees about the

return of funds to Coakley and "things should have been explained to the trustees maybe a little

bit better and we'd understand, but we were never much of a part of anything with Coakley and [Defendant Perry].  Maybe we should have been."  (Lertora Dep. at p. 129:4-20).

89.     The Plan only permitted contributions to be returned to employers "in the event [an] Employer makes a contribution to the Trust Fund as a result of a mistake of fact, such contribution shall be returned to [the] Employer within one year after it was made, upon [the] Employer's written request to the Trustee."  (Ex. 1, Plasterers' Local Union No. 96 Pension Plan at p. 29).

90.     Defendant Perry never advised the Defendant Trustees of ERISA's anti-inurement provision.  (Molnar Dep. at p. 141:16-18; Pepper Dep. at pp. 207:10 - 208:1).

91.     Defendant Molnar believes the return of contributions to contributing employers was inconsistent with the Plan document.  Defendant Molnar testified that, had he been advised that such forfeitures were inconsistent with the Plan document and with ERISA, Defendant Molnar would not have allowed such forfeitures.  (Molnar Dep. at pp. 141:6 - 143:9).

92.     Defendant Perry believed the term "mistake of fact," upon which the permissibility of the return of contributions to employers was based to be a "legalese term that I can't identify with."  When asked whether it was his job to administer this Plan, Defendant Perry defined his job as "custodial in fulfilling the wishes of the trustees."  Defendant Perry didn't believe that this section of the Plan had anything to do with the distribution of funds to contractors.  (Perry Dep. at 382:3 - 385:17; 391:6 - 393:14).

**The Board Failed to Hold Regular Meetings as Required by Governing Documents**

93.     Pursuant to the Plan's trust agreement, the Board of Trustees were required to "hold an annual meeting each year during the month of January, and bi-monthly meetings

18

thereafter, which shall be deemed regular meetings." (Ex. 25, Agreement and Declaration of Trust for Pension Plan of Plasterers' Local Union No. 96 at p. 14).

94.     The Board of Trustees never met at the required frequency during Defendant Molnar's tenure as a Trustee. Defendant Molnar had "no idea" why the Trustees did not meet with the required frequency. (Molnar Dep. at p. 136:12-21).

95.     The Defendant Trustees never asked Defendant Perry or Mr. Scholar how frequently the Board of Trustees was required to meet under the terms of the trust agreement. (Lertora Dep. at p. 223:9-22).

96.     Defendant Molnar was unaware that this meeting frequency requirement existed, despite being provided a copy of the trust agreement and reading it. (Molnar Dep. at p. 43:8-17).

97.     Defendant Pepper was also unaware of this meeting frequency requirement and can not recall the Trustees ever meeting with the frequency required by the trust agreement. (Pepper Dep. at pp. 48:12 - 49:5).

98.     Defendant Perry never advised the Trustees that fiduciaries of ERISA benefit plans are required to administer the Plan in accordance with its governing documents. (Molnar Dep. at pp. 123:18 - 124:8, 136:22 - 137:3; Pepper Dep. at p. 184:8-17).

99.     Defendant Perry never advised the Trustees that they could amend the trust agreement to provide for less frequent meetings. (Molnar Dep. at p. 137:4-8).

100.    Defendant Perry's believed that "the procedure was supposed to be every quarter" but Defendant Perry was not aware of any amendment to the trust to reflect quarterly meetings. (Perry Dep. at pp. 372:12-373:11).

101.    Defendant Perry was aware that, as Plan Administrator, he was required to administer the Plan in accordance with its governing documents.  (Perry Dep. at pp. 27:21 - 28:13).

102.    Meetings of the Board of Trustees did not take place under the schedule required by the Plan documents because "the trustees weren't amenable" to meeting with such regularity. (Perry Dep. at p. 28:7-13).

103.    Defendant Perry's only attempts to rectify the failure to meet regularly was to have Ms. Wagner call the trustees "[m]aybe" once a year.  (Perry Dep. at pp. 30:19 - 31:1).

104.    Defendants provided Plaintiffs with minutes for a meeting held on January 25, 1994.  (Ex. 15, Minutes of the Board of  Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for January 25, 1994).  The next minutes Defendants provided to Plaintiffs were for a meeting held on November 9, 1995.  (Ex. 12, Minutes of the Board of Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for November 9, 1995).

105.    Defendant Perry could only testify that he was "not too sure that there may not have been a meeting" during this 21-month lapse between January 1994 and November 1995. (Perry Dep. at pp. 314:1 - 315:21).

106.    Defendant Lertora testified that he "would assume there" would be minutes for any meetings held between January 1994 and November 1995 had any such meetings taken place.  (Lertora Dep. at p. 176:14-21).

107.    Following the November 1995 meeting, the next meeting did not take place until January 27, 1998.  (Ex. 26, Minutes of the Board of Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for January 27, 1998).

108.    Ms. Wagner notified the Trustees of a meeting scheduled for December 9, 1997, which apparently never took place, by letter, stipulating that "we have not had a meeting for quite some time." (Ex. 27, Letter from Lee P. Wagner to Trustees of Operative Plasterers Local Union No. 96 Pension and Welfare Funds dated December 3, 1997).

109.    Defendant Perry stated that he and Ms. Wagner "were trying" to get another meeting going in the interim stating: "We wrote.  We called."  However, he "never spelled it out so thusly" as to say that the lack of meetings was not in conformity with the Plan's documents because they had "reached a stage where the trustees would respond only if it was something very important:  What do you want me for?  What do you need me for?  And they'd come if it had to be a response." (Perry Dep. at pp. 322:13 - 324:13).

110.    Following the January 1998 meeting of the Board of Trustees, the next meeting did not take place until June 22, 1999.  (Ex. 28, Minutes of the Board of Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for June 22, 1999).

111.    Defendant Perry stated that he "did nothing" to try to get the Trustees to meet except having Ms. Wagner call the trustees to try to arrange meetings.  (Perry Dep. at pp. 345:16 - 346:15).

112.    Following the June 1999 meeting, the next meeting did not take place until September 19, 2000.  (Ex. 29, Minutes of the Board of Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for September 19, 2000).

113.    Defendant Pepper does not think there were any meetings between June 1999 and September 2000.  (Pepper Dep. at p. 182:1-7).

114.    In the interim, Defendant Perry "would discuss with some of the trustees directly and [Ms. Wagner] would make phone calls periodically, trying to get them together.  And they

were always of the assumption that, What do we have to discuss?"  Defendant Perry did not

personally advise new Trustees of their obligation to meet every three months, but instead simply

assumed that Ms. Wagner did because she was "that good at her job."  (Perry Dep. at

pp. 348:21 - 350:18).

115.    Following the September 2000 meeting of the Board of Trustees, the next meeting

did not take place until January 8, 2002.  (Ex. 30, Minutes of the Board of Trustees of the

Plasterers Local Union No. 96 Pension and Welfare Funds for January 8, 2002).

116.    This period between meetings is consistent with Defendant Pepper's recollection

as to the frequency of meetings.  (Pepper Dep. at pp. 184:18 - 185:16).

117.    In the interim, Defendant Perry and Ms. Wagner "would call [the trustees] and

talk with them. . . . We always had the same answers:  What do we want a meeting for?  What

are we going to discuss?"  (Perry Dep. at p. 352:1-14).

118.    Mr. Scholar noted that "there were long gaps" between meetings and in response

he "would call [Ms. Wagner] and say, what's happening, are you still there?  And she would

laugh. . . . [I]t would just be difficult to get everybody to show up for a quorum at least."

(Scholar Dep. at p. 58:5-16).

119.    Defendant Perry never considered alternatives to ensure that the trustees met as

frequently as required by the Plan's documents, including the possibility of having telephonic

board meetings.  Mr. Scholar never told Defendant Perry that it would be impermissible to have

telephonic meetings.  (Perry Dep. at pp. 325:5 - 327:4).

## The Board of Trustees Failed to Operate With the Requisite Number of Trustees

120.     The Plan's trust agreement requires that the Board of Trustees consist of three Trustees appointed by the union and three Trustees appointed by the employers.  (Ex. 25, Agreement and Declaration of Trust for Pension Plan of Plasterers' Local Union No. 96 at p. 13).

121.     At a meeting held on January 27, 1998, the Board only consisted of four Trustees. (Ex. 26, Minutes of the Board of Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for January 27, 1998).

122.     According to Defendant Molnar, the Board "couldn't get anyone.  The membership was down to not very members."  Defendant Molnar was unaware of the trust agreement's requirement of three members from both the union and the employers.  Defendant Perry never advised the Trustees who had the authority or responsibility to appoint someone as a trustee.  (Molnar Dep. at p. 125:9-22).

123.     Defendant Pepper knew that there were supposed to be three employer trustees under the trust agreement but "[n]obody wanted to come aboard."  He did not know who had the authority to appoint trustees.  (Pepper Dep. at pp. 56:5 - 58:11).

124.     Defendant Perry knew that the Plan was operated with less than the six trustees required by the Board but did not attempt to remedy this because he believed that the trustee had to be an employing contractor and "there were no other employing contractors who were available."  (Perry Dep. at pp. 37:17 - 40:9).

125.     Defendant Perry believed that Defendant Lertora was no longer an employing contractor by 2002 yet he did not object to his sitting as a trustee after this point because he did not "believe [he was] supposed to question that" and he did not believe that it was his

23

responsibility to see that the Plan was administered with its governing documents in this regard. (Perry Dep. at pp. 40:22 - 46:1).

### Defendants Concealed Their Improper Distributions of Plan Assets

126.    The Trustees never directed Defendant Perry to advise Plan participants that funds contributed on their behalf had been returned to contributing employers. (Molnar Dep. at pp. 144:19 - 145:9).

127.    In reference to Plan participants, Defendant Lertora testified "I don't have a clue whether they were informed" about the return of Plan assets to contributing employers. (Lertora Dep. at p. 220:6-20).

128.    Defendant Trustees did not advise New Trustees that joined the board following the disbursements to employer-contractors of those 1994 disbursements. (Molnar Dep. at pp. 152:2-153:8).

129.    Keith Hickman became a Trustee to the Plan in 1999. He was not informed of the disbursements to contributing employers until after Defendant Perry was terminated as Plan Administrator in the fall of 2005. (Ex. 31, Deposition of Keith Hickman ("Hickman Dep.") at pp. 17:6-13; 166:14 - 167:5).

130.    Despite having been a Trustee since 1992, Defendant Beddow mistakenly believed he had resigned from the Board of Trustees in 1993 after he had resigned from the Plasterers' Local 96 union. (Beddow Dep. at pp. 9:6 - 10:20).

131.    Defendant Beddow officially remained a Trustee until at least 1995. (Ex. 8, 1994 Annual Return Report of Employee Benefit Plan at Service Provider and Trustee Information attachment).

132.    However, Defendant Beddow never attended any meetings of the Board of

Trustees.  (Beddow Dep. at pp: 11:8-12; 19:6-12).

133.    Prior to the initiation of this litigation, Defendant Beddow was not aware that any

of the distributions to contributing employers had taken place.  (Beddow Dep. at p. 29:9-21).

### III. STANDARD OF REVIEW

**A.**    **General Summary Judgment Standard**

Summary judgment is appropriate when, after reviewing the record taken as a whole,

there is no genuine issue of material fact and the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986);

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The party seeking summary judgment has the

initial burden to show absence of evidence to support the non-moving party's case.  Celotex, 477

U.S. at 325.  The opposing party must demonstrate that a genuine issue of material fact exists.

Mere allegations or denials are insufficient. Anderson, 477 U.S. at 248.

**B.**    **It is Proper For the Court to Grant Summary Judgment on Whether a Party**
**Breached its Fiduciary Duties Under ERISA**

A determination that a party breached its fiduciary duties under ERISA is appropriate for

the Court to address on summary judgment.  See Shade v. Panhandle Motor Serv. Corp., No. 95-

1129, 1996 U.S. App. LEXIS 16703 (4th Cir. July 11, 1996) (affirming grant of summary

judgment to plaintiff's claim that defendant breached its fiduciary duties under ERISA) (attached

hereto as Ex. 32); Chao v. Malkani, 216 F. Supp. 2d 505 (D. Md., 2002) (hereafter Malkani I)

(granting summary judgment to plaintiff's claims that defendants breached their fiduciary duties

under ERISA), aff'd 452 F.3d 290 (4th Cir. 2006) (hereafter Malkani II); Pension Benefit Guar.

Corp. v. Baker, No. Y-97-4372, 1999 U.S. Dist. LEXIS 20715 (D. Md. Jan. 25, 1999) (same)

(attached hereto as Ex. 33); Scardelletti v. Bobo, No. JFM-95-52, 1997 U.S. Dist. LEXIS 14498

(D. Md. Sep. 8, 1997) (hereafter Scardelletti II) (granting plaintiffs' motion for summary

judgment as to their claim that the defendant trustees breached their fiduciary duties under

ERISA) (attached hereto as Ex. 34).

**C.    It is Proper for the Court to Grant Partial Summary Judgment Regarding Only Certain Amounts of Damages Alleged in a Party's Complaint**

Pursuant to Fed. R. Civ. P. 56(a), "[a] party claiming relief may move, with or without

supporting affidavits, for summary judgment on all or part of the claim." (emphasis added).

Under this standard, a party may seek partial summary judgment as to only a certain portion of

the damages sought in the complaint. See Bouchat v. Balt. Ravens Football Club, 346 F.3d 514,

520 (4th Cir. 2003) ("[A]n award of partial summary judgment . . . with respect to particular

categories of revenue comports, in the proper circumstances, with the basic tenets of our Rule 56

jurisprudence."); Gadsden v. Fripp, 330 F.2d 545, 547 (4th Cir. 1964); Ransom v. Telecredit

Serv. Corp., No. 91-897, 1992 U.S. Dist. LEXIS 22738, *8, *11 (D. Md. Feb. 5, 1992) (attached

hereto as Ex. 35).

**D.    It is Proper for the Court to Grant Partial Summary Judgment Regarding Only Certain Time Periods Alleged in a Party's Complaint**

In addition to seeking summary judgment on certain damages alleged in a party's

complaint, it is also proper to seek partial summary judgment as to only certain time periods

alleged in the complaint. See Goettee v. Comm'r, 192 Fed. Appx. 212, 216-17 (4th Cir. 2006)

(affirming grant of partial summary judgment to defendants for tax year 1978 when plaintiffs

sought abatement of interest charges for tax years 1978, 1979, 1981, and 1982) (attached hereto

as Ex. 36); Imgarten v. Bellboy Corp., 383 F. Supp. 2d 825, 832 (D. Md. 2005) (noting that the

court had previously granted plaintiff's motion for partial summary judgment on the claim that

defendant was profitable for the years 1999 and 2000 and therefore owed plaintiff unpaid

26

commissions for those years, even though plaintiff's complaint was for the years 1996-2000);

Justin G. v. Board of Educ. of Montgomery County, 148 F. Supp. 2d 576 (D. Md. 2001)

(granting defendants' motion for summary judgment as to the 1999-2000 school year, but

denying as to the 1998-1999 school year.)

### IV. DEFENDANTS WERE UNDISPUTEDLY FIDUCIARIES UNDER ERISA

Defendant Trustees were undisputedly fiduciaries to the Plan. 29 U.S.C. § 1002(21)(A).

See Laborers' Dist. Council Health & Welfare Trust Fund No. 2 v. Comet Contr., LLC, No.

RWT 03-2196, 2006 U.S. Dist. LEXIS 55968, *5-6, 39 Employee Benefits Cas. (BNA) 1685 (D.

Md. July 25, 2006) ("Under ERISA, the Trustees, as fiduciaries, are required to administer the

Funds 'solely in the interest of the participants and beneficiaries' and 'in accordance with the

documents and instruments governing the [Plan]' and they have brought this action to comply

with their fiduciary obligation to ensure that participants receive the contributions to which they

were entitled.") (attached hereto as Ex. 37); NARDA, Inc. v. R.I. Hosp. Trust Nat'l Bank, 744 F.

Supp. 685, 690 (D. Md. 1990) ("As the trustee under the [plaintiff] Trust, the [defendant] Bank

was a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A)."); Makar v. Health Care Corp.,

872 F.2d 80, 83 (4th Cir. 1989) ("ERISA also imposes broad fiduciary responsibilities on plan

trustees and extensively regulates their conduct.").

Based upon his position as Plan Administrator to the Plan, Defendant Perry inherently

qualified as a fiduciary to the Plan, just like the Defendant Trustees. See Questions and Answers

Relating to Fiduciary Responsibility Under the Employee Retirement Income Security Act of

1974, 29 CFR 2509.75-8(D-3) ("Some offices or positions of an employee benefit plan by their

very nature require persons who hold them to perform one or more of the functions described in

section 3(21)(A) of the Act. For example, a plan administrator or a trustee of a plan must, b[y]

the very nature of his position, have 'discretionary authority or discretionary responsibility in the

administration' of the plan within the meaning of section 3(21)(A)(iii) of the Act. Persons who hold such positions will therefore be fiduciaries.") (quoting ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii); see also Difelice v. U.S. Airways, Inc., 497 F.3d 410, 423 (4th Cir. 2007) (noting the "fiduciary duties of a plan administrator."); Provident Life & Accident Ins. Co. v. Cohen, 423 F.3d 413, 424 (4th Cir. 2005) ("It is now evident that . . . the benefit plan administrator[] is a fiduciary with the right to bring a civil action under" ERISA); Johannssen v. Dist. No. 1 - Pacific Coast Dist., MEBA Pension Plan, No. AMD 96-2355, 1997 U.S. Dist. LEXIS 14351, *64 (D. Md. Aug. 8, 1997) (referring to "[t]he plan administrator[] as a fiduciary under ERISA") (attached hereto as Ex. 38).

## V. DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY FAILING TO DIVERSIFY THE PLAN'S INVESTMENTS

### A.   The Defendants Breached Their Fiduciary Duties By Failing to Maintain a Diversified Investment Portfolio

Section 404(a)(1)(C) of ERISA requires fiduciaries to invest Plan assets in a diversified portfolio.  29 U.S.C. § 1104(a)(1)(C).  Moreover, ERISA's "prudent man duty" requires a fiduciary to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  Difelice, 497 F.3d at 424 (quoting 29 U.S.C. § 1104(a)(1)(C)).  See also Reich v. Walter W. King Plumbing & Heating Contr., 98 F.3d 147, 152 (4th Cir. 1996) (hereafter King III) ("ERISA requires a plan's fiduciary to diversify the plan's investments unless under the circumstances it is clearly prudent not to do so."); Meyer II, 250 F. Supp. 2d at 565 ("[T]he duty to diversify investments 'cannot be stated as a fixed percentage, because a prudent fiduciary must consider the facts and circumstances of each case.'") (quoting Reich v. King, 861 F. Supp. 379, 383 (D. Md. 1994)) (hereafter King I); Trustees of Pressmen Local 72 Industry Pension Fund v. Judd & Detweiler, Inc., 736 F. Supp. 1351, 1356 (D. Md. 1988) ("Indeed, unless a plan's particular circumstances so warrant,

overcommitment of the plan's portfolio to bonds (or any other single type of investment) might well constitute a breach of the trustees' fiduciary duty to maintain a diversified portfolio.")

Diversification is the process of spreading assets among different investments, securities, issuers, maturity dates and localities in order to minimize the portfolio's exposure and to distribute the risk of the portfolio. See Ex. 39, Expert Report of Michael D. Cairns (the "Cairns Report"), at ¶ 6. Diversification is not only mandated by ERISA, it is the best tool for achieving an appropriate balance between investment risk and return. See id.

It is undisputed that Defendants failed to maintain the Plans assets in a diversified portfolio. Throughout the Defendants' tenures as fiduciaries of the Plan, the Defendants caused virtually all of the Plan's assets to be invested in certificates of deposit and Treasury bills. See Statement of Undisputed Facts ("SOF") at ¶ 13-15. For the year 1994, 92.7% of Plan assets were invested in CDs due to mature in 1995. See id. at ¶ 13. As of September 30, 1995, an amount equal to 78.8% of the total value of Plan assets on December 31, 2004 were invested in U.S. Treasury bills. See id. at ¶ 14. Such an allocation does not constitute a prudently diversified portfolio under ERISA. See Ex. 39, Cairns Report, at ¶ 5. Here, Defendants decision to maintain an undiversified portfolio on behalf of the Plan with virtually all Plan assets invested in CDs and Treasury bills, the Defendants breached their fiduciary duty to diversify Plan assets. See Ex. 40, Expert Report of Henry Rose (the "Rose Report"), at ¶ 14. Defendants actions demonstrate a flagrant disregard for ERISA's requirement to invest Plan assets in a diversified portfolio and constituted a breach of their fiduciary duties.

**B.**     **The Defendants Cannot Establish That Their Failure to Diversify Was Prudent**

Once it is established that Defendants did not diversify the Plan's investments, the burden shifts to the Defendants to establish that it was prudent to not diversify the Plan's investments. See Meyer II, 250 F. Supp. 2d at 565 ("[I]f the plaintiff meets his initial burden of establishing a

failure to diversify, the burden thereupon shifts to the defendant to prove that even though not diversified, the allocation was nonetheless prudent."); <u>King II</u>, 867 F. Supp. at 343. Defendants "bear the 'heavy burden' of showing that their decision not to diversify was clearly prudent. <u>King I</u>, 861 F. Supp. at 383. This heavy burden "is not merely to prove that the investment is prudent, but that there is no risk of large loss resulting from the non-diversification." <u>Id</u>. (internal citations omitted). Such a defense "must be measured by an objective standard--that of a prudent investor similarly situated." <u>King II</u>, 867 F. Supp. at 343.

Defendants cannot meet this heavy burden here. It was the Defendants' decision and desire that Plan assets be invested in this undiversified manner. <u>See</u> SOF at ¶ 23, 25. The Defendants knew that the investment of the Plan's assets in certificates of deposit and Treasury bills <u>only</u> was not a diversified portfolio. <u>See</u> SOF at ¶ 20. Defendants could not have considered whether or not it was prudent to comply with ERISA's diversification requirement because Defendants did not know that ERISA required fiduciaries to invest in a diversified portfolio and they did not seek legal advice as to whether their undiversified investment strategy complied with ERISA. <u>See id</u>. at ¶ 21-22, 24, 26. In fact, Defendants' investment "strategy" was not based upon a statement of investment policy at all, rather, the Defendants blindly maintained the ongoing investment strategy developed by their predecessors, without giving any thought to changing it. <u>See id</u>. at ¶ 23, 27. Thus, as a matter of law, there is no way for the Defendants to contend that their decisions to maintain an undiversified portfolio was prudent, as required under ERISA.

**C.     For the Three-Year Period Ending December 31, 2005, the Plan and its Participants Were Damaged By Defendants' Breach in Failing to Diversify the Plan's Assets in an Amount of $432,960.62**

The actual value of Plan assets as of December 31, 2002 was $1,674,827.00. <u>See</u> SOF at ¶ 28. Had this amount been invested in a 50% S&P 500 and 50% Lehman Aggregate, then the

value of those assets as of December 31, 2005 would have been $2,548,023.62.  See SOF at ¶ 29.

Such an investment strategy "is an appropriate mix of asset classes for the Plasterers' Plan in

which to add income and appreciation while also retaining principal." Ex. 39, Cairns Report, at

¶ 10.  The actual value of Plan assets on December 31, 2005 was $2,115,063.00.  See SOF at ¶

30.  Thus, by failing to diversify Plan assets for the period from January 1, 2003 through

December 31, 2005, the Defendants damaged the Plan and its participants in the amount of

$432,960.62.[4]

## VI. THE DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY FAILING TO ACT PRUDENTLY

### A.   ERISA Fiduciaries Have a Duty to Act Prudently

ERISA requires plan fiduciaries to act in accordance with a prudent man standard of care.

Kowalewski v. Detweiler, 770 F. Supp. 290, 292 (D. Md. 1991).  Specifically, ERISA

§ 404(a)(1)(B)  requires fiduciaries to act "with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in  the conduct of an enterprise of a like character and with like aims." 29

U.S.C. § 1104(a)(1)(B); Difelice, 497 F.3d at 422-423.  The requirement for fiduciaries to act

prudently, is the most "fundamental canon of the ERISA statutory scheme."  Elmore v. Cone

Mills Corp., 6 F.3d 1028, 1042 (4th Cir. 1993) reheard en banc and rev'd in part on other

grounds, 23 F.3d 855 (4th Cir. 1994); Bidwill v. Garvey, 943 F.2d 498, 507 (4th Cir. 1991)

("Trustees are charged under ERISA with a duty to discharge their responsibilities with the care,

skill, prudence, and diligence under the circumstances then prevailing that a prudent man would

use.") (internal citations omitted); Doe v. Blue Cross Blue Shield, of Md., Inc., 173 F. Supp. 2d

---

[4]     Calculated as the value of Plan assets on December 31, 2005 if the $1,674,827.00 actual value of Plan
assets had been prudently invested on January 1, 2003, minus the actual value of Plan assets on December
31, 2005.

398, 402 (D. Md. 2001) ("Section 404(a) obligates fiduciaries . . . to exercise the care of an ordinarily prudent person in managing the plan."); Scardelletti v. Bobo, 897 F. Supp. 913, 917 (D. Md. 1995) (hereafter Scardelletti I) ("The former trustees as fiduciaries of the Plan are charged under ERISA with the duty to discharge their responsibilities with the care, skill, prudence, and diligence that a prudent man would use.") (internal citations omitted).

**B.** **Defendants Breached Their Fiduciary Duty to Act Prudently by Failing to Maintain a Diversified Portfolio and Prudent Investment Strategy**

As part of the overarching duty to act prudently, ERISA requires a plan fiduciary to make discretionary investment decisions with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use. Tatum v. R.J. Reynolds Tobacco Co., 392 F.3d 636, 639 (4th Cir. 2004); "When deciding whether a plan fiduciary has acted prudently, a court must inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." See also Difelice, 497 F.3d at 420 (internal citations omitted); Meyer v. Berkshire Life Ins. Co., 250 F. Supp. 2d 544, 565 (D. Md. 2003) (hereafter Meyer II) ("29 U.S.C. § 1104(a)(1)(B) mandates that a fiduciary be prudent in each investment decision.") (internal citations omitted); Reich v. King, 867 F. Supp. 341, 343 (D. Md. 1994) (hereafter King II) (holding the prudent person standard requires the fiduciary to (1) employ proper methods to investigate, evaluate and structure the investment; (2) act in a manner as would others who have a capacity and familiarity with such matters; and (3) exercise independent judgment when making investment decisions.)

As set forth in Section V.B, supra, Defendants did not act prudently in their investment decisions. Defendants did not maintain any statement of investment policy, but instead, simply blindly followed the same undiversified investment strategy that they had relied upon for years.

32

<u>See</u> SOF at ¶ 23, 27.  Defendants failed to inquire about their requirements to have a diversified

portfolio, or seek any legal guidance on the investment requirements under ERISA.  <u>See</u> <u>id</u>. at ¶

21-22, 24, 26.  As such, Defendants did not act prudently by failing to diversified the Plan's

investments, and as a result, harmed the Plan and its participants.

**C.** **The Defendant Trustees Breached Their Fiduciary Duty to Act Prudently By Failing to Oversee and Monitor the Performance of Defendant Perry and Mr. Scholar**

As noted above, fiduciaries under ERISA are charged with the duty to act "with the care,

skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting

in a like capacity and familiar with such matters would use in the conduct of an enterprise of a

like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  This duty extends to the prudent

selection and monitoring of those individuals chosen to manage a plan.  <u>See</u> <u>DiFelice v. US</u>

<u>Airways, Inc.</u>, 235 F.R.D. 70, 78 (E.D. Va. 2006) ("[T]he central question at issue in this

litigation is whether US Airways breached its fiduciary duty to select and monitor investment

options prudently.");  <u>Batchelor v. Oak Hill Med. Group</u>, 870 F.2d 1446, 1447 (9th Cir. 1989)

(finding the existence of "a limited fiduciary duty under ERISA" which permitted "the plaintiffs

[to] maintain an action . . . for breach of fiduciary duties in connection with the selection of a

third party as fund administrator");  <u>Leigh v. Engle</u>, 727 F.2d 113, 135 (7th Cir. 1984) ("[T]he

fiduciaries responsible for selecting and retaining the[] . . . plan administrators . . . had a duty to

monitor appropriately the administrators' actions.");  ERISA Section 404(c) Plans,  29 C.F.R. §

2550.404c-1(f)(8) (noting that a fiduciary "does have a duty to monitor [a plan manager]'s

performance to determine the suitability of continuing [the plan manager] as an investment

manager, however, and [the manager]'s imprudence would be a factor which [the fiduciary] must

consider in periodically reevaluating its decision to designate" the manager).

33

The Defendant Trustees failed to adequately oversee or monitor the performance of Defendant Perry in his role as Plan Administrator and Mr. Scholar in his role as legal counsel. The Defendant Trustees never reviewed either individual's qualifications or sought bids from other potential service providers for comparison.  See SOF at ¶ 31, 45.  The Defendant Trustees were unaware that the Plan was the only employee benefit plan which either Defendant Perry or Mr. Scholar was responsible for.  See id. at ¶ 31, 46.  The Defendant Trustees had no idea what either Defendant Perry or Mr. Scholar was paid from the Plan assets, or whether either had written agreements to provide services to the Plan.  See id. at ¶  36, 49.

With regard to Defendant Perry, the Defendant Trustees selected an individual with no background or understanding of ERISA to serve as Plan Administrator, and the Defendant Trustees did they realize that Defendant Perry was a fiduciary under ERISA.  See id. at ¶ 39-42. Defendants failed to monitor Defendant Perry's investments on behalf of the Plan.  See id. at ¶ 32-35.  With regard to Mr. Scholar, Defendant Trustees simply blindly accepted Mr. Scholar's appointment as Plan counsel without reviewing his qualifications.  See id. at ¶ 43-45.  The Defendant Trustees did not hesitate to use Mr. Scholar as Plan counsel for their ERISA multiemployer Plan despite the fact he declares himself to not be an ERISA lawyer and proclaims himself to have "limited knowledge" as to multiemployer plans.  See id. at ¶ 50-52.

The Defendant Trustees breached their fiduciary duty to act prudently by continuing to retain Defendant Perry and Mr. Scholar as Plan Administrator and Plan counsel given their obvious lack of qualifications for those positions.  The slightest bit of monitoring of either individual could have only led to one prudent decision – their termination from their positions. Had either individual been terminated, the massive damage done to the Plan by the Defendants' prohibited transactions and their failure to diversify may have been avoided.

**D.** **Defendants Breached Their Fiduciary Duty By Failing to Ensure Defendant Perry Was Covered By Fiduciary Insurance**

Defendant Perry did not carry fiduciary insurance and the Defendant Trustees never inquired as to whether Defendant Perry carried such insurance. See SOF at ¶ 53-54. By not carrying such insurance, Defendant Perry made it more likely that the Plan would not be able to be made whole if, as did happen here, he breached his fiduciary duties in such a way as to cause damage to the Plan. Similarly, the Defendant Trustees made it more likely that the Plan would not be made whole if a breach occurred by not requiring that Defendant Perry carry insurance. Thus, as this failure could cause substantial damage from being repaired, including in this case, it is clear that this failure to ensure that Defendant Perry did carry fiduciary insurance was a breach of the Defendants' fiduciary duty to act prudently.

**VII. DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY IMPROPERLY TRANSFERRING PLAN ASSETS TO CONTRIBUTING EMPLOYERS, INCLUDING ENTITIES CONTROLLED BY THE DEFENDANT TRUSTEES**

**A.** **Defendants Improperly Returned Plan Assets to Contributing Employers in 1994**

In 1994, each of the Defendants caused the Plan to distribute Plan assets to contributing employers based upon a theory that funds, which had been contributed to the Plan on behalf of employees who never became vested to the Plan, were to be forfeited back to the contributing employers. See SOF at ¶ 55-58. The Defendant Trustees unanimously approved the disposition of these funds on January 25, 1994 and Defendant Perry notified the recipient contributing employers that such funds would be forthcoming in letters dated February 1, 1994. See id. at ¶ 55-57. The checks were signed by Defendants Lertora and Molnar and were sent to, among others, Defendant Lertora's majority-owned company and Defendant Pepper's employer. See id. at ¶ 58-59. As a result of these actions, approximately $121,000 was reverted to contributing employers. See id. at ¶ 69.

**B.**     **Defendants Violated the Anti-Inurement Provision of Section 403(c)(1) of ERISA**

Section 403(c)(1) of ERISA, provides that "the assets of a plan shall never inure to the

benefit of any employer and shall be held for the exclusive purposes of providing benefits." 29

U.S.C. § 1103(c)(1) (emphasis added); Mary Helen Coal Corp. v. Hudson, 235 F.3d 207, 211

(4th Cir. 2000); see also Malkani I, 216 F. Supp. 2d at 515 ("ERISA § 403(c)(1) states that, with

limited statutory exceptions, the assets of a plan shall never inure to the benefit of any employer

and shall be held for the exclusive purposes of providing benefits to participants in the plan and

their beneficiaries and defraying reasonable expenses of administering the plan.") (internal

citations omitted); O'Neil v. Marriott Corp., 538 F. Supp. 1026, 1029 (D. Md. 1982) ("§

403(c)(1) of ERISA, 29 U.S.C. § 1103(c)(1), . . . requires that plan assets never inure to the

benefit of the employer.")

Defendants violated ERISA's anti-inurement provision by permitting approximately

$121,000 to inure to the benefit of the various contributing employers who received these

"forfeitures," including Defendants Lertora and Pepper. See Ex. 40, Rose Report, at ¶ 13.

**C.**     **Defendants Breached their Fiduciary Duty By Failing to Use Plan Assets Solely for
the Exclusive Purposes Permitted Under ERISA**

Pursuant to ERISA § 404(a)(1)(A), a fiduciary is required to discharge his duties with

respect to an ERISA plan "solely in the interest of participants and beneficiaries, for the

exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii)

defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A); Marks v.

Watters, 322 F.3d 316, 324 (4th Cir. 2003) (quoting 29 U.S.C. § 1104(a)(1)(A)). See also Phelps

v. CT Enters., 194 Fed. Appx. 120, 123 (4th Cir. 2006) ("Assets of an ERISA plan shall never

inure to the benefit of any employer and shall be held for the exclusive purposes of providing

benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of

administering the plan.") (internal citations omitted) (attached hereto as Ex. 41); <u>Arens v.</u>

<u>DeFries</u>, No. WN-93-1796, 1994 U.S. Dist. LEXIS 20726, *29 (D. Md. Aug. 19, 1994) ("ERISA

requires fiduciaries to discharge their duties with respect to a plan solely in the interest of the

participants and beneficiaries of the plan and for the exclusive purpose of providing benefits to

them. . . . As a corollary to this exclusive benefit rule, section 1103(c)(1) provides that the assets

of a plan shall never inure to the benefit of any employer and shall be held for the exclusive

purposes of providing benefits to participants in the plan and their beneficiaries and defraying

reasonable expenses of administering the plan.") (internal citations omitted) (attached hereto as

Ex. 42).

By causing the distribution of these funds to go to the various contributing employers, the

Defendants also breached their fiduciary duty to use Plan assets for the exclusive purposes for

which such assets may be used under ERISA.  Distributing Plan assets to contributing employers

did not provide any benefit to Plan participants and beneficiaries, nor did those distributions

defray reasonable expenses of administering the Plan.  Thus, the Defendants, plainly used Plan

assets for other than the exclusive purposes for which those assets could be used and, as a result,

breached their fiduciary duties.  <u>See</u> Ex. 40, Rose Report, at ¶ 13.

**D.  Defendants Breached Their Fiduciary Duties By Causing the Plan to Enter into Prohibited Transactions Under ERISA**

Section 406(a)(1)(D) of ERISA prohibits a plan fiduciary from causing a transaction

between a plan and a party in interest.  Specifically, ERISA provides that "a fiduciary with

respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know

that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of,

a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D); <u>Arens</u>, 1994 U.S. Dist.

LEXIS 20726 at *20.  <u>See also</u> <u>Wood v. Commissioner</u>, 955 F.2d 908, 913 (4th Cir. 1992)

(stating ERISA § 406(a)(1)(D)'s purpose as "prohibit[ing] a plan fiduciary from engaging in a transaction that he knows or should know constitutes a direct or indirect sale or exchange of property between the party and a party in interest."); Malkani I, 216 F. Supp. 2d at 514 ("ERISA § 406(a) makes § 408 the exclusive means by which a fiduciary can transfer money to a party in interest.") Pursuant to § 3(14)(C) of ERISA, an employer whose employees are covered by the Plan constitutes a "party in interest." 29 U.S.C. § 1002(14)(C).

Defendants entered into such a prohibited transaction by distributing plan assets to contributing employers, who are "parties in interest" under ERISA. All of the contributing employers who received these "forfeitures" constituted a party in interest. Thus, the Defendants breached their fiduciary duties by causing the Plan to engage in a transaction that constituted a direct transfer to a party in interest of assets of the Plan. 29 U.S.C. § 1106(a)(1)(D).[5]

### E.   Defendants Breached Their Fiduciary Duties By Causing the Plan to Return Assets to Entities Controlled by Defendant Trustees

Section 406(b)(1) of ERISA, establishes that it is also a prohibited transaction for a fiduciary to "(1)deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account

---

[5]   An actual transfer of Plan assets obviously qualifies as a sufficient transfer as to be a prohibited transaction because the Fourth Circuit has recognized that fiduciaries enter into prohibited transactions with employers by simply failing to collect employer contributions in a timely manner, thereby permitting employers to retain such assets which would otherwise belong to the plan. See Phelps, 194 Fed. Appx. at 124 (citing ERISA Technical Release 92-01, 57 Fed. Reg. 23272 (June 2, 1992)). Thus, Defendants clearly entered into a prohibited transaction by not merely failing to collect required contributions but instead by affirmatively authorizing payments to contributing employers. See Ex. 40, Rose Report, at ¶ 13.

from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(1).

Thus, if a fiduciary causes such "self-dealing" to take place, a prohibited transaction has occurred. See Malkani II, 452 F.3d at 296 (calling it "not surprising that the" retroactive reimbursements which defendant plan administrators "managed to extract from the Plan constituted a prohibited transaction under ERISA."); see also Phelps, 194 Fed. Appx. at 123 ("The fiduciary responsibility provisions of ERISA 'apply the law of trusts to discourage abuses such as self-dealing.'") (quoting Raymond B. Yates, M. D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 23); Child-Olmsted v. Loyola College, No. CCB-04-3559, 2005 U.S. Dist. LEXIS 7523, *10, 34 Employee Benefits Cas. (BNA) 2665 (D. Md. Apr. 28, 2005) (finding that it was "Congress's goal that by imposing uniform regulatory standards for employee benefit plans, ERISA 'would safeguard employees from such abuses as self-dealing.'") (attached hereto as Ex. 43) (quoting Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 15 (1987)).

Defendants, therefore, entered into prohibited transactions under ERISA by permitting the Plan to distribute assets to Defendants Lertora and Pepper. Defendants caused the Plan to distribute assets to a company of which Defendant Lertora was the majority owner and to the employer of Defendant Pepper. See SOF at ¶ 59, 61. By engaging in such self-dealing, Defendants actions duly constituted prohibited transactions under ERISA.

**F.** **By Engaging in these Prohibited Transactions, Defendants' Damaged the Plan and its Participants in an Amount of $335,224**

As of January 1, 1994, the Plan assets were valued at $1,260,967, based upon the Plan's IRS Form 5500 submitted for 1994. See Ex. 39, Cairns Report, at ¶ 10; see also Ex. 8, 1994 Annual Return Report of Employee Benefit Plan at Financial Schedules attachment. Based upon that starting point, under a mix of 50% S&P 500 and 50% Lehman Aggregate, recommended by

Mr. Cairns, as described <u>supra</u>, as opposed to the imprudent and undiversified investment strategy used by the Defendants, the value of the Plan's assets as of December 31, 2005 would have been $3,500,159.  <u>See</u> Ex. 39, Cairns Report, at ¶ 10.   When the value of the improper forfeitures is added back into the Plan and invested under this prudent allocation mix, the value of the Plan would then have been $3,835,383.  <u>See</u> <u>id</u>.  Thus, the Defendants' prohibited distribution of Plan assets to contributing employers damaged the Plan to the sum of $335,224.[6] As noted <u>supra</u>, pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), Plaintiffs are also entitled to their attorneys' fees and costs incurred in bringing this action.

## VIII. DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY FAILING TO ACT IN ACCORDANCE WITH THE PLAN'S GOVERNING DOCUMENTS

### A.   ERISA Requires Fiduciaries to Act in Accordance with the Plan's Governing Documents

ERISA § 404(a)(1)(D) requires plan fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D); <u>White v. Sun Life Assur. Co.</u>, 488 F.3d 240, 257 (4th Cir. 2007); <u>see also</u> <u>Dzinglski v. Weirton Steel Corp.</u>, 875 F.2d 1075, 1080 (4th Cir. 1989) ("While ERISA requires a fiduciary to discharge its duties solely in the interest of the participants and beneficiaries, . . . the fiduciary must do so in accordance with the documents and instruments governing the plan.") (internal citations omitted); <u>Kress v. Food Emplrs. Labor Rels. Ass'n</u>, 285 F. Supp. 2d 678, 683-684 (D. Md. 2003) ("Determination of whether to award benefits under an ERISA plan is made in the first instance by the language of the plan itself. . . . An ERISA fiduciary must discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan.") (internal

---

[6]     Calculated as the value of the Plan with the forfeitures remaining as Plan assets as it would have existed on December 31, 2005, if prudently invested, minus the value of the Plan with the forfeitures distributed, and therefore no longer Plan assets, as it would have existed on December 31, 2005, if prudently invested.

citations omitted); <u>Chao v. Moore</u>, No. AW-99-1283, 2001 U.S. Dist. LEXIS 9012, *9, 26

Employee Benefits Cas. (BNA) 2033 (D. Md. June 15, 2001) ("Trustees 'additionally are

required to act 'in accordance with the documents and instruments governing the plan.'")

(attached hereto as Ex. 44).

**B.      The Defendants Failed to Act in Accordance With Plan Documents By Returning
         Funds to Contributing Employers**

The Plan document only permits contributions to be returned to employers if a

contribution was made to the Plan as a mistake of fact.  <u>See</u> SOF at ¶ 89.  Here, the forfeitures

were made, not as a mistake of fact, but simply to reimburse contractors for contributions

intentionally and properly made on behalf of employees who had happened not to have become

vested under the Plan.  This does not qualify as a mistake of fact.  Therefore, the Defendants

breached their fiduciary duties by failing to act in accordance with the Plan document.  Had the

Defendants acted in accordance with the Plan document, they would not have distributed money

to contributing employers, and the Plan would not have been financially damaged in the amount

of $335,224.

**C.      The Defendants Failed to Act in Accordance with Plan Documents by Failing to
         Meet With the Requisite Frequency to Ensure Proper Oversight**

The Plan's trust agreement required bi-monthly meetings of the Board of Trustees.  <u>See</u>

<u>id</u>. at ¶ 93.  The Defendants were unaware that this requirement existed.  <u>See id</u>. at ¶ 96-97.  The

Board of Trustees would often go well over one year between meetings.  <u>See id</u>. at ¶ 104-116.

The Defendants never considered alternative forms of meetings, such as telephonic meetings, to

meet this requirement.  <u>See id</u>. at ¶ 119.  Thus, by failing to meet with the frequency required by

the trust agreement, the Defendants further breached their fiduciary duties to act in accordance

with the Plan documents.  Had the Defendants met with greater regularity, it is possible that the

forfeiture distributions could have been reconsidered or that an idea to diversify the Plan's investments could have been raised, and damage to the Plan could have been avoided.

**D.**     **The Defendants Failed to Act in Accordance With the Plan Documents by Allowing an Incomplete Board of Trustees to Operate without a Quorum**

The Plan's trust agreement further required that the Board of Trustees consist of three trustees appointed by the union and three appointed by employers. See id. at ¶ 120. The Board was incomplete at times. See id. at ¶ 121. The Defendants simply acquiesced when they "couldn't get anyone" to join as a trustee. See id. at ¶ 122-124. The Defendant Trustees were unaware that they had the power to simply appoint individuals to be trustees. See id. at ¶ 122-123. Thus, by failing to ensure a complete Board of Trustees, the Defendants further breached their fiduciary duties. Had the Defendants not breached their duties in this way, they could have ensured additional voices on the Board of Trustees who could have questioned the forfeiture distributions and/or the Plan's investments in an imprudent undiversified portfolio, and therefore avoided further damage to the Plan and its participants.

## IX. PLAINTIFFS ARE ENTITLED TO RELIEF FOR THE DEFENDANTS' PROHIBITED TRANSACTIONS

**A.**     **Plaintiffs' Action for Recovery Is Not Barred by a Statute of Limitations Because Defendants Concealed Their Prohibited Transactions**

Section 413 of ERISA provides that "with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, . . . in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113. As recognized by this Court, "[c]ases involving 'fraud or concealment' are exempt from" the standard three- or six-year limitations period imposed by § 413 "and may be filed up to six years after the violation is discovered." Meyer v. Berkshire Life Ins. Co., 128 F. Supp. 2d 831, 836 (D. Md. 2001)

(hereafter Meyer I).  See also Meyer II, 250 F. Supp. 2d at 569 (noting that the standard three- or six-year limitations period under § 413 only applies when "the fraud or concealment exception are not applicable.") This Court has further recognized that when fiduciaries intentionally "conceal[] information relevant" to their breaches, such "actions might be subject to the six-year 'fraud or concealment' statute of limitations rather than the three-year provision." Meyer I, 128 F. Supp. 2d at 836 n. 5.  See also Ex. 45, Expert Report of Norman Stein (the "Stein Report"), at ¶ 13 ("Section 413 provides a separate rule: in the case of fraud or concealment, the statute of limitations must be commenced within six years of the date of the discovery of the breach. Courts have generally interpreted the term 'fraud or concealment' as referring not to the underlying fiduciary violation, but concealment of the breach itself.") (attached hereto as Ex. 45)

Here, the only individuals that were aware of the Defendants' prohibited transactions were the Defendants themselves.  The Defendants did not notify Plan participants that Plan assets had been distributed to contributing employers.  See SOF at ¶ 126-127.  Additionally, the Defendants did not inform new trustees as the trustees joined the Board.  See id. at ¶ 128-129.  In fact, Mr. Hickman had been a fiduciary for nearly six years before he was made aware of those disbursements in the fall of 2005.  See id. at ¶ 129.  Because Defendants clearly concealed their improper employer distributions, the six-year statute of limitations did not begin to run until the concealment ended in 2005.  This case was brought within a few months of when the statute of limitations began to run, therefore, the Plaintiffs' action for recovery of those funds is not barred. See Ex. 40, Rose Report, at ¶ 15 ("It would be astonishing and contrary to the policy underlying ERISA if wrongdoing fiduciaries could diminish or partially bar their liability for their wrongdoing by remaining in their positions and failing to reveal their wrongdoing until a later time.")

**B.      Alternatively, the Damages Caused By Defendants' Prohibited Transaction May Be Recovered Based Upon the Defendants' Failure to Remedy Their Past Breaches**

Section 405(a)(3) of ERISA declares that "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a)(3).  Indeed, a fiduciary's failure to remedy a known breach will subject that fiduciary to liability for failure to remedy the breach.  See Smith v. Sydnor, 184 F.3d 356, 363 (4th Cir. 1999) (finding "support in [plaintiff]'s amended complaint for our conclusion that he has pleaded valid claims for breach of fiduciary duties" based upon plaintiff's claims that, inter alia, one fiduciary "violated its co-fiduciary duties under ERISA § 405 by  . . . failing to remedy [the other fiduciary]'s numerous breaches of fiduciary duties."); Richman v. Aetna Life Ins. Co., No. 92-1149, 1992 U.S. App. LEXIS 20949, *10-11 (4th Cir. Aug. 31, 1992) ("It is clear from the provision that, if [defendant insurance company] knew of [plaintiff's employer]'s breach . . . and either failed to take reasonable steps to remedy the breach, or was complicitous in concealing the breach, liability would arise.") (attached hereto as Ex. 46).  Indeed, this Court has recognized that "[t]he legislative history [of ERISA] indicates that liability for . . . failure to remedy a breach by a cofiduciary" exists where "the fiduciary knew that the other individual was a fiduciary, that the cofiduciary participated in the act constituting the breach, and that the act constituted a breach. In the alternative, the cofiduciary's breach must be shown to have resulted from the fiduciary's breach of one of the other duties specified in ERISA." Brink, 496 F. Supp. at 1384.  See also NARDA, 744 F. Supp. at 691 ("[A] fiduciary may be liable for the breach of another fiduciary with respect to the plan if he participates in the breach, conceals it, by his own breach enables it, or has knowledge of it, unless he attempts to remedy it.").  Therefore, under ERISA, "[t]here is

an affirmative obligation on a fiduciary to correct a fiduciary breach and the failure to do so constitutes a separate fiduciary breach itself." Ex. 40, Rose Report, at ¶ 13; see also Ex. 45, Stein Report, at ¶ 18.

As established supra, the Plaintiffs in this matter did not have actual knowledge of Defendants' prohibited transactions until 2005. Additionally, Defendant Beddow was unaware of the prohibited transaction until the initiation of this litigation. See SOF at ¶ 130-133. As Defendant Beddow lacked actual knowledge of the fiduciary breaches that took place as part of the distribution of Plan assets to contributing employers that began on February 10, 1994, he could have brought an action until February 10, 2000 to remedy those breaches. See ERISA § 413(1)(A), 29 U.S.C. § 1113(1)(A) (noting that where a plaintiff lacked actual knowledge of a breach at the time the breach occurred, that plaintiff may bring an action within "six years after . . . the date of the last action which constituted a part of the breach or violation."; see also Ex. 45, Stein Report, at ¶ 27 (noting that because "trustee Beddow had not attended any trustee meetings and may not have had any knowledge of the facts relating to the improper reversions" that therefore the six-year statute of limitations would be appropriate). Therefore, when the Defendants did not bring such an action by February 10, 2000, they breached their fiduciary duty to remedy known breaches. See Ex. 40, Rose Report, at ¶ 15.

During those six years, Defendants could have taken a number of actions to remedy those breaches. See Ex. 45, Stein Report, at ¶ 28. Any of the Defendants, as fiduciaries of the Plan, could have brought a civil action based upon a breach of fiduciary duty. See ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (holding that "[a] civil action may be brought" by a "fiduciary for appropriate relief under section 1109 of this title."); see also ERISA § 409, 29 U.S.C. § 1109 (imposing liability for breach of fiduciary duty). Alternatively, any of the Defendants could have

notified the Department of Labor, whose secretary is empowered to bring actions for breach of fiduciary duty.  See ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).  Instead, Defendants did nothing.

As Plaintiffs did not have actual knowledge of Defendants' omission to remedy the known breaches until 2005, under ERISA § 413(1)(B), 29 U.S.C. § 1113(1)(B), the statute of limitations did not begin to run on the Defendants' failure to remedy until "six years after . . . the latest date on which the fiduciary could have cured the breach or violation"  As the latest date on which the Defendants could have cured their breach was February 10, 2000, the Plaintiffs were entitled to bring this action based upon the Defendants failure to remedy known breaches through February 10, 2006.  This action was filed before that deadline and, therefore, this action based upon the 1994 prohibited transactions is timely.  Thus, while Plaintiffs clearly are entitled to recover based on the initial breach underlying the initial transactions based upon the Defendants' concealment of that breach, even were this Court to conclude that the statute of limitations had expired on the actual transactions, those same damages would be available to Plaintiffs based upon the Defendants' breach of fiduciary duty in their failure to remedy their known breach of undertaking the prohibited transactions by February 10, 2000.  See Ex. 40, Rose Report, at ¶ 15.

### X. EACH OF THE DEFENDANTS IS JOINTLY AND SEVERALLY LIABLE

ERISA § 409(a) imposes personal liability on defendants for their breaches of fiduciary duty.  29 U.S.C. § 1109(a) ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such  breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or

46

remedial relief as the court may deem appropriate, including removal of such fiduciary.")

Accordingly, when, as here, multiple fiduciaries breach their fiduciary duties causing damage to an ERISA plan, those defendants are jointly and severally liable for the damage caused. See, e.g., Chao v. Rhoades, No. 1:04CV00854, 2006 U.S. Dist. LEXIS 19887, *9 (M.D.N.C. Apr. 13, 2006) ("The statutory basis for a suit claiming breach of fiduciary duty under ERISA is 29 U.S.C. § 1109. Section 1109(a) imposes personal liability on any fiduciary who breaches 'any of the responsibilities, obligations or duties imposed upon fiduciaries' by ERISA. . . . Where there is more than one fiduciary, they may be held jointly and severally liable for breaches of the duties imposed by ERISA.") (attached hereto as Ex. 47); Elmore v. Cone Mills Corp., No. 6:88-3258-17, 1991 U.S. Dist. LEXIS 13583, *90 n. 1 (D.S.C. Sep. 18, 1991) ("ERISA liability for breach of fiduciary liability is personal. . . . Thus, [the defendants are] severally liable for the breach of fiduciary duty.") (attached hereto as Ex. 48), rev'd in part on other grounds, 23 F.3d 855 (4th Cir. 1994); Davidson v. Cook, 567 F. Supp. 225, 240 (E.D. Va. 1983) ("Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary is personally liable to the plan for any losses resulting from breaches of the fiduciary's duties and is subject to other equitable or remedial relief, including removal from office. Under this provision, the . . . Trustees and [the former plan administrator] are jointly and severally liable for the losses.")

## XI. PLAINTIFFS ARE ENTITLED TO RECOVER THEIR ATTORNEYS' FEES AND COSTS INCURRED IN BRINGING THIS ACTION

Pursuant to ERISA § 502(g)(1), Plaintiffs' attorneys' fees and costs incurred in bringing this action are recoverable. 29 U.S.C. § 1132(g)(1). In making an attorneys' fees award, the Fourth Circuit instructs district courts to consider the following factors: "(1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing party would deter

other persons acting under similar circumstances; (4) whether the party requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions." Mid Atl. Med. Servs., LLC v. Sereboff, 407 F.3d 212, 221 (4th Cir. 2005); see also Jani v. Bell, No. WDQ-04-1606, 2005 U.S. Dist. LEXIS 44331, *2-5 (D. Md. Nov. 7, 2005) (attached hereto as Ex. 49).

Here, each of the factors supports granting attorneys' fees to Plaintiffs.  Most importantly, the Defendants have the ability to pay attorneys' fees as the Defendant Trustees who, as described infra, are jointly and severally liable, are covered under an insurance policy.  See Quesinberry v. Life Ins. Co., 987 F.2d 1017, 1030 n. 12 (4th Cir. 1993) (distinguishing cases in which attorneys' fees are paid out of an insurance policy from those cases in which fees would be paid out of plan assets and, therefore, would caution against awarding such fees).  Additionally, the Plaintiffs have significant reason to believe that Defendant Perry possesses substantial assets. The Fourth Circuit has held that when, as here, the ability to pay exists, such a factor is "neardispositive" as "[b]ased on this factor alone, absent special circumstances, a prevailing ERISA . . . plaintiff should ordinarily receive attorneys' fees from the defendant." Rodriguez v. MEBA Pension Trust, 956 F.2d 468, 472 (4th Cir. 1992) (internal citations omitted).  Thus, this "neardispositive" factor obviously breaks in favor of awarding Plaintiffs attorneys' fees.

The Defendants were clearly sufficiently culpable as to support a finding of attorneys' fees.  This Court has noted that "[c]ulpability connotes wrongful conduct that is not intentional or deliberate." Jani, 2005 U.S. Dist. LEXIS 44331 at *2.   The Defendants' conduct in this case, which was made up of intentional and deliberate actions and decisions, exceeds this standard and shows their high level of culpability: failing to diversify the Plan's investment portfolio,

distributing Plan assets to the Defendant Trustees themselves, concealing those distributions for over ten years, failing to even hold meetings for stretches well over one year, and failing to have the slightest concern as to whether the Plan counsel and Plan Administrator were even familiar with ERISA.  "Culpability can be found where a plans decision is discernibly against the weight of the evidence."  Id. (internal citations omitted).  Here, given that the Defendants decisions went against the requirements of ERISA, the requirements of the Plan's governing documents, and a basic understanding of prudent investing, it is clear that those decisions were "discernibly against the weight of the evidence" and, therefore, that the Defendants were sufficiently culpable as to award attorneys' fees to the Plaintiffs.

The deterrence factor is plainly met based upon the fact that fiduciaries of other plans would be encouraged to make sure that they prudently invest assets of the plans they represent and to ensure that no fiduciaries cause plan assets to be needlessly and improperly distributed to contributing employers.  This Court has specifically referred to "the negligent enforcement of or the wilful violation of clear ERISA standards" as examples of the "type of behavior which ERISA's fee-shifting provisions would logically seek to deter."  American Med. Sec., Inc. v. Larsen, 31 F. Supp. 2d 502, 507 (D. Md. 1998).  Additionally, as the Fourth Circuit has noted that "[w]here, as here, the degree of culpability was such as to constitute a breach of fiduciary duty . . . it is obvious that monetary sanctions may well operate to deter repetitions of the conduct."  Rodriguez, 956 F.2d at 472.  See also Shade, 1996 U.S. App. LEXIS 16703 at *13 (upholding an award of attorneys' fees on the grounds that the award "would deter other ERISA plan administrators from similar activities.")

The final two factors also plainly fall in favor of awarding attorneys' fees to the Plaintiffs. The Plaintiffs seek to have the Plan reimbursed for the damages caused by Defendants' conduct,

thereby "benefit[ing] all participants and beneficiaries of [this] ERISA plan." Mid Atl. Med.
Servs, 407 F.3d at 221. Finally, the relative merits of the parties' positions show that fees should
be granted because, for all of the reasons noted in this Memorandum, the "Defendants' position
has no merit at all." Essex v. Randall, No. DKC 2003-3276, 2005 U.S. Dist. LEXIS 3942, *27,
35 Employee Benefits Cas. (BNA) 1389 (D. Md. Mar. 15, 2005) (attached hereto as Ex. 50).

## XII. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs'
Motion for Partial Summary Judgment because Defendants breached their fiduciary duties in the
following ways: by failing to diversify the Plan's assets, thereby causing damage to the Plan and
plan participants in the amount of $432,960.62, plus interest, as damages for the three-year
period ending December 31, 2005; by improperly distributing Plan assets to contributing
employers of the Plan, thereby causing damages to the Plan and plan participants in the amount
of $335,224; and by failing to act prudently and in accordance with the governing plan
documents. Plaintiffs respectfully request that this Court further award Plaintiffs their attorneys'
fees and costs incurred in bringing this action to correct Defendants' egregious violations of
ERISA.

Respectfully submitted,

Dated: February 29, 2008

_____/s/_____
Jonathan G. Rose (MD Bar No. 15138)
Sheppard Mullin Richter & Hampton LLP
1300 I Street, NW, 11th Floor East
Washington, DC 20005
Telephone: (202) 772-5390
jrose@sheppardmullin.com
*Attorney for Plaintiffs*

50

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of February, 2008, I caused a copy of the foregoing

Plaintiff's Motion for Summary Judgment to be filed with the Court, via the Court's ECF system,

which will send copies to the following counsel of record:

> Peter R. Kolker, Esq.
> Zuckerman Spaeder LLP
> 1800 M Street, NW, Suite 1000
> Washington, D.C. 20036-5802

> John C. Hayes, Esq.
> Nixon Peabody LLP
> 401 Ninth Street, N.W., Suite 900
> Washington, D.C. 20004-2128

> _____/s/_____
> Jonathan G. Rose

51