# <u>EXHIBIT 1</u>

PLASTERERS' LOCAL UNION NO. 96
PENSION PLAN

PLASTERERS' LOCAL UNION NO. 96

PENSION PLAN

## TABLE OF CONTENTS

PAGE

ARTICLE   1   Definitions . . . . . . . . . . . . . . . . .   3

ARTICLE   2   Eligibility and Participation . . . . . . . . . . .   9

ARTICLE   3   Contributions . . . . . . . . . . . . . . . . .   10

ARTICLE   4   Valuation of Trust Fund and Allocation of
              Contributions, Forfeitures and Income . . . . . . .   11

ARTICLE   5   Limitations on Annual Additions . . . . . . . . . .   12

ARTICLE   6   Retirement Benefits . . . . . . . . . . . . . . .   14

ARTICLE   7   Retirement Dates . . . . . . . . . . . . . . . .   15

ARTICLE   8   Benefits Payable on Death . . . . . . . . . . . .   16

ARTICLE   9   Benefits Payable Upon Termination of
              Employment . . . . . . . . . . . . . . . . . . .   18

ARTICLE   10   Regulations Governing Distribution
               of Benefits . . . . . . . . . . . . . . . . .   19

ARTICLE   11   Administration of the Plan . . . . . . . . . . .   25

ARTICLE   12   Amendment and Termination . . . . . . . . . . .   27

ARTICLE   13   General Provisions . . . . . . . . . . . . . . .   29

PLASTERERS' LOCAL UNION NO. 96

PENSION PLAN

Article 1

DEFINITIONS

The following words and phrases when used throughout this Plan shall have the following meanings:

1.1  "Account" shall mean the interest of a Participant in the Trust Fund.

1.2  "Accrued Benefit" shall mean the balance in a Participant's Account as determined in accordance with this Plan.

1.3  "Actuarial Equivalent" shall mean having or that which has equal actuarial value based on the assumptions and factors described in Schedule A.

1.4  "Age" shall mean age at the last birthday.

1.5  "Beneficiary" shall mean the person or persons designated by a Participant or who is otherwise entitled to receive benefits in the event of the death of such Participant, as provided in this Plan.

(a) "One-Year Break in Service." An Employee shall be deemed to have a One-Year Break in Service with respect to any Plan Computation Period if he does not complete more than 500 Hours of Service during such Computation Period.

(i) If an employee would suffer a Break-in-Service due to disability, military service, or employment by federal or District of Columbia government, he will be deemed to have met the minimum 500 of hours service during that calendar year if he would have qualified for the 500 hours had the period of disability, military service or federal or District of Columbia government employment been spent working for employer.

(b) "Multi-Year Break in Service." An Employee shall be deemed to have a Multi-Year Break in Service with respect to any Plan Computation Period if the number of the Employee's consecutive One-Year Breaks in Service equals or exceeds the greater of five (5) or the aggregate number of the Employee's years of service before such Period.

- 3 -

1.7  "Code" shall mean the Internal Revenue Code of 1986 as amended from time to time.

1.8  "Collective Bargaining Agreement" shall mean the written agreement entered into on the 1st day of April, 1958, between the Union and The Employing Plasterers' Association Incorporated of the District of Columbia, providing for the establishment of this Plan, or any extension or extensions thereof, and any similar or future agreement entered into in writing between the Union and an Employer or a group of Employers, providing for payment by the individual Employer for hours worked by his Employees into this Plan.

1.9  "Covered Employment" shall mean employment by an Employer at an employment for which the Employer has agreed with the Union to contribute to the Plan or employment by the Union, for which contributions are made to the Plan.

1.10  "Effective Date"  shall mean January 1, 1987.

1.11  "Employee" shall mean an employee in covered Employment or working for the Union.

1.12  "Employer" shall mean each employer member of The Employing Plasterers' Association, Incorporated of the District of Columbia and each individual employer who has presently in force, or who hereafter executes a collective bargaining agreement with the Union, the terms and conditions of which are similar to those contained in the Agreement in force between the Union and the Association.

1.13  "Employment Commencement Date" shall mean the date on which an Employee first performs an Hour of Service.  With respect to an Employee who has incurred a Multi-Year Break in Service, it shall mean the first day on which he is entitled to be credited with an Hour of Service after the Plan Computation Period in which he has incurred a Multi-Year Break in Service.

1.14  "Hour of Service" shall mean:

0103

(a) Each hour for which an Employee is paid or entitled to payment for the performance of duties for the Employer during the applicable Computation Period.

(b) Each hour for which an Employee is paid or entitle to payment during any single Computation Period:

(i) No more than 501 Hours of Service shall be credited to an employee on account of any single continuous period during which the Employee performs no duties during a period of disability, military service or employment with the federal or District of Columbia government whether or not such period occurs in a single Computation Period.

(ii) No Hours of Service shall be credited with respect to payment to an Employee made or due under a plan maintained solely for the purpose of complying with applicable worker's compensation, unemployment compensation or disability insurance law, or with respect to a payment which solely reimburses an Employee for medically related expenses incurred by the Employee.

(iii) For purposes of this provision, a payment shall be deemed to be made by or from the Employer regardless of whether such payment is made by or due from the Employer directly, or indirectly through, among others, a trust fund or insurer to which Employer contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer or other entity are for the benefit of particular Employees or are on behalf of a group of Employees in the aggregate.

(c) Each Hour of Service for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by Employer, excluding, however, any such hour credited to an Employee pursuant to the other provisions of this section.    These hours shall be credited to the Employee for the Computation Period or Periods to which the award or agreement pertains rather than the Computation Period in which the award, agreement or payment is made. Crediting of hours under this subsection with respect to periods described in subsection (b) above shall be subject to the limitations described therein.

(d) For purposes of determining if an Employee has incurred a One-Year Break in Service, the Plan shall take into account up to 501 Hours of Service which would normally have been credited to such Employee except for an absence by reason of Maternity or Paternity Leave. Such Hours shall be credited to the Employee for the Plan Year in which such absence from work begins, if the Employee would be prevented from incurring a One-Year Break in Service in such year solely because Hour of Service credit is given for the period of absence; otherwise, such Hours shall be credited in the immediately following Plan Year. An Employee shall not be given Hour of Service credit for absence by reason of Maternity or Paternity Leave unless the Employee furnishes to the Plan Administrator timely information which is reasonably required to establish to the satisfaction of the Plan Administrator that the absence from work is by reason of Maternity or Paternity Leave and the number of days for which there was such an absence.

- 5 -

0104

(e) The Plan shall credit an Employee with Hours of Service pursuant to the foregoing provisions in accordance with Department of Labor Regulations #2530.200b-2 (b) and (c) as amended from time to time.

1.15 "Maternity or Paternity Leave" shall mean the absence of an Employee from work for any period;

(a) By reason of the pregnancy of the Employee,

(b) By reason of the birth of a child of the Employee,

(c) By reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or

(d) For the purposes of caring for such child for a period beginning immediately following such birth or placement.

1.16 "Participant" shall mean any person in receipt of or entitled to any benefits under this Plan.  The term Participant shall include all classifications as hereinafter defined.

(a) "Active Participant" shall mean any Employee included in the Plan as provided under Article 2.

(b) "Retired Participant" shall mean a Participant who has retired under any of the provisions of Article 7, but whose Account has not been fully distributed.

(c) "Vested Participant" shall mean a Participant who is entitled to a benefit under Article 9, and whose Account has not been fully distributed.

1.17 "Plan" shall mean Operative Plasterers' Local Union No. 96 Pension Plan described herein, as from time to time supplemented and amended.

1.18 "Plan Administrator."  The Board of Trustees of the Operative Plasterers' Local Union No. 96 Pension Fund is hereby designated "Plan Administrator" for purposes of applicable federal law.

1.19 "Plan Year" shall mean a period of twelve (12) months commencing on any January 1st and ending on the next December 31st.

- 6 -

1.20  "_Service_" for the purposes of eligibility to participate, shall mean the period of any Employee's employment during the respective Computation Periods.

1.21  "_Surviving Spouse._" A Participant's surviving spouse shall mean the individual who was legally married to the Participant on the date of the Participant's death. A former spouse shall be treated as the Participant's spouse or surviving spouse to the extent provided under a qualified domestic relations order as described in Code Section 414(p).

1.22  "_Total and Permanent Disability_" shall mean, for an Employee, a disability adjudged by the Plan Administrator on the basis of medical evidence,

   (a) That causes the Employee to be totally disabled by boldily injury or disease, so as to be prevented thereby from engaging in any occupation or employment for remuneration of profit as a result of such bodily injury or disease, either occupational or nonoccupational in cause, but excluding disability incurred while in the service of the Armed Forces of any country, and

   (b) That such disability will be permanent and continuous during the remainder of his life, provided, however, that no Employee shall be deemed to be totally and permanently disabled for the purpose of the Plan if his incapacity consists of chronic alcoholism or addiction to narcotics, or if such capacity was contracted, suffered or incurred while he was engaged in a felonious enterprise or resulted therefrom, or resulted from an intentionally self-inflicted injury.

1.23  "_Trust Agreement_" shall mean the instrument executed by Employer and Operative Plasterers' Union No. 96 fixing the rights and liabilities of each with respect to holding and administering the Trust Fund for the purposes of the Plan.

1.24  "_Trustee_" shall mean the Trustee, Trustees, or Successor Trustee, appointed by the Employing Plasterers' Association of D.C. and, the Operative Plasterers' Union No. 96, acting at any time under the terms of the Trust Agreement.

1.25  "_Trust Fund_" shall mean all funds and assets held or invested in common at any time by Trustee under the terms of the Trust Agreement.

1.26  "_Union_" shall mean Operative Plasterers' Local Union No. 96 of Washington, D.C., affiliated with The Operative Plasterers' and Cement Masons' International Association of the United States and Canada.

0106

1.27 "<u>Valuation Date</u>" shall mean:

    (a) The last day of each calendar year,

    (b) The effective date of the resignation or removal of a Trustee.

1.28 "<u>Year of Service</u>" shall mean a twelve consecutive month period, beginning with January 1, during which the employee is credited with 1,000 or more Hours of Service.  An Employee who is not credited with 1,000 or more Hours of Service during his initial 12 months of employment shall complete a Year of Service as of the end of any Plan Year in which he is credited with 1,000 or more Hours of Service.

0107

# ARTICLE 2

## ELIGIBILITY AND PARTICIPATION

2.1   (a) Each Employee who is in Covered Employment is eligible to become an Active Participant of the Plan as of such date.

2.2   An Employee's active participation in this Plan shall terminate in the event he incurs a One-Year Break in Service.  If a former Participant returns to the service of Employer, he shall become an Active Participant upon the completion of One Hour of Service after his return to service.

2.3   Plan Administrator shall notify in writing each Employee who is eligible to become an Active Participant, of the existence of the Plan, of its basic provisions as may be required by federal law, and of his eligibility to participate.  Any Employee eligible to become an Active Participant shall be provided with such forms for his execution as may be necessary to administer the Plan.  Each Employee who becomes an Active Participant shall, if requested to do so by Employer, execute a written statement on a form or forms to be furnished by the Employer on which he shall evidence his designation of Beneficiary or Beneficiaries, and his consent to be bound by the terms and provisions of the Plan.

0108

## ARTICLE 3

### CONTRIBUTIONS

3.1    For each Participant, Employer shall contribute to the Trust Fund, at the end of each month, an amount specified in the Collective Bargaining Agreement multiplied by the Hours of Service performed by the Participant in that month.

In no event shall Employer's contributions with regard to any Plan Year exceed the total of the maximum amount which will constitute an allowable deduction under the Code or any similar law limiting allowable deductions for Federal Income Tax purposes.

3.2    Employer shall pay to Trustee its contributions on account of each month not later than the time prescribed by the Collective Bargaining Agreement. All contributions shall be remitted to the Trustee by the Employer and shall be accompanied by written instructions from Employer specifying the Participant to whose accounts the contributions are to be credited, the amounts contributed by the Employer, and any other relevant information required by the Trustee.

3.3    So long as this Plan remains in effect, except as otherwise stated in the Plan, the Trust Fund shall pay all administration expenses of the Plan, including the compensation of Trustee, custodians, investment advisors, auditors, counsel and paid plan administrator.

3.4    The accrued benefits of all participants of the Plasterers' Local Union No. 96 Defined Benefit Pension Plan shall become 100% vested and annuitized as of December 31, 1986.   All such annuitized benefits shall be transferred to individual accounts for the Participants under this Plan as of December 31, 1986. All expenses relating to such transfer shall be paid from the Trust, to the extent permitted by law.

0109

## ARTICLE 4

## VALUATION OF TRUST FUND AND ALLOCATION OF CONTRIBUTIONS, FORFEITURES AND INCOME

4.1   The Plan Administrator shall have the power to establish and maintain a separate Account in the name of each Active Participant.

4.2   However, no allocation of contributions shall be made to the Account of any Active Participant to the extent that such allocation exceeds the limit on contributions and other additions set forth in Article 5 of this Plan.

4.3   The amounts available in all Accounts shall constitute the Trust Fund and shall be invested and administered as a unit.

4.4   The fair market value of the Trust Fund shall be determined by the Trustee on each Valuation Date.

4.5   The part of a Participant's Account held in each investment category of the Trust Fund shall be adjusted as of each Valuation Date by allocating to each such part an amount of gain or loss which bears the same proportion that the value of such part bore to the value of all such parts at the end of the immediately preceding Valuation Date.  All adjustments under this Section shall be deemed to have been made on the Valuation Date to which they are related, although actually determined on some later date.

4.6   The Plan Administrator shall specify the manner in which contributions for Participants will be invested.

4.7   All forfeitures under the Plan shall be allocated to the accounts of the Participants.

- 11 -

0110

## ARTICLE 5

## LIMITATIONS ON ANNUAL ADDITIONS

5.1   _Defined Contribution Plan Limitations._   The "Annual Addition" to a Participant's Account for this Plan and any other defined contribution Plan maintained by an Employer or Affiliated Company shall not exceed the lesser of $30,000 (or such other specific dollar amount as the Commissioner of Internal Revenue Service may permit from time to time by subsequently promulgated regulations and rulings), or 25% of such Participant's compensation from Employer and such Affiliated Company for such Plan Year.

5.2   _Defined Benefit Plan/Defined Contribution Plan Limitation._   In the event that any Participant of this Plan is a participant under one or more defined benefit plans maintained by Employer or an Affiliated Company, then for any Plan Year, the sum of the Defined Benefit Plan Fraction and the Defined Contribution Plan Fraction for such Plan Year shall not exceed one (1).

5.3   _Application of Limitation._   If it is determined that, but for the foregoing limitation, the Annual Addition to a Participant's Account for any Plan Year would exceed the limitation, the benefit under the defined benefit Plan shall be reduced to the extent necessary to bring it within the limitation.

5.4   _Special Definitions._

(a)   "Annual Addition."   For the purpose of this limitation a Participant's "Annual Addition" to his Account shall mean the sum of:

(i)   Employer contributions to the Participant's Account made directly, or indirectly, plus,

(ii) Amounts allocated to an individual medical account (as defined in Code Section 415(1)) which is part of a defined benefit plan maintained by Employer, and

(iii) Amounts derived from contributions paid or accrued after December 31, 1985 in taxable years ending after such date, which are attributable to post-retirement medical benefits allocated to the separate account of a key employee as defined in Code Section 419A(d)(3), under a welfare benefit fund as defined in Code Section 419(e), maintained by Employer.

0111

(b) "Defined Benefit Plan Fraction." For purposes of this Plan, the Defined Benefit Plan Fraction for any Plan Year is a fraction, the numerator of which is the Participant's projected annual benefit, determined as of the close of the Plan Year, under the defined benefit plan and the denominator of which is the lesser of:

(i) The product of 1.25 multiplied by the dollar limitation in effect under Code Section 415(b)(1)(A) for such Plan Year, or

(ii) The product of 1.4 multiplied by one hundred percent (100%) of the Participant's average Compensation for the three (3) consecutive calendar years in which the Participant received the highest compensation while an Employee.

(c) "Defined Contribution Plan Fraction." For purposes of this Plan, the "Defined Contribution Plan Fraction" for any Plan Year is a fraction, the numerator of which is the sum of annual additions to the Participant's Accounts under the Plan, as of the close of such Plan Year and all prior Plan Years and the denominator of which is the sum of the lesser for each Plan Year of the following amounts determined for such Plan Year and each prior Plan Year in which the Participant participated in this Plan:

(i) The product of 1.25 multiplied by the dollar limits under Code Section 415(c)(1)(A) applicable for such Plan Year, or

(ii) Thirty-five percent (35%) of the Participant's Compensation for such Plan Year.

(d) "Projected Annual Benefit." For purposes of this Plan, a Participant's Projected Annual Benefit means an amount equal to the annual benefit to which the Participant would be entitled under the terms of the defined benefit plan in which the Participant is a participant assuming that the Participant continues participation until the Participant's normal retirement age, that the Participant's Compensation continues at the same rate as that in the Plan Year in consideration, until the Participant attains normal retirement age and that all relevant factors used to determine benefits under such plan remain constant. Projected Annual Benefit is a benefit expressed in the form of either a single life annuity or a qualified joint and survivor annuity disregarding any ancillary benefits or benefits attributable to a rollover contribution.

In addition to other limitations set forth in the Plan, and notwithstanding any other provisions of the Plan, the benefits under this Plan shall not exceed the amounts permitted under Section 415 of the Code at any time. For purposes of this paragraph and determining compliance with Section 415 of the Code, Compensation shall mean compensation as determined in Section 415(b)(3) of the Code and the regulation thereunder.

# ARTICLE 6

## RETIREMENT BENEFITS

6.1   Upon a Participant's Normal Retirement Date, Early Retirement Date, Deferred Retirement Date or Disability Retirement Date (as described in Article 7), one hundred percent (100%) of the fair market value of the Participant's Accounts as determined in accordance with Section 4.4 shall be distributed as a retirement benefit, subject to the terms and conditions set forth in Article 10.

0113

## ARTICLE 7

### RETIREMENT DATES

7.1   Wherever in this Plan reference is made to a retirement date, it shall mean the Normal Early, Deferred, or Disability Retirement Date, whichever is the one that applies to the individual involved.

7.2   <u>Normal Retirement Date</u>. A Participant shall have the right to retire on the first of the month coincident with or the next following his sixty-fifth birthday. Such date shall be known as the Normal Retirement Date.

7.3   <u>Early Retirement Date</u>. A Participant may retire before Normal Retirement Date, but on or after the first day of the month coinciding with or next following the date on which he attains age sixty (60) and completes 6 years of service. The date of such retirement shall be known as the Early Retirement Date.

7.4   <u>Deferred Retirement Date</u>. An Active Participant, who continues in the active employ of Employer after his Normal Retirement Date, shall continue as an Active participant of this Plan until his actual retirement. The date of such retirement shall be known as the Deferred Retirement Date.

7.5   <u>Disability Retirement Date</u>. If an Active Participant suffers Total and Permanent Disability, attains age 50 and has at least 6 years of participation in the Plan, he shall be deemed to have retired on the date it was determined that he suffered such disability. The date of actual retirement under this provision shall be known as the Disability Retirement Date.

- 15 -

## ARTICLE 8

## BENEFITS PAYABLE ON DEATH

8.1   Any death benefit payable under this Article shall be paid following a Participant's death to the Participant's surviving spouse, if the Participant has a surviving spouse, unless the surviving spouse has consented to payment to another designated Beneficiary in writing, such consent acknowledges the effect of such election and is witnessed by a Plan representative or a notary public. Such written consent will not be required, if it is established to the satisfaction of the Plan Administrator that the consent may not be obtained because there is no spouse, because the spouse cannot be located, or because of other circumstances as may, by regulations, be prescribed by the Secretary of the Treasury from time to time.

8.2   Upon the death of an Active Participant prior to actual retirement, the death benefit payable by reason of his death shall be an amount equal to one hundred percent (100%) of such Participant's Accounts, valued in accordance with Article 4.   The entire interest of the Participant shall be paid in a lump sum within six months of the Participant's death, subject to the following restrictions.   First, if the amount which would be payable exceeds $3,500 and payment would be made before the Participant's Normal Retirement Date, the recipient must consent in writing to receive it.   If such consent is not given, the Plan Administrator shall maintain the account until the Participant would have reached his Normal Retirement Date and shall then distribute the Account. Second, the Plan Administrator may adopt uniform rules under which any of the following provisions may apply:

(a) If the distributions are to be made to or for the benefit of a designated Beneficiary, they may be made over such Beneficiary's life (or a period not extending beyond the Beneficiary's life expectancy) if distributions commence within six months after the Participant's death (or later, as permitted by regulations promulgated by the Secretary of the Treasury).

(b) If the distributions are to be made to the Participant's Surviving Spouse over the spouse's life (or a period not extending beyond the spouse's life expectancy) payment need not commence earlier than the date on which the Participant would have reached age 70 1/2 or one year after the Participant's death, if later.

0115

(c) If both the Participant and the Participant's spouse die prior to the commencement of payments, if the Surviving Spouse was the intended primary beneficiary, then distributions shall be made within six months of the spouse's death, unless the exception described at subparagraph (a) hereof is applicable, substituting "spouse" for "Participant."

8.3   Upon the death of a Participant prior to the complete distribution of his benefits, payment of benefits shall continue to the Participant's designated Beneficiary at a rate no less rapidly than the rate payments were being made to the Participant during his lifetime.

0116

## ARTICLE 9

### VESTING

A participant shall be vested in his Accrued Benefit in accordance with the following schedule:

| YEARS OF SERVICE | PERCENTAGE VESTED |
|---|---|
| Less than three (3) years | 0% |
| Three (3) but less than four (4) | 40% |
| Four (4) but less than five (5) | 60% |
| Five (5) but less than six (6) | 80% |
| Six (6) or more years | 100% |

Notwithstanding the foregoing, in the event of any amendment to the vesting schedule, each participant whose vested percentage of his accrued benefit derived from Employer contributions is determined under such schedule, and who has completed at least three (3) years of service, shall thereafter have said vested percentage determined with or without regard to such amendment, whichever is more favorable to him.- For this purpose, an individual shall qualify as a "Participant who has completed at least said three (3) years, as of any date within the following period:  (1) the period which commences with the date of adoption of said amendment, (2) effective date of said amendment, or (3) the date written notice of said amendment is issued to said Participant.  Said right of election shall apply only to an individual who is a Participant at the time of making the election and who has completed said three (3) years of service prior to the expiration of the election period.  Said election shall be irrevocable.

In addition, each Participant shall be credited with one year of service, for determining the vested percentage of his accrued benefit, for each year prior to January 1, 1987, in which Participant had one (1) year of service to the Employer.

0117

## ARTICLE 10

## REGULATIONS GOVERNING DISTRIBUTION OF BENEFITS

### 10.1   Claims for Benefits.

(a) The Plan Administrator shall make all determinations as to the right of any person to a benefit under the Plan.  The Plan Administrator shall decide within sixty (60) days after receiving the claim from a Participant or Beneficiary (hereinafter referred to as "Claimant"), or his duly authorized representative.  If the claim is denied in part or in full, a written notice of denial shall be sent to the Claimant and his duly authorized representative.

(b) The written notice shall set forth in a manner calculated to be understood by the Claimant:

(i) The specific reason or reasons for the denial;

(ii) Specific reference to pertinent Plan provisions on which the denial is based;

(iii) A description of any additional material or information necessary for the Claimant to perfect the claim, and an explanation of why such material or information is necessary; and

(iv) Explanation of the Plan's claim review procedure.

(c) If the notice of the denial of claim has not been furnished and the claim has not been granted within sixty (60) days after receipt by the Plan Administrator, the claim shall be deemed denied.

(d) Within sixty (60) days after the denial of a claim, the Claimant, or his duly authorized representative, may appeal in writing the denial of the claim to the Plan Administrator and request a review.  In connection with the review, the Claimant or his duly authorized representative, may review pertinent documents and may submit issues and comments in writing.

0118

(e) The Plan Administrator shall deliver to the Claimant the decision on review in writing to the Claimant and his duly authorized representative not later than sixty (60) days after the receipt of the request for such review, unless there are special circumstances (such as holding a hearing, if the Plan Administrator deems necessary), which require extensions of time for processing, in which case the decision shall be rendered as soon as possible, but not later than one hundred twenty (120) days after receipt of a request for a review. The written decision shall include specific reasons for the decision, written in a manner calculated to be understood by the Claimant, and specific references to the pertinent Plan provisions on which the decision is based.

10.2  <u>Commencement of Payment</u>. The following provisions shall be applicable for determining when the distribution of benefits shall be made:

(a) Unless a Participant shall otherwise elect, the payment of Normal Retirement Benefits under this Plan to the Participant shall begin not later than the 60th day after the close of the Plan Year in which the latest of the following occurs:

1. The date on which the Participant attains the age of 65,

2. The date of such Participant's retirement under the Early Retirement provisions of this Plan, or

3. The date such Participant terminates his service with Employer or membership in the Union.

(b) In the event of a Participant's early retirement, distribution of his benefits shall commence as soon as administratively feasible after his Early Retirement Date, unless he elects in writing at least 30 days prior to his early retirement, subject to the approval of the Plan Administrator, to defer payment of his benefits until his Normal Retirement Date.

(c) In the event of death of a Participant, payment of benefits shall commence as soon thereafter as administratively possible.

(d) In the event of the disability retirement of a Participant, the payment of benefits shall commence as soon as administratively feasible after his Disability Retirement Date unless he elects a later payment date with the consent of the Plan Administrator.

(e) If a Participant terminates employment for reasons other than disability, retirement or death, the payment of benefits shall commence as soon as administratively feasible after his Normal Retirement Date, unless the Participant elects a different payment date with the consent of the Plan, Administrator.

10.3  Distributions.  Payment of benefits to any Participant must commence not later than the first day of April following the calendar year in which occurs the later of the Participant's termination of employment or attainment of age 70 1/2.

10.4  Normal Form of Benefit.

(a) The normal form of benefit for a Participant who has a Spouse shall be an Actuarial Equivalent joint and survivor annuity, with monthly installments payable after the death of the Participant to the Spouse, if then living, for the life of such Spouse in an amount equal to fifty percent (50%) of the benefit paid to the retired Employee.

(b) In the case of retirement where the Participant has no Spouse, the normal form of benefit shall be a single life annuity with equal monthly installments payable to the Participant during his lifetime with 36 payments guaranteed.

10.5  Optional Form of Benefits.  In lieu of the normal form of benefit as determined under Section 10.4, the Participant may elect, one of the following Actuarial Equivalent optional forms of benefit:

(a) single life annuity payable in equal monthly installments to the retired Participant for his life, with 120 monthly payments guaranteed; or

(b) a single sum payment in lieu of any other benefits under the Plan in complete discharge of all obligations to the Participant under the Plan.

10.6  Rules for Election of Optional Benefits.  The following rules shall be uniformly and nondiscriminatorily applied with respect to the election of optional forms of benefits by filing written notice in the form and manner prescribed by the Plan Administrator.

(a) A Participant may elect an optional form of benefit at any time during the period commencing 90 days prior to the first day of the calendar month for which benefits are first payable to the Participant and terminating on such benefit commencement date. If a Participant notifies the Plan Administrator less

- 21 -

than 90 days prior to the first day of the month for which his benefit payments would commence of his intent to terminate employment, the election period will end on the lapse of the full 90-day period commencing with such notice, and benefit payments will commence on the first day of the month coincident with or next following the lapse of such election period with benefit payments made retroactive to the first day of the month coincident with or next following the announced retirement of the Participant.

(b) A Participant who has a Spouse may elect to receive an optional form of benefit only if (1) the Spouse consents in writing not to receive the normal form of benefit, (2) such consent acknowledges its own effect, and (3) such consent is witnessed by a Plan representative or a notary public.  A Participant is not required to comply with the above steps if he establishes to the satisfaction of a Plan representative that he either has no Spouse or that his Spouse cannot be located.

(c) The Participant shall have the right to revoke his waiver of the automatic payment of benefits in the form of a joint and survivor annuity.  Such revocation may be made at any time prior to the Participant's annuity starting date.

(d) In the event of the death of the Participant's Spouse or other designated beneficiary prior to the first day of the month for which a Participant's benefit payments are scheduled to commence, but after an election of a joint and survivor annuity has been made hereunder, the election shall be automatically revoked.

10.7  Explanations to Participants.  The Plan Administrator shall provide to each Participant within a reasonable period of time before his benefits are to commence a written explanation of:

(a) the terms and conditions of the normal form of benefit;

(b) the Participant's right to waive the normal form of benefit and the effect of such waiver;

(c) the rights of the Participant's Spouse with respect to such waiver; and

(d) the right to revoke an election to receive an optional form of benefit and the effect of such revocation.

0121

10.8 <u>Termination of Benefits</u>.  The last benefit payment hereunder shall be made for the month in which occurs:

(a) in the case of a Surviving Spouse's benefit or a joint and survivor benefit, the later of the death of the Participant and the Spouse or, if applicable, the designated beneficiary of such Participant; or

(b) in the case of a single life annuity with 36 or 120 monthly guaranteed payments, the later of the death of the Participant or the lapse of the 36 or 120 monthly guaranteed payments; or

(c) in the case of a single sum payment, the distribution of such benefit payment.

10.9 <u>Beneficiary Designation</u>.

(a) The designation of a beneficiary under a joint and survivor annuity shall be fixed and may not be changed on or after benefit payments commence.

(b) The designation of a beneficiary to receive any remainder of a guaranteed number of payments may be made or changed until the date on which the guaranteed period has expired.

(c) Subject to Subsections (a) and (b) and to the provisions set forth above relating to the rights of Spouses to survivor benefit payments, each Participant shall have the right at any time to designate or to change the previous designation of the beneficiary or beneficiaries who shall receive benefits, if any, after his death by executing and filing with the Plan Administrator a form prescribed by the Plan Administrator.  No designation, revocation or change of beneficiaries shall be valid and effective unless and until filed with the Plan Administrator.  If no designation is made, or if all of the beneficiaries named in such designation predecease the Participant or, cannot be located by the Plan Administrator, the interest, if any, of the deceased Participant shall be paid to the surviving relatives of the Participant in the first surviving class in the schedule, set forth as follows:

(1)  spouse,
(2)  lineal descendants (including stepchildren and adopted persons) per stirpes,
(3)  parents equally,
(4)  the Participant's estate.

- 23 -

0122

10.10 <u>Mailing Address</u>.  Benefit payments and notifications hereunder shall be deemed made when mailed to the last address furnished to the Plan Administrator.

10.11 <u>Deferral of Payment</u>.  Where it is determined that the commencement of distribution of benefits to a Participant or his Beneficiary is to be deferred for one 1) month or more from the date of the event giving rise to the payment of benefits, the Plan Administrator may segregate from the Trust Fund cash or property, equal to the value of the Participant's Account which shall be invested separately or deposited in an interest-bearing bank account.  The value of such segregated account, increased by any income, or decreased by any losses, shall be distributed to the Participant for whose benefit such account is being held in the manner provided in this Section for the distribution of benefits.  Such segregated account shall not share in gains or losses of the Trust Fund.  Except to the extent of such a segregation, the Participant's Account shall continue to be valued in the same manner as if he were still an Active Participant.

10.12 <u>Non-Alienation of Benefits</u>.  Benefits under this Plan shall not be subject in any way to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any action by way of anticipating, alienating, selling, transferring, assigning, pledging, encumbering, or charging the same shall be void and of no effect; nor shall any such benefit be in any manner subject to the debts, contracts or liabilities of the person entitled to such benefit.  However, this provision shall not apply to a qualified domestic relations order as described in Section 414(p) of the Code.  In the event that any Participant's benefits are garnished or attached by order of any court, the Trustees may bring an action for a declaratory judgment in a court of competent jurisdiction to determine the proper recipient of the benefits to be paid hereunder.  During the pendency of said action, any benefits which became payable shall be paid into the court as they become payable to be distributed by the court to the proper recipient as determined by the final action of said court.

10.13 <u>Termination of Liability</u>.  After all benefits have been paid in full to the Participant or to his designated Beneficiary, all liability to the Participant or to his Beneficiary shall cease.

10.14 <u>Incapacity</u>.  If any person entitled to receive any benefits hereunder is, in the judgment of a court of competent jurisdiction, legally, physically, or mentally incapable of personally receiving and receipting for any distribution, the Plan Administrator should make distribution to such other person, or institutions that have been appointed as guardian by a court of competent jurisdiction.

10.15 <u>The Plan Administrator's Determination</u>.  The determination of the Plan Administrator as to the identity of the proper payee of any benefit under this Plan, and the amount properly payable, shall be conclusive, and payment in accordance with such determination shall constitute a complete discharge of all obligations on account thereof.

10.16 <u>Uniform Application</u>.  The provisions of this Article 11, shall be applied in a uniform and consistent manner under like circumstances as to all participants in this Plan.

- 24 -

0123

<u>ARTICLE 11</u>

<u>ADMINISTRATION OF THE PLAN</u>

11.1  Plan Administrator.

(a) The Plan Administrator is the designated agent for service of process pursuant to applicable federal law. The administration of the Plan shall be the responsibility of said Plan Administrator.

(b) The Plan Administrator may at any time or from time to time delegate to a named fiduciary or fiduciaries all or any part of its responsibilities, obligations, duties or powers set forth herein and it may alter, amend or revoke any such delegation at its discretion. The Plan Administrator shall not be liable for any act or omission of any such named fiduciary in carrying out the duties or powers so delegated, except as may be required by federal law. Any delegation of duties or powers shall be evidenced by a document in writing which shall be filed with the records of the Plan.

(c) The Plan Administrator may appoint a qualified Investment Manager to manage, acquire, or dispose of any asset of the Plan. To be qualified, the Investment Manager must be registered as an investment advisor under the Investment Advisors Act of 1940; or, be a bank, as defined in the Act; or, be an insurance company qualified to perform the services of such Investment Manager under the laws of more than one state. In addition, such Investment Manager must acknowledge in writing that he is a fiduciary with respect to the Plan. The Investment Manager shall serve at the pleasure of the Plan Administrator, but may resign by written notice to the Administrator.

11.2  <u>Trust Agreement</u>.  Employing Plasters' Association of D.C. and Local Plasters' Union No. 96 shall enter into a Trust Agreement for the management of the trust funds forming a part of this Plan.

11.3  <u>Assignment of Administrative Authority</u>.  The Employing Plasterers' Association of D.C. and the Local Plasterers' Union No. 96 shall appoint a Plan Administrator to administer the Plan.



11.4  <u>Powers and Duties of Plan Administrator</u>.  The Plan Administrator shall administer the Plan in accordance with its terms and shall have all powers necessary to carry out the provisions of the Plan.  The Plan Administrator shall interpret the plan and shall determine all questions arising in the administration, interpretation, and application of the Plan, and it shall endeavor to act, whether by general rules or by particular decisions, so as not to discriminate in favor of any person.   Any such determination by the Plan Administrator shall be conclusive and binding on all persons.

11.5  <u>Operation of Plan Administrator</u>.

(a)  The Plan Administrator may appoint such accountants, counsel, specialist, paid plan administrator and other persons as the Plan Administrator deems necessary or desirable in connection with the administration of this Plan. The Plan Administrator shall be entitled to rely conclusively upon, and shall be fully protected in any action taken by it in good faith in relying upon any opinions or reports which shall be furnished to it by such accountant, counsel, or other specialists.

11.6  <u>Records and Reports</u>.  The Plan Administrator shall keep all books of accounts, records, and other data as may be necessary for proper administration of the Plan.  The Plan Administrator shall make its records available to Employing Plasterers' Association of D.C., Local Plasterers' Union No. 96 or any Participant for examination during business hours, except that a Participant shall examine only such records as pertain exclusively to the examining Participant and the Plan and Trust Agreement as currently in effect or hereafter amended.

11.7  <u>Required Information</u>.  Employing Plasterers' Association of D.C., and Local Plasterers' Union No. 96, the Participants, and any beneficiary shall furnish to the Plan Administrator any information or proof requested by the Plan Administrator and reasonably required to administer the Plan.

11.8  <u>Payment of Expenses</u>.  Except as otherwise required by law, the Plan Administrator shall serve without bond and without compensation for services as such, but all expenses of the Plan Administrator shall be paid by the Trust Fund.

11.9  <u>Dual Capacity</u>.  An individual or corporation may serve in more than one fiduciary capacity.

0125

## ARTICLE 12

## AMENDMENT AND TERMINATION

12.1  This Plan may be wholly or partially amended or otherwise modified by the Employing Plasterers' Association of D.C. and  Plasterers' Local Union No. 96 to the extent permitted under the Collective Bargaining Agreement, however, provided that:

(a) any such amendment or modification shall not authorize or permit any part of the Trust Fund (other than such part as is required to pay administration expenses) to be used for or diverted to purposes other than for the exclusive benefit of the Participants or their Beneficiaries or estates;

(b) any such amendment or modification shall not have any retroactive effect so as to cause any reduction in the amount theretofore credited to any Participant, or deprive any Participant of any rights which have vested in him prior to such amendment or diminish his Account or Accrued Benefit, or cause or permit any portion of the Trust fund to revert to or become the property of Employer, except that any amendment may be retroactive which is necessary to bring the Plan into conformity with governmental rules and regulations in order to qualify the Plan and Trust for Federal income tax purposes; and

(c) any such amendment or modification which increases the duties or liabilities of the Plan Administrator may not be made without written consent of the parties so affected.

12.2  Upon termination or partial termination of the Plan, the rights of all affected employees shall be fully vested.

12.3  In the event Employer contributions are discontinued, all of the assets on hand in the Trust Fund shall continue to be held by the Plan Administrator, who shall retain their rights and duties.  The interest of each Participant in the Trust Fund shall become fully vested on the date of discontinuance and shall not thereafter be subject to forfeiture.

12.4  In the event the Plan and Trust are terminated, the last day of the month immediately following termination shall be deemed a Valuation Date.  Plan Administrator shall, as soon as administratively possible, pay, assign and transfer to each member the balance of his Account, which is to be distributed in accordance with Article 10.

0126

12.5  In no event shall the assets of this Plan be merged, consolidated or transferred to any other plan, unless such plan provides that if it is terminated immediately after such merger, consolidation or transfer, each Participant of this Plan shall be entitled to receive a benefit which is at least equal to the benefit the Participant would have been entitled to receive immediately before the merger or consolidation, if this Plan had then terminated.

0127

## ARTICLE 13

### GENERAL PROVISIONS

13.1 **Exclusiveness of Benefits**.   This Plan has been created for the exclusive benefit of the Participants hereunder and Beneficiaries.   Except as provided in this Section, no part of the Trust Fund shall ever revert to, or be used by Employer, nor shall the Trust Fund ever be used other than for the exclusive benefit of the Participants or their Beneficiaries and for the administrative expenses of this Plan.

(a) In the event Employer makes a contribution to the Trust Fund as a result of a mistake of fact, such contribution shall be returned to Employer within one year after it was made, upon Employer's written request to the Trustee.

(b) In the event this Plan is not initially approved and qualified by the Internal Revenue Service, so as to permit Employers to deduct their contributions to the Trust Fund for federal income tax purposes, all of Employers' contributions to the Trust Fund shall be returned to Employers within one year after the date of denial of qualification of the Plan, upon Employers' written request to the Plan Administrator.

(c) In the event that a deduction for federal income tax purposes taken by Employers with respect to any contribution to the Trust Fund is disallowed, in whole or in part, the contribution, to the extent disallowed, shall be returned to Employers within one year after the disallowance of the deduction, upon Employers' written request to the Trustee.

13.2 **Limitation of Rights**.  Neither the establishment of this Plan, nor any modification hereof, nor the creation of any fund, trust or account, nor the payment of any benefits shall be construed as giving any Participant or Employee, or any person whomsoever, any legal or equitable right against Employers, Plan Administrator or Local Plasterers' Union No. 96 unless such right shall be specifically provided for in the Plan or conferred by affirmative action of the Plan Administrator in accordance with the terms and provisions of the Plan.

13.3 **Title to Assets**.  No Participant or Beneficiary shall have a legal or equitable right or interest in the funds set aside, or otherwise received or held under the Plan, or in any assets of the Trust Fund, except as expressly provided in the plan, and no Participant shall be deemed to possess a right to share in any assets except as herein provided.

0128

13.4  <u>Construction of Terms</u>.  The masculine pronoun whenever used shall include the feminine and the singular shall include the plural.

13.5  <u>Incorrect Age</u>.  In the event that a Participant's birth is proven to have occurred on a date earlier than the date originally stated by the Participant at the time of entry into the Plan, the amount of said Participant's benefit shall be adjusted on the basis of the correct information, and the amount of any over-payment of benefits made to said Participant shall be deducted from any succeeding payments as the Committee shall elect.

13.6  <u>Severability</u>.  Should any provision of this Plan or the rules and regulations adopted hereunder be deemed or held to be lawful or invalid for any reason, such fact shall not adversely affect the remaining provisions herein or therein contained unless such invalidity shall render impossible or impractical the functioning of this plan, and in such case, the appropriate parties shall immediately adopt a new provision to take the place of the illegal or invalid provision.

13.7  <u>Titles and Headings</u>.  The titles and headings of the sections in this instrument are placed herein for convenience of reference only and in case of any conflict, the text of this instrument, rather than such titles or headings shall control.

Dated:   JAN 27 1989

EMPLOYING PLASTERERS ASSN. OF D.C.     PLASTERERS' LOCAL UNION NO. 96

By: _____          By: _____

Attest: _____          Attest: _____

By: _____          By: _____

Attest: _____          Attest: _____

By: _____          By: _____

Attest: _____          Attest: _____

- 30 -

0129

# EXHIBIT 2

1

1    IN THE UNITED STATES DISTRICT COURT

2    DISTRICT OF MARYLAND

3    - - - - - - - - - - - - - - - - - - - - - - - - - - :

4    PLASTERERS' LOCAL UNION NO. 96    :    **ORIGINAL**

5    PENSION PLAN, et al.,    :

6    Plaintiffs    :    Civil Action No.

7    v.    :    PJM 06 CV 338

8    HAROLD PERRY, et al.,    :

9    Defendants    :

10   - - - - - - - - - - - - - - - - - - - - - - - - - - :

11

12   Deposition of HARRY C. PERRY, JR.

13   Washington, D.C.

14   Tuesday, August 7, 2007

15   10:05 a.m.

16

17

18

19

20   Job No.:  1-108813

21   Pages  1 - 445

22   Reported By:  Susan B. Fillmore, R.P.R.


L.A.D.
REPORTING &

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

12

1    A    I was.

2    Q    -- in the evening?

3    A    In the evening.

4    Q    Okay.  And did you continue -- I'm sorry.

5  After graduating Ben Franklin University, where did

6  you work?

7    A    Still with Harry L. Malin.

8    Q    Okay.  With a raise?

9    A    I hope.

10   Q    What was your title at that point?

11   A    Senior accountant.

12   Q    And how many people were in the office?

13   A    At one time it was about ten.

14   Q    Okay.  When did you become the

15  administrator to the Plasterers' --

16   A    19- --

17   Q    Let me finish the question so we have a

18  record that looks clear.  When did you first become

19  administrator to the Plasterers' funds?

20   A    I believe it was in 1973.

21   Q    1973?

22   A    I think so; I think that was it.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

16

1    changed.

2         A    Still stayed the same.  It was called

3    Malin, Dery and Perry.

4         Q    And when did that change?

5         A    When Mr. Dery died.

6         Q    Okay, and when was that?

7         A    You got me.  Sometime after.

8         Q    After Mr. Malin?

9         A    Yeah.  Sometime in, probably, late '70s.

10        Q    Okay.  So you took over in 1973 the full

11   administrator role?

12        A    To the best of my recollection.

13        Q    Okay.  And who assisted you with respect

14   to the administrative responsibilities?

15        A    Lee Wagner.

16        Q    So Ms. Lee Wagner was working for you in

17   1973.

18        A    I believe she was, yeah.  I'm not sure.  I

19   think she -- yeah, she came here in the '60s.

20        Q    And Ms. Wagner still works for you today,

21   correct?

22        A    Yes.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

19

1    '60s --

2         A    None.

3         Q    -- as associate administrator?

4         A    (Witness shakes head.)

5         Q    Did you ever get any specific training in

6    order to be able to perform the plan administration

7    responsibilities?

8         A    No.

9         Q    And that was true after you became the

10   administrator after Mr. Malin passed away?

11        A    That's true.

12        Q    Well, in 1974 there was a law that was

13   passed called the Employee Retirement Income

14   Security Act of 1974.  Were you aware of its

15   passage?

16        A    Not really.  I don't recall any particular

17   involvement.

18        Q    What do you mean by involvement?

19        A    Knowing about it.

20        Q    Okay.  Do you recall a time that you did

21   become aware that -- and I'm going to refer to it

22   now as ERISA -- that ERISA was enacted and imposed

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

20

1   certain requirements with respect to the

2   administration?

3       A    No, it never had anything to do with my

4   responsibilities.

5       Q    It was your understanding -- I'm sorry --

6   it was your understanding that ERISA had nothing to

7   do with your responsibilities?

8       A    It was my understanding I had nothing to

9   do with ERISA.  That was a legal matter, if

10  anything, not an accounting matter.

11      Q    Is that still your understanding today, as

12  you sit here today?

13      A    Yes, my position is still the same.

14      Q    Your belief is the same, that ERISA has

15  nothing to do with the plan administration

16  responsibilities?

17      A    Not during my tenure.

18           MR. KOLKER:  Objection to form.

19  BY MR. ROSE:

20      Q    He's objected.  You can answer.

21      A    Pardon?

22      Q    Would you like the question reread?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

21

1          (The record was reread as follows:

2          "Question:  Your belief is the same, that

3          ERISA has nothing to do with the plan

4          administration responsibilities?")

5    A   I was not aware that I was responsible for

6  ERISA during that period or any period since then.

7  BY MR. ROSE:

8    Q   When you say responsible for ERISA, what

9  do you mean?  I mean, you're not responsible for the

10  passage of it.  That was Congress.  You're not

11  responsible for issuing regulations.  That's the

12  Department of Labor, IRS's and PBGC's

13  responsibility.

14          What do you mean, that it --

15          MR. ROSE:  I'm sorry, what was his

16  response?

17          (The record was read as follows:

18          "Answer:  I was not aware that I was

19          responsible for ERISA during that

20          period or any period since then.")

21  BY MR. ROSE:

22    Q   What did you mean when you said you were

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

27

1      Q    Every three months, there was supposed to

2  be a trustee meeting.

3      A    Uh-huh.

4      Q    And did that ever change?

5      A    No.

6      Q    So as long as you were administrator, from

7  1973 through, roughly, the summer of 2005, the

8  trustees were supposed to meet every three months.

9  That's your understanding.

10     A    (Witness nods head.)

11     Q    And did they?

12     A    They didn't.

13     Q    And what did you do to see that the

14 trustees complied with that responsibility?

15     A    We only addressed requests for them to

16 meet.

17     Q    Is that what you felt your role was, to

18 simply request that they meet?

19     A    No, that's not what the trustees' trust

20 says, but that's the way it was.

21     Q    Are you aware that an administrator is

22 required to administer a fund in accordance with its

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

28

1   governing documents?

2           MR. KOLKER:  Objection to form.

3           THE WITNESS:  Yeah.

4   BY MR. ROSE:

5       Q    You can answer.  Would you like it reread?

6       A    Am I aware?

7           MR. ROSE:  Reread the question, please.

8           (The record was read as follows:

9           "Question:  Are you aware that an

10          administrator is required to administer a

11          fund in accordance with its governing

12          documents?")

13      A    Yes, but the trustees weren't amenable.

14  BY MR. ROSE:

15      Q    Well, what did you do to notify them of

16  their requirement to meet under the trust agreement?

17      A    We wrote them, and in some cases Ms.

18  Wagner, who undertook this, would advise them that

19  they were supposed to have a trustees meeting.

20  And --

21      Q    And those letters would be --

22          MR. KOLKER:  Can you -- excuse me, can you

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

30

1          (Cell phone interruption.)

2          MR. ROSE:  Pardon me, I thought I had this

3    off.

4    BY MR. ROSE:

5          Q     Thank you.

6          A     That's my answer --

7          Q     Okay.  What did you do to notify them, the

8    trustees, of their --

9          A     -- we wrote --

10         Q     -- responsibilities?

11         MR. KOLKER:  Let him finish his question

12   and then you do your answer.

13         THE WITNESS:  Go ahead.

14   BY MR. ROSE:

15         Q     What did you do to notify the trustees

16   that they were required under the trust agreement to

17   meet on a quarterly basis?

18         A     We wrote letters saying that a meeting

19   should be had.

20         Q     Every week, every month?

21         A     No.

22         Q     Once a year?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

31

1      A      Maybe.

2      Q      Why once a year if they were supposed to

3  meet quarterly?

4      A      Because at that time there may have been

5  something that had to be done with the trustees'

6  permission.

7      Q      Well, isn't that more reason to call for a

8  meeting and make sure that they're complying with

9  their trust agreement?

10            MR. KOLKER:   Objection, argumentative.

11            THE WITNESS:   Yes, it is.

12  BY MR. ROSE:

13      Q      I'm sorry, will you please answer.  He's

14  made his objection.

15      A      I get your point, but I don't know what

16  the answer is.

17            MR. ROSE:   Please reread the question.

18            (The question was read as follows:

19            "Question:   Well, isn't that more reason

20            to call for a meeting and make sure that

21            they're complying with their trust

22            agreement?")

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

37

1  touch with the employer trustees?

2      A     On occasion, when it demanded or needed

3  inquiry.

4      Q     Well, why wouldn't it need inquiry as

5  often as with the union trustees did?

6          MR. KOLKER:  Objection to form.  What is

7  "it"?

8      A     I have no idea.

9  BY MR. ROSE:

10     Q     The need, the need to consult with the

11 trustees.

12         MR. KOLKER:  Objection to form.

13     A     Whatever came up and they had to talk to

14 any of the trustees about what should be done about

15 some item, she would talk to them.

16 BY MR. ROSE:

17     Q     How many trustees were there supposed to

18 be under the trust agreement?

19     A     Six.

20     Q     Three from the union side and three from

21 the employer side?

22     A     (Witness nods head.)

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

38

1        Q    And how many trustees were there for a

2  period of years?

3            MR. KOLKER:  Objection to form.  What

4  years?

5        A    What period?

6  BY MR. ROSE:

7        Q    During the '70s.

8            MR. KOLKER:  Objection to form.

9        A    There were six, I believe.

10  BY MR. ROSE:

11        Q    Okay, what about the '80s?

12            MR. KOLKER:  Objection to form.

13        A    Probably six.

14  BY MR. ROSE:

15        Q    Six, there were six trustees throughout

16  the '80s?

17        A    I don't know that for sure.

18        Q    Okay.

19        A    But I think we had a pretty good

20  representation during that time.

21        Q    Was there a time when you didn't have a

22  quorum of trustees?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

39

1       A    Yes.

2            MR. KOLKER:   Objection to form.

3    BY MR. ROSE:

4       Q    And when was that?

5       A    I can't recall, but there had been recent

6    years we had that problem.

7       Q    And what did you do when you became aware

8    that the trustees, that there was not a quorum of

9    the board?

10      A    We had a meeting, and if there was no

11   quorum, then the -- each trustee had gotten a notice

12   of what business was being transacted at that

13   meeting.  So they were aware of what was going on.

14   Nothing happened.

15      Q    Well, if I understood your testimony, you

16   were aware that your trust agreement required six

17   trustees, correct?

18      A    (Witness nods head.)

19      Q    And there was a period of time that you

20   were aware that there was not a full board, correct?

21      A    (Witness nods head.)

22      Q    What did you do to notify the appropriate

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

40

1    individuals that there was a need to appoint

2    trustees to comply with the trust agreement?

3            MR. KOLKER:   Objection to form.

4        A    The trustees were aware --

5    BY MR. ROSE:

6        Q    Did you understand my question?

7        A    The trustees were aware that they needed

8    another trustee.  But there were no other employing

9    contractors who were available.

10       Q    Is it your understanding that a trustee

11   has to be an employing contractor?

12       A    That's what I understood.

13       Q    And how did you come to this

14   understanding?

15       A    Because there were three employing

16   contractors on the trust.

17       Q    But you're saying, as you sit here today,

18   you understood that only an employing contractor

19   could be.

20       A    I'm not a lawyer.  I cannot define whether

21   someone could or could not be.

22       Q    When did Mr. Lertora stop doing business

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

41

1    as a contractor?

2          MR. KOLKER:  Objection to form; lack of

3    foundation.

4      A    Can't recall.

5    BY MR. ROSE:

6      Q    Do you recall that there was a time that

7    he did stop?

8      A    He did stop.

9      Q    And do you recall approximately when it

10   was?

11     A    (Witness shakes head.)

12     Q    No?  Was it 2000?

13         MR. KOLKER:  Objection to form.

14     A    I don't know.

15   BY MR. ROSE:

16     Q    2001?

17         MR. KOLKER:  Objection; asked and

18   answered.

19     A    Maybe.

20         MR. ROSE:  No, it wasn't.  I asked about

21   2000.

22         MR. KOLKER:  He told you he didn't recall.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

42

1          MR. ROSE:  Well, I'm trying to help probe

2     his memory.  I appreciate your objection.

3          MR. KOLKER:  Objection.

4     BY MR. ROSE:

5          Q    Okay.  What about 2002, was he still an

6     employing contractor then?

7          A    I don't recall that he was.

8          Q    So you're saying that you don't think he

9     was?

10         A    I don't think he was.

11         MR. KOLKER:  Objection to form.

12    BY MR. ROSE:

13         Q    You don't think he was in 2002.

14         A    (Witness nods head.)

15         Q    Okay.  And what forms that belief?

16         MR. KOLKER:  Objection to form.

17    BY MR. ROSE:

18         Q    Why do you believe that he wasn't an

19    employing contractor when --

20         A    You asked for my recall and I gave it to

21    you.

22         Q    I know, and I'm just asking why it is that

Case 8:06-cv-00338-PJM   Document 92-1   Filed 02/29/08   Page 49 of 241

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

43

1    you believe in 2000, as opposed to 2001, that --

2         MR. KOLKER:  Objection to form.  And I'm

3    objecting to your arguing with the witness.

4         MR. ROSE:  I'm trying to --

5         MR. KOLKER:  If you want to ask him a

6    question, he's going to answer your question.  But

7    if you're going to engage in a kind of baiting

8    questioning, that's --

9         MR. ROSE:  I'm asking a question.

10        MR. KOLKER:  Let me finish, please.

11        MR. ROSE:  This is my deposition and I'm

12   asking the questions that I want to ask.  You are

13   able to object, and they will be taken down on the

14   record.

15        MR. KOLKER:  I'm going to complete my

16   objection.  If you're not going to let me complete

17   the objection, then we're going to have to end the

18   deposition.

19        MR. ROSE:  That's your call.

20        MR. KOLKER:  It is.  My objection is that

21   when you're baiting the witness, that's improper.

22   If you're arguing with the witness, that's improper.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

44

1   If you want to ask him a question, let him complete

2   his answer.

3          MR. ROSE:  I don't know what you mean by

4   baiting, but I'm here to ask questions in any manner

5   that I choose so long as they're not objectionable.

6   You are able to make objections.  Please state them

7   for the record and let us move on.

8          MR. KOLKER:  I have.  But they are

9   objectionable.

10          Please read back my last question.

11          (The record was read as follows:

12          "I know, and I'm just asking why it is

13           that you believe in 2000, as opposed to

14           2001, that" --)

15   BY MR. ROSE:

16      Q    If I understood your testimony, you stated

17   that in 2002, it was your belief that Mr. Lertora

18   was no longer an employing contractor; is that

19   correct?

20      A    That was my recall.

21      Q    And why is it that you believe that in

22   2002 Lertora was no longer an employing contractor?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

45

1        MR. KOLKER:  Objection to form.

2    A    Just my recall.

3  BY MR. ROSE:

4    Q    Okay.  If he was no longer an employing

5  contractor, based on what you had testified earlier

6  to, that you had to be an employing contractor to be

7  a trustee, why is it that you allowed him to

8  continue sitting as a trustee?

9    A    I don't believe I'm supposed to question

10  that.  That would be a legal matter, not mine.

11    Q    Well, you're the plan administrator, and

12  did you not see it as part of your responsibility to

13  see that --

14    A    I did not.

15    Q    I'm sorry, can I finish my question?

16    A    (Witness nods head.)

17    Q    -- to see that the Plan was

18  administered -- I'm sorry -- that the Fund was

19  administered in accordance with its governing

20  documents?

21    A    That part, I did not.

22    Q    No?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

46

1    A    No.

2    Q    You had a Plan document, correct?   There

3    was a Plan document?

4    A    (Witness nods head.)

5    Q    And did you look at it to ensure that the

6    decisions you made were consistent with that Plan

7    document?

8    A    I don't believe it referred to anything

9    like that in the Plan document, the original

10   trust.

11   Q    Well, what about the trust agreement?

12   A    The trust agreement really specifies that

13   the trustees will hire somebody to take over certain

14   duties for them, including a lawyer, an accountant

15   and so forth.

16   Q    That's all it does?

17   A    Generally speaking, as far as I know.

18   Q    When was the last time you read the trust

19   agreement?

20   A    Beg your pardon?

21   Q    When was the last time you read the trust

22   agreement?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

58

1      A      The trustees.

2   BY MR. ROSE:

3      Q      The trustees were responsible for the

4   investments.

5      A      They indicated where the money was to go.

6      Q      How often did the trustees give such

7   directions?

8      A      Whenever a certificate matured, it was

9   presented to the trustees, who -- one union trustee

10  and one contractor trustee signed the check to put

11  the money in the bank, or they signed cards to open

12  an account.

13     Q      Did the Fund have a statement of

14  investment policy?

15     A      It did not.

16     Q      Why not?

17     A      It just didn't.

18     Q      Did you ever raise it with the trustees?

19     A      I did not.  I'm not an investment

20  counselor.

21     Q      Did you ever suggest to the trustees they

22  get an investment counselor?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

71

1    ten-year period.

2            MR. KOLKER:  Just a minute.  What's the

3    question?

4    BY MR. ROSE:

5        Q    My question is, did you ever work with

6    counsel on plan design issues?

7            MR. KOLKER:  Objection to the form.

8        A    Yes.

9    BY MR. ROSE:

10       Q    Okay.  Could you please give me examples

11   of when you worked with counsel on plan design

12   issues.

13       A    Whenever there was a need to have a plan

14   change or explanation, it usually came through

15   Mrs. Wagner.  We would discuss it, and she was very

16   familiar with the plan and would prepare information

17   for the trustees' consideration, which was also

18   conveyed to the counsel, I believe.

19           MR. BRAMLETTE:  Read back his answer,

20   please.

21           (The last answer was read as requested.)

22   BY MR. ROSE:

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

72

1      Q      Did Ms. Wagner have any special expertise

2   dealing with ERISA-covered Pension and Welfare

3   Funds?

4      A      Not to my knowledge.

5      Q      Did you ever suggest that she get some

6   additional education or attend seminars to keep up

7   with the developments in administration of ERISA

8   plans?

9      A      I did not.

10     Q      Why not?

11     A      She was pretty well savvy to what the Plan

12  was as it was.  She --

13     Q      How did you determine that she was savvy?

14            MR. KOLKER:  Well, just a minute.  You

15  interrupted him again.

16     A      There were no complaints from the

17  trustees.

18  BY MR. ROSE:

19     Q      Is that your measure of whether or not --

20     A      I would say so.

21     Q      -- Ms. Wagner knew what she was doing?

22     A      Well, in this case I think it was.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

73

1       Q     Why is that?

2       A     Because she was very proficient at what

3    she did --

4       Q     And what did you base that --

5       A     -- in the context of her employment.

6       Q     And what did you base your assessment that

7    she was proficient in what she did?

8       A     Based on my knowledge of what she did.

9       Q     But you don't have any knowledge of ERISA,

10   correct?

11           MR. KOLKER:   Objection; that's

12   argumentative.

13   BY MR. ROSE:

14      Q     Did you testify earlier that you didn't

15   really know anything about ERISA?

16           MR. KOLKER:   Objection.   It's

17   argumentative and his earlier testimony is already a

18   part of the record.

19      Q     Well, let me ask you --

20           MR. KOLKER:   Let me finish my objection,

21   please.   I think I've asked you that already six

22   times.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

74

1          MR. ROSE:  Well, I'm taking a deposition,

2   I'm asking questions --

3          MR. KOLKER:  You are taking a deposition,

4   and I am permitted to object.

5          MR. ROSE:  You certainly are.

6          MR. KOLKER:  So let me finish my

7   objection.

8          MR. ROSE:  Please do.

9          MR. KOLKER:  His testimony is part of the

10  record, and I object to your asking him to repeat

11  testimony he's already given.

12         MR. ROSE:  So that's asked and answered?

13  That your objection?

14         MR. KOLKER:  I'm not answering your

15  questions.

16         MR. ROSE:  Okay, good.

17  BY MR. ROSE:

18     Q    Would you like the question reread?

19          (The record was read as follows:

20          "Question:  Did you testify earlier that

21          you didn't really know anything about

22          ERISA?")

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

75

1        A     The answer is yes.

2    BY MR. ROSE:

3        Q     So upon what do you base your assessment

4    that Ms. Wagner was doing a proficient job?

5              MR. KOLKER:  Objection, asked and

6    answered.

7              MR. ROSE:  No, it actually wasn't

8    answered, but thank you.

9        A     Covered all bases, as far as I was

10   concerned, on the matters that were brought before

11   us.  There was no complaints from counsel, no

12   complaints from trustees.  And there was an

13   examination by the Department of Labor at one time

14   that didn't disclose any malfunctioning of the trust

15   agreement.

16   BY MR. ROSE:

17       Q     That was of the Welfare Fund, correct?

18       A     Was it the Welfare Fund?

19       Q     I'm asking you.

20       A     I don't remember.

21       Q     Okay.  Well, who would remember?

22       A     Pardon.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

85

1      Q    A written agreement.  I was just

2   clarifying.

3      A    Not to my knowledge.

4      Q    Why not?

5      A    There was no written agreement.

6      Q    I've asked a different question.  I've

7   asked you why not.

8      A    Not my responsibility.

9      Q    Well, whose responsibility was it?

10      A    The attorney's.

11      Q    The attorney's responsibility?

12      A    It was up to him to submit, or the

13   trustees when they accepted his services.

14      Q    Well, what, if anything, did the trustees

15   do to supervise the attorney?

16      A    He attended meetings when they had them.

17   And if there was a question, they may have called

18   him personally at some time or another for

19   clarification.  I'm not aware of it.

20      Q    What, if anything, did the trustees do to

21   supervise your responsibilities as Plan

22   administrator?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

86

1      A     As a group or individually?

2      Q     Either.

3      A     Either?  None.

4      Q     The trustees did nothing.  It's your

5  understanding the trustees did nothing to supervise

6  your role as plan administrator.

7      A     They didn't take any specific action in

8  our Plan.  We kept them advised, but they didn't

9  participate.

10     Q     Well, what do you mean by that?

11     A     They didn't participate in anything except

12 that was brought before them by us.

13     Q     And "us" being you and Ms. Wagner?

14     A     Yes.

15     Q     So there were never instances when counsel

16 raised issues that you or Ms. Wagner hadn't raised

17 for the trustees' consideration?

18     A     Repeat that, please.

19         MR. ROSE:  Could you please read the

20 question back.

21         (The record was read as requested.)

22     A     Probably the counsel was involved when we

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

87

1   had a problem which was brought to the trustees'

2   attention, and the counsel's advice or whatever

3   counsel was -- submitted, either written or at a

4   meeting.  But I don't recall them ever making a

5   independent statement to the trustees about any

6   particular thing.

7   BY MR. ROSE:

8       Q    At any point during your tenure as Plan

9   administrator for the funds, was there ever a point

10  where you were concerned that the trustees might be

11  opening themselves up to potential liability?

12      A    No.

13      Q    Never.

14      A    No.

15      Q    What other service providers did the Fund

16  hire?

17      A    The independent accountant.

18      Q    How were they selected?

19      A    It was the same firm which had been

20  providing those services from day one of the

21  creation of the trust.

22      Q    Is that the firm of Bailey & Bailey?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

119

1    trustees to execute, and that was it.

2    BY MR. ROSE:

3        Q    How did you decide on what term of a CD

4    that you would invest in?

5        A    They wanted short term only.  That was

6    their wish.

7        Q    Who's they?

8        A    The trustees.

9        Q    So what did you consider short term?

10       A    What did I think of short term?

11       Q    You said your direction was the trustees

12   told you they wanted short term, correct?

13       A    Right.

14       Q    What did you buy with that direction?

15       A    Probably six months.

16       Q    Six-month CDs?

17       A    (Witness nods head.)

18       Q    Probably?  You don't recall?

19       A    Not offhand.  Could be a year,

20   depending.

21       Q    And what would make you decide to get a

22   one-year versus a six-month CD?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

121

1   CD, these are the rates?

2        A    No, we tried to get the best rate and then

3   submit it to the trustees for their signatures.

4        Q    And what about treasury instruments that

5   were invested in?

6        A    Through the bank, when the CDs went down,

7   it was suggested treasuries, and we said, okay,

8   we'll go to treasuries.

9        Q    Who suggested treasuries?

10       A    It was an offbeat remark at one of the

11  meetings that somebody suggested, treasuries are

12  getting more money.

13       Q    So an offbeat remark is what you consider

14  to be your investment direction?

15       A    I would say it was something that would be

16  worth looking into.

17       Q    Was that something that was reduced to

18  writing at that trustees meeting?

19       A    No, it was not.

20       Q    Why not?

21       A    Because it was wasn't.

22       Q    Did you not consider the directions of a

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

1   trustee as to how they wanted the Plan assets

2   invested, not to be something that would be worthy

3   of reducing to writing in trustee minutes?

4       A    If it was an offbeat suggestion, it wasn't

5   a matter that was brought before the trustees by a

6   trustee.  We merely looked into it.

7       Q    But you did purchase treasury instruments,

8   correct?

9       A    Yes.

10      Q    So you did more than look into it.  You

11  actually invested in them, correct?

12           MR. KOLKER:  Well, objection to form.

13  What do you mean by "you"?

14  BY MR. ROSE:

15      Q    Did you understand my question?

16      A    You said I actually purchased trustees.

17  You invested in them.

18      Q    Sure.  No, I said that you actually

19  invested treasury instruments.  Correct?

20           MR. KOLKER:  Objection to form.

21      A    We purchased treasury instruments for the

22  trustees.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

123

1    BY MR. ROSE:

2         Q    Right.  And you did that based on some

3    direction that you received, correct?

4         A    Yes.

5         Q    And you said the direction you received

6    was an offhand comment at a trustees meeting,

7    correct?

8         A    Right.

9         Q    Okay, so you acted on an offhand comment

10   at a trustees meeting, that wasn't reduced to

11   writing in the minutes, correct?

12        A    That's correct.

13        Q    Do you recall any instances where the

14   attorney had prepared the minutes where you thought

15   there were parts of the meeting that had not been

16   reflected that needed additional materials?

17        MR. KOLKER:  Objection.  What time period

18   are you speaking about?

19        A    There were occasions.

20        MR. KOLKER:  Just a minute.

21        MR. ROSE:  Any.

22        MR. KOLKER:  Any time?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

132

1    A    Well, whatever.

2    Q    But the bottom line is, would you consider

3  that to be an important document?

4    A    Yes.

5    Q    And the Plan amendments, how is it that

6  you, how is it that you ensured that Plan amendments

7  were kept in your records in an orderly fashion?

8    A    They were in the file of the trust, I

9  believe.

10    Q    And you inherited the files of your

11  predecessor, Mr. Malin?

12    A    That's correct.

13    Q    And were those files complete?

14    A    Would they be complete?

15    Q    Were his files complete?

16    MR. KOLKER:  Objection to form.  Calls for

17  the mind of another.

18    A    Complete as to what, I don't know.  But

19  they were complete as to his records, so whatever he

20  was doing, I guess.  We assumed them.

21  BY MR. ROSE:

22    Q    Well, when you took over in 1973, did you

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

133

1    do a review of the Plan documents to see if --

2         A    No, I did not.

3         Q    And why not?

4         A    I didn't have anything to do with the Plan

5    documents.  I was doing the custodial duties that

6    Mr. Malin did.

7         Q    So you had nothing to do with the Plan

8    documents except to hold them in your files?

9              MR. KOLKER:  Objection to form and asked

10   and answered.

11        A    No.  We referred to them on occasion when

12   it was necessary to answer questions that referred

13   to the trust.

14   BY MR. ROSE:

15        Q    Could you give me an example of an

16   instance when you did?

17        A    No.  I don't recall any, but we did.

18        Q    Well, are you aware -- were you aware that

19   there were 11 amendments to the trust that were not

20   part of the files that you turned over?

21        A    No.

22        Q    That surprises you?  Does that surprise

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

162

1    highly unlikely that an unfunded liability may in

2    fact exist.  At that point, the reserve, together

3    with the accrued interest thereon, should be

4    distributed to the vested participants.

5              Do you see that?

6        A    I do.

7        Q    Do you recall whether when the escrow

8    account was closed, that whether or not the monies

9    were distributed to the vested account -- to the

10   participants' vested accounts?

11       A    I don't recall the actual distribution,

12   but I'm sure it took place.

13       Q    And there would be records reflecting the

14   distribution.

15       A    There would be records shown on the

16   actuarial statements of each of the members.

17       Q    Okay.  It goes on in the next paragraph.

18   It says, With regard to forfeitures in a money

19   purchase plan, forfeitures must be used to reduce

20   employer contributions.

21             Was that your understanding?

22       A    That's his opinion.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

163

1     Q     Did you have a contrary opinion?

2     A     No.

3     Q     Goes on to say, The Plan does not now

4  specify how this is carried out.  You should give

5  the specific employer the benefit of the forfeiture

6  in the following year.

7           Do you see that?

8     A     I do.

9     Q     Do you understand what he meant by that?

10    A     Yes.

11    Q     What did he mean by that?  What's your

12 understanding?

13    A     Exactly what he said.  The Plan does not

14 specify how this forfeiture money is to be carried

15 out.  And then it said that you should give the

16 specific employer the benefit of the forfeiture in

17 the following year.  It couldn't be in the current

18 year because it's the not complete.  The following

19 year the person would be -- have -- what do you call

20 it, the -- what's the word I want to use.

21           It escapes me.  But if the so-called

22 participant didn't have any vesting, was not vested,

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

181

1          MR. KOLKER:  Let him answer the question.

2          MR. ROSE:  He has.

3          MR. KOLKER:  No, you're interrupting him

4     again.

5     BY MR. ROSE:

6          Q    Mr. Perry, did you have something else you

7     wanted to say with respect to that?

8          A    The paragraph you refer to is his

9     statement as to his interpretation of the monies

10    that are paid into the multi-employer plan.

11         Q    My question to you is, do you agree with

12    that?

13         A    I would agree with his assessment.

14         Q    Okay.  Next paragraph, it says, The best

15    way to ensure that the union member does not lose

16    ownership of his wage contributions to these plans

17    is to have immediate 100 percent vesting in the

18    plan.  In this way, the employee would always owe

19    the plan contribution.  If he leaves employment with

20    the union contractor, he would have the money

21    waiting for him when he retired at age 65.

22    Immediate vesting would eliminate the possibility of

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

186

1      A      (Witness peruses exhibit.)

2             I don't recall exactly getting it, but

3      I've seen it before, and I think it's part of the

4      records.

5      Q      Well, it's part of this record.

6      Mr. Coakley writes to Mr. Scholar.  It says, I'm in

7      receipt of your letter dated February 20, 1991,

8      together with a letter from Mr. Perry, the plan

9      administrator, concerning forfeiture of plan

10     participants' contributions to employer contractors.

11            It goes on to say, This is to advise you,

12     the administrator and others, that C.J. Coakley,

13     Inc. is the only contractor who is employing drywall

14     finishers under this plan, and thus a single

15     employer as outlined in paragraph 2 of your letter.

16            It goes on to say, Since we are the only

17     affected contractor and Plasterers' Local 96 has no

18     training program for this skill, be assured that if

19     this change is implemented, C.J. Coakley Company

20     will terminate its participation in this plan.

21            He was goes on to say in closing, I trust

22     that this action will not be necessary.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

187

1     A     That's Mr. Coakley's opinion of what he

2  read from the letter that was sent by Sam Scholar.

3     Q     This was a pretty serious letter from

4  Mr. Coakley to have written.

5     A     From Mr. Coakley, yes.

6     Q     And when you saw this, did you understand

7  this to be a pretty important issue?

8     A     I would say so, yes.

9     Q     What, if anything, did you do after

10 receiving this letter?

11    A     There had to be a meeting after this date,

12 April 8, 1991, to address this particular problem.

13    Q     And Mr. Coakley basically threatened to --

14 not basically -- he threatened to withdraw from the

15 plan if, in fact, you-all did, or the trustees did

16 what was suggested by counsel.  Correct?

17    A     That's correct.

18    Q     He also states in here -- I just want

19 to -- he says he's the only contractor who's

20 employing drywall finishers.  Is that true?

21    A     Not really.  There were others who did it

22 on the side.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

188

1    Q    I mean, there was Hampshire & Company,

2  correct?

3    A    Yes.

4    Q    They weren't doing it on the side.  They

5  were a signatory, correct?

6    A    But he was the only contractor who had a

7  membership in the group who was drywall only.

8    Q    That's not what this says.

9    A    That's the C.J. Coakley Company,

10  Incorporated.

11    Q    This says he's the only one employing

12  drywall finishers, and that wasn't true.

13    A    Not really.

14    Q    Because, I mean, you had contribution

15  reports from other employers, correct?

16    A    That's correct, he was not the only one.

17    Q    And he would get, as trustee, copies of

18  the 5500s, correct?

19    A    (Witness nods head.)

20         He would.

21    Q    And the annual audit?

22    A    He would.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

189

1    Q    And the contributing employers are

2    reflected in both of those documents, correct?

3    A    That's true.

4    Q    So you knew that that was a false

5    statement when you reviewed this?

6    A    I think the general understanding was that

7    it was exactly what it purports to be.

8    Q    And what is that?

9    A    Bullish threat.

10    Q    Okay.  That same sentence that we were

11    just referring to refers to, you know, his

12    conclusion that because he's the only -- he

13    erroneously states that he's the only contractor,

14    that this is a single-employer plan as outlined in

15    paragraph two of the letter.

16         Do you see that?  What did you think of

17    that?

18    A    Well, knowing Mr. Coakley, I would say

19    he'd be single-minded about certain issues, and he

20    was about this one.

21         He was the largest contributor to the

22    fund, also.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

190

1      Q    So his threat to withdraw is a serious

2   one.   Correct?

3      A    Correct.

4           (Perry Exhibit No. 8 marked for

5   identification and retained by counsel.)

6   BY MR. ROSE:

7      Q    Mr. Perry, I'm showing you a document.

8   It's dated May 20, 1991.  It appears to be a letter

9   or memo from you to the trustees of the Pension and

10  Welfare Funds.  Do you see that?

11     A    Yes.

12     Q    And it says, We received the attached

13  letter today.  As you will note, C.J. Coakley

14  Company has applied not only the pension fund

15  contribution for the month of April, but also the

16  Welfare Fund contribution against the alleged monies

17  due him for forfeited pension fund contributions on

18  his employees from 1987 and 1988.

19          Do you see that?

20     A    I do.

21     Q    What did you mean when you wrote, against

22  the alleged monies due him?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

191

1    A    It's alleged by him.

2    Q    Did you have a different view?

3    A    Well, based on the previous letter, which

4  is April 8th, it would follow in the same context,

5  that he decided on his own to take a remedy, and

6  that was it.

7    Q    It's a pretty unique word to use in a

8  writing to the trustees of a fund that you work for,

9  to refer to another trustee's demand as "alleged

10  monies due."

11    A    Probably so.  Might have been a misuse,

12  wrong word.

13    Q    Well, but you used it.

14    A    I did.

15    Q    My question is, is that you used the word

16  "alleged" because you weren't convinced that he was

17  due those monies?

18    A    In April, this was still in a --

19    Q    This is May 1991.

20    A    Yeah, this was still in the works.  It

21  hadn't been settled yet.

22    Q    What's the "this"?

195

1    established that he was the largest contributing

2    employer.

3        A    He was.

4        Q    Basically, he had threatened to take his

5    marbles and go home and withdraw from the

6    participation in the Fund.  And then goes on, and he

7    sent the letter unilaterally taking credits that

8    haven't yet been authorized by the trustees; is that

9    correct?

10        A    That's the way the letter is written.

11        Q    Okay.  And I'm guessing must have been

12    alarming, because it appears that it was sent

13    first-class mail.  There's no fax draft lines, and

14    you received it on the 20th of May, and it's dated

15    the 17th.  So it appears that you turned around and

16    sent this out to the trustees almost immediately.

17        A    That's true.

18        Q    What action did you take with respect to

19    this letter from Ms. Doyle?

20        A    This went to the trustees.

21        Q    Just forwarded it on?  Did you contact

22    Ms. Doyle?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

196

1      A     No.  He was not a man to contact.

2  Confrontational person.

3      Q     Carol Doyle was a man?

4      A     Pardon?

5      Q     Carol Doyle was a man?  Was Carol Doyle a

6  man?

7      A     I don't know.  Carol Doyle, I think it

8  must have been a woman.

9      Q     Okay.  Well --

10     A     Two R's would make it a man; one R would

11  make it a woman.

12     Q     Well, that's what I was trying to get

13  clear up.

14           Okay.  Next document, the next page, next

15  document within this exhibit is a letter dated July

16  2nd, '91 from Lee to the trustees.  And it says,

17  Attached is copy of the letter from C.J. Coakley

18  Company detailing deduction of the balance of their

19  portion of the '87-'88 refunds due contractors.

20           Do you see that?

21     A     I see that.

22           MR. BRAMLETTE:  Can I clarify?  Are you on

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

197

1   the June 17th letter or the July 2nd letter?

2          MR. ROSE:  I'm sorry, I'm on the July --

3   I'm sorry, that was the next letter.  I apologize.

4   That was not the next one.  I'm sorry, let me back

5   up.  Strike that.  I flipped just one ahead.

6   Ms. Doyle threw me off.

7   BY MR. ROSE:

8          Q     The next page I'd like to direct your

9   attention to is the June 17, 1991 letter from

10  Ms. Doyle to the Local at your office address.  Your

11  office address was 1411 K Street, correct?

12         Mr. Perry, 1411 K Street is your office?

13         A     It was and still is.

14         Q     And that's the Plasterers' Fund's office,

15  correct?

16         A     Correct.

17         Q     Or was.  I'm sorry.

18         Okay.  Ms. Doyle's letter says, We have

19  deducted the remaining balance of the C.J. Coakley

20  Company portion of refunds due contractors for the

21  above.  And it says, See May 17th letter.  And it

22  says, The amounts due the Local, or due the Fund's

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

198

1    for pension May '91 was roughly 8,160, and to the

2    Welfare Fund, Coakley owed $22,661, for a total of

3    30,822, approximately.  They take the rest of this

4    alleged credit of 12,797.97, and they sent the

5    check, apparently, for $18,024.  Do you see that?

6        A    I see that.

7        Q    What did you do with respect to

8    Ms. Doyle's June 17th letter?

9        A    June 17th letter is where we sent a copy

10   of the June 17th and May 17th to the trustees so

11   that they would have a comparative whatever.

12       Q    Okay.

13       A    Showed them marked as enclosures there.

14   In other words this letter is a cover letter for

15   these two letters.

16       Q    The May 22nd letter was a cover letter for

17   the July 2nd?

18       A    No.

19       Q    Oh, I'm sorry, for the May and the June

20   letter.  How could you have a cover letter sending

21   something on June 17th in a letter dated May 20th?

22            It appears --

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

199

1    A    The letter is dated, that I wrote, is

2    dated July 2nd.  And it covers a letter from

3    Coakley, which is June 17th.

4    Q    July 2nd was Lee.  The letter we were

5    looking at before referred to -- was May 20th, 1991,

6    the first page of this exhibit.

7    A    May 20th, we wrote a letter which covered

8    May 17th.

9    Q    Correct.

10   A    June 17th, he advised us of what he was

11   doing.  This letter of July 2nd --

12   Q    You mean he further advised you, because

13   you knew what he was doing.

14   A    Yeah.  And July 2nd --

15   Q    And the May 17th letter stated that he

16   claimed that he had 12,700 and --

17        MR. KOLKER:  Would you let Mr. Perry

18   finish.

19   A    This letter is a cover, and both were

20   sent, so there would be a continuity.

21   BY MR. ROSE:

22   Q    So the July 2nd letter from Ms. Wagner.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

200

1    A    Yes.

2    Q    Okay.  What did you do in the meantime?

3    A    After July 2nd?

4    Q    You send out the July 2nd; you had

5    Ms. Wagner send out the July 2nd with the

6    newsletter.  What did you do as administrator --

7    A    Nothing of consequence that I could

8    delineate here.

9    Q    Did you suggest that counsel should be

10   brought in?

11   A    Counsel would have been apprised.  Copy to

12   Sam Scholar.

13   Q    Well, did you suggest to the trustees that

14   maybe counsel should be brought in to file --

15   A    I did not.

16   Q    Let me finish my question.  That the

17   counsel should be brought in to perhaps file an

18   action --

19   A    No.

20   Q    -- to collect amounts due?

21   A    No.

22   Q    You never did that.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

201

1    A    No.

2    Q    Why not?

3    A    Sam Scholar, it was his --

4    Q    That's his call?  The attorney decides?

5         MR. KOLKER:  Can you let him finish the

6    answer, please.

7    BY MR. ROSE:

8    Q    Had you finished your answer, Mr. Perry?

9         MR. KOLKER:  No, he hadn't.  He was right

10   in the middle of the question --

11        MR. ROSE:  You're inside his mind?

12        MR. KOLKER:  I can hear --

13        MR. ROSE:  He can answer.

14        MR. KOLKER:  Excuse me.  I can hear you

15   interrupting him, and the reporter can read it back

16   that way.  Let him finish his answer.  Now we're now

17   up to seven times I've given you this instruction.

18        MR. ROSE:  Thank you very much.  I think

19   I'm finally getting it.

20   BY MR. ROSE:

21   Q    Mr. Perry, did you have anything further

22   you wanted to say about that document?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

202

1        A    No.  This covers it.

2        Q    Okay, thank you.

3             Did you speak with Mr. Scholar?  Do you

4    recall speaking with Mr. Scholar after receiving

5    these letters, and saying, Sam, what is he doing?

6    Something like that?

7        A    I don't recall a conversation with

8    Mr. Scholar.  Had we referred to Mr. Scholar,

9    Mr. Scholar would have acted.  I don't know what

10   correspondence followed this.

11       Q    Do you have an understanding as to what

12   the annual contributions received by the Fund were

13   at this time?

14       A    No.

15       Q    Did you understand that --

16       A    An understanding?

17       Q    Do you have a recollection as to what

18   the --

19       A    No.

20       Q    -- average contributions brought in by the

21   Fund in a year?

22            MR. KOLKER:  Objection to form.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

204

1      A     He was the largest contributor.

2      Q     Were you concerned what this might do to

3   the financial stability of the Fund, Mr. Coakley's

4   unilateral action?

5      A     In my recollection, the $30,000 would not

6   have stumbled any operation of the Fund whatsoever.

7   In other words, we had sufficient funds, oh, way

8   over beyond that.

9      Q     Is that right?

10     A     We did.

11     Q     Okay.  Well, let's get to that.

12           (Perry Exhibit No. 9 for identification

13   and retained by counsel.)

14   BY MR. ROSE:

15     Q     Mr. Perry, I'm showing you a document.

16   It's entitled Joint Meeting Agenda.  Is that

17   something that you would have created in preparation

18   for a meeting?

19     A     Lee and I would have created it together,

20   she would, with her information and mine.

21     Q     Okay.  It's an agenda for a meeting

22   apparently held on the 23rd of July 1991.  Do you

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

205

1    see that?

2         A    Yes.

3         Q    Or at least scheduled for it.

4              No. 1, it says, Do the trustees wish to

5    change current pension plan vesting to status of

6    immediate vesting?  Says, Refer to letter from legal

7    counsel.  And that was the February '91 letter where

8    Mr. Scholar had concluded that this was a different

9    plan; this was a multi-employer defined contribution

10   plan, and they were a different treatment because

11   these were not fringe benefits, they're a wage

12   setoff?  Do you recall that?

13             MR. KOLKER:  Objection to form.

14   BY MR. ROSE:

15        Q    Do you recall that?

16        A    I recall it as a remedy offered by

17   Mr. Scholar.

18        Q    So you were raising the specific issue

19   with the trustees at this meeting, we need a

20   resolution.  Is that the idea?

21        A    That's the reason for it on this agenda.

22        Q    The second thing is you're seeking

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

206

1   direction from the trustees.  It says, Should the

2   Fund's investments be in -- or investments be

3   invested in amounts smaller than jumbo certificates

4   of deposit to take advantage of better interest

5   rates when available.

6        A     Jumbos at that time began to drop.  Why, I

7   don't know.  You could get lower denominations at a

8   better rate.  Mr. Coakley was the guy who proposed

9   jumbo securities.

10       Q     Okay.  So you were just trying to seek

11  clarification as to whether or not you should be out

12  there selecting jumbo certificates as opposed to

13  some other --

14       A     Yes.

15       Q     -- smaller certificate that might draw a

16  better rate.

17       A     That would be it, clarification.

18       Q     No. 3, it says, The resolution to transfer

19  funds from the pension fund to the Welfare Fund to

20  replace those Welfare Fund contributions

21  appropriated by Coakley as a credit to his expected

22  pension fund forfeit refunds.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

207

1          Do you see that?

2     A    I do.

3     Q    It's pretty strong words.  Do you recall

4 how that was addressed at the meeting?

5     A    I think we covered in a previous letter,

6 arrangement wherein Mr. Coakley offset funds from

7 the -- his contributions that were due and payable

8 from the amounts that were owed him.  Part of it was

9 owed to the Welfare Fund.  We had to transfer funds

10 from the Pension Fund to the Welfare Fund since he

11 had shorted the Welfare Fund.  He owed the Welfare

12 Fund so-many dollars.  He took it off of his Pension

13 Fund contributions.  Therefore, we had to put money

14 back into the Welfare Fund.

15     Q    Why?

16     A    Why?

17     Q    You just testified there was plenty of

18 money.

19     A    Because it had to be done.

20     Q    Why?

21     A    How do you explain A, B, C, D?

22          It had to be done because he took the

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

208

1    monies out of the Welfare Fund when he shouldn't

2    have by deducting what he owed.  So the funds had to

3    be replaced since he wasn't going to put it in

4    there, and we owed him, or so he said we owed him.

5    The pension fund, we took that money and replaced it

6    in the Welfare Fund, which means that that was the

7    only thing we could do.

8        Q     In here you use the word, the

9    contributions "appropriated" by Coakley?

10       A     Yeah.

11       Q     That's a pretty strong word.

12       A     Well --

13       Q     What did you mean by appropriated?

14       A     Well --

15       Q     It means taking, right?

16       A     Appropriated means exactly the action

17   taken by Mr. Coakley.  He had arbitrarily made a

18   decision to take the funds.  That's appropriation.

19       Q     And what did you do to --

20       A     It wasn't a check issue or anything like

21   that.

22       Q     What did you do to deal with his

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

209

1    arbitrary, unilateral action that potentially could

2    injure the funds?

3        A    It was all part of the action we have

4    discussed before.  It went before the members.

5    Mr. Scholar brought it to the attention of the

6    members.  It had nothing to do with me.

7            MR. KOLKER:  And you said members.

8    BY MR. ROSE:

9        Q    Why not?

10           MR. KOLKER:  Just a minute.

11           MR. ROSE:  You don't need to couch this.

12   You can ask him question when I'm done to clarify

13   this.

14           MR. KOLKER:  Yeah, we haven't talked about

15   members yet.

16           MR. ROSE:  You'll have a chance to clarify

17   anything you want with him when I'm done.

18           MR. KOLKER:  Okay, if you want to leave

19   the record with an inaccurate --

20           MR. ROSE:  Yeah, I can ask the questions,

21   and I'm making the record I choose to.  You'll have

22   an opportunity to clarify.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

210

1          MR. KOLKER:  Okay.

2          Could you read back my last question,

3    please.

4          (The record was read as follows:

5          "Questions:  What did you do to deal with

6          his arbitrary, unilateral action that

7          potentially could injure the funds?")

8          MR. KOLKER:  Objection to form.

9     A    No more than I did when he took the first

10   amount of money, which was referred to Mr. Scholar,

11   who referred it to the trustees.

12   BY MR. ROSE:

13    Q    Are you aware that the pension fund and

14   the Health Fund are separate legal entities?

15    A    They are.

16    Q    You understood that?

17    A    I knew it from the word get-go.

18    Q    What made you think you could transfer

19   money from the pension fund to the Health Fund?

20    A    Do you understand that Mr. Coakley took

21   pension money that we owed him, so he said, to pay

22   Welfare Fund benefits which he owed.  Okay?  That

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

215

1        Q     And you believe that the appropriate

2    response was to do nothing?

3        A     Yeah.

4              MR. KOLKER:  Objection.  Objection to

5    form.

6        A     Appropriate response was to have a meeting

7    and have a resolution to have the trustees approve

8    it.

9    BY MR. ROSE:

10       Q     Well, why wouldn't it have been an

11   appropriate response to sue him for failing to

12   contribute?

13       A     That's a legal matter.  You'll have to ask

14   Mr. Scholar.

15       Q     Have you ever been involved in litigation

16   before?

17       A     Against me?  No.

18       Q     Have you ever initiated litigation?

19       A     No.

20       Q     Well, are you aware that frequently when

21   parties believe that there are amounts due them,

22   that they initiate litigation to collect those

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

216

1    amounts?

2        A    That's true; I agree.

3        Q    Are you aware that under ERISA and

4    decisions of the Supreme Court and every circuit

5    court in this country, that fiduciaries of employee

6    benefit plans are required to collect amounts due?

7            MR. KOLKER:  Objection to form.

8        A    I would take that under advisement.

9    BY MR. ROSE:

10       Q    Is that a no?

11       A    That's a no.  Oh, wait a minute.

12           MR. ROSE:  Read me the question, please.

13           THE WITNESS:  Yeah, read the question.

14           (The record was read as follows:

15           "Question:  Are you aware that under ERISA

16           and decisions of the Supreme Court and

17           every circuit court in this country, that

18           fiduciaries of employee benefit plans are

19           required to collect amounts due?")

20           MR. KOLKER:  Just a minute.  Calls for a

21    legal conclusion.

22       A    That's why we have a resolution here.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

217

1    If -- anything at this meeting that the counsel

2    would object to would be reflected in that No. 3.

3    It would be up to him to stand forward and say, Hey,

4    (whistling).

5    BY MR. ROSE:

6        Q    It's your view, as plan administrator, you

7    had no obligation to do that.

8        A    I did not.

9        Q    Okay.  Did you understand you were a

10   fiduciary of the Plan?

11       A    I'm a fiduciary but only in the sense of

12   what I spelled out before.

13       Q    And what was that?

14       A    What was the word I used?

15       Q    Custodial, I believe, you said.

16       A    Custodial, yes.

17       Q    You thought you were a custodial

18   fiduciary.

19       A    Okay, I have a title, custodial fiduciary.

20       Q    Is that what you referred to yourself as

21   during your tenure?

22       A    I would say that would be appropriate.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

233

1    A    I understood your question.

2    Q    Thank you.

3    A    In the first line of paragraph two,

4 there's a presumption that in the Plan at that time,

5 November 25th, that if a member who had not vested

6 became vested, then those monies in previous periods

7 would come to his credit.  That's it.

8         Now, the second thing says, in effect, if

9 those monies were given back to the contractor,

10 where would they come from?  This forfeit, how would

11 we get them back.  And it goes in to spell this

12 capitalization, of what to do and what not to do.

13    Q    And my question to you is, as plan

14 administrator, did you think that was an appropriate

15 result for the participants, to have to make up a

16 shortfall for a contractor who refused to repay

17 forfeited amounts?

18         MR. KOLKER:  Objection to form.

19 BY MR. ROSE:

20    Q    Did you understand my question?

21    A    I understood your question, and it's not

22 for me to cure that.  It's up to the lawyer to sue

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

234

1    to get the money back.

2        Q    The lawyer makes the decision to sue?

3        A    Pardon?

4        Q    It's your view that Fund counsel makes the

5    decision to sue?

6        A    It would be the trustees' decision to say,

7    Where's the money coming from?  And they would say,

8    Not out of your pockets because we represent the

9    current members, who should instruct the trustees --

10   I mean the attorney, to sue for recovery.

11       Q    And it was your view as plan administrator

12   that you didn't have an independent fiduciary duty

13   to look after the participants' and beneficiaries'

14   interests?

15           MR. KOLKER:  Objection to form.

16   BY MR. ROSE:

17       Q    Did you understand my question?

18       A    I understand, but in what form?  I had

19   certain duties to make records, reflect their

20   participation in the plan.  But I had no other

21   duties to protect them.

22       Q    Well, if the monies --

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

308

1      Q    I'm looking at the first page, not the

2  second page.  That's my question.

3      A    I think it is my notes.

4      Q    So is this what you would do throughout a

5  meeting with your agenda, sort of following what

6  the --

7      A    When we'd cover each one that we covered,

8  I'd make a note.

9      Q    Okay.  Directing your attention to No. 2,

10  paragraph No. 2, is says, Investment of Cash Funds

11  Other Than Certificates of Deposit.  And it says,

12  Due to many bank mergers in this area, it is

13  becoming difficult to find banks in which the funds

14  do not already have the federally insured limit.

15  The suggestion:  That part of the money be invested

16  in one- and two-year treasury bills as certificates

17  mature.  Do you see that?

18      A    I do.

19      Q    Was that your suggestion?

20      A    It was.

21      Q    And you don't have any specific investment

22  expertise to give that advice, correct?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

314

1      Q     Okay.  Mr. Perry, I'm showing you a

2   document.  It is minutes of the Pension and Welfare

3   Funds for a meeting that supposedly took place on

4   November 9, 1995.  Do you see that?

5      A     I do.

6      Q     Do you think this was the rescheduled

7   meeting from September?

8      A     I can't -- unless I see something in here

9   which would refer to those items ... it doesn't seem

10  to have any items on there.

11     Q     I guess my question is, what did you do in

12  between January of 1994 and November of 1995 to try

13  to get --

14     A     Trying to get another meeting or --

15     Q     Excuse me, would you please allow me to

16  finish my question.

17     A     Go ahead.

18     Q     -- to get a trustees meeting scheduled?

19     A     That's what we tried to do, apparently.

20     Q     Well, there's almost two years, over a

21  year and a half.

22     A     Two years?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

315

1      Q     I think it was a year and a half, January

2   of '94 --

3      A     September 15th, '95 to November 9th, '95

4   is a couple of months, a month and a few days.

5            I'm sorry, '94 is what I referred you to.

6            MR. KOLKER:  What are you referring to

7   now?  What exhibit?

8            MR. ROSE:  I am referring to Exhibit 19,

9   which is the minutes from January 25, 1994, which

10  was the meeting that we had minutes for before the

11  one in Exhibit 22.

12     A     1994, January.  Right.

13  BY MR. ROSE:

14     Q     All right.  And my math is a little weak,

15  but it's roughly, what, 22 months between meetings.

16     A     Okay.

17     Q     My question is what, as plan

18  administrator, did you do to try and get a meeting

19  scheduled consistent with the trust agreement?

20     A     I'm not too sure that there may not have

21  been a meeting.

22     Q     Are you talking about this  --

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

322

1      A      Yeah, he was having cancer problems and

2   stuff like that, so he wanted to quit.

3      Q      I understand.  But he didn't?

4      A      Pardon?

5      Q      He didn't, though, correct?

6      A      He still has it.  It's in remission.

7      Q      I'm sorry, he didn't quit.

8      A      No, no, he didn't quit.  Was he fired, I

9   don't know that.

10            (Perry Exhibit No. 23 marked for

11   identification and retained by counsel.)

12   BY MR. ROSE:

13      Q      Mr. Perry, I show you a document that's

14   marked Exhibit 23.  It is a dated December 3, 1997,

15   and it's to the trustees of the Operative

16   Plasterers' Pension and Welfare Funds.  And it's

17   from Lee.  Did you ask Lee to send this letter?

18      A      Yes.

19      Q      She's trying to schedule a meeting for

20   December 9th?  Do you see that?

21      A      I see that.

22      Q      It's a little over two years since the

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

323

1    prior meeting.   And the prior meeting was November

2    9, 1995.

3            MR. KOLKER:   What's the question?

4    BY MR. ROSE:

5        Q     The question is, what did you do as plan

6    administrator to try and get the trustees to meet

7    for a trustee meeting consistent with the trust

8    document?

9        A     We were trying.   We wrote.   We called.

10       Q     Two years?

11       A     (Witness nods head.)

12       Q     Did you ever write something that, this is

13   not in conformity with the trust documents?

14       A     We never spelled it out so thusly.

15       Q     Why not?

16           MR. KOLKER:   Objection to form.

17   BY MR. ROSE:

18       Q     Did you understand my question?

19       A     I understood your question.

20       Q     Why didn't you?

21       A     We just didn't.

22       Q     You just didn't think it was your role?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

324

1       A     I didn't say that.

2             MR. KOLKER:  Objection to form.  You're

3    being argumentative again.

4             MR. ROSE:  No, I'm asking a question.

5    BY MR. ROSE:

6       Q     Why didn't you?

7             MR. KOLKER:  He already gave you his

8    answer.

9       A     Because we'd reached a stage where the

10   trustees would respond only if it was something very

11   important:  What do you want me for?  What do you

12   need me for?  And they'd come if it had to be a

13   response.

14   BY MR. ROSE:

15      Q     Was it your understanding as plan

16   administrator that there has to be an in-person

17   meeting for there to be a qualified board of

18   trustees meeting?

19      A     I've been given to understand that if we

20   had six members present, we could do it without a

21   meeting.

22      Q     No, I'm not suggesting -- listen to my

325

1    question.   I wasn't suggesting that there was no

2    meeting and that you sent something around for

3    unanimous consent, which does require all the

4    trustees to sign off on some action.

5           I'm asking whether or not you, as plan

6    administrator, ever considered alternatives to

7    ensure that the trustees met on a regular basis

8    consistent with the trust agreement, by including

9    the possibility of having telephonic board meetings.

10    A    We discussed that with the attorney, who I

11   think advised us at one time or another that if we

12   wanted to take action, then each of the trustees

13   would have to respond with a written reply.  I think

14   somewhere in the written correspondence, there's

15   something to that nature.

16    Q    Is the answer to my question no?

17         MR. KOLKER:  Objection, asked and

18   answered --

19   BY MR. ROSE:

20    Q    Did you understand my question?

21         MR. KOLKER:  No, just a minute.

22   Objection, asked and answered.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

326

1      A      I already gave you an answer.

2             MR. ROSE:   Just go back -- no, actually it

3      wasn't.

4             But please read it back, and we'll get an

5      answer.

6                (Discussion off the record, after which a

7                portion of the record was read as

8                follows: "Question: I'm asking whether

9                or not you, as plan administrator, ever

10               considered alternatives to ensure that

11               the trustees met on a regular basis

12               consistent with the trust agreement, by

13               including the possibility of having

14               telephonic board meetings?")

15     A      No.

16     BY MR. ROSE:

17     Q      Did Fund counsel ever tell you that that

18     would be impermissible board action to have a

19     telephonic board meeting?

20     A      No.

21     Q      Just never considered it as a

22     possibility?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

327

1       A     Never was brought up in that context.

2       Q     But you never even thought about it, is my

3    question.

4       A     I did not.

5             (Perry Exhibit No. 24 marked for

6    identification and retained by counsel.)

7    BY MR. ROSE:

8       Q     Mr. Perry, the document I'm showing you is

9    marked Exhibit 24.  It appears to be minutes for a

10   Pension and Welfare Fund Trustees Meeting held on

11   January 27, 1998.  Do you see that?

12      A     I do.

13      Q     Appearing, four trustees.

14      A     Four trustees.

15      Q     So is it your understanding there were

16   only four sitting trustees at the time?

17      A     Do I understand there are four?

18      Q     Was it -- is it your recollection there

19   were only four sitting trustees at the time this

20   meeting was held?

21      A     Yes.

22      Q     Okay.  And that's based on your

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

342

1          MR. KOLKER:  Let's take a break.

2          MR. ROSE:  We'll wait for you to finish

3    your call.

4          (Recess taken from 4:27 to 4:42 p.m.)

5    BY MR. ROSE:

6          Q    Did you carry fiduciary insurance?

7          A    I carried my own accounting insurance up

8    through 2002, I think it was.  I didn't have

9    fiduciary insurance, as such.

10         Q    Why not?

11         A    I thought my accounting insurance was

12   sufficient, but apparently it didn't cover fiduciary

13   capacities.

14         Q    Did you ever review your policy or ask

15   someone to review it for whether or not to determine

16   whether it would cover fiduciary acts?

17         A    No, I didn't.  Well, I think it specifies

18   somewhere in there that it covers.

19         Q    It was errors and omissions.

20         A    I believe it probably covered me for funds

21   that I might have taken, physically.

22         Q    Your personal errors and omissions

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

343

1  insurance, it's your impression it would cover funds

2  that you might have taken?

3      A    (Witness nods head.)

4      Q    That you were a fiduciary.

5      A    Yes.

6      Q    And you had no fiduciary insurance.

7      A    I do not.

8      Q    And you never considered getting fiduciary

9  insurance; is that correct?

10     A    No, I never did consider it.

11     Q    And the trustees, did they ever ask if you

12 had fiduciary insurance?

13     A    They did not.

14     Q    Is that something that you think is a

15 prudent thing, for a plan administrator providing

16 fiduciary duties to have insurance that would cover

17 their acts?

18         MR. KOLKER:   Objection to form.

19 BY MR. ROSE:

20     Q    Did you understand my question?

21     A    There was --

22     Q    I'm sorry, did you understand my question?

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

344

1    A    I did.  There were letters from counsel on

2    two occasions, which stipulated -- well, on one

3    occasion, which stipulated I should not be covered

4    under the plan carried by the trustees because I

5    would be financially responsible.

6    Q    You mean the insurance covered by the --

7    A    Yes.  They did prepare a document, or a

8    contract, which I never saw, or don't recall seeing

9    or signing.  Subsequently, Scholar prepared a

10   contract to be executed with the trustees.  I don't

11   recall ever getting it or signing it or it being a

12   matter of record.

13   Q    To the best of your knowledge, you never

14   were asked by any trustee at any time as to whether

15   or not you carried fiduciary insurance; is that

16   correct?

17   A    I was not.

18   Q    And is that something you think you would

19   remember?

20   A    I would.

21   Q    And if there were any written requests or

22   demands from trustees requesting evidence of your

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

345

1    fiduciary -- or your having fiduciary insurance --

2         A    No.

3         Q    -- would -- I'm sorry.  There are none.

4    There are no such writings from any trustee?

5         A    None.

6              MR. ROSE:  Okay, let's mark this, please.

7              (Perry Exhibit No. 26 marked for

8    identification and retained by counsel.)

9    BY MR. ROSE:

10        Q    Mr. Perry, I'm showing you a document

11   that's been marked Exhibit 26.  It is a document

12   that appears to be the minutes of a Pension and

13   Welfare Fund board meeting that was held on June 22,

14   1999.  Do you see that?

15        A    I do.

16        Q    So based on the records that we received,

17   when your services were terminated and between

18   Exhibits 24 and 26, it appears -- and my math is a

19   little rough -- about one year and five months

20   since, between the meeting of January 27, 1998 and

21   this meeting in June 1999.

22        A    There was a period of no record of

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

346

1    minutes, right.

2         Q    Right.   About a year and a half.   Does

3    that seem about right between the meeting intervals?

4         A    If there's no evidence of a meeting by

5    minutes, I suppose they're not.

6         Q    And what, if anything, did you do as plan

7    administrator to try and inform the trustees of

8    their obligation under the trust agreement to meet

9    regularly?

10        A    We did nothing except try to get them to

11   have a meeting.

12        Q    Well, that's something.   How did you do

13   that?

14        A    Calling.   Lee would call.   Try to get them

15   together.

16        Q    It took a year and a half to get a date?

17   Did you ever consider at any point setting dates,

18   quarterly dates, a year in advance?

19        A    We did at one time in the past.   We had

20   dates set up on the calendar.   They just passed them

21   off.

22        Q    Item No. 4 in the minutes, the last

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

348

1     your recollection.  This is a meeting held in 1999,

2     and it suggests that there's discussions as to

3     whether or not that vesting rule, that there was so

4     much discussion about from 1989 through 1993-'94, is

5     still being discussed and addressed.

6         A     Well --

7             MR. KOLKER:  Object to the form.  I don't

8     think your question's complete at two points.

9     BY MR. ROSE:

10        Q     Did you understand my question?  My

11    question is, do you have any recollection as to

12    whether or not there were forfeiture issues between

13    1994 and this date?

14        A     It might refresh my mind that it had not

15    been done as it was suggested.

16        Q     And it actually -- well, we'll see it

17    actually wasn't even done in 1999.

18            (Perry Exhibit No. 27 marked for

19    identification and retained by counsel.)

20    BY MR. ROSE:

21        Q     Mr. Perry, I'm showing you a document

22    that's been marked Exhibit 27.  It appears to be

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

349

1   minutes from a Pension and Welfare Board meeting, or

2   board meetings, dated September 19, 2000.  We're a

3   little over a year, about 14 months --

4         A    Pardon?

5         Q    It's about 14 months between the meetings?

6         A    Yeah.

7         Q    What, if anything, did you, as plan

8   administrator, do to try and get the trustees to

9   comply with their trust agreements requirements to

10   hold regular meetings.

11         A    We would discuss with some of the trustees

12   directly and Lee would make phone calls

13   periodically, trying to get them together.  And they

14   were always of the assumption that, What do we have

15   to discuss?

16         Q    And did you ever point out that there's a

17   requirement under the trust agreement just to meet?

18         A    I think they understood that there was a

19   requirement, because they had sat before every three

20   months back in previous years, the same trustees.

21         Q    Well, some of these trustees weren't the

22   same trustees.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

350

1    A    That's true, some weren't, but Lertora was

2   there.

3    Q    So did you ever notify new trustees of

4   their obligation?

5    A    And Pepper was there.

6    Q    Did you ever notify new trustees as to

7   their obligation --

8    A    I'm sure they were all advised.

9    Q    Excuse me, will you let me finish my

10  question.  Did you ever let any of the new trustees

11  know about their obligation to hold regular meetings

12  under the trust agreement?

13   A    I'm sure Lee did.

14   Q    You're sure of it.  What makes you so

15  sure?

16   A    Just that she would.

17   Q    Because she's that good?

18   A    Yes.

19   Q    Who's Ken Adams?

20   A    Pardon?

21   Q    Who is Ken Adams?

22   A    I don't know.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

352

1    Q    Mr. Perry, I'm showing you a document

2    that's been marked Exhibit 28.  After your apparent

3    meeting on September 19, 2000, the next meeting that

4    was held was January of 2002.  Is that these minutes

5    of a meeting in January 2002?

6    A    2002.

7    Q    What, if anything, did you as plan

8    administrator do to ensure that the trustees held

9    regular meetings as required by the trust agreement?

10   A    We would call them and talk with them.

11   Lee would make -- usually called because letters

12   weren't answered a lot of times.  We had always the

13   same answers:  What do we want a meeting for?  What

14   are we going to discuss?

15        Well, that was a long meeting.  10:30 a.m.

16   to 11:00 o'clock p.m.  Whew, man, a tough one.

17   Q    Are you being facetious?

18        Do you recall approximately how long the

19   average board meeting was when they were actually

20   held?

21   A    In recent years?  Before, we were fairly

22   regular.  Maybe every once a year.

Case 8:06-cv-00338-PJM  Document 92-1  Filed 02/29/08  Page 115 of 241
DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

372

1          MR. ROSE:  Don't waste my time.  If you

2    have an objection, make it.

3          MR. KOLKER:  I'm objecting to what I

4    consider to be absurd questions about whether an

5    office --

6          (Inaudible simultaneous speaking.)

7          MR. ROSE:  Off the record, you can waste

8    the time, but you're not wasting mine.

9          MR. KOLKER:  Then keep going.

10         MR. ROSE:  Okay.

11   BY MR. ROSE:

12         Q    Mr. Perry, directing your attention to

13   page 14 of this trust agreement enacted in 1958,

14   that he has no amendments attached to it or anywhere

15   else in your files, Section 2 on page 14 states, The

16   pension trustee shall hold an annual meeting each

17   year during the month of January and bimonthly

18   meetings thereafter, which shall be deemed regular

19   meetings.

20         Do you see that?

21         A    I do.

22         Q    Is it your understanding as to how often

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

373

1    meetings were required under the trust agreement?

2          MR. KOLKER:  Objection, asked and

3    answered.

4       A    The trust agreement spells it out, but the

5    procedure was supposed to be every quarter.

6    BY MR. ROSE:

7       Q    Well, was there an amendment to the trust?

8       A    That's true.

9       Q    I'm sorry, was there an amendment to the

10   trust reflecting quarterly meetings?

11      A    Not to my knowledge.

12      Q    Okay.  So you just changed it

13   administratively without changing the trust

14   instrument.

15      A    There may have been minutes that reflected

16   that change; I do not know.  But the trustees agreed

17   to meet every quarter.

18      Q    Is it your understanding that agreement

19   within minutes, that are reflected in minutes by the

20   trustees, constitute or could possibly constitute an

21   amendment to the trust?

22      A    No.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

374

1           MR. ROSE:  Okay, let's go to the Plan

2    document.

3           (Perry Exhibit No. 34 marked for

4    identification and retained by counsel.)

5    BY MR. ROSE:

6      Q    Mr. Perry, I'm showing you a document.

7    It's the Plan document, and the first pages of the

8    Plan document -- let's see, roughly the first

9    approximately ten pages, nine, ten pages of this are

10   amendments to the plan.  Do you see that?

11     A    Yes.

12     Q    Okay.  Directing your attention to the

13   first page, and this is Amendment 4th of Operative

14   Plasterers' Local Union No. 96 Pension Plan.  Do you

15   see that?

16     A    I see that.

17     Q    It says, By resolution of June 26, 2001,

18   the Board of Trustees of the Plasterers' Fund, said

19   amendment being necessitated by the decision of the

20   Trustees to revise retirement and forfeiture rules

21   of the plan, to be effective July 22, 1999.

22           Do you see that?

382

1      A      I'd have to read it to be familiar with

2   it.

3      Q      Well, what it says is, This plan has been

4   created for the exclusive benefit of the

5   participants hereunder and beneficiaries.  Except as

6   provided in this section, no part of the trust fund

7   shall ever revert to or be use by employer, nor

8   shall the trust fund ever be used other than for the

9   exclusive benefit of the participants or their

10  beneficiaries and for the administrative expenses of

11  this plan.

12            Do you see that?

13     A      I do.

14     Q      Okay.  Take a look at A, B and C, if you

15  could, 13.1, and tell me whether or not forfeitures

16  fit into A, B or C, alleged forfeitures.

17     A      (Witness peruses exhibit.)

18            A, B and C, you're referring to.  Would

19  you call those forfeitures?

20     Q      I'm just asking you whether or not any of

21  those, whether the forfeiture provision that you

22  based your return of monies, whether they fell into

383

1    A, B or C of 13.1.

2         A    As I see it, they provide for the employer

3    to get his money back if certain events happen.

4         Q    Well, it says if there's a mistake of

5    fact.

6         A    Pardon?

7         Q    It says if there's a mistake of fact.

8         A    That's correct.  That's A.

9         Q    Right.  What about, do you think that that

10   fits the forfeiture provision?  Do you think that

11   the contributing employers, were they contributing

12   under a mistake of fact?

13        A    That's a legalese term that I can't

14   identify with.

15        Q    Well, you said the reason they had monies

16   returned is because those participants hadn't

17   reached 1,000 hours.

18        A    I didn't say that at all.  I said these

19   three items here refer to, Return of funds to the

20   employer as specified.  A mistake of fact, whatever

21   that is.

22        Q    Do you see anything in this claim

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

384

1    provision -- and please take as much time as you

2    like.  You can reread it five times if you like.

3    Take a look at this plan provision and see if

4    there's anything in this plan provision that would

5    justify the plan administrator, or the trustees, for

6    that matter, to --

7        A    I'm not qualified to --

8        Q    -- take money out of the plan and send it

9    back to employers.

10       A    I'm not qualified to give that opinion,

11   and that's why the attorney was given the role of

12   finding out whether or not forfeitures could be

13   allowed under the plan.

14       Q    But your job was to administer this plan,

15   correct?

16       A    My job was custodial in fulfilling the

17   wishes of the trustees.

18       Q    So a participant walks in your door and

19   says, I want to retire in five years.  Is that a

20   custodial function when you provided information as

21   to their benefit?

22           MR. KOLKER:  Objection to form.

385

1        A    We're doing that for the trustees.

2    BY MR. ROSE:

3        Q    Of course you're doing it for the

4    trustees.  You're being paid to do it by the

5    trustees.  My question is, is that a custodial

6    function, providing benefit information to

7    participants as to their retirement expectations?

8            MR. KOLKER:  Objection to form and lack of

9    foundation.

10       A    We thought it was.

11   BY MR. ROSE:

12       Q    And are you aware of anything in the plan

13   document that would justify the return of money to

14   Employers?

15       A    I'm not able to really say anything about

16   that, because it's not up to me to make that kind of

17   a judgment.

18       Q    Well, let's go back.  Let me direct your

19   attention to page 26, 11.4 four.

20       A    12.4?

21       Q    I'm sorry, 11.4 on page 26.  It is at the

22   top again.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

391

1    his answer.  Then you can ask the next question, but

2    you cannot interrupt his answer.

3              MR. ROSE:  Okay.  Are you done?

4              MR. KOLKER:  Yes.

5    BY MR. ROSE:

6         Q    Mr. Perry, did you ever interpret this

7    plan provision?

8         A    As an individual --

9         Q    13.1.

10        A    -- looking into the Plan for a specific

11   answer, no.

12        Q    Okay.  If you had read this provision --

13        A    Yes.

14        Q    -- any time before you distributed monies

15   to the contractors, is that -- is this provision

16   something that might have given you pause --

17             MR. KOLKER:  Objection.

18             MR. ROSE:  Will you let me finish my

19   question?  You are extremely rude.  You sit there

20   and you're such a hypocrite.  You claim that I cut

21   off, and you do it all the time.

22             MR. KOLKER:  Well, your question's going

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

392

1    to be objectionable.

2           MR. ROSE:  Well, that's fine, then you can

3    make your objection when I finish my question, sir.

4           MR. KOLKER:  Do you want to stop shouting?

5           MR. ROSE:  Can you please read back where

6    we are.

7           (The record was read at page 391, lines 12

8    through 16.)

9    BY MR. ROSE:

10      Q    To -- before he interrupted me -- to

11   distribute monies to the contractors?

12          MR. KOLKER:  Objection, form.

13   BY MR. ROSE:

14      Q    Did you understand my question?

15      A    I understand your question.

16      Q    Thank you.

17      A    And for a., a mistake of fact.  I don't

18   know what that is, but ... I don't think it alludes

19   to the monies that were returned to the trustees.

20          And the other one, if I'd read it and we

21   had a disqualification of Internal Revenue, I think

22   that as a matter of course, that would be

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

393

1    follow-through that we would do that.  And federal

2    income taxes wouldn't actually go back to the

3    employer if it was his money, after this length of

4    the deduction.

5           Let's put it this way.  I don't think this

6    contributes to the answer that you want.  I don't

7    think this relates to what we might have done with

8    Mr. Coakley's affair.

9       Q    You don't think this has any bearing on

10   the distribution of monies out of the trust to the

11   contractors?

12      A    I don't think so.  In my opinion --

13      Q    Why not.

14      A    -- the only one that's relevant is A.

15      Q    Well, why is -- I'm just referring to

16   13.1, that's all.  I'm just asking you why 13.1

17   isn't relevant with respect to your having checks

18   cut and sent to the contractors.  Money out of the

19   trust was sent back to the contractors, and this

20   provision specifically says that that should not

21   happen.  "It shall never revert to or be used by the

22   employer."  That's what this says.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

433

1   BY MR. ROSE:

2       Q    Well, the participant who -- I'm sorry.

3   For an employee for which contributions were made

4   and amounts were returned for any of the

5   participants, did you notify any of the participants

6   that money had been taken out of the trust and

7   returned to contractors?

8       A    No.

9       Q    Mr. Kolker directed your attention to

10  Exhibit 4, which was a 1990 letter.  It was a

11  January 10, 1990 letter.  And in looking at this

12  letter, it was suggested that you had relied on

13  Mr. Scholar's legal advice or conclusions in this

14  letter; is that correct?

15      A    Yes.

16      Q    And it's dated January 10, 1990.  You see

17  that?

18      A    Yes.

19      Q    Okay.  Directing your attention back to

20  Exhibit 5, at page 0203, this is a February 20, 1991

21  letter.  Over a year later, Mr. Scholar sends a

22  letter to you, the plan administrator -- it was a

434

1   hand-delivered, in fact, letter to you -- where he

2   says in the third full paragraph:  The Plasterers'

3   Plan is a multi-employer plan in which union members

4   have asked the employer to pay a portion of their

5   wages into the union pension and Welfare Fund

6   instead of directly to employees' wages.  This is

7   not a fringe benefit.  It is the employees' money

8   that in a sense is put in a forced savings account.

9          A    Yes.

10          MR. KOLKER:  Is there a question?

11  BY MR. ROSE:

12          Q    Yes.  My question is, this letter was

13  written approximately 13 months later and has a

14  conclusion that is inconsistent with the legal

15  opinion that apparently you relied on with respect

16  to the forfeitures.  Did you ever investigate the

17  plan or trust instrument, or any other document or

18  resource, to determine if in fact Mr. Scholar's

19  seemingly inconsistent legal opinions were accurate?

20          A    There is a letter other than that

21  somewhere, where -- not in this group.

22          Q    I'm asking what did you do.

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

435

1        A     Pardon?

2        Q     What, if anything, did you do in response

3    to receiving a letter 13 months after the letter you

4    claim you relied upon in acting on the forfeitures,

5    that is inconsistent with that legal opinion?

6        A     Did nothing.

7             MR. ROSE:  Thank you.  I have no further

8    questions.

9             THE WITNESS:  But there is a letter --

10            MR. ROSE:  I have no further questions.

11            MR. KOLKER:  Just a minute.  Let the

12   witness finish his answer.

13            MR. ROSE:  He did answer.

14            MR. KOLKER:  No, he's --

15            MR. ROSE:  If you'd like to ask him

16   additional to verify --

17            MR. KOLKER:  Are you going to prevent him

18   from answering his question?

19            MR. ROSE:  He had.  He said he did

20   nothing.

21            MR. KOLKER:  He was answering the question

22   when you cut him off.  I want to provide him the

DEPOSITION OF HARRY C. PERRY, JR.
CONDUCTED ON TUESDAY, AUGUST 7, 2007

436

1    opportunity to complete his answer.

2          MR. ROSE:  Then ask him.

3          MR. KOLKER:  Would you complete your

4    answer, please.

5          THE WITNESS:  There was a letter later on,

6    which I saw and you saw (indicating), which

7    stipulated in one sentence that it was okay to pay

8    the money back to the contractors.

9    BY MR. ROSE:

10         Q    But, in light of that additional comment,

11   my question is, did you do anything to determine the

12   inconsistency --

13         A    No.

14         Q    -- of the legal advice between the January

15   1990 letter from counsel and the February '91

16   letter?

17         A    No.

18         Q    Okay.

19         A    And I don't know when the date of the

20   other letter was.  That's the problem.

21         Q    Is that a letter that would be in the

22   files, that would have been transferred at the time

441

1   forfeiture distributions, not me.

2        Q    But you never did anything, independently

3   or otherwise, to notify the trustees that Mr.

4   Scholar had given these independent opinion -- or,

5   I'm sorry, inconsistent opinions?

6        A    I did not.

7        Q    The trustees were aware of the advice that

8   Mr. Scholar had given in February of 1991, correct?

9        A    I believe they had copies of all his

10  correspondence.

11       Q    Because you would have forwarded it,

12  correct?

13       A    (Witness nods head.)

14            MR. ROSE:  Okay, I have no further

15  questions.

16            MR. BRAMLETTE:  I have no questions.

17            MR. KOLKER:  We're going to read and sign.

18  I'm going to have to let you know whether we'll get

19  a transcript.

20            (Signature having not been waived, the

21  Deposition of Harry C. Perry, Jr., was concluded at

22  6:35 p.m.)

# EXHIBIT 3

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

(Southern Division)

--------------------------------:

PLASTERERS' LOCAL UNION NO. 96   :

PENSION PLAN, et al.,            :

               Plaintiffs   :   Civil Action No.

v.                               :   PJM 06 CV 338

HAROLD PERRY, et al.,            :

               Defendants   :

--------------------------------:

Deposition of DONALD A. MOLNAR

Washington, D.C.

Thursday, August 16, 2007

9:35 a.m.

Job No.:  1-109714

Pages  1 - 176

Reported By:  Susan B. Fillmore, R.P.R.

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 11

1     Q    Okay.  You just remember you were called

2  back into service.

3     A    Yeah, he called me back, and he couldn't

4  get anyone to help with the meeting, so ...

5     Q    When you were the business manager of the

6  local, did you have appointment authority to appoint

7  trustees to the Plasterers' Fund of Washington,

8  D.C.?  And when I refer to the "Fund," I might refer

9  to it as  the "Plan" occasionally.  I'm referring to

10  Plasterers' Funds of Washington, D.C.

11     A    No, I didn't.

12     Q    Do you know who did hold the appointment

13  authority for the union?

14     A    No.  I don't know if there was anyone that

15  did.  When a trustee came due, you got one.

16     Q    Okay.  Do you recall when you became a

17  trustee on the Plasterers' Fund?

18     A    Sometime in the late '60s.

19     Q    In the late '60s?  Well, how long did you

20  serve as a trustee of the Plasterers' Funds?

21     A    I would say maybe 12, 14 years.  But there

22  was a little break.  I resigned once and then they

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 12

1   asked me to come back.

2       Q    Do you recall when that was, when you

3   resigned?

4       A    Probably sometime in the '80s.

5       Q    Do you recall being reappointed in 1988?

6       A    '88?

7       Q    I know these events are a long time ago.

8   I'm just asking questions and if you remember.

9       A    No, I don't remember, whether that was the

10   year or not.

11       Q    Okay.  Do you recall becoming -- being

12   reappointed or being a trustee of the Funds in the

13   late '80s?

14       A    Yes.

15       Q    Okay.  And do you recall when your tenure,

16   second tenure with the Plasterers' Funds ended?

17       A    Probably '96 or '7, something like that,

18   and they got -- I resigned after I retired.

19       Q    Are you sure it wasn't in 2000?

20       A    You know, it could have been.

21       Q    Okay.  Well, I'll show you some documents.

22   We'll go through some documents that will hopefully

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 15

1    you work with Lee Wagner, Mr. Perry's assistant?

2        A    Yes, she was at most of the meetings.

3        Q    Just most of the meetings?

4        A    Well, I would say all of them.

5        Q    Okay.  And if you had a question with

6    respect to the plan, who would you call, Mr. Perry

7    or Ms. Wagner?

8            MR. BRAMLETTE:  Objection to the form.

9    BY MR. ROSE:

10       Q    Do you understand my question?

11       A    Yes, well, you call the office, and you

12   always got Lee Wagner first.

13       Q    Okay.  Do you recall the board of trustees

14   ever reviewing Mr. Perry's qualifications to be the

15   plan administrator?

16       A    No.

17       Q    If the board did review his qualifications

18   to be the plan administrator, do you think you would

19   recall that?

20           MR. KOLKER:  Objection to form.

21           MR. ROSE:  Do you understand my question?

22       A    Yeah, I would remember those.

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 16

1   BY MR. ROSE:

2        Q    Was there ever any concern by the board of

3   trustees that Mr. Perry -- as to whether or not Mr.

4   Perry possessed the qualifications to be the plan

5   administrator?

6             MR. KOLKER:   Objection, lack of

7   foundation.

8        A    No.

9   BY MR. ROSE:

10       Q    Do you recall any review of Mr. Perry's

11  credentials to be plan administrator?

12       A    No.

13       Q    And if there was such a review, do you

14  think you would recall it?

15            MR. KOLKER:   Objection to form.

16       A    I think I would.

17  BY MR. ROSE:

18       Q    Okay.  Do you recall whether or not the

19  board of trustees ever considered seeking

20  competitive bids, a request for proposal, to

21  determine whether or not there were other plan

22  administrators who might possess greater

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 17

1    qualifications to be plan administrator?

2           MR. BRAMLETTE:  Objection as to form.

3    BY MR. ROSE:

4       Q    Do you understand my question?

5       A    Yes.  No, not to my knowledge.

6       Q    Okay.  Were you aware that the Plasterers'

7    Funds were the only employee benefit plans that

8    Mr. Perry worked for?

9       A    No.

10      Q    Is that something that you think you would

11   have liked to have known as you were a trustee?

12      A    Yeah, I imagine, yes.

13      Q    What, if any, inquiry did you ever make

14   with respect to the qualifications of Ms. Wagner to

15   be Mr. Perry's assistant in the administration of

16   the Funds?

17      A    None.

18      Q    And why not?

19      A    Saw no need to.

20      Q    Okay.  While you were a trustee, did you

21   have any idea as to what the fair market price would

22   be for plan administrative services?

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 18

1      A    No, I didn't.

2      Q    Do you know what Mr. Perry was paid as

3    plan administrator?

4           MR. KOLKER:  Objection to form.  What time

5    period?

6    BY MR. ROSE:

7      Q    During the time period he was a trustee.

8      A    No, I didn't.

9      Q    Okay.  Do you recall ever making any

10   inquiry as to whether or not -- as to the amount

11   Mr. Perry was being paid to be plan administrator?

12          MR. BRAMLETTE:  Objection as to form.

13   BY MR. ROSE:

14     Q    Do you understand my question?

15     A    Yes.  No.

16     Q    Do you recall whether the board ever asked

17   Mr. Perry to provide a copy of an agreement between

18   him and the Fund?

19          MR. BRAMLETTE:  Objection to form.

20     A    No.

21   BY MR. ROSE:

22     Q    Do you know whether or not there was an

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 19

1    agreement between Mr. Perry and the Funds for him to

2    provide plan administrative services?

3         MR. KOLKER:  Objection to form.

4    BY MR. ROSE:

5         Q    Do you understand my question?

6         A    Yes.  And, no.

7         Q    Would you be surprised to know that Mr.

8    Perry testified that there was no such agreement for

9    him to provide plan administrative services?

10        MR. KOLKER:  Objection to form, and I

11   don't think that's an accurate statement.  And his

12   testimony --

13        MR. ROSE:  Well, I have his deposition,

14   and you will have an opportunity to clarify when you

15   get it.

16        A    No.

17   BY MR. ROSE:

18        Q    Is that something that you think would

19   have been helpful for you to know when you were a

20   trustee?

21        MR. KOLKER:  Objection to form.

22   BY MR. ROSE:

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 24

1      A      No.

2      Q      Do you recall approximately when he became

3   counsel to the Funds?

4      A      Sometime in the '70s, I would think.

5      Q      Were you a trustee at that time?

6      A      Yes.

7      Q      Okay.  Do you recall there ever being any

8   review of Mr. Scholar's credentials to be counsel to

9   the Funds?

10      A      Not to my knowledge.

11      Q      Were you aware that the Plasterers' Funds

12   were the only employee benefit plans that

13   Mr. Scholar provided legal advice to?

14      A      No.

15      Q      Is that something that, as a trustee, you

16   would have liked to have known?

17           MR. BRAMLETTE:   Objection as to form.

18   BY MR. ROSE:

19      Q      Do you understand my question?

20      A      Yes.  Yeah, I guess.

21      Q      Did you ever make any inquiry of

22   Mr. Scholar's qualifications whatsoever at any point

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 25

1    in time when you were a trustee?

2         A    No.

3         Q    Do you recall any other board member, any

4    other trustee, who made such an inquiry as to

5    Mr. Scholar's qualifications?

6              MR. BRAMLETTE:   Objection as to form.

7    BY MR. ROSE:

8         Q    Do you understand my question?

9         A    Yes.  No, I don't remember.

10        Q    Okay.  Is that something that you think

11   you would remember?

12             MR. KOLKER:   Objection to form.

13   BY MR. ROSE:

14        Q    Do you understand my question?

15        A    Yes.  I don't know whether I would

16   remember it or not.

17        Q    Fair enough.  Were you ever advised by

18   Mr. Perry that the trustees should establish a

19   payroll audit policy?

20        A    No.

21        Q    Do you recall whether Mr. Scholar ever

22   advised the trustees that there should be a payroll

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 26

1    audit policy?

2        A    No.

3        Q    Do you recall Mr. Perry ever advising that

4    the trustees should establish a statement of

5    investment policy?

6        A    I don't recall.

7        Q    Do you recall Mr. Scholar ever advising

8    the trustees that they should establish a statement

9    of investment policy?

10       A    No.

11       Q    What was the investment policy of the

12   board of trustees during the time period that you

13   sat as a trustee?

14           MR. BRAMLETTE:  Objection as to form.  You

15   can answer.

16   BY MR. ROSE:

17       Q    Do you understand my question?

18       A    Yes.  And I don't know whether I can

19   really answer it.  Mr. Perry's office handled the

20   investments.

21       Q    And why is it that you believe that

22   Mr. Perry's office was handling the investments?

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 28

1          MR. KOLKER:  Objection to form.

2     BY MR. ROSE:

3          Q     Do you understand my question?

4          A     Yes.

5          Q     And your answer is?

6          A     Yes.

7          Q     You were aware that he was.

8          MR. KOLKER:  Objection to form.

9     BY MR. ROSE:

10         Q     During the time period that you were a

11    trustee, what directions did the board give -- I'm

12    sorry.

13         What, if any, directions did the Board

14    give Mr. Perry with respect to the types of assets

15    that he should be investing the Plan's assets in?

16         A     None, really, to my knowledge, that I can

17    remember.

18         Q     So it would be fair to say that the

19    trustees allowed Mr. Perry to make those decisions

20    on his own?

21         MR. KOLKER:  Objection to form.  Your

22    questions are all leading questions and improper.

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 32

1      Q      Do you understand my question?

2      A      Yes.  And, yes, I guess it would, yeah.

3      Q      Is that something you think you would have

4    raised at a board meeting?

5           MR. BRAMLETTE:   Objection to form.

6      A      Well, it might have been discussed at a

7    board meeting.

8    BY MR. ROSE:

9      Q      But you don't recall any such discussions.

10     A      No.

11     Q      Do you recall any discussions among the

12   trustees as to the performance of the Fund's assets?

13   Meaning the investment returns of the Plan's assets.

14     A      Nothing specific, no.

15     Q      Do you recall any time, during your tenure

16   as a trustee, where the trustees had any concern as

17   to whether or not Mr. Scholar was competent to

18   provide advice to the Funds?

19     A      No.

20     Q      Do you ever remember a time where the

21   board of trustees ever considered obtaining an

22   independent legal opinion to check the accuracy of

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 33

1    advice that Mr. Perry -- I'm sorry -- that Mr.

2    Scholar provided the trustees?

3         A    No.

4         Q    Who was responsible for the Fund's

5    recordkeeping?

6              MR. KOLKER:  Objection to the form.

7    BY MR. ROSE:

8         Q    Do you understand my question?

9         A    Yes.  You mean specific person or --

10        Q    Person or organization, whoever.

11        A    Well, Mr. Perry's office took care of

12   that.

13        Q    Okay.  Did you receive regular

14   correspondence from the Plan administrator with

15   respect to the administration, ongoing

16   administration of the Funds?

17        A    Yes, we did.

18        Q    What types or correspondence did you

19   receive from the Plan administrator?

20        A    Well, we got a listing as to retirees, how

21   much they drew, how much they had in their Fund.

22        Q    When you say how much they had in their

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 43

1          MR. KOLKER:  Objection to form.

2          MR. BRAMLETTE:  Objection as to form.

3    BY MR. ROSE:

4     Q    Do you understand my question?

5     A    Yes.

6     Q    And your answer?

7     A    No, I don't recall them going that long.

8     Q    Were you aware when you were a trustee as

9    to how often the board was supposed to meet in

10   accordance with the trust document?

11    A    I didn't know, no.

12    Q    Where you ever provided a copy of the

13   trust document?

14    A    Yes, when I first came on as a trustee.

15    Q    Do you recall whether or not you reviewed

16   it?

17    A    I probably read it, yes.

18    Q    Okay.  Did you receive a copy of the plan

19   document when you were a trustee?

20    A    Yeah, I believe I did, yeah.

21    Q    Were you a participant of the Fund, as

22   well?

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 62

1   were members of the Local 96 as plasterers.

2   BY MR. ROSE:

3       Q    Do you recall Mr. Scholar ever advising

4   the board as to whether or not Mr. Coakley qualified

5   as a single employer under the Plan?

6           MR. BRAMLETTE:   Objection.

7       A    I don't, I don't recall.  I don't

8   recollect.

9   BY MR. ROSE:

10      Q    Mr. Coakley goes on to say, Since we are

11  the only affected contractor, the Plasterers' Local

12  96 has no training program for the skill.  Be

13  assured that if this change is implemented, C.J.

14  Coakley Company will terminate its participation in

15  this Plan.

16          Do you see that?

17      A    Yes.

18      Q    It sounds like a threat.  Is that a fair

19  statement?

20      A    Yes.

21      Q    And do you recall whether or not it was

22  communicated to you that Mr. Coakley had made the

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 67

1          (Record read as requested.)

2     BY MR. ROSE:

3          Q     Do you understand the implications of

4     Coakley having taken this deduction?

5               MR. KOLKER:  Objection to form.

6     BY MR. ROSE:

7          Q     Do you understand my question?

8          A     Repeat it.

9               (The record was read as follows:

10              "Question:  Do you understand the

11              implications of Coakley having taken

12              this deduction?")

13         A     Yes, I guess I do.

14    BY MR. ROSE:

15         Q     This was money that was otherwise due the

16    Fund, correct?

17         A     Yes.

18         Q     And Mr. Coakley has, even though a

19    decision hasn't been made by the Funds, taken a

20    deduction.

21              MR. BRAMLETTE:  Objection as to form.  You

22    can answer.

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 68

1    BY MR. ROSE:

2         Q     Do you understand my question?

3         A     If you would, repeat it.

4         Q     At the time that this letter was written

5    by Mr. Coakley, there is nothing in the record that

6    suggests that the board had approved the return of

7    monies to the contractors.  Do you understand?

8         A     Yes.

9         Q     Okay.  Do you understand that Mr. Coakley

10   was unilaterally taking this money by not

11   contributing it?

12        MR. BRAMLETTE:  I reaffirm my objection.

13   BY MR. ROSE:

14        Q     Do you understand?

15        A     Yes.

16        Q     Is it your recollection that Mr. Coakley

17   was the largest contributing employer to the Fund?

18        MR. BRAMLETTE:  Objection, asked and

19   answered.

20        A     At that time, yes.

21   BY MR. ROSE:

22        Q     Okay.  Do you have a sense as to whether

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 69

1   or not this was a large amount of money for the

2   Fund?

3         A    Yes.

4         Q    Do you have any recollection of Mr.

5   Coakley unilaterally taking these alleged forfeited

6   amounts, to quote Mr. Perry, without -- before the

7   board approved such return of contributions?

8              MR. BRAMLETTE:   Objection as to form.   You

9   can answer.

10  BY MR. ROSE:

11        Q    Do you understand my question?

12        A    Yes, but I did not know he took this

13  money.

14        Q    You didn't know that Coakley unilaterally

15  chose not to contribute amounts that were otherwise

16  due?

17        A    Yeah.

18        Q    Do you recall any discussion by the Board

19  as to whether or not legal action should be

20  initiated against Mr. Coakley for his failure to

21  contribute in accordance with his collective

22  bargaining agreement?

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 70

1        A     No, I don't.

2        Q     Directing your attention to the next page

3    of this exhibit, it's a June 17 letter, June 17,

4    1991 letter, again from Ms. Doyle at Coakley.  And

5    she says in this letter, "We have deducted the

6    remaining balance of C.J. Coakley Company's portion

7    of the refunds due contractors for the above-

8    referenced year," referring to 1988 in the re line.

9    And they took an additional -- or deducted an

10   additional $12,797 from the $30,822 that otherwise

11   would have been due.  Do you see that?

12       A     Yes.

13       Q     Do you recall any discussion of the board,

14   by the board, of this unilateral decision by

15   Mr. Coakley to not contribute amounts to the Fund

16   based on alleged forfeiture provision?

17       A     Yes, I remember discussing it.

18       Q     What of those discussions do you recall?

19       A     I don't ...

20       Q     Would you agree that it's improper for a

21   contributing employer to fail to contribute to the

22   Fund in accordance with their collective bargaining

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 71

1    agreement?

2         MR. BRAMLETTE:  Objection, calls for a

3    legal conclusion.

4    BY MR. ROSE:

5         Q    Do you understand my question?

6         A    Yes.

7         Q    And you understood that that was not

8    allowed, correct?

9         A    Yes.

10        Q    And the collective bargaining agreement,

11   that's a contract, correct?

12        MR. BRAMLETTE:  Objection, calls for a

13   legal conclusion.  You can answer.

14   BY MR. ROSE:

15        Q    You negotiated these contracts, correct?

16        MR. BRAMLETTE:  Hold on.  Can we go back

17   and just have him answer your question to which I

18   objected.

19        MR. ROSE:  Okay, certainly.  I thought he

20   had.

21        MR. BRAMLETTE:  I just want to make sure

22   we've got one question at a time.

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 72

1          MR. ROSE:  Certainly.

2          (The record was read as follows:

3          "Question:  And the collective bargaining

4          agreement, that's a contract, correct?")

5          THE WITNESS:  Yes.

6    BY MR. ROSE:

7          Q    You negotiated the contract, correct?

8          A    Yes.

9          Q    And you understood it was legally

10   enforceable, correct?

11         MR. BRAMLETTE:  Objection, legal

12   conclusion.

13         A    Yes.

14   BY MR. ROSE:

15         Q    But the trustees did absolutely nothing to

16   try and enforce Mr. Coakley's collective bargaining

17   agreement; is that correct?

18         MR. BRAMLETTE:  Objection.

19         A    I don't recall.  I guess not.

20   BY MR. ROSE:

21         Q    Do you recall Mr. Perry ever advising the

22   trustees that they had a legal duty as fiduciaries

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 103

1      Q      Do you recognize the signatures on this

2   check?

3      A      Yes, I do.

4      Q      Whose signatures are those?

5      A      Lertora's and myself.

6      Q      Directing your attention to PerrySecond

7   22721, do you see that?

8      A      Yes.

9      Q      Okay, it's a letter dated January 29, 1994

10  from Lee Wagner to C.J. Coakley Company, and at the

11  bottom there's a copy of a check dated July 26,

12  1994.  Do you see that?

13     A      Yes.

14     Q      The lower left-hand corner, it says, For

15  refunds of 1993 contributions made for ineligible

16  employees.  Do you see that?

17     A      Yes.

18     Q      Do you recognize the signatures?

19     A      Yes, I do.

20     Q      And those signatures are from who?

21     A      Lertora and mine.

22     Q      Do you see the amount is $3,416?

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 104

1        A     Yes.

2        Q     At the time you signed this, did you

3   understand that you were returning money to C.J.

4   Coakley from the Plan?

5        A     Yes.

6        Q     Directing your attention to the next page,

7   it's a copy of a check dated February 19, 1994 to

8   C.J. Coakley Company in the amount of $69,281.78.

9   Do you see that?

10       A     Yes.

11       Q     In the Memo portion, it says, For return

12   of forfeited contributions.  And in parentheses, it

13   says,  Non-vested Employees.  Do you see that?

14       A     Yes.

15       Q     Do you recognize the signatures?

16       A     Yes.

17       Q     Is that your signature there?

18       A     Yes.

19       Q     Do you recall signing the $69,000 check

20   returning Plan assets to C.J. Coakley Company?

21       A     I guess I do.  It's my signature.

22       Q     That's a lot of money for the Plasterers'

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 111

1      Q    And do you recognize the signatures?

2      A    Yes, I do.

3      Q    And whose signatures are they?

4      A    James Lertora and myself.

5           MR. ROSE:  That's it for this exhibit.

6           (Molnar Exhibit No. 14 marked for

7      identification and attached to transcript.)

8      BY MR. ROSE:

9      Q    Mr. Molnar, I'm showing you a document

10     that's been marked Exhibit 14.  This is a multi-page

11     exhibit of 1099s for the distributions to Employers.

12     Have you ever seen this document before?

13     A    No.

14     Q    This document was never sent to the

15     trustees by the Plan administrator?

16          MR. KOLKER:  Objection to form.

17     A    I don't know if it was or not.

18     BY MR. ROSE:

19     Q    Okay.  Mr. Molnar, do you recall the

20     trustees ever asking the Plan administrator whether

21     or not he had fiduciary insurance coverage?

22     A    No.

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 112

1    Q    Is that something you think you would

2    recall?

3    A    I would think, yes.

4    Q    As a trustee of employee benefit funds,

5    did you think it was important that your plan

6    administrator have insurance coverage to cover any

7    potential negligence or occurrence that caused a

8    loss to the Plan?

9         MR. BRAMLETTE:   Objection as to form.

10   BY MR. ROSE:

11   Q    Do you understand my question?

12   A    Yes.  Yes, I would think, yes.

13   Q    Okay.  Did you ever make inquiry of your

14   fund counsel as to whether or not he had malpractice

15   insurance?

16   A    No.

17   Q    So the board of trustees never required

18   the Plan administrator or Fund counsel to provide

19   certification that they, in fact, had coverage to

20   make the Plan whole for negligence or other events

21   that caused a loss to the Plan as a result of their

22   conduct?

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 118

1    after this date, soon after this date.  Does that

2    refresh your recollection as to what that entry

3    related to?

4         A    No.  This disposition of funds.  I don't

5    know if it was the funds given back to the

6    contractors and it's in there.  But, I mean, I don't

7    know if that's what it is saying or not.

8         Q    Well, we just went through that exhibit

9    where you said you had signed a bunch of checks that

10   had been returned to contractors.

11        A    Right.

12        Q    For, at least according to the check and

13   the letter, for forfeited contributions under this

14   purported rule required under the Plan.  Would you,

15   as trustee, have signed a check if it had not been

16   authorized by the board of trustees to return the

17   amounts to the contractors?

18        A    No.

19        Q    So do you clearly recall the board

20   authorizing the return of Plan assets to the

21   contractors?

22        A    I don't clearly recall, but I -- no.

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 119

1      Q     But you would not have signed checks

2    returning amounts from the Pension Fund to

3    contractors unless there had been such

4    authorization, correct?

5      A     Yes.

6            (Molnar Exhibit No. 17 marked for

7    identification and attached to transcript.)

8    BY MR. ROSE:

9      Q     Mr. Molnar, I'm showing you a document

10   that's been marked Exhibit 17.  It's really three

11   sheets of basically the same document with different

12   marginalia put on it by different people.  Mr. Perry

13   testified that one appeared to be his handwriting

14   and one appeared to be Lee's.  The question is, do

15   you recall -- I'll sorry.  And this appears to be an

16   agenda for -- it has a line through it, and it says,

17   a meeting proposed date of September 12, 1995.  Do

18   you recall ever seeing an agenda for a meeting that

19   took place on or near that date?

20     A     I don't recollect.  I don't know.

21     Q     Directing your attention to No. 2.  It

22   says, Investment of cash funds other than

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 120

1    certificates of deposit.  It says, Due to the many

2    bank mergers in this area, it is becoming difficult

3    to find banks in which the Funds do not already have

4    a Federally insured limit.  Suggestion:  That part

5    of this money be invested in staggered one- and

6    two-year Treasury bills as certificates mature.

7              Do you see that?

8    A    Yes.

9    Q    Do you recall that issue coming before the

10   board?

11   A    Yes.

12   Q    Do you recall Mr. Perry making this

13   recommendation?

14   A    Yes.

15             MR. KOLKER:  Objection to the form.

16   BY MR. ROSE:

17   Q    I'm sorry?

18   A    Yes.

19   Q    Yes, you do.  Do you recall Mr. Perry ever

20   providing other investment suggestions for the

21   board's consideration?

22   A    Nothing specific, no.

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 121

1     Q     Do you know whether or not the board ever

2     put in writing, in any form whatsoever, instructions

3     for Mr. Perry's investment activities?

4     A     No.

5           (Molnar Exhibit No. 18 marked for

6     identification and attached to transcript.)

7     BY MR. ROSE:

8     Q     Mr. Molnar, I'm showing you a document.

9     It's minutes from a board meeting dated November 9,

10    1995.  Do you see that?

11    A     Yes.

12    Q     Based on these minutes, it appears that

13    you were in attendance?

14    A     Yes.

15    Q     Directing your attention to paragraph

16    No. 2, it says, The trustees unanimously adopted a

17    resolution to authorize investing the funds in

18    staggered one- and two-year Treasury bills, as well

19    as Federally-insured certificates of deposit.

20          Do you see that?

21    A     Yes.

22    Q     Directing your attentions to the second

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 123

1    for quite some time, we have only four trustees.   I

2    hope all of you can make it.   Thanks.

3              Do you see that?

4        A    Yes.

5              The prior meeting minutes that we have for

6    1995, it appears that it was over two years between

7    trustee meetings.   Do you recall there being a

8    two-year interval between meetings, from '95 to '97?

9              MR. BRAMLETTE:   Objection as to form.   You

10   can answer.

11   BY MR. ROSE:

12       Q    Do you understand my question?

13       A    Yes, I do.   But, I -- no.   I would say no.

14       Q    Okay.   Were you aware that the trust

15   document directed the board to meet far more

16   frequently than every two years?

17       A    Seems to me I did, yes.

18       Q    Were you aware that fiduciaries of benefit

19   plans, ERISA benefit plans, are required to

20   administer the funds, the plans, in accordance with

21   the governing documents?

22             MR. BRAMLETTE:   Objection, calls for legal

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 124

1    conclusions.   You can answer.

2    BY MR. ROSE:

3        Q    Do you understand my question?

4        A    Yes.   No, I didn't know that.

5        Q    The plan administrator, Mr. Perry, never

6    advised the trustees of that fact?

7            MR. KOLKER:   Objection to form.

8        A    I don't think so, no.

9    BY MR. ROSE:

10       Q    Do you recall Mr. Scholar ever advising

11   the trustees that they were required to administer

12   the Fund in accordance with the governing

13   documents?

14       A    No.

15           (Molnar Exhibit Nos. 20 through 22 were

16   marked for identification and attached to

17   transcript.)

18   BY MR. ROSE:

19       Q    Mr. Molnar, I'm just directing your

20   attention to Exhibit 20 at this time.   It's minutes

21   from a meeting that was apparently held on January

22   27, 1998.   Do you see that?

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 125

1     A     Yes.

2     Q     It appears that it was a year or so

3  between meetings.  Appears that you were in

4  attendance at this meeting.

5     A     Yes.

6     Q     You have very good attendance at the

7  meetings.  Do you recall ever missing one?

8     A     Not many.

9     Q     Okay.  There are only four trustees.

10  Why?

11     A     They couldn't get anyone.  The membership

12  was down to not very many members.

13     Q     Were you aware that the trust agreement

14  directed the Fund to have three trustees on each

15  side?

16     A     No, I didn't know.

17     Q     So you were not -- you don't recall being

18  advised by the Plan administrator that the trustees,

19  the trustees with appointing authority had a

20  responsibility to appoint someone?

21        MR. KOLKER:  Objection to form.

22     A     Not to my recollection, no.

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 136

1      Q    Okay, directing your attentions to page 14

2   of the trust agreement.  It says -- Section 2

3   towards the top.  It says, The Pension trustees

4   shall hold an annual meeting each year during the

5   month of January and bimonthly meetings thereafter

6   which shall be deemed regular meetings.  At the

7   annual meeting, the Pension Trustees shall select

8   from among them a chairman and co-chairman of the

9   Pension trustees to serve for a period of one year

10  commencing with regular or special meetings.

11         And it goes on.

12         Do you recall whether during your tenure

13  as trustee, whether or not the trustees ever met at

14  the frequency required under the trust agreement?

15      A    No.

16      Q    You don't recall?

17      A    We never met those times.

18      Q    Okay.  Is there any particular reason why

19  it was the trustees did not meet in accordance with

20  the trust document?

21      A    I have no idea.

22      Q    Do you recall when the Plan administrator

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 137

1    or Fund counsel ever advised the trustees of such a

2    requirement, to hold more frequent meetings?

3         A    No.

4         Q    Do you recall whether the Plan

5    administrator or Fund counsel ever advised that you

6    could amend the trust agreement to provide for less

7    frequent meetings?

8         A    No.

9         Q    What, if anything, did the Board of

10   Trustees do to oversee the Plan administrator and

11   Fund counsel in between meetings with respect to

12   Plan administration issues?

13        A    When I was a business manager, the only

14   thing we did, we would communicate at times by

15   phone.  That was all.

16        Q    What kind of issues would you address?

17        A    Well, anything.  If they needed a

18   contractor's name or a new member or an apprentice

19   or what have you.

20             (Molnar Exhibit No. 24 marked for

21   identification and attached to transcript.)

22   BY MR. ROSE:

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 141

1    actually page -- I think it's the second-to-last

2    page, page 29.   Section 13.1, the page before the

3    signature page.   It says, Exclusiveness of Benefits,

4    right at the top, 13.1.   Do you see that, sir?

5         A    Yes.

6         Q    It says, This Plan has been created for

7    the exclusive benefit of the participants

8    hereunder and beneficiaries.   Except as provided in

9    this section, no part of the Trust Fund shall ever

10   revert to or be used by employer, nor shall the

11   Trust Fund ever be used other than for the exclusive

12   benefit of the participants or their beneficiaries

13   and for the administrative expenses of this Plan.

14        Do you see that?

15        A    Yes.

16        Q    Do you recall ever being advised of

17   ERISA's anti-inurement provision?

18        A    No.

19        Q    Do you recall ever being advised of this

20   specific section of the Plan document?

21        A    No.

22        Q    Based on your reading of this section, do

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 142

1    you believe that the reversion of assets to

2    contributing employers is inconsistent with this

3    provision?

4           MR. KOLKER:  Objection, calls for a legal

5    conclusion.

6           MR. BRAMLETTE:  Objection, calls --

7           MR. ROSE:  Actually, he was empowered

8    to --

9           MR. KOLKER:  His prior objection.  So

10   you've got it.

11          MR. ROSE:  That's fine.

12   BY MR. ROSE:

13      Q    Do you see this?

14      A    Yes.

15      Q    Does this appear to be inconsistent with

16   the action taken by the board of trustees to get

17   Plan assets back to employers?

18      A    Yes.

19      Q    If you had been advised by the Plan

20   administrator that it was inconsistent to give money

21   back to employers, inconsistent with the Plan

22   document provisions and ERISA, would you have

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 143

1   allowed Plan assets to be returned to the

2   contractors?

3          MR. KOLKER:  Objection to form.  It's a

4   hypothetical question.

5   BY MR. ROSE:

6       Q    Do you understand my question?

7       A    Yes.

8       Q    And your answer is?

9       A    No.

10      Q    You would not have allowed the reversion

11  of assets had you been advised that it was improper

12  under the --

13          MR. KOLKER:  Objection; he's answered.

14          MR. BRAMLETTE:  Objection.

15          MR. KOLKER:  The question's been answered.

16  You don't need to repeat his answer as you're

17  characterizing it.

18          MR. ROSE:  And your objection's noted.

19      A    Yes.

20  BY MR. ROSE:

21      Q    Directing your attention to the last page,

22  is that your signature there in the lower right-hand

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 144

1    corner?

2         A    Yes.

3         Q    Did you read this document before you

4    signed it?

5         A    I probably read some of it.

6         Q    But not the whole thing, you think?  If

7    the Fund counsel had advised you that giving Plan

8    assets back to employers was inconsistent with the

9    plan document and ERISA, would you have allowed

10   monies to be returned to the employers?

11        A    I don't think so.

12        Q    Why do you say you don't think so?

13        A    No.  I would say no.

14        Q    Did the board of trustees ever inform

15   participants of the Plan that it had given money,

16   Plan assets, back to contributing employers?

17        A    I don't know.  I couldn't answer that yes

18   or no.  I don't know.

19        Q    You don't recall the board of trustees

20   ever directing the Plan administrator to advise the

21   participants that balances contributed in their

22   particular names had been returned to contributing

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 145

1     employers?

2              MR. BRAMLETTE:  Objection as to form.

3              MR. KOLKER:  Objection to form.

4     BY MR. ROSE:

5         Q    Do you understand my question?

6         A    Yes.  No.

7         Q    Is that something you think you would

8     remember?

9         A    Yeah, I think I would, yes.

10        Q    Do you recall when Mr. Perry ever advised

11    the board of trustees that giving Plan assets back

12    to employers constituted a prohibited transaction

13    under ERISA?

14             MR. KOLKER:  Objection to form; lack of

15    foundation.

16    BY MR. ROSE:

17        Q    Do you understand my question?

18        A    Yes.  No.

19        Q    Is that something you think you would

20    recall?

21        A    Yes.

22        Q    Do you recall whether Mr. Scholar ever

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 147

1      A     Lertora.

2      Q     Mr. Lertora?  Do you recall what Mr.

3  Lertora asked?

4      A     He didn't think it was right.  In fact, he

5  told them he didn't want the money back.

6      Q     When we went through that exhibit with the

7  checks, it appeared you signed the check that was

8  presumably sent to Mr. Lertora.  Do you recall

9  whether that check was ever returned?

10      A     That, I don't know.

11      Q     During your time as trustee, do you recall

12  at any point whether the Plan administrator advised

13  the board that ERISA required that Plan assets be

14  invested in a diversified portfolio?

15      A     No.

16      Q     Is that something you think you would

17  remember?

18      A     I don't know whether I would have or not.

19      Q     Okay.  Do you recall at any time when you

20  were a trustee whether Mr. Scholar, Fund counsel,

21  ever advised the trustees that ERISA required that

22  Plan assets be invested in a diversified portfolio?

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 148

1      A      No.

2      Q      Do you understand what a diversified

3  portfolio is?

4      A      Not really.

5      Q      Do you understand the types of investments

6  that the Plans you were a trustee to held?

7      A      I believe that the bulk of it was CDs.

8      Q      And what type of investment is that?  What

9  is your understanding of what type of investment

10 that is?

11         MR. KOLKER:  Objection to form.

12 BY MR. ROSE:

13     Q      Do you understand my question?

14     A      I understand the question, but I really

15 don't know an answer.

16     Q      Well, there are conservative investments

17 and riskier investments.  There's a spectrum.  Where

18 on that spectrum would you see CDs?

19     A      Conservative.

20     Q      Okay.  And if most of the assets were in

21 CDs, a conservative investment, would you understand

22 that to be a diversified portfolio?

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 149

1            MR. BRAMLETTE:   Objection.

2    BY MR. ROSE:

3        Q    Do you understand my question?

4        A    Yeah.  No.

5        Q    If you had been advised by the Plan

6    administrator or Fund counsel that you were required

7    to have a diversified portfolio for the Plan's

8    assets, would you have in fact diversified the

9    assets of the Plan?

10           MR. BRAMLETTE:   Objection, compound.  You

11   can answer.

12   BY MR. ROSE:

13       Q    Do you understand my question?

14       A    Yes.  Well, I think I would have been in

15   favor of diversifying the investment.

16       Q    Was there ever any consideration to hire

17   an investment manager to handle the assets of the

18   Plan?

19           MR. BRAMLETTE:   Objection, asked and

20   answered.

21           MR. ROSE:   I asked about an investment

22   consultant.

8b6ee0b1-067e-42fe-a166-7f0a07ba953c

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 152

1   BY MR. ROSE:

2       Q    The question is, does that refresh your

3   recollection as to whether there were new trustees

4   after 1994 that joined the board.

5       A    Oh, yes.

6       Q    Mr. Robinson and Mr. Hickman, correct?

7       A    Right.

8       Q    My question is, at any point did the plan

9   administrator -- are you aware whether the plan

10  administrator or Fund counsel -- take them one at a

11  time.  Are you aware whether the plan administrator

12  ever advised Mr. Hickman or Mr. Robinson as to the

13  reversion of assets to the employers in 1994?

14      A    I have no idea.

15      Q    Do you recall any such discussions taking

16  place at any board meetings that you attended?

17      A    With those two gentlemen?

18      Q    Yes.

19      A    No.

20      Q    Same question, do you recall Mr. Scholar

21  ever advising the trustees, the new trustees,

22  Mr. Robinson and Mr. Hickman, that assets of the

DEPOSITION OF DONALD A. MOLNAR
CONDUCTED ON THURSDAY, AUGUST 16, 2007

Page 153

1  plan had been reverted, handed back to employers in

2  1994?

3      A    No.

4      Q    Do you recall any trustee of the board

5  advising Mr. Hickman or Mr. Robinson of the fact

6  that plan assets had been paid to employers in

7  1994?

8      A    Not to my knowledge.

9           MR. ROSE:  Let me just take a brief break.

10          (Recess taken from 12:54 to 1:01 p.m.)

11          (Molnar Exhibit No. 25 marked for

12  identification and attached to transcript.)

13  BY MR. ROSE:

14      Q    I'll show you an August document that's

15  been marked Exhibit 25.  This is referred to as a

16  Form 5500.  It's an annual filing required with the

17  Federal government for all qualified employee

18  benefit plans.  Do you recall whether or not, as a

19  trustee, you would receive copies of the Form 5500s

20  that were filed with the Federal government?

21      A    Yes.

22      Q    Every year?

# **EXHIBIT 4**

1

1         IN THE UNITED STATES DISTRICT COURT

2             DISTRICT OF MARYLAND

3              (Southern Division)

4  --------------------------------:

5  PLASTERERS' LOCAL UNION NO. 96   :

6  PENSION PLAN, et al.,         :

7               Plaintiffs   :  Civil Action No.

8  v.                    :  PJM 06 CV 338

9  HAROLD PERRY, et al.,        :

10            Defendants   :  **ORIGINAL**

11  --------------------------------:

12

13       Deposition of JAMES S. LERTORA

14           Washington, D.C.

15       Tuesday, September 18, 2007

16            10:02 a.m.

17

18

19

20  Job No.:  1-112167

21  Pages  1 - 244

22  Reported By:  Susan B. Fillmore, R.P.R.



1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

20

1      A     I don't know.

2      Q     Was it in the '70s?

3      A     I don't know.  I don't recall -- that

4   wasn't very important to us.  Getting it done was

5   important.

6      Q     Okay.  You're here today because at some

7   point in time you served as a trustee in the

8   Plasterers, to the Plasterers' Funds here in

9   Washington, D.C.  When did you first become a

10  trustee to the Plasterers' Funds?  Do you recall?

11     A     Jeez.  Yeah, you're asking questions I

12  don't -- how in the hell am I going to remember

13  them?  I don't know.

14     Q     I understand we're talking about instances

15  that are a long ways back.  And I'm just asking for

16  your best recollection.  If you don't recall, then

17  just please let me know, but I may use --

18     A     I'm not here -- I just don't know.

19     Q     -- follow-up questions to try and help you

20  pin down dates.

21           Do you think it was in the '60s?

22     A     I don't know.  I can't say any more than

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

21

1    that.  You can ask me three or four more times,

2    you'll get the same answer.

3              MR. BRAMLETTE:  Just answer the question.

4    BY MR. ROSE:

5        Q    That's fine.  Do you recall who was a

6    trustee at the time you began serving as a trustee?

7        A    No.

8        Q    Do you recall how it is you became

9    appointed as a trustee?

10       A    They needed somebody.  That's why you

11   appointed anybody.  We didn't have a lot of

12   contractors.

13       Q    Who's the "they" that you're referring to?

14       A    I'm sorry?

15       Q    Who is the they that you're referring to?

16       A    Well, my old boss is one.  I may have even

17   taken his place.

18       Q    Who was your old boss?

19       A    Bill Farris.

20            MR. KOLKER:  Bill what?

21            MR. ROSE:  Fryars, I think he said.

22            THE WITNESS:  I'm sorry?

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

22

1          MR. KOLKER:  I couldn't hear what you

2    said.

3          THE WITNESS:  Bill Farris, F-a-r-r-i-s.

4          MR. BRAMLETTE:  Farris.

5    BY MR. ROSE:

6       Q    And you were appointed by an employer

7    association?

8       A    We didn't do things formal like you-all

9    do.  They said they needed a trustee and they asked

10   me to be one.  We were not appointed, as such.  If

11   we could -- you could get somebody to do it, you

12   asked them, and they either did it or didn't do it.

13      Q    So as best you recall, you were asked to

14   do it, and you were told when a meeting was and you

15   showed up?

16      A    That's right.

17      Q    Do you recall who the plan administrator

18   of the Funds were at the time that you --

19      A    The administrator, he's the same fellow

20   that finished up.

21      Q    Is that Harry Perry?

22      A    Harry Perry.

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

25

1    don't recall his name.

2              MR. BRAMLETTE:  Let him finish it.  I know

3    you probably know where he was going, but let him,

4    because --

5    BY MR. ROSE:

6        Q    It's going to be a written record.  It

7    helps make it easier for our court reporter and

8    anyone reading it.

9              So do you recall who the Fund counsel was

10   at the time when you began serving?

11       A    No.

12       Q    Okay.  Was it Sam Scholar?

13       A    No.

14       Q    Okay.  Do you recall when Mr. Scholar

15   began serving as Fund counsel to the Plasterers'

16   Funds?

17       A    He was just introduced to us:  This is our

18   new lawyer.  That's all we knew about it.  Fine with

19   me.

20       Q    How was he introduced?  By whom, do you

21   recall?

22       A    Well, we showed up at a meeting, and they

26

1    introduced him to us.

2        Q    When you say "they," meaning Mr. Perry

3    introduced him?

4            MR. KOLKER:   Objection.

5        A    I'm sure it was Mr. Perry or Ms. Wagner.

6    I don't remember.

7    BY MR. ROSE:

8        Q    Okay.  But someone at the administrator's

9    office?

10       A    Yes.

11       Q    Do you recall there being a vote of the

12   board of trustees as to whether or not to retain

13   him?

14       A    There was not.

15       Q    Okay.

16       A    Not if I was there; I don't even know if I

17   was there.

18       Q    What kind of interaction did you have with

19   Mr. Perry during your time as a trustee on the

20   Funds?

21           MR. KOLKER:   Objection to form.

22   BY MR. ROSE:

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

29

1    any point when you served as a trustee, making an

2    effort to determine what the fair market rate was

3    for plan administrative services?

4        A    No.

5        Q    Do you know how much Mr. Perry was paid

6    for plan administrative services?

7        A    Don't have a clue.  I know what I was

8    paid.

9        Q    And that was zero?

10       A    That's it, right.

11       Q    That's a good thing.  That would have been

12   another problem.

13           Do you have any -- do you know whether or

14   not Mr. Perry served as plan administrator for any

15   other employer benefit funds?

16       A    No.  I don't know what else he did.  He

17   couldn't make a living on us.

18       Q    Were you aware that his primary employment

19   was as an accountant?

20       A    Was what?

21       Q    Was as an accountant.  That was his

22   primary employment?

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

30

1    A    No.

2    Q    You were not aware of that?

3    A    No.

4    Q    You never had any idea what he did.

5    A    I didn't have a clue except what I knew he

6    did, and I knew he took care of this Local 96 Health

7    and Welfare and Pension Plan.

8    Q    You testified a little earlier about

9    Mr. Scholar being introduced to the board as a new

10   attorney.  Do you recall whether the board did any

11   review of his credentials to serve as Fund

12   counsel?

13   A    I don't recall.

14        MR. BRAMLETTE:  Objection as to form.  Go

15   ahead; you can answer.

16   A    I don't recall any.

17   BY MR. ROSE:

18   Q    Is that something you think you would

19   recall?

20   A    Yeah, probably, because -- I don't even

21   know what the guy was paid.  I don't know.  I don't

22   dig into things that I figure are none of my

31

1    business, and I just didn't dig into it.  I assume

2    it was somebody else's job; it wasn't my job.

3         Q    To figure out --

4         A    So I just ignored it.

5         Q    It was your sense while you were a trustee

6    that what service providers were paid was not a

7    responsibility for the trustees?

8              MR. KOLKER:  Objection.

9              MR. BRAMLETTE:  Objection to form.

10        A    I didn't even know what ours was.

11   BY MR. ROSE:

12        Q    Okay.

13        A    And we were never instructed.  I don't

14   even know -- I just assumed whatever we were

15   supposed to do, we were doing it.

16        Q    Do you know whether or not there was any

17   written agreement between Mr. Perry and the Fund for

18   his permission of the plan administrative services?

19        A    No.  That was took place way before me.

20        Q    And what about with Mr. Scholar, do you

21   know whether or not there was any written agreement

22   between the Fund and Mr. Scholar?

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

32

1    A    No, I do not.

2    Q    Do you recall whether or not the board of

3    trustees at any point that you served as a trustee

4    ever considered hiring an independent counsel to

5    give an opinion at any point?

6         MR. BRAMLETTE:  Objection as to form.  You

7    can answer.

8    A    No.

9    BY MR. ROSE:

10   Q    Is that something you think you would

11   remember if the board considered it?

12   A    I know I would remember it.

13   Q    Okay.  Who was responsible for maintaining

14   a Fund's records?

15   A    I assume the administrator.

16   Q    Did you receive correspondence from the

17   administrator advising you on financial matters or

18   other ongoing administrative issues?

19   A    What we did, we did at the meeting.

20   Q    Do you recall approximately how often the

21   board met?

22   A    Sometimes --

88

1    invested in amounts smaller than jumbo certificates

2    of deposit to take advantage of better interest

3    rates when available.  Do you see that?

4        A    Yes.

5        Q    Was there an investment policy of the

6    Fund?  Was there a written investment policy?

7             MR. KOLKER:  Objection; that's two

8    questions.

9        A    I don't know.  Not that I'm aware of.

10   BY MR. ROSE:

11       Q    Do you recall the board of trustees ever

12   discussing whether or not a statement --

13       A    We didn't do it.

14       Q    -- of investment policy should be created?

15   Sorry.  You can answer now.

16       A    No, I don't think the trustees did that.

17       Q    Okay.  Do you recall Mr. Perry or

18   Ms. Wagner --

19       A    Well, like I said --

20            MR. BRAMLETTE:  Let him finish.

21   BY MR. ROSE:

22       Q    Excuse me, let me finish.  Do you recall

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

89

1    Mr. Perry or Ms. Wagner ever suggesting to the

2    trustees that there should be a statement of

3    investment policy, a written statement of investment

4    policy?

5        A    No.

6        Q    Do you recall Mr. Scholar ever advising

7    the trustees that there should be a written

8    statement of investment policy?

9        A    No.

10       Q    Directing your attention to No. 3, it

11   says, Resolution to transfer funds from the Pension

12   Fund to the Welfare Fund to replace those Welfare

13   Fund contributions appropriated by Coakley as a

14   credit to his expected Pension Fund forfeit refunds.

15   Do you see that?

16       A    Yes, I see it.

17       Q    Do you see the word "appropriated by

18   Coakley"?

19       A    Uh-huh.

20       Q    Do you recall there being any discussion

21   of the board of trustees about Mr. Coakley's

22   appropriating funds?

95

1   questions.

2          Item No. 2 states, The trustees

3   unanimously adopted a resolution permitting the

4   administrator to buy CDs of less than $100,000 to

5   get better rates, in his discretion.

6          Do you see that?

7      A    I see it.

8      Q    Was that your understanding, that Mr.

9   Perry had discretion to purchase CDs?

10     A    Well, I assumed he did.

11     Q    Why do you say that?

12     A    Because it was done.  We didn't go to the

13  bank.  I don't know if he or Lee did it, went out

14  and bought the stuff.  I don't have a clue.

15     Q    Did it matter to you?

16     A    No.  As long as it was invested.

17     Q    It didn't matter how, so long --

18     A    I'm sorry?

19     Q    I'm asking a question.  To you it didn't

20  matter how the money was invested, so long as he

21  and/or Lee was taking care of the investments?

22          MR. BRAMLETTE:  Objection.

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

129

1      Q     Well, you were a trustee of the Pension

2   Fund, correct?

3      A     That's right, we were.

4      Q     So why is it that you felt that it wasn't

5   any of your business whether or not money was

6   returned out of the --

7      A     Because nothing was explained.

8      Q     -- out of the Pension Trust Fund to

9   contributing employers?

10         MR. BRAMLETTE:   Objection to form and

11   argumentative.

12   BY MR. ROSE:

13      Q     Do you understand my question?

14      A     Yeah.  Do you want an answer?

15      Q     Please.

16      A     Oh, well.  You know, things should have

17   been explained to the trustees maybe a little bit

18   better and we'd understand, but we were never much

19   of a part of anything with Coakley and the

20   administrator.  Maybe we should have been.

21      Q     Do you recall whether or not you voted

22   against the return of monies to the --

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

130

1     A    I didn't even know if we voted on it.

2     Q    Okay.  And do you recall whether -- it's

3   your recollection that only Mr. Coakley received

4   monies from the trust back into his company.

5     A    As far as I know.

6     Q    Okay, let's move on.

7     (Lertora Exhibit No. 19 marked for

8   identification and retained by counsel.)

9   BY MR. ROSE:

10     Q    Mr. Lertora, I'm showing you a document

11   that's marked Exhibit 19.  It's a cover memo or

12   letter from Lee Wagner.  It's dated January 30, '95,

13   and it says, The enclosed form 1099 Misc. shows the

14   amount of contributions paid to Operative

15   Plasterers' Local Union No. 96 Pension Fund by Blake

16   Construction Company, Inc.  The employees for whom

17   these payments were made did not meet all

18   requirements for membership and/or vesting under the

19   terms of the pension plan agreement, and the

20   contributions are being refunded.

21     Do you see that?

22     A    Yes, I do.

131

1      Q      Does that refresh your recollection at all

2   as to whether or not the trustees approved the

3   return of monies from the pension fund to

4   contractors?

5      A      This is a first I've heard of it.

6      Q      Hang on one second.

7           Mr. Lertora, can you just scan through

8   this exhibit, which is a collection of letters and

9   various tax forms relating to the Pension Fund's

10  return of assets to contributing employers.  Can you

11  just take a look through and see whether or not

12  anything in here refreshes your recollection as to

13  the trustees' decision to return plan assets to

14  contributing employers.

15     A      (Witness peruses exhibit.)

16          MR. BRAMLETTE:  You're going to ask him

17  about the whole thing?

18          MR. ROSE:  I'm going to take him to

19  specific things, I think.  I'm just trying to

20  refresh his recollection.  I thought maybe some

21  names, amounts, might help.

22          MR. BRAMLETTE:  I don't want him answering

132

1  questions of the whole thing if he hasn't had time

2  to read the whole thing.

3           MR. ROSE:  No, absolutely not.  He can

4  have all the time he wants, but I'm going to direct

5  his attention to a few specific ones that you've

6  seen.

7  BY MR. ROSE:

8     Q    Mr. Lertora, let me try and direct your

9  attention to a specific document, okay.

10  Approximately 20 pages in, there's a letter dated

11  July 25, 1994.  There's a document number in the

12  lower right-hand corner that says PerrySecond --

13     A    Perry what?

14     Q    PerrySecond, it's this number down here.

15     A    What is the number?

16     Q    It's 22- --

17           MR. BRAMLETTE:  What page number?

18           MR. ROSE:  I'm looking for the letter.

19           Perry Second 22724.

20           MR. KOLKER:  What page number are you

21  looking for?

22           MR. ROSE:  It's a letter dated July 25,

140

1    Lertora, Inc. which could not be credited to the

2    employees for whom they were made.

3             Do you see that?

4        A    Yeah.

5        Q    Directing your attention to the next page,

6    the next page is document number PerrySecond 22796,

7    and there's a letter, or I'm sorry, a check in the

8    amount of 3,363.70 made out to James S. Lertora,

9    Inc.  Do you see that?

10       A    Yes.

11       Q    And it says, For: Refund of forfeited

12   contributions.  Do you see that?

13       A    Yes.

14       Q    Is that your signature there on the

15   right-hand side?

16       A    Yes, it is.

17       Q    You signed a check from the Pension Fund.

18       A    Signed it to myself.

19       Q    To yourself.  Do you recall why you did

20   that?

21       A    I don't even recall doing it.

22       Q    Okay.  Do you recall anyone telling you to

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

141

1   do that it?

2        A    No.

3        Q    And you have absolutely no recollection of

4   receiving this $3300.

5        A    No, I do not.

6        Q    Do you have any idea what you did with

7   this check?

8        A    My secretary probably cashed it in.

9        Q    Okay.  You think it was returned to the

10   company, company bank account?

11        A    Probably.

12        Q    Were there any other shareholders or

13   owners of James S. Lertora, Inc.?

14        A    No.

15        Q    You were a 100 percent owner?

16        A    Yep.

17        Q    Okay.  Directing your attention --

18        A    No, that wasn't true.  My wife was.

19        Q    She had an ownership interest, as well?

20        A    She what?

21        Q    Your wife had an ownership interest in the

22   company, as well?

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

142

1    A    Yeah.

2    Q    What percentage?

3    A    I don't know.  It wasn't 51 percent.

4    Q    Okay.

5    A    I don't really know.  20 or 30 percent.

6    Q    That's fine.  Directing your attention to

7    the next page, which is PerrySecond 22733?

8    A    Yeah.

9    Q    It says it's to -- it's a letter from Lee

10   Wagner dated February 19, 1994 to you and Mr. Donald

11   Molnar.  Who is Donald Molnar.

12   A    He was a business agent.

13   Q    Was he a trustee of the Fund?

14   A    I think he was.

15   Q    Okay.  It says, As approved by the

16   trustees of the Pension Fund at the January 25, 1994

17   meeting, we have written to each contractor who has

18   a refund of contributions due from the plan.  We

19   have issued checks for these contractors who have

20   returned the required W-9 Form.  We are enclosing a

21   copy of the W-9 Form together with any

22   correspondence received and the checks for your

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

149

1   these checks were cut?

2       A     Probably not.   They probably gave me the

3   checks to sign, period.

4       Q     Do you recall ever asking any questions as

5   to why you were signing all these checks?

6       A     I don't recall signing them, no.

7       Q     Okay.   Directing your attention to the

8   fourth-from-the-last document in this exhibit.

9   Right there.   Directing your attention to the bottom

10  of this page, these are Miscellaneous Income forms,

11  1099 forms that were issued by the plan

12  administrator.   And at the bottom of the page, this

13  one is for James S. Lertora, Inc.   Do you see that?

14      A     Yes, I do.

15      Q     It says, Other Income.   This one is for

16  $2,363?  Do you see that?

17      A     What amount?

18      Q     $2,363.70.

19      A     It's 3363.

20      Q     $2,363 is what I see.   Granted, it's a

21  little faded.

22      A     I see 3363.70.

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

159

1      the trustees that there was a legal requirement

2      under a law call ERISA, the Employee Retirement

3      Income Security Act 1974, as amended, that there was

4      a requirement for the trustees to have a diversified

5      portfolio for the Fund?

6           A     No.

7           Q     If you had been advised by Mr. Scholar

8      that there was a legal duty to have a Diversified

9      portfolio, investment portfolio for the Pension

10     Fund, what would you have done as a trustee?

11               MR. KOLKER:   Objection to form.

12     BY MR. ROSE:

13          Q     Do you understand my question?

14          A     Yes.   Probably would have been more mouthy

15     about how it was -- if they had to be done a certain

16     way.   I thought we were doing it in accordance with

17     the trust.

18          Q     The same question for Mr. Perry, if Mr.

19     Perry or Ms. Wagner had ever advised you or the

20     other trustees that there was a legal duty to have a

21     diversified portfolio of investments of the Pension

22     Fund's assets, would you have directed that the

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

168

1     Mr. Perry and Ms. Wagner that you're referring to?

2        A     Yes.

3        Q     Same question for Mr. Scholar, did you

4     think Mr. Scholar really knew what he was doing?

5        A     He confused me a lot.

6        Q     Why do you say that?

7        A     Well, I don't know.  I just -- that's the

8     only way I now how to answer it.  He just confused

9     me sometimes.

10       Q     Did you know how he was being paid?

11       A     No, I don't have a clue.

12       Q     Did you ever make any inquiry?

13       A     No.  I figured they -- I'm Johnny Come

14    Lately.  I don't know what it was worth anyway.  And

15    they had the other attorney, I assumed, that -- I do

16    a lot of assuming; maybe it's a big mistake; I don't

17    know.  But I just don't -- I don't have a clue what

18    any of these people pay.  I just knew how much, how

19    rich I was getting from being a trustee.  So -- and

20    so that's just the way I answered.

21             MR. ROSE:  Okay.  Let's get back on docs.

22    Exhibit 20.

DEPOSITION OF JAMES S. LERTORA
CONDUCTED ON TUESDAY, SEPTEMBER 18, 2007

176

1          MR. BRAMLETTE:  Objection.

2     A    I don't recall a year passing.

3  BY MR. ROSE:

4     Q    Only one?

5     A    No, I said I don't recall even a year

6  passing --

7     Q    Is that right?

8     A    -- without a meeting.

9          MR. BRAMLETTE:  Let him finish his answer.

10         MR. ROSE:  I'm sorry.

11    A    It could have happened, but I don't recall

12  it.

13  BY MR. ROSE:

14    Q    Okay.  Well, if there had been meetings of

15  the board, would there be minutes reflecting that?

16         MR. KOLKER:  Objection to form.

17         MR. BRAMLETTE:  Objection.

18  BY MR. ROSE:

19    Q    Do you understand my question?

20    A    I would assume there was.  They always had

21  meetings.

22    Q    And at the board meetings that you

220

1    general?

2         Q    I'm asking a general question first.  And

3    if you would like it re-read, I'd be happy to have

4    it.

5         A    I don't recall that he did that.

6         Q    Okay.  With respect to the amounts that

7    were sent back to the contributing employers, these

8    checks that we looked at in Exhibit 19, do you know

9    whether or not any notice was given to the

10   participants that money had been sent from the

11   Pension Fund to the contributing employers?

12        A    Did -- read it again.

13             MR. ROSE:  That's okay.  Please.

14             (Last question was read as requested.)

15             MR. BRAMLETTE:  I'm going to object as to

16   form.  You can answer.

17   BY MR. ROSE:

18        Q    Do you understand the question?

19        A    Whether or not they were informed.  No, I

20   don't have a clue whether they were informed.

21             (Lertora Exhibit No. 31 marked for

22   identification and retained by counsel.)

223

1    Ms. Wagner, do you recall them ever advising you

2    that Section 2 of Article 10 of the trust agreement

3    required regular meetings?

4         A    Yes, they probably did.

5         Q    Do you recall what, if anything, they did

6    to ensure that the board held regular meetings

7    consistent with the Trust Agreement?

8         A    I do not know.

9         Q    Did you ever make any inquiry of the plan

10   administrator, Mr. Perry or Ms. Wagner, as to what

11   the appropriate interval for board meetings was

12   under the Trust Agreement?

13        A    No.

14        Q    Did you ever ask Mr. Scholar what the

15   interval of board meetings was that was required

16   under the Trust Agreement?

17        A    No.

18        Q    Do you recall any trustee asking either

19   the plan administrator or Fund counsel what the

20   required regular intervals for board meetings was

21   under the Trust Agreement?

22        A    No.

229

1         MR. BRAMLETTE:  Objection.

2   BY MR. ROSE:

3      Q    In this year.  Do you see that?

4      A    Yes.

5      Q    Okay.  Looking at the percentage of assets

6   at the beginning of the year, it would appear that

7   approximately 10 percent of assets were given back

8   to the employers, based on this Form 5500.

9         MR. BRAMLETTE:  Objection.

10        MR. KOLKER:  Objection.

11  BY MR. ROSE:

12     Q    Do you see that?

13     A    Yes, I see it.

14     Q    Do you think that's a substantial

15  percentage of the assets to have given back to the

16  employers?

17        MR. BRAMLETTE:  Objection to form.

18     A    Not if it was due, no.  Maybe it should

19  have been more.  I don't even know if they sent me

20  everything I was due.

21  BY MR. ROSE:

22     Q    Okay.  Do you think you were due anything?

# EXHIBIT 5

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

(Southern Division)


PLASTERERS' LOCAL UNION
NO. 96 PENSION PLAN, et al.,          Civil Action No.
                                      PJM 06 CV 338
          Plaintiff(s),

v.

HAROLD PERRY, et al.,

          Defendant(s).



DEPOSITION OF EDGAR PEPPER

Washington, DC

September 26, 2007

10:00 a.m.



Job No. 1-112182

Pages 1-289

Reported by: Linda S. Kinkade, CSR, RMR, CRR

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 27

1      Q    And then the Local would decide --

2      A    Where it goes, correct.

3      Q    -- amongst it with its members as to how

4  much would be salaried, how much would be allocated to

5  pensions and other funds?

6      A    Correct.

7           MR. BRAMLETTE:  Just let him finish.

8  BY MR. ROSE:

9      Q    At some point in time it appears that you

10 were given the privilege of serving as a trustee on

11 the plasterers' pension or plasterers' funds of

12 Washington, DC.  Do you recall when that was?

13     A    Yeah, in early '90s, I think it was.

14     Q    Do you recall the year?

15     A    I think it was '91.

16     Q    How is it that you recall 1991?

17     A    Taking over from an existing plaster member

18 that passed on, I think it was.

19     Q    And how is it that you were told that you

20 were being selected to be a trustee on the fund?

21     A    I think he just called up and said, would

22 you be on the trust fund.

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 29

1    provided those documents?

2         A    Probably so, yes.

3         Q    But you don't specifically recall?

4         A    No.

5         Q    Did you ever request a copy of the trust

6    agreement?

7         A    No, I didn't.  No, I didn't.

8         Q    So at the time you became the trustee, who

9    was the plan administrator?

10        A    Perry.

11        Q    Harry Perry?

12        A    Uh-huh.

13        Q    And who was his assistant?

14        A    Lee.

15        Q    Lee Wagner?

16        A    Yes.

17        Q    Do you recall at any time the Board --

18   while you were a member of the Board of Trustees, do

19   you recall at any time there being a request for a

20   review of the credentials of Mr. Perry and Mr. -- or

21   Ms. Wagner to determine if they were qualified to

22   serve as plan administrators?

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 30

1          MR. KOLKER:  Objection.

2          MR. BRAMLETTE:  Object to the form.

3     BY MR. ROSE:

4          Q    Do you understand my question?

5          A    Yeah, I understand.  No.

6          Q    While you were a trustee, was there at any

7     time any recommendation made to do an investigation as

8     to whether or not the funds were paying fair market

9     value for Mr. Perry's services as plan administrator?

10         MR. KOLKER:  Objection to form, lack of

11    foundation.

12         THE DEPONENT:  No.

13    BY MR. ROSE:

14         Q    Were you aware when you became the trustee

15    that the plasterers' funds were the only employee

16    benefit plan that Mr. Perry provided plan

17    administrative services to?

18         A    I didn't know.

19         Q    Is that something that you think you would

20    have liked to have known?

21         MR. KOLKER:  Object to the form.

22         MR. BRAMLETTE:  Object to the form.

4b36ec7e-f1a9-4c72-9d12-28316a7d15bd

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 31

1          THE DEPONENT:  No.

2    BY MR. ROSE:

3          Q    Why do you say that?

4          A    Didn't want to get involved.

5          Q    Why do you say that?

6          A    I don't -- he had other businesses, as far

7    as I know.

8          Q    Do you know what his other business was?

9          A    No, I don't know.

10         Q    Did you ever ask him?

11         A    No.

12         Q    What was your understanding of Lee Wagner's

13   role in terms of the plan administration of the funds?

14         A    Just the secretary.

15         Q    Did you have contact with her with respect

16   to plan administration responsibilities?

17         MR. KOLKER:  Objection to form.

18         THE DEPONENT:  No.

19   BY MR. ROSE:

20         Q    Did you understand my question?

21         A    Uh-huh.

22         Q    When I say that, you wouldn't -- if you had

4b36ec7e-f1a9-4c72-9d12-28316a7d15bd

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 32

1    a question about minutes or some other event going on

2    with the funds, who would you contact?

3              MR. BRAMLETTE:  Objection, lack of

4    foundation.

5              MR. KOLKER:  Object to the form.

6    BY MR. ROSE:

7         Q    Do you understand my question?

8         A    Yes.  No, I did not.

9         Q    Do you have any idea what Mr. Perry was

10   being paid for plan administrative services to the

11   pension fund in 1991 when you came on board?

12        A    No.

13        Q    Do you have any idea what he was being paid

14   in 2005?

15        A    I didn't have -- no.  I didn't, no.

16        Q    Do you recall there ever being a discussion

17   of the Board as to whether or not his fee should be

18   increased?

19        A    No, I didn't.  No.

20        Q    Just so I'm clear, you don't recall

21   Mr. Perry ever coming to the Board and asking for a

22   rate increase during the time that you were trustee?

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 33

1      A    No.

2      Q    Do you know whether or not there was a

3  written agreement between Mr. Perry and the funds for

4  him to provide plan administration services?

5      A    No, I don't know.

6      Q    Did you ever make any inquiry as to whether

7  there was a written agreement for Mr. Perry to provide

8  plan administrative services?

9      A    No.

10     Q    Do you recall any other trustee ever making

11  inquiries as to whether or not Mr. Perry had a written

12  agreement with the fund to provide plan administrative

13  services?

14     A    I don't recall.

15     Q    Is that something you think you would

16  recall?

17     A    If it was brought up.

18     Q    Who was the fund counsel at the time that

19  you became the trustee in 1991?

20     A    The same.

21     Q    Mr. Scholar?

22     A    Mr. Scholar.

4b36ec7e-f1a9-4c72-9d12-28316a7d15bd

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 34

1      Q    Did you ever do any review of Mr. Scholar's

2  credentials to determine whether he was competent to

3  provide legal services to the plasterers' funds?

4           MR. BRAMLETTE:  Object to the form.

5  BY MR. ROSE:

6      Q    Do you understand my question?

7      A    Yes, I understand.  No.

8      Q    Do you recall whether the Board ever raised

9  any discussion as to Mr. Scholar's credentials to

10 provide legal services to the plasterers' funds?

11     A    Not by my knowledge.

12     Q    Were you aware that the plasterers' funds

13 were the only employee benefit plans or employee

14 benefit clients that Mr. Scholar provided legal

15 services to?

16     A    I don't --

17          MR. KOLKER:  Objection, lack of foundation.

18          THE DEPONENT:  I don't know.  I didn't know

19 him.

20 BY MR. ROSE:

21     Q    Do you recall the Board ever discussing

22 whether it would be prudent to go out to the market,

4b36ec7e-f1a9-4c72-9d12-28316a7d15bd

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 35

1    do a request for proposal to determine whether or not

2    there was more qualified or perhaps lower-priced legal

3    services for someone to provide legal services to the

4    plasterers' fund?

5         A    No.

6              MR. BRAMLETTE:   Objection to form.

7         You can answer.

8              THE DEPONENT:   Nobody said anything, but, I

9    mean, it was mentioned one time, but they said this is

10   it, this is set, we're not -- this is what we're going

11   to do.   That was it.

12   BY MR. ROSE:

13        Q    Can you please describe for me the one time

14   that you're referring to?

15        A    Well, I think something was brought up

16   about, when the monies were coming to, you know, your

17   Treasury notes and market funds were due for renewal,

18   and it was brought up then.   But they said, no, they

19   weren't going to go any further than just put in

20   Treasury markets.   They didn't want to gamble the

21   money.   They didn't want to gamble away what they

22   already have.

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 40

1      Q    What do you mean?

2      A    I mean, if he brought something up, he

3  would have to go through the Board, through the

4  committee.

5      Q    When you say --

6      A    As far as I know, he didn't do that.

7          MR. KOLKER:  Okay.  That question was asked

8  and answered.

9          Do you have another question?

10          MR. ROSE:  I do.

11          MR. KOLKER:  Okay.

12  BY MR. ROSE:

13      Q    Is it your understanding that Mr. Perry had

14  no responsibilities with respect to the investment of

15  plan assets?

16      A    I'm not sure really if he did or didn't.

17      Q    Well, who did have responsibility for the

18  investment of plan assets?

19      A    I would think the trust fund -- the

20  trustees for both parties.

21      Q    Were there any investment committees

22  created by the Board?

4b36ec7e-f1a9-4c72-9d12-28316a7d15bd

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 43

1    BY MR. ROSE:

2         Q    Is that something that, as a trustee, you

3    think would have been helpful for you to assist in the

4    investment strategy of the plan's assets?

5              MR. BRAMLETTE:   Object to the form.

6    BY MR. ROSE:

7         Q    Do you understand the question?

8         A    Yes.   I mean, I'm sure it would have,

9    but --

10        Q    Do you know how much Mr. Scholar was paid

11   to be the attorney --

12        A    No.

13        Q    -- for the plasterers' funds?

14        A    No, I do not.

15        Q    Do you know whether there was a written

16   agreement, retention agreement, between the

17   plasterers' funds and Mr. Scholar with respect to his

18   provision of legal services to the funds?

19        A    I don't know when I was there, no.

20        Q    Did you ever make any inquiry as to whether

21   or not there was such a written agreement?

22        A    No.

4b36ec7e-f1a9-4c72-9d12-28316a7d15bd

DEPOSITION OF EDGAR PEPPER

CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 44

1    Q   Do you recall any other trustee ever making

2  such an inquiry as to whether or not there was an

3  agreement between Mr. Scholar and the fund?

4    A   Not as I know.

5    Q   Do you recall Mr. Scholar ever coming to

6  the Board while you were a trustee and requesting an

7  increase of his fee?

8    A   No.

9    Q   If he had, do you think you would have

10 recalled that?

11   A   If he did, I would think so, yes.

12   Q   You weren't aware that he was receiving a

13 monthly payment regardless of whether or not he

14 provided any services to the funds?

15       MR. KOLKER:  Object to the form, lack of

16 foundation.

17       THE DEPONENT:  I don't know the payment of

18 any of them, no.

19 BY MR. ROSE:

20   Q   Do you recall whether or not Mr. Scholar

21 ever recommended initiating any actions against

22 contributing employers to collect amounts that were

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 48

1    I think, you know, every three months there was a

2    meeting, and then it started breaking down because --

3         Q    Do you recall approximately when this

4    started breaking down?

5         A    Oh, that was probably at the end of the

6    '90s.

7         Q    So your recollection is that the Board met

8    approximately four times a year?

9         A    Yes.

10        Q    Until the late '90s?

11        A    Uh-huh.

12        Q    Do you have any understanding as to how

13   often the Board was supposed to meet under the trust

14   agreement?

15        A    I thought it was every three weeks -- I

16   mean every three months, four times a year.

17        Q    Who informed you of that?

18        A    That's what I thought it was.

19        Q    Did anyone ever inform you of that?

20        A    Not really, no.  Not specifically, no.

21        Q    So you don't recall ever being advised that

22   the trust agreement actually required six meetings a

DEPOSITION OF EDGAR PEPPER

CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 49

1    year?

2          A    No.  No, I do not.

3          Q    Do you recall there ever being a year where

4    six meetings were held while you were trustee?

5          A    No, I don't recall that.

6          Q    Do you recall that there were intervals

7    between meetings in excess of a year?

8          MR. KOLKER:  Object to the form, lack of

9    foundation.

10         THE DEPONENT:  No, I don't remember that

11   either, no.

12   BY MR. ROSE:

13         Q    So is it your best recollection that the

14   Board met at least once a year while you were trustee?

15         MR. KOLKER:  Object to the form, lack of

16   foundation, and that does not describe his testimony.

17         THE DEPONENT:  At least.

18   BY MR. ROSE:

19         Q    At least?

20         A    Yeah, I would think.  I mean, I remembered

21   it would go --

22         Q    I'm just asking for your recollection.

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 52

1          Q    Do you know --

2          A    No, I don't.

3          Q    Do you know what a record retention policy

4     is?

5          A    No.

6          Q    Do you know whether Hampshire has a record

7     retention policy?

8               MR. KOLKER:  Object to the form, lack of

9     foundation.

10              THE DEPONENT:  I don't know.

11    BY MR. ROSE:

12         Q    Do you recall there ever being any

13    discussion by the Board as to whether or not the

14    plasterers' fund should have a record retention

15    policy?

16         A    I don't recall that, no.

17         Q    Do you remember there ever being any

18    discussion by the Board as to whether or not it would

19    be prudent to have a statement of investment

20    guidelines for the pension fund assets?

21         A    No, I don't recall.

22         Q    Do you recall whether Mr. Perry or Ms.

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 53

1    Wagner ever recommended to the Board that a statement

2    of investment policy guidelines would be a prudent

3    thing for the Board to consider?

4         A    I don't recall that, no.

5         Q    Same question for Mr. Scholar.  Do you

6    recall whether Mr. Scholar ever advised the trustees

7    during your period as a trustee as to whether or not

8    it would be prudent to have a statement of investment

9    policy guidelines for the Board?

10        A    I don't recall that.

11        Q    If Mr. Scholar had, do you think you would

12   remember that?

13        A    I would think so.

14        Q    If Mr. Perry or Ms. Wagner had made such a

15   recommendation, do you think you would remember that?

16        A    I would think so.

17        Q    Did you take notes at any of the Board

18   meetings?

19        A    No.

20        Q    Never?

21        A    Never.

22        Q    Did you retain any records or documents

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 56

1    documents were provided for discussion purposes at the

2    actual Board meetings but were not circulated in

3    between meetings?

4         A    Correct.

5         Q    During the time that you served as a

6    trustee, the entire time you served as a trustee,

7    could you please tell me whether or not the number of

8    trustees fluctuated on the Board?

9         A    With respect to -- what trustee are you

10   talking about?  Just in general?

11        Q    Yes.

12        A    Yeah, especially on the Local side they

13   were always changing there.  The employee side was

14   just Jim and I.  Could never seem to get a third.

15        Q    And that was your recollection through

16   virtually your entire time you were a trustee, you

17   were the only other serving -- you and Mr. Lertora --

18        A    Huh-uh.

19        Q    -- were the only other serving employer

20   trustees?  Are you aware how many trustees were

21   supposed to be appointed under the agreement?

22        A    I think it was three.

DEPOSITION OF EDGAR PEPPER

CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 57

1          MR. BRAMLETTE:  Object to the form.  Go

2    ahead.

3          THE DEPONENT:  Three on each side.

4    BY MR. ROSE:

5          Q    Do you know what, if any, efforts were made

6    to try and locate another employer trustee during

7    those years so that there would be a full slate of

8    trustees?

9          A    Yeah, there were.  Nobody wanted to come

10   aboard.

11         Q    Do you know how many people were approached

12   with that opportunity?

13         A    No, I don't, no.

14         Q    Was Mr. Lertora the point person in trying

15   to take care of filling that slot?

16         A    Yes, at that time.

17         Q    Was there some later time that you took the

18   point in trying to locate a replacement trustee?

19         A    No.

20         Q    Do you know who had appointment authority

21   under the trust agreement?

22         MR. BRAMLETTE:  Objection.

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 58

1        You can answer.

2   BY MR. ROSE:

3        Q    Do you understand my question?

4        A    No, I don't.

5        Q    Do you know who under the trust agreement

6   had actual authority to appoint trustees?

7        A    Not really, no.

8        Q    Do you remember there ever being any

9   discussion of the Board as to who had appointment

10  authority?

11       A    No.

12       Q    I think we're going to start rolling.

13       When you became a trustee, were you made aware

14  that there had been a prior plan that had been

15  terminated, prior pension plan, that had been

16  terminated?

17            MR. BRAMLETTE:  Object to the form.

18       You can answer.

19  BY MR. ROSE:

20       Q    Do you understand my question?

21       A    I knew about it, but I didn't know anything

22  about it.

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 82

1       Q    Right.

2       A    This is just a letter that's come up

3  afterwards.

4       Q    As of the date in 1991, was he a single

5  employer under the plasterers' plan that you were a

6  trustee of?

7            MR. BRAMLETTE:   Object to the form.

8  BY MR. ROSE:

9       Q    Do you understand my question?

10      A    A single employer?  No, he's not a single.

11      Q    Do you recall there being any discussion

12 among the Board of Trustees as to what to do in the

13 face of this threat from Mr. Coakley to terminate his

14 participation in the plan?

15      A    No, I don't.

16           MR. BRAMLETTE:   Objection to form.

17 You can answer.

18           THE DEPONENT:   No, I don't.

19 BY MR. ROSE:

20      Q    Did you understand my question?

21      A    Yes, I understand.

22      Q    And, I'm sorry, your answer?

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 83

1      A    No, I don't recall.

2      Q    If there were such discussion, do you think

3   that you would recall?

4      A    I would.

5      Q    Do you have any understanding as to what

6   percentage of the annual contributions to the

7   plasterers' funds Mr. Coakley was making at the time

8   that he wrote this letter?

9      A    No, I don't.

10      Q    Do you think it was a large percentage of

11   the contributions to the fund?

12      A    I really don't know.

13      Q    You have no idea?

14      MR. BRAMLETTE:  Objection, asked and

15   answered.

16   BY MR. ROSE:

17      Q    Did Hampshire employ more participants in

18   the plasterers' fund than Mr. Coakley's company at

19   this time?

20      MR. BRAMLETTE:  Objection.

21      THE DEPONENT:  I can't say.  I don't know.

22   BY MR. ROSE:

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 133

1    A    I think they were, yes.

2    Q    Treasury Bills as well?

3    A    Uh-huh.

4    Q    Short-term obligations?

5    A    Yes.

6    Q    And why short-term obligations?

7    A    I don't recall.  I don't know.

8    Q    Do you recall there ever being any

9  discussion as to whether or not short-term obligations

10  were an appropriate investment for the pension fund?

11    A    No, I don't recall that.

12    Q    If there was such a discussion, do you

13  think you would remember?

14    A    I would think so.

15    Q    Do you recall -- did Mr. Scholar ever

16  advise the Board of Trustees that there was a

17  requirement under ERISA to have a diversified

18  portfolio of investments?

19    A    I don't recall hearing that.  I don't

20  recall hearing that.

21    Q    Do you recall Mr. Perry or Ms. Wagner ever

22  informing the trustees that there is a requirement

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 134

1    under ERISA to have a diversified portfolio of

2    investments?

3          A    No.

4          Q    If they had given that advice, do you think

5    you would remember that?

6          A    I would think so.

7          Q    During your approximately 14, 15 years as

8    serving as a trustee on the plasterers' fund, how many

9    times do you recall having discussions with respect to

10   the investment strategy of the pension fund?

11         A    I would say a couple times, that's all.

12         Q    Two times?

13         A    I would say a couple times, that's all.

14         Q    As best you can recall, what were those

15   discussions?  What did they entail?

16         A    By moving it from one to another, you know,

17   keeping it low investments, not going over the hundred

18   thousand.  That's all I was involved in.

19         Q    Talking about in terms of the CD amounts --

20         A    CD --

21         Q    -- to ensure that the FDIC insurance would

22   apply?

4b36ec7e-f1a9-4c72-9d12-28316a7d15bd

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 153

1          THE DEPONENT:  No, I did not.

2    BY MR. ROSE:

3          Q    Did you understand my question?

4          A    I understand what you're saying.  No, I did

5    not.

6          Q    Are you aware --

7          A    Or hear say.

8          Q    Are you aware of any action by any other

9    trustee to try and initiate some sort of action to

10   recoup the monies that had been distributed from the

11   pension plan to the contributing employers?

12         A    No, I don't recall that.  I don't recall

13   those comments.

14         Q    Did Mr. Scholar ever advise the trustees

15   that the trustees should initiate an action to recoup

16   the amounts that had been distributed from the pension

17   plan's assets to the contributing employers?

18         A    No, I did not hear anything from him.

19         Q    If he had made such a recommendation, do

20   you think you would remember?

21         A    Uh-huh.  Uh-huh.

22         Q    You need to say --

4b36ec7e-f1a9-4c72-9d12-28316a7d15bd

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 154

1       A    Yes.

2       Q    And same question for Mr. Perry or Ms.

3    Wagner.  Did either of them ever suggest to the

4    trustees that an action should be initiated or whether

5    or not there should be consideration of initiating an

6    action to recoup the amount that had been distributed

7    from the pension plan to contributing employers?

8       A    I don't recall.

9       Q    If, in fact, he had given such advice, do

10   you think you would recall?

11      A    I probably would, yes.

12      Q    Directing your attention to the next page,

13   you see there are two checks cut for John Hampshire.

14      A    Uh-huh.

15      Q    That was the company that you worked for,

16   correct?

17      A    Uh-huh.

18      Q    And you took these checks and you gave it

19   to the treasurer?

20      A    I didn't take them.

21      Q    I'm sorry.

22      A    I didn't handle them.

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 182

1      Q    Do you recall whether or not any Board

2   meetings were held between June 22nd, 1999 and

3   September 19th, 2000?

4      A    I don't think so, no.

5      Q    So you think there was in excess of a year

6   between these meetings?

7      A    Yeah, uh-huh.

8      (Exhibit No. 26 marked for identification and

9   retained by counsel.)

10  BY MR. ROSE:

11     Q    Did you ever ask the plan administrator why

12  the trustees weren't holding more regular meetings of

13  the Board?

14     A    I think it was brought up to everybody, but

15  it was just the way people were scheduled.  They

16  couldn't make it or there was always something come up

17  at the last minute.

18     MR. ROSE:  Could you re-read that question,

19  please.

20     (Record read.)

21     THE DEPONENT:  Yeah.  We said, yes.  We

22  asked them why aren't we having more and they were

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 184

1    trustees are required to administer the fund in

2    accordance with its governing documents and that would

3    include its trust agreement?

4         A    I don't recall him specifically saying

5    anything like that, no.

6         Q    If he had, do you think you would?

7         A    I would think, yes.

8         Q    Same question for Mr. Perry or Ms. Wagner.

9    Did they ever advise the trustees that there was a

10   legal requirement under ERISA to administer the plan

11   in accordance with its governing documents, including

12   the trust agreement?

13        A    I don't recall them saying anything like

14   that.

15        Q    And if they did, do you think you would

16   recall that?

17        A    I would think, yes.

18        Q    Directing your attention to a document

19   that's been marked Exhibit 26, this appears to be

20   minutes from a meeting held on January 8th, 2002, and

21   under the trustees identified as present, you're

22   listed there --

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 185

1        A    Uh-huh.

2        Q    -- in the lower left-hand corner.  Is that

3    your signature?

4        A    Uh-huh.

5        Q    Would that indicate to you, you were

6    present at the meeting?

7        A    Yes.

8        Q    This meeting was held almost 18 months

9    after the prior meeting of September 19, 2000.  Do you

10   see that?

11       A    Uh-huh.

12       Q    Is that --

13       A    Possible?

14       Q    Is that consistent with your recollection

15   as to how often Board meetings were being held?

16       A    Yes.

17       Q    And in item 1 here of Exhibit 26, it says,

18   the minutes of the prior meeting were approved.

19       You don't recall ever receiving circulated

20   draft minutes before the meeting actually was held --

21       A    No.

22       Q    -- do you?

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 207

1          Do you recall Mr. Perry or Mr. Scholar ever

2     pointing out this provision to the trustees when there

3     were discussions relating to the alleged forfeiture?

4          A    Not when I was there.

5          Q    Do you recall any discussion by the

6     trustees as to the exclusiveness of benefits provision

7     in the plan document when the Board was determining or

8     deciding to authorize the return of plan assets?

9          A    Not when I was there.

10         Q    Have you ever heard of a provision called

11    the anti-inurement provision of ERISA?

12         A    No.

13         Q    Did Mr. Scholar or Mr. Perry or Ms. Wagner

14    ever advise you as a trustee that there was a

15    provision of ERISA called the anti-inurement provision

16    that prohibited the return of any assets to a

17    contributing employer?

18         A    I don't recall, no.

19         Q    If they had, do you think you would recall?

20         A    I would think.

21         Q    Why do you think so?

22         A    I would think if I heard it, I would have

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 208

1    said something about it.

2           Q    And at no point after the Board took action

3    in 1994 to authorize the return of pension plan assets

4    to contributing employers do you recall any discussion

5    after that time of the exclusiveness of the benefits

6    provision in the plan document?

7           A    No.

8           (Exhibit No. 28 marked for identification and

9    retained by counsel.)

10   BY MR. ROSE:

11          Q    Mr. Pepper, I'm showing you a document

12   that's been marked Exhibit 28.   This document is the

13   Summary Plan Description for the plasterers' pension

14   fund as of December 31st, 2002.

15          Have you seen this document before?

16          A    I might have.

17          Q    On what occasion do you think you might

18   have seen this document?

19          A    Whatever the meetings we had at the time.

20          Q    Is this the kind of thing that the plan

21   administrator would seek approval of by the Board

22   before distributing to the participants and

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 217

1  period during your point -- I'm sorry -- do you recall

2  Mr. Scholar or Mr. Perry during your tenure as a

3  trustee on the funds ever advising the trustees that

4  an action had to be taken as a result of an amendment

5  to ERISA?

6        A    No.

7        Q    If they had, do you think that's something

8  you would recall?

9        A    Possible.

10       Q    Why do you say just "possible"?

11       A    If he said it, I would recognize it.

12       Q    Did you ever ask the plan administrator

13  whether or not he carried insurance that covered his

14  conduct, his actions, as plan administrator to the

15  pension fund or, I'm sorry, to the plasterers' funds?

16       A    No, I did not ask.

17       Q    Do you recall whether any trustee ever made

18  any inquiry to the plan administrator as to whether or

19  not it carried insurance that would cover his conduct

20  and services as plan administrator to the funds?

21       A    I don't recall anyone saying anything like

22  that, no.

4b36ec7e-f1a9-4c72-9d12-28316a7d15bd

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 218

1      Q   If there had been such a discussion, do you

2   think you would remember that?

3      A   It could have.  Yes.

4      Q   I'm sorry.  Your answer was?

5      A   Some -- you mean if they was listed, I

6   mean, if somebody said it?

7      Q   I was just asking whether or not you would

8   remember.  Do you think you would remember it if there

9   had been discussion of whether or not the plan

10   administrator had insurance that actually covered his

11   conduct?

12      A   No, I don't remember -- I don't remember

13   anybody saying anything like that.

14      Q   But you think you would if there was such a

15   discussion?

16      A   No.  If he didn't say anything about it, I

17   don't think I would remember.

18      Q   I was asking if there was such a

19   discussion, do you think --

20      A   No.

21      Q   -- you would remember?

22      A   No, I wouldn't know.

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 224

1  your administrative.  He's doing the administrative of

2  the accounting.

3       Q    While you were a trustee, were you aware

4  that the plan administrator was a fiduciary under

5  ERISA?

6            MR. KOLKER:  Objection, calls for a legal

7  conclusion.

8            THE DEPONENT:  No.

9  BY MR. ROSE:

10      Q    You were not aware of that?

11      A    No.

12      Q    Fund counsel never advised the trustees, as

13 far as you're aware, that the plan administrator had

14 an independent fiduciary obligation to the

15 participants and to the trustees?

16      A    It was never discussed.

17      Q    As best you can recall, what was the

18 trustee's process in determining what the plan's

19 investments should consist of?

20      A    I was not privy to it.  I can't tell you.

21 I don't know.

22      Q    When you say you were not privy to it --

DEPOSITION OF EDGAR PEPPER

CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 226

1      MR. KOLKER:  Objection, asked and answered,

2  in essence, before.  Different question, same

3  substance.

4      MR. ROSE:  "In essence"?  That's an

5  interesting objection.

6      MR. KOLKER:  You've asked the same substance

7  now three or four hours ago.  Now you're asking it

8  again with different wording.

9      MR. ROSE:  It's a different question.

10  BY MR. ROSE:

11      Q   Do you know what a statement of investment

12  policy is?

13      MR. KOLKER:  Objection, asked and answered.

14      THE DEPONENT:  No.

15      MR. ROSE:  No, I asked whether they had one.

16  I'm now asking whether he knows what one is.

17      THE DEPONENT:  No, I don't.

18  BY MR. ROSE:

19      Q   How did the trustees determine what

20  specific investments the pension fund would invest in?

21      A   Just by going with what they had been doing

22  for the last 50 years, I guess.  I don't know.  I

DEPOSITION OF EDGAR PEPPER

CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 227

1     really don't know.

2          Q    And, as a trustee, you thought it was your

3     role to simply go with the previous investment

4     strategy?

5          A    Yes.

6               MR. BRAMLETTE:   Objection, argumentative.

7     You can answer.

8               MR. ROSE:   He already did.

9               THE DEPONENT:   Yes.

10    BY MR. ROSE:

11         Q    Were you aware that the health fund held

12    two individual company stocks?

13         A    Stocks?   No, I did not.

14         Q    As in equities in two particular companies.

15    You weren't aware of that?

16         A    No.

17         Q    Have you ever heard of PSEG?

18         A    (Shaking head from side to side.)

19         Q    What about NICOR?

20         A    No.

21         Q    Do you have any understanding as to why the

22    health fund would have two individual company stocks

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 239

1      certificates of deposit or short-term U.S. Treasury

2      obligations as instructed by the trustees.

3           Do you see that?

4           A    Yes.

5           Q    Is that statement consistent with what your

6      understanding of the investment strategy of the

7      pension plan was?

8           A    Yes.

9           Q    And how often do you recall reviewing with

10     the other trustees whether or not the investment

11     strategy was working or whether or not a change might

12     be in order?

13          MR. KOLKER:  Objection, asked and answered.

14          THE DEPONENT:  The same.  I mean, they were

15     brought up every year for reinvestment, and, like I

16     said before, they didn't want to go into a portfolio

17     of stocks or anything like that.  So they just left

18     them in the CDs.

19     BY MR. ROSE:

20          Q    When you say "they," who are you referring

21     to?

22          A    The trustees.  The trustees.

4b36ec7e-f1a9-4c72-9d12-28316a7d15bd

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 240

1      Q    You were one of the trustees.

2      A    Yes, I was one of the trustees, and so were

3  the labor trustees that went along with it, too.

4      Q    What was your individual vote with respect

5  to this investment strategy?

6      A    I just brought it up one time, couple

7  times, and they said, no, they didn't want to stick

8  their neck out.

9      Q    But you were okay --

10      A    Yeah.

11      Q    I'm sorry.  You were okay with this

12  investment strategy?

13      A    At the time, yes.

14      Q    Okay.

15      A    Yes.

16      Q    And at some other time did that change?

17      A    No.

18      Q    So you were okay with it all along.

19      A    Right.  Right.

20      Q    Okay.  Are you aware of what this action,

21  this litigation that you are a defendant in, involves

22  or relates to?