# **<u>EXHIBIT 26</u>**

MINUTES OF THE BOARD OF TRUSTEES OF THE
PLASTERERS LOCAL UNION NO. 96
PENSION AND WELFARE FUNDS

The meeting of the Board of Trustees of Plasterers Local No. 96 Pension and Welfare funds was held at the office of the Administrator at 10:30 a.m. on January 27, 1998.

The following trustees were present:

Donald A. Molnar
Wallace Lerner
James S. Lertora
Ed Pepper

Harry Perry, Jr., Sam D. Scholar and Lee Wagner were also present.

1. The minutes of the prior meeting were approved.

2. The Trustees asked Sam Scholar to prepare an application for a disability applicant to receive benefits from the Welfare Fund to enable him to have health insurance. The Trustees queried whether the exclusion of disability benefits for applicants with drug or alcohol abuse as the source of their disability could be enforced in light of ADA.

3. Three dental plans were proposed. Optimum Choice was ruled out. U.S. Life and Guardian would be studied further by the Trustees and the Administrator.

4. The Trustees determined that new members could be eligible for insurance coverage as soon as they had 260 hours without it being in a designated quarter.

5. The Trustees determined that all employees working under the agreement must have Welfare Fund contributions deducted from their paychecks as the agreement provides.

6. The Trustees determined that they could not provide insurance/to members who *SUBSIDY* retired prior to reaching age 65 and did not have Medicare insurance.

The meeting was adjourned at approximately 11:30 am.

James S. Lertora

Ed Pepper

Donald A. Molnar

Wallace Lerner







# **<u>EXHIBIT 27</u>**

**PLAS'RERS LOCAL UNION No. 96**

**PENSION FUND     WELFARE FUND**

1411 K STREET, N.W.
SUITE 502
WASHINGTON, D.C. 20005

HARRY C. PERRY, JR.
ADMINISTRATOR
•
(202) 347-6503

December 3, 1997

To:  Trustees of Operative Plasterers Local Union No. 96
     Pension and Welfare Funds

This is to confirm that there will be a meeting of the Trustees in the
Administator' office   at 1411 K Street, N.W., Suite 502 on Tuesday,
December 9, 1997 at 10:30 AM.*

Cordially,

Lee P. Wagner

*   Please note that we have changed the time of the meeting from 10:00
to 10:30.  I wanted to get this letter in the mail so did not poll
everyone.  If you are unable to come at 10:30, please call me at once so
I can call everyone.  Since we have not had a meeting for quite some
time and have only four Trustees, I hope all of you can make it. Thanks.

AGENDA:

1)  Discussion of better dental coverage for members

    a.  Information for three plans enclosed.

In response to questions from members and prospective members, Wally
Lerner, Local 96 BA, would like the following items brought up for
discussion.

2.  Would it be possible for new members to have insurance coverage as
soon as they have 260 hours without it being in a designated quarter as
now required.  (Members may have to work 5 - 6 months before being
covered under the present rules.)

3.  Must all employees working under the agreement have Welfare Fund
Contributions paid on them?  Some members who have wives with insurance
would prefer the money in their paycheck.

4.  Would it be possible to pay all or part of the insurance premiums
for members or their wives who have retired before age 65 and do not
have Medicare?  This would apply only to members who have retired after
a long period of work in Local 96.



EXHIBIT
21

EXHIBIT
22

EXHIBIT

# **<u>EXHIBIT 28</u>**

DON:

HERE ARE THE MINUTES OF THE
6/22/99 MEETING.  COULD YOU
SIGN THEM.  THANKS.

KEITH HICKMAN SAID HE WAS GOING
TO CALL YOU ABOUT THE TRUSTEES.

IF YOU DECIDE YOU ARE GOING TO
RESIGN, AND YOU DID SEEM LIKE
YOU WANTED TO, JUST SEND A
LETTER TO THE TRUSTEES AT THIS
ADDRESS.

THANKS,

## MINUTES OF THE BOARD OF TRUS
## PLASTERERS LOCAL UNION
## PENSION AND WELFARE F

The meeting of the Board of Trustees of Plasterers Loc
Welfare funds was held at the office of the Administrator at 10:30 a.m. on June 22, 1999.

The following trustees were present:

Donald A. Molnar
Dave Robinson
Keith Hickman
James S. Lertora
Ed Pepper

Harry Perry, Jr., Sam D. Scholar and Lee Wagner were also present.

1. The minutes of the prior meeting were approved.

2. The Trustees reviewed and approved the proposed application for disability
assistance from the Welfare Fund for disabled members who were less than 65 years of
age.

3. The Trustees agreed to review proposed reciprocity agreements and consider
their adoption.

4. The Trustees were advised that the Pension Plan would have to be revised to
allow contributions for workers immediately rather than after 1,000 hours of service as
previously provided. It was discussed that the new contract between the Union and the
Employers did not retain the 1,000 hour rule.

5. The Trustees voted unanimously to increase the quarterly maximum contribution
from the Welfare Fund for Health insurance premiums from $910 to $1,050.

The meeting was adjourned at approximately 12:30 pm.

James S. Lertora

Donald A. Molnar

Ed Pepper

Keith Hickman

EXHIBIT
25

EXHIBIT
24

PerrySecond -- 00946

EXHIBIT

# EXHIBIT 29

MINUTES OF THE BOARD OF TRUSTEES OF THE
PLASTERERS LOCAL UNION NO. 96
PENSION AND WELFARE FUNDS

The meeting of the Board of Trustees of Plasterers Local No. 96 Pension and Welfare funds was held at the office of the Administrator at 10:30 a.m. on September 19, 2000.

The following trustees were present:

Stephen Stovall
Keith Hickman
James S. Lertora
Ed Pepper

Harry Perry, Jr., Sam D. Scholar and Lee Wagner were also present.

1. The minutes of the prior meeting were approved.

2. The Trustees reviewed and approved the motion to have Ken Adams seek quotes from other insurance companies and that we contact Robin Williams Oskuie to discuss possible benefit reductions with the Mamsi/OCI Policy as a way to reduce premiums.

3. Keith Hickman discussed that he could check into delegating part of the $1.00 per year increase for 3 years into the Welfare Fund to increase income for the Welfare Fund. No motion was made on this idea.

4. The Trustees unanimously adopted a motion to fund $150.00 per insured member ever two years for eyeglasses.

The meeting was adjourned at approximately 12:30 pm.

_____          _____
James S. Lertora                          Stephen Stovall

_____          _____
Ed Pepper                                    Keith Hickman

EXHIBIT
25

EXHIBIT
27


EXHIBIT
26

# **<u>EXHIBIT 30</u>**

**MINUTES OF THE BOARD OF TRUSTEES OF THE
PLASTERERS LOCAL UNION NO. 96
PENSION AND WELFARE FUNDS**

The meeting of the Board of Trustees of Plasterers Local No. 96 Pension and Welfare funds was held at the office of the Administrator at 10:30 a.m. on January 8, 2002.

The following trustees were present:

     Stephen Stovall
     Keith Hickman
     James S. Lertora
     Ed Pepper

Harry Perry, Jr., Sam D. Scholar and Lee Wagner were also present.

1. The minutes of the prior meeting were approved.

2. The Trustees reviewed the idea of raising the quarterly premium allowance in light of the increases in August and October, 2001. They decided to table any decision to raise the allowance until the April, 2002 meeting of the Trustees.

3. They Trustees decided that there would be no change to the rules concerning the current policy allowing members to stay on the insurance by paying the entire premium without any allowance from the plan and the rules allowing a benefit of $1,250 per quarter for covered members.

4. For new hires beginning January 1, 2002, it was agreed that they would be eligible to participate in the insurance plan after achieving during an initial designated quarter at least 260 hours. Previous period hours from prior quarters can be used to accumulate the 260 hours for the new hires.

5. Steve Stovall discussed the Morgan Stanley materials and it was agreed that he should report back on all of the costs of the program.

The meeting was adjourned at approximately 11:00 pm.

_____   _____
James S. Lertora                  Stephen Stovall

_____   _____
Ed Pepper                         Keith Hickman





PerrySecond -- 00870



# EXHIBIT 31

Kieth Hickman

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

(Southern Division)


PLASTERERS' LOCAL UNION NO. 98 )

PENSION PLAN, et al.,            )

        Plaintiffs,         )

       v.                     ) Civil Action No.

HAROLD PERRY, et al.,            ) PJM 06 CV 338

        Defendants.         )

     - - - - - - - - - - -


DEPOSITION OF KEITH HICKMAN

WEDNESDAY, OCTOBER 3, 2007


Reported by:  Lori G. Mackenzie, RPR

Job No.:  183134

f84ed25c-f022-4bea-9413-2b86380a3671

Kieth Hickman

Page 17

1    with the Plasterers Local 96; is that correct?

2            A.    Yes.

3            Q.    Do you have any other position with

4    any other union?

5            A.    No.

6            Q.    Can you tell me when you -- did

7    there come a point when you became a trustee of

8    the pension fund that the Plasterers Local 96

9    maintained?

10           A.    Yes.

11           Q.    When was that?

12           A.    Roughly 1999, the end of '99,

13   somewhere.

14           Q.    And how did it come about that you

15   became a trustee?

16           A.    By virtue of my position.

17           Q.    By virtue of your position as

18   business manager?

19           A.    Yes.

20           Q.    And did there come a point when

21   there was a vacancy among the trustees of the

22   pension fund in 1999?

f84ed25c-f022-4bea-9413-2b86380a3671

Kieth Hickman

1    contractors that occurred prior to the time that

2    you became a trustee?

3                MR. ROSE:  Objection, vague and

4    ambiguous.

5    BY THE WITNESS:

6         A.    I didn't know anything about the

7    Plasterers plan before I came on board.

8    BY MR. KOLKER:

9         Q.    Okay.

10        A.    I'm a Cement Mason.

11        Q.    No, no, no.  My question -- let

12   me -- I didn't do a good job of that question.

13   Let me try it again.

14                After you came on board in 1999, did

15   you thereafter at any point come to learn that

16   before you were a board member the Plasterers had

17   refunded certain sums to certain contractors?

18   Did you ever hear that?  While you were a trustee

19   from 1999 to 2005?

20                MR. ROSE:  Objection.  When in 2005?

21   Through the end of the year?

22                MR. KOLKER:  No.  Until Harry Perry

Kieth Hickman

Page 167

1   was terminated, in the fall of 2005.  I think it

2   is September.

3   BY THE WITNESS:

4         A.    Actually, I think we found out after

5   we started the merger process.

6   BY MR. KOLKER:

7         Q.    Who is we?

8         A.    The local, the trustees.

9         Q.    Okay.  You found out when?

10         A.    I don't know the exact time.  But --

11   that's when we started -- we were actually -- the

12   trustees found out.

13         Q.    Okay.  Did you ever hear about that

14   prior to the time that you -- that you are

15   describing that you discussed this during the

16   merger?

17             MR. ROSE:  Objection, vague and

18   ambiguous.  What is "that"?

19   BY MR. KOLKER:

20         Q.    All right.  Did you ever -- let me

21   withdraw the question and I will try to put it

22   more clearly.

# EXHIBIT 32

LEXSEE

**CASSANDRA LYNN SHADE, Executrix and personal representative of Marvin E. Stephens, deceased, Plaintiffs-Appellees, v. PANHANDLE MOTOR SERVICE CORPORATION, Defendant-Appellant, and RALPH ALBERTAZZIE; MOUNTAIN STATE BLUE CROSS & BLUE SHIELD, INCORPORATED, Trustees/Successors in interest of Blue Cross/Blue Shield of West Virginia; PHOENIX MUTUAL LIFE INSURANCE COMPANY; WEST VIRGINIA PUBLIC EMPLOYEES INSURANCE AGENCY, Defendants, BERKELEY COUNTY WEST VIRGINIA SCHOOL BOARD, Defendant & Third Party Plaintiff, v. CAROLA STEPHENS, Third Party Defendant.**

No. 95-1129

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**1996 U.S. App. LEXIS 16703**

**June 18, 1996, Submitted**
**July 11, 1996, Decided**

**NOTICE:** [*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 91 F.3d 133, 1996 U.S. App. LEXIS 35181.

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of West Virginia, at Elkins. Richard L. Williams, Senior District Judge, sitting by designation. (CA-93-5-M).

**DISPOSITION:** AFFIRMED

**COUNSEL:** Barry P. Beck, MARTIN & SEIBERT, L.C., Martinsburg, West Virginia, for Appellant.

Joseph E. Caudle, Tampa, Florida, for Appellees.

**JUDGES:** Before MURNAGHAN, HAMILTON, and LUTTIG, Circuit Judges.

**OPINION**

PER CURIAM:

Appellant Panhandle Motor Service Corporation ("Panhandle") appeals from the district court's order entering judgment in favor of Appellee Marvin E. Stephens on his claim for medical expenses and attorneys' fees in this action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1132(e) (West Supp. 1996). Finding no reversible error, we affirm.

Stephens initiated this action against Panhandle and various other defendants pursuant to the civil enforcement provisions of ERISA. 29 U.S.C.A. § 1132(e) (West Supp. 1996). Following a one-day bench trial, the district court [*2] found that Panhandle breached its fiduciary duty to Stephens by failing to notify him of a change in his insurance coverage status and in failing to correct its mistake once it learned that Stephens had been inadvertently omitted from insurance coverage. [1] Panhandle timely appealed. [2]

1    On November 29, 1994, the district court granted Phoenix Mutual Insurance Company's ("Phoenix") motion for summary judgment on its cross-claim against Panhandle for attorneys' fees.

2    Stephens died unexpectedly of congestive heart failure on June 24, 1995. Cassandra Lynn Shade, Stephens' daughter, qualified as Stephens' executrix and personal representative, and has replaced Stephens in this action.

The facts of the case are ably recounted in the district court's findings of fact and conclusions of law. Panhandle operates the Panhandle 76 Truck Stop on Interstate 81 in Berkeley County, West Virginia. The company is owned by Ralph Albertazzie and Edward Stout. Panhandle currently employees about 70 employees. Between 1978 [*3] and 1994, Panhandle employed more than 1600 employees at different times. Panhandle first employed Stephens on October 19, 1978. Stephens worked for Panhandle intermittently between 1978 and January 11, 1992.

On May 1, 1980, Stephens was enrolled in his wife Carola Stephens' employee group health plan with the Berkeley County Board of Education ("BCBE"). BCBE's group health plan was provided by the West Virginia Public Employees Insurance Agency. In December 1989, Stephens enrolled in Panhandle's employee group health plan through Mountain State Blue Cross & Blue Shield ("Blue Cross"). In March 1990, Stephens and Carola Stephens separated.

In the fall of 1990, Stephens was diagnosed with a seriously malfunctioning liver and was certified as a candidate for a liver transplant at the University of Virginia Medical Center. Stephens was notified on December 24, 1990, that a liver was available for transplant. Later that day, Stephens went to the University of Virginia Medical Center, received the liver transplant, and began an extended period of recovery.

Panhandle's employment file for Stephens bears a December 24, 1990, entry stating "quit-disability," suggesting that Stephens quit [*4] his job on that date. Trial testimony revealed that when Stephens left for his liver transplant, employees at Panhandle did not believe that he would return to work. However, Stephens filed a written request for a medical leave of absence with Panhandle. Stephens was neither notified that he had been terminated nor given termination pay as required by W. Va. Code § 21-5-4 (1996). In fact, both Stephens and Panhandle represented to the district court that Stephens was on a medical leave of absence when he left work to have the liver transplant.

On March 1, 1991, Panhandle terminated its employee group health plan with Blue Cross and implemented a self-insurance plan. Panhandle entered into an arrangement with Phoenix Mutual Insurance Company ("Phoenix"), whereby Phoenix would provide "stop-loss" insurance coverage for Panhandle. Phoenix

agreed to cover any medical bills of covered Panhandle employees that exceeded $ 5000. Stephens' coverage under Blue Cross thus terminated in March 1991.

However, due to an administrative error, Panhandle did not transfer Stephens to its new group health plan. Panhandle omitted Stephens' name from the list of Panhandle employees that it sent to Phoenix. [*5] Panhandle also excluded the name of a Mr. McIntyre, an employee suffering from cancer, from the employee census. The district court concluded that the record failed to establish that Panhandle intentionally omitted the names of Stephens and McIntyre from the list sent to Phoenix. The evidence at trial established that under Panhandle's plan with Phoenix, Stephens would have been required to pay $ 72.28 per month for individual health insurance coverage.

Stephens and Carola Stephens were divorced on March 14, 1991. On that date, Carola Stephens notified her BCBE group health plan that Stephens and their daughter were no longer covered dependents. Carola Stephens had previously informed Stephens that she would terminate his BCBE coverage unless he agreed to pay the insurance premiums. On March 31, 1991, BCBE sent a letter to Stephens notifying him that his coverage under its group health plan was terminated because of his divorce and that he had sixty days to elect continuation coverage. Stephens did not elect to continue his coverage under the BCBE plan because he believed that he was covered under the Blue Cross plan through Panhandle.

On April 11, 1991, Stephens returned to work [*6] at Panhandle on a part-time basis. On June 17, 1991, however, Stephens terminated his employment with Panhandle because of illness. Pursuant to the requirements of the Comprehensive Omnibus Budget and Reconciliation Act ("COBRA"), Panhandle notified Stephens that he could elect continuation coverage under Panhandle's group health plan with Phoenix. Because Panhandle had never submitted Stephens' name to Phoenix, however, Stephens' request to elect continuation coverage was denied.

Stephens again returned to work at Panhandle in August 1991. Stephens was not listed as a beneficiary under Panhandle's group health plan with Phoenix. Stephens ultimately terminated his employment with Panhandle because of illness in January 1992. Stephens became eligible for Medicare in April 1993.

The evidence at trial established that Panhandle made a profit of approximately $ 25,000 for tax year 1993. A statement of financial condition submitted with the tax return revealed that Panhandle's owners, Albertazzie and Stout, each earned about $ 80,000 in 1993. The evidence adduced at trial further revealed that Stephens' medical treatments have cost him $ 160,908.30. Stephens submitted documentation indicating [*7] that he incurred $ 31,777 in attorneys' fees in prosecuting this action.

We review findings of fact by the district court for clear error. Fed. R. Civ. P. 52(a); *Hendricks v. Central Reserve Life Ins. Co.*, 39 F.3d 507, 512-13 (4th Cir. 1994). The findings of fact will not be set aside unless clearly erroneous, and due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses. We find that the district court did not clearly err in this case.

A. *Stephens' Claim for Medical Expenses*

Under the COBRA amendments to ERISA, the plan sponsor of an employee group health plan over a certain size must provide continuing coverage for qualified beneficiaries who would lose coverage under the plan because of a "qualifying event." 29 U.S.C.A. § 1161(a) (West Supp. 1996). A qualifying event is defined as any of the following: (1) the death of the covered employee; (2) the termination of the covered employee's employment; (3) the divorce or legal separation of the covered employee from the employee's spouse; (4) the covered employee becoming entitled to benefits under Title XVIII of the Social Security Act; (5) a dependent child ceasing to be a [*8] dependent child; or (6) a proceeding in a case involving an employer from whose employment the covered employee retired at any time. 29 U.S.C.A. § 1163 (West Supp. 1996).

Both parties represented that Stephens was on medical leave of absence from Panhandle when he left work on December 24, 1990, to have a liver transplant. A medical leave of absence does not constitute a "qualifying event" under 29 U.S.C.A. § 1163. *See generally Truesdale v. Pacific Holding Co.*, 778 F. Supp. 77, 82-83 (D.D.C. 1991) (employer's switch to new group health plan did not trigger COBRA notice requirement). Thus, Panhandle was not obligated to send Stephens a COBRA continuation coverage notice at the beginning of his medical leave of absence, and the district court correctly so held.

The district court also found, however, that by failing to inform Phoenix that Stephens was a covered employee under Panhandle's group health plan, Panhandle breached its fiduciary duty to Stephens. ERISA defines "fiduciary" as including any person or entity that "has any discretionary authority or discretionary responsibility in the administration of [an ERISA] plan." 29 U.S.C.A. § 1002(21)(A)(iii) (West Supp. 1996). [*9] Congress intended that the term "fiduciary" be construed broadly. *See Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987); *Connors v. Paybra Mining Co.*, 807 F. Supp. 1242, 1245 (S.D.W. Va. 1992). Panhandle was the administrator of its group health plan; consequently, the district court properly found that Panhandle acted as a "fiduciary" within the meaning of the statute, and accordingly, owed a fiduciary duty to Stephens. *See Barnes v. Lacy*, 927 F.2d 539, 544 (11th Cir.) (fiduciary duty attaches where employer "wears two hats" by acting as both employer and plan administrator), *cert. denied*, 502 U.S. 938, 116 L. Ed. 2d 324, 112 S. Ct. 372 (1991).

ERISA provides that a fiduciary breaches its duty to a plan participant by preventing or interfering with the receipt of benefits to which the participant is entitled. 29 U.S.C.A. § 1104(a)(1)(B) (West 1985 & Supp. 1996); *Blatt*, 812 F.2d at 813. Moreover, an ERISA fiduciary has a duty to inform a beneficiary of any change in his coverage status. *Willett v. Blue Cross & Blue Shield*, 953 F.2d 1335, 1340 (11th Cir. 1992). Thus, the district court properly found that when Panhandle terminated its group health plan with Blue Cross and implemented [*10] a self-insured plan with Phoenix providing stop-loss coverage, it had a fiduciary duty to enroll all of its employees in the new plan so that they enjoyed continued medical coverage. Panhandle's failure to inform Phoenix that Stephens was a covered employee denied Stephens coverage under the plan, and thus constituted a breach of Panhandle's fiduciary duty to Stephens.

The district court also found that Panhandle further breached its fiduciary duty in neglecting to inform Stephens of the change in his insurance coverage status, and in failing to correct its mistake once it learned that Stephens had been omitted from the employee census provided to Phoenix.

A fiduciary that breaches the fiduciary duties owed a plan participant is personally liable "to make good to such plan any losses to the plan resulting from each such breach, . . . and shall be subject to such other equitable or

remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a) (1988). The district court found that, in this case, the appropriate remedy was to restore Stephens to the position he would have occupied but for Panhandle's breach of its fiduciary duty. *See Donovan v. Bierwirth*, 754 F.2d 1049, [*11] 1056 (2d Cir. 1985). Accordingly, the court ordered Panhandle to reimburse Stephens for all medical expenses incurred between March 1991 (the date on which his Blue Cross coverage terminated) and April 1993 (the date Stephens became eligible for Medicare benefits). Stephens' documentation revealed that he incurred $ 124,542.89 in medical expenses between March 1991 and April 1993. The district court subtracted from that total $ 1,734.72 in insurance premiums that Stephens would have had to pay Panhandle's group health plan during that time. Accordingly, the district court properly ordered Panhandle to reimburse Stephens for medical expenses in the amount of $ 122,808.17.

B. *Stephens' Claim for Punitive Damages*

The district court next considered Stephens' claim for punitive damages. COBRA provides that a court may assess a penalty of up to $ 100 per day from the date the employer failed to provide the required COBRA notice. 29 U.S.C.A. § 1132(c)(1) (West Supp. 1996). The penalty provisions of the statute are intended to induce compliance by plan administrators. *Paris v. F. Korbel & Bros., Inc.*, 751 F. Supp. 834, 839-40 (N.D. Cal. 1990). In this case, Panhandle employees stated [*12] that they subjectively believed that Stephens terminated his employment on December 24, 1990, when he left to receive a liver transplant. Although such termination would have constituted a "qualifying event" requiring Panhandle to provide continuation coverage notice, Panhandle failed to provide such notice. Thus, the district court found it appropriate to impose a penalty to impress upon Panhandle the importance of compliance with COBRA notice requirements. Because the record did not establish that Panhandle acted in bad faith, and because Panhandle had already amended its COBRA notification procedure, the court declined to assess the maximum penalty of $ 100 per day. Rather, the court found that Panhandle should pay Stephens a penalty of $ 5 per day from December 24, 1990, to March 11, 1993 (the date Stephens filed the instant suit). *See Phillips v. Riverside,*

*Inc.*, 796 F. Supp. 403, 411 (E.D. Ark. 1992). Thus, the total penalty assessed was $ 4,035. We find that amount to be reasonable.

C. *Stephens' Claim for Attorneys' Fees*

In an ERISA enforcement action, a court may award reasonable attorneys' fees and the costs of action to either party. 29 U.S.C. § 1132(g)(1) (1988). [*13] In determining whether such an award is appropriate, courts generally consider: (1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing party would deter other persons from similar conduct; (4) whether the party requesting attorneys' fees sought to benefit all participants and beneficiaries of the ERISA plan; and (5) the relative merits of the parties' positions. *Knepper v. Automotion, Inc.*, 788 F. Supp. 999 (N.D. Ill. 1992).

Analyzing those factors, the district court properly assessed attorneys' fees. First, the court found that Panhandle has sufficient resources to satisfy an attorneys' fees award. Next, the court reasoned that Panhandle must be held accountable for its negligent administration of its group health plan, which rendered Stephens uninsured in the face of substantial medical expenses. Third, the court found that penalizing Panhandle would deter other ERISA plan administrators from similar activities. Thus, upon reviewing Stephens' quantified fee demand, the court ordered Panhandle to reimburse Stephens for attorneys' [*14] fees in the amount of $ 27,712. [3]

> 3   The court also directed Panhandle to reimburse Phoenix for attorneys' fees in the amount of $ 18,151.12. That portion of the district court's order is not being challenged on appeal here.

Based upon the foregoing, we find that the district court did not clearly err in awarding judgment for Stephens in this action. The record supports the district court's findings of fact and conclusions of law. Accordingly, we grant Appellees' motion for submission on the briefs and we affirm the district court's order.

*AFFIRMED*

# EXHIBIT 33

LEXSEE

**PENSION BENEFIT GUARANTY CORP. v. ROBERT E. BAKER**

**CIVIL NO. Y-97-4372**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

**1999 U.S. Dist. LEXIS 20715**

**January 25, 1999, Decided**

**DISPOSITION:** [*1] Plaintiff's Motion for Summary Judgment granted.

**COUNSEL:** Peter Roth, Esquire, Office of the General Counsel, Pension Benefit Guaranty Corporation, Washington, D.C.; Lynne A. Battaglia, Esquire, United States Attorney for the District of Maryland, Baltimore, Maryland; and Larry D. Adams, Esquire, Assistant United States Attorney, Baltimore, Maryland, counsel for the plaintiff.

Robert E. Baker, pro se defendant.

**JUDGES:** Joseph H. Young, Senior United States District Judge.

**OPINION BY:** Joseph H. Young

**OPINION**

**MEMORANDUM OPINION**

This matter is before the Court on the Plaintiff's Motion for Summary Judgment. The Plaintiff, Pension Benefit Guaranty Corporation [Pension Benefit], is a wholly-owned United States government corporation created under the Employee Retirement Income Security Act of 1974 [ERISA] § 4002 to administer the mandatory pension plan termination insurance program established under Title IV of ERISA. Pension Benefit insures payment of certain benefits upon termination of a pension plan to which Title IV applies. *See* ERISA §§ 4021, 4022, and 4061.

The Defendant, Robert Baker, served as the financial trustee of the Section 4049 trust established for the Pension Plan [*2] for Management Group Employees of Eastmet Corporation and Eastern Stainless Steel Co. [together "Eastmet"] between 1988 and July 1997. Baker was a practicing attorney and a member of the United States Trustee's office's panel of Chapter 7 bankruptcy trustees.

During his tenure as trustee, Baker paid himself approximately $ 217,650.00 from the trust's assets. This figure constitutes almost the entirety of the trust's total assets. Pension Benefit argues that such a substantial payment constitutes a breach of fiduciary duty as a matter of law.

Baker asserts he was entitled to the money, which included a liquidated annual retainer of $ 30,000.00 for legal and trustee services, but concedes he never actually received any explicit authorization from Pension Benefit for this retainer payment but argues that because there was no objection, there was implicit authorization.

Baker was removed as trustee by letter dated July 25, 1997. The letter requested that Baker turn over the property and records of the trust, make an accounting for the trust, and produce evidence of his fiduciary bond. In May 1998, Baker turned over a single box representing ten years of trust records.

I.

Summary [*3] Judgment may be granted in a civil case where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In

Page 1

considering a motion for summary judgment, the Court must consider the facts and draw any inference in the light most favorable to the nonmoving party. *Tuck v. Henkel Corp.,* 973 F.2d 371, 374 (4th Cir. 1992), *cert. denied,* 507 U.S. 918, 122 L. Ed. 2d 671, 113 S. Ct. 1276 (1993). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). If a motion for summary judgment is properly made and supported, the burden shifts to the opposing party to show that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n.11, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Finding no genuine dispute as to any material [*4] facts, this case is appropriate for summary judgment.

II.

The terms and conditions of the trusteeship explicitly state that the trustee is a fiduciary within the meaning of ERISA section 3(21), as amended, 29 U.S.C. § 1002, and is subject to the rules applicable to fiduciaries under Title I of ERISA. A financial trustee of a 4049 trust under ERISA is bound by duties of loyalty and prudence.

As a financial trustee, Baker was statutorily prohibited from engaging in transactions with the trust, unless the fees for those services were reasonable. ERISA §§ 406(a) and 408(b), as amended §§ 1106(a) and 1108. Accordingly, the question presented is whether it was reasonable for Baker to receive over $ 200,000.00, or approximately 99% of the trust's assets, in compensation.

In general, ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." *Varity v. Howe,* 516 U.S. 489, 506, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996) (quoting ERISA § 404(a)). As a matter of law, it was not in the interest of the participants and beneficiaries to spend almost the entirety of their [*5] trust on personal compensation for Baker. This Court concludes, as a matter of law, that such compensation in unreasonable.

III.

This Court held a hearing on damages on December 1, 1998. Both parties agreed that the total loss to the trust totals $ 303,454.00 plus interest from September 30, 1998 to the date of payment. The Court must decide

what, if any, fees Baker is entitled to retain.

The Appointment Agreement limited Baker to reasonable administrative expenses incurred in the performance of his duties. Baker himself conceded that the trust's matters were not particularly complex. It is unknown how much time Baker spent because he kept no records and is unable to estimate. Baker admits that he has no time records. Specifically, in his deposition, Baker stated, "any time records that existed are no longer in my possession. Whatever existed have been thrown out."

Implicit in one's fiduciary duties is the duty to maintain records. *See Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 142-43, 87 L. Ed. 2d 96, 105 S. Ct. 3085 (1985). Any doubts left unresolved due to the trustee's poor record keeping should be ruled in the trust's favor and against the [*6] trustee. While Baker did perform a few ministerial tasks, there is little evidence of how much time Baker dedicated to the trust, the value of his services, or his expenses.

In light of Baker's poor record keeping and his unreasonable depletion of the trust, Baker could be completely denied any fees. However, this Court is disturbed that over the course of nine years, the trust was almost entirely depleted by Baker's "compensation," and yet no one at Pension Benefit objected. Surely, Pension Benefit bears some responsibility in this matter.

Baker himself estimated that a reasonable fee for his work during the Eastmet bankruptcy would be $ 7,500.00. In a letter to Mark Friedman dated March 8, 1988, Baker wrote:

> My best estimate of said advance expenses, including my compensation, office expenses, mailing and telephone expenses and any necessary employment of professionals is $ 7,500.

Because Baker provided written notice of this fee, he will be permitted to retain it.

Accordingly, Baker shall pay Pension Benefit the entirety of the loss, namely $ 303,454.00, less the sum of $ 7,500.00 plus the interest on the $ 7,500.00 previously calculated into the total loss.

[*7] IV.

1999 U.S. Dist. LEXIS 20715, *7

In summary, the Court finds that Baker breached his fiduciary duties under ERISA when he took as personal compensation nearly the entirety of the trust. Based on the foregoing analysis, the Plaintiff's Motion for Summary Judgment is hereby granted.

Joseph H. Young

Senior United States District Judge

# EXHIBIT 34

LEXSEE

**R.A. SCARDELLETTI, et al. v. DONALD A. BOBO, et al.**

**Civil No. JFM-95-52**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

**1997 U.S. Dist. LEXIS 14498**

**September 8, 1997, Decided**

**DISPOSITION:** [*1] The former trustee defendants' motion for summary judgment denied. Plaintiffs' motion for summary judgment granted in part and denied in part; and Defendant Nemann's motion to dismiss and for summary judgment granted in part and denied in part.

**COUNSEL:** For JACK BOYCE, all of the above as Trustees aka Transportation Communications International Union Staff Retirement Plan, plaintiff: Robert P. Gallagher, Groom & Nordberg, Washington, DC.

For DONALD A. BOBO, R. I. KILROY, F. T. LYNCH, FRANK MAZUR, defendants: Marc H. Rifkind, Slevin & Hart, Washington, DC. Thomas J. Hart, Slevin & Hart, Washington, DC.

For ROBERT E. NEMANN, ROBERT E. NEMANN & ASSOCIATES, defendants: Patrick J. Szymanski, Baptiste & Wilder, P.C., Washington, DC. Roland P. Wilder, Jr., Baptiste and Wilder, Washington, DC.

**JUDGES:** J. Frederick Motz, United States District Judge

**OPINION BY:** J. Frederick Motz

**OPINION**

OPINION

The current trustees of the Transportation Communications International Union ("TCU" or the "union") Staff Retirement Plan ("Plan") have brought this action against the Plan's former trustees pursuant to the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. § 1001 *et seq.* ("ERISA"). [*2] The Plan's current trustees, R.A. Scardelletti, Frank Ferlin, Jr., R.P. Wojtowicz, and Jack Boyce, claim that the former trustees, Donald A. Bobo, R.I. Kilroy, F.T. Lynch, and Frank Mazur, breached their fiduciary duties when they recommended the adoption of cost-of-living adjustment ("COLA") Plan amendments to the TCU Executive Council in 1988 ("1989 COLA") and 1990 ("1991 COLA"). [1] The current trustees have also brought state law professional malpractice claims against the Plan's former actuary, Robert E. Nemann, and his company, Robert E. Nemann & Associates.

> 1  One current member of TCU's Executive Council, L. E. Bosher, International Vice President, was a trustee at the time the 1989 and 1991 COLAs were adopted but was not named as a defendant in this action. Def. M. for Summ. J. at 3.

In an August 21, 1995 opinion, I denied a motion to dismiss filed by the former trustees, holding that under a plain reading of the Plan documents the trustees were Plan fiduciaries when they provided the TCU Executive [*3] Council with information necessary for it to carry out its duties. Scardelletti v. Bobo, 897 F. Supp. 913, 918 (D. Md. 1995) ("Scardelletti I"). The former trustees have now filed a summary judgment motion claiming that a recent Supreme Court decision, Spink v. Lockheed, 135 L. Ed. 2d 153, 116 S. Ct. 1783 (1996), and a recent Fourth Circuit decision, Custer v. Sweeney, 89 F.3d 1156 (4th Cir. 1996), have undermined the logic of Scardelletti I and require the entry of summary judgment on their behalf. Specifically, the former trustees continue to maintain that the trust duties I identified in my opinion are not fiduciary duties under ERISA. The former trustees also argue that, first, even if they were

Page 1

fiduciaries, their conduct satisfied ERISA's prudence standard, and, second, that their actions did not cause any damages to the Plan. Nemann has also filed a hybrid motion to dismiss and for summary judgment.

In response, the current trustees have filed their own summary judgment motion, distinguishing the Spink and Custer decisions and asserting that those cases are consistent with my 1995 opinion. Furthermore, the plaintiffs maintain that the former trustees [*4] blindly, unreasonably, and imprudently (i.e. in violation of the prudent person standard of care) relied on Nemann's contradictory and unsubstantiated advice when they decided to recommend the 1991 COLA [2] to the Executive Council. Finally, the current trustees ask for the court to exercise its equitable authority to declare the 1991 COLA null and void, and to find against the defendants in the amount of $ 5.4 million, which is the amount the plaintiffs claim to have already paid out in COLA benefits as a result of the 1991 COLA amendment.

> 2 Both parties' briefs focus solely on the events surrounding the adoption of the 1991 COLA. Except to the extent that Nemann has moved for dismissal of the claims against him with respect to the 1989 COLA, those claims are not at issue at this time.

I.

The TCU is a labor union which represents approximately 85,000 employees of railroads and airlines in the United States and Canada. The TCU is governed by an Executive Council consisting of the officers of the union. The [*5] TCU pension Plan was created to provide pensions for union employees. TCU's Executive Council appoints five trustees to oversee the Plan's operations. The Executive Council, however, retains sole authority to amend the Plan. Although members of the Executive Council are not automatically trustees of the Plan, all of the parties in this case, both former and current trustees, respectively were or are both trustees and Executive Council members.

Originally, the Plan did not provide for any type of COLA for Plan participants. In the early 1980's the COLA issue was raised but was rejected as cost prohibitive on the advice of the Plan's actuary, Robert Nemann. In 1988 the trustees asked Nemann to reevaluate the COLA idea and, after doing so, Nemann reported that the Plan could afford to give a one-time

COLA of 10% after a retiree's fifth year of retirement. The trustees recommended such a COLA to the Executive Council, which adopted the COLA by Plan amendment effective January 1, 1989 (the "1989 COLA").

Even after this change, however, some Plan participants continued pushing for the adoption of an automatic COLA. In response to one such request in the Summer of 1989 defendant and former [*6] trustee Bobo asked Nemann for advice on a reply. Without conducting any study, Nemann indicated that funding an automatic COLA would be cost prohibitive. In February 1990 the trustees again discussed the COLA issue, specifically asking Nemann to analyze whether the Plan could afford a second one-step COLA of 10% eight years after retirement.

COLAs were next discussed at an October 12, 1990 trustees meeting. Nemann reported to the group that the Plan was in excellent financial shape, noting that it had a balance of $ 5.2 million and that it would be fully funded within 1.9 years. The trustees asked Nemann whether the Plan could afford an automatic COLA and he responded affirmatively--stating that it could do so without increasing the Plan's historic contribution rate of 17.5%. Nemann was not asked at that meeting or at any other time about the one-step COLA that was discussed in February. Nor did Nemann ever produce or distribute to the trustees any written analysis of any type of COLA. Rather, his recommendation was based on his own calculations and with reference to his annual actuarial reports, and it was always given orally.

In addition to stating that the Plan could afford an [*7] automatic COLA, Nemann also told the trustees that the COLA could be made retroactive. The trustees then voted to recommend an automatic, retroactive COLA to the TCU Executive Council. The next day, the Executive Council, relying on the trustees' recommendation, approved the COLA Plan amendment.

After the trustees meeting, Bobo asked Nemann to double-check his calculations to be sure the Plan could afford the COLA. [3] Nemann assured Bobo that he had confirmed his computations and that the COLA was affordable. In addition, when Nemann prepared the 1990 annual report in the Spring of 1991, he confirmed again that the Plan could implement the COLA without a change in the contribution rate.

3  These facts relating to Nemann re-checking his calculations are in dispute, but I assume them to be true since they have been asserted by the defendants, against whom I am ruling.

The next year, Scardelletti, who had previously been International Vice President, clandestinely organized his own slate to run for the Executive [*8] Council and staged a successful "eleventh hour coup" to become TCU President. At this point, the facts and exact timeline after become somewhat more contested, but it is undisputed that the following occurred. After taking office, the Plan's new Executive Council hired a new actuary, Daniel C. Rudin, to confirm that Nemann's advice regarding the COLA, and his work in general, had been accurate. Initially, Rudin worked with Nemann. At some point between 1991 and 1993, Nemann discovered that his valuation of the COLA had been in error, which he tried to correct without telling anyone. In 1993, however, Rudin discovered that Nemann had committed serious errors in his valuation of the 1991 COLA and that the Plan faced substantially larger liabilities than Nemann had originally projected. Specifically, Rudin estimated that the Plan was underfunded by $ 14.3 million in 1993 as a result of the 1991 COLA, and that the annual contribution rate would have to be increased to 31.5% in order to cover this deficiency. In response to this problem the Executive Council froze the COLA for future service accruals for active employees in 1993. However, the Executive Council did not repeal the COLA outright [*9] because it believed it was bound by ERISA's prohibition on cut-backs of "accrued benefits."

The underfunding problem persisted, however, and two years later the Executive Council amended the Plan to reduce future benefit accruals by 50% and increase the normal retirement age in order to further decrease the Plan's liabilities. Shortly thereafter, plaintiffs brought this suit.

II.

Plaintiffs' claims against the former trustees are based upon the premise that ERISA fiduciaries must "discharge their responsibilities 'with the care, skill, prudence, and diligence that a prudent man ... would use.'" Scardelletti I, 897 F. Supp. at 918 (quoting 29 U.S.C. § 1104(a)(1)(B)).

In Scardelletti I I held that the former trustees were ERISA fiduciaries. Defendants have requested me to

reconsider this ruling on two grounds. First, citing four cases that have been decided since Scardelletti I which allegedly undermine my analysis, defendants continue to argue that any recommendation with respect to a plan amendment, and particularly a non-binding recommendation, is a settlor's act not a fiduciary act. Second, they claim that their duties outlined in the Plan document, regarding the [*10] provision of information to the TCU Executive Council and the hiring of agents to help them fulfill that duty, run only to the TCU Executive Council and not to the Plan participants. Thus, defendants argue that those responsibilities are not fiduciary duties since fiduciary duties run only to plan participants.

A.

In Scardelletti I I held that "the plan documents themselves allocate the relevant discretionary authority or responsibility which is 'pivotal' to the statutory definition of 'fiduciary,'" and that "under a plain reading of [the Plan documents], the former trustees had discretionary powers and duties to properly inform the employer of necessary information and to seek advisors to aid them in the exercise of their duties." 897 F. Supp. at 918 (citations omitted). The four cases defendants cite decided after Scardelletti I are not to the contrary. Lockheed Corp. v. Spink, 135 L. Ed. 2d 153, 116 S. Ct. 1783 (1996), Varity Corp. v. Howe, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996), Coyne & Delany Co. v. Selman, 98 F.3d 1457 (4th Cir. 1996), and Custer v. Sweeney, 89 F.3d 1156 (4th Cir. 1996). In fact, these decisions all tend to support my holding.

[*11] For example, in Lockheed Corporation v. Spink the Supreme Court reaffirmed the rule that an employer who sponsors a plan acts as a settlor, not as a fiduciary, when it alters or amends the terms of the plan. 116 S. Ct. at 1789. I described this rule as "well settled" in my Scardelletti I. 897 F. Supp. at 917. The Court held that when Lockheed, the employer and plan sponsor, amended the terms of its plan it did "not trigger ERISA's fiduciary provisions." 116 S. Ct. at 1790. The Court did not hold, however, that non-employers who take action relating to amending a plan are likewise immune from suit for breach of fiduciary duty. While it may be true, as defendants argue, that amending a plan can never be considered an application of the terms of a plan, this case is not about a plan amendment. Only the TCU Executive Council has the authority to amend. Rather, this case is about information provided to the Executive Council by

the Plan trustees. The Plan explicitly gives the trustees the responsibility and duty to provide the Executive Council with information, and the trustees have a fiduciary duty to ensure that the information they give is thorough and accurate. [4]

> 4    Furthermore, Spink does not overrule the relevant portion of the 8th Circuit's decision in Schaefer v. Arkansas Medical Society, 853 F.2d 1487 (8th Cir. 1988), that I cited in Scardelletti I. 897 F. Supp. at 918-19. Although defendants correctly quote a portion of the Schaefer opinion that is of questionable legitimacy given well-settled caselaw, that portion is separate and distinct from the portion I cited. In Schaefer, the 8th Circuit held that both (1) AMS (the plan sponsor) and the plan trustees, and (2) Schaefer (a trustee and plan member) had breached their fiduciary duties by amending (AMS and the trustees), or recommending amendment of (Schaefer), the plan to add an automatic COLA without adequate analysis or investigation. 853 F.2d at 1491-92. Although apparently not argued in that case, obviously AMS should not have been held liable as a fiduciary for such an amendment, as it acted as settlor when adopting the amendment. However, this error does not undermine the distinction between an amendment and making recommendations or providing information during the consideration of an amendment. The fact is that the 8th Circuit's conclusions that AMS, the trustees, and Schaefer were fiduciaries were made without discussion or analysis. Id. Thus, the portion of the 8th Circuit's opinion regarding Schaefer's fiduciary status, although perhaps diminished in authority due to the court's error with respect to AMS's fiduciary status and because the court did not explain its analysis, has not been overruled. In any event, I believe my analysis to be correct with or without Schaefer.

[*12] The Supreme Court's Varity Corporation v. Howe opinion further supports my interpretation. Like Lockheed and unlike our case, Varity was both the employer and the plan administrator. Howe sued Varity for making reassuring statements regarding the security of a pension plan shortly before the plan failed. 116 S. Ct. at 1068-69. Although Varity, as employer, clearly would have the authority to eliminate the pension plan free of fiduciary liability, the Court examined more closely whether Varity's statements regarding the security of the plan were made in its capacity as employer (i.e., settlor) or as plan administrator (i.e., fiduciary). "To decide whether Varity's actions [fell] within the statutory definition of 'fiduciary' acts, [the Court] must interpret the statutory terms which limit the scope of fiduciary activity to discretionary acts of plan 'management' and 'administration.'" Id. at 1072-73 (citing ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) [5]). The Court then looked to the common law of trusts for guidance on the meaning of the terms "fiduciary" and "administration," and concluded that "the ordinary trust law understanding of fiduciary 'administration' of [*13] a trust is that to act as an administrator is to perform the duties imposed, or exercise the powers conferred, by the trust documents." Id. at 1073 (citing Restatement (Second) of Trusts § 164 (1957); 76 Am.Jur.2d, Trusts § 321 (1992)).

> 5    ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) states in relevant part:
>
>> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

The Court in Varity proceeded to hold that, in addition, there is more to fiduciary plan administration than just complying with the specific terms of the plan--other "activities that are ordinary [*14] and natural means of achieving the objective of the plan" are also fiduciary acts. Id. at 1073-74 (internal quotations and citation omitted). Included within such acts is "making statements about the likely future of [a] plan" because "plan administrators often have, and commonly exercise, discretionary authority to communicate with beneficiaries about the future of plan benefits." Id. at 1074.

1997 U.S. Dist. LEXIS 14498, *14

Significant to my interpretation of the Court's Varity opinion is the argument advanced by the dissent, and rejected by the Court, regarding the interpretation of ERISA's language, specifically the meanings of the terms "fiduciary" and "administration." The dissent argued that the dictionary definitions of those terms should be used, not their meanings in the context of the common law of trusts. Id. at 1085-86. The defendants in this case have made the same basic argument. They assert, without explaining, that making a recommendation regarding a plan amendment is not plan administration, presumably on the assumption that only acts regarding collection, disbursement, and investment of plan assets come within ERISA's definition of "administration" or "management." In addition, [*15] defendants claim that "the mere fact that a trust agreement confers a duty does not ... bring it within the ERISA definition of fiduciary." This assertion is directly contrary to the Supreme Court's holding in Variety that "administration" duties are defined by the pension plan documents. I relied on that very proposition in Scardelletti I. 897 F. Supp. at 918 ("The plan documents themselves allocate the relevant discretionary authority or responsibility which is 'pivotal' to the statutory definition of 'fiduciary.'") (quoting Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 61 (4th Cir. 1992)).

The Fourth Circuit also relied on this principle last year in Custer v. Sweeney, 89 F.3d at 1162. The defendant in that case, Sweeney, was an attorney who was legal counsel for a trustee subcommittee that made non-binding recommendations to its board of trustees regarding investments. Id. at 1163. The first step the court took in determining whether Sweeney acted as a fiduciary was to "concede that the pension plan's documents do not expressly confer ERISA fiduciary status on Sweeney." Id. at 1162. Only after looking first to the plan documents did the court then examine [*16] whether Sweeney's acts nevertheless made him a *de facto* fiduciary. *Id.* The court concluded that they did not; Sweeney, as legal counsel, simply provided legal advice and "performed only ministerial functions" for a subcommittee that made non-binding recommendations to the full board of trustees. Id. at 1163.

Defendants try to extend the holding in Custer to mean that anyone who makes non-binding recommendations is not a fiduciary. The key, however, is not the binding or nonbinding nature of the recommendations. Nor is it necessarily whether an individual is given the title "fiduciary" in the plan. Rather, what is critical is whether the plan has given an individual discretionary authority over plan administration. In Custer the plan gave the board of trustees the discretionary authority to manage investments and therefore it was a fiduciary with respect to the investment decision at issue. Likewise, in the present case, the Plan specifically gives the TCU trustees discretionary authority to provide the TCU Executive Council with whatever information the Executive Council needs about the Plan. Although defendants assert that there is no distinction between Sweeney, [*17] a legal counselor, and the TCU trustees because both were giving non-binding advice, in fact, they are not the same because the plan in Custer did not give Sweeney any discretionary authority, while the TCU Plan does give the TCU trustees discretionary authority. The distinction is the difference.

Finally, the Fourth Circuit's most recent opinion relating to this issue, Coyne & Delany Co. v. Selman, is also consistent with Scardelletti I. 98 F.3d at 1465. The plan sponsor and employer in that case had retained full authority to amend the plan, including the authority to hire and fire the plan administrator, in the plan documents. Id. at 1461. Noting that the power to hire and fire necessarily includes the power to monitor, the court simply held that "a plan sponsor does become a fiduciary under [ERISA's] definition *if* (that is, 'to the extent') it retains or exercises 'any discretionary authority' over the management or administration of a plan," including active oversight of its plan administrator. Id. at 1465 (citation omitted). Although the court did not mention the Supreme Court's instruction in Varity that one must look first to the plan documents [*18] to determine whether a party has been given any discretionary administrative duties, 116 S. Ct. at 1073, that is implicitly what it did. Here, the plan documents explicitly gave the TCU trustees the discretionary administrative duty to provide the employer with information and to hire agents to assist it with that duty. See Scardelletti I, 897 F. Supp. at 918. Thus, that duty was a fiduciary duty.

B.

Defendants assert that whatever duty they had to provide the Executive Council with information cannot be a fiduciary duty because it was a requirement that ran to the Executive Council, not to the Plan participants. Since fiduciary duties are owed only to plan participants,

Page 5

defendants argue that a duty to provide information to the Executive Council cannot be a fiduciary duty.

Defendants have accurately stated a rule of law, but it is inapplicable to these facts. The cases they cite all involved the claim by a non-participant party of a fiduciary breach. Board of Trustees of the Watsonville Frozen Food Welfare Trust Fund v. California Coop. Creamery, 877 F.2d 1415, 1422 (9th Cir. 1989); Carl Colteryahn Dairy v. Western Pa. Teamsters and Employers Pension Fund, 847 F.2d [*19] 113, 119 (3d Cir. 1988); Alton Memorial Hosp. v. Metropolitan Life Ins. Co., 656 F.2d 245, 249 (7th Cir. 1981). These courts each responded that a fiduciary duty runs only to plan participants and that therefore non-participants may not bring a claim against fiduciaries. Id. Unlike those cases, in the present case the TCU Executive Council is not claiming that the former trustees breached a fiduciary duty to the council (a non-fiduciary). Rather, this case involves the current trustees, acting in furtherance of their present fiduciary duty to Plan participants, claiming that the former trustees breached their fiduciary duty to the participants.

Defendants' argument attempts to put the cart before the horse, asking first to whom the duty is owed in order to determine whether it is a fiduciary duty. The correct approach is to first ask whether the Plan assigns any discretionary administrative duties. If it does, then the party to whom those assignments are made has a fiduciary duty to fulfill them in consideration *only* of the best interests of plan participants.

Defendants also assert that they breached no duty regarding the provision of information because the Executive [*20] Council never requested any information from the trustees. The Plan requires the trustees to provide TCU with information it "may require." Agreement § 15.01(e). Defendants claim that this triggers fiduciary duties only if the TCU actually requests information. But the phrase "may require" does not definitively mean "requests." If this is what was intended then the drafters of the Plan should have used the term "requests." Rather, the phrase "may require" is more ambiguous, giving the trustees the discretion to determine what information must be provided. It is precisely that discretion which puts a fiduciary duty on the trustees to provide accurate and full information--for if they do not, the sponsor could make a decision injurious to Plan participants without first knowing the

likely ramifications of its actions.

III.

ERISA requires that a fiduciary act "with the care, skill, prudence, and diligence ... that a prudent man ... would use." 29 U.S.C. § 1104(a)(1)(B). In Scardelletti I, I summarized how courts have enforced that standard of care in contexts such as that presented here:

> In order to meet the prudent person standard, fiduciaries must undertake a careful [*21] and impartial investigation when they do not have sufficient experience and familiarity with a particular matter. In conducting that investigation fiduciaries may retain independent, outside experts when appropriate. The use of independent advisers is not, however, a complete defense to a claim of imprudence. Fiduciaries may be liable for failing to exercise reasonable judgment in relying on the advice of independent advisors. As one court has stated, an outside appraisal is not a magic wand; rather, it is a tool which must be used properly. That tool is used properly only when the fiduciary ensures that the information relied on by the expert is complete and up-to-date.

897 F. Supp. at 919 (internal quotations and citations omitted). In addition, the prudence test focuses on the process that fiduciaries used to make their decision, that is, on their conduct and the procedures they followed "at the time they engaged in the challenged transactions." Donovan v. Mazzola, 716 F.2d 1226, 1231-32 (9th Cir. 1983); see generally James F. Jorden et al., Handbook on ERISA Litigation § 3.03[A] at 3-56-58 (1992).

Applying this standard, and viewing the facts in the light [*22] most favorable to the defendants, I conclude that a reasonable fact-finder would have to find that the former trustees breached their fiduciary duty to the Plan participants when they recommended to the TCU Executive Council that the automatic COLA was affordable and that it be approved. The former trustees made their decision based only on the oral report of their actuary, Nemann. Not only did Nemann not provide the former trustees with a study to back up his conclusions,

but, in fact, he had not prepared any such report. Instead, he was simply relying on the annual actuarial report that he was required to prepare and which did not include any analysis of a new COLA. Moreover, Nemann had been instructed at the previous trustees meeting to study a different, one-time COLA, one similar to the 1989 COLA, to take effect eight years after retirement. Instead, Nemann reported that an automatic COLA was affordable.

Moreover, minutes from trustees meetings in 1982, 1988 and 1989 reflect that Nemann had been telling the former trustees for years that a COLA was a very unusual feature for a pension plan like TCU's to have, and that its cost would be "prohibitive." Bobo had even adopted this [*23] very language in a July 13, 1989 letter to R. J. Devlin, a plan participant, explaining why the trustees had not previously adopted an automatic COLA. In addition, trustees meetings minutes from 1982, 1983, 1984 and 1989 also reflect that the trustees had repeatedly expressed concern that the ratio of active participants to retirees had significantly decreased (retirees actually outnumbered active participants by 1989) and would continue doing so. In sum, the former trustees knew that implementing an automatic, retroactive COLA was a rare and expensive proposition, one that they did not endorse for years because of its cost. Yet when they finally did decide that it was affordable, the trustees did so without themselves looking at the numbers, double-checking their actuary's calculations and assumptions, or understanding just how expensive it would actually be.

In their own defense, the former trustees have made essentially five arguments why their decision was prudent. First, they note that they had reliably relied on Nemann's work for many years, and that Nemann had been studying a COLA for at least nine years before making his recommendation. The prudence standard, however, requires [*24] them to ensure that their expert is making recommendations based on the most up-to-date information available; thus, Nemann's knowledge of past analyses is irrelevant. Moreover, fiduciary trustees must also be sure the expert's analysis is complete. Donovan v. Cunningham, 716 F.2d 1455, 1474 (5th Cir. 1983). Without reviewing the calculations and assumptions on which Nemann relied, the former trustees did not have any idea whether his conclusions were based on complete information. [6]

6   The trustees have also argued that ERISA does not require that fiduciaries make their decisions based only on written reports. While this may be true, the fact is that, as they admit in their brief, they were "laymen without any training in the complex actuarial discipline." Recognizing this, rather than shirking their responsibilities by relying unconditionally on Nemann's advice, they should have requested Nemann to provide documentation and support for his conclusions in the most straightforward way possible.

Second, [*25] notwithstanding their concern about the ratio of active participants to retirees, defendants also knew, from reviewing the 1989 annual actuarial report, that the plan was in "great shape," that it had run a surplus of $ 5.2 million in 1988 and that it was projected that it would become fully-funded by 1991. While this may be the best evidence that the defendants' decision was prudent, it is undermined by the fact that what they had tasked Nemann with studying before their October meetings was another one-time COLA, not an automatic, retroactive COLA. Given what the trustees had been previously told about the rarity and prohibitive cost of such a COLA, a reasonably prudent person would have required more information before concluding that such a change was affordable.

Third, defendants claim they were prudent because Bobo asked Nemann to double-check his calculations after he concluded that the 1991 COLA was affordable. However, this consisted of nothing more than Nemann reporting back to him, orally again, that his initial computations were accurate. Nemann never provided Bobo or any other of the former trustees with any documentation to support his recommendation prior to adoption [*26] of the amendment. In effect, defendants blindly accepted Nemann's conclusions without any independent consideration whatsoever.

Fourth, the former trustees assert that the new trustees, upon taking office in 1991, did not immediately discover any error--and that therefore the former trustees' recommendation was not so blatantly unreasonable as to constitute a fiduciary breach. The new trustees, however, did immediately involve new consultants, in addition to Nemann, and discovered that the plan's liabilities had recently ballooned. Acting as any fiduciary should, the new trustees then ordered a new review of the COLA to ascertain its stability. Rather than continuing to rely on

Nemann's word, the new fiduciaries undertook a thorough review of the plan's finances.

Fifth, defendants have presented an analysis by an expert whom they have retained in this litigation which shows that in his opinion Nemann's calculations were accurate, and that other intervening events are what has caused the plan's current financial crisis. This evidence may be relevant in determining whether damages were caused to the Plan by defendants' imprudence. However, the prudent person standard requires an analysis [*27] of the process the fiduciaries used to come to their conclusions, not the results of those conclusions. Brock v. Robbins, 830 F.2d 640, 647 (7th Cir. 1987); Jorden, et al., Handbook on ERISA Litigation § 3.03[A] at 3-58. Whether Nemann was right or wrong is irrelevant to the question of whether the prudent person standard was met. The fact is that the fiduciaries' procedure and conduct in accepting his oral report and forwarding that information on to the Executive Council was not careful and independent, and was thus imprudent.

IV.

As just indicated, the proffered testimony of defendants' expert may be relevant to the question of whether defendants are liable for damages caused to the Plan by their imprudence. There are two other issues relating to damages that must be addressed.

A.

The first of these issues is whether a fiduciary breach leading to the adoption of a plan amendment which significantly increases a plan's funding requirements causes ERISA damages under § 409. 29 U.S.C. § 1109. I decided that question in the affirmative in Scardelletti I. 897 F. Supp. at 920. Defendants have reargued that a plan amendment creating new liabilities to plan participants [*28] can never damage a plan.

To support their contention defendants assert that under my interpretation if a plan's sponsor were wealthy enough to afford new obligations created for the plan participants it would not be injured. Defendants further claim that my interpretation would "radically expand the scope" of ERISA fiduciary responsibility, requiring fiduciaries to conduct a thorough review of an employer's financial stability to see whether it could afford an amendment creating new benefits for participants.

This argument is a "strawman." The job of the fiduciary, in the first instance, is to thoroughly examine whether the *plan* can afford the change without benefit reductions or contribution increases. Perhaps there might be an unusual case in which the fiduciary concludes that the plan cannot afford the change but is then persuaded, after making a further investigation meeting the prudent person standard, that the employer's financial health and stability is sufficient to overcome the plan's own financial limitations. That theoretical possibility does not, however, excuse a fiduciary from fulfilling its primary duty to take prudent measures to protect the financial health of [*29] the plan for the benefit of plan participants.

B.

This brings me to the second issue: whether the adoption of the COLA was irreversible. Asserting that it was irreversible, plaintiffs claim monetary damages for the amount that the Plan has paid out in COLAs since January 1, 1991. As of the end of 1996, this amount was estimated to be $ 5.4 million.

In Scardelletti I I accepted plaintiffs' assertion that the COLA is unrepealable, stating that "the current trustees are caught between a rock and a hard place to remedy this situation because ERISA prohibits amendments of the Plan repealing an automatic COLA." 897 F. Supp. at 916. Defendants did not contest the point at that time. I now conclude that I was in error.

ERISA provides that an accrued benefit "may not be decreased by an amendment of the plan." 29 U.S.C. § 1054(g)(1). ERISA also provides that an amendment "eliminating or reducing ... a retirement-type subsidy (as defined in regulations) ... shall be treated as reducing accrued benefits." Id. at § 1054(g)(2). The purpose of this requirement is to protect that which an employee has been promised and has earned over time. See Alessi v. Raybestos-Manhattan, Inc., [*30] 451 U.S. 504, 510, 68 L. Ed. 2d 402, 101 S. Ct. 1895 (1981). In other words, if an employee works with the expectation that she is earning, and will receive, a pension benefit, an employer may not later decide not to give her the benefit that it has promised and she has earned. In the present case, Plan participants who retired prior to 1991 did not work with the expectation that they would receive a COLA. Thus, the COLA was not an accrued benefit. [7]

[7]    ERISA provides that what is an "accrued

benefit" is to be determined by each individual plan. 29 U.S.C. § 1002(23)(A). However, this is not a case of a plan providing a benefit and two parties arguing over whether it was included in the plan's definition of "accrued benefits." It is clear that the TCU Plan did not contain any automatic COLA prior to 1991. The question in our case is purely whether a later-added benefit may be considered an accrued benefit.

The present case is thus distinguishable from Hickey v. Chicago Truck Drivers Union, in which [*31] the Seventh Circuit held that a COLA was an accrued benefit. 980 F.2d 465, 470 (7th Cir. 1992). In Hickey the COLA had been added by plan amendment in 1973 and "in 1987, the Plan was terminated without providing funding for future increases in the cost-of-living." Id. at 466-67. From 1973 forward "[a] participant's right to have his basic benefit adjusted for changes in the cost-of-living accrued each year along with the right to the basic benefit." Id. at 469. Here, beneficiaries who retired before 1991 did not accrue any COLA benefit. [8] Cf. San Diego AFL-CIO Bus Drivers Local Div. 1309 of the Amalgamated Transit Union v. San Diego Transit Corp., 26 F.3d 132, 1994 WL 198663, at *3-5 (9th Cir. May 19, 1994) (unpublished table decision) (holding that a COLA which had been given for an expressly limited term was not an accrued benefit and could be eliminated after its term expired).

> 8   Although plaintiffs are correct in asserting that the Hickey court did not distinguish between pre-1973 and post-1973 retirees, it does not necessarily follow that that distinction is irrelevant for determining whether the benefits were accrued. It is most likely that there were few pre-1973 retirees still receiving benefits under that plan, and that the issue was not even raised in that case. There is certainly no indication from the court's opinion that it was raised by the parties.

[*32] Plaintiffs alternatively assert that the 1991 COLA is a "retirement-type subsidy" made unrepealable by § 1054(g)(2). ERISA does not define what "retirement-type subsidy" means, explicitly providing instead for a federal agency (presumably the IRS or the Pension Benefits Guaranty Corporation ("PBGC")) to define it via regulations. 29 U.S.C. § 1054(g)(2). Neither the IRS nor the PBGC has ever clarified what this term means (even though this subsection was added in 1984).

The only guidance available on the meaning of "retirement-type subsidy," therefore, is legislative history, specifically, the U.S. Senate report which accompanied the 1984 ERISA amendments. S. Rep. No. 98-575 (1984), reprinted in 1984 U.S.C.C.A.N. 2547. That report stated that "a subsidy that continues after retirement is generally to be considered a retirement-type subsidy," but then explicitly excluded several benefits, such as a medical benefit, a social security supplement, or a plant shutdown benefit "that does not continue after retirement age." Id. It may be inferred that Congress intended, by using the term "continues," to protect benefits which are provided prior to retirement but which are understood [*33] to continue after retirement. The 1991 COLA, however, was not a benefit that was received prior to retirement.

In summary, plaintiffs could have repealed the 1991 COLA amendment at any time. Thus, their damages claim is severely undermined, as passage of that amendment did not create any irreversible financial obligations for the Plan. That does not mean, however, that plaintiffs can recover no damages at all. They can do so for COLA benefits that were paid out up until the time that plaintiffs by reasonable investigation could have determined that adoption of the 1991 COLA was imprudent and taken steps to vacate the Plan amendment creating the COLA. When that date was can be established at trial.

V.

In their complaint, plaintiffs asserted three claims against Nemann and his company. Nemann has moved either for dismissal or summary judgment on each of them. Plaintiffs have filed a cross-motion for summary judgment as to their claim for professional malpractice under state law. They now concede that their other two claims are without merit.

As to the remaining claim, plaintiffs asserted in their complaint that Nemann failed to "act with skill, care, prudence, and diligence" by "improperly [*34] understating the actuarial valuations related to the COLA amendments," "rendering advice without performing an evaluation of the COLA amendments," and "failing to complete an actuarial study regarding the feasibility of a second COLA amendment."

Plaintiffs base their claim against Nemann on four factors, all of which they claim are in violation of the

American Academy of Actuaries' code of professional conduct. They assert that (1) Nemann told the TCU trustees that the 1991 automatic, retroactive COLA was affordable; (2) Nemann did not provide any documentation for his recommendation and should not have given the advice without preparing an adequate study; (3) Nemann based his advice on improper assumptions; and (4) Nemann failed to tell the trustees that his recommendation was based on a five-minute analysis conducted during a breakfast meeting with Bobo, and thereby allowed his work to be used to mislead the trustees.

Nemann contests these facts. First, he asserts that he never told the trustees that the 1991 COLA was affordable, but rather only "that no immediate increase in contributions was necessary, that the automatic COLA would substantially increase the amortization period, [*35] and that he could not say whether a future increase would be necessary without doing a full cost analysis." Second, Nemann argues that he was only providing the information as requested of him by Bobo, and that a full-blown, written report was never requested. Third, Nemann insists that his basic analysis of the COLA's impact was accurate. Finally, Nemann asserts that he did tell the trustees "that he could not give any exact answer concerning the cost of the proposed automatic COLA without doing a full study."

Genuine disputes of material fact exist as to these issues. Therefore, neither side is entitled to summary judgment as to plaintiffs' malpractice claims against Nemann.

A separate order effecting the rulings made in this opinion is being entered herewith.

Date: September 8, 1997

J. Frederick Motz

United States District Judge

ORDER

For the reasons stated in the memorandum entered herewith, it is, this 8th day of September 1997

ORDERED

1. The former trustee defendants' motion for summary judgment is denied.

2. Plaintiffs' motion for summary judgment is granted in part and denied in part; and

3. Defendant Nemann's motion to dismiss and for summary judgment [*36] is granted in part and denied in part.

J. Frederick Motz

United States District Judge

# EXHIBIT 35

LEXSEE

**ANDREA L. RANSOM, Plaintiff vs. TELECREDIT SERVICE CORPORATION,**
**Defendant**

**CIVIL NO. H-91-897**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

**1992 U.S. Dist. LEXIS 22738**

**February 5, 1992, Decided**

**DISPOSITION:**      [*1] Defendant's motion for summary judgment denied; and plaintiff's motion for partial summary judgment granted in part and denied in part.

**COUNSEL:** For ANDREA L. RANSOM, plaintiff: Morton A. Sacks, Cable, McDaniel, Bowie & Bond, Baltimore, Md.

For ANDREA L. RANSOM, plaintiff: Michael D. Smigiel, Law Office, Elkton, Md.

For TELECREDIT SERVICE CORPORATION, defendant: Peter F. Axelrad, Jackson & Caldwell, Martin B. Ellis, Frank, Bernstein, Conaway and Goldman, Baltimore, Md.

**JUDGES:** Alexander Harvey II, Senior United States District Judge.

**OPINION BY:** Alexander Harvey II

**OPINION**

MEMORANDUM AND ORDER

Presently pending in this civil action are plaintiff's motion for partial summary judgment and defendant's motion for summary judgment. Plaintiff Andrea L. Ransom (hereinafter "Ransom") is here seeking a recovery from defendant Telecredit Service Corporation (hereinafter "Telecredit") for numerous alleged violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et. seq. (hereinafter the "FDCPA" or the "Act").

Defendant Telecredit sent eleven collection letters to plaintiff, attempting to collect sums due under four separate debts. The eleven counts of plaintiff's [*2] complaint allege separate violations of the FDCPA for each of the eleven letters sent to plaintiff by defendant.

In seeking partial summary judgment, plaintiff has asked the Court to find and declare as a matter of law: (1) that Telecredit is a "debt collector" as that term is defined by FDCPA, 15 U.S.C. § 1692a(6); (2) that each of the eleven collection letters sent by Telecredit to plaintiff is a "communication" concerning a debt conveyed to a "consumer" as those terms are defined by the FDCPA, 15 U.S.C. §§ 1692a(2) and 1692a(3), respectively; (3) that Telecredit violated the FDCPA with respect to each of the four debts sought to be collected from plaintiff by failing to provide her with the notice required by the FDCPA, 15 U.S.C. § 1692g(a); (4) that each of the eleven collection letters sent by Telecredit to plaintiff violates the FDCPA in that each fails to contain the warning mandated by the FDCPA, 15 U.S.C. § 1692e(11); (5) that each of the eleven collection letters sent by Telecredit to plaintiff violates the FDCPA in that each contains a false representation of the character [*3] and amount of the debt in violation of § 1692e(2)(A) of the FDCPA; and (6) that each of the eleven collection letters sent by Telecredit to plaintiff violates the FDCPA in that each contains one or more false representations in order to collect or attempt to collect a debt in violation of § 1692e(10) of the FDCPA. By its motion for summary judgment, defendant Telecredit seeks judgment in its favor as to each count of the complaint on the ground that Telecredit is not a "debt collector" within the meaning of the FDCPA and is therefore not subject to the requirements of the Act.

Memoranda, affidavits, and exhibits in support of and in opposition to the pending motions have been filed by the parties and reviewed by the Court. Oral argument has been heard in open court. For the reasons to be stated herein, defendant's motion for summary judgment will be denied, and plaintiff's motion for partial summary judgment will be granted in part and denied in part.

I

Facts

The essential facts concerning the business operations of Telecredit are undisputed. Telecredit is a computerized check authorization and purchase service which provides check authorization services to its clients (known [*4] as "subscribers"). Its clients are primarily retail establishments and banks. When a consumer/drawer presents a check to one of Telecredit's subscribers, the subscriber contacts Telecredit. Telecredit then consults its computerized check authorization files and either authorizes or declines to authorize payment of the check based upon information in Telecredit's files concerning the drawer's check writing history.

As a part of the services provided to subscribers, Telecredit agrees to purchase, up to a certain specified amount, any checks authorized for acceptance which subsequently are dishonored by the drawer's bank. Thus, the retailer receives the agreed amount whether or not Telecredit ultimately collects from the drawer. After Telecredit purchases the dishonored checks from its subscribers, it initiates collection proceedings on its own behalf against the drawer. Any sums recovered are payable to Telecredit. However, Telecredit does not purchase or take title to dishonored checks until they have been returned unpaid by the drawer's bank.

Telecredit regularly attempts to collect sums due on dishonored checks purchased from its subscribers and in fact seeks to collect on every [*5] check purchased from its subscribers. Although these collection activities constitute a small percentage of Telecredit's business, [1] the record here indicates that Telecredit purchases approximately 600,000 such checks each year.

> 1 An affidavit submitted by defendant states that these collection activities involve less than one percent of the checks it authorizes and that less than seven percent of its employees are involved in collection activities.

Telecredit sent plaintiff Ransom eleven collection letters seeking to collect on four separate checks submitted by plaintiff to subscribers of defendant. All four of these checks were subsequently dishonored by plaintiff's bank and then purchased by defendant. On March 19, 1990, plaintiff wrote a check to Toys R' Us in the amount of $ 44.02 which was returned unpaid by her bank (hereinafter referred to as check # 1). On April 20, 1990, plaintiff wrote a check to K-Mart in the amount of $ 49.73 which was returned unpaid by plaintiff's bank (check # 2). These checks [*6] were subsequently purchased by Telecredit which then sought to recover from plaintiff the amounts of the unpaid checks. In addition, Telecredit sought to recover from plaintiff the amount of $ 15.70 (plus a $ 15.00 "service charge") for a check returned unpaid to K-Mart and then purchased by Telecredit (check # 3) and the amount of $ 15.00 for a "service charge" on another of plaintiff's returned checks purchased by defendant from Toys-R-Us. (check # 4).

As noted above, defendant sent eleven letters to plaintiff seeking to collect on these four unpaid checks. [2] Telecredit sent plaintiff six letters pertaining to check # 1. These six letters were dated March 31, 1990 (hereinafter referred to as letter # 1), April 10, 1990 (letter # 2), April 20, 1990 (letter # 3), April 30, 1990 (letter # 4), May 10, 1990 (letter # 5), and May 21, 1990 (letter # 6). Telecredit sent plaintiff one letter seeking to recover the service charge on check # 4, dated April 7, 1990 (letter # 7). Three letters were sent by Telecredit to plaintiff seeking to recover on check # 2. These three letters were dated May 22, 1990 (letter # 8), June 1, 1990 (letter # 9), and July 2, 1990 (letter # 10). One letter was [*7] sent by Telecredit to plaintiff seeking to collect on check # 3, dated July 7, 1990 (letter # 11).

> 2 It appears that Telecredit in fact sent more than eleven letters to plaintiff pertaining to these four checks. However, this suit involves only the eleven letters discussed herein.

Each of the above-mentioned letters states that the plaintiff is required to pay a "service charge" of $ 15.00 in addition to the amount of the unpaid check. In addition, each of the above-mentioned letters purports to be sent and/or signed by a natural person who in fact does not exist. [3] Letter # 2 and letter # 9 both state that plaintiff is subject to felony penalties (a fine of not more than $ 1,000 and/or imprisonment for not more than 18 months) for failing to pay debts in the amount of $ 44.02

and $ 49.73, respectively. Letter # 5 and letter # 10 both state that plaintiff's checks payable to Telecredit's subscribers are "in direct violation of the Maryland Civil Code concerning unpaid checks." Lastly, two of the letters, letter [*8] # 2 and letter # 9, state that plaintiff "needs" to make payment in a certain specified manner. [4]

> 3   An affidavit submitted by defendant asserts that "Telecredit uses certain specified pseudonyms on each form of correspondence it sends to drawer's of checks it purchases. It does this to facilitate proper handling of telephone calls from recipients of its correspondence and not to mislead or even confuse those recipients."
> 4   Specifically, these two letters state: "If your check is 30 days or older, you will need to wire the funds through 'WESTERN UNION' or mail it by the Post Office's 'EXPRESS MAIL' service."

II

Summary Judgment Principles

The principles to be applied by this Court in considering a motion for summary judgment under Rule 56, F.R.Civ.P., are well established. The burden is on the party moving for summary judgment to demonstrate clearly that there is no genuine issue of fact, and that he is entitled to judgment as a matter of law. Barwick v. Celotex Corp., 736 F.2d 946, 958 (4th Cir. 1984). [*9] This burden is met by consideration of affidavits, exhibits, depositions and other discovery materials. Id. The Fourth Circuit has stated that, with regard to motions for summary judgment, trial judges have "an affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from going to trial." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). A mere scintilla of evidence in favor of the non-moving party will not suffice to defeat a summary judgment motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

Rule 56(e), F.R.Civ.P., provides that "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for

trial." See Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236, 240 (4th Cir. 1988). [*10] The party opposing summary judgment must produce appropriate evidence pursuant to Rule 56(e) to establish that an issue of material fact exists as to matters on which it bears the burden of proof.

Rule 56 also contemplates the grant of partial summary judgment under the same standards. F.R.Civ.P. 56(d). See also 6 J. W. Moore, W. J. Taggert & J. C. Wicker, Moore's Fed. Prac. P 56.04[1] at 56-63 (2d ed. 1991) (when summary judgment cannot properly be rendered upon whole case, court should specify which material facts are really in issue, thereby facilitating and expediting trial); 6 (Part 2) J. W. Moore & J. C. Wicker, Moore's Fed. Prac. P 56.20 [3.-0] at 56-685 and P 56.20 [3.-2] at 56-691 (2d ed. 1988) (Rule 56 clearly provides that claimant may move for summary judgment upon less than whole case; court may make summary adjudication short of final adjudication even if other matters must be tried because of the existence of genuine issues of material fact).

When these principles are applied to the facts of record here, this Court concludes that plaintiff's motion for partial summary judgment should be granted in part and denied in part and that defendant's motion [*11] for summary judgment should be denied.

III

Discussion

(a)

"Debt Collector"

The threshold issue in this case, as agreed by the parties, is whether Telecredit is a "debt collector" subject to the requirements of the FDCPA. 15 U.S.C. § 1692a(6). Plaintiff argues that Telecredit is a "debt collector" within the meaning of the Act since it is a third-party independent collector which regularly collects, or attempts to collect, debts originally owed to others. Plaintiff relies primarily on Holmes v. Telecredit Service Corp., 736 F. Supp. 1289, 1294 (D. Del. 1990), which held that Telecredit (the same defendant in this case) is a "debt collector" under substantially similar facts. Plaintiff further asserts that none of the statutory exceptions of the FDCPA (15 U.S.C. § 1692a(6)(A)-(F)) are applicable to Telecredit. According to plaintiff, it is

particularly significant that Telecredit is not exempted under the "creditor" exception in the Act (15 U.S.C. § 1692a(6)(A)) because the assignee exception specifically applies to Telecredit.

In support of its own motion and in opposition to plaintiff's [*12] motion, defendant Telecredit contends that a literal reading of the FDCPA indicates that it is not a "debt collector" and is therefore not subject to the requirements of the Act. Telecredit argues that since it purchases the checks and owns the debts prior to the time that it collects on the debts, it does not collect "debts owed or due another." 15 U.S.C. § 1692a(6). Telecredit also argues that since it collects only debts that it owns, it is exempted under the "creditor" exception contained in § 1692a(6)(A) of the Act. Telecredit further contends that it is not subject to the Act under the assignee exception contained in the definition of "creditor" because that exception applies to those who attempt to collect a debt "for another." 15 U.S.C. § 1692a(4).

The FDCPA imposes civil liability only on "debt collectors." 15 U.S.C. § 1692k; Holmes, supra at 1290. It follows that if Telecredit is not a "debt collector," summary judgment must be granted in its favor. The term "debt collector" is defined in the FDCPA as follows:

> The term "debt collector" means any person who uses any instrumentality [*13] of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6).

Following the definition of "debt collector," the statute lists six exceptions. 15 U.S.C. § 1692a(6)(A)-(F). The first exception is that "creditors" are not included in the definition of "debt collector." 15 U.S.C. § 1692a(6)(A). The term "creditor" is defined as:

> any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating

collection of such debt for another.

15 U.S.C. § 1692a(4). The second part of this definition, which excludes from the definition of "creditor" those receiving an assignment of a debt in default, is known as the assignee exception.

The parties have cited several cases which discuss whether entities [*14] which collect on debts to which they have title are "debt collectors" as that term is used in the FDCPA. Defendant argues that this Court should adopt the reasoning of the court in Alexander v. Moore & Associates, Inc., 553 F. Supp. 948 (D. Haw. 1982). In Alexander, a commercial relationship similar to the one here existed between a check guaranty service, RENTCHECK, and a landlord who had received bad checks from tenants. RENTCHECK paid the landlord's claims, took an assignment of the claims, and sought payment from the tenants. As one of its rulings, the Court concluded that RENTCHECK was not subject to the FDCPA since facts revealed "only that RENTCHECK sought to collect on amounts it had to pay the landlords pursuant to its rent guarantee. These are not debts 'owed or due another'." Id. at 954.

Whether Telecredit is a "debt collector" and whether any of the statutory exceptions apply to Telecredit were the precise issues before the Court in Holmes v. Telecredit Service Corp., supra. Finding the definition of "debt collector" to be ambiguous, District Judge Schwartz, in a well-reasoned opinion, examined the statute's legislative [*15] history and determined that Congress intended to distinguish between creditors who are not subject to the Act and independent third party collectors who are subject to the Act. Rejecting the analysis of the FDCPA in Alexander, the Court in Holmes stated that "by use of the language 'owed or due another' Congress was attempting to exclude those entities that extend credit from the effects of the Act." 736 F. Supp. at 1293. Accordingly, the Court held that Telecredit is subject to the FDCPA since "Telecredit is a third party collecting a debt originally owed to another. . . . It is not in the business of extending credit." Id.

The Court in Holmes also held that Telecredit could not avail itself of the definitional exception for "creditors" since "it falls under the exception for assignees." Id. The court concluded that since Telecredit received title to the dishonored check after it was "in default," it was an assignee within the meaning of §

1692a(4) of the Act and therefore subject to the requirements of the FDCPA. Id.

The decision in Holmes relied in large part upon an analysis of the FDCPA undertaken by District Judge Thompson in Kimber v. Federal Financial Corp., 668 F. Supp. 1480 (M.D. Ala. 1987). [*16] The Court in Kimber examined § 1692a(4) in light of § 1692a(6) and determined that Congress meant to include within the "universe" of "debt collectors" and assignees those who regularly attempt to collect on debts which were originally owed or due to another. Id. at 1485.

This Court would agree completely with the decision reached in Holmes. The analysis of the Act by Judge Schwartz in Holmes (and by Judge Thompson in Kimber) is sound and persuasive. Defendant Telecredit suggests that this Court should give a literal reading to the definition of "debt collector" and should find that Telecredit is not within that definition. In particular, defendant argues that it owned the debts which it sought to collect from plaintiff and that it was not collecting debts "owed or due another" within the meaning of the FDCPA. [5] Telecredit argues that there is no basis for reading the word "originally" into the definition of "debt collector" and for construing the Act as reading "*originally* owed or due another."

> 5   Telecredit concedes, as it should, that it "regularly" collects debts. Telecredit annually attempts to collect on approximately 600,000 dishonored checks. This certainly constitutes a "regular" part of its business activities. See Holmes, 736 F. Supp. at 1291.

[*17] Contrary to defendant's contention, were this Court to give the Act a strictly literal reading, it would also lead to the conclusion that the FDCPA applies to an entity like Telecredit. It is not necessary to add language to the statute in order to define "debt collector" in the manner suggested by plaintiff. The statute uses the word "owed" which is in the past tense and the word "due" which is in the present tense. Accordingly, it would be reasonable to read the definition of "debt collector" as including those who collect debts currently "due" to others and as also including those who collect debts formerly "owed" to others. If Congress had no such intention in enacting the FDCPA, it could have used the word "owing" instead of the word "owed."

It is true, as other courts have noted, that the definitional section of the FDCPA is "far from a model of drafting clarity." Kimber, 668 F. Supp. at 1484; see also Holmes, 736 F. Supp. at 1292. This Court will accordingly not rely merely on the language of the FDCPA. Rather, the Court will interpret the words "debt collector" in the statute by also considering the statutory purpose of, the legislative history [*18] of and other definitional provisions of the FDCPA. The meaning of the term "debt collector" can best be determined by considering the intention of Congress in including in the Act an exception for "creditors" and a definition of "creditor."

This Court is satisfied that the Act's legislative history indicates that Congress intended the Act to apply to entities like Telecredit. The Senate Committee that considered the Act stated that "the primary persons intended to be covered are independent debt collectors." S.Report No. 95-382, 95th Cong., 1st Sess., reprinted in 1977 U.S. Code Cong. & Admin. News 1695, 1697. The Committee explained that the Act applied to third-party collectors of past due debts because,

> unlike creditors, who generally are restrained by the desire to protect their good will when collecting past due accounts, independent collectors are likely to have no future contact with the consumer and often are unconcerned with the consumer's opinion of them.

Id. at 1486.

Telecredit argues that it is restrained by the desire to protect consumer good will. However, as the court in Holmes noted,

> This is simply not the case. Telecredit's "customers" [*19] are the businesses which subscribe to its services. Except for its collection activities, it has no direct dealings with ultimate consumers, and its business does not depend upon their good will.

736 F. Supp. at 1293. Telecredit is assuredly the type of third-party independent debt collector intended by Congress to be covered by the Act.

Analysis of the definitional provisions of the FDCPA

as a whole supports this interpretation of "debt collector." The definition of "debt collector" specifically excludes "creditors." 15 U.S.C. § 1692a(6)(A). "Creditor" is defined in § 1692a(4) of the Act as "any person who offers or extends credit creating a debt or to whom a debt is owed." 15 U.S.C. § 1692a(4). As noted by the court in Kimber, "There would be no need to exclude creditors--those who collect debts for themselves--from the general definition of debt collector unless that general definition included those who collect debts for themselves." 668 F. Supp. at 1485. Telecredit must therefore be included in the general definition of debt collector since it collects debts for itself that were formerly [*20] owed to others.

To be excluded from the statutory definition of "debt collector," Telecredit must show not only that the creditor exception applies but also that it is not covered by the "assignee" exception to the definition of "creditor." Section 1692a(4) excludes from the definition of creditor "any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." 15 U.S.C. § 1692a(4). There is no question that the debts purchased by Telecredit from its subscribers are "in default" when purchased. Telecredit contends, however, that it does not pursue collection efforts "for another." [6] This Court would disagree. In rejecting this argument, the Court adopts and relies on the reasoning of the Court in Kimber:

> The first part of § 1692a(4) defines the universe of creditors as either those who originate a debt or those to whom a debt is owed; in either case, the creditors are not collecting the debts for others. The second part of § 1692a(4), the assignee exception, then purports to exclude from this universe those persons who collect assigned or transferred [*21] debts that are already in default when assigned or transferred. To say that this exception applies only to those who collect debts for others would be to render the exception superfluous and meaningless; those who collect debts for others are not within the original definitional universe, and there is therefore no need to exclude them. Rather, the excluding factors in the exception are that the debts are the result of an assignment or

transfer and that the debts were already in default at the time of assignment or transfer. With the phrase "for another" at the end of the exception, Congress merely intended that the debts should have *originally* belonged to another and that the creditor was therefore in effect a third-party or independent creditor.

668 F. Supp. at 1485 (Emphasis in original).

> [6] Telecredit argues that Congress intended that the assignee exception applies only to temporary assignments, "i.e., assignments without recourse or for collection only, which do not give the assignee all right title and interest to the property assigned." Telecredit contends that the purchase of checks from its subscribers is a permanent assignment. There is no basis in the Act for this distinction. As the court in Kimber noted in rejecting a similar argument, "to say that the statute's coverage extends to only a specific form of contract, that is, a temporary assignment contract, would be to limit the law severely and to leave it open to easy evasion by simply adopting a different form of contract." 668 F. Supp. at 1485.

[*22] Applying these principles to the facts of this case, this Court finds and concludes as a matter of law that Telecredit is a "debt collector" as that term is used in the FDCPA. Accordingly, Telecredit is subject to the requirements of the Act. Telecredit may not rely on the statutory exception for "creditors" since it is an assignee of a debt in default.

(b)

"Communication" to a "Consumer"

Having concluded that Telecredit is a "debt collector" subject to the FDCPA, this Court also finds as a matter of law that each of the eleven debt collection letters sent by Telecredit to plaintiff is a "communication" as that term is used in the FDCPA. 15 U.S.C. § 1692a(2). The FDCPA defines communication as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). The letters sent to plaintiff by Telecredit were transmitted through the United States Postal Service and concerned debts allegedly owed by Ransom to a toy store and a department store.

This Court further finds that, as a natural person allegedly obligated to pay those debts, Ransom is a "consumer" as that term [*23] is defined in the FDCPA. 15 U.S.C. § 1692a(3).

(c)

Notice Requirements

This Court next finds and concludes that Telecredit, as a debt collector covered by the FDCPA, violated the Act by failing to provide the notice required by § 1692g(a) with respect to two of the four debts which Telecredit sought to collect from plaintiff. Section 1692g(a) of the FDCPA requires that:

(a) Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification [*24] of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a).

With respect to the debts which Telecredit sought to collect on check # 1 and check # 2, plaintiff has submitted letter # 1 and letter # 8, the initial communications from Telecredit to plaintiff concerning these debts. These initial communications do not contain the information required by 15 U.S.C. § 1692g(a)(3)-(5). Nor has Telecredit produced any evidence indicating that it provided the necessary information to plaintiff "within five days after the initial communication." 15 U.S.C. § 1692g(a). Accordingly, this Court has concluded that Telecredit violated the FDCPA with respect to its attempts to collect debts represented by check # 1 and check # 2 in that Telecredit failed to provide the information [*25] required by § 1692g(a) of the Act.

With respect to check # 3 and check # 4, plaintiff has not submitted the initial communication sent by Telecredit to plaintiff relating to those debts. In the absence of any evidence in the record establishing the failure of Telecredit to provide the information required by § 1692g(a) with respect to these debts, the Court cannot conclude at this stage of the case that Telecredit violated § 1692g(a) of the FDCPA with respect to its attempts to collect the debts represented by check # 3 and check # 4.

(d)

Statutory Warning

Next, this Court has concluded that each of the

eleven collection letters sent by Telecredit to plaintiff violated the FDCPA in that each letter failed to contain the warning required by § 1692e(11) of the Act. Section 1692e(11) provides that the following conduct violates the Act: "the failure to disclose clearly in all communications made to collect a debt . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." 15 U.S.C. § 1692e(11). See e.g., Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d 22, 26-27 (2d Cir. 1989) [*26] (FDCPA requires that all communications contain § 1692e(11) warning).

The record here clearly establishes that none of the eleven debt collection letters sent to plaintiff by Telecredit contain the warning required by § 1692e(11). Accordingly, this Court concludes that each of the eleven collection letters sent by Telecredit to plaintiff also violates § 1692e(11) of the FDCPA.

(e)

False Representation -- Service Charge

Plaintiff asserts that each of the eleven collection letters sent by Telecredit to plaintiff also violates § 1692e(2)(A) in that each of the eleven letters demands payment of a $ 15.00 "Service Charge." Section 1692e(2)(A) of the FDCPA prohibits the use of any "false representation of the character, amount, or legal status of any debt[.]" 15 U.S.C. § 1692e(2)(A).

Telecredit argues that it has a right to impose the service charge because it requires each subscriber by contract to post a service charge notice at the point of sale and that such notice creates an implied contract that binds the consumer, in this case, Ransom. However, when the subscriber does not properly display the service charge notice and it is not seen by the [*27] consumer, the debt collector has no right to demand or collect the service charge in question. See In re Scrimpsher, 17 B.R. 999, 1013 (Bankr. N.D.N.Y. 1982) (absent some proof of service charge term in legally binding obligation, right to service charge is baseless and false in violation of § 1692e(2)(A); summary judgment granted).

In this case, Ransom asserts that she never saw any such service charge notice at any relevant time. Telecredit has not produced evidence to the contrary. In particular, Telecredit has not shown that any of the subscribers involved in this case had the service charge

notice posted at the point of sale at any relevant time. Accordingly, this Court has concluded that each of the eleven communications sent by Telecredit to plaintiff contained a false representation of the character or amount of a debt in violation of § 1692e(2)(A).

(f)

False Representation -- Fictitious Signer

Plaintiff also contends that each of the eleven debt collection letters sent by Telecredit to plaintiff violates the FDCPA in that each letter is "signed" by a person who in fact does not exist. Section 1692e(10) of the FDCPA provides that the following conduct [*28] violates the FDCPA: "The use of any false representation or deceptive means to collect or attempt to collect any debt . . . ." 15 U.S.C. § 1692e(10).

Telecredit admits that all "signers" of its collection communications are fictitious. In an analogous situation, it has been determined that the use of aliases by debt collectors making telephone contact with debtors violates the FDCPA. Bingham v. Collection Bureau, Inc., 505 F. Supp. 864, 874 (D.N.D. 1981). Telecredit explains that the pseudonyms are invented by Telecredit for use in debt collection letters to facilitate the handling of phone calls. Whatever may be Telecredit's motivation, this Court concludes that the use of a pseudonym is a false representation made by Telecredit to Ransom in order to collect a debt in violation of § 1692e(10) of the FDCPA.

(g)

False Representation -- Criminal Sanctions

Plaintiff next asserts that two of the collection letters sent by Telecredit to plaintiff violate § 1692e(10) of the FDCPA in that these two letters threaten felony sanctions for actions of plaintiff which under the law would be mere misdemeanors. Plaintiff contends that the statements [*29] in question amount to false representations in violation of § 1692e(10).

Letter # 2 (the communication of April 10, 1990) and letter # 9 (the communication of June 1, 1990) both contain the following language:

The following criminal statute(s) or code(s) are applicable in Maryland:

ARTICLE 27, STATE STATUTE

140    ET    SEQ.    Sanctions: IMPRISONMENT for not more than 18 months; and/or a FINE of not more than $ 1,000; and FULL RESTITUTION.

These two communications seek to collect debts of $ 44.02 and $ 49.73, respectively. In fact, the potential sanction which might be imposed on plaintiff for passing these two checks is a fine of not more than $ 100, the offense is merely a misdemeanor under Maryland law. Md. Ann. Code art. 27, § 143(b) (1987 Repl. Vol., 1990 Cum. Supp.). This Court accordingly concludes that each such representation that a felony sanction may be imposed on Ransom was a false representation used by Telecredit to collect or attempt to collect a debt in violation of § 1692e(10) of the FDCPA.

(h)

False Representation -- Civil Sanctions

Plaintiff also argues that two of the letters sent by Telecredit to plaintiff violated § 1692e(10) of the Act [*30] in that they falsely informed plaintiff that her actions were in violation of the "Maryland Civil Code." Plaintiff contends that since there is no body of law known as the "Maryland Civil Code," each such representation constitutes a false representation in violation of § 1692e(10).

Although there is technically no body of law known as the "Maryland Civil Code," the representation in question can readily be understood as referring to relevant provisions of the Maryland Code. Accordingly, this Court cannot conclude as a matter of law that Telecredit's references to the "Maryland Civil Code" constituted a false representation in violation of § 1692e(10) of the FDCPA.

(i)

False Representation -- Need to Pay

Plaintiff contends that two of the debt collection letters sent by Telecredit to plaintiff violate § 1692e(10) in that they falsely represent that Ransom "needs" to make payment in a certain specified manner. Letter # 2 (the communication of April 10, 1990) and letter # 9 (the communication of June 1, 1990) both contain the following language: "If your check is 30 days or older,

you will need to wire the funds through 'WESTERN UNION' or mail it by the Post Office's 'EXPRESS [*31] MAIL' service."

On the record here, this Court concludes that this statement constitutes a false representation in violation of § 1692e(10) of the FDCPA. There is nothing in the record to support the representation that Ransom "needs" to make payment of these debts through or by any particular medium. Indeed, Telecredit has admitted that it in reality had no such requirement and that it accepts payment no matter how it is delivered.

IV

Conclusion

For the reasons stated, this Court will deny defendant's motion for summary judgment since defendant is a "debt collector" as that term is defined by the FDCPA. With respect to the following issues, this Court finds that plaintiff Ransom is entitled to partial summary judgment in her favor and that as a matter of law plaintiff Ransom is entitled to a declaratory judgment providing that: [7]

(1) Telecredit is a "debt collector" as that term is defined by the FDCPA, 15 U.S.C. § 1692a(6), and Telecredit is therefore subject to the FDCPA;

(2) Each of the eleven collection letters sent by Telecredit and received by Ransom is a "communication," pursuant to 15 U.S.C. § 1692a(2), [*32] which was conveyed to a "consumer," pursuant to 15 U.S.C. § 1692a(3);

(3) With respect to two of the four debts Telecredit seeks to collect from Ransom, Telecredit has violated the FDCPA in that each initial communication sent to Ransom by Telecredit failed to contain the notice required by 15 U.S.C. § 1692g(a) and in that the required notice was not otherwise sent to Ransom within five days of the initial communication;

(4) Each of the eleven collection letters sent by Telecredit to Ransom violates the FDCPA in that each fails to

contain the warning required by 15 U.S.C. § 1692e(11);

(5) Each of the eleven collection letters sent to Ransom by Telecredit violates the FDCPA in that each contains a false representation of the character and amount of a debt in violation of 15 U.S.C. § 1692e(2)(A);

(6) Each of the eleven debt collection letters sent to Ransom by Telecredit violates the FDCPA in that each contains a false representation concerning the identity of the signer in violation of 15 U.S.C. § 1692e(10);

(7) The two collection communications [*33] described herein as letter # 2 and letter # 9 violate the FDCPA in that each contains a false representation concerning Maryland law in violation of 15 U.S.C. § 1692e(10); and

(8) The two collection communications described herein as letter # 2 and letter # 9 violate the FDCPA in that each contains a false representation concerning required methods of payment in violation of 15 U.S.C. § 1692e(10).

7   Whether or not plaintiff can collect damages for more than one violation in a particular letter is an issue not addressed in this Memorandum and Order.

Plaintiff's request for partial summary judgment will be denied as to two of the issues presented herein. The Court has not concluded as a matter of law that defendant's communications to plaintiff pertaining to check # 3 and check # 4 violate § 1692g(a) nor that defendant's communications of May 10, 1990 and July 2, 1990 violate § 1692e(10) by referring to the "Maryland Civil Code."

Accordingly, it is [*34] this 5Th day of February, 1992 by the United States District Court for the District of Maryland,

ORDERED:

1. That defendant's motion for summary judgment is hereby denied; and

2. That plaintiff's motion for partial summary judgment is hereby granted in part and denied in part.

Alexander Harvey II

Senior United States District Judge