# EXHIBIT 36

LEXSEE

**JOHN G. GOETTEE, JR.; MARIAN GOETTEE, Petitioners - Appellants, versus
COMMISSIONER OF INTERNAL REVENUE, Respondent - Appellee.**

**No. 05-1975**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**192 Fed. Appx. 212; 2006 U.S. App. LEXIS 19034; 2006-2 U.S. Tax Cas. (CCH)
P50,484; 98 A.F.T.R.2d (RIA) 5669**

**May 26, 2006, Argued
July 28, 2006, Decided**

**NOTICE:** [**1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States Tax Court. (Tax Ct. No. 96-26591).
Goettee v. Comm'r, T.C. Memo 2003-43, 2003 Tax Ct. Memo LEXIS 47 (T.C., 2003)

**DISPOSITION:** AFFIRMED.

**COUNSEL:** ARGUED: Matthew Joseph McCann, Bethesda, Maryland, for Appellants.

Randolph L. Hutter, UNITED STATES DEPARTMENT OF JUSTICE, Tax Division, Washington, D.C., for Appellee.

ON BRIEF: Eileen J. O'Connor, Assistant Attorney General, Richard Farber, UNITED STATES DEPARTMENT OF JUSTICE, Tax Division, Washington, D.C., for Appellee.

**JUDGES:** Before MOTZ, GREGORY, and DUNCAN, Circuit Judges.

**OPINION**

[*214] PER CURIAM:

Petitioners-Appellants, John and Marian Goettee, appeal the Order and Decision of the Tax Court denying

them abatement of interest that had accrued on past-due taxes. The Goettees claim that the delay in payment was due in large part to the IRS and that they therefore should not be liable for interest accrual resulting from that delay. They also contend that the Tax Court abused its discretion in refusing to award them reasonable litigation costs in the action as a prevailing party.

Because the IRS is not compelled to abate [**2] interest for the periods in question under the applicable statutes and regulations, and because the Tax Court reasonably acted within its discretion in refusing to award litigation costs to the Goettees, we Affirm the Order and Decision of the Tax Court.

I.

During September 1981, the Goettees acquired a limited partnership interest in The Thompson Equipment Associates partnership ("TEA"), a type of shelter that came to be known as a "Barrister Books" shelter. The IRS subsequently found this type of shelter to be improper.

On October 15, 1986, the IRS sent the Goettees a notice of deficiency. In it, the IRS made adjustments on account of TEA items and determined deficiencies and additions to the Goettee's tax liability for 1978, 1979, 1981, and 1982. On November 3, 1986, the Goettees challenged this determination in Tax Court and sought a redetermination of their tax liabilities for all four years. The Tax Court assigned the Goettees' case to a group of cases collectively referred to as the Barrister Books project. Andrew M. Winkler served as lead counsel for the IRS in the Barrister Books cases.

192 Fed. Appx. 212, *214; 2006 U.S. App. LEXIS 19034, **2;
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

Sometime around 1986, Winkler began extending a uniform settlement offer to Barrister [**3] Books investors by settlement letters one batch at a time. [*215] Winkler decided not to send a letter to all Barrister Books investors simultaneously because he felt that it would be impossible for the IRS to process all of the settlements at once. Winkler stopped extending the offer on or about May 16, 1989 because he was waiting for the resolution of Series 115, the lead case in the Barrister Books litigation project. In the spring of 1993, after the Series 115 case concluded, Winkler again began extending settlement offers. He sent the letters out roughly in alphabetical order, subject to some exceptions. For example, if several investors were represented by a single representative, Winkler extended the offer to those individual investors at the same time.

Although the Barrister Books settlements were complex, the IRS staffed the matter leanly. The agency assigned the work to officers to handle in addition to their normal case load. Around July 1993, the Goettees' case was assigned, along with about seventy-five other Barrister Books cases, to appeals officer Fran Rowland in the IRS's Cincinnati office. Like other appeals officers, Rowland managed multiple priorities while she processed [**4] the settlement of the Barrister Books cases. Cases nearing the end of the limitations period and those calendared for trial in Cincinnati and Columbus, Ohio were given a higher priority than the Barrister Books cases. Although Rowland's caseload was down by about half in the spring of 1993, it returned to normal about the same time that the Barrister Books cases were assigned to her. Because of the increase in her workload, Rowland did not send settlement letters to any Barrister Books taxpayers until about September of 1993.

The settlement letters (1) stated the terms of the settlement offer, (2) asked the recipients to submit to Rowland copies of their canceled checks within 10 days so that she could verify the recipients' actual cash investment in the partnership, and (3) stated that upon receipt of the verification information, Rowland would send to the taxpayer computations which showed the tax effects of the settlement offer to that taxpayer.

Once a taxpayer accepted the settlement offer and returned the signed decision document, Rowland prepared and submitted to her boss, Paul Becker, an appeals transmittal and case memorandum for his approval. If Becker approved, he signed [**5] the

appeals transmittal and case memorandum and transmitted the settlement documents to Winkler. Winkler then reviewed the format and contents of the decision documents, signed them, and forwarded them to the Tax Court for entry of decision.

On November 24, 1993, Rowland sent the Goettees a settlement letter. On December 2, 1993, the Goettees returned the verification information to Rowland. On October 26, 1994, Rowland mailed the settlement documents to the Goettees. They signed the decision document on November 25, 1994, and mailed it to Rowland on December 14, 1994. The IRS eventually accepted the settlement and billed the Goettees for their tax deficiencies.

The Goettees paid all of the back taxes due, but asked for an abatement of the interest that had collected on the taxes due, which amounted to the following amounts: 1978: $ 65,336.10-- 1979: $ 36,456.54-- 1981: $ 4,689.52-- 1982: $ 13,243.89. Following negotiations between the parties, the IRS decided to abate interest that had accrued between October 4, 1995 and November 20, 1996 because the Goettees had been given incorrect advice by the IRS during this time. The IRS refused to abate the interest that accrued during any [**6] other periods.

At some point during the negotiations between the parties, the Goettees also submitted $ 40,000 to the IRS as part of an [*216] Offer in Compromise ("OIC") of their interest liability. The IRS eventually rejected the OIC.

On December 6, 1996, the Goettees filed a timely petition with the Tax Court challenging the IRS's denial of the majority of their request for abatement. The IRS filed a motion for partial summary judgment, which the Tax Court granted, holding that the statute under which the Goettees sought relief did not apply to tax year 1978. Accordingly, the case continued to trial only with respect to abatement of interest concerning the taxable years 1979, 1981, and 1982.

At trial, the Goettees contended that interest abatement was warranted for two specific periods during which their delay in payment was attributable to improper action by the IRS: the 328 day period between December 2, 1993 and October 26, 1994 during which time the IRS was computing the tax due after it made the Barrister Books settlement offer to the Goettees, and the 139 day

192 Fed. Appx. 212, *216; 2006 U.S. App. LEXIS 19034, **6;
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

period between December 14, 1994 and May 2, 1995 during which time the IRS was processing the Goettees' signed settlement [**7] agreement. [1] The Goettees also requested that the Tax Court "order abatement for unspecified additional periods." J.A. at 563. The Tax Court ultimately held that the IRS abused its discretion in not abating interest for the period of January 25 through April 24, 1995. With respect to all other periods at issue, the Tax Court held that the IRS did not abuse its discretion by not abating interest assessed against the taxpayers.

> [1]   At trial, the IRS conceded that abatement of interest for one period of time - February 25 through April 25, 1995 - was appropriate.

The Goettees filed a motion for reconsideration, which the Tax Court denied. In addition, they filed a motion for an award of reasonable litigation costs as a prevailing party in the amount of $ 59,735.09. The Tax Court also denied this motion. The Goettees timely appeal to this court the Tax Court Decision and Order, the rejection of their motion for reconsideration, and the rejection of their motion for an award of reasonable litigation costs.

## II.

[**8]   The Goettees first contend that the Tax Court erred in granting partial summary judgment to the IRS and dismissing the Goettees' claim for interest abatement for tax year 1978 from the suit. We reject this contention.

The Goettees filed their petition with the Tax Court seeking abatement of interest with respect to tax years 1978, 1979, 1981, and 1982. The Tax Court granted partial summary judgment to the IRS, dismissing the 1978 tax year from the suit. The Tax Court held that the Goettees' claim for abatement of interest sounded under 26 U.S.C. § 6404(e), [2] which only applies to tax years beginning after 1978. Tax Reform Act of 1986, Pub. L. No. 99-514, § 1563(b), 100 Stat. 2085, 2762. The Goettees argue that the Tax Court erred in not also assessing their claim under § 6404(a), which *would* apply to tax year 1978 and which authorizes the Service "to abate the unpaid portion of the assessment of any tax or any liability in respect thereof, which (1) is excessive in amount, or (2) is assessed after the expiration of the period of limitation properly applicable thereto, or (3) is erroneously or illegally assessed." 26 U.S.C. § 6404 (a) [**9] . This argument fails.

> [2]   All statutory citations are to Title 26 of the United States Code.

Both the statute and the applicable regulations indicate that § 6404(a) does not [*217] apply to income, estate, or gift taxes. 26 U.S.C. § 6404(b); Treas. Reg. § 301.6404-1(b). Because the excess interest at issue is a liability" in respect of" an income tax assessment, and because income tax assessments are specifically barred from consideration, the Tax Court correctly refused to consider the Goettees' claim under Section 6404(a). *Bax v. Comm'r*, 13 F.3d 54, 58 (2d Cir. 1993); *Asciutto v. Comm'r*, T.C. Memo 1992-564, n.5. We therefore affirm the Tax Court's partial summary judgment dismissing the abatement claim for tax year 1978. [3]

> [3]   The Goettees also raise § 6402(a) in support of their claim relating to the 1978 tax year. They, however, raise it for the first time in their reply brief. Accordingly, the Goettees waived this argument because they did not raise it in their opening brief. *United States v. Jones*, 308 F.3d 425, 427 n.1 (4th Cir. 2002).

[**10]   III.

The Goettees next argue that the Tax Court erred in holding that the Commissioner did not abuse his discretion in refusing to abate interest for the vast majority of the delay alleged by the Goettees. Specifically, they contend that (1) the IRS was obligated to abate interest for the 328 day period between December 2, 1993 and October 26, 1994 that it delayed in computing the tax due after it made the Barrister Books settlement offer to them; (2) the period of time between October 4, 1995 and November 20, 1996 that the IRS chose for the partial abatement period was incorrect; (3) the IRS was obligated to abate interest for the approximately 54 month period of time between May 1989 and November 1993 that it took to extend the Barrister Books settlement offer to them; and (4) the IRS was obligated to abate interest for the period of time between May 15, 1996 and January 1997 that it held the $ 40,000 deposit. We address all four contentions in turn.

### A.

Before we discuss the Goettees' specific contentions, however, it is helpful to understand the statutory and regulatory context in which interest abatement operates. Interest on an unpaid federal tax liability accrues from the

Case 8:06-cv-00338-PJM   Document 92-7   Filed 02/29/08   Page 5 of 70

192 Fed. Appx. 212, *217; 2006 U.S. App. LEXIS 19034, **11;
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

[**11] date that the payment is due until the date that the payment is made. § 6601(a). The Internal Revenue Code, however, provides a mechanism to abate interest when the delay in making the tax payment results from unreasonable actions by the IRS. Abatement of interest for unreasonable errors and delays by the IRS is controlled by § 6404(e), which, for the time period applicable to this case, stated in relevant part:

> (e) Abatement of interest attributable to unreasonable errors and delays by Internal Revenue Service.
>
> (1) In general. In the case of any assessment of interest on . . . any deficiency attributable in whole or in part to any unreasonable error or delay by an officer or employee of the Internal Revenue Service (acting in his official capacity) in performing a ministerial or managerial act, . . . the Secretary may abate the [*218] assessment of all or any part of such interest for any period. For purposes of the preceding sentence, an error or delay shall be taken into account only if no significant aspect of such error or delay can be attributed to the taxpayer involved, and after the Internal Revenue Service has contacted the taxpayer in writing with respect to such deficiency [**12] or payment.

§ 6404(e)(1)(A) (1995). [4]

[4]    Congress later expanded 26 U.S.C. § 6404(e)(1) to allow the IRS to abate interest for an "unreasonable" error or delay in performing a "ministerial or managerial" act. Taxpayer Bill or Rights, Pub. L. No. 104-168, § 301, 110 Stat. 1452,1457 (1996) (effective for tax years beginning after July 30, 1996). This amendment to § 6404(e) is inapplicable to this case.

Even though § 6404(e) is phrased in the permissive ("the Secretary *may* abate the assessment of all or any part of such interest"), the IRS does not have unfettered discretion in deciding whether to abate interest. Once the taxpayer meets procedural requirements not relevant here, the Tax Court has the authority to overturn the IRS's decision not to abate interest if the taxpayer can

demonstrate both that the delay resulted from unreasonable delay by an IRS employee in performing a ministerial act and that the Commissioner abused its discretion in refusing to abate the interest. [**13] 26 U.S.C. § 6404(h). [5] The Treasury regulations in effect at the time relevant to this case defined a "ministerial act" as

> a procedural or mechanical act that does not involve the exercise of judgment or discretion, and that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as conferences and review by supervisors, have taken place. A decision concerning the proper application of federal tax law (or other federal or state law) is not a ministerial act.

[5]    At the time the Goettees filed their petition, the operative jurisdictional statute was § 6404(g), which was predesignated § 6404(h) under the IRS Restructuring and Reform Act of 1998, effective for tax years ending after July 22, 1998. Pub. L. No. 105-206 § 3305(a), 112 Stat. 685.

Temp. Treas. Reg. § 301.6404-2T, 52 Fed. Reg. 30163 (Aug.13, 1987). The regulations also provide examples of ministerial acts, which include: (1) the transfer of a case file to [**14] another IRS office after the taxpayer requested and the appropriate IRS officials approved the transfer and (2) the issuance of a notice of deficiency after the notice has been prepared and reviewed and all other prerequisites to issuance have been completed. *Id.* (Examples 1-2). Examples of acts that are not ministerial include: (1) the delay in processing a taxpayer's return caused by the IRS's need first to examine extensively a tax shelter in which the taxpayer invested; (2) a manager's decisions to send an employee to training and not to reassign the employee's cases during the training; and (3) a decision to delay a planned examination of a taxpayer's return because of other work priorities and resource limitations. *Id.* (Examples 3-5).

Further, a taxpayer seeking interest abatement must go beyond simply alleging general delay by the IRS, and also identify "a specific period of time over which interest should be abated as a result of the error or delay."

192 Fed. Appx. 212, *218; 2006 U.S. App. LEXIS 19034, **14;
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

*Donovan v. Comm'r*, 80 T.C.M. (CCH) 78, 80, T.C. Memo 2000-220 (2000).

To meet the burden of showing an abuse of discretion, the taxpayer must demonstrate that the IRS refusal to abate interest was made "arbitrarily, capriciously, [**15] or without sound basis in fact or law." *Lee v. Comm'r*, 113 T.C. 145, 149 (1999).

With this background in mind, we turn to the Goettee's specific contentions.

B.

The Goettees first contend that the Tax Court erred in holding that the IRS did not abuse its discretion in refusing to abate interest for the period of time between the decision to extend the Barristers Books settlement offer to taxpayers and the time when the Goettees actually [*219] received the offer. [6] Specifically, the Goettees contend that "[o]nce the decision was made by IRS to extend the offer to all Barrister Books investors, the actual transmittal of such an offer to each investor was a ministerial act." Appellant's Brief at 23. A review of the record, however, reveals that the Goettees vastly oversimplify the situation.

> 6   The IRS claims that the Goettees waived this argument by not raising it in the Tax Court. After review of the record, we hold that the Goettees' arguments in the tax court concerning this issue were substantial enough to preserve it for appeal. We consider the argument fully here.

[**16] Winkler did testify in the Tax Court that Barrister Books settlement offers were to be made available to all eligible taxpayers. J.A. at 95. However, he immediately followed that statement by noting that only he and one other appeals officer would be available to work on the project. *Id.* Because he decided that making the settlement offers to everyone at once would be "very difficult" with only two agents working on the case, he decided to make the offers in small groups so as not to overwhelm resources. *Id.* In addition, Winkler testified that he stopped sending out settlement offers while he waited for the "Series 115 case" to be resolved by the Tax Court. Winkler anticipated that the IRS would prevail, and that its settlement position would be enhanced as a result. *Id.* at 241-42. In other words, the delay in sending out settlement offers resulted both from an administrative decision to not overwhelm limited IRS resources and

from a strategic preference for offering the settlement from a position of strength.

Strategic litigation decisions are, almost by definition, not ministerial. See *Lee*, 113 T.C. at 150-51 (noting that an 11 year delay [**17] resulting from litigation decisions was not a ministerial delay). In addition, delay resulting from the allocation of IRS resources is defined as non-ministerial according to the relevant regulations. Treas. Reg. § 301.6404- 2T(b)(2) (example 5) (1993). Accordingly, we affirm the Tax Court holding that the IRS did not abuse its discretion in holding that the 2 Sadler 243, 4 A 1, 18 Week. Notes Cas. 565/2 year delay in sending the Barrister Books settlement offer to the Goettees was the result of non-ministerial actions and, therefore, not eligible for interest abatement pursuant to Section 6404(e).

C.

The Goettees next argue that the Tax Court erred in holding that the IRS did not abuse its discretion in refusing to abate interest for the 328 days that elapsed between the Goettees accepting the Barrister Books settlement offer and the IRS informing them of the amount of tax that would be due. According to the Goettees, the mechanical act of computing the tax due and preparing a stipulation decision are ministerial acts which fall under the statute. While the Goettees correctly note that the computation of the tax and mailing of the letter are ministerial acts, J.A. at 574 (Tax Court finding), they fail to [**18] recognize that these acts were not the reason for the delay.

Specifically, the Tax Court found that "[i]t does not appear that there was any delay in [the ministerial acts of] preparing the settlement documents and mailing them to petitioners." *Id.* at 575. Instead, the Tax Court found that the more than 300 day delay resulted from Rowland's "prioritization decisions." *Id.* at 572. As we have noted, Rowland handled the Barrister Books settlement offers in addition to her normal case load, which included cases with statutory deadlines. In view of this fact, the Tax Court "conclude[d] that Rowland's delay in beginning to process [*220] petitioners' response to the settlement offer is properly attributable to respondent's reasonable prioritization decisions, and thus is not attributable to error or delay in performing a ministerial act." *Id.* at 574.

Factual findings by the Tax Court can only be overturned upon a showing of clear error--which the

Page 5

192 Fed. Appx. 212, *220; 2006 U.S. App. LEXIS 19034, **18;
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

Goettees do not make here. *See Norfolk Southern Corp. v. Comm'r*, 140 F.3d 240, 248 (4th Cir. 1998). The Goettees instead challenge the Tax Court's overall legal conclusion. They contend that allowing the IRS to delay in [**19] the performance of ministerial acts via "prioritization decisions" with non-ministerial acts will enable the agency to thwart the goals of § 6404(e). Unfortunately for the Goettees, the examples given in the applicable regulations are almost directly on point:

> Example 4. A revenue agent is sent to a training course, and the agent's supervisor decides not to reassign the agent's cases. During the training course, no work is done on the cases assigned to the agent. Neither the decision to send the agent to the training course nor the decision not to reassign the agent's cases is, under the circumstances, a ministerial act. Thus, interest attributable to the delay cannot be abated.

> Example 5. A taxpayer who claimed a loss from a tax shelter on the taxpayer's income tax return is notified that the Internal Revenue Service intends to examine the return. However, because of other work priorities and resource limitations, a decision is made not to commence the examination for an extended period thereafter. The decision not to commence the examination involves the exercise of judgment and discretion and is not a ministerial act; consequently, interest attributable to the [**20] period of delay cannot be abated.

Temp. Treas. Reg. § 301.6404-2T, 52 Fed. Reg. 30163 (Aug.13, 1987) (examples 4-5). As in examples 4 and 5, the allocation of scarce IRS resources that occurred here provides a valid reason for non-ministerial IRS delay. We find no meaningful distinction between the prioritization decisions discussed in examples 4 and 5 and the prioritization decisions in this case. Accordingly, we affirm the Tax Court on this claim.

D.

The Goettees next contend that the dates that the IRS chose to abate interest in their case (10/04/95 to 09/20/96) were not linked to any actual events and were, therefore, an arbitrary and abusive use of IRS discretion. The Goettees want these dates extended to correlate to the date they first submitted their abatement request (09/05/95) and the date that the IRS acted to disallow the abatement claim (11/13/96). We reject this claim because the Goettees did not raise it until their motion for reconsideration pursuant to Rule 161 of the Rules of the United States Tax Court.

"The Tax Court has held that decisions interpreting Rules 59 and 60 of the Federal Rules of Civil Procedure [**21] apply to motions for reconsideration and further trial under Rule 161 of the Rules of the United States Tax Court." Estate of Kraus v. Comm'r, 875 F.2d 597, 602 (7th Cir. 1989) (citing *Wheeler v. Comm'r*, 46 T.C.M. (CCH) 642, T.C. Memo 1983-385 (1983)). As in decisions under Rules 59 and 60 of the Federal Rules of Civil Procedure, the panel reviews the Tax Court's denial of a motion for reconsideration under the abuse of discretion standard. Id.

In this case, the Tax Court noted that

> Petitioners did not ask us to consider at trial or on brief the specific time periods set forth in their motion that were allegedly [*221] confused or ignored by the Commissioner's Appeals Office during which errors or delays occurred that warrant abatement of interest. Instead, petitioners asked the Court, on answering brief, to order an abatement for additional unspecified time periods. In *Goettee I* we declined to do so. We do not now entertain petitioners' more detailed request. As we stated, supra, reconsideration is not the appropriate forum for offering new legal theories or rehashing previously rejected arguments to reach the desired result. [**22]

*Goettee v. Comm'r*, T.C. Memo 2004-9, 2004 Tax Ct. Memo LEXIS 9, 87 T.C.M.(CCH) 808, 810 (2004). In other words, the Tax Court rejected this argument on motion for reconsideration because the Goettees could and should have raised this argument in a previous filing. Such rejections are common in Tax Court because "[r]econsideration under Rule 161 serves the *limited* purpose of correcting substantial errors of fact or law and

allows the introduction of newly discovered evidence that the moving party could not have introduced, by the exercise of due diligence, in the prior proceeding." *Estate of Quick v. Comm'r*, 110 T.C. 440, 441 (1998) (emphasis added). "Reconsideration is not the appropriate forum for . . . tendering new legal theories." *Id.* at 441-42. Accordingly, we hold that the Tax Court did not abuse its discretion in refusing to consider an argument on reconsideration that should have been raised at trial.

E.

The Goettees argue that the Tax Court erred in holding that IRS did not abuse its discretion in refusing to toll the accrual of interest for the period of time that the IRS held the Goettees' $ 40,000 submitted with the OIC. While this argument may hold [**23] some superficial appeal, the Tax Court clearly and concisely explained why the applicable statutes and regulations do not allow for interest abatement in such a case. We find this reasoning compelling and, accordingly, affirm the Tax Court on this issue.

The Goettees contend, in essence, that the IRS cannot charge them interest on a liability while the IRS is holding funds designated to pay that liability. This contention fails because it misapprehends the legal status of the money at issue. Because the Goettees submitted the check as part of an offer in compromise of a liability, the $ 40,000 is treated as a deposit, *not* as a payment of their tax liability. *See Keith v. Commissioner*, 35 T.C. 1130, 1136 (1961). This was *not* money given to the IRS as a credit against the liability at issue. This was instead a deposit, in the nature of a surety bond, that accompanied the Goettees' offer to settle the case. *See Rosenman v. United States*, 323 U.S. 658, 662, 65 S. Ct. 536, 89 L. Ed. 535, 102 Ct. Cl. 851, 1945 C.B. 410, 1945-1 C.B. 410 (1945). There is no indication that the Goettees ever intended it to be applied to their outstanding liability. [7] It was part of a separate transaction to settle the liability. [**24] The effect of the $ 40,000 on the Goettees' accruing interest was, therefore, nonexistent.

> 7   The regulations applicable at the time confirm that money accompanying OICs is not normally meant to be applied to the liability at issue. Specifically, they note that "[i]f an offer in compromise is withdrawn or rejected, the amount tendered with the offer . . . shall be refunded without interest, *unless the taxpayer has stated or agreed* that the amount tendered may be applied

to the liability with respect to which the offer was submitted." Treas. Reg. § 301.7122-1(d)(4) (1993) (emphasis added).

Also, even if the $ 40,000 should have been applied to the liability, it still would not affect the Goettee's claim for abatement of interest. The IRS procedures [*222] applicable at the relevant time indicate that "[t]he Service will allocate any remittance treated as a payment of tax to penalty or interest as designated by the taxpayer if the remittance exceeds the full amount of the underlying [**25] tax due. . . . If more than one period of tax is involved, the Service will allocate an undesignated remittance so as to satisfy all tax, penalty, and interest *for the earliest period before applying any excess to other periods*." Rev. Proc. 84-58, 1985-48 I.R.B. 39, at 6.01 (emphasis added). In this case, therefore, the entire $ 40,000--which was not designated to apply to any specific year--would be allocated against the liability for 1978--which was over $ 40,000 and over which the Tax Court does not have jurisdiction. See, supra, Section II. [8]

> 8   There does appear to be a four month period in which the IRS held the $ 40,000 after the Goettees withdrew the OIC. This extra delay does not, however, address the underlying concern--that the $ 40,000 cannot be applied to abate the interest for the underlying debt. The proper remedy (if any) for that four month delay is not the abatement that the Goettees request in this case.

F.

In short, we hold that the Tax Court did not err in holding that [**26] the IRS did not abuse its discretion in refusing to abate interest for all of the disputed periods at issue.

IV.

Finally, the Goettees appeal the Tax Court's refusal to award them reasonable litigation costs in this matter as a prevailing party. Under § 7430, the prevailing party in any administrative or court proceeding in connection with the "determination, collection, or refund of any tax, interest, or penalty" may be awarded a judgment for reasonable administrative or litigation costs. § 7430(a). In order to receive an award of litigation costs, the taxpayer must (1) be the prevailing party; (2) have exhausted available administrative remedies; (3) meet certain net-worth requirements; and (4) have not unreasonably

192 Fed. Appx. 212, *222; 2006 U.S. App. LEXIS 19034, **26;
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

protracted or delayed the proceedings. §§ 7430(a), b(1), b(3), c(4). Because this statute "renders the United States liable for attorney's fees for which it would not otherwise be liable, [it] amounts to a partial waiver of sovereign immunity[and] must be strictly construed in favor of the United States." *Ardestani v. INS*, 502 U.S. 129, 137, 112 S. Ct. 515, 116 L. Ed. 2d 496 (1991). The panel reviews the Tax Court's denial of litigation costs under § 7430 for [**27] an abuse of discretion, "accord[ing] substantial deference to the reasoning of the Tax Court." *Dang v. Comm'r*, 259 F.3d 204, 208 (4th Cir. 2001).

The Tax Court in this case held that the Goettees were not a "prevailing party" at trial and, accordingly, did not reach the other requirements under § 7430. Essentially, the statute defines a "prevailing party" as one "which (I) has *substantially prevailed* with respect to the amount in controversy, or (II) has *substantially prevailed* with respect to the most significant issue orset of issues presented." § 7430(c)(4)(A)(I) (emphasis added). While refusing to establish a mathematical cutoff for "substantial," the Tax Court noted that the Goettees only prevailed with respect to three months of IRS delay, while the IRS prevailed with respect to almost 16 months of the alleged delay. J.A. at 691. In addition, the Court noted that the Goettees were only awarded "not quite 5 percent" of the amount of interest that they claimed should be abated. Id. at 695. Taking these numbers into account, as well as the fact that there was no one dominating issue in this case on which the Goettees prevailed, the Tax Court held that [**28] the Goettees did not "substantially prevail" as to either the most significant [*223] issue or the amount in controversy in this case.

The Goettees contest this decision, contending that they prevailed with respect to the most significant issue--whether the IRS abused its discretion in refusing to abate interest. Citing *Wilkerson v. United States*, 67 F.3d 112 (5th Cir. 1995), and *Huckaby v. United States Dep't. of Treasury*, 804 F.2d 297 (5th Cir. 1986), the Goettees argue that "substantially prevailing" presents a yes or no question--not a question that lends itself to degrees of difference. Once the IRS admitted that it had abused its discretion, according to the Goettees, they "substantially prevailed" as a matter of law. We disagree.

As the Tax Court held, the cases on which the Goettees rely are distinguishable from this case. In both *Wilkerson* and *Huckaby*, the Fifth Circuit did note that one does not need to prevail on the majority of the issues presented in order to satisfy the "substantially prevail" test. However, unlike those cases, in which a central issue dominated the proceedings, this case represented a series of claims of delay against [**29] the IRS, only a very few of which actually bore fruit at trial. The Goettees actually raised a series of individual--and unrelated--claims of delay against the IRS, requesting abatement for each individual claim. The parties, by stipulation, chose to conflate these individual disputes into one abuse of discretion issue in the Tax Court. J.A. at 694. This conflation, however, does not change the fact that, at heart, this case presented a series of claims against the IRS, the vast majority of which were determined in the IRS's favor in the Tax Court. There was simply no central issue in this case, as there was in Wilkerson and Huckaby, upon which either of the parties could "substantially prevail," notwithstanding the remainder of the litigation.

In short, this issue, as noted above, falls squarely within the discretion of the Tax Court, which has witnessed these proceedings from the beginning and has carefully weighed the interplay between the parties' stipulations, what was actually at issue, and who actually prevailed. J.A. at 694. We hold that the Tax Court did not abuse its discretion in refusing to award the Goettees reasonable litigation costs.

V.

For all of the foregoing reasons, [**30] the Decision and Order of the Tax Court is *AFFIRMED*. 9

> 9   The parties agree that there is a typographical error in the Tax Court's June 1, 2005 order. Specifically, the Tax Court decided that interest should be abated for the period January 25 though April 24, 1995. The June 1, 2005 order, however, states that interest should be abated for the period February 24 through April 24, 1995. The parties also agree that the dollar amounts stated in the June 1, 2005 order correctly reflect the underlying decision. The typographical error, therefore, is harmless. We leave to the Tax Court's discretion whether to correct this harmless error.

# **EXHIBIT 37**

LEXSEE

**LABORERS' DISTRICT COUNCIL HEALTH AND WELFARE TRUST FUND
NO. 2 et al., Plaintiffs, v. COMET CONTRACTING, LLC, et al., Defendants.**

Civil Case No. RWT 03-2196

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

2006 U.S. Dist. LEXIS 55968; 39 Employee Benefits Cas. (BNA) 1685

July 25, 2006, Decided
July 25, 2006, Filed

**COUNSEL:** [*1] For Laborers' District Council Health and Welfare Trust Fund No. 2, Laborers' District Council Pension and Disability Trust Fund No. 2, Laborers' Joint Training Fund of Washington, D.C. and Vicinity, Eugene Pinder as Chairman of the Board of Trustees of and for the Laborers' District Council Health and Welfare Trust Fund No. 2, Laborers' District Council Pension and Disability Trust Fund No. 2, Trustee Aaron Webb, as Secretary of and for the Board of Trustees of and for the Laborers' District Council Health and Welfare Trust Fund No. 2, and Laborers' District Council Pension and Disability Trust Fund No. 2, Dennis Desmond as Chair of and for the Board of Trustees and for the Laborers' Joint Training Fund of Washington, D.C. and Vicinity, Plaintiff: Jonathan G Rose, Katten Muchin Rosenman LLP, Washington, DC;

For Comet Contracting, LLC, USA Remediation Services, Inc., Defendants: David John Fudala, Law Office of David J Fudala, Fairfax, VA; James T Bacon, Allred Bacon Halfhill and Young PC, Fairfax, VA.

**JUDGES:** ROGER W. TITUS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ROGER W. TITUS

**OPINION**

**MEMORANDUM OPINION**

This is an ERISA case that now comes before the Court for decision after [*2] a bench trial. The case was brought by a group of employee benefit trust funds ("the Funds") against two related environmental remediation companies, USA Remediation Services, Inc. ("USA"), and Comet Contracting, LLC ("Comet"). Comet was a party to a collective bargaining agreement with the Laborers' District Council of Washington, D.C. and Vicinity, a labor organization that represents (or represents unions that represent) Comet's employees. The agreement, and by incorporation the trust agreements of the Funds, obligated Comet to make timely reports to the Funds of the hours worked by covered employees and to make a monetary contribution to the Funds for each of those hours on behalf of the employees. The Funds brought this action because, they alleged, Comet had failed to fulfill its obligations despite performing work that was covered under the collective bargaining agreement. The Funds joined USA as a defendant because, they alleged, it was an alter ego of Comet.

In its motion for summary judgment, USA challenged its alter ego status and argued that it could not be held liable for Comet's alleged violations of the collective bargaining agreement. Paper No. 52. On June 13, 2005, the [*3] Court heard argument on and orally granted the motion in part and denied it in part. It held that although USA could not be held liable an alter ego of Comet, a second theory advanced by the Funds, the "single-employer" theory, had been adequately pled (and thus could be considered) and could survive summary judgment.

The Funds thus proceeded to a bench trial under the single-employer theory. At the pretrial conference, the liability and damages phases of trial were bifurcated. Accordingly, a hearing as to liability was held on January 12, 2006. At that hearing, for reasons that will be

2006 U.S. Dist. LEXIS 55968, *3; 39 Employee Benefits Cas. (BNA) 1685
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

explained below, this Court preliminarily found both USA and Comet to be liable. An Order followed on January 25, 2006, that authorized the Funds to perform an audit of certain of USA's records on or before February 24, 2006, so as to allow the Funds to establish the amount of contribution and delinquency payments owed; required the Funds to provide an audit report to USA on or before March 3, 2006; authorized USA to object to specific audit calculations no more than twenty days later; authorized USA to depose the Funds' auditor; and set a hearing on damages for April 17, 2006.

At the damages hearing, [*4] the Court took this matter under advisement. This opinion now explains the Court's findings, first as to liability, then as to damages. For the reasons that follow, the Court will, by separate order, enter judgment in favor of the Funds, against both defendants jointly and severally, in the amount of $ 1,124,898.

## FINDINGS OF FACT: LIABILITY

Prior to the liability hearing held on January 12, 2006, both Plaintiffs and Defendants submitted proposed findings of fact and conclusion of law. *See* Paper No. 78 (Defendants); Paper No. 79 (Plaintiffs). These proposals revealed that all material facts were stipulated. At the hearing, it was only necessary to hear legal argument as to whether a "bargaining unit" determination was necessary or within the jurisdiction of the Court-see *infra*-and to work through the proposed findings to distill the agreed-upon facts from the arguments in the pleadings. On the basis of the proposed findings of fact and the colloquy at the hearing, the Court therefore makes the following findings:

1. Plaintiff Funds were created and exist pursuant to Agreements and Declarations of Trust entered into between participating employers and union locals [*5] affiliated with the Laborers International Union of North America, A.F.L.-C.I.O. ("Laborers"). The Funds are "multi-employer benefit plan [s] "as defined in 29 U.S.C. §§ 1002(3) and (37)(A), and are established and regulated pursuant to Section 302 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 181 *et seq.*, and the Employee Retirement Income Security

Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*2. The Funds are jointly administered by employer trustees appointed by the Construction Contractors Council of Washington, D.C., and the Masonry Employers Association of Washington, D.C., and trustees appointed through procedures established by the Laborers. The Funds are managed by their Boards of Trustees which act as the "plan sponsor" as defined in 29 U.S.C. § 1002(16)(B)(iii). Under ERISA, the Trustees, as fiduciaries, are required to administer the Funds "solely in the interest of the participants and beneficiaries" and "in accordance with the documents and instruments governing the [Funds]" and they have brought this action to comply with [*6] their fiduciary obligation to ensure that participants receive the contributions to which they were entitled. 29 U.S.C. § 1104(a)(1).

3. Hundreds of employers participate in the Funds, each having an obligation to contribute under 29 U.S.C. § 1145. These employers are signatories to collective bargaining agreements with specific Laborers locals which negotiate only a sum of money to be contributed to the Funds as required by the Trust Agreements. The Funds receive contributions from participating employers pursuant to their collective bargaining agreements.

4. Each month, participating employers complete Employer Report Forms in accordance with the Funds' rules listing the names of eligible employees, hours worked and contributions due and owing. The employers then remit these self-reported Forms and contributions to the Funds for processing. The Funds then pay pension, disability and health benefits to thousands of qualified participants and their dependants who satisfy the Funds' eligibility requirement.

5. Defendant USA is a Virginia

2006 U.S. Dist. LEXIS 55968, *6; 39 Employee Benefits Cas. (BNA) 1685
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

corporation, incorporated in 1991. Its home office is located in Warrenton, Virginia, [*7] and until January 1, 2005, it maintained a branch office in Saquoit, New York.

6. USA provides environmental abatement and remediation services, including the abatement of hazardous substances such as asbestos and lead, as well as selective demolition.

7. Similarly, Defendant Comet provides environmental abatement and remediation services as well as selective demolition. Comet was designed to perform the same type of work that USA performed, but for jobs that required union-only contractors.

8. Comet was organized as a Virginia limited liability company in 2000, with Victoria Sullivan, wife of USA president Jeffrey A. Sullivan, as 99% owner.

9. Prior to the time that Comet entered into a broad, comprehensive collective bargaining agreement, USA had always been a non-union employer. From time to time, USA has entered into "project specific" agreements with unions, the scope of which is limited to a specific project on which USA has contracted to perform services.

10. Jeffrey Sullivan is the president and co-owner of USA. Mr. Sullivan wrote the check representing his wife, Victoria Sullivan's, capital contribution. Mr. Sullivan was also listed as a member of [*8] Comet on Comet's bank's signature card. A signature stamp of Mr. Sullivan's name was used for the vast majority of all of the checks issued by Comet.

11. Victoria Sullivan is the vice-president and co-owner of USA. In addition, Mrs. Sullivan was the 99% owner of Comet and, according to numerous documents filed with federal and state governmental entities, was also represented as the managing member of Comet. Although Mrs. Sullivan worked only part-time at best, she was paid as a full-time employee of USA at a salary of $ 52,000.00 per year. Mrs. Sullivan played virtually no role in Comet's business operations, and her capital contribution to Comet of $ 500 was paid by her husband Jeffrey Sullivan.

12. David Kelsey is a director and risk manager of USA, and has been employed by USA since 1998. Mr. Kelsey and Mr. Sullivan are close friends going back to when they were roommates in college. Mr. Kelsey also owns a 1% interest in Comet. As an officer and employee of USA, Mr. Kelsey's salary was always paid by USA. At the same time, however, Mr. Kelsey was the person who ran all of Comet's day-to-day operations. According to Mr. Kelsey, even though Mrs. Sullivan purportedly was [*9] Comet's 99% owner, he said that the only person he worked for was Jeffrey Sullivan, "because he's [the] only one there I would listen to." Kelsey Dep. at 56, ll. 18-21.

13. Anita VanSice was USA's controller for approximately 13 years prior to her resignation, a few weeks after her deposition in this case. Ms. VanSice became a 10% owner of USA in 2001, and sold back her 10% interest to the Sullivans at the time she resigned in November, 2004. Although Ms. VanSice was at all times an employee of USA and was paid her salary by USA, she performed virtually all of the financial responsibilities required for Comet's operations including, but not limited to, transferring funds between USA's and Comet's bank accounts, processing payroll information, drafting payroll and vendor's checks, and signing Victoria Sullivan's name to Comet documents that were filed with federal and state governmental authorities.

14. Robert Giroux was employed by

2006 U.S. Dist. LEXIS 55968, *9; 39 Employee Benefits Cas. (BNA) 1685
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

USA as an estimator. In this capacity, Mr. Giroux developed business opportunities and prepared USA's bids for prospective work. Although Mr. Giroux received his salary from USA, he also performed work for Comet, including playing a key role [*10] in developing the business opportunity that prompted USA's decision to use Comet as "a union vehicle in order to perform the [union only] work." Giroux Dep. at 78, ll. 20-21. Although Mr. Giroux was always an employee of USA, and never held any position with Comet, he executed two separate collective bargaining agreements, and did so only because his boss, Mr. Sullivan, wanted him to do so.

15. Jeffrey Scott Jones is the nephew of Jeffrey and Victoria Sullivan and has been employed by USA since 1994. Although Mr. Jones was at all times an employee of USA and always received his salary from USA, Mr. Jones performed extensive services for Comet including, among other things, the preparation of bids for prospective Comet projects and collecting Comet's mail from its stated business address, a Mail Boxes Etc. store.

16. USA entered into a Project Agreement with the Laborers' District Council in 1999 for work at the Pentagon, which applied only to employees working on the project, and which expired when the project was completed.

17. USA, through its New York office, has entered into several project specific agreements with labor unions, which were limited in scope to employees [*11] working on the project, and which expired when the project was completed.

18. USA is not a signatory to the collective bargaining agreement which is the subject of this litigation.

19. In 2001, Comet entered into a subcontract for a demolition project at Gallery Place in Washington, D.C. Only union labor was allowed to work on the project by the property owner. Mr. Sullivan and Mr. Giroux had discussed the possibility of creating a new union company that would be able to perform the work on Gallery Place. Mr. Kelsey informed them that "there was already a company in existence"-Comet. Giroux Dep. at 83, ll.2-6.

20. On July 17, 2001, Comet entered into a collective bargaining agreement with the Laborers' District Council, which expired by its terms on May 31, 2002. On June 1, 2002, Comet signed a renewal of the same collective bargaining agreement, extending its termination date to May 31, 2005. The collective bargaining agreement was not a "project specific" agreement of the type occasionally entered into by USA. Rather, the agreement obligated Comet to pay union wages and to contribute to the union funds for all labor performed by its employees within the scope of the [*12] collective bargaining agreement.

21. USA was in negotiations with the Gallery Place project developer months before Mr. Sullivan decided to have Comet enter into the collective bargaining agreement. Comet had nothing to do with the preparation of the bid, and Messrs. Giroux and Sullivan as representatives of USA were the ones who secured the work and reached the agreement for Comet to perform the work on the Gallery Place project. Giroux Dep. at 77, ll. 7-22; 86, ll. 6-7; 87, ll. 1-5.

22. Comet completed the Gallery Place project, and it performed four other projects on a building located at 2100 M Street in Washington, D.C. and one other small job in the District of Columbia.

23. In 2001, Comet generated gross revenues of under $ 300,000, and in 2002, the gross revenues were under $ 10,000. As of the date of the hearing on liability in January 2006, Comet had not filed its tax return for 2003. Its total gross revenues

2006 U.S. Dist. LEXIS 55968, *12; 39 Employee Benefits Cas. (BNA) 1685
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

from 2001 to 2003 were under $ 500,000. Comet ceased doing business in 2003.

24. Comet was insured on USA's account. Mr. Sullivan testified that the reasons for this were common ownership and the close relationship between the companies. In a letter [*13] dated July 16, 2001, Mr. Kelsey instructed USA's insurance broker to "add Comet Contracting, LLC as a permanent additional insured to the USA Remediation Services, Inc. Commercial General Liability Policy." P.'s Exh. 13, Letter from Kelsey to Izard (emphasis in original).

25. Comet's original business address was Mr. and Mrs. Sullivan's home residence. Comet's business address was later changed to a Mail Boxes Etc. location which listed the address as a "Suite" instead of the mail box number. Although Mr. Sullivan claims that he was never an owner or employee of Comet, he nevertheless turned in expense reports for reimbursement of Comet-related activities at Gallery Place.

26. USA's owners and officers admitted at their depositions that Comet's operations were run by David Kelsey, with considerable assistance from Ms. VanSice, out of USA's headquarters in Warrenton, Virginia. VanSice Dep. at 20, ll. 6-20; Kelsey Dep. at 29, ll.20-22. Comet had virtually no equipment of its own, but rather used USA's equipment for whatever its jobs needed. Mr. Sullivan testified that he "would let Comet use anything it needed. . . . [W] e did a project that part of USA's compensation [*14] was . . . a transfer of equipment. . . . So . . . whatever Comet needed, they could help themselves to." J. Sullivan Dep. at 201,l. 14 to 202, l. 2.

27. Bids that were submitted by Comet showed its interrelationship and single-employer status with USA, because they were being submitted by USA

employees on Comet's letterhead with a provision stating that "USA will perform the work scope as described for the lump sum of. . ." or "USA shall provide sufficient management, supervision, labor, [etc.] . . ." P.'s Exh. 15, Letters from USA to secure work for Comet.

28. Ms. VanSice, as USA's Controller, was responsible for ensuring that both Comet's and USA's financial responsibilities were handled properly. She had to transfer large sums of money from USA to Comet (and then from Comet back to USA) for virtually all of Comet's financial needs, including making payroll and paying vendors. VanSice Dep. at 160, l. 17 to 161, l. 5; P.'s Exh. 14.

29. There were no promissory notes or notes payable of any kind reflecting an obligation to repay the sums transferred from USA to Comet or whether any interest was assessed. Accounting records reflected a note payable, but there was no [*15] note. VanSice Dep. at 211, ll. 7-17. According to Ms. VanSice, Mr. Sullivan was the person who authorized her to transfer funds from USA to Comet for "[e] ach individual" transfer. Id. at 160, l. 17 to 161, l. 5. When asked what was USA's interest in "seeing that Comet was able to make its payroll," VanSice testified that USA funded Comet "[b] ecause Mr. Sullivan was an owner of Comet Contracting." Id. at 195, ll. 4-18; 197, ll. 1-20; 199, ll. 4-22.

30. An administrative services agreement between USA and Comet was "never reduced to writing." Comet transferred all of its profits to USA pursuant to the unwritten administrative services agreement. This had the effect of reducing Mr. and Mrs. Sullivan's personal taxes because the money was distributed to USA instead of Mrs. Sullivan.

31. Mr. Sullivan stated that "Comet didn't exist but for the name. . . . Comet was essentially . . . USA staff performing

all the functions of Comet, whenever it had [its] limited need for any payroll or whatever." J. Sullivan Dep. at 129.

32. USA's owners, officers, and employees ran every facet of Comet's operations. Mr. Kelsey and Ms. VanSice were the USA owners and officers [*16] most involved in the day-to-day business operations of Comet, conducting all of its management functions out of USA's headquarters. In this regard, Ms. VanSice "regularly represented to people outside of USA and Comet that [she] was the controller for Comet." VanSice Dep. at 139-140. On the job sites, Comet used USA's supervisors to oversee its jobs. Mr. Sullivan was represented by Mr. Kelsey to be a Vice President of Comet, at least where it served a business purpose of USA, such as helping collect funds owed to Comet because those funds were in turn owed to USA.

33. Comet's labor relations were controlled entirely by USA's owners and officers. Comet entered into collective bargaining agreements when Robert Giroux, an employee of USA, executed the labor agreements at the direction of his boss, Mr. Sullivan. Mr. Kelsey was responsible for the day-to-day issues relating to labor relations and staffing. In at least one instance, Mr. Sullivan instructed Mrs. VanSice to hold off issuing payroll checks to Comet's employees.

## CONCLUSIONS OF LAW: LIABILITY

In light of the foregoing, USA stipulates that "plaintiffs will prove the four elements needed to make a finding that [*17] USA and Comet constituted a single employer: 1) the interrelationship of operations; 2) the presence of common management; 3) the presence of common control of labor relations; and 4) the presence of common ownership. *See [Trustees of the Nat'l Automatic Sprinkler [Indus. Pension Fund] v. Zengel Bros., Inc.*, 911 F.2d 725 (4th Cir. 1990)." D.'s Proposed

Findings of Fact and Conclusions of Law (Paper No. 78), P 13.

According to the Funds, this stipulation resolves the one issue in the liability phase of trial: if USA and Comet constitute a single employer, the Funds argue, then USA is bound by the Comet collective bargaining agreement and is liable. The only remaining issue-for the damages phase-is to count the number of covered employee-hours and the fund contributions thereon. USA, on the other hand, argues that in addition to a finding that USA and Comet were a single employer, the Court must also determine whether USA and Comet constitute a "single appropriate bargaining unit"-and that this determination cannot be made in this proceeding, but instead falls within the exclusive subject-matter jurisdiction of the NLRB.

As this Court has previously indicated on the [*18] record in this case, *see* Transcript of Motions Hearing (Paper No. 64) at 82, ll. 9-22, the bargaining unit determination is not one that needs to be made in the context of this suit. USA cites a litany of cases in which courts have approached the questions of (1) whether two companies constitute a single employer and (2) which employees constitute an appropriate bargaining unit as two prongs of a single inquiry. *E.g., Carpenters Local Union No. 1846 etc. v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 505 (5th Cir. 1982). However, these cases have generally involved a suit by a labor union, under the Labor Management Relations Act or similar statutes, to enforce its own collective bargaining agreements and either force an employer to deal with the union or to refrain from using a second corporation to hire non-union labor. *E.g., id.* at 497-99; *Walter N. Yoder & Sons, Inc. v. Sheet Metal Workers' Local Union No. 100*, 661 F. Supp. 1141 (D. Md. 1987). The purpose of inquiring into the appropriate bargaining unit, rather than merely ending the inquiry with an examination of whether the two companies should be treated as one, is "to protect the [*19] rights under section 7 of the NLRA, 29 U.S.C. § 157, of the employees of each of the subentities constituting the single employer to bargain collectively with representatives of their own choosing." *Carpenters Local Union No. 1846*, 690 F.2d at 507. In other words, the fact that two companies are managed jointly, such that they are appropriately treated as a single employer and bound by the same contracts, does not imply that the employees of each company have sufficiently common interests that they would or should choose to be

represented by the same union. Thus, before allowing a union to represent employees of the non-union subentity, a court must ensure that the two companies are one not just from the standpoint of management, but also from the standpoint of the employees themselves.

Here, in contrast, the conduct of the non-union company's labor relations is not at issue; rather, third parties-multi-employer employee benefit funds-are seeking monetary relief on a pre-existing, enforceable contract from the two corporations that constitute a single employer. Neither the union, the National Labor Relations Act, nor any representational issues [*20] are directly implicated. The question of what constitutes an appropriate bargaining unit is supplanted by the question of which employees and jobs are covered by the contract that gives rise to USA's and Comet's pension obligations-a question that can and should be resolved during a payroll audit rather than as a question of liability. *See Trs. of the Nat'l Auto Sprinkler Indus. Pension Fund v. Budget Plumbing Corp.*, 111 F. Supp. 2d 716, 719 (D. Md. 2000) (stating that where two companies constitute a single employer they are "therefore [] jointly and severally liable for delinquent [employee benefit fund] contributions"); *see also Vance v. NLRB*, 71 F.3d 486 (4th Cir. 1995) (affirming an NLRB determination, which had made no inquiry into the appropriate bargaining unit, that the two companies constituting a single employer were jointly liable for damages resulting from unfair labor practices). Thus, as the Seventh Circuit has observed, courts "need not decide representational issues to impose liability for contributions to a multi-employer plan." *Moriarty v. Svec*, 164 F.3d 323, 334 (7th Cir. 1998).

In *Moriarty v. Larry Lewis Funeral Dirs.*, 150 F.3d 773 (7th Cir. 1998), [*21] the court of appeals considered a question essentially identical to the one presented here and reached the same result. In *Larry Lewis*, a unionized funeral home made employee benefit contributions, as required by its collective bargaining agreements, on behalf of its own principals and employees, Larry and Gina Lewis. 150 F.3d at 775. Eventually, the funeral home went out of business; when it did so, the Lewises went to work for another funeral home, of which Larry ultimately became the owner and manager. *Id.* The second funeral home continued to make fund contributions on behalf of Larry and Gina, but did not do so on behalf of any other employee; consequently, the funds sued under the collection provisions of

ERISA-the same cause of action as in the instant case-alleging that the two funeral homes constituted a single employer and that the second home owed contributions for all of its employees, not just the Lewises. *Id.* The district court dismissed the suit for the reason advanced by USA: it held that it lacked jurisdiction to determine the appropriate bargaining unit. *Id.* at 776.

The Seventh Circuit reversed. It observed that the determination [*22] of an appropriate bargaining unit had no

> relevance to a suit under the collection provision of ERISA, 29 U.S.C. § 1132(e)(1). No employee wants to change bargaining representatives (or decertify a union); no one contends that an unfair labor practice has been committed; the NLRB therefor has no role to play. The Funds' claims are based on contracts rather than principles of labor law. Sometimes it is hard to tell whether a particular firm is a party to the contract; that is the problem this case poses, and it may be resolved without regard to the NLRB's principles of unit determination.

*Id.* The reasoning of the court of appeals applies equally here: this Court has determined that USA and Comet are a single employer, and that determination is all that is necessary to hold USA liable under the terms of the collective bargaining agreement. The remaining question is which employees those terms cover-a question of damages and contract law.

Even if a separate inquiry into the appropriate bargaining unit were necessary, this Court finds, as an alternative holding, that it has jurisdiction to make such a determination and that the relevant employees [*23] of Comet and USA constitute an appropriate bargaining unit.

This Court has jurisdiction to decide the appropriate bargaining unit because it "may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies." *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 626, 95 S. Ct. 1830, 44 L. Ed. 2d 418 (1975); *see Carpenters Local Union No. 1846*, 690 F.3d at 519

2006 U.S. Dist. LEXIS 55968, *23; 39 Employee Benefits Cas. (BNA) 1685
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

(holding that "where collateral issues of labor law, such as the determination of the appropriateness of a bargaining unit, become essential to the determination of the existence of a breach of contract under [an] independent federal remedy, . . . a federal court may pass upon this issues . . . notwithstanding the fact that a unit determination by the Board might be available if one of the parties filed an unfair labor practice charge or sought unit clarification"). [1]

> 1   *South Prairie Constr. Co. v. Local No. 627*, 425 U.S. 800, 96 S. Ct. 1842, 48 L. Ed. 2d 382 (1976), though a Supreme Court case decided after *Connell*, is not to the contrary. In it, the Supreme Court reversed the U.S. Court of Appeals for the D.C. Circuit after that court had failed to let the NLRB determine the appropriate bargaining unit in the first instance. *Id.* at 803-04. *South Prairie*, however, was an appeal from an NLRB determination; the D.C. Circuit could and should have remanded. *See id.* at 804-06. In other words, *South Prairie* stands only for the "basic principle that an agency should be afforded the opportunity to decide a factual issue before the issue is decided by an appellate court." *Brown v. Sandimo Materials*, 250 F.3d 120, 129 (2d Cir. 2001) (discussing *South Prairie*).

[*24] To determine whether the employees share a community of interests and thus constitute an appropriate bargaining unit, the NLRB (or a court) looks to "such factors as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function, and degree of employee interchange." *NLRB v. J.C. Penney Co.*, 559 F.2d 373, 375 (5th Cir. 1977). Here, USA employees have little bargaining history; only Comet is unionized, and indeed was created specifically to perform jobs that required union workers. But as to the remaining factors-geographic proximity, common supervision, job function, and employee interchange-USA and Comet overlap entirely; USA and Comet were operated to do the same types of jobs, with the same equipment and employees, under the same roof.

Accordingly, even if this Court had to make a bargaining unit determination, it would conclude that the Comet and USA laborers constitute one bargaining unit and that the collective bargaining agreement applies to workers on both Comet and USA jobs. USA and Comet are jointly and severally liable; the remaining question is

for how much, and that depends on how many hours were worked [*25] on jobs covered by the collective bargaining agreement.

## DAMAGES

Although the audit process was unnecessarily contentious-requiring intervention from the undersigned on two occasions-an audit report was completed and provided to USA by the specified deadline. The final version of this report, dated March 1, 2006, calculated that 413,752 hours of labor were covered by the collective bargaining agreement but had not been reported to the union, and that no contribution payments had been made. At a contribution rate of $ 2.95 per hour, [2] this yielded $ 1,220,568 in unpaid contributions. Adding liquidated damages at a rate of 15% ($ 183,085) and interest of $ 335,475, the report calculated total damages of $ 1,739,128.

> 2   The third-party administrator for the Funds, Carday Associates, provided this figure to the auditor. It represents the total of the contribution rates for each relevant fund during the covered period: $ 1.65 for the Laborers' Health and Welfare Fund, $ 0.90 for the Laborers' Pension Fund, $ 0.30 for the Laborers' Training Fund, and $ 0.10 for the Laborers' Employers' Cooperative and Education Trust.
>
> The audit report also includes a line-item for the "Health & Safety Fund" of $ 0.02 per hour, but for reasons that are not clear to the Court this was apparently not included in the $ 2.95 total. Because Plaintiffs supplied, and Defendants did not challenge, the $ 2.95 total, the Court will adopt this figure.

[*26] Unfortunately, this final version of the audit report was not provided to the defendants until the day of the damages hearing; what the defendants received in a timely fashion was a preliminary version dated February 23, 2006. As counsel to the Funds explained during the damages hearing, this preliminary version identified a substantially lower number of covered hours because, between the preliminary and final versions, the auditor was able to identify for the first time the geographic location at which some of the laborers' jobs had taken place. [3] The preliminary version excluded these jobs from its calculations because of the possibility that they were outside the scope of the geographically-limited collective

2006 U.S. Dist. LEXIS 55968, *26; 39 Employee Benefits Cas. (BNA) 1685
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

bargaining agreement; the final version included additional jobs that had been identified as falling within that scope. Thus, the preliminary version counted only 262,017 covered hours, yielding $ 772,954 in unpaid fund contributions. Adding liquidated damages of $ 115,943 and interest of $ 235,998, it calculated damages of $ 1,124,898.

> 3   As far as this Court is aware, the final report only added jobs to the list of covered jobs; it did not subtract any. Thus, every job counted in the preliminary report was counted in the final report, but the converse is not true: not all jobs counted in the final report were counted in the preliminary one.

[*27] Whatever the reason for the Funds' failure to provide the final report until the damages hearing, the failure denied USA the opportunity to effectively challenge the greater damages that the final report contained. This Court ordered that the audit report be turned over to USA on or before March 3, 2006; that USA have the opportunity to challenge specific findings in the report within 20 days; and that USA have the opportunity to depose the auditor on or before April 7, 2006. *See* Order of Jan. 25, 2006, Paper No. 87. As it happened, USA did not make any specific challenges to the report it received at all, nor did it choose to depose the auditor, but this Court cannot assume that it would not have done so if it had timely received the final report containing additional jobs and greater liability. Because the use of the final report would therefore prejudice USA, this Court accordingly declines to consider the findings in the final report, and instead adopts the findings of the preliminary audit report.

As mentioned, USA declined to make any specific challenges to the auditor's findings. Instead, it submitted (to both the Court and to the Funds) a list of general objections. [*28] *See* Paper No. 89 (objections); Paper No. 90 (supplemental objections). Aside from its ongoing objection to the jurisdiction of this Court to make a determination of an appropriate bargaining unit, *see supra,* USA objects to (1) the inclusion of general laborers in the listing of Health and Welfare and pension contributions, even though Health and Welfare and pension contributions "shall not apply to General Laborers" under the collective bargaining agreement; (2) the failure to account for a lower rate of contribution as to construction laborers; (3) the failure to reflect a credit for

contributions paid by Comet; (4) the absence of "supporting documentation" required by the January 26, 2006, Order of this Court; and (5) the failure of the auditor's estimation techniques to account for projects in which the labor was subcontracted to other companies.

This Court advised USA, during a telephone status conference well in advance of the damages hearing, that its objections were not challenges to "specific findings" within the meaning of this Court's Order of Jan. 25, 2006. USA's noncompliance with the Court's orders is reason enough to overrule its objections.

Even addressing them [*29] on the merits, however, this Court overrules each of them. The Funds' auditor performed a thorough audit of USA's payroll weekly job tickets, weekly job summaries, payroll reports, and tax forms. Its audit report accounted for each hour worked on each covered job within the geographic scope of the collective bargaining agreement, and provided thorough documentation, thus meeting this Court's requirement that the Funds provide "supporting documentation." The report counted only job tickets falling within specific job descriptions (such as asbestos abatement or mold removal) that fall within the collective bargaining agreement. Audit Rep. at 2. Some hours worked could not be identified as belonging to a covered job description, and some jobs did not have any hours listed, but in each case, the auditors' report excluded damages that may have arisen from these unknowns. *Id.* The audit report, then, amounts to uncontradicted evidence; USA has pointed to no specific job hours that should be excluded or accounted for at a lower rate, whether because of subcontracting, work done by general laborers, or work done by construction laborers. Instead, it has made only vague allegations that [*30] the audit was done incorrectly. This is not evidence, nor is it even a well-formed objection.

Accordingly, the findings of the preliminary audit report are adopted by this Court, and Comet and USA will be held jointly and severally liable in the amount that the preliminary report reflects: $ 1,124,898. If anything, this is an underestimate, because of the failure of the Funds to deliver the finalized report and because of the auditor's conservativism. Judgment will be entered in favor of the Funds by separate order.

July 25, 2006

DATE

2006 U.S. Dist. LEXIS 55968, *30; 39 Employee Benefits Cas. (BNA) 1685
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669


/s/                                              UNITED STATES DISTRICT JUDGE

    ROGER W. TITUS

# EXHIBIT 38

LEXSEE

**HOWARD E. JOHANNSSEN, MARVIN E. LONG and DONNA FISHER, Plaintiffs
v. DISTRICT NO. 1-PACIFIC COAST DISTRICT, MEBA PENSION PLAN,
Defendant**

**CIVIL NO. AMD 96-2355**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

**1997 U.S. Dist. LEXIS 14351**

**August 8, 1997, Decided
August 8, 1997, Filed**

**DISPOSITION:**     [*1] Motions for summary judgment
DENIED.


**COUNSEL:** For plaintiffs: Cyril V. Smith, Sheryl B.
Goldstein, Zuckerman, Spaeder, Goldstein, Taylor &
Better, Baltimore, MD.

For defendant: Marilyn L. Baker, Mooney, Green, Baker,
Gibson, Washington, DC.

**JUDGES:** ANDRE M. DAVIS, United States District
Judge.

**OPINION BY:** ANDRE M. DAVIS

**OPINION**

    MEMORANDUM

**I. INTRODUCTION**

    Plaintiffs Howard E. Johanssen, Marvin E. Long
and Donna C. Fisher initiated this action against
defendant District No.1-Pacific Coast District, MEBA
Pension Plan ("the StaffPlan"), a pension plan governed
by the Employee Retirement Income Security Act of
1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, seeking a
declaratory judgment requiring the StaffPlan to recognize
their accrual of pension benefits under a controversial
amendment ("the 1992 amendment") to the plan
document, the validity of which the Plan Administrator
refused to acknowledge. Specifically, plaintiffs allege
that the StaffPlan has violated 29 U.S.C. §§

1132(a)(1)(B) and (a)(3) [1], by denying them "past service
credit," i.e., credit, for purposes of pension benefit
accruals, for time in the employment of an employer who
was not a signatory to the StaffPlan, and for [*2] whom
no employer contributions were made to fund any future
benefits. Pending before the Court are the parties'
cross-motions for summary judgment, which have been
exhaustively briefed; a hearing has been held. For the
reasons set forth below, the motions for summary
judgment shall be denied and the case will be scheduled
for non-jury trial.

    1    Section 1132(a)(1)(B) provides that a civil
    action may be brought by a beneficiary "to
    recover benefits due to him under the terms of his
    plan, to enforce his rights under the terms of the
    plan, or to clarify his rights to future benefits
    under the terms of the plan[.]" It is not clear
    whether any of the plaintiffs are presently entitled
    to the actual payment of any benefits; the relief
    sought here is primarily a "clarification" of future
    entitlements.

       Section  1132(a)(3)  provides  equitable
    remedies for the violations described in §
    1132(a)(1)(B). The section specifically provides
    that a civil action may be brought

        By a participant, beneficiary, or
        fiduciary (A) to enjoin any act or
        practice  which  violates  any
        provision of this subchapter or the
        terms of the plan, or (B) to obtain
        other appropriate equitable relief

1997 U.S. Dist. LEXIS 14351, *2
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

(i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

While plaintiffs may avail themselves of the remedies contained in § 1132 (a)(1)(B), further equitable relief is available only where necessary, i.e., "appropriate." *See Varity Corp. v. Howe*, 134 L. Ed. 2d 130, 116 S. Ct. 1065, 1077, 1079 (1996) (finding that § 1132 (a)(1)(B) "specifically provides a remedy for breaches of fiduciary duty" regarding the interpretation of plan documents and the payment of claims, and "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief . . . .").

[*3]  **III.  STANDARDS FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson*, 477 U.S. at 248. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, [*4] which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248-49. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 545 (4th Cir. 1995), *rev'd on other grounds*, 134 L. Ed. 2d 433, 116 S. Ct. 1307 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Anderson*, [*5] 477 U.S. at 252; *Shealy*, 929 F.2d at 1012.

When, as in the instant case, both parties file motions for summary judgment, the court applies the same standard of review. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp., Com. Div.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment -- even where ... both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied*, 469 U.S. 1215, 84 L. Ed. 2d 337, 105 S. Ct. 1191 (1985). Rather, the role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Management Corp. v. Hartford Accident & Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985) (quoting Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 2d § 2720).

**IV. FACTS**

The plaintiffs' claims are straightforward. An extraordinarily generous, yet unfunded, enhancement of their pension benefits was adopted in the form of an amendment to the [*6] StaffPlan in the waning days of the regime of a group of corrupt union leaders, who briefly exercised their fraudulently-obtained control over union affairs. Seeking to overcome resistance to the amendment by the Staff Plan Administrator, plaintiffs contend that the amendment must be given effect because a plausible interpretation of the relevant documents suggests that the adoption of the amendment was proper procedurally and substantively, and therefore unassailable by the Plan Administrator, and its propriety is otherwise

1997 U.S. Dist. LEXIS 14351, *6
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

beyond the reach of this Court to scrutinize.

In this unusual case, the parties, understandably, disagree over the facts, the meaning of the facts and the proper application of settled legal principles to the facts. As explained below, I conclude that summary judgment is not appropriate for two essential reasons. First, in my view, the pertinent provisions of the plan document regarding amendments are ambiguous as a matter of law, and thus, there exists a genuine dispute of material fact over the correct interpretation of the StaffPlan's amendment procedure. Second, the actuarial consequences of the 1992 amendment (so far as can be determined on the present record) [*7] coupled with the circumstances surrounding its adoption, appear to be so far beyond the boundaries of what was in the contemplation of the original and current sponsor of the StaffPlan, that there is a genuine dispute of material fact over the propriety of the 1992 amendment in the first instance. What is not yet ripe for review, in any event, is the question whether, assuming the 1992 amendment is effective, any of the plaintiffs actually qualify for the pension enhancements which were intended for them, as the amendment may be interpreted by the Plan Administrator, pursuant to the power delegated to the Administrator by the plan document.

Accordingly, I am satisfied that a full development of the facts, including credibility determinations, is necessary to a proper resolution of the novel legal issues framed by the circumstances shown in the summary judgment record. Provided below is a summary of some of the material facts relevant to the dispute. Because the presence of disputed facts is self-evident in this cross-motions context, it is not necessary to delineate with precision which strand of which version of the parties' respective accounts should be given primacy, and I shall [*8] not endeavor to do so.

## A. The Origins of the StaffPlan and its Essential Structure

Prior to March 1988, there existed a labor union known as District No. 1-Pacific Coast District, MEBA ("District No.1"). District No. 1 represented licensed marine engineers on oceangoing vessels. In addition, District No. 1 was the parent organization of several affiliate labor organizations that represented employees primarily in the aviation and public sector industries. As explained in detail below, as a result of a broad-based racketeering scheme, District No. 1 merged with another maritime union in 1988, only to be restored to its prior independent status by 1993.

The StaffPlan is a pension plan originally established in 1972 by District No. 1. Initially, the purpose of the StaffPlan was to provide pension benefits to the employees of District No.1. Over time, however, certain affiliates of District No. 1 and other related organizations became participating employers in the StaffPlan as well. Before the 1988 merger discussed below, the plan document defined the term "Employer" as follows: "The Employer is the District No. 1- Pacific Coast District, MEBA and its affiliated organizations [*9] listed below: Professional Air Traffic Controllers Organization; Joint Maritime Congress; Benefit Plan, Radio Officers Union; Medical and Benefits Plan, MEBA; MEBAR Realty Holding Trust; Radio Officers Union District No. 3, MEBA; ROU Maritime Electronic Training School." From its inception, the StaffPlan was largely intended to mirror the MEBA Pension Trust, also known as the "Deep Sea Plan." [2]

> 2   The Deep Sea Plan is a pension plan that was created, and is maintained, pursuant to collective bargaining agreements between District No. 1 and various maritime employers, and covers the employees of those employers who were represented by District No. 1. The Deep Sea Plan, as well as the other MEBA Benefit Plans, is a jointly administered multi-employer plan, and is subject to the limitations of Section 302 of the Labor Management Relations Act of 1947, 29 U.S.C. § 186. As such, it has a separate Board of Trustees, half of whom are appointed by the Union and half of whom are appointed by the employers.

Thus, the [*10] StaffPlan is a funded multi-employer pension plan. It is financed by contributions made by District No. 1 and the other employers whose employees are participants in the StaffPlan. The StaffPlan's actuary determines the proportionate share of the costs to be paid by each employer based on the number of employees covered by the Plan and the demographics of that employee population. For certain years, no contributions were required to fund the benefits promised by the Plan, while in other years, substantial contributions were necessary. It appears that the StaffPlan currently has approximately 250 participants, and in 1995, had assets valued at

1997 U.S. Dist. LEXIS 14351, *10
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

approximately $ 5 million.

To establish the StaffPlan, District No. 1 entered into a Group Annuity Contract with the John Hancock Mutual Life Insurance Company ("John Hancock"). For all periods relevant to this action, the contract, including its various amendments, served as the Staff Plan's governing document. As will be made clear presently, the term "Contract Holder" is not defined in the plan document, and the identity of such entity, *inter alia*, lies at the heart of the dispute in this case. In any event, John Hancock is responsible [*11] for making benefit payments under the contract. The contributing entities send their contributions to John Hancock, which uses the monies to finance benefits. Amounts not immediately needed for benefit payments are invested in accordance with the terms of the contract.

For most of the StaffPlan's existence, the administration of the Plan has been handled by a Plan Administrator. From 1972 to 1986, that position was held by employees of District No. 1. In 1986, however, District No. 1 designated Lucille Hart ("Hart") as the StaffPlan Administrator. [3] As Plan Administrator, Hart was responsible for all facets of the StaffPlan's operations except benefit payment. Accordingly, in Article I, § 16, the Plan document provided as follows, in pertinent part:

> SECTION 16. Determinations by Plan Administrators
>
> . . . . Except as herein otherwise expressly provided, the Plan Administrators shall have the *exclusive right to interpret the Plan and to decide any matters arising thereunder in connection with the administration of the Plan*. They shall make all such determinations in a consistent and non-discriminatory manner. All such determinations shall be conclusive for the purposes [*12] of the Plan, subject to the provisions of Section 18 [providing for appeals].

Hart Aff., Exh.A at I-15.2 (emphasis added). Thus, it is undisputed that Hart, as Plan Administrator, was responsible for all StaffPlan benefit eligibility determinations.

3  Prior to Hart's appointment, Frank Laurito, the

controller for District No. 1, served as StaffPlan Administrator. Under settled ERISA doctrine, an employer is permitted to serve as the administrator of a benefit plan, as did District No. 1 until 1986; however, it thereby assumes certain fiduciary duties. *See generally Lockheed Corp. v. Spink*, 135 L. Ed. 2d 153, 116 S. Ct. 1783, 1789-90 (1996). By relinquishing its dual role, District No. 1 was freed of any fiduciary duties toward the participants or beneficiaries under the StaffPlan, *except, interestingly enough, in the selection of plan administrators. Cf. Licensed Div. Dist. No. 1 MEBA/ NMU, AFL-CIO v. DeFries*, 943 F.2d 474, 478 (4th Cir. 1991)("[A] union exercises the discretionary authority of a fiduciary when it appoints trustees"), *cert. denied*, 502 U.S. 1071 (1992).

[*13]  The Plan document contains two explicit provisions concerning amendments. The first section, Article I, § 21 provides as follows, in pertinent part:

> SECTION 21. Amendment of the Plan
>
> The Employer shall have the right to amend in any respect the Plan at any time by an instrument in writing, duly executed by the Employer; provided, however, no amendment shall adversely affect benefits already purchased or established . . . .

*Id.* at I-17.0. In addition, Article III, § 8 provides, in pertinent part:

> SECTION 8. Modification of Contract
>
> This Contract may be modified at any time by written agreement between the John Hancock and the Contract Holder . . .
> .

*Id.* at III-3.0. Also relevant is Article III, § 10, which provides:

> SECTION 10. Control of Contract
>
> The John Hancock shall deal exclusively with the Plan Administrators with respect to those matters in this Contract so designated and with respect to any other matters pertaining to the control and management of the operation and administration of the Plan, and shall deal

exclusively with the Contract Holder with respect to all other matters under this Contract. *The Plan Administrators [\*14] and Contract Holder shall act for and on behalf of each Employer in any matter pertaining to this Contract and each such act shall be binding on each Employer.*

*Id.* at III-4.0 (emphasis added). As these excerpts from the StaffPlan show, the plan document variously employs the term "Employer" and "each Employer."

Although no such specific procedure is spelled out in the document, Hart, as Plan Administrator, also reviewed and signed all StaffPlan amendments. Significantly, other than the amendment at issue in the instant case, it appears that every plan amendment from the StaffPlan's inception until the present, was signed by the Plan Administrator, although the parties vigorously dispute what, if any, legal effect such history may or should have on the determination of the issues presented here. What is clear, nevertheless, is that certain rudimentary formalities were observed, and a document reciting "It is understood and agreed . . . the following modifications and alterations are hereby made . . . " was executed by the Plan Administrator and John Hancock to formalize amendments. *See, e.g., id.*, Exh. B.

Indeed, throughout Hart's tenure, the normal amendment procedure [\*15] was that amendments would be drafted by John Hancock, either upon the Administrator's request or upon a determination by John Hancock that a change in the law required amendment of the Plan. John Hancock would then send the draft amendment to Hart for her review. After reviewing the draft, Hart would, under certain circumstances, also have the Staff Plan's counsel and/or the actuary review the draft amendment. [4]

> 4    In part, because the parties dispute the accuracy of their respective versions of the historical record as to the amendment procedures, a full trial on the merits is mandated here. What is manifest, however, is that the amendment at issue in this case is *sui generis*. No comparable amendment of such a controversial substantive content-- e.g., reimbursement by a labor union to a union employee for his dissipation of his *federal* pension benefits, expended on behalf of the union when he quit his federal employment to go to

work for the union, and without consideration for how or who would pay for such largess-- had ever been proposed or considered. It is probably safe to infer that no one involved in the creation or administration of the StaffPlan (with one possible exception, discussed *infra* n. 9 & p. 34) ever contemplated that union leadership would take such an action to reward an employee in the manner that the corrupt leaders sought to reward the plaintiffs here.

[\*16] **B. The 1988 Union Merger and the Creation of District No. 1 - MEBA/NMU**

As previously mentioned, District No. 1 maintained a relationship-- poorly delineated in the summary judgment record-- with several "affiliate" labor organizations. These affiliates included the Professional Air Traffic Controllers Organization ("PATCO"), the Professional Airways Systems Specialists ("PASS"), and later, the National Air Traffic Controllers Association ("NATCA"). Members of these organizations elected their own officers and were governed by their own constitutions and by-laws. District No. 1 also exercised some measure of control over two constituent entities referred to as "divisions." Two such divisions were the Professional, Office and Industrial Division ("POID"), and the Florida-based Federation of Public Employees ("FOPE"). POID consisted primarily of clerical employees who worked for employers that were parties to collective bargaining agreements with District No. 1. FOPE similarly consisted of various public sector bargaining units in and around Broward County, Florida.

In March 1988, in an effort to enhance the cause of unionism within the maritime industry, District No. 1 merged [\*17] with the National Maritime Union ("NMU"), a union that represented seamen on oceangoing vessels. The merged union was known as District No. 1-- MEBA/NMU ("MEBA/NMU"). The merger was approved by a vote of the membership of each of the merging unions, after a national campaign. Among the more controversial issues attendant to the merger campaign was the question of whether the well-funded StaffPlan controlled by District No. 1 would retain its identity separate from the allegedly underfunded NMU pension plan. At the time of the merger campaign, Eugene DeFries ("DeFries") was president of District No. 1 and a leader in the merger movement. DeFries had assured his membership that the pension plans would

remain separate and distinct. [5]

> 5   Although defendant makes this and related assertions in its reply memorandum, on motion of the plaintiffs, I struck an affidavit which provided the clearest support for such assertions. In preparation for trial, plaintiffs shall be afforded an opportunity to depose additional witnesses.

> I should also note that I disagree with plaintiffs' assertion that the criminal proceedings which grew out of the 1988 merger are irrelevant to the issues in this case. I am prepared to read the entire record of those proceedings in order to obtain a complete understanding of the nature and scope of the fraud that was perpetrated upon the membership of District No. 1.

[*18] As a part of the merger, two divisions of MEBA/NMU were created, the "Licensed Division" and the "Unlicensed Division." The "Licensed Division" consisted largely of the membership that formerly had been the pre-merger District No. 1. The "Unlicensed Division" consisted largely of the pre-merger NMU. Upon approval of the merger, the merged entity-- MEBA/NMU-- was governed by a District Executive Committee (the "MEBA/NMU DEC"), essentially under the control of the President, which originally was DeFries. It soon became apparent, contrary to earlier assurances, that DeFries and his cronies on the DEC intended to combine the two pension plans, and this realization quickly resulted in a rank-and-file movement to undo the merger. [6]

> 6   See supra n. 5.

Each division of MEBA/NMU had voting representation on the MEBA/NMU DEC. In addition, both the Licensed and the Unlicensed Divisions maintained their predecessors' divisional units and affiliations. Pending elections scheduled for December 1990, DeFries acted as [*19] Chairman of the Licensed Division. As a result of the 1990 election, however, DeFries and his slate of officers were ousted from leadership of the Licensed Division and replaced by a group under the leadership of Gordon Ward (the "Ward Group"). After their election, the new officers of the Licensed Division sought to replace the union-appointed trustees of the MEBA Benefit Plans, who had been appointed by the DeFries-controlled MEBA/NMU DEC. The DeFries-appointed trustees resisted, claiming that

MEBA/NMU, not the Licensed Division, had the authority to appoint trustees to the jointly-administered MEBA Benefit Plans. The Licensed Division filed suit in this Court, and was ultimately determined by the Fourth Circuit, affirming an Order of Judge Nickerson, to be the appropriate party to appoint trustees to the MEBA Benefit Plans. *See Licensed Div. Dist. No. 1 MEBA/NMU, AFL-CIO v. DeFries*, 943 F.2d 474 (4th Cir. 1991), *cert. denied*, 502 U.S. 1074, 117 L. Ed. 2d 137, 112 S. Ct. 972 (1992).

In March 1991, MEBA/NMU entered into an agreement with PASS, an affiliate of the pre-merger District No. 1 and, after the merger, of the Licensed Division, under which PASS would become a separate [*20] division of MEBA/NMU, aligned with the DeFries control group. Plaintiff Johannssen was president of PASS at that time. Johannssen later became a vice president of MEBA/NMU and consequently a voting member of the MEBA/NMU DEC. The Industrial, Technical and Professional Employees Union ("ITPE"), formerly an affiliate of the Unlicensed Division, was also made a division of MEBA/NMU, aligned with the DeFries control group.

In January 1992, the membership of the Licensed Division unanimously approved a resolution under which it no longer recognized MEBA/NMU; the Licensed Division began operating as a separate organization using its former name "District No. 1-PCD, MEBA" (hereafter "District No. 1/Post-Merger"). For approximately 18 months thereafter, District No.1/Post-Merger and MEBA/NMU engaged in ongoing disputes regarding the ownership of the assets District No. 1, and litigation ensued.

## C. The Effect of the Merger on the StaffPlan

From the date of the merger in 1988 until some time in 1991, Hart, as the Plan Administrator, conducted the affairs of the StaffPlan as if she believed that MEBA/NMU was the legitimate successor to District No. 1. Documents prepared under her supervision [*21] by the StaffPlan, such as the "Annual Return/Report of Employee Benefit Plan" (also known as a "Form 5500") required to be filed with the Internal Revenue Service, the Department of Labor and the Pension Benefit Guaranty Corporation, reflect this apparent belief. After the Ward Group was elected in 1990 to lead the Licensed Division, however, and after the Fourth Circuit affirmed, on August 26, 1991, Judge Nickerson's ruling that the Licensed

Division -- not MEBA/NMU -- had the authority to appoint trustees to the MEBA Benefit Plans, Hart conducted business in a fashion reflecting her belief that the Licensed Division, then calling itself "District No. 1-PCD, MEBA" was the legitimate successor to the original District No. 1. [7]

   7   The Form 5500 for the Plan year 1992 reflected this determination. *See* Df's Exh. H.

Notwithstanding Hart's attitude, by virtue of a formal resolution of the MEBA/NMU DEC, during the period 1991 through 1993 or 1994, the "Employer" under the Plan was defined as "District No. 1-MEBA/NMU [*22] and its affiliated organizations." The affiliated organizations included in the definition of "Employer" were the Professional Air Traffic Controllers Organization; the Joint Maritime Congress; the Benefit Plan, Radio Officers Union; the MEBA Medical and Benefits Plan; MEBAR Realty Holding Trust; the Radio Officers Union District No. 3, MEBA; the ROU Maritime Electronic Training School and the National Air Traffic Controllers Association.

### E. The 1992 Amendment to the StaffPlan

Upon DeFries' retirement, in or about March 1992, Alexander "Doc" Cullison ("Cullison") replaced DeFries as head of MEBA/NMU. Thereafter, in October 1992, the MEBA/NMU DEC unanimously approved an amendment to the StaffPlan's provisions governing "service credit" (the number of years which count in determining pensions payable) so as to grant pension credits to StaffPlan participants for service with affiliated unions and other named entities. Although Plaintiff Johannssen, a member of the MEBA/NMU DEC, abstained in the vote, this concession to form carried little practical import in the real world. Johannssen was unabashed in his longtime support for such action, and Cullison readily admitted on deposition [*23] that the issue of additional service credits was "something that [Johannssen] had been concerned about, lobbying for it for many years . . . ." Cullison Depo. at 8. *See also* Johannssen Aff. P 3("[The defendant's interpretation of the 1992 amendment] is not a correct interpretation . . . . I know this because I was present during the deliberations of the District Executive Committee . . . .").

The language of the 1992 amendment provided as follows:

Notwithstanding anything to the contrary, Service shall be granted to all Participants for each year of Service as an employee or officer of (i) Professional Airways Systems Specialists (PASS); (ii) Professional Air Traffic Controllers Organization (PATCO), or its subordinate bodies; (iii) Professional Office and Industrial Division (POID) or its subordinate bodies; (iv) service with a contracted employer of District No. 1-MEBA/NMU or one of its affiliates; (v) and the American Federation of Government Employees (AFGE) or its subordinate bodies; provided that the participant has not received service credit with respect to any other pension plan in which the participant is entitled to an accrued benefit.

Pls' Exh. [*24] 30. It is undisputed that the amendment's primary purpose, if not its sole purpose, was to ensure past service credits for the plaintiffs. In drafting and passing the amendment, however, the MEBA/NMU DEC did not address, or even consider, how the cost of the past service credit would be funded. The DEC also failed to consider how many people actually would be covered by the amendment, or the overall effect of the amendment on the StaffPlan, although only one person other than the three plaintiffs here actually has been identified as encompassed by the murky language of the amendment.

Moreover, rather than involve Plan Administrator Hart in effectuating the amendment, as normally occurred both before and after the merger, Cullison sent a letter directly to John Hancock Senior Account Executive Charles Harootunian ("Harootunian") on December 1, 1992, advising him of the amendment and asking him to prepare the necessary documents to incorporate the amendment into the Plan. This appears to be the only occasion in the history of the StaffPlan that someone other than the Plan Administrator dealt directly with John Hancock. On December 15, 1992, John Hancock sent Cullison a StaffPlan amendment [*25] incorporating the changes requested in his letter, which Cullison apparently signed and returned to John Hancock; however, no party has produced a copy of the executed amendment. Thereafter, on or about January 6, 1993, John Hancock submitted the 1992 amendment to the District of Columbia Insurance Commission for routine regulatory

approval.

Meanwhile, Hart first learned of the amendment when she received a copy of Cullison's December 1, 1992 letter to Harootunian. Accordingly, after conferring with counsel to the StaffPlan, Hart contacted Harootunian directly in January 1993 and advised him that MEBA/NMU did not have the authority to amend the StaffPlan document. In reaching this conclusion, Hart allegedly relied primarily on the fact that the new leaders elected in the Licensed Division were challenging the legitimacy of MEBA/NMU, as well as on the Fourth Circuit's *DeFries* decision, which held that the Licensed Division was the appropriate entity to appoint trustees to the MEBA Benefit Plans. Allegedly, then, Hart concluded that the Licensed Division, not MEBA/NMU, also had authority with respect to administration of the StaffPlan.

Ultimately, as a result of Hart's conversation [*26] with Harootunian, John Hancock contacted the District of Columbia Insurance Commission on January 26, 1993, advising them that the 1992 amendment had been "rescinded" by the "Contract Holder." Apparently, Hart never communicated this turn of events to Cullison or any other member of the DEC, nor did Harootunian; similarly, neither Cullison and the MEBA/NMU DEC nor the plaintiffs ever followed up with Hart or John Hancock to ascertain whether the 1992 amendment had been effectuated or formally included in the plan document. [8] Thus, it was not until the plaintiffs received their next annual statement that they learned that Hart (and John Hancock) had ignored the 1992 amendment and refused to give it effect.

> 8   It is inexplicable why the MEBA/NMU DEC, who in October 1992 purported to be Hart's boss, and at whose pleasure she served as Plan Administrator, would go to such efforts to avoid having her involved in the adoption of the 1992 amendment. Nor does the record disclose what, if anything, happened between the October 20, 1992 meeting at which the 1992 amendment was approved and December 1, 1992, when Cullison sent the amendment to John Hancock. There is room for an inference, not affirmatively undercut by the record, that Cullison and the members of the MEBA/NMU DEC doubted their own authority to effect the 1992 amendment without Hart's input.

[*27] **F. The Indictment, Trial and Conviction of Former Union Officers**

Within two months of the purported "rescission" of the 1992 amendment, in March 1993, 12 former officers of both the pre-merger District No. 1 and MEBA/NMU were indicted by a grand jury in the District of Columbia for a number of offenses, including election fraud related to the 1988 union merger. Thereafter, on June 29, 1993, a superseding indictment was filed charging 16 individuals, including both former and incumbent officers of MEBA/NMU as well as former officers of District No. 1, with 10 counts of racketeering, fraud and embezzlement. These charges alleged, *inter alia*, that the elections of the officers were procured by fraud, that the merger of the former District No. 1 with the NMU was procured by fraud, and that the nearly $ 2 million in "severance pay" the top elected officials of the former District No. 1 paid to themselves constituted embezzlement. The record does not suggest, and the defendant has not asserted or intimated in any way, that any of the plaintiffs here were involved in criminal activity at any time.

After a trial ending in July 1995, seven of the defendants, including Cullison [*28] and former president DeFries, were convicted on all counts. *See United States v. DeFries*, 909 F. Supp. 13, 15 (D.D.C. 1995)(ordering forfeitures under RICO in consequence of convictions). The remaining defendants plead guilty to various charges. The case is on appeal.

Shortly after the indictments were disclosed, on June 4, 1993, the various labor organizations affected by the merger entered into a so-called Interim Settlement Agreement ("ISA"). Although counsel for defendant stated rather cryptically at the summary judgment hearing that the ISA had not been "effectuated," it appears that pursuant to the ISA, MEBA/NMU has ceased to exist. *See* Pls' Exh. 21.

**G. Plaintiffs and Their Claims Against the StaffPlan**

Plaintiffs seek a total of 53 years of service credit on the authority of the 1992 amendment. Johannssen seeks 21 years additional service credit; Long seeks 24 years additional service credit; and Fisher seeks 8 years additional credit.

**1. Howard Johannssen**

From April 1968 until March 1977, Johannssen was

employed by the Federal Aviation Administration ("FAA"). While at the FAA, he also served, until 1976, as a union representative for the American Federation [*29] of Government Employees ("AFGE"). In June 1974, Johannssen began working with PATCO and District No. 1 to form a new union. Also while employed by the FAA, Johannssen participated in the Civil Service Retirement System ("CSRS") pension plan. When he resigned from the FAA to work for PATCO, however, Johannssen withdrew his $ 10,000 contribution to the pension plan for use in moving to Washington, D.C., and to fund his union organizing activities.

In 1977, Johannssen resigned from the FAA and was elected president of the newly-formed Professional Airways Systems Specialists ("PASS"), a union sponsored and supported by PATCO and District No. 1. From 1977 to 1989, Johannssen was employed by PASS, as well as several other unions associated or affiliated with District No. 1 and its successor, MEBA/NMU. While PASS formally became an affiliate of District No. 1 in 1982, it did not become a participating employer in the StaffPlan until 1992, after its merger into MEBA/NMU. Johannssen, however, became a participant in the StaffPlan in 1989, when he was assigned to take over FOPE.

Johannssen claims that beginning in April 1968, he was repeatedly promised that he would be awarded past service [*30] credit for each of his years as an FAA employee, for his service as an officer of AFGE, and for his years of service with PATCO, PASS and the other affiliated unions. According to Johannssen, these promises came from Jessie Calhoun ("Calhoun"), former president of District No. 1, DeFries, who succeeded Calhoun, and Michael J. Rock ("Rock"), a senior representative of PATCO. Johannssen thus alleges that, in reliance on these promises, he gave up his federal pension with the FAA, and obtained no other vested pension benefits from 1977 to 1989.

**2. Marvin Long**

From March 1967 to 1977, Long was employed by the FAA as an air traffic controller. In 1977, he left the FAA to work full-time as an organizer for PATCO. While employed by the FAA, Long participated in the CSRS pension plan. He withdrew his pension, however, to finance his relocation to Washington, D.C. and to fund his organizing activities on behalf of PATCO and District No. 1. In 1983, after PATCO ceased operation, Long

went to work for PASS. As a result of the 1991 merger of PASS with MEBA/NMU, Long was appointed national vice president of the PASS Division, a position he held until October 1994.

While at PATCO, Long [*31] participated in the StaffPlan for the years 1977 through 1981. Yet, because his pension rights had not vested prior to PATCO's dissolution, Long and other non-vested employees suffered a "break in service" under the terms of the StaffPlan. In addition, from 1983 to 1991, the majority of time Long was employed by PASS, it did not have a pension plan. Long resumed participation in the StaffPlan in 1991, when PASS became a division of MEBA/NMU.

Long claims that when he left the FAA to work full time as an organizer, he was promised that he would receive pension credit from District No. 1 for his past years of service with the FAA. He further claims that he was promised by Calhoun and Rock that he would receive pension credit for his years of service with PATCO and PASS without pension benefits. Long claims to have relied on these promises when he left his employment at the FAA.

**3. Donna Fisher**

From 1967 to 1971, Fisher was employed by Trans World Airlines. From 1971 to 1977, she was employed by the Boeing Company and from 1977 to 1980, by Boeing Services International, a Boeing Company subsidiary. Beginning in 1973, Fisher was also an officer of the Florida Association of Professional [*32] Employees ("FAPE"). She initially served as the recording secretary, and later as president. From 1973 to 1981, FAPE was affiliated with, and a subordinate body of District No. 1 and the Professional Office and Industrial Division ("POID"). In 1981, FAPE merged into District No. 1. Fisher did not obtain any vested pension benefits from her employment at Trans World Airlines, the Boeing Company or its subsidiary. Fisher has been an employee of District No. 1 and a participant in the StaffPlan since 1980.

Fisher's claim for past service credit is based on her association with FAPE from 1973 to 1980. According to Fisher, her then superior, Walter Browne ("Browne"), at some point, proposed that she "buy" part of the cost of her past service credit by accepting smaller increases in her salary as an employee of a District No. 1 affiliate, the Federation of Public Employees ("FOPE"). [9] Thereafter,

Case 8:06-cv-00338-PJM   Document 92-7   Filed 02/29/08   Page 31 of 70

1997 U.S. Dist. LEXIS 14351, *32
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

on May 20, 1986, Browne wrote to DeFries and told him that perhaps Fisher's past service credits could be partly funded in a way "which would affect future salary adjustments" for Fisher as a FOPE employee. Browne Aff. P 7. At the same time, Browne told Fisher that she was going to receive a weekly [*33] salary increase only half as large as other FOPE employees, and that this would be offered to District No. 1 as a way of paying part of the cost of her past service credits. According to Browne, the lower salary paid to Fisher was never corrected; therefore, she received lower pay every succeeding year as a result.

9    Plaintiffs assert that the 1992 amendment to the StaffPlan "was consistent with the StaffPlan's previous treatment of at least one similarly situated employee," namely Browne. Pls' Mem. in Supp. of Mot. for Summ. J. at 18. As discussed *infra* p. 34, however, it appears that Browne received three years of past service credits based merely on the instructions of former District No. 1 President DeFries to erstwhile Plan Administrator Frank Laurito in May 1984, and not through a StaffPlan amendment.

**H. The StaffPlan's Denial of Plaintiffs' Claims**

After receiving their 1993 pension statements, plaintiffs contacted the StaffPlan to determine why they had not received their past service credits [*34] pursuant to the 1992 amendment. In a letter dated March 30, 1994, Hart notified Fisher that she was not entitled to additional service credit because FAPE "was not and is not a participating Employer in the StaffPlan." In a follow up letter of April 18, 1994, Hart advised Fisher that the Amendment was not part of the StaffPlan. By letters dated October 4, 1994, Hart also notified Johannssen and Long that they were not entitled to additional service credits because the Amendment "is not, and was not at any time, part of the StaffPlan." After receiving these responses from the StaffPlan, Johannssen and Long retained counsel and properly exhausted the StaffPlan's internal remedies. Defendant contends, however, that Fisher failed to exhaust her administrative remedies, a contention which I reject, but which is immaterial for present purposes, in any event, as the discussion below demonstrates. [10]

10    Although ERISA does not contain an explicit exhaustion provision, an ERISA claimant generally is required to exhaust the remedies

provided by the employee benefit plan in which he or she participates as a prerequisite to an ERISA action for denial of benefits under 29 U.S.C. § 1132. *Makar v. Health Care Corp. of the Mid-Atlantic (Carefirst)*, 872 F.2d 80, 82 (4th Cir. 1989); *see also Amato v. Bernard*, 618 F.2d 559, 566-67 (9th Cir. 1980).

In the case *sub judice*, defendant claims that Fisher failed to provide adequate records concerning her employment with FAPE in order to substantiate her claim for past service credit. Hart requested this information by way of letters dated April 18, 1994 and August 30, 1994. Fisher did respond to Hart's requests in a letter dated September 19, 1994, however, in which she explained that she had no such Social Security records, but offered to provide alternative forms of proof, such as sworn statements from past officers of FAPE. Thus, it appears that Fisher made a good faith effort to supply Hart with the documentation she needed.

Similarly, defendant claims that Fisher did not comply with the appeal procedure in the StaffPlan. Yet, Fisher did write several letters to Hart explaining her claim and why she believed the StaffPlan erred in denying her past service credit. Most important, however, Hart could not say, based on the substantial communications she had with Fisher that there was not a de facto appeal. *See* Hart Depo. at 16-17. At the very least, Hart's testimony demonstrates that the appeal procedure was not as "formal" as defendant suggests. For this reason, and because Hart stated, in effect, that she had thoroughly reviewed Fisher's claim, *see id.* at 167, I conclude that Fisher has exhausted her administrative remedies.

[*35] **IV. ANALYSIS**

Fundamentally, this case presents two issues for determination. First, the Court must decide the question of whether the 1992 amendment is a valid and subsisting provision of the StaffPlan. This inquiry encompasses the following sub-issues: (1) whether in October 1992 the MEBA/NMU DEC, on the one hand, or the Licensed Division, on the other hand, had the authority to adopt an amendment to the Staff Plan; and if in fact the MEBA/NMU DEC had such authority to the exclusion of the Licensed Division, (2) whether anything more than a

1997 U.S. Dist. LEXIS 14351, *35
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

simple majority vote by the MEBA/NMU DEC was necessary to effectuate an amendment to the StaffPlan, e.g., whether some other entity or authority, such as the Plan Administrator or John Hancock or one of the affiliated "Employers" named in the plan document, had any role to play in the amendment process; and finally, (3) whether, on its face, the 1992 amendment was of the type that could be adopted, under any circumstances.

Second, if indeed the 1992 amendment is a valid and subsisting provision of the StaffPlan, then the issue presented is whether any one or more of the plaintiffs are entitled to service credits under the terms of [*36] that amendment. At this point in the development of the case, I am not at all concerned with this second question. I shall explain.

## A. Standard of Review

The parties have framed the issues somewhat at variance from the manner in which I have set them out above. Not surprisingly, the parties have approached this case under the existing paradigm of ERISA "denial-of-benefit" cases. Thus, they have cast the threshold issue as requiring a determination, under settled ERISA jurisprudence, of the correct *standard of review* applicable to Hart's actions in (1) "rescinding" the amendment and (2) assuming, *arguendo*, the 1992 amendment is a part of the Staff Plan, denying benefits based on Hart's interpretation and construction of the amendment. In other words, as they put it, I must determine the appropriate standard by which to review the decision of Plan Administrator Hart to deny plaintiffs' benefits, quite apart from the merits of that decision. In this respect, understandably but nevertheless erroneously, the parties have put the cart before the horse, because, as to the legal issue of whether the StaffPlan was validly amended, I am not reviewing *Hart's action*, but I [*37] am making an ultimate legal determination subject to plenary court review.

In the run-of-the-mine ERISA cases involving a review of determinations by plan administrators or other fiduciaries, courts are governed by the Supreme Court's decision in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989). In *Bruch*, the Court stated that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms

of the plan." 489 U.S. at 115. *See also Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997); *Fagan v. National Stabilization Agreement of the Sheet Metal Indus. Trust Fund*, 60 F.3d 175, 179 (4th Cir. 1995); *De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1186 (4th Cir. 1989).

Thus, under *Bruch*, if discretion does exist, review should be deferential, and a plan administrator's decision to deny benefits may only be overturned for abuse of that discretion. Accordingly, a court may not disturb a benefits determination by an administrator authorized to exercise [*38] discretion unless the decision was unreasonable. *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994); *De Nobel*, 885 F.2d at 1187.

In determining whether a plan administrator abused his or her discretion a court must consider a number of factors, such as whether the administrator's interpretation is consistent with the goals of the plan; whether it might render some language in the plan documents meaningless or internally inconsistent; whether the challenged interpretation is at odds with the procedural and substantive requirements of ERISA itself; whether the provisions at issue have been applied consistently; and whether the fiduciaries' interpretation is contrary to the clear language of the plan. *Sheppard & Enoch Pratt*, 32 F.3d at 126; *Lockhart v. United Mine Workers of Am. 1974 Pension Trust*, 5 F.3d 74, 77 (4th Cir. 1993); *De Nobel*, 885 F.2d at 1188.

While under an abuse of discretion standard a court's assessment of the reasonableness of a plan administrator's decision must be based only on those facts known to the plan administrator at the time, the Fourth Circuit has said that under a *de novo* standard of review, [*39] there may be exceptional circumstances that warrant a district court's consideration of evidence that was not taken into account by the administrator. *Sheppard & Enoch Pratt*, 32 F.3d at 125; *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993). In *Quesinberry*, the Court stated that such exceptional circumstances would include, *inter alia*, the availability of very limited administrative review procedures with little or no evidentiary record; and the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts. [11] 987 F.2d at 1027.

> 11 The Court also noted that the list of factors it presented was not exhaustive, but rather "is merely a guide for district courts faced with

motions to introduce evidence not presented to the plan administrator." *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1027 (4th Cir. 1993).

In the instant case, plaintiffs maintain that because Hart had no discretion to make, modify or rescind [*40] amendments to the StaffPlan, her decision to "rescind" the 1992 amendment is entitled to no deference and *de novo* review should be the standard in determining the amendment's validity. In this regard, plaintiffs primarily rely on Article I, § 21 of the Staff Plan, which states that the "Employer," namely, according to plaintiffs, MEBA/NMU, had the power to amend the StaffPlan at any time by written amendment. While conceding that Hart, as Plan Administrator, had the "exclusive right to interpret the Plan" as well as the power "to decide any matter arising . . . in connection with the administration of the Plan," pursuant to Article I, § 16, plaintiffs nevertheless maintain that there is no textual support in the plan document itself for Hart's unilateral disavowal of the 1992 amendment. [12]

> 12   Plaintiffs' concession is well taken, indeed. "'Discretion is not an all-or-nothing proposition. A plan can give an administrator discretion with respect to some decisions, but not others . . . . A plan administrator has exactly the amount and type of discretion granted by the plan, no more, and no less.'" *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir.) (quoting *Anderson v. Great West Life Assurance Co.*, 942 F.2d 392, 395 (6th Cir. 1991)), *cert. denied*, 513 U.S. 1058 (1994); *see also Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 1997 WL 361172 (1st Cir. 1997). Clearly then, Hart's *interpretation* of the amendment, assuming it is indeed a part of the StaffPlan, would be entitled to deferential review by a court. Thus, if after trial on the merits of the threshold question, a determination is reached that the 1992 amendment is a part of the StaffPlan, I expect to remand the benefit determination question to the Plan Administrator for a fresh, "non-hypothetical" interpretation and determination of plaintiffs' entitlements under the 1992 amendment. This is appropriate because, given Hart's undeviating view that the StaffPlan has never actually contained the 1992 amendment, it follows that no Plan Administrator has ever actually applied it to the plaintiffs; only after a binding judicial determination of the threshold question will it be ripe for decision.

[*41]   For its part, defendant has accepted the plaintiffs' statement of the issues and has sought to avoid defeat largely by seeking to have the Court apply a deferential standard of review within the contemplation of Fourth Circuit denial-of-benefit jurisprudence. In keeping with that approach, defendant relies on *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 115 S. Ct. 1223, 131 L. Ed. 2d 94 (1995), for the proposition that plan administrators are implicitly vested with the discretion to rescind an amendment. In *Schoonejongen*, the Court recognized the importance of requiring an employee benefit plan to have procedures for amending the plan and for identifying persons with the authority to amend the plan. In this regard, the Court stated that "having an amendment procedure enables plan administrators, the people who manage the plan on a day-to-day level, to have a mechanism for sorting out, from among the occasional corporate communications that pass through their offices and that conflict with the existing plan terms, the bona fide amendments from those that are not." 115 S. Ct. at 1230. The Court further noted that "plan administrators appear to have a statutory responsibility [*42] actually to run the plan in accordance with the currently operative, governing plan documents and thus an independent incentive for obtaining new amendments as quickly as possible and for weeding out defective ones." *Id.* at 1231.

Thus, *Schoonejongen* certainly indicates an appreciation for the responsibilities attendant to proper plan administration, including but not limited to recognition of legitimate amendments. That case stops far short of vesting plan administrators with the a blanket "discretion" to ignore an amendment, however, where as in the instant situation, there is specific authority identified in the plan providing for an amendment procedure, namely Article I, § 21, and that procedure was at least ostensibly followed. Indeed, although the Court ultimately may determine that the MEBA/NMU DEC lacked the authority to amend the plan, or to amend the plan by its unilateral act under the circumstances of this case, it nevertheless remains clear that if, in fact, the 1992 amendment achieved binding legal effect immediately upon its adoption by the MEBA/NMU DEC, then Hart's actions did not fall within the discrete bounds of her delegated authority under the terms of [*43] the StaffPlan.

An example of a case in which a plan administrator's treatment of an amendment is subject to discretionary review may prove illustrative. In *Hutchins v. Champion Int'l Corp.*, 110 F.3d 1341 (8th Cir. 1997), Hutchins was receiving disability income through his ERISA-covered benefit plan when he was convicted of a criminal offense and sentenced to incarceration. After Hutchins went to prison, the plan administrator amended the disability plan to exclude payments to those incarcerated, and Hutchins lost 21 months of benefits, which he brought suit to recover. *Id.* at 1342. The relevant provision of the plan stated as follows: "the Company hereby reserves the right to amend or terminate the Plan at any time by action of its Board of Directors; provided, however any amendment which is *not a substantive* amendment shall be made on behalf of [the Company] by the [plan administrator]." *Id.* at 1343 (alterations and emphasis added). Furthermore, the Court observed:

> The plan provides the [plan administrator] with the "sole, absolute and uncontrolled" discretion to administer the plan and states that this includes the power to interpret its provisions. [*44] We therefore review the [plan administrator's] interpretation of its plan under an abuse of discretion standard. See *Donaho v. FMC Corp.*, 74 F.3d 894, 898 (8th Cir.1996). Since the [plan administrator] has been given discretion to interpret the terms of the plan, we may not find the interpretation invalid merely because we disagree with it, but only if it is unreasonable. *Id.* at 898-99. An interpretation is "reasonable if a reasonable person could have reached a similar decision, given the evidence before him." *Id.* at 899.

110 F.3d at 1344 (alterations and emphasis added).

Hutchins did not dispute the power of the employer to amend its plan; however, he contended that only the Board of Directors, and not the plan administrator, could effect an amendment of the type which was used to deny his benefits, because the amendment could not be deemed "not a substantive amendment," a term which the plan did not define. *Id.* at 1343. The district court granted summary judgment to Hutchins, applying a deferential standard of review, and the court of appeals, disagreeing,

reversed, finding that the plan administrator's interpretation of the controlling word "substantive" [*45] was reasonable. Of course, no comparable language can be found in the StaffPlan granting Hart the kind of interpretative power over *the amendment process*, in contrast to her power to make *eligibility determinations*, as seen in *Hutchins*.

Thus, I conclude that a plenary "standard of review" applies here, but not as to the issue of whether Hart's actions were correct or incorrect, reasonable or unreasonable, but to determine the proper construction of the StaffPlan's amendment provision by examining the actions and inactions of all the participants in this case. In other words, as to this threshold question of the validity of the 1992 amendment, I am not reviewing Hart's actions within the narrow confines of ERISA jurisprudence respecting standards and scope of review. Rather, my task is to assess and weigh whatever relevant evidence may exist, in a traditional adversarial proceeding, to determine the most appropriate interpretation of the StaffPlan, in light of the latent ambiguities inherent in the plan document, as illuminated by the structure, purpose and history of the StaffPlan.

The Court in *Bruch* plainly recognized and anticipated that this approach might be necessary [*46] in certain cases arising under ERISA. There, Justice O'Connor elaborated upon the idea that ordinary legal analysis applies to the interpretation of a written instrument in the ERISA context:

> As they do with contractual provisions, courts construe terms in trust agreements without deferring to either party's interpretation. "The extent of the duties and powers of a trustee is determined by the rules of law that are applicable to the situation, and not the rules that the trustee or his attorney believes to be applicable, and by the terms of the trust *as the court may interpret them*, and not as they may be interpreted by the trustee himself or by his attorney." 3 W. Fratcher, Scott on Trusts § 201, at 221 (emphasis added). A trustee who is in doubt as to the interpretation of the instrument can protect himself by obtaining instructions from the court. Bogert & Bogert, supra, § 559, at 162-168; Restatement (Second) of Trusts

§ 201, Comment b (1959). See also *United States v. Mason*, 412 U.S. 391, 399, 93 S. Ct. 2202, 2208, 37 L. Ed. 2d 22 (1973). The terms of trusts created by written instruments are "determined by the provisions of the instrument as interpreted in light [*47] of all the circumstances *and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible*." Restatement (Second) of Trusts § 4, Comment d (1959).

The trust law de novo standard of review is consistent with the judicial interpretation of employee benefit plans prior to the enactment of ERISA. Actions challenging an employer's denial of benefits before the enactment of ERISA were governed by principles of contract law. If the plan did not give the employer or administrator discretionary or final authority to construe uncertain terms, the court reviewed the employee's claim as it would have any other contract claim-- by looking to the terms of the plan and other manifestations of the parties' intent. See, e.g., *Conner v. Phoenix Steel Corp.*, 249 A.2d 866 (Del.1969); *Atlantic Steel Co. v. Kitchens*, 228 Ga. 708, 187 S.E.2d 824 (1972); *Sigman v. Rudolph Wurlitzer Co.*, 57 Ohio App. 4, 11 N.E.2d 878 (1937)(second emphasis added).

489 U.S. at 112-13.

*Schoonejongen* also affirmatively supports this approach. The precise issue before the Court in that case was "whether the standard provision in many employer-provided benefit [*48] plans stating that 'The Company reserves the right at any time to amend the plan' sets forth an amendment procedure that satisfies" statutory requirements. 115 S. Ct. at 1226. The Court held that such language, though admittedly bare, nonetheless satisfied the requirements imposed by Congress. *Id.* The Court noted, however, in dicta that is significant for present purposes, "we do not mean to imply that there is anything wrong with plan beneficiaries trying to prove that unfavorable plan amendments were not properly adopted and are thus invalid. *This is exactly what respondents are trying to do here, and nothing in*

*ERISA is designed to obstruct such efforts.*" *Id.* at 1231 (emphasis added). The Court further reasoned as follows:

> Having determined that the Curtiss-Wright plan satisfies § 402(b)(3), we do not reach the question of the proper remedy for a § 402(b)(3) violation. *On remand, the Court of Appeals will have to decide the question that has always been at the heart of this case: whether Curtiss-Wright's valid amendment procedure--amendment "by the Company"--was complied with in this case. The answer will depend on a fact-intensive inquiry, under applicable corporate* [*49] *law principles, into what persons or committees within Curtiss-Wright possessed plan amendment authority, either by express delegation or impliedly, and whether those persons or committees actually approved the new plan provision* contained in the revised SPD. See 2 W. Fletcher, Cyclopedia of the Law of Private Corporations § 444, pp. 397-398 (1990) (authority may be by express delegation or it "may be inferred from circumstances or implied from the acquiescence of the corporation or its agents in a general course of business"). If the new plan provision is found not to have been properly authorized when issued, the question would then arise whether any subsequent actions, such as the executive vice president's letters informing respondents of the termination, served to ratify the provision *ex post*. See id., § 437.10, at 386.

*Id.* (emphasis added). Accordingly, in my view, if there is nothing "wrong with plan beneficiaries trying to prove that unfavorable plan amendments were not properly adopted and are thus invalid," then it follows that a plan administrator, acting on behalf of plan beneficiaries and other employers in a multi-employer plan, surely may resist an [*50] unfunded increase in benefits awarded to a small cadre of loyal lieutenants to a corrupt leadership by challenging the validity of the amendment on which that group relies, in an action by them to enforce the terms of the amendment. [13]

13   Plainly, Hart could have brought suit and sought a declaratory judgment in 1993 as to the effectiveness of the 1992 amendment under the federal question jurisdiction provided by 28 U.S.C. § 1331 and the Declaratory Judgment Act, 28 U.S.C. § 2201(a). *See DeFries*, 943 F.2d at 477, citing *Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985 (4th Cir.), *cert. denied*, 498 U.S. 982, 112 L. Ed. 2d 524, 111 S. Ct. 512 (1990).

**B. The Contentions of the Parties**

Defendant advances two principal reasons why the 1992 amendment is void, although, consistent with the views expressed above, they are recast here as arguments addressed to this Court rather than as arguments in support of any discretion enjoyed by Hart, as Plan Administrator. First, defendant maintains [*51] that the MEBA/NMU DEC did not have the authority to amend the StaffPlan in 1992. Second, defendant claims that the terms of the 1992 amendment were so inherently harmful to the Plan and its participants, and its aim so manifestly antithetical to the StaffPlan's purpose, that the MEBA/NMU DEC lacked the authority to adopt this particular amendment. I consider each of these claims in turn, and conclude that summary judgment is inappropriate.

**1. Authority**

With respect to the issue of authority to amend the StaffPlan, defendant largely concedes that in 1988, and continuing until December 1990, the leadership of MEBA/NMU and that of the Licensed Division were the same. Thus, there was no reason to suspect that MEBA/NMU might not be the rightful entity to direct the StaffPlan. According to defendant things changed significantly, however, when the membership of the Licensed Division elected new leaders who began to challenge "both the leadership of MEBA/NMU and the legitimacy of the merger itself." Df's Reply Mem. at 12. Thereafter, in defendant's view, the Contract Holder under the StaffPlan was the Licensed Division, which after withdrawing its recognition of MEBA/NMU as a legitimate [*52] entity in January 1992, began using the name District No. 1-PCD, MEBA. Moreover, defendant points out, Hart always interpreted the plan document (and it should be so interpreted by this Court) to give the Contract Holder the sole authority to amend the plan. 14

14   According to defendant, the plan document should be interpreted in this manner because while the "Contract Holder" has the independent authority to amend the Plan, the "Employer" includes more than one entity, and they all would be required to act to effectuate an amendment. Df's Reply Mem. at 14.

Relatedly, defendant contends that the Fourth Circuit's determination in *Licensed Division Dist. No.1 MEBA/NMU, AFL-CIO v. DeFries*, that the Licensed Division was "the Union" for purposes of appointing trustees to the MEBA Benefit Plans is evidence that the MEBA/NMU DEC lacked the authority to effect the amendment. 15

15   The MEBA Benefit Plans were the MEBA Pension Trust, the MEBA Medical Plan, the MEBA Vacation Plan and the MEBA Training Plan. As plaintiffs point out, while *DeFries* examined the effect of the merger between District No. 1-PCD and NMU, the StaffPlan was not even considered in that case. Thus, defendant's reliance on *DeFries* is attenuated.

[*53] There are significant difficulties with defendant's position, to be sure. First, Hart concedes that the Licensed Division was never listed as either the "Employer" or the "Contract Holder" in the plan document.

> Q. Was the Licensed Division, capital L, capital D, ever listed as the employer or plan sponsor or the contract-holder under the StaffPlan?
>
> A. On what?
>
> Q. On any document, any writing, to your knowledge?
>
> A. No.

Hart Depo. at 119. Hart also conceded at one point that MEBA/NMU held both of these positions.

> Q. I think you used the term "contract holder" before. Do you know whether that was a define [sic] term under the StaffPlan's plan document?
>
> A. I think it was.

Q. The term "Employer" that I used, it was capitalized. Who was the contract-holder under the plan, the StaffPlan in 1988 after the merger creating the MEBA/NMU had gone into effect?

A. I believe the plan document was not changed to change the name, that the plan document still had the name District No. 1, Pacific Coast District, MEBA. But in 1988, the successor entity at that time would have been the MEBA/NMU.

Q. In 1988, then, would MEBA/NMU have been the [*54] Capital C, Contract Holder under the StaffPlan?

A. Yes.

Hart Depo. at 54-55. As harmful as they are, however, these admissions are not binding on defendant. More importantly, they certainly do not bind this Court as a matter of law to adopt the view expressed by Hart.

In any event, plaintiffs argue that the mere fact that the Licensed Division was mounting a challenge to the legitimacy of the merger is an insufficient basis on which to conclude that MEBA/NMU was no longer the proper governing body. Nevertheless, events that transpired shortly after passage of the 1992 amendment proved that the union merger was procured through gross fraud. Plaintiffs argue strenuously that this evidence is wholly irrelevant to the real issues before this Court. Plaintiffs may be quite right. I am not, however, prepared to say on the record as it exists presently, that they are right as a matter of law. *See supra* n. 5.

Defendant also makes a strong argument that although the plan document inexplicably uses the term "Employer" in the section creating the right to amend, in fact the "Employer" named in the Staff Plan consisted, in October 1992, of the following entities, in addition [*55] to MEBA/NMU: PATCO; Joint Maritime Congress; Benefit Plan, Radio Officers Union; MEBA Medical and Benefits Plan; MEBAR Realty Holding Trust; Radio Officers Union District No. 3, MEBA; ROU Maritime Electronic Trading School; and NATCA. In my judgment, a genuine dispute of material fact exists as to the actual authority for the exercise of the power to amend granted to the "Employer." The plausible argument that the "Contract Holder" could amend unilaterally, but that action by fewer than all of the constituent entities encompassed by the singular "Employer" required joint action or, alternatively, the concurrence of the Plan Administrator, cannot be rejected as a matter of law on this record.

The language set forth in Article III, § 10 supports the conclusion that the StaffPlan is ambiguous. Section 10 provides:

The John Hancock shall deal exclusively with the Plan Administrators with respect to those matters in this Contract so designated and with respect to any other matters pertaining to the control and management of the operation and administration of the Plan, and shall deal exclusively with the Contract Holder with respect to all other matters under this Contract. [*56] *The Plan Administrators and Contract Holder shall act for and on behalf of each Employer in any matter pertaining to this Contract and each such act shall be binding on each Employer.*

Hart Aff., Exh. A at III-4.0 (emphasis added). This language is readily susceptible to an interpretation whereby the Plan Administrator, acting on behalf of "*each* Employer," should be recognized as having a role in the effectuation of an amendment whose unavoidable effect will be to increase the costs of the StaffPlan for some employers for the benefit of a small group of employees of other employers. *See infra* pp. 36-38.

Plaintiffs vigorously counter the contention that action by "each employer" was needed for an effective amendment by arguing that it is "flatly untrue," Pls' Reply Mem. at 17, and note that in the history of the StaffPlan, according to the record as it now stands, there is no indication that any entity other than District No. 1, as it evolved over time, was instrumental in effectuating amendments. This rejoinder simply points up that this is the first time the issue has found its way into a legally adversarial context. It is obvious that no other amendment in the [*57] history of the StaffPlan was on a par with the 1992 amendment.

Similarly, none of the plaintiffs' other contentions demonstrate their entitlement to judgment *as a matter of law* on the issue of authority. Contrary to plaintiffs'

assertion, defendant clearly is permitted to argue, even if somewhat inconsistently, that only the Licensed Division had amendment authority, on the one hand, but advance as well the contention that the MEBA/NMU DEC could not exercise amendment authority unilaterally. Likewise, the scant evidence in the record of the history of arguably similar instances of union largess fails to aid plaintiffs in the summary judgment context. As to the contention that plaintiff Fisher's supervisor, Browne, received substantially identical treatment as the plaintiffs seek under the 1992 amendment, the contention is simply not borne out by the record. At best, the record shows that through an act of raw executive power, Browne was rewarded with three additional years of service credits. This result, which occurred in 1984 while District No. 1 was acting as both sponsor and fiduciary, and which was achieved without leaving a paper trail, was certainly not accomplished with [*58] the help or acquiescence of an independent Plan Administrator. Moreover, it is undisputed even by plaintiffs that the award of past service credits to Browne did not result from an amendment to the plan document.

Finally, on the one occasion (involving NATCA) when past service credits *were* provided for, immediate arrangements were made for funding by the affected employer. In this case, as mentioned above, part of plaintiffs' claims relate to service with a federal governmental agency, that is, for service with an entity never contemplated as likely to become an employer under the StaffPlan. Thus, the strength of plaintiffs' contentions in all of these regards is properly to be measured on the whole evidentiary record after trial; these contentions most assuredly do not render a trial unnecessary.

Accordingly, I conclude that the StaffPlan is ambiguous as a matter of law, largely for the reasons stated by Judge Easterbrook in an analogous context.

> Where does the interpretation of pension plans and other agreements fit into this scheme? The answer within the world of litigation would be: It depends. Both the declaration of trust establishing the Plan and the Association Agreement [*59] are contracts. When a contract is clear, a court declares its meaning as a matter of law. When a contract is ambiguous, a court sends questions of interpretation to the

trier of fact. *RTC v. M & L Investments*, 984 F.2d 190, 193 (7th Cir.1993); *Woodbridge Place Apartments v. Washington Square Capital, Inc.*, 965 F.2d 1429, 1439 (7th Cir.1992). And the existence of ambiguity can present formidable problems. Pension agreements do not get to be ambiguous because of parol evidence, such as the fact that an employer joined with its fingers crossed behind its back, *Central States Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir.1989) (in banc), or because of statements people made to each other about the meaning of otherwise-clear documents, see *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608, 616 (7th Cir.1993) (in banc). Still, ambiguous language (intrinsic ambiguity) or an unexpected application of language that appears clear in its linguistic context (extrinsic ambiguity) may pose problems for a trier of fact. *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620-21 (7th Cir.1989).

*Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, [*60] 3 F.3d 994, 999 (7th Cir. 1993), *aff'd*, 513 U.S. 414, 130 L. Ed. 2d 932, 115 S. Ct. 981 (1995). *See also Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132 (3rd Cir. 1993)(term "each employee" ambiguous in collective bargaining agreement requiring payment into multi-employer employee benefit plan); *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 96 (3rd Cir. 1992)(interpretation of benefit plan requires resolution of factual question of intent). *See also Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820,    , 1997 WL 361172, *23 (1st Cir. 1997)("As a general rule (independently of the special characteristics of ERISA claims cases), disputes over interpretation of a document (or set of documents taken together as a unit) are decided as matters of law are decided.").

## 2. Harm to the Plan

Defendant's other principal argument in support of the invalidity of the 1992 amendment is that because the terms of the amendment were so inherently harmful to the Staff Plan and its participants, under the circumstances of its adoption by MEBA/NMU, the

amendment could not be effective without Hart's concurrence. [*61] Specifically, defendant maintains that even if the MEBA/NMU DEC had the authority ordinarily to amend the StaffPlan unilaterally, the 1992 amendment may nonetheless appropriately be rejected because it will have an incalculable adverse actuarial impact on the Plan.

A primary purpose of ERISA is, of course, to "'protect ... the interests of participants in employee benefit plans and their beneficiaries, ... by establishing standards of conduct, responsibility, and obligations for fiduciaries ....'" *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1468 (4th Cir. 1996)(quoting 29 U.S.C. § 1001(b)). Correspondingly, "attempts to prevent unanticipated costs that may limit the resources of an employee benefit plan are among the proper concerns of a plan's administrator." *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 825 (11th Cir.), *cert. denied*, 467 U.S. 1242, 82 L. Ed. 2d 823, 104 S. Ct. 3514 (1984). Administrators accomplish this goal, in part, by relying on "the advice of professional actuaries and accountants." *Whipp v. Seafarers Vacation Plan*, 832 F.2d 853, 857 (4th Cir. 1987).

In the case *sub judice*, the 1992 amendment provided that past service credit [*62] be given to all participants for each year of service as an employee or officer of (i) PASS; (ii) PATCO or its subordinate bodies; (iii) POID or its subordinate bodies; (iv) service with a contracted employer of MEBA/NMU or one of its affiliates; and (v) AFGE or its subordinate bodies. Yet, it is undisputed that no one knew precisely what this language meant or how it would affect the StaffPlan. In fact, Frank Katz ("Katz"), the StaffPlan's actuary, wrote to Hart after receiving a copy of the amendment expressing concerns about the effect of the amendment on the StaffPlan. Katz stated, *inter alia*, that because he had no information about the "subordinate bodies" of PATCO, POID and AFGE, it was impossible to determine the actuarial impact of the amendment on the Plan. Tellingly, *at their respective depositions, neither Johannssen, nor Michael Derby ("Derby"), counsel for MEBA/NMU at the time of the amendment and who had a direct hand in drafting it, or even Cullison, for that matter, knew what the subordinate bodies of these three organizations were.*

Katz also stated that he did not know the meaning of the language giving past service credit to any participant with "service [*63] with a contracted employer of

MEBA/NMU or one of its affiliates" but that "its effect could be significant." Hart Aff., Exh. E. Moreover, in response to questions concerning this portion of the amendment language, Cullison testified that the "MEBA had hundreds of contracted employers" and "a lot of affiliates." Cullison Depo. at 22. Relatedly, in her deposition, Hart noted that "the amendment talks about service with a contracted employer of District No. 1-MEBA/NMU, which leaves open to me any employer who had a contract with that entity, any shipping company. I could not guess how many employees would be covered, but there could be many, many." Hart Depo. at 229.

Not surprisingly then, when Hart first contacted Harootunian at John Hancock, after learning of the amendment, she advised him that such an amendment "would have significant cost implications to the plan." *Id.* at 104. Thus, it is unclear whether Hart, in fact, had a designated role to play in the context of effectuating the 1992 amendment. Stated differently, it cannot be said as a matter of law that the effectiveness of the 1992 amendment was shorn of any fiduciary role on the part of the Plan Administrator to the StaffPlan [*64] participants and beneficiaries, as well as to "each Employer." Based upon the amendment's language, it is simply impossible to determine the number of participants who may be eligible for past service credits, because the amendment, by its terms, is not limited to plaintiffs.

For their part, plaintiffs argue that "in the four-and-a-half years since the 1992 Amendment was passed, the only StaffPlan participants ever identified as eligible were [Johannssen, Long and Fisher] and another PASS employee named Abby Bernstein" Pls' Mem. in Opp. to Df's Cross Mot. for Summ. J. at 23. Here, plaintiffs miss the mark. The plan administrator, as a fiduciary under ERISA, quite logically has an obligation to consider not just the ascertained costs of amendments to his or her plan, but to consider the *potential* costs as well. [16] *See* 29 U.S.C. § 1104(a) ( "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-- (A) for the exclusive purpose of: (i) *providing benefits to participants and their beneficiaries*[.]")(Emphasis added). In sum, because of the vague wording of the 1992 amendment itself, there appears [*65] to be no truly reliable basis on which to determine the ultimate cost to the StaffPlan. Thus, in the summary judgment context, the fact that no other persons have come forward to claim

1997 U.S. Dist. LEXIS 14351, *65
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

the bounty of the 1992 amendment is not dispositive. Full factual development is required.

16 In early 1991, Katz calculated the cost of giving three PASS employees, Long, Johannssen and Bernstein, full past service credits in the StaffPlan. The result of these calculations showed that it would cost the plan approximately $ 550,000 for these three participants. If amortized over 30 years, the cost would be approximately $ 33,900. With respect to Ms. Fisher, the total present value of amending the StaffPlan for her was calculated at between $ 102,000 and $ 220,000, depending on when she retired.

To be sure, the question of whether this Court has any power to inquire into the *propriety* of the 1992 amendment, as apart from its *procedural regularity*, is problematic, at best. 17 Plaintiffs have cited a host of cases in which [*66] participants and/or beneficiaries were not allowed to resort to equitable estoppel principles to obtain benefits that the plain language of a benefit plan, or the permitted though harsh interpretation of a plan's provisions by the plan fiduciary, otherwise denied them. *See, e.g., Healthsouth Rehabilitation Hosp. v. American Nat'l Red Cross*, 101 F.3d 1005 (4th Cir. 1996), *cert. denied*, 138 L. Ed. 2d 194, 117 S. Ct. 2432 (1997); *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54 (4th Cir. 1992), *cert. denied*, 506 U.S. 1081, 122 L. Ed. 2d 359, 113 S. Ct. 1051 (1993). 18 Nevertheless, whether a federal court is powerless, in adjudicating a defense to an outlandishly generous award of benefits made by a rogue band of union leaders in an act seemingly consonant with a demonstrable scheme to loot the union of its revenue and assets, is a question that simply has not been answered in any case cited to or found by this Court. The Supreme Court and the Fourth Circuit, however, have recognized the need to develop rules of decision for cases that arise in the interstices of ERISA's statutory mandates:

ERISA abounds with the language and terminology of trust law. See, e.g., [*67] 29 U.S.C. §§ 1002(7) ("participant"), 1002(8) ("beneficiary"), 1002(21)(A) ("fiduciary"), 1103(a) ("trustee"), 1104 ("fiduciary duties"). ERISA's legislative history confirms that the Act's fiduciary responsibility provisions, 29 U.S.C. §§ 1101-1114, "codify and make applicable

to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts." H.R.Rep. No. 93-533, p. 11 (1973), U.S.Code Cong. & Admin.News 1974, pp. 4639, 4649. Given this language and history, we have held that courts are to develop a "federal common law of rights and obligations under ERISA-regulated plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S. Ct. 1549, 1558, 95 L. Ed. 2d 39. See also *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 24, n. 26, 103 S. Ct. 2841, 2854, n. 26, 77 L. Ed. 2d 420 (1983) ("'[A] body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans'") (quoting 129 Cong.Rec. 29942 (1974) (remarks of Sen. Javits)).

*Bruch*, 489 U.S. at 110. *See also Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985 (4th Cir.)(recognizing federal [*68] common law of unjust enrichment under ERISA), *cert. denied*, 498 U.S. 982, 112 L. Ed. 2d 524, 111 S. Ct. 512 (1990). Whether the facts of this case will bring it within the scope of this narrow authority to develop a federal common law necessary to the complete effectuation of Congress's aims in enacting ERISA simply cannot be determined at this time on the present record. The plaintiffs correctly emphasize in their arguments that they have not been shown to have been involved in any wrongdoing and that, as a matter of law, the MEBA/NMU DEC did not act as fiduciaries in its endeavor to reward plaintiffs, but merely as a trust "settlor" enjoying expansive authority over the terms of the StaffPlan. This is a compelling argument, of course, but it should be a first principle of ERISA jurisprudence that "'the trustee [i.e., the plan administrator] must hold the settlor to [his] obligation." *Central States, Southeast and Southwest Areas Pension Fund v. Central Transp., Inc.*, 472 U.S. 559, 572, n. 13, 86 L. Ed. 2d 447, 105 S. Ct. 2833 (1985). A full factual development of these and all of the issues discussed above is necessary, in my judgment, to inform the Court as to the rule [*69] of decision that should be applicable in this case of first impression.

17 Of course, the most straightforward challenge would be a claim that the 1992 amendment

1997 U.S. Dist. LEXIS 14351, *69
2006-2 U.S. Tax Cas. (CCH) P50,484; 98 A.F.T.R.2d (RIA) 5669

violates ERISA, and defendant attempts to mount such a challenge by arguing that *any attempt to comply with the 1992 amendment* would violate ERISA. The argument is that, because other union benefit plans in which the plaintiffs are "parties in interest" are employers under the StaffPlan, the StaffPlan is precluded from assessing against those plans the costs necessary to pay to plaintiffs the enhanced benefits awarded them under the 1992 amendment; such an assessment, defendant contends, would constitute a "prohibited transaction." *See* Df's Mem. in Supp. of Cross Mot. for Summ. J. at 44-46, citing *Landwehr v. DuPree*, 72 F.3d 726, 733-35 (9th Cir. 1995). This strained argument must be rejected for present purposes: it is based entirely upon speculation as to how the enhanced benefits might be funded *in fact*, and in any event is not supported by extant caselaw. *See Spink*, 116 S. Ct. at 1788-92(explicating "prohibited transaction" provisions of ERISA). Nevertheless, the contention points up the critical need to explore fully the factual and legal milieux which inform the proper interpretation of the StaffPlan's amendment provisions, as well as the financial implications of the 1992 amendment, in light of the text, structure, purpose and history of the StaffPlan.

[*70]

18     Nevertheless, plaintiffs have stressed repeatedly that their claims to past service credits rest in large measure on some notion of detrimental reliance. *See supra* pp. 17-20.

## V. Conclusion

For the reasons discussed above, I shall deny the motions for summary judgment filed by the parties and set this matter for trial. A separate order follows.

Filed: August 8, 1997

ANDRE M. DAVIS

United States District Judge

## ORDER

In accordance with the foregoing Memorandum, it is this 8th day of August, 1997, by the United States District Court for the District of Maryland ORDERED

(1) That the cross-motions for summary judgment BE, and they hereby are DENIED; and it is further ORDERED

(2) That counsel for the parties shall confer and advise the Court on or before September 10, 1997, what, if any, additional discovery any party desires to undertake, and propose a schedule for such additional discovery.

The Clerk shall Mail a copy of the foregoing Memorandum and this Order to all counsel.

ANDRE M. DAVIS

United States District Judge

# **EXHIBIT 39**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Southern Division)

| | |
|---|---|
| PLASTERERS' LOCAL UNION NO. 96 PENSION PLAN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> HAROLD PERRY, *et al.*, <br><br> Defendants. | C.A. No. PJM 06 CV 158 |

## EXPERT REPORT OF MICHAEL D. CAIRNS

1. I am employed as the East Coast Taft Hartley Director and Senior Investment Consultant with New England Pension Consultants ("NEPC"). NEPC is an investment consulting firm founded in 1986 which services over 254 retainer clients with $250 billion in assets covering corporate, endowment, public, high net worth and Taft Hartley clients.

2. I am currently the investment consultant on eight Taft Hartley clients, with thirteen plans (defined benefit, defined contribution, health & welfare and training funds), for NEPC with asset values ranging from $4 million $1.6 billion.  Within those thirteen plans, I currently consult on three defined benefit plans with assets in excess of $1 billion and two defined benefit plans with assets in excess of $600 million.

3. I have eighteen years of investment and benefits consulting experience as a fiduciary in the Taft-Hartley market.  Prior to joining NEPC, I was a Senior Investment Consultant at The Marco Consulting Group ("MCG") from 2001-2006, the largest investment consulting firm dedicated to the Taft Hartley market with assets under advisement of $80 billion.  While at MCG, I was the lead Investment Consultant on over 20 client relationships which had over $4 billion in total assets.  Prior to joining MCG, I was employed at Milliman & Robertson Inc., a leading actuarial firm, from 1997 to 2001 as a Benefits Consultant on both pension and welfare plans for the Taft-Hartley unit of Milliman & Robertson, Inc.  Prior to Milliman & Robertson Inc., I was spent over five years, 1991 to 1997, as the Regional Manager for Zenith Administrators, Inc., one of the nation's leading third party administrators of Taft-Hartley benefit plans.  Prior to my involvement in the multi-employer (Taft Hartley) arena, I worked in the public accounting field. I am a Certified Employee Benefit Specialist ("CEBS") and I am a member of the International Society of Certified Employee Benefit Specialists ("ISCEBS").

4. I am a regular speaker at educational conferences covering investment consulting, including the Enhanced Income for Retirement by Education, The Marco Consulting Group's Client Conference, the NEPC Client Conference and the International Foundation of Employee Benefit Plans, covering topics such as international investing, private equity, investing for pension and health & welfare funds and hedge funds.

1

## Summary of Findings

5. It is my understanding that from at least 1994 through early 2005, the Plasterers' Local Union No. 96 Pension Plan ("Plasterers' Plan") had virtually all of the Plan assets invested in certificates of deposits, money market or cash equivalents. Such an allocation does not constitute a prudently diversified portfolio under the Employees Retirement Income Security Act ("ERISA") of 1974.

6. Diversification is not only mandated by ERISA, it is the best tool for achieving an appropriate balance between investment risk and return. Diversification is the process of spreading assets among different investments, securities, issuers, maturity dates and localities in order to minimize the portfolio's exposure and to distribute the risk of the portfolio. A fund can reduce its risk through diversification simply by holding investment instruments which are not perfectly correlated. In other words, a fund can reduce its exposure to asset class risk by holding a diversified portfolio of asset classes, such as stocks, bonds, etc. Diversification will allow for the same portfolio return with reduced risk. For diversification to work, the component assets must not be perfectly correlated, which means their return patterns do not move together and would react differently to the same event. A blending of these asset types with different patterns reduces volatility and can increase investment return.

7. Diversification of a fund is done through the asset allocation process. Asset allocation is the primary determinant contributing to the long term success of a fund. The purpose of asset allocation is to determine the efficient allocation, or spreading, of asset classes (stocks, bonds, etc.) and provide a solid foundation for diversifying a fund's investable assets across these asset classes. The purpose of diversification is not primarily to increase returns, but to achieve a desired level of return with a lower amount of risk. An appropriate asset mix, or allocation, is one which offers the high probability of achieving an investment return that is expected to fund the benefit levels promised by a fund and do so with a high level of diversification and at the lowest possible risk level. This is the ultimate goal of asset allocation.

8. Much of what we know about asset allocation and diversification is based on the Modern Portfolio Theory ("MPT"), which was developed by Harry Markowitz and published under the title "Portfolio Selection" in the 1952 Journal of Finance. In general, the MPT, which was first developed for a "stock" only portfolio, shows the risk of a diverse portfolio of individual stocks will be less than the inherent risk in holding any single one of the individual stocks. It was later expanded to show how the MPT could be applied to asset allocation as a whole. MPT showed how "unsystematic risk", which common sources are business risk and financial risk, can be

diversified away by investing in various asset classes that are not all affected the same way by market events, meaning they are uncorrelated. As described above, this is the basis of diversification.

9. The Trustees of the Plasterers' Local Union No. 96 Pension Plan should have used prudent diversification of the Plan's assets to eliminate or reduce risk by investing in higher yielding asset classes, such as the broad market S&P 500 (stocks) and the Lehman Aggregate (bonds), both of which are appropriate asset classes for the Plasterers' Plan, over the period beginning January 1, 1994 through December 31, 2005.

10. A prudent asset allocation mix of a 50% S&P 500 and 50% Lehman Aggregate, which is an appropriate mix of asset classes for the Plasterers' Plan in which to add income and appreciation while also retaining principal, for the period under review ending December 31, 2005, in lieu of cash, as the Plan was invested in, would have led to an approximate market value of assets on December 31, 2005 of $3,500,159.00, with a beginning market value at January 1, 1994 of $1,260,967.00 or $3,835,383.00 on December 31, 2005, assuming the reversions to employers of $120,768.00 are added to the January 1, 1994 beginning market value to equal $1,381,735.00. These approximations do not take into consideration benefit and administrative payouts.

11. Based on my eighteen years of experience, serving as a fiduciary to Taft Hartley pension plans, it is my opinion that a prudent asset mix for the Plasterers' Plan would have been 50% S&P 500 and 50% Lehman Aggregate. This prudent allocation of the Plasterers' Plan assets would have effectively increased the market value of the assets significantly, as set forth in the attached charts, in order to cover the administrative expenses of the Plasterers' Plan and to provide a reasonable level of benefits for the Plasterers' participants.

Respectfully Submitted,


Michael D. Cairns, CEBS
June 25, 2007

# Prudent Asset Allocation – Exhibit A

- On January 1, 1994, the audited statement of market value of assets was $1,260,967

- Prudent asset allocation mix:
  - 50% S&P 500 / 50% LB Aggregate

- Estimated market value of assets for prudently allocated assets (using actual returns):

| Date | 50% S&P 500 / 50% LB Aggregate |
|---|---|
| Jan-94 | $1,260,967 |
| Dec-94 | $1,250,812 |
| Dec-95 | $1,600,478 |
| Dec-96 | $1,814,047 |
| Dec-97 | $2,204,347 |
| Dec-98 | $2,614,969 |
| Dec-99 | $2,879,255 |
| Dec-00 | $2,915,399 |
| Dec-01 | $2,865,058 |
| Dec-02 | $2,695,514 |
| Dec-03 | $3,137,568 |
| Dec-04 | $3,376,109 |
| Dec-05 | $3,500,159 |

| Date | Actual Market Values |
|---|---|
| Jan-94 | $1,260,967 |
| Dec-94 | $1,178,602 |
| Dec-95 | $1,304,938 |
| Dec-96 | $1,398,573 |
| Dec-97 | $1,238,796 |
| Dec-98 | $1,178,578 |
| Dec-99 | $1,319,108 |
| Dec-00 | $1,387,079 |
| Dec-01 | $1,571,668 |
| Dec-02 | $1,665,343 |
| Dec-03 | $1,628,599 |
| Dec-04 | $1,717,595 |
| Dec-05 | $1,929,843 |

| Date | Actual Investment Return |
|---|---|
| Jan-94 | NA |
| Dec-94 | $36,636 |
| Dec-95 | $69,550 |
| Dec-96 | $62,580 |
| Dec-97 | $61,349 |
| Dec-98 | $59,204 |
| Dec-99 | $47,406 |
| Dec-00 | $65,131 |
| Dec-01 | $58,582 |
| Dec-02 | $25,006 |
| Dec-03 | $7,610 |
| Dec-04 | $8,240 |
| Dec-05 | $43,031 |



# Prudent Asset Growth





# Prudent Asset Allocation – Exhibit B

- On January 1, 1994, the audited statement of market value of assets, assuming forfeitures of $120,768 were added to equal $1,381,735

- Prudent asset allocation mix:
  - 50% S&P 500 / 50% LB Aggregate

- Estimated market value of assets for prudently allocated assets (using actual returns):

| Date | 50% S&P 500 / 50% LB Aggregate |
|------|-------------------------------|
| Jan-94 | $1,381,735 |
| Dec-94 | $1,370,608 |
| Dec-95 | $1,753,762 |
| Dec-96 | $1,987,786 |
| Dec-97 | $2,415,466 |
| Dec-98 | $2,865,416 |
| Dec-99 | $3,155,013 |
| Dec-00 | $3,194,619 |
| Dec-01 | $3,139,457 |
| Dec-02 | $2,953,675 |
| Dec-03 | $3,438,065 |
| Dec-04 | $3,699,452 |
| Dec-05 | $3,835,383 |

| Date | Actual Market Values |
|------|---------------------|
| Jan-94 | $1,260,967 |
| Dec-94 | $1,178,602 |
| Dec-95 | $1,304,938 |
| Dec-96 | $1,398,573 |
| Dec-97 | $1,238,796 |
| Dec-98 | $1,178,578 |
| Dec-99 | $1,319,108 |
| Dec-00 | $1,387,079 |
| Dec-01 | $1,571,668 |
| Dec-02 | $1,665,343 |
| Dec-03 | $1,628,599 |
| Dec-04 | $1,717,595 |
| Dec-05 | $1,929,843 |

| Date | Actual Investment Return |
|------|-------------------------|
| Jan-94 | NA |
| Dec-94 | $36,636 |
| Dec-95 | $69,550 |
| Dec-96 | $62,580 |
| Dec-97 | $61,349 |
| Dec-98 | $59,204 |
| Dec-99 | $47,406 |
| Dec-00 | $65,131 |
| Dec-01 | $58,582 |
| Dec-02 | $25,006 |
| Dec-03 | $7,610 |
| Dec-04 | $8,240 |
| Dec-05 | $43,031 |



# Prudent Asset Growth

## Market Value of Assets





# Appendix

## Actual Calendar Year Returns

| Year | S&P 500 | LB Aggregate |
|------|---------|--------------|
| 1994 | 1.31% | -2.92% |
| 1995 | 37.44% | 18.47% |
| 1996 | 23.07% | 3.62% |
| 1997 | 33.36% | 9.68% |
| 1998 | 28.58% | 8.68% |
| 1999 | 21.05% | -0.83% |
| 2000 | -9.12% | 11.63% |
| 2001 | -11.89% | 8.44% |
| 2002 | -22.11% | 10.27% |
| 2003 | 28.69% | 4.11% |
| 2004 | 10.87% | 4.33% |
| 2005 | 4.92% | 2.43% |



# EXHIBIT 40

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Southern Division)

| | |
|---|---|
| PLASTERERS' LOCAL UNION NO. 96 PENSION PLAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> HAROLD PERRY, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) )  C.A. No. PJM 06 CV 158 |

## EXPERT REPORT OF HENRY ROSE

1.      I am an attorney in independent practice specializing in
employee benefits law.  From March 1985 through December 1992, I was a partner and
chair of the Employee Benefits Department of the law firm of Epstein Becker & Green.
From January 1, 1993 to January 31, 1995, I was Of Counsel to that law firm.  Since
February 1, 1995, I have been engaged in the independent practice of law.  My practice
includes, inter alia, counseling clients and attorneys regarding compliance with the
Employee Retirement Income Security Act of 1974, as amended ("ERISA"), particularly
on fiduciary issues.  My practice is limited to the specialty of employee benefits law.

2.      I held the position of General Counsel of the Pension Benefit
Guaranty Corporation ("PBGC") from its inception on September 2, 1974 through
January 4, 1985.  In this position, I was responsible for providing advice to PBGC

January 4, 1985. In this position, I was responsible for providing advice to PBGC officials, including in connection with PBGC's fiduciary responsibilities arising from its trusteeship of hundreds of defined benefit pension plans. In addition, I managed all legal matters, including PBGC litigation on fiduciary issues in coordination with the Department of Labor. The PBGC is a wholly owned corporation of the United States and its board of directors consists of the Secretary of Labor as Chairman, the Secretary of the Treasury and the Secretary of Commerce. I served as secretary to the Board of directors.

3.      I held the position of Associate Solicitor for Legislation and Legal Counsel at the U.S. Department of Labor from 1970 through 1974. My responsibilities in this position included being the Labor Department's lead draftsman of Titles I and IV of ERISA. Title I includes the statute of limitations provision relating to actions for breach of fiduciary obligations. I was also the Department's technical liaison to the relevant committees of the Congress (House Labor and Education Committee, House Ways and Means Committee, Senate Labor Committee and Senate Finance Committee) in connection with the genesis of ERISA. I had frequent contact with Congressional committee staff and occasional contact with members of those committees. I also had responsibility to oversee testimony of the Secretary of Labor and other officials of the Department of Labor and attended the Congressional committee hearings at which the testimony was presented.

4.     A copy of my curriculum vitae is attached to this report and is incorporated herein as attachment A.

5.     I was Chairman of the American Bar Association's Joint Committee on Employee Benefits, 1995-1996.   I am regularly involved in the exchange of information among employee benefits specialists (in private practice and in the Government).  Among the occasions for such exchanges of information are meetings of the following groups of which I am a member:

Employee Benefits Committee,  Section of Tort and Insurance Practice, American Bar Association; Chairman, 1993-1994

Employee Benefits Committee, Section of Labor and Employment Law, American Bar Association;

Employee Benefits Committee, Section of Taxation, American Bar Association;

Employee Benefits Committee, Section of Real Property, Probate and Trust Law, American Bar Association;

Chapter Editor, Employee Benefits Law, ABA Section of Labor and Employment Law (BNA);

ERISA Roundtable, a group of preeminent specialists that meets monthly

6.     I have been retained as an expert witness/consultant in the following matters:

*In re Arbitration between AmEx, Inc. and Homestead Mining  Company*, AAA No. 58 199 0001 87.

*In re Arbitration between Chicago Truck Drivers Pension Fund and Louis Zahn Drug Co.*

*In re Masters, Mates and Pilots Pension Plan and IRAP Litigation*, 85 Civ. 9545 (VLB) U.S. Dist. Ct., S.D.N.Y.

*Asher Edelman v. Times Newspapers, Ltd.*, 1989 E No. 760, In the High Court of Justice, Queen's Bench Division (Great Britain)

*In re Budd Company Pension Plan Litigation*, No. 91-4082, U.S. Dist. Ct.,  E.D.Pa.

*Reich v. Pacific Lumber Company*, No. C-91-1812 and Related Case C-89-3500, U.S. Dist. Ct., N.D. Cal.

*Maher, et al. v. Strachan Shipping Company, et al.*, No. 92-2834, U.S. Dist. Ct., E.D. La.

*Bussian v. RJR Nabisco, Inc.*, No. H-91-1533, U.S. Dist. Ct., S.D. Texas.

*Calobrace v. American National Can Co.*, No. 93-C-0999, U.S. Dist. Ct., N.D. Ill.

*Reich v. Smith International, Inc.*, No. CV 92-1196, U.S. Dist. Ct., C.D. Cal.

*Maureen Rose v. Cooney, et al. and Xerox Corporation*, No. 5-92-CV-208, U.S. Dist. Ct., D. Conn.

*Hashimoto v. Bank of Hawaii, et al.*, No. 91-00090, U.S. Dist. Ct., D. Hawaii.

*Sheet Metal Workers' International Association v. Carlough, et al.*, No. 93-1593-A, U.S. Dist. Ct., E.D. Va.

*Central Maine Power Company, et al. v. State Street Bank and Trust Company*, No. 94-00150-B, U.S. Dist. Ct. of Maine.

*Averill v. Carullo*, No. 94-753-A, U.S. Dist. Ct., E.D. Va.

*Le Blanc v. Williams*, No. C95-1557-A, U.S. Dist. Ct., E.D. Va.

*In re Arbitration between Safeway, Inc. and Central States Southeast and Southwest Areas Pension Plan*, AAA No. 5-621-297-95

   7.    I argued and won two U.S. Supreme Court cases involving complex employee benefit isues:    *Nachnan Corporation v. PBGC,* 446 U.S. 359 (1980) and *Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581 (1993).

   8.    I served as a Special Master regarding ERISA fiduciary issues in *Rehab Computer, Inc. Restated Employee Money Purchase Trust, et al. v. Kenneth D. White, et al.*, Civil Action No. 84-921-A, U.S. District Court for the Eastern District of Virginia (Report of Special Master is dated April 24, 1985).

   9.    I have been retained as an expert witness and consultant on behalf of the Plaintiff in the present action.  My hourly rate in this matter is $350.

   10.    I have reviewed the documents listed in attachment B and have been asked to discuss the matters below.

   11.    I have been informed of the following:  In early 1994, the trustees and plan administrator of the Plaintiff Plan caused substantial portions of Plan assets to

be improperly transferred to contributing employers of the Plan. Further, from the inception of the Plan to 2006, the Plan's trustees and plan administrator caused the Plan's assets to be deposited solely in money market accounts or certificates of deposit.

12.     The information above was revealed in late fall 2005 and in 2006 when the Plan retained new counsel, a new auditor, a new plan administrator, and a new investment advisor.

13.     The transfer of Plan assets to employer-contributors violates a number of provisions of ERISA, including Section 403(c) which provides that "the assets of a plan shall never inure to the benefit of any employer"; Section 404(a)(1)(A) which requires that plan fiduciaries use plan assets "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and Section 406(a)(1)(D) which prohibits the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

There is an affirmative obligation on a fiduciary to correct a fiduciary breach and the failure to do so constitutes a separate fiduciary breach itself. ERISA has a special concern for breaches of fiduciary responsibility by reason of omission. Among the provisions reflecting this concern is Section 405(a)(3) of ERISA. That section specifies that a fiduciary "shall be liable for a breach of fiduciary responsibility. . .if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Such reasonable efforts may include

timely filing an action for fiduciary breach and/or reporting the breach to the Department of Labor. No such efforts were made by defendants in the present case.

      14.    The placement of the Plan's assets solely in money market accounts and certificates of deposit for over a decade is inconsistent with Section 404(a)(1)(B) which requires plan fiduciaries to exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." It is also inconsistent with Section 404(a)(1)(C) which requires "diversifying the investments of the plan so as to minimize the risk of large losses" and there were large losses of income by the imprudent placement of plan assets solely in money market accounts and certificates of deposit for more than a decade by the Plan's trustees and plan administrator. "Comparing the return on the improper investment with that of a reasonably prudent alternative" is an appropriate means of asserting damages. *Leigh v. Engle,* 858 F.2d 361, 367 (7th Cir. 1988).

    The duty to adequately examine the merits of an investment is a fundamental duty of a fiduciary at common law and under ERISA. The Third Circuit Court of Appeals in *Meinhardt v. Unisys Corporation,* 74 F. 3d 420 (3rd Cir. 1996) characterized "the duty to conduct an independent investigation into the merits of a particular investment" as "the most basic of ERISA's investment fiduciary duties." *Id* at 435. Section 409(a) of ERISA provides that "any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries...shall be personally

liable to make good to such plan any losses to the plan resulting from each such breach..."

        15.    This action is timely. Plan participants and some trustees did not learn of the serious violations of ERISA until late 2005 or in 2006 when new counsel and other new service providers were retained. I am informed that the prior service providers and certain of the trustees concealed or failed to disclose the information relating to the ERISA violations. Apart from the ERISA violations that occurred in 1994, there is a separate ERISA violation by certain trustees and the former plan administrator for failure to take appropriate action to redress the wrongdoing by former fiduciaries and by former service providers to the Plan. Section 413(1)(B) provides that "in the case of an omission" the six year statute of limitations begins to run from "the last date on which the fiduciary could have cured the breach or violation." In such a situation, "the statute of limitations for such a claim starts to run in the last year in which the plan should have taken the action it failed to take." Employee Benefits Law, Second Edition, 2006 Cumulative Supplement, at p. 565. Here, the last year in which the plan should have taken action was 2000 and therefore statute of limitations on the independent fiduciary breach of failure to take action starts to run at that time, and the present action was filed within six years of that independent fiduciary breach.

        Furthermore, "ERISA Section 413 provides that, in the case of 'fraud or concealmemt,' an action may be commenced not later than six years after the date of discovery of the breach or violation." Here, the present action was filed not only within

six years of the date of discovery, but it was filed within three years of the Plaintiffs'

knowledge of the breach.

It would be astonishing and contrary to the policy underlying ERISA if

wrongdoing fiduciaries could diminish or partially bar their liability for their wrongdoing

by remaining in their positions and failing to reveal their wrongdoing until a later time.

In light of my participation in the genesis of ERISA, it would be inconsistent with

Congressional intent to diminish the liability of the wrongdoers in such circumstances.

*See Martin v. Consultants & Administrators, Inc.* 966 F.2d 1078 (7th Cir. 1992) at fn. 12.


Respectfully submitted,

*Henry Rose*

Henry Rose


Dated: June 25, 2007

# ATTACHMENT A

# HENRY ROSE

*1627 I Street, N.W.  Suite 900  Washington, D.C. 20006*          **Telephone:** **(202) 887-0467**
                                                                    **Fax:** **(202) 887-6999**

## PROFESSIONAL EXPERIENCE

**Conner & Winters**                                       *May 1999 - Sept. 2000*
*Of Counsel*                                               *July 2004 – Present*
                                                           *Washington, D.C.*

**Ice Miller**                                             *Oct. 2000 - July 2004*
*Of Counsel*                                               *Washington, D.C*

**Independent Practice of Law**                            *Feb. 1995 - April 1999*
                                                           *Washington, D.C.*

**Epstein Becker & Green, P.C.**                           *Jan. 1993 - Jan. 1995*
*Of Counsel*                                               *Washington, D.C.*

**Epstein Becker & Green, P.C.**                           *Mar. 1985 - Dec. 1992*
*Partner and Chairman of Employee Benefits Department*     *Washington, D.C.*

**Pension Benefit Guaranty Corporation (PBGC)**            *Sept. 1974 - Dec. 1984*
*General Counsel*                                          *Washington, D.C.*

- Provided legal advice to the Board of Directors, Presidentially-appointed Advisory Committee, PBGC departments and the private sector (employers, union officials, attorneys and others).
- Managed legal department.
- Supervised litigation and participated in U.S. District Courts, Bankruptcy Courts, U.S. Courts of Appeals and U.S. Supreme Court. Negotiated settlements of cases.

**U.S. Department of Labor**                               *1970 - 1974*
*Associate Solicitor for Legislation and Legal Counsel*    Washington, D.C.

- Worked extensively on developing Titles I and IV of ERISA as the lead draftsman and liaison for the Department of Labor in the development of those portions of ERISA.
- Drafted, reviewed and commented on proposed federal legislation.
- Wrote, reviewed and edited testimony of the Secretary of Labor and other Department officials.
- Maintained liaison with Office of Management and Budget, other executive agencies, Congressional staffs and interest groups.

Other positions held at U.S. Department of Labor              *1962 - 1970*

*Deputy Associate Solicitor for Legislation and Legal Counsel*
*Deputy Associate Solicitor for Labor-Management Laws*
*Counsel for Civil Rights*
*Counsel for Pension and Welfare Plans*
*Special Assistant to the Solicitor*

# *HENRY ROSE*

*1627 I Street, N.W.  Suite 900  Washington, D.C. 20006*          *Telephone:  (202) 887-0467*
                                                                 *Fax:  (202) 887-6999*

## CAREER HIGHLIGHTS

- Drafted Titles I and IV of the Administration's proposed Employee Retirement Income Security Act (ERISA) while Associate Solicitor of the Department of Labor.

- Participated in the shaping of an important new federal termination insurance program and in the shaping of a new federal agency as General Counsel of the PBGC (1974-1984).

- Argued and won two U.S. Supreme Court cases involving complex employee benefit issues:

  *Nachman Corporation v. PBGC,*  446 U.S. 359 (1980)

  *Local 144 Nursing Home Pension Fund v. Demisay,* 508 U.S. 581 (1993)

## RETAINED AS CONSULTANT AND/OR EXPERT WITNESS
## BY OTHER LAW FIRMS, INCLUDING:

| | |
|---|---|
| Kirkland & Ellis | Chicago, IL |
| Holleb & Coff | Chicago, IL |
| Bryan Cave | St. Louis, MO |
| Arent, Fox, Kintner, Plotkin & Kahn | Washington, DC |
| Rose Law Firm | Little Rock, AR |
| Wolf, Block, Schorr  & Solis-Cohen | Philadelphia, PA |
| Morrison & Foerster | San Francisco, CA |
| McCalla, Thompson, Pyburn, Hymowitz & Shapiro | New Orleans, LA |
| Jones, Day, Reavis & Pogue | Washington, DC |
| Jenner & Block | Chicago, IL |
| Paul, Hastings, Janofsky & Walker | Los Angeles, CA |
| Highsaw, Mahoney & Clarke, P.C. | Washington, DC |
| Nixon, Hargrave, Devans & Doyle | Rochester, NY |
| Goodsill, Anderson, Quinn & Stifel | Honolulu, HI |
| Goodwin, Procter & Hoar | Boston, MA |
| Latham & Watkins | New York, NY & Chicago, IL |
| Pepper, Hamilton & Scheetz | Philadelphia, PA |
| O'Melveny & Myers | Los Angeles, CA |
| Kansas Public Employees Retirement System Litigation Group | |
| Morgan, Lewis & Bockius | New York, NY |

# HENRY ROSE

*1627 I Street, N.W.  Suite 900  Washington, D.C. 20006*　　　　　*Telephone:   (202) 887-0467*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*Fax:   (202) 887-6999*

## BAR ADMISSIONS & OTHER RELEVANT EXPERIENCE

Admitted to Practice Law:
　New York
　District of Columbia
　U.S. Supreme Court
　U.S. Courts of Appeals for the District of Columbia, 2nd, 3rd, 4th, 5th, 6th, 9th and 10th Circuits
　U.S. District Courts for the Western District of New York, Southern District of New York,
　　Western District of Tennessee and Central District of Illinois.

Special Master regarding ERISA fiduciary issues, U.S. District Court for the Eastern District of Virginia, *Rehab Computer, Inc. Restated Employee Money Purchase Trust v. Kenneth D. White,* Civil Action No. 84-921-A (Report dated April 24, 1985)

Private practice, Buffalo, New York　　　　　　　　　　　　*1953 - 1956*

National Labor Relations Board　　　　　　　　　　　　*July 1952 - Nov. 1953*

Assistant Special Counsel, (part time)
Emergency Crime Committee, Chicago City Council　　　　　*Feb. - June 1952*

## PROFESSOR/LECTURER

Guest Lecturer,
Law Schools of Harvard University, American University, Catholic University, Georgetown University, George Washington University.

Lecturer, part time,　　　　　　　　　　　　　　　　　*1968*
University of Virginia Law School

Associate Professor,　　　　　　　　　　　　　　　　*1958 - 1962*
Rutgers University Law School

Associate Professor,　　　　　　　　　　　　　　　　*1957 - 1958*
University of Toledo College of Law

Lecturer, part time,　　　　　　　　　　　　　　　　　*1954 - 1956*
University of Buffalo School of Law

Teaching Associate,　　　　　　　　　　　　　　　　*1951 - 1952*
Northwestern University School of Law

# HENRY ROSE

| | |
|---|---|
| *1627 I Street, N.W.  Suite 900  Washington, D.C. 20006* | *Telephone:  (202) 887-0467* |
| | *Fax:  (202) 887-6999* |

## EDUCATION

| | |
|---|---|
| Yale University Law School, Sterling Fellow | *1956 - 1957* |
| University of Buffalo Law School, J.D. (cum laude) | *1951* |
| University of Buffalo<br>College of Arts and Science, B.A. (cum laude) | *1950* |

## HONORS

| | |
|---|---|
| Recipient of The Jacob Javits Award for Outstanding Contribution to Retirement Security | *April 2006* |
| Charter Member, American College of Employee Benefits Counsel, American Bar Association | 2000 |
| Distinguished Career Service Award, PBGC | *1978* |
| Secretary of Labor's Career Service Award, Department of Labor | *1971* |
| Academic Visitor, London School of Economics | *1971-1972* |
| Award for Distinguished Achievement, Department of Labor | *1968* |
| Ford Foundation Research Grant | *June - Dec. 1959* |

## PUBLICATIONS & PUBLIC SPEAKING

Chapter Editor, Employee Benefits Law, ABA Section of Labor and Employment Law  (BNA 2000).

Lecture and participate in panel discussions at meetings and seminars of numerous organizations, including: American Bar Association; American Law Institute-American Bar Association; Practicing Law Institute; International Foundation of Employee Benefit Plans; International Meetings of Insolvency Insurers, Helsinki, Finland and Stockholm, Sweden.

"Fiduciary Liability Where You Least Expect It: Liability of Non-Fiduciaries," 16th Annual Joint Mid-Winter Meeting, Life, Health, Public Regulation of Insurance and Employee Benefits Committees, ABA Tort & Insurance Practice Section, January 11, 1990.

5

# HENRY ROSE

*1627 I Street, N.W.  Suite 900  Washington, D.C. 20006*          *Telephone:*   *(202) 887-0467*
                                                                    *Fax:*   *(202) 887-6999*

With Linda E. Rosenzweig. The Pension Answer Book - 1989 Supplement.  New York: Panel Publishers, 1988;  "Legal Considerations Concerning Post-Retirement Health Benefits." Topics in Total Compensation: Post Retirement Benefits.  Vol. 3, No. 2, New York: Panel Publishers,

Winter 1988;  "Legal Framework of Post-Employment Health Benefits." Prepared for the First Annual Symposium on Funding Post-Employment Health Care Benefits of the Institute for International Research, September 17-18, 1987;  " Single-Employer Pension Plan Amendments Act of 1986." Pension Briefings.  Washington, D.C.; Federal Publications, Inc., 1986.

Monograph, "Plan Termination Insurance," American Law Institute-American Bar Association Committee on Continuing Professional Education, 1978.

Article, "A Critical Look at the Hatch Act," 75 Harvard Law Review 510 (1962).

"Digest of Umpire Decisions," Chrysler-U.A.W., A.F.L.-C.I.O., 2nd edition, 1958, co-edited with Clyde W. Summers.


## PROFESSIONAL ASSOCIATIONS

American Bar Association:
    Joint Committee on Employee Benefits, Chair                                           *1995 - 1996*
    Torts and Insurance Practice Section, Chair, Employee Benefits Committee   *1993 - 1994*
    Section of Labor and Employment Law, Co-Chair,
        Employee Benefits Committee Subcommittee on Plan Termination   *1988 - present*
    Section of Taxation, Employee Benefits Committee
    Section of Real Property, Probate and Trust Law, Employee Benefits Committee

District of Columbia Bar Association

# ATTACHMENT B

The following documents were reviewed by Henry Rose in connection with the preparation of his expert report:

I.     Correspondence Regarding Forfeitures:

     A.     October 16, 1989 letter to Sam Scholar from Harry Perry

     B.     January 2, 1990 letter to Sam Scholar from Harry Perry

     C.     January 10, 1990 letter to Harry Perry from Sam Scholar (with Amendment No. 1 attached)

     D.     January 15, 1990 letter to trustees from Harry Perry

     E.     October 3, 1990 letter to Sam Scholar from Harry Perry

     F.     October 18, 1990 letter to Sam Scholar from Harry Perry

     G.     February 20, 1991 letter to Harry Perry from Sam Scholar

     H.     March 6, 1991 letter to trustees from Harry Perry

     I.     April 8, 1991 letter to Sam Scholar from C.J. Coakley Co, Inc. signed by C.J. Coakley

     J.     May 7, 1991 Meeting Agenda

     K.     May 17, 1991 letter to trustees from C.J. Coakley Co., Inc. signed by Carol Doyle

     L.     May 20, 1991 letter to trustees from Harry Perry

     M.     June 17, 1991 letter to trustees from C.J. Coakley Co., Inc. signed by Carol Doyle

     N.     July 2, 1991 letter to Trustees from Lee Wagner

     O.     July 23, 1991 Meeting Agenda

     P.     November 25, 1991 letter to Sam Scholar from Harry Perry

     Q.     Undated Meeting Agenda

     R.     Undated Meeting Agenda/List of questions

     S.     January 9, 1992 letter to Lee Wagner from Sam Scholar

     T.     March 1, 1993 letter to Contractors from Lee Wagner

     U.     December 21, 1993 letter to Harry Perry from C.J. Coakley Co., Inc. signed by C.J. Coakley

V.      January 25, 1994 Meeting Agenda

W.      March 22, 1994 letter to Sam Scholar from Harry Perry

X.      September 7, 1994 letter to Lee Wagner from Sam Scholar

Y.      March 25, 1997 letter to Sam Scholar from Lee Wagner

Z.      February 4, 2003 letter to Trustees from Lee Wagner

II.     1991 through 2002 Board Meeting Minutes:

A.      July 23, 1991

B.      January 25, 1994

C.      November 9, 1995

D.      January 27, 1998

E.      June 22, 1999

F.      September 19, 2000

G.      January 8, 2002

H.      April 23, 2002

I.      July 23, 2002