# EXHIBIT 41

LEXSEE

**PAUL L. PHELPS; JERRY H. GILSTRAP; JERRY W. CUDDY; GERALD W. LYDA; NINA POSEY; THOMAS R. WILLIAMS; ALVIN A. STIWINTER; TROY J. COTTRELL; THOMAS L. CARLSON; ROBERT W. CARTER; WAYNE F. MCWHORTER; RODNEY K. DEANHARDT, SR.; MELVIN M. BROCK; EDWARD J. COOLEY; CHARLES A. FURR; FRANCIS C. AIKEN; ELIZABETH AUDREY LOREDO; JIMMY S. STATON; NORMAN DAVIS; EUGENE M. KRENEK; RICHARD N. RYDER, II; KATHERINE D. LACKEY, Plaintiffs - Appellants, versus CT ENTERPRISES, INCORPORATED; SACO LOWELL, INCORPORATED, Defendants - Appellees, and CLIFF THEISEN; TOM POMIAN; MIKE TEMPLETON; BRANCH BANKING AND TRUST OF SOUTH CAROLINA, Defendants.**

No. 05-2071

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**194 Fed. Appx. 120; 2006 U.S. App. LEXIS 20480; 38 Employee Benefits Cas. (BNA) 2127**

**May 26, 2006, Argued
August 9, 2006, Decided**

**NOTICE:** [**1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of South Carolina, at Greenville. Henry M. Herlong, Jr., District Judge. (CA-02-3739-HMH).
Phelps v. C.T. Enters., 394 F.3d 213, 2005 U.S. App. LEXIS 497 (4th Cir. S.C., 2005)

**DISPOSITION:** AFFIRMED.

**COUNSEL:** John Robert Peace, Greenville, South Carolina, for Appellants.

Vance Earle Drawdy, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Greenville, South Carolina, for Appellees.

**JUDGES:** Before WILKINSON and WILLIAMS, Circuit Judges, and Glen E. CONRAD, United States District Judge for the Western District of Virginia, sitting

by designation.

**OPINION**

[*121] PER CURIAM:

This appeal arises out of a claim for plan benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*; 29 U.S.C. § 1132; 28 U.S.C. § 1331, brought by former employees ("the Employees") of Saco Lowell ("Saco Lowell") and CT Enterprises ("CT"). The Employees allege that Saco Lowell and CT violated their fiduciary duties regarding plan assets. The district court, concluding [**2] that the defendants did not violate their fiduciary duties and that the plaintiffs did not suffer any loss, entered an order granting summary judgment to the defendants. The Employees appeal the order granting summary judgment. For the reasons set forth below, we affirm the judgment of the district court.

I.

Saco Lowell manufactured equipment used in the textile industry. Employees were eligible to participate in the CT Enterprises Group Health Benefits Plan ("the

194 Fed. Appx. 120, *121; 2006 U.S. App. LEXIS 20480, **2;
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

Plan"), a selfinsured, ERISA-governed, group health plan. The Plan's claim administrator, [*122] Kanawha Benefit Solutions, Inc. ("Kanawha"), received contributions, processed claims, and distributed benefits.

Employees were paid weekly, and participants in the Plan had contributions withheld from their weekly paychecks on a pretax basis. From May 25, 2000, to December 12, 2000, Saco Lowell and CT paid Kanawha administrative fees. [1]

   1  In an amendment to the Plan effective July 1, 2000, CT was listed as the employer.

Beginning in about July 2000, however, [**3] CT did not provide sufficient funds to Kanawha to pay all outstanding claims of participants. On July 21, 2000, Kanawha issued a check log bill for $ 84,999.41 in claims, indicating that payment in full was required. During approximately the same period, the bank informed Saco Lowell and CT that it would no longer fund the company.

In August of 2000, the bank took control of a new account for Saco Lowell. In September, the bank agreed to forbear from calling in various promissory notes; the notes provided that any judgment not paid within 30 days would constitute default. Due to these problems, the company management held meetings to inform employees of the company's financial situation, during which shortcomings in funding claims under the Plan were also mentioned. Employees were told that the company was doing everything it could to pay outstanding claims, but they were never told that employer contributions were not being made to Kanawha. On November 21, 2000, the Employees were given notice that the Plan would be terminated on November 28. The Employees were not informed at this point about the status of claims incurred prior to November 28, 2000, or of the status of employer [**4] contributions to the Plan.

II.

On November 5, 2002, twenty-two participants in the Plan, who had made claims prior to its termination, filed an action against CT Enterprises, Inc., Saco Lowell, Inc., Cliff Theisen, Tom Pomian, Mike Templeton, and Branch Banking and Trust of South Carolina [2], in the United States District Court for South Carolina. They sought to recover payment for approved but unpaid claims, as well as other appropriate equitable relief. The

defendants filed a motion to dismiss, which was granted in part and denied in part by the district court. The parties filed cross-motions for summary judgment, and the district court granted the defendants' motion. On appeal, we vacated the district court's opinion and remanded for further proceedings. See Phelps v. C.T. Enters., 394 F.3d 213 (4th Cir. 2005). We directed the district court to reconsider the Employees' theory that Saco Lowell and CT breached a fiduciary duty by failing to remit the Employees' contributions to Kanawha.

   2  The defendant bank was later dismissed.

[**5] Following remand, the parties again filed cross-motions for summary judgment, and the district court granted in part and denied in part the defendants' motion, and denied the Employees' motion. Both parties submitted motions for reconsideration. Following additional submissions, the district court entered judgment in favor of the defendants. The district court concluded that failure to remit employee contributions to the Plan as soon as practicable did not result in loss to the Employees, because the Plan was exempt from the trust requirements of ERISA. The court also found that failure to disclose to the Employees that the contributions were no longer being remitted to Kanawha on a [*123] weekly basis did not constitute a breach of any fiduciary duty. The Employees filed a motion to amend/correct the order, which the district court denied. The Employees now appeal the district court's decision to grant summary judgment, contending that Saco Lowell and CT breached their fiduciary duties in two ways: they misused employee contributions and failed to remit employee contributions to the plan administrator as soon as practicable; and they failed to disclose material information about the Plan [**6] to the Employees.

III.

We review a grant of summary judgment de novo, viewing all facts and inferences in the light most favorable to the nonmoving party. Love-Lane v. Martin, 355 F.3d 766, 775 (4th Cir. 2004). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

IV.

The Employees contend that Saco Lowell and CT breached their fiduciary duties by misapplying employee

194 Fed. Appx. 120, *123; 2006 U.S. App. LEXIS 20480, **6;
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

contributions and failing to remit employee contributions to the plan administrator as soon as practicable. Saco Lowell and CT assert that they timely submitted employee contributions to the Plan and there was no breach of fiduciary duty.

The Employee Retirement Income Security Act, or ERISA, was enacted

> to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation [**7] for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b) (2006). Assets of an ERISA plan "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1) (2006). *See also Raymond B. Yates, M. D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 22, 124 S. Ct. 1330, 158 L. Ed. 2d 40 (2004) (holding that 29 U.S.C. § 1103(c)(1) "demands only that plan assets be held for supplying benefits to plan participants"). The fiduciary responsibility provisions of ERISA "apply the law of trusts to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others." *Id*. at 23.

It is a requirement of most ERISA plans that the assets be held in trust. *See* 29 U.S.C. § 1103 (2006). The Saco Lowell and CT Plan was not subject to the trust [**8] requirement, however, because the Plan was a "cafeteria plan," as defined by 26 U.S.C. § 125 (2006). [3] For cafeteria plans, the Department of Labor does not assert a violation "solely because of a failure to hold participant contributions in trust." ERISA Technical Release 92-01, 57 Fed. Reg. 23272 (June 2, 1992). However, this allowance does not relieve fiduciaries "of an obligation to ensure that participant contributions are applied only to the payment [*124] of benefits and reasonable administrative expenses of the plan." *Id*. Therefore, even though the Saco Lowell and CT Plan was not subject to any trust requirement, there was still a fiduciary duty to ensure that employee contributions were not used for the company's general operating expenses.

> 3 A "cafeteria plan" is defined as an arrangement under which "all participants are employees, and the participants may choose among 2 or more benefits consisting of cash and qualified benefits." 26 U.S.C. § 125 (2006).

[**9] In our earlier decision in *Phelps v. C.T. Enterprises, Inc.*, we concluded that the district court had not thoroughly addressed the Employees' claim that Saco Lowell and CT failed to remit the contributions withheld from the Employees' paychecks to Kanawha. 394 F.3d at 221. We directed attention to the case of *Pension Benefit Guaranty Corp. v. Solmsen*, 671 F. Supp. 938 (E.D.N.Y. 1987), which held that a defendant who did not forward employee contributions to an ERISA-governed plan, instead using the contributions to pay company expenses, breached a fiduciary duty. Subsequent to the decision in *Solmsen*, the Department of Labor issued a regulation which provided that employee contributions are plan assets. 29 C.F.R. § 2510.3-102 (2004). These contributions become plan assets "as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets." *Id*.

The date on which the contributions become plan assets cannot occur later than 90 days from the date the contributions are withheld. *Id*. Even if all employee contributions are submitted to the plan within 90 days, however, [**10] this fact does not necessarily establish that an employer has fulfilled its fiduciary duty. The 90-day period is not intended to serve as a "safe harbor." Regulation Relating to Definition of "Plan Assets" - Participant Contributions, 61 Fed. Reg. 41220, 41223 (Aug. 7, 1996). An ERISA Technical Release specifically provides that

> [t]he regulation is not intended . . . to allow employers to use participant contributions for their own purposes . . . employers who fail to transmit promptly such amounts, and plan fiduciaries who fail to collect those amounts in a timely manner, will violate the requirement that plan assets be held in trust; in addition,

194 Fed. Appx. 120, *124; 2006 U.S. App. LEXIS 20480, **10;
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

such employers and fiduciaries may be engaging in prohibited transactions . . . . The Department wishes to stress that the outside limit of 90 days is not intended to supercede the preceding portion of the rule, that is, the participant contributions become plan assets "as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets."

ERISA Technical Release 92-01, 57 Fed. Reg. 23272 (June 2, 1992).

Considering these basic principles underlying [**11] ERISA and the contours of fiduciary duties regarding plan assets, we conclude that funds withheld as employee contributions to a plan cannot be used by an employer for any purpose other than funding the plan. In this case, if Saco Lowell and CT had used the funds withheld from the Employees' weekly paychecks as general assets of the company, there would have been a clear breach of Saco Lowell's and CT's fiduciary duties. Even though the cafeteria plan avoided the trust requirement, there was still a requirement that plan assets, including employee contributions, be used only to benefit the participants, and not as general assets of the company.

In their brief, Saco Lowell and CT claim that "the undisputed evidence" shows that all amounts withheld from employee paychecks were ultimately remitted to the Plan. (Appellee Br. at 27). The Employees have presented no evidence to the contrary. Templeton, Saco Lowell's comptroller, [*125] testified that all employee contributions were transferred to the Plan. (J.A. 163, 166, and 168). He specifically verified that "all of the employee contributions that were withheld were . . . transferred to Kanawha for either the payment of claims or the reasonable [**12] expense of administering the Plan." (J.A. 168). Clifford Thiesen, Saco Lowell's chief executive officer, also testified that all employee contributions were forwarded to the Plan. (J.A. 103).

Until July of 2000, employee contributions were submitted to the Plan on a weekly basis. After this point, Saco Lowell withheld employee contributions on a weekly basis, but stopped making submissions to Kanawha on a weekly basis. However, within 90 days of each weekly paycheck, CT forwarded amounts greater than the sum of the employee contributions to Kanawha.

While these amounts were not sufficient to pay all the claims, it is now clear that all *employee* contributions were remitted to Kanawha within 90 days of receipt.

After consideration of the record, which has been expanded since the case was previously before us, we conclude that Saco Lowell and CT did not breach any fiduciary duty in the processing of employee contributions. All contributions were remitted to the Plan within 90 days, and there is no evidence that Saco Lowell and CT used the contributions inappropriately, as general assets of the company, during the intervening time. Although Saco Lowell's comptroller recognized that [**13] funds taken out of employee paychecks were not sequestered from other company funds (J.A. 163), the regulations do not require that participant contributions to cafeteria plans be held in trust. ERISA Technical Release 92-01, 57 Fed. Reg. 23272 (June 2, 1992). In addition, the comptroller agreed that "all of the employee contributions that were withheld were, in fact, transferred to Kanawha for either the payment of claims or the reasonable expense of administering the Plan." (J.A. 168). The chief executive officer stated that, to the best of his knowledge, "no amounts held from any Saco Lowell employee's pay for the Medical Plan were used for any purpose other than for paying benefits and/or administrative expenses under the Medical Plan." (J.A. 103). Therefore, viewing the evidence in the light most favorable to the Employees, there is no support for the claim that Saco Lowell and CT breached their fiduciary duties by applying the employee contributions to payroll or other general company expenses. In fact, all evidence is to the contrary, supporting Saco Lowell and CT's assertion that employee contributions were not used as general assets. Further, to the extent of [**14] the Employees' argument that the change in the timing of payment of employee contributions to the administrator constituted a breach of fiduciary duty, we conclude that CT forwarded contributions to Kanawha as soon as practicable, in light of the extenuating financial situation of the company. [4]

4   The facts of this case are distinguishable from those in *Solmsen*, in which the employer suffered substantial business hardship and used employee plan contributions to pay general expenses of the company. 671 F. Supp. at 945. While changed financial circumstances did not justify the misuse of employee contributions in *Solmsen*, an employer does not breach a fiduciary duty merely

194 Fed. Appx. 120, *125; 2006 U.S. App. LEXIS 20480, **14;
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

because the timing of payments to the plan administrator is altered in the face of an onset of adverse circumstances.

V.

The Employees also allege that the district court erred in finding that there was no claim for breach of fiduciary duty regarding the failure to disclose material information to plan participants. The [**15] district court found that there was no breach [*126] of fiduciary duty because there was no loss caused by any delay in remission of employee contributions, and the failure to remit contributions on a weekly basis was therefore not a material fact that the Employees needed to know. The Employees claim that Saco Lowell and CT breached their fiduciary duties in three ways: by failing to provide complete information in response to beneficiary questions; by failing to notify the Employees that their required contributions were no longer being transferred to Kanawha on a weekly basis; and by failing to notify the Employees that employer contributions to the Plan were not being paid. According to the Employees, this information was material because if the information had been disclosed to them, they could have obtained other medical coverage.

Our Circuit has identified two situations in which an ERISA administrator has a fiduciary duty to advise beneficiaries. *See Griggs v. E.I. DuPont De Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001). First, a fiduciary must give complete and accurate information to a beneficiary if the beneficiary requests information. *Id.* Second, a fiduciary [**16] must provide "material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection." *Id.* The Employees contend that Saco Lowell and CT have breached both of these duties.

The Employees first claim that Saco Lowell and CT misrepresented the status of the Plan in response to a direct question at the meeting with the Employees in November. They base this claim upon Templeton's statement in his deposition that "I do remember questions coming up about the health care [at an employee meeting] which Cliff [Thiesen] said that we were doing everything we could to get them paid at the time." (J.A. 50). This is the only evidence presented by the Employees in support of their claim. We conclude that, even viewed in the light most favorable to the

Employees, the statement does not support the notion that Templeton breached a fiduciary duty to provide information. The evidence establishes that Templeton gave information that was correct as he understood the circumstances at the time of the meeting.

The Employees also claim that Saco Lowell and CT failed to disclose material information that beneficiaries [**17] needed to know about the status of the Plan. In regards to the employee contributions to the Plan, there were no "material facts affecting the interest of the beneficiary which [the fiduciary] knows the beneficiary does not know and which the beneficiary needs to know for his protection." *Griggs*, 237 F.3d at 381. We have concluded that employee contributions were not used as general assets, and that CT forwarded contributions to Kanawha as soon as practicable considering the change in Saco Lowell's and CT's circumstances, and within 90 days. Therefore, we conclude that the district court properly held that there was no fiduciary duty to disclose information relating to the employee contributions to the fund, and there was no loss to the Employees resulting from a failure to disclose this information.

Based upon a *de novo* review of the record, we further conclude that Saco Lowell and CT adequately informed the Employees about the circumstances of the Plan and employer contributions to the Plan. In August, the Employees were told that the company was not "currently meeting all [] obligations, that the bank was controlling the purse strings, and hopefully, [the [**18] company] would be able to resolve this going forward." (J.A. 188). As to the health care plan, Thiesen testified in his deposition that he told the participants [*127] that "right now we're having some problems - that was obvious - and we're hoping to resolve them in the near future." (J.A. 189). According to Thiesen, the Employees were not told that the plan was no longer solvent, because "we didn't think that we were not solvent. We felt that we had opportunities that were going to allow us to continue as a business." (J.A. 190). Thiesen further stated in his deposition that "[w] e had submitted a plan to the bank that we thought we could get approved and would allow us to continue on." (J.A. 192). These statements demonstrate that Saco Lowell and CT kept the Employees apprised of the circumstances of the company and the Plan as they were understood. We conclude that the Employees were informed of the status of the Plan to the extent of Saco Lowell's and CT's knowledge, and there was no breach of the fiduciary duty to inform.

194 Fed. Appx. 120, *127; 2006 U.S. App. LEXIS 20480, **18;
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

VI.

Viewing the facts in the record and the reasonable inferences in the light most favorable to the Employees, we conclude that Saco Lowell and CT did not breach [**19] their fiduciary duties to participants in the ERISA-governed Plan. CT forwarded all employee contributions to Kanawha within 90 days of withholding from weekly paychecks, and there is no evidence that employee contributions were misused for general business expenses of the company. In addition, representatives of the company did inform the Employees about the financial status of the Plan and the company, to the best of the representatives' knowledge. They therefore did not breach a fiduciary duty to inform the Employees about material facts of which the participants had a need to know. Accordingly, we conclude that the district court properly determined that the defendants were entitled to summary judgment. We affirm the decision of the district court, and find it unnecessary to reach the issue of whether the individual plaintiffs would have been entitled to damages.

The judgment of the district court is hereby

*AFFIRMED.*

# EXHIBIT 42

LEXSEE

**PAUL M. ARENS, et al. v. CLAYTON EUGENE DEFRIES, et al.**

**Civil Action No. WN-93-1796**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

**1994 U.S. Dist. LEXIS 20726**

**August 19, 1994, Decided**
**August 19, 1994, FILED; August 22, 1994, ENTERED**

**COUNSEL:** [*1] For PAUL M. ARENS, JEROME PASHAK, plaintiffs: Jonathan D. Schiller, Kaye, Scholer, Fierman, Hays & Handler, PH, Washington, DC. William A. Isaacson, Kaye, Scholer, Washington, DC.

For CLAYTON EUGENE DEFRIES, C. E. DODSON, KARL LANGREBE, defendants: Edward A. Scallet, LeBoeuf, Lamb, et al, Washington, DC. James J. Valentino, Law Office, Washington, DC. Seth Lloyd, Law Office, N/A, Detroit, MI. Dykema Gossett, Law Office, N/A, Washington, DC. For C. W. DAULLEY, EDMUND DAVIS, THOMAS MURPHY, FRANKLIN RILEY, W. I. RISTINE, R. F. SCHAMANN, ALLEN TAYLOR, SHANNON WALL, DONALD MASINGO, PHILIP J. SHAPIRO, defendants: Edward A. Scallet, LeBoeuf, Lamb, et al, Washington, DC. James J. Valentino, Law Office, Washington, DC.

For AMERICAN ASSOCIATION OF RETIRED PERSONS, movant: Cathy Ventrell-Monsees, AARP, Washington, DC.

For JESSE CALHOON, interested party: Jonathan D. Schiller, Kaye, Scholer, Fierman, Hays & Handler, PH, Washington, DC.

**JUDGES:** William M. Nickerson, United States District Judge. Magistrate Judge Daniel E. Klein, Jr.

**OPINION BY:** William M. Nickerson

**OPINION**

***MEMORANDUM***

The following motions are before the Court: Defendant MEBA Medical & Benefits Plan's Motion for Summary [*2] Judgment (Paper No. 59); Individual Defendants' Motion for Partial Summary Judgment (Paper No. 85); Defendants Hadju, Bem, Austin and Langley's Motion to Dismiss or in the Alternative for Summary Judgment (Paper No. 161); Plaintiffs' Motion for Summary Judgment Against Defendant MEBA Medical Plan and Its Trustees on Count VI (Paper No. 132); Plaintiffs' Motion for Summary Judgment Against All Individual Defendants on Counts I, III-V of the Complaint (Paper No. 133); and Defendants' Motion to Strike Plaintiffs' Demand for a Jury Trial (Paper 137). Upon consideration of the pleadings and review of the relevant case law, the Court determines that no hearing is necessary (Local Rule 105.6), Defendants' motions for summary judgment will be granted, Plaintiffs' motions for summary judgment will be denied, and Defendants' motion to strike Plaintiffs' demand for a jury trial will be granted.

*I. BACKGROUND*

Plaintiffs in this case are Paul M. Arens and Jerome Pashak, two retired maritime officers who were formerly active members of the Licensed Division of District No. 1 of the Marine Engineers Beneficial Association ("MEBA" or "the Union"). They bring this action under the Employee [*3] Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. §§ 1001-1461, and the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. §§ 141-187. [1] The essential facts of this case are not in dispute.

   1   Plaintiffs originally filed this suit as a class action. They have subsequently withdrawn their

1994 U.S. Dist. LEXIS 20726, *3
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

motion for class certification and all allegations relating to the class. Marine Engineers Pensioners, Inc. ("MEP") was also a plaintiff in the original complaint but has now withdrawn from this action.

At the time of the filing of this action, both Plaintiffs were participants in the multi-employer MEBA Medical and Benefits Plan ("the Medical Plan") as well as a separate pension plan, the MEBA Pension Trust ("the Pension Plan" or "Pension Trust"). Both Plaintiffs have subsequently withdrawn from the Medical Plan. Each plan has twelve trustees--six representing the employers and six representing the Union.

Plaintiffs' original complaint named as defendants the Medical Plan and thirteen individuals [*4] who are former and present employer and union trustees of the Medical Plan and Pension Plan. [2] Plaintiffs' Second Amended Complaint [3] adds five individual defendants, who are current union trustees of the Medical Plan and Pension Plan. [4]

> [2]   Defendants Clayton Eugene DeFries, C.W. Daulley, C.E. Dodson, Karl Landgrebe, Donald Masingo, R.F. Schamann, and Shannon Wall are former union trustees of both the Medical Plan and the Pension Trust. Defendants Edmund Davis, Thomas Murphy, Franklin Riley, William Ristine, and Allen Taylor are current employer trustees of both the Medical plan and the Pension Trust. Defendant Philip Shapiro is a former employer trustee of the Pension Trust and Medical Plan.
> [3]   This Court granted Plaintiffs' Motion to file a Second Amended Complaint on March 1, 1994 (Paper 116).
> [4]   The five additional defendants are Gordon Ward, Joel Bem, Nicholas Hadju, William Langley, and Mark Austin. The Court will refer to the eighteen individual defendants as "individual Defendants" or "Defendant Trustees." Defendant Ward has not been served.

[*5] The Medical Plan and Pension Plan were first established in 1950 pursuant to collective bargaining agreements between the Union and various employers of the shipping industry. The plans have been continued over the years pursuant to a series of successive collective bargaining agreements. At issue in this case is the collective bargaining agreement in effect from July 1986 to June 15, 1990 ("1986-1990 CBA"). Under the

1986-1990 CBA, participants in the Medical Plan were not required to pay any contributions for their medical benefits. Rather, the employers made the necessary contributions to meet the cost of benefits and administration of the Medical Plan. In June 1990, representatives of the Union and employers met at the bargaining table to negotiate a new collective bargaining agreement for 1990-1994. The terms of this agreement are set forth in a Memorandum of Understanding entered into by the parties on June 16, 1990 ("the 1990-1994 CBA"). The 1990-1994 CBA extended the 1986-1990 CBA and provided for two changes in the plans that are at the heart of this suit. First, the parties agreed that the Medical Plan would be amended "to provide coverage for all pensioners . . . on a [*6] full contributory basis to be paid by such pensioners." 1990-1994 CBA at 6, Appendix A to Defendant MEBA Medical Plan's Motion for Summary Judgment. Second, the bargaining parties agreed that the Pension Plan would be amended to allow for a monthly increase in pension benefits "in an amount no less than the contributory amount determined under the MEBA Medical and Benefits Plan for pensioner medical coverage." *Id.* at 6-7. According to the Administrator of the two plans, Lucille Hart, this supplemental pension benefit was calculated to equal the cost of coverage under the Medical Plan plus 15 per cent for taxes. Affidavit of Lucille Hart, P 12. On October 17, 1990, the Trustees of the Plans adopted these changes as Amendment 91-1 to the Rules and Regulations of the Medical Plan and Amendment 91-1 to the Pension Plan. Pensioner contributions to the Medical Plan and the supplemental pension benefit became effective January 1, 1991.

MEBA notified the pensioners of these changes in a letter dated December 20, 1990. The written notification explained to pensioners that they had three choices: they could elect to (1) assign the pension supplement (less 15 per cent) directly to the Medical [*7] Plan and continue their health care coverage as before; (2) receive the pension supplement and pay their premium to the Medical Plan themselves; or (3) keep the pension supplement and seek medical coverage elsewhere. The pensioners were informed that if they elected to assign the supplemental pension benefit directly to the Medical Plan, they could revoke the assignment at any time. However, once a pensioner discontinued coverage under the Medical Plan, he could not thereafter re-apply for coverage under the Medical Plan. *See* Plaintiffs' Ex. 3 (December 20, 1990 letter from MEBA to pensioners).

Upon receiving this letter, both Plaintiffs elected to continue their coverage under the Medical Plan by authorizing the Pension Plan to pay their pension supplements directly to the Medical Plan beginning in January 1991. *See* Affidavit of Lucille Hart, Ex. E ("Election and Authorization Form"). In May 1991, Plaintiff Pashak revoked his authorization, and the Pension Plan sent his supplemental pension benefit directly to him. Affidavit of Jerome Pashak, P 3. Pashak then purchased his own less expensive coverage under Blue Cross/Blue Shield. Pashak Deposition pp. 53-54, 177. Plaintiff [*8] Arens remained a participant in the Medical Plan until April 1993, when he revoked his authorization and requested that he receive his pension supplement directly. Affidavit of Paul Arens, P 1, Deposition at 19-22. Arens now purchases his own medical insurance through Banker's Life and Casualty at about half the price of the Medical Plan. Arens Deposition at 22.

In their Second Amended Complaint, Plaintiffs allege that they are entitled to free lifetime medical benefits. Their complaint asserts that "plan documents for the Medical Plan have long promised retirees that health benefits will be paid to a pensioner 'until his death.'" Second Amended Complaint at P 28 (quoting Article VIII of the Medical Plan's Rules and Regulations). Plaintiffs further allege that the effect of the 1990 changes in the CBA was to transfer funds from the Medical Plan to the Pension Trust to the benefit of MEBA employers. The complaint asserts that the "transfer of medical costs from the Medical Plan to the Pension Trust benefits, and inures Pension Trust assets to, contributing employers to the Medical Plan whose contributions to the Medical Plan and liabilities for such contributions are reduced by the [*9] transfer." *Id.,* P 49. Based upon these allegations, Plaintiffs set out six counts of alleged violations of ERISA and the LMRA: breach of ERISA's Exclusive Benefit Rule (Count I); breach of fiduciary duties under ERISA (Count II); prohibited transaction with an adverse party (Count III); prohibited transactions with parties in interest (Count IV); violation of ERISA's prohibition against assignments (Count V); and breach of the covenants of the applicable collective bargaining agreements in violation of ERISA and the LMRA (Count VI).

All Defendants have submitted motions for summary judgment. While they assert a number of arguments in support of these motions, their essential contentions are

(1) that Plaintiffs were not entitled to free lifetime medical benefits and (2) that the arrangement set up by the bargaining parties does not constitute a transfer of assets between the Medical Plan and Pension Plan nor any other transaction prohibited by ERISA or the LMRA. Plaintiffs have opposed Defendants' motions and submitted two cross-motions for summary judgment on Counts I and III-VI. [5]

> 5   Other motions before the Court include Defendant the MEBA Medical Plan's Motion to Strike Plaintiffs' Reply in Support of Their Motion for Summary Judgment on Count VI (Paper No. 154) and The American Association of Retired Persons' ("AARP") Motion for Leave to File a Brief in Amicus Curiae in Support of Plaintiffs' Opposition to Individual Defendants' Motion for Summary Judgment. (Paper No. 145). The Court will deny Defendant Medical Plan's Motion to Strike and will grant AARP's Motion for Leave to File a Brief in Amicus Curiae.

[*10] *II. Summary Judgment Standard*

Summary judgment is proper if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Rule 56 mandates the entry of summary judgment against a party who, after reasonable time for discovery and upon motion, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial [and] the moving party is entitled to judgment as a matter of law.'" *Id.* at 323. (citations omitted).

If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, [*11] 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (citations omitted). Unsupported speculation is insufficient to defeat a motion for summary judgment. *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Ash v. United*

1994 U.S. Dist. LEXIS 20726, *11
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

*Parcel Serv., Inc., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986)). Moreover, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. *Anderson*, 477 U.S. at 247-48. Thus, only disputes over those facts that might affect the outcome of the case under the governing law are considered to be "material." *Id.*

Finally, in assessing such a motion, the Court must view the evidence and all justifiable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962) (per curiam).

With these principles in mind, the Court will address the arguments presented by the parties.

## II. Analysis

### A. Termination of Medical Benefits

Plaintiffs' claims rest upon the proposition that they are entitled to free lifetime medical benefits. Before examining the [*12] specific allegations of the complaint, the Court will first address the nature of the pensioners' medical benefits.

While a pension plan, such as the Pension Trust, is subject to ERISA's vesting requirements, welfare benefit plans such as the Medical Plan [6] are specifically exempt from such requirements. 29 U.S.C. § 1051(1). [7] "Because a welfare benefit plan is not subject to ERISA's vesting provisions, an employer is free to amend the terms of the plan or terminate it entirely." *Biggers v. Wittek Indus., Inc.*, 4 F.3d 291, 295 (4th Cir. 1993). *See also Pierce v. Security Trust Life Ins. Co.*, 979 F.2d 23, 29 (4th Cir. 1992) ("'Since . . . an employee's interest in a welfare benefit plan is not vested, the employer has the right at any time to amend or terminate a [welfare plan].'") (quoting *Reichelt v. Emhart Corp.*, 921 F.2d 425, 429 (2d Cir. 1990), *cert. denied*, 501 U.S. 1231, 111 S. Ct. 2854, 115 L. Ed. 2d 1022 (1991)); *Sejman v. Warner-Lambert Co.*, 889 F.2d 1346, 1348-49 (4th Cir. 1989), *cert. denied*, 498 U.S. 810, 112 L. Ed. 2d 19, 111 S. Ct. 43 (1990). An employer's ability to amend a welfare plan, therefore, depends upon the contractual terms of the [*13] collective bargaining agreements and other documents pertaining to the plan.

6    ERISA defines welfare benefit plans as any plan which provides, *inter alia*, medical, surgical,

sickness, accident, disability or death benefits. 29 U.S.C. § 1002(1)(A).

7    The rationale behind not requiring vesting of welfare benefits is to encourage employers to provide them. "In enacting ERISA, Congress apparently determined that subjecting employee welfare benefit plans to the same vesting, funding and trust requirements as pension plans would be so costly as to discourage employers from providing welfare benefits at all." *Schwartz v. Interfaith Medical Ctr.* 715 F. Supp. 1190, 1196 (E.D. N.Y. 1989) (citing 1973 U.S. Code Cong. & Admin. News 4639-40). *See Sutton v. Weirton Steel Div. of Nat'l Steel Corp.*, 724 F.2d 406, 410 (4th Cir. 1983) ("Congress believed that the 'vesting of [welfare benefit plans] would seriously complicate the administration and increase the cost of the plans whose primary function is to provide retirement income.'") (quoting 1974 U.S. Code Cong. & Admin. News 4890, 4935), *cert. denied*, 467 U.S. 1205, 81 L. Ed. 2d 345, 104 S. Ct. 2387 (1984).

[*14] In *Pierce*, twelve retired employees sued the defendant employer for amendments made to their welfare plan requiring employees to make partial contributions to their medical plan. The court found that the summary plan description provided to the employees adequately notified them that the medical benefits were not vested. *Pierce*, 979 F.2d at 28. The court then held that "since the medical and hospital benefits involved here were not vested, such benefits were terminable at will by the employer." *Id.* at 29. Similarly in this case, plan documents clearly notified all parties that the pensioners medical benefits were not vested and that the Trustees reserved the right to amend, modify or terminate the provisions of the plan.

Plaintiffs argue that the Medical Plan's Rules and Regulations provide for free lifetime medical coverage. In support of their argument, Plaintiffs focus on the words "until his death" in the section of the Rules and Regulations describing the benefits for which an employee is eligible. Article VIII of the Rules and Regulations "Benefits for Pensioners") begins: "Upon qualification for a pension from the MEBA Pension Trust, until his death and during [*15] the period he continues to be entitled to such pension, a Pensioner shall be eligible for the following benefits. . . ." Plaintiffs' reliance on this isolated paragraph is misplaced. The

1994 U.S. Dist. LEXIS 20726, *15
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

plain language of this provision indicates that the words "until his death" are intended to qualify the duration of a pensioner's eligibility for benefits. Furthermore, other provisions in the Rules and Regulations clearly inform pensioners that their medical benefits are not vested and are subject to termination by the Trustees.

The Rules and Regulations state that the Trustees have complete discretion to amend, modify or terminate the Plan and that no benefits provided to pensioners under the Plan are vested. Article VIII begins with the statement:

> The Trustees have complete discretion to amend, modify, or terminate the Plan at any time and from time to time. The authority of the Trustees to amend, modify, or terminate the Plan applies to benefits for Pensioners and their Dependents as well as active Eligible Employees and their Dependents. Accordingly no benefits provided to Eligible Employees (or their Dependents or beneficiaries) or Pensioners (or their Dependents or beneficiaries) under [*16] this Plan are (or should considered to be) "vested."

Rules and Regulations, as amended through October 28, 1987, Article VIII, p. 43. The Rules and Regulations also reserve the right of the Trustees to terminate or amend the amount or conditions of any benefit.

> The Trustees expressly reserve the right in their sole discretion and without notice to employees, employers, the Union or others affected hereby, but upon a non-discriminatory basis ... to terminate or to amend either the amount or conditions with respect to any benefit, even though such termination or amendment affects claims which have already accrued; and ... to amend any other provisions of these Rules and Regulations.

*Id.* Article XII, at 34.

In addition to the Rules and Regulations, the 1984-1990 CBA and the Trust Agreement governing the Medical Plan demonstrate that Plaintiffs had no vested interest in their medical benefits. The 1986-1990 CBA

expressly limits the duration of the employers' obligation to pay for the cost of welfare benefits under the Medical Plan to that of the Agreement and further provided that the Trustees have the authority to amend the Medical Plan.

> All existing [*17] welfare benefits shall be continued in effect for the life of the Agreement and shall be paid for by the Company [employers]; provided, however, that the Trustees shall have full authority to modify the Medical Plan.

1986-1990 CBA, p. 76, P 34(h). Article II of the Trust Agreement states that a participant in the Medical Plan has no vested right to lifetime benefits:

> No Employer, nor the Association [MEBA] nor the individual Participants shall have any vested rights in or to the Fund or any part thereof except the right of the qualified Participants, or their dependents, or their beneficiaries or next of kin to receive the benefits provided for in the Plan to which they may be respectively entitled, and upon termination of the Trust hereby created, to have the funds put to the uses and purposes specified herein.

Trust Agreement Establishing the Pension and Welfare Plan (as amended and consolidated through Amendment No. 45, October 28, 1987), Article II, Section 2.7.

The Court thus finds that Plaintiffs were not entitled to free lifetime medical benefits. Any claims by Plaintiffs that Defendant Trustees imprudently amended the Medical Plan to require pensioner [*18] contributions or that Defendant Trustees have constructively terminated their benefits in violation of plan documents is therefore without merit. [8] This conclusion is supported by the recent decision in *Schoonejongen v. Curtiss-Wright Corp.*, 18 F.3d 1034 (3d Cir. 1994), *cert. granted*, 129 L. Ed. 2d 937, 115 S. Ct. 42 (1994). In *Curtiss-Wright*, a group of retirees sued their former employer for terminating their health insurance when the employer closed its plant. The retirees relied on language in the summary plan descriptions that stated that benefits would terminate "upon death." *Id.* at 1036-37. The court rejected their argument that this language created vested rights and found that the employer's reservation of the right to

1994 U.S. Dist. LEXIS 20726, *18
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

amend the plan rendered the retirees' right to benefits terminable:

> Even if the plan contained unambiguous assurances that all retirees would have health insurance benefits for life so long as [the employer] maintained a post-retirement health insurance program, the general reserved right to amend the terms of the plan in whole or in part would render the right of any retiree or group of retirees terminable by the adoption of [*19] a legally effective amendment.

*Id.* at 1042. In the instant case, the MEBA employers' unambiguous and legal reservation of the right to amend the Medical Plan rendered Plaintiffs' rights to medical benefits terminable. The *Curtiss-Wright* court noted the propriety and wisdom of an employer's reservation of the right to amend a plan. "One important and proper purpose of reserving a general right to amend is to permit the conditioning or cessation of any participants' benefits not vested by virtue of the mandate of ERISA in ways not originally foreseen in order to meet the unanticipated changes of circumstance." *Id.* (footnote omitted). Confronted with the rising costs of health care, the employer representatives and Medical Plan Trustees in this case met this "unanticipated change of circumstance" by deciding to terminate pensioners' medical benefits.

> 8   In their Motion for Summary Judgment on Count VI, Plaintiffs introduce the claim that there was a technical defect in the amendment process. Where there is no corresponding claim in the Second Amended Complaint, this afterthought does not warrant summary judgment. Accordingly, the Court rejects this argument.

[*20] **B. The 1990 Amendments to the Medical Plan and the Pension Plan**

Having determined that Plaintiffs were not entitled to free lifetime medical benefits, the Court now turns to their remaining claims. Plaintiffs allege that the arrangement set up by the bargaining parties constitutes a prohibited transaction with an adverse party, a prohibited transaction with a party in interest, and a prohibited assignment. Plaintiffs also claim the Trustees of both plans breached the exclusive benefit rule and other fiduciary duties under ERISA by adopting the two

changes as amendments to the plans. Finally, Plaintiffs claim that Defendants' actions are in violation of the LMRA. The Court will address each of these claims in turn.

*1. Prohibited Transactions*

ERISA prohibits a plan fiduciary [9] from causing a transaction between a plan and a party in interest. 29 U.S.C. § 1106(a)(1)(D) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." [10] ERISA also [*21] prohibits transactions between a plan and a party with adverse interests. Section 1106(b)(2) provides: "A fiduciary with respect to a plan shall not . . . in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U.S.C. § 1106(b)(2). *See NLRB v. Amax Coal Co.,* 453 U.S. 322, 332-34, 69 L. Ed. 2d 672, 101 S. Ct. 2789 (1980); *Sutton v. Weirton Steel Div. of Nat'l Steel Corp.,* 724 F.2d 406, 411 (4th Cir. 1983), *cert. denied,* 467 U.S. 1205, 81 L. Ed. 2d 345, 104 S. Ct. 2387 (1984). Under both types of prohibited transactions, Plaintiffs in this case must demonstrate that a Pension Plan fiduciary caused a "transaction" between the Pension Plan and a party in interest or an adverse party. *Sutton,* 724 F.2d at 411. These claims fail because the record shows that there was no "transaction" between the Pension Plan and the Medical Plan. [11]

> 9   ERISA defines a "fiduciary" as one who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Defendant Trustees do not dispute that they are plan fiduciaries for purposes of ERISA.

[*22]

> 10   All citations to ERISA will be made to the corresponding provision in Title 29 of the United States Code.

> 11   A "party in interest" includes a fiduciary, an employer, an employee organization, or a person providing services to a plan. 29 U.S.C. § 1002(14). Defendant MEBA Medical Plan

1994 U.S. Dist. LEXIS 20726, *22
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

contends that it is neither a party in interest nor an adverse party. Because the Court determines that there has been no "transaction" between the plans, it will not address whether the Medical Plan is a party in interest or an adverse party.

The parties do not dispute that in June 1990, when the bargaining parties met to form the 1990-1994 CBA, representatives of the employers bargained for a reduction in employer costs to the Medical Plan, and at the same time, the representatives of the employees bargained for an increase in employee benefits. The compromise that was reached resulted in the termination of employer contributions to the Medical Plan and an increase in monthly pension benefits which pensioners could use to continue their health care coverage under the Medical Plan. Upon being notified [*23] of the pension supplement, both Plaintiffs authorized the Pension Plan to send their supplemental pensions to the Medical Plan.

Plaintiffs urge the Court not to look at the form of the arrangement, but rather at its substance and the underlying economic realities. See Plaintiffs' Opposition to Individual Defendants' Motion for Summary Judgment at 38 (citing Int'l Bhd. of Teamsters v. Daniel, 439 U.S. 551, 558, 58 L. Ed. 2d 808, 99 S. Ct. 790 (1979) (in determining whether a financial relationship constitutes a benefit plan governed by ERISA, the court must look to the "substance--the economic realities of the transaction--rather than the names that may have been employed by the parties.")) Without commenting on the applicability of Daniel to this case, the Court will indulge Plaintiffs in this request. The result, however, is favorable to Defendants. The undisputed facts reveal that the basic economic reality of this arrangement was not a transfer of assets from one plan to another. Rather, there were two separate and distinct transactions: (1) the Pension Plan paid a monthly pension supplement to Plaintiffs; and (2) Plaintiffs authorized the Pension Plan to assign their [*24] monthly supplement to the Medical Plan in order to continue their health coverage under the Medical Plan. The fact that funds were passed from one plan to another is incidental to this arrangement.

Plaintiffs argue that language in the December 1990 letter from MEBA to pensioners referring to a transfer of funds between the two plans demonstrates that Defendant Trustees caused a prohibited transaction. The December 1990 letter states in relevant part:

> The recently ratified Collective Bargaining Agreement contains a new provision concerning Pensioner Medical Coverage. This provision takes the cost of medical coverage for Pensioners out of the MEBA Medical Plan and, in effect, *transfers* it to the financially stronger MEBA Pension Plan during the term of the new Collective Bargaining Agreement.

Plaintiffs' Ex. 3 (emphasis added). Language chosen by union officers to explain the changes to pensioners is by no means conclusive on the issue of whether there was a "transaction" between the two plans. At most, this language shows that MEBA officials *believed* the arrangement was a transaction between the two plans. That belief, however, does not dispel the economic [*25] reality of the two separate and distinct transactions, neither of which was in violation of ERISA.

The Court therefore concludes that the arrangement among pensioners, the Pension Plan and the Medical Plan is not a prohibited transaction under section 1106 and that Defendants are entitled to summary judgment on Counts III and IV as a matter of law. The Department of Labor ("DOL") is in accord with this conclusion. See U.S. Dep't of Labor Opinion Letter No. 85-40 (November 27, 1985); *Biggers v. Wittek Indus., Inc.,* 4 F.3d 291, 298 (4th Cir. 1993) (citing a DOL opinion letter as reinforcement of the court's interpretation). In Opinion Letter 85-40, the DOL determined that a similar situation did not present a violation under section 1106. The DOL summarized the situation presented to it as follows.

> The trustees have proposed that an arrangement be established pursuant to which a Pension Plan retiree who also participates in the Welfare Plan would be afforded the option of authorizing the Pension Plan to deduct from his or her monthly pension check an amount equal to the amount required to be paid to the Welfare Plan. The Pension Plan would then transfer monthly to the [*26] Welfare Plan an amount representing the total amount of deductions for all retirees who participate in the program. The arrangement would be entirely voluntary on the part of the retiree; it would be authorized by the retiree in writing in

1994 U.S. Dist. LEXIS 20726, *26
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

advance and would be revocable at any time at the sole discretion of the retiree.

1985 ERISA LEXIS 4, *2. The DOL determined that this arrangement is not a prohibited transaction even if the third party is a party in interest.

> The mere payment of money to which a participant or beneficiary is entitled, at the direction of the participant or beneficiary, to a third party who is a party in interest would not be prohibited under section 406(a)(1)(D) [29 U.S.C. § 1106(a)(1)(D).

*Id.* at *10. The DOL also determined that this arrangement did not present a transaction with an adverse party.

> In addition, it does not appear that there would be an adversity of interests involved in the transfer of funds by the Pension Plan to the Welfare Plan at the written direction of the Pension Plan participants and beneficiaries as contemplated by section 406(b)(2) of ERISA [29 U.S.C. § 1106(b)(2)].

*Id.* at *11. *Accord,* [*27] 29 C.F.R. 2509.78-1.

### 2. ERISA's Anti-Assignment Provisions

29 U.S.C. § 1056(d)(1) provides that a "pension plan shall provide that benefits provided under the plan may not be assigned or alienated." [12] The terms "assignment" and "alienation" are defined by the Secretary of the Treasury as "any direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan, in or to, all or part of any plan benefit payment which is, or may become, payable to the participant or beneficiary." Treasury Regulation § 1.401(a)-13(c)(1), 26 CFR § 1.401(a)-13(c)(1)(ii). *See Trucking Employees of N. Jersey Welfare Fund, Inc. v. Colville,* 16 F.3d 52, 55-56 (3d Cir. 1994); *Guidry v. Sheet Metal Workers Int'l Ass'n, Local 9,* 10 F.3d 700, 708 (10th Cir. 1993). The record shows that the arrangement established by the bargaining parties does not fit this definition. Both Plaintiffs gave written authorization, which was voluntary and revocable, for direct payment of their pension supplements to the Medical Plan. This authorization alone did not give the Medical Plan any enforceable

rights [*28] or interests against the Pension Plan. Moreover, the Medical Plan acknowledged that it had no enforceable right against the Pension Plan for these benefits. [13] Plaintiffs' election to have their pension supplements paid directly to the Medical Plan, therefore, did not constitute an assignment for purposes of § 1056(d)(1). Accordingly, the Pension Plan Trustees are entitled to summary judgment on Count V.

12    The Internal Revenue Code also prohibits assignments. IRC § 401(a)(13)(A). ERISA provides for a limited exception to the anti-assignment provision: a voluntary and revocable assignment that does not exceed in the aggregate 10 per cent of any benefit payment. 29 U.S.C. § 1056(d)(2). For the reasons that follow, the Court need not address whether this exception applies.

13    On March 1, 1991, the Trustees of the Medical Plan filed an acknowledgement with the Pension Plan stating that the Medical Plan Trustees

> acknowledge to the administrator of the MEBA Pension Plan and Trust . . . that the Medical Plan has no enforceable right in, or to, any plan benefit payment or portion thereof (with respect to supplementary Pension Benefits payable under the Pension Plan and assigned to the Medical Plan), except to the extent of payments actually received pursuant to the terms of the arrangement. This acknowledgement is intended to be a blanket written acknowledgment for all participants and beneficiaries who are or may be covered under the arrangement with the Pension Pan for direct payments by the Pension Plan to the Medical Plan.

Affidavit of Lucille Hart, Ex. F.

[*29] *3. ERISA's Exclusive Benefit Rule*

In addition to the prohibitions on certain transactions and assignments, ERISA requires fiduciaries to discharge

1994 U.S. Dist. LEXIS 20726, *29
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

their duties with respect to a plan "solely in the interest of the participants and beneficiaries" of the plan and "for the exclusive purpose of . . . providing benefits to [them]." 29 U.S.C. § 1104(a)(1)(A). As a corollary to this "exclusive benefit rule," section 1103(c)(1) provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). In Count I, Plaintiffs argue that in adopting and ratifying Amendment 91-1 to the Pension Plan, the Defendant Trustees breached their duty to use plan assets for the exclusive benefit of participants. Plaintiffs further allege that the arrangement inures to the benefit of the employers because they now are absolved of contributions to the Medical Plan.

The record does not support this claim. Any benefit resulting from the 1990 changes to the two plans is enjoyed by Plaintiffs, [*30] who receive extra pension benefits each month. [14] MEBA Employers are in a worse position as a result of the 1990 amendments to the plans. Although the Pension Plan has been over funded and employers have not been required to contribute since 1986, the issuance of the pension supplement will accelerate their need to recommence contributing to the Pension Plan by two years. *See* Deposition of Edward Morgan, Individual Defendants' Ex. 15 (Collective Bargaining Notes).

14  Plaintiffs have not suffered from a decrease in Pension Plan assets caused by the issuance of the pension supplement. There remains a substantial surplus in the Pension Plan. As of 1990, the Pension Trust had a surplus of $ 280 million. *See* Affidavit of Lucille Hart in Support of Defendant Medical Plan's Motion for Summary Judgment at P 8. Furthermore, Plaintiffs cannot claim that they may suffer from a depletion of assets in the future. ERISA does not require an employer to maintain a surplus. *Bigger v. American Commercial Lines,* 862 F.2d 1341, 1343-44 (8th Cir. 1988) ("The employer is not obligated by law to buildup a surplus of assets over the amount needed to fund [a plan's] benefits."). Once a surplus is established, pensioners do not have any pretermination rights in the surplus funds. *Id.* ("ERISA therefore protects only assets that have been earned.").

[*31]  Plaintiffs' reasoning behind their allegation that the Defendant Trustees violated the exclusive benefit rule is terribly misplaced. Defendants are entitled to summary judgment on Count I as a matter of law. This conclusion is supported by the Sixth Circuit's comments regarding the exclusive benefit rule in *Holliday v. Xerox Corp.*.

> The language of ERISA stating that 'the assets of a plan shall never inure to the benefit of an employer' cannot be read as a prohibition against any decisions of an employer with respect to a pension plan which have the obvious primary purpose and effect of benefitting the employees, and in addition the incidental side effect of being prudent from the employer's economic perspective.

732 F.2d 548, 551 (6th Cir.), *cert. denied,* 469 U.S. 917, 83 L. Ed. 2d 229, 105 S. Ct. 294 (1984). In this case, where Plaintiffs enjoy the benefit of their monthly pension supplements and the employer trustees acted in the interest of economic prudence, the language of section 1103 does not apply.

### 4. Breach of Fiduciary Duty

In Count II, Plaintiffs assert several breaches of fiduciary duty by the thirteen original Defendant Trustees. *See* 29 U.S.C. § 1104 (defining the "prudent [*32] man standard of care" for fiduciaries). In paragraph 65, Plaintiffs allege that the Defendant Trustees breached their fiduciary duties by "imprudently requiring pensioners to pay the full cost of their participation in the Medical Plan and adopting the supplementary pension benefit for the purpose of evading ERISA's prohibition on the transfer of plan assets to another plan with different beneficiaries." Second Amended Complaint at P 65. This claim is without merit for several reasons. First, as discussed above, the decision to require pensioners to contribute to the Medical Plan was the result of the employers' properly exercising their reserved right to amend the terms of the Medical Plan. Second, also discussed above, there has been no transfer of assets in violation of ERISA. Finally, the Court agrees with Defendants' arguments that they cannot be held liable as fiduciaries for enacting the amendments to the plans.

1994 U.S. Dist. LEXIS 20726, *32
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

Defendants assert that the decisions to amend the two plans are "design" decisions for which they cannot be held liable. They also assert that in adopting and ratifying these decisions, they were carrying out "settlor" functions. Defendants argue that as Trustees they [*33] cannot be held liable under ERISA for either plan "design" changes or their "settlor" functions. Several courts have acknowledged this distinction between employers' functions as designer and settlor of a plan, for which they are not liable as fiduciaries, and their functions as plan administrators, for they are subject to ERISA's exacting fiduciary standards. *See, e.g., Johnson v. Georgia-Pacific Corp.,* 19 F.3d 1184, 1188 (7th Cir. 1994) (reviewing ERISA's definition of "fiduciary" and determining that when the defendant employer made amendments to the plans, it was acting as "settlor," not as trustee); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1158 (3d Cir. 1990) (distinguishing between an employer's role as "plan sponsor" and "plan administrator"); *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.), *cert. denied,* 498 U.S. 984, 112 L. Ed. 2d 529, 111 S. Ct. 517 (1990) ("When an employer decides to . . . amend . . . a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards.") (internal quotation and citation omitted).; *Hlinka v.* [*34] *Bethlehem Steel Corp.,* 863 F.2d 279, 285 (3d Cir. 1988) ("The *design* of this plan was unquestionably not violative of ERISA because BSC [the defendant company] in drafting the plan was acting as an employer and not a fiduciary."); *Id.* ("The ERISA scheme envisions that employers will act in a dual capacity as both fiduciary to the plan and as employer. ERISA does not prohibit an employer from acting in accordance with its interests as an employer when not administering the plan or investing its assets.") (citations omitted); *Musto v. American Gen. Corp.,* 861 F.2d 897, 911 (6th Cir. 1988) ("There is a world of difference between administering a welfare plan in accordance with its terms and deciding what those terms are to be. A company acts as a fiduciary in performing the first task, but not the second."), *cert. denied,* 490 U.S. 1020, 104 L. Ed. 2d 182, 109 S. Ct. 1745 (1989). In *Johnson v. Georgia-Pacific,* the Seventh Circuit explained:

Employers decide who receives pension benefits and in what amounts, select levels of funding, adjust myriad other details of pension plans, and may decide to terminate the plan altogether. In doing these things, we have [*35] held, they are no more the employees' "fiduciaries" than when they decide what wages to offer or whether to close the plant and lay the workers off.

19 F.3d at 1188.

The Fourth Circuit has also recognized the distinction. *See Sejman v. Warner-Lambert Co.,* 889 F.2d 1346, 1349 (4th Cir. 1989) ("While the employer acts as a fiduciary in administering plan assets, it violates no fiduciary duty in amending a plan involving non-vested interests. . . . Business decisions . . . reducing the amount of unaccrued benefits have routinely been held to be non-fiduciary.") (citation omitted), *cert. denied,* 498 U.S. 810, 112 L. Ed. 2d 19, 111 S. Ct. 43 (1990); *Dzinglski v. Weirton Steel Corp.,* 875 F.2d 1075, 1079 (4th Cir.) ("When an employer is administering an employee benefit plan, the employer 'must satisfy the exacting fiduciary standards imposed by ERISA.'. . . ERISA, however, does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets.'") (citations omitted), *cert. denied,* 493 U.S. 919, 107 L. Ed. 2d 261, 110 S. Ct. 281 (1989).

In paragraphs 67 and 68, Plaintiffs allege that Defendants [*36] committed "several other acts not in the interest of the participants and beneficiaries" of the plans. Neither Plaintiffs nor Defendants request summary judgment on these claims. Accordingly, with respect to Count II, the Court will grant judgment in favor of the individual Defendants on paragraph 65 only.

*5. Plaintiffs' LMRA Claims*

In Count VI, Plaintiffs allege that the Medical Plan and the Medical Plan Trustees breached the covenants of the applicable collective bargaining agreements in violation of Section 301 of the LMRA (29 U.S.C. § 185(a)) and Section 502(a)(1)(B) of ERISA (29 U.S.C. § 1132(a)(1)(B)). Second Amended Complaint at PP 115, 117. The LMRA provides for suits by and against labor organizations for violations of contracts between an employer and unions. 29 U.S.C. § 185(a). ERISA provides for the right of a participant under a plan governed by ERISA to bring a civil action to recover

benefits due him under the plan and to enjoin any action which violates any provision of ERISA. 29 U.S.C. § 1132(a)(1)(B) and (a)(3).

Plaintiffs' specific allegation in Count VI is that the Medical Plan has failed to enforce a "$ 2,000 cap on total out-of-pocket expenses and to [*37] provide the required benefits of 80% of usual, reasonable, and customary charges." Second Amended Complaint at P 116. Plaintiffs, however, have failed to provide any evidentiary support for this claim. Both Pashak and Arens have testified that they have not suffered in this respect. *See* Arens Deposition at 17-18, 67-69; Pashak Deposition at 58-59, 156. According to the Medical Plan's Administrator, no pensioner has been denied the benefit of the $ 2,000 cap or 80% coverage by the Plan. *See* Lucille Hart Affidavit at P 20. Plaintiffs have presented no evidence to refute this statement. With respect to Plaintiffs' claims under section 1132, they have failed to present any evidence of benefits due them under the Medical Plan. Further, as there have been no violations of ERISA, there are no grounds for a claim under section 1132(a)(1)(B) and (a)(3).

With respect to the LMRA claims, Defendant Medical Plan argues that it cannot be liable under the LMRA for activities that occurred during the collective bargaining process. The Court agrees. Non-signatories to collectively bargained contracts between employers and unions may not be sued under 29 U.S.C. § 185. *See Int'l Union, United* [*38] *Mine Workers v. Covenant Coal Corp.,* 977 F.2d 895, 897 (4th Cir. 1992) ("It is axiomatic that only a party to a contract can violate that contract. A contract governs only the conduct of the parties who have agreed to its terms.").

*C. Defendant Ward*

Defendant Ward, who was added as a Defendant in the Second Amended Complaint, has not been served. 120 days have passed since the Court allowed the filing of the Second Amended Complaint on March 1, 1994. In accordance with Fed. R. Civ. P. 4(m), Plaintiffs will be required to show cause why a dismissal should not be entered in Ward's favor for the failure of service within 14 days of the date of this Memorandum and Order.

*III. CONCLUSION*

In summary, the Court finds that (1) Plaintiffs are not entitled to free lifetime medical benefits under the Medical Plan; (2) there has been no transfer of assets from the Pension Plan to the Medical Plan; (3) Defendant Trustees have caused no transaction in violation of 29 U.S.C. § 1106; (4) there has been no assignment of Plaintiffs' benefits in violation of 29 U.S.C. § 1104; and (5) there has been no breach of ERISA's "exclusive benefit rule." Accordingly, Defendants are entitled [*39] to judgment in their favor as a matter of law on all counts relating to those claims--Counts I and III-VI and paragraph 65 of Count II. The Court will deny Plaintiffs' motions for summary judgment and will grant Defendants' motions for summary judgment. The only remaining claims are alleged in paragraphs 67 and 68 in Count II against the thirteen original defendants pursuant to 29 U.S.C. § 1132(a)(2) and (3). As there is no right to a jury trial on these equitable claims, *see Spinelli v. Gaughan,* 12 F.3d 853, 857-58 (9th Cir. 1993); *Dameron v. Sinai Hosp. of Baltimore, Inc.,* 815 F.2d 975, 981 (4th Cir. 1987), the Court will grant Defendants' Joint Motion to Strike Plaintiffs' Jury Demand.

A separate Order will issue.

William M. Nickerson

United States District Judge

Dated: August 19, 1994.

*ORDER*

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this 19th day of August, 1994 by the United States District Court for the District of Maryland, ORDERED:

1. That Defendant The MEBA Medical & Benefits Plan's Motion for Summary Judgment (Paper No. 59) is hereby GRANTED;

2. That Individual Defendants' Motion for Partial Summary [*40] Judgment (Paper No. 85) is hereby GRANTED;

3. That Defendants Hadju's, Bem's, Austin's and Langley's Alternative Motion for Summary Judgment (Paper No. 161) is hereby GRANTED;

4. That Plaintiffs' Motion for Summary Judgment Against All Individual Defendants on Counts I, III-V of the Complaint (Paper No. 133) is hereby DENIED;

5. That Plaintiffs' Motion for Summary Judgment Against Defendant The MEBA Medical Plan and its Trustees on Count VI (Paper No. 132) is hereby DENIED;

6. That Judgment is hereby GRANTED in favor of Defendants Clayton Eugene DeFries, C.W. Daulley, C.E. Dodson, Karl Landgrebe, Donald Masingo, R.F. Schamann, Shannon Wall, Edmund Davis, Thomas Murphy, Franklin Riley, William Ristine, Allen Taylor, Philip Shapiro, Joel Bem, Nicholas Hadju, William Langley, and Mark Austin and against Plaintiffs on Counts I, III - VI and Paragraph 65 of Count II;

7. That Judgment is hereby GRANTED in favor of Defendant The MEBA Medical & Benefits Plan and against Plaintiffs on Count VI;

8. That Defendant's Motion to Strike Plaintiffs' Demand for a Jury Trial (Paper 137) is hereby GRANTED;

9. That the American Association of Retired Persons'

Motion to File a Brief in Amicus Curiae [*41] (Paper No. 145) is hereby GRANTED;

10. That Defendant The MEBA Medical & Benefits Plan's Motion to Strike Plaintiffs' Reply in Support of their Motion for Summary Judgment on Count VI (Paper No. 154) is hereby DENIED;

11. That Plaintiffs SHOW CAUSE why a dismissal should not be entered in favor of Defendant Gordon Ward within fourteen (14) days of the date of this Order; and that

12. That the Clerk of the Court mail copies of the foregoing Memorandum and this Order to all counsel of record.

William M. Nickerson

United States District Judge

# EXHIBIT 43

LEXSEE

## GISELE A. CHILD-OLMSTED v. LOYOLA COLLEGE

### CIVIL ACTION NO.: CCB-04-3559

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

### 2005 U.S. Dist. LEXIS 7523; 34 Employee Benefits Cas. (BNA) 2665

### April 28, 2005, Decided

**COUNSEL:** [*1] For Gisele A. Child-Olmsted, Plaintiff: Steven M Wishnow, Kanter and Wishnow Chtd, Chevy Chase, MD.

For Loyola College In Maryland, Inc., Defendant: Laura Pierson Scheinberg, Bruce S Harrison, Shawe and Rosenthal LLP, Baltimore, MD.

**JUDGES:** Catherine C. Blake, United States District Judge.

**OPINION BY:** Catherine C. Blake

**OPINION**

## MEMORANDUM

The plaintiff, Gisele Child-Olmsted, filed suit on September 21, 2004 for breach of contract in the Circuit Court for Baltimore City against her employer, Loyola College, after her request for an early retirement benefit was denied. The defendant removed the case to this court on the basis that the matter is covered by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § § 1001 *et seq.*, and therefore this federal court has exclusive jurisdiction. The plaintiff filed a motion to remand, arguing that the early retirement benefit was not an "employee welfare benefit plan" covered by ERISA, and therefore there was no basis for federal jurisdiction. For the reasons that follow, the plaintiff's motion to remand will be granted.

## BACKGROUND

At the time this dispute arose in the fall of 2001,

[*2] Gisele Child-Olmsted was a tenured, full professor at Loyola College. (Compl. P 3.) She was 54 years old and had been employed by the College for eighteen years. (*Id.* P 4.) She began an approved sabbatical leave of absence in June 2001 (*Id.* P 15). While she was on sabbatical in the fall of 2001 the defendant distributed its Faculty Handbook of September 2001 to her and the rest of the faculty. (*Id.* P 5.) Among other things, the Faculty Handbook included a description of the College's Voluntary Early Retirement Program ("VERP"), a program that had been established previously by the College to provide certain financial support to eligible, regular, tenured faculty who wished to retire prior to the normal retirement age of 65. (*Id.* P P 6-7.) Under the VERP all regular, tenured, faculty members whose age plus years of service added together were equal to or greater than the sum of 70 were eligible for early retirement. Participants in the VERP would receive an early retirement severance payment upon termination of tenured employment. *(See* Pl.'s Motion to Remand, Ex. 1, "Voluntary Early Retirement Program for Faculty.") The Faculty Handbook contained a formula showing [*3] that the severance payment would be calculated based on a combination of age, salary, and number of service years. (*Id.*) The VERP provided four ways in which a participant could receive the severance payment: (1) twenty-four semi-monthly installments; (2) forty-eight semi-monthly installments; (3) a lump sum deposit into the participant's annuity plan; or (4) a lump sum payment. (*Id.*) While participants would still have access to their accumulated retirement accounts, they would not receive post-retirement benefits from the college, although they could set aside part of their severance payment for benefits and they could continue to participate in the College's group health insurance through COBRA. (*Id.*)

2005 U.S. Dist. LEXIS 7523, *3; 34 Employee Benefits Cas. (BNA) 2665
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

The Faculty Handbook included provisions describing the process for participation in the VERP. The Handbook specified that "eligible faculty shall provide written notification to their Chairperson and to the appropriate Dean by October 1 of their planned last academic year of employment," and that "exceptions to the October 1 deadline will be considered on the basis of extraordinary circumstances." (*Id.*) The Handbook stated that "final approval rests with the Vice-President [*4] for Academic Affairs." (*Id.*) The Handbook explained that the Vice President "may deny an application and will provide a written rationale for the denial," and then listed three factors that could justify denial, all relating to the impact of the early retirement of the faculty member on the College. [1] In addition, the Handbook provided that "if a large number of applications have been received for early retirement in the same year, and the above three situations do not apply, applications will be prioritized on the basis of most years of service." In closing, the VERP description stated that "the College reserves the right to amend or terminate [the program], in full or in part, at any time." (*Id.*) This is consistent with an earlier statement in the VERP description that "periodically, a report detailing the financial implications of the plan is presented to the President. A recommendation to continue or discontinue the plan will be made at the conclusion of each review." (*Id.*)

> 1 The Vice-President of Academic Affairs could deny an application if he determined that granting the application would: (1) lead to difficulties in meeting contractual, financial, legal or other obligations by which the College is bound; (2) negatively affect an audit, accreditation or any other review to which the College or any of its programs may be subject; (3) seriously disrupt the conduct of a College operation or program. (*Id.*)

[*5] The plaintiff states that while on sabbatical leave she learned on or about November 14, 2001 from a colleague that the College's Vice-President for Academic Affairs, David Haddad, Ph.D., intended to recommend to the President and Board of Trustees of the College that the VERP be discontinued. (Compl. P 18.) On or about November 15, 2001, the plaintiff notified the defendant's Human Resources Department that she wished to retire pursuant to the VERP. (*Id.* P 19.) According to the plaintiff, at this time, the VERP remained in full force and effect. (*Id.* P 20.) The plaintiff then applied for early retirement with the instructions provided to her by the

Human Resources Department. (*Id.* P 22.) In accordance with guidance from the Human Resources Department, the plaintiff next contacted the office of Vice-President Haddad to request an appointment with him at the earliest possible time in order to continue the application process. (*Id.* P 23.) She was scheduled for the first available appointment on December 10, 2001. (*Id.* P 24.) On that day, she met with Vice-President Haddad. He informed her that her application for early retirement was not timely inasmuch as the VERP [*6] had been terminated by the College five days earlier on December 5, 2001. (*Id.* P 25.) According to the plaintiff, the Vice-President nonetheless represented to her that he would attempt to secure her participation in the program. (*Id.* P 26.) Months later, Vice-President Haddad notified the plaintiff that the College would not permit her to participate in the early retirement program because the program had been terminated. The plaintiff then filed suit, alleging that the defendant breached its contractual obligation to permit her to retire either by accepting her application as it was presented or by granting an exception based upon "the extraordinary circumstances" of her being on approved sabbatical leave during the time when the termination of the program was contemplated and carried out. (*Id.* P 28.)

## ANALYSIS

The sole issue before the court is whether the defendant's Voluntary Early Retirement Program ("VERP") constitutes an "employee welfare benefit plan" as defined by ERISA. If it does, then by the preemptive force of ERISA, this court has exclusive jurisdiction over the claim, and the motion to remand must be denied. If the VERP is not an ERISA plan, then [*7] this court lacks subject matter jurisdiction over the matter and the motion to remand must be granted.

Removal of cases from state court to federal court is appropriate when the federal district court has original jurisdiction, as it does in a "federal question" case, that is, "a case arising under the Constitution, laws, or treaties of the United States.'" *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 95 L. Ed. 2d 55, 107 S.Ct. 1542, 1546 (1987) (quoting 28 U.S.C. § 1331). Generally, under the "well-pleaded complaint rule," a federal cause of action only arises if the plaintiff's complaint raises issues of federal law. *Id.; Pinney v. Nokia, Inc.,* 402 F.3d 430, 442 (4th Cir. 2005) (noting also that "a plaintiff is master of the claim, and he may avoid federal jurisdiction by exclusive reliance on state law in drafting his complaint")

2005 U.S. Dist. LEXIS 7523, *7; 34 Employee Benefits Cas. (BNA) 2665
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

(citations and internal quotations omitted).

In limited circumstances, a state common law complaint, such as the one at issue in this case, may nonetheless convert into one stating a federal claim, if it "is necessarily federal in character by virtue of the clearly manifested intent of Congress. [*8] " *Metropolitan Life Ins. Co.*, 481 U.S. at 67. Courts have recognized that claims involving employee welfare benefit or retirement plans may present such a situation due to the exclusive preemption provision contained in ERISA. *Id.* at 66-67; *see also Holland v. Burlington Indus. Inc.*, 772 F.2d 1140, 1146-47 (4th Cir. 1985) (observing that the "sweeping federal preemption" provision "must be given broad effect") (citations and quotations omitted). Section 514(a) of ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). "State laws" "encompass [] not only statutes but also common law causes of action, such as [plaintiff's] claim for breach of contract." *Gresham v. Lumbermen's Mut. Cas. Co.*, 2005 U.S. App. LEXIS 6078, 2005 WL 844728, F.3d (4th Cir. 2005). In analyzing when state claims are preempted by ERISA, the Supreme Court has looked to "the language of ERISA's pre-emption provision, the underlying purpose of that provision, and the overall objectives of ERISA itself." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 7, 96 L. Ed. 2d 1, 107 S.Ct. 2211, 2215 (1987). [*9] First, the Supreme Court has noted the important distinction between "employee benefits" and "employee benefit *plans*," observing that Congress meant to preempt only the latter. *Id.*, 482 U.S. at 8. In other words, "an employer's decision to extend benefits does not constitute, in and of itself, the establishment of an ERISA plan." *Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 256 (8th Cir. 1994). In providing that ERISA would preempt state laws related to employee benefit plans, Congress's intent was to "establish a uniform administrative scheme" so that employers operating in more than one state would not be subject to conflicting regulations. *Fort Halifax*, 482 U.S. at 9-11 (citing *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 77 L. Ed. 2d 490, 103 S.Ct. 2890, 2894 (1983)). This policy decision was made in recognition of the fact that "employers establishing and maintaining employee benefit plans are faced with the task of coordinating complex administrative activities," and Congress did not want conflicting regulatory burdens to cause employers to reduce benefits or refrain from offering them. *Id.* at 11. This is likewise [*10] consistent with Congress's goal that by imposing uniform regulatory standards for employee benefit plans, ERISA "would safeguard employees from such abuses as self-dealing, imprudent investing, and misappropriation of plan funds.'" *Id.* at 15 (quoting 120 Cong. Rec. 29932). "The focus of [ERISA] thus is on the administrative integrity of benefit plans-which presumes that some type of administrative activity is taking place." *Id.*

In *Fort Halifax*, while reviewing whether a Maine law that required employers to provide a one-time severance payment to employees in the event of a plant closing was preempted by ERISA, the Supreme Court outlined a number of factors that indicate whether an employee benefit constitutes an ERISA "plan." First, the Court reasoned that the Congressional concerns reflected in ERISA only arise "with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." The Court determined that the Maine statute's "requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation." *Id.* at 12. [*11] The Court reasoned that:

> The employer assumes no responsibility to pay benefits on regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan.

*Fort Halifax*, 482 U.S. at 12.

The Fourth Circuit has applied the *Fort Halifax* analysis in an unreported decision, *see Lomas v. Red Storm Entm't, Inc.*, 49 Fed. Appx. 396, 400 (4th Cir. 2002), reversing summary judgment where an employee's severance agreement "does not require an administrative scheme and it does not appear to be an employee benefit

2005 U.S. Dist. LEXIS 7523, *11; 34 Employee Benefits Cas. (BNA) 2665
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

plan as defined by ERISA." In so ruling, the Fourth Circuit stated that it was "impressed by and find [s] persuasive the decision of one of [*12] our sister circuits." *Id.* (citing *Kulinski,* 21 F.3d at 258) (focusing on whether a severance agreement required "the establishment of a separate, ongoing administrative scheme to administer the promised benefits," to find that the company exercised no discretion and was required only to write a check).

In keeping with the framework developed by the Eighth Circuit, as well as other circuit courts and district courts in this circuit, I will analyze whether the defendant's early retirement program created an "ongoing administrative scheme" that required it to exercise discretion in such a way that the benefit program would be considered an ERISA plan. *See, e.g., Tinoco v. Marine Chartering Co.,* 311 F.3d 617, 622 (5th Cir. 2002) (finding that severance benefits provided under an early retirement program were not covered by ERISA because the program did not "require[] an administrative scheme to make ongoing discretionary decisions based on subjective criteria"); *O'Connor v. Commonwealth Gas Co.,* 251 F.3d 262, 268-69 (1st Cir. 2001) (finding that severance bonus and other early retirement incentives tied to years of service were [*13] based on "objective" and "mechanical" determinations and therefore did not implicate ERISA); *Velarde v. Pace Membership Warehouse, Inc.,* 105 F.3d 1313, 1317 (9th Cir. 1997) (holding there was no ERISA plan because "the employer was simply required to make a single arithmetical calculation to determine the amount of the severance benefits" and there was no need for an "ongoing administrative scheme"); *Emery v. Bay Capital Corp.,* 354 F.Supp.2d 589, 593 (D.Md. 2005) (describing factors used to determine whether an ERISA plan exists, including "whether the severance payments came due upon the occurrence of a single, unique event or whenever the employer terminates the employees" and "whether the severance arrangement . . . requires the employer to engage in a case-by-case review of employees"); *Donovan v. Branch Banking & Trust Co.,* 220 F.Supp. 2d 560, 564-65 (S.D.W.Va. 2002) (same); *cf. Emmenegger v. Bull Moose Tube Co.,* 197 F.3d 929, 935 (8th Cir. 1999) (holding that the company's severance plan was covered by ERISA because "the decision to pay benefits is made on an individual, ongoing basis, after exercising the discretion [*14] described in the plan"); *Cecil v. AAA Mid-Atlantic, Inc.,* 118 F.Supp. 2d 659, 664 (D.Md. 2000) (holding that supplemental retirements

benefits constituted an ERISA plan because the company was required to "manage [the employee's] accounts, and distribute to him the premiums to which he was entitled" on an ongoing basis).

It is clear that severance pay, such as the early retirement severance pay at issue in this case, can be considered an "employee benefit" as that term is defined under ERISA. *See Massachusetts v. Morash,* 490 U.S. 107, 116, 104 L. Ed. 2d 98, 109 S.Ct. 1668, 1673 (1989) (citing *Holland v. Burlington Indus. Inc.,* 772 F.2d 1140 (4th Cir. 1985)); *cf. Biggers v. Wittek Ind., Inc.,* 4 F.3d 291, 295 (4th Cir. 1993) (observing that "[a] *plan* established by an employer providing for severance pay benefits is an employee welfare benefit plan covered by ERISA") (emphasis added). What is less certain is whether the College's early retirement program constituted an ERISA "employee benefit *plan.*" The plaintiff insists that it did not, emphasizing that no ongoing administrative scheme existed to administer the VERP. Rather, [*15] the plaintiff contends, participant eligibility was "determined in a purely mechanical manner," because the VERP description provided that "all regular, tenured, faculty members whose age plus years of service added together are equal to or greater than the sum of 70 are eligible to participate." (*See* Pl.'s Mot. to Remand at 2-3.) According to the plaintiff, approval of a faculty member's application was "virtually automatic;" apparently the College never denied an eligible faculty member's request for early retirement pursuant to the VERP. (*See* Pl.'s Reply to Def.'s Opp. at 2). The plaintiff notes that according to the College's records "since 1997, approximately 2 to 3 faculty members have applied for early retirement each year." (*See* Pl.'s Reply to Def.'s Opp., Ex. 2, March 13, 2002 Meeting Minutes of the Loyola College Board of Trustees). Apparently, once the College announced that it was considering terminating the program in 2001, seven faculty members applied and were approved for the program. (*Id.*)

Furthermore, the plaintiff maintains that little to no employer discretion was exercised in determining the severance pay amount, because the VERP provided a formula [*16] based on employee salary and years of service to calculate the benefits. Once the final sum was calculated by the formula, the College would simply execute the payment according to the retiree's wishes. Therefore, the plaintiff maintains, the College did not undertake any long-term obligation with respect to

2005 U.S. Dist. LEXIS 7523, *16; 34 Employee Benefits Cas. (BNA) 2665
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

payments that would create "periodic demands on its assets [that require] financial coordination and control." (Pl.'s Mot. to Remand at 6) (quoting *Fort Halifax*, 482 U.S. at 12) (internal quotations omitted). Rather, the severance payment was "triggered by a single event, that is, the decision of the eligible faculty member to retire." (*Id.*) The plaintiff contends that the VERP represents the sort of "agreement [] involving one-time or short-term payouts upon the termination or retirement of an employee [that does not] constitute [an] ERISA plan []." (*Id.* at 4) (quoting *Cecil*, 118 F.Supp. 2d at 664).

The defendant disputes this characterization as an over-simplified view of the VERP. According to the College, the VERP required the Vice-President of Academic Affairs to exercise considerable discretion, in that there [*17] were several factors that might justify denial of a faculty member's request for early retirement. *See supra* note 1. The defendant further argues that because the VERP provided that a participant could elect "to have the monies dispersed over one year, two years, in a lump sum, or deposited into the faculty member's regular annuity plan with the remaining balance paid in a lump sum payment," such "a menu of options required a greater need for administration of the plan." (*See* Def.'s Opp. at 5.) Finally, the defendant urges the court to focus on Supreme Court and Fourth Circuit cases that have stated that employee severance benefit plans can be employee welfare benefit plans covered by ERISA, *see Fort Halifax*, 482 U.S. at 7 n.5; *Massachusetts v. Morash*, 490 U.S. at 116, *Holland*, 772 F.2d at 1145; *Biggers*, 4 F.3d at 295, rather than the cases from other jurisdictions relied on by the plaintiff.

The cases relied on by the College, however, are not readily applicable to the facts presented in this case. For example, in both *Fort Halifax* and *Morash*, the Supreme Court merely cited *Holland* for the proposition [*18] that severance pay plans may be considered employee welfare benefit plans, without analyzing whether a voluntary early retirement benefit program, such as the one at issue in this case, was an ERISA welfare benefit plan. *See* 482 U.S. at 7 n.5; 490 U.S. at 116. In *Holland*, which pre-dates *Fort Halifax*, the Fourth Circuit determined that severance pay provided to employees after they were *involuntarily* terminated "due to circumstances such as elimination or modification of operations or other job elimination due to bona fide organization changes," related to the employer's welfare benefit plan and therefore was covered by ERISA. 772 F.2d at 1143-44

(internal quotations and citations omitted). Similarly, the *Biggers* court relied on *Morash* to find that a severance plan that provided pay to employees after a plant closing was an employee welfare benefit within the scope of ERISA, even if it only applied to one employee. 4 F.3d at 297. In each of these cases, the benefits at issue were contingent upon the occurrence of an event outside the employee's control, and thus operated as a kind of safety net that the employees [*19] could expect to rely on, in a way that implicated ERISA. *See Morash*, 490 U.S. at 115-16 (noting that "the distinguishing feature of most of these benefits [referring to medical, sickness, accident, and disability benefits, etc.] is that they accumulate over a period of time and are payable only upon the occurrence of a contingency outside the control of the employee"). The *Morash* court specifically noted that "it is unlikely that Congress intended to subject to ERISA's reporting and disclosure requirements those vacation benefits which by their nature are payable on a regular basis from the general assets of the employer *and are accumulated over time only at the election of the employee.*" 490 U.S. at 116 (emphasis added). Therefore, these cases cannot be read to require, as the defendant urges, that any benefit plans involving severance pay are automatically considered ERISA employee welfare benefit plans. Rather, the severance pay plan at issue in this case was a strictly voluntary early retirement program, thus making it more like the plans the Supreme Court noted would likely be outside the scope of ERISA. *Id.*

Indeed, the VERP appears [*20] to more closely resemble the severance pay plans deemed not covered by ERISA in cases in other circuits. *See, e.g., Tinoco*, 311 F.3d at 623 (finding that early retiree health benefits discontinued by employer were not employee welfare benefit plans under ERISA); *O'Connor*, 251 F.3d at 268-69 (early retirement severance bonus was not covered by ERISA because it was administered in an "objective" and "mechanical" manner); *Velarde*, 105 F.3d at 1317 (determining that employer's "stay on bonus" and severance pay was not an ERISA plan because the employer exercised only "slight" discretion in administering the plan). *Cf. Emmenegger*, 197 F.3d at 935 (finding that severance plan constituted an ERISA plan because the record showed the employer exercised discretion in such a way that in "each case someone must make an ad hoc judgment about the reason for the employee's termination and evaluate the quality of that person's service"). While the defendant insists that the

2005 U.S. Dist. LEXIS 7523, *20; 34 Employee Benefits Cas. (BNA) 2665
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

VERP required the Vice-President to exercise considerable discretion and review each applicant for approval, it appears, as the plaintiff has argued, that little [*21] discretion was exercised and that approval was "virtually automatic." A minimal exercise of discretion does not convert an early retirement plan into an employee welfare benefit plan under ERISA.

Those factors that did exist were focused on the college's institutional health, rather than the individual applicant's qualifications for the program. Such factors, which apparently were designed to enable the employer to exercise some control over the possible financial and organizational impact of the early retirement program, likewise do not constitute the sort of discretion that implicates ERISA. *See, e.g., O'Connor,* 251 F.3d at 265 (although the employer "reserved the right to limit participation [in an early retirement plan] to 300 employees, and to delay the retirement of any employee who elected to participate for up to one year," the court ultimately found there was little discretion involved and therefore the plan was not covered by ERISA).

Moreover, the defendant's argument that an ongoing administrative scheme was created because the VERP provided four different payout options, at least one of which obligated the College to make payments over a two year period, [*22] is not persuasive. [2] Courts have recognized that severance benefits providing for installment payments over an extended period of time need not trigger ERISA obligations. *See, e.g., Tinoco,* 311 F.3d at 622 ("severance plans that provide certain benefits over a period of time do not necessarily require an ongoing administrative scheme") (citing *Fontenot v. NL Industries, Inc.,* 953 F.2d 960 (5th Cir. 1992)); *Cecil,* 118 F.Supp. 2d at 664 (noting that "agreements involving one-time or short-term payouts upon the termination or retirement of an employee do not constitute ERISA plans") (citing *Delaye v. Agripac, Inc.,* 39 F.3d 235, 237 (9th Cir. 1994); *Kulinski,* 21 F.3d at 258; *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530 (3d Cir. 1992)).

> 2   Similarly, the fact that the VERP apparently was paid out of general assets versus a separate trust fund is not dispositive. *Fort Halifax,* 482 U.S. at 17-18 (citing *Holland,* 772 F.2d 1140).

[*23] The VERP was created to provide incentives for early retirement in an effort to better facilitate the entry of new professors into the faculty ranks. When the College determined that the financial burdens of this program outweighed the benefits, the Board of Trustees voted to eliminate it. The defendant argues this is precisely why the VERP should be considered covered by ERISA -- this kind of discretion strikes at the heart of Congress's concern that employees not be left out in the cold by their employers. I disagree. According to the program description, the VERP could have been eliminated at any time, and it was essentially voluntary, both on the part of the College and on the part of the eligible participants. Under this voluntary early retirement plan, "the employer assumed no responsibility to pay benefits on an ongoing basis." *Fort Halifax,* 482 U.S. at 12. [3]

> 3   By this analysis, I am expressing no opinion on the merits of the plaintiffs contract claim against the College.

In short, [*24] the defendant has failed to demonstrate that the VERP necessitated an "ongoing administrative scheme" that required the kind of "discretionary determination . . . that triggers an employer's fiduciary obligation to its beneficiaries." *O'Connor,* 251 F.3d at 269. Accordingly, the VERP was not an "employee welfare benefit plan" within the meaning of ERISA. As a result, this court lacks subject matter jurisdiction over the plaintiff's claim, and this case must be remanded to the Circuit Court for Baltimore City.

A separate order follows.

April 28, 2005

   Date

   Catherine C. Blake

   United States District Judge

## ORDER

For the reasons stated in the accompanying Memorandum, it is hereby ORDERED that:

> 1.  the plaintiff's Motion to Remand (docket entry no. 10) is **Granted;**

> 2.  this case shall be **Remanded** to the Circuit Court for Baltimore City;

> 3.  copies of this Order and

accompanying Memorandum shall be sent
to counsel of record; and 4. the clerk of the
court shall **CLOSE** this case.

Date

Catherine C. Blake

United States District Judge

April 28, 2005

# EXHIBIT 44

LEXSEE

**ELAINE L. CHAO, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, Plaintiff, vs. JACK F. MOORE AND JOHN M. GRAU, Defendants.**

**Civil Action No. AW-99-1283**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION**

**2001 U.S. Dist. LEXIS 9012; 26 Employee Benefits Cas. (BNA) 2033**

**June 15, 2001, Decided**

**DISPOSITION:**     [*1] Defendants' Motion for Partial Summary Judgment [45-1] DENIED.

**COUNSEL:** For ELAINE L. CHAO, plaintiff: Myrna A. Butkovitz, Richard T. Buchanan, U.S. Department of Labor, Joan M. Roller, Law Office, Philadelphia, PA USA.

For JACK F. MOORE, JOHN M. GRAU, defendants: James M. Kefauver, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., Rockville, MD USA.

**JUDGES:** Alexander Williams, Jr., United States District Judge.

**OPINION BY:** Alexander Williams, Jr.

**OPINION**

**MEMORANDUM OPINION**

The Secretary of Labor of the United States Department of Labor (the "Secretary") brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. The complaint alleges that the trustees of a pension plan breached their fiduciary duties in causing the plan to enter a series of imprudent transactions. Currently pending before the Court is Defendants' Motion for Partial Summary Judgment. The motion has been fully briefed by all parties. No hearing is deemed necessary. See Local Rule 105.6. Upon consideration of the arguments made in support of, and opposition to, the Defendants' motion, the

Court makes the following determinations.

**I. [*2] FACTUAL BACKGROUND**

Defendants, Jack Moore and John Grau, were trustees to the National Electrical Benefit Fund (the "Fund"). The Fund is a defined benefit pension plan under § 3(1) of ERISA and is subject to its provisions. In 1990, the trustees were approached by Terence McAuliffe and Richard Swann for the purpose of purchasing certain real estate in Florida. The group ultimately arranged for a newly formed limited partnership to own the property. In November 1990, American Capitol Group I Assets Limited Partnership (the "Limited Partnership" or "LP") was formed. American Capitol Management Company ("ACMC") was the general partner and the Fund was the limited partner. Each partner held a 50% interest in the LP. ACMC was owned by McAuliffe and his wife.

In 1992, McAuliffe proposed a second real estate purchase for the development of single-family homes. Under the proposed transaction, the Fund would loan $ 10 million to another McAuliffe entity, Columbia Land and Development Corporation ("Columbia"), to acquire and develop the property (the "Country Run Loan"). In addition to a mortgage on the property, as security for the loan, the Fund was to receive completion and payment [*3] guarantees from ACMC as well as a stock pledge supported by ACMC's shares in the LP. The trustees obtained a report from the Weitzman Group to evaluate the propriety of the transaction. The Weitzman Report concluded that the Country Run Loan was a suitable investment. This conclusion was based in part on representations as to the value of the ACMC's guarantee.

2001 U.S. Dist. LEXIS 9012, *3; 26 Employee Benefits Cas. (BNA) 2033
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

The trustees decided to approve the loan.

While the Country Run Loan was transpiring, in June 1992, McAuliffe offered to sell additional shares of ACMC's interest in the LP to the Fund at a 15% discount. On June 22, 1992, the trustees signed an agreement purchasing the shares for $ 450,000. This purchase ultimately resulted in the Fund gaining an additional 6.8% interest in the LP. On June 26, 1992, the trustees executed the loan documents for the Country Run Loan. The parties dispute whether the Country Run Loan encountered difficulties.

In 1993, McAuliffe proposed an additional sale of ACMC's LP interests to the Fund at a 15% discount. The trustees accepted the proposal and the Fund paid $ 2 million to ACMC for additional shares of the LP. As a result of the purchase, the Fund's interest in the LP rose to 88.1%. Correspondingly, [*4] ACMC's interest declined to 11.9%. Eventually, in June 1997, ACMC purchased the Fund's interests in the LP and the Country Run Loan for $ 30,250,000.00.

## II. DISCUSSION

### A. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Haavistola v. Community Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993); Etefia v. East Baltimore Comm. Corp., 2 F. Supp. 2d 751, 756 (D. Md. 1998). For the purposes of summary judgment, a genuine dispute exists if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248. The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." Masson v. New Yorker Magazine, 501 U.S. 496, 520, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) (citations omitted). [*5] In the absence of contradictory evidence showing a genuine dispute as to a material fact, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). While the nonmoving party must do more than merely raise some doubt as to the existence of a fact, the moving party ultimately bears the burden of demonstrating the absence of all genuine issues of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Thus, "as the party moving for summary judgment, . . . the trustees can prevail only by demonstrating the absence of a genuine issue of material fact either on elements of the claim for which [the Secretary will] bear the burden of persuasion at trial or on elements for which the trustees themselves bear the burden of persuasion at trial." Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 917 (8th Cir. 1994) (hereinafter Roth I).

### B. Evidentiary Issues

As a preliminary matter, the Court needs to address the parties' respective objections to particular evidence presented [*6] by each party. First, the trustees assert that the affidavit of the Secretary's expert, Margaret B. Sowell, does not comply with the requirements of Rule 56(e) of the Federal Rules of Civil Procedure. The trustees maintain that the affidavit fails to include facts pertaining to the merits of the LP purchases and, therefore, is conclusory. "An affidavit that states facts on which the expert bases an opinion satisfies Fed. R. Civ. P. 56(e) even though the expert does not attach the data supporting the facts." M&M Medical Supplies v. Pleasant Valley Hosp., 981 F.2d 160, 166 (4th Cir. 1992). As the expert affidavit in M&M Medical Supplies, Sowell's affidavit is "far more than a conclusory statement" based upon general theories that is "devoid of reasoning." 981 F.2d at 164-65. Sowell sufficiently cited the facts on which her opinion was based, including the particulars of the Country Run Loan and the circumstances surrounding both LP purchases. The trustees' arguments concerning what additional considerations should have been included in her analysis goes to the weight to be accorded to her opinion, not its admissibility.

Next, the Secretary maintains [*7] that a memorandum sent from McAuliffe to the trustees delineating the positive progress of the LP properties is unauthenticated and inadmissable hearsay that cannot be considered on a motion for summary judgment. The Court disagrees. First, the memorandum may be sufficiently authenticated by Trustee Moore's deposition testimony that he read the memorandum and his familiarity with its author. See Fed. R. Evid. 901. Secondly, "hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter*

2001 U.S. Dist. LEXIS 9012, *7; 26 Employee Benefits Cas. (BNA) 2033
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

asserted.'" United States v. Lis, 120 F.3d 28, 30 (4th Cir. 1997) (quoting Fed. R. Evid. 801(c)) (emphasis in case). The trustees assert that this memorandum was relied upon in their decision to make the second LP purchase. "Where a statement is relevant under the facts and circumstances of a case to show its impact or effect on a particular [reader], the statement may be relevant without regard to its truth." Glen Weissenberger, Federal Rules of Evidence, § 801.7 (1998-99 ed.) (citing United States v. Freeman, 619 F.2d 1112, 1121 (5th Cir. 1980) (finding letter [*8] admissible because it was relevant to prove the effect on the reader)). Here, for purposes of determining whether the trustees acted in accordance with their fiduciary duties, the primary relevance of the memorandum is not the truth of the matter asserted therein, i.e., the status of the LP properties. Rather, the memorandum's significance lies in its effect on the trustees in their consideration of the second LP purchase. Therefore, the memorandum is not hearsay and properly available for the Court's review.

C. Breach of Fiduciary Duty under § 404(a)(1)(B)

There is no dispute that, at all relevant times, Moore and Grau were fiduciaries to the Fund as defined in Section 3(21) of ERISA. See 29 U.S.C. § 1002(21). Section 404(a)(1)(B) of ERISA requires a fiduciary to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "A fiduciary's subjective, good faith belief in his prudence will not insulate [*9] him from liability." Reich v. King, 867 F. Supp. 341, 343 (D. Md. 1994). "Rather, the prudent person standard has been determined by the courts to be an objective standard, requiring the fiduciary to (1) employ proper methods to investigate, evaluate and structure the investment; (2) act in a manner as would others who have a capacity and familiarity with such matters; and (3) exercise independent judgment when making investment decisions." Id. "Under this standard, a fiduciary is obligated to investigate all decisions that will affect the pension plan, and must act in the best interests of the beneficiaries." Schaefer v. Arkansas Medical Soc'y, 853 F.2d 1487, 1491 (8th Cir. 1988). Trustees "additionally are required to act 'in accordance with the documents and instruments governing the plan.'" Bidwill v. Garvey, 943 F.2d 498, 507 (4th Cir. 1991) (quoting 29 U.S.C. § 1104(a)(1)(D)).

"A trustee acts judiciously, then, in hesitantly exercising an ambiguous power." Id.

In interpreting the duty of prudence, the Secretary has prescribed regulations that incorporate the modern portfolio theory. See 29 C.F.R. § 2550.404a [*10] -1 (2000); Laborers Nat'l Pension v. Northern Trust Advisors, 173 F.3d 313, 317 (5th Cir. 1999) (finding it erroneous to review investment decision in isolation, "instead of according to the modern portfolio theory required by ERISA policy as expressed by the Secretary's regulations"). The regulations provide that an investment manager satisfies the prudence requirement if the manager gives "appropriate consideration" to

> those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties.

29 C.F.R. § 2250.404a-1(b)(1)(i) (2000). "Appropriate consideration" includes, but is not limited to the following factors: (1) the investment objectives of the plan, taking into consideration the risk of loss and opportunity for gain and (2) the composition of the plan with regard to diversification; (3) the liquidity and [*11] current return of the portfolio relative to the cash flow requirements of the plan; (4) the projected return of the portfolio relative to the funding objectives of the plan. See 29 C.F.R. § 2250.404a-1(b)(2) (2000).

Much of the Defendants' brief is devoted to heralding the beneficial results of the LP purchases. However, "the prudent person standard is not concerned with results; rather, it is a test of how the fiduciary acted viewed from 'the perspective of the 'time of the [challenged] decision' rather than from the 'vantage point of hindsight.'" Roth I, 16 F.3d at 918 (quoting Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984)). See also In re Unisys Savings Plan Litig., 74 F.3d 420 (3d Cir. 1996) (holding that the prudent investor standard requires "focusing on a fiduciary's conduct in arriving at an investment decision, not on its results"). Thus, the appropriate inquiry is whether, at the time of purchase, it was objectively

reasonable for the trustees to consummate a transaction that deteriorated the secondary collateral of an impending or existing loan financed by the Fund.

The record [*12] reveals inconsistencies as to the extent of the trustees' deliberations or investigation prior to entering the LP purchases. The first purchase for $ 450,000 appears to be based upon several factors: (1) the 15% discount off the market value of the LP shares as determined by an independent appraisal; (2) Trustee Moore's belief that the Limited Partnership was doing well; and (3) the opinion of Roy Dickinson, the head of the Fund's investment staff, that the 15% percent discount made the LP purchase attractive. Furthermore, in their brief, the Defendants assert that, in deciding to go through with the purchase despite the impairment to the contemplated collateral, they "determined that the Fund would receive substantial value for its $ 450,000 investment." (Def. Mot. Summ. J. at 19.)

After reviewing the evidence in the light most favorable to the non-movant, the Court finds that genuine issues of material fact exist as to the prudence of the LP investments. "An outside appraisal is not a 'magic wand'; rather, it is 'a tool' which must be 'used properly.'" Scardelletti v. Bobo, 897 F. Supp. 913, 919 (D. Md. 1995) (quoting Donovan v. Cunningham, 716 F.2d 1455, 1474 (5th Cir.1983)). [*13] Hiring an independent appraiser does not entitle a fiduciary to summary judgment when "there is insufficient evidence in the . . . record to determine whether the appraisal adequately informed the [challenged] decision . . . . [and] what the appraiser based his calculations on or what the results of his analysis even mean." Roth I, 16 F.3d at 918. From the partnership interest transfer agreement, it appears that the independent appraisal of the fair market value of the Limited Partnership had not been performed. At the time of the purchase and not until almost a year after the purchase, the trustees did not have an independent estimation of what they were getting a 15% discount for. Thus, a reasonable finder of fact could determine that the independent appraisal played a marginal role in the decision to purchase the additional LP interests. Likewise, the record does not disclose whether the trustees scrutinized the appraisal.

Moreover, it is unclear what was the basis for Moore's belief that the Limited Partnership was "doing well." Grau accepted Moore's opinion in approving the transaction apparently without undertaking an

independent investigation. There is [*14] little explanation for Mr. Dickinson's belief that the 15% discount made the deal attractive. "A fiduciary's independent investigation of the merits of a particular investment is at the heart of the prudent person standard." Fink v. National Sav. & Trust Co., 249 U.S. App. D.C. 33, 772 F.2d 951, 957 (D.D.C. 1985). Furthermore, in their depositions, the trustees could not recall much of the content of their deliberations in deciding to enter the transaction. Trustee Moore could not remember documents he reviewed in coming to his conclusion. Mr. Dickinson thought the reduction in the collateral wasn't considered significant, but couldn't recall. (Dickinson Dep. at 187.) While the inability to recall is not tantamount to an acknowledgment that no such consideration was made, it likewise does not mean there was appropriate consideration of the relevant factors. Such equivocal statements lend to issues of credibility that are best reserved for the trier of fact. See In re Unisys Savings Plan Litig., 74 F.3d 420, 433 n.10 (3d Cir. 1996) ("Ambiguities and conflicts in a deponent's June 15, 2001 testimony are generally matters for the fact-finder to sort out. [*15] ").

Defendants highlight that, at the time of the first LP purchase, the Country Run Loan had not been signed and finalized. Therefore, according to Defendants, the effect of the first LP purchase on the value of the secondary collateral for the impending Country Run Loan was not a relevant consideration. The Defendants assert that ERISA imposes no duty to consider the effects of one investment decision on future transactions of the Fund that have not been completed. The trustees correctly state that a fiduciary's actions must be judged by the facts reasonably known at the time of the challenged investment action and not upon subsequent events. See In re Unisys Savings Plan Litig., 74 F.3d at 434. This general rule is based in the idea that trustees cannot reasonably be held responsible for random market fluctuations and other unforeseeable events. The trustees' extension of that rule to release trustees from considering the downstream impact of investments on the portfolio is inconsonant with the modern portfolio theory's emphasis on investing with a view to the fund's portfolio as a whole. The trustees cannot turn a blind eye to impending transactions to which they [*16] are fully aware and are playing an active role. At the time of the first LP purchase, the trustees knew that the Country Run Loan would be closed within days and that the purchase would reduce the value of the available collateral for that loan. Trustee Moore

2001 U.S. Dist. LEXIS 9012, *16; 26 Employee Benefits Cas. (BNA) 2033
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

also knew that McAuliffe intended to apply almost half of the $ 450,000 purchase price toward Columbia's equity contribution for the Country Run Loan. These factors represent appropriate considerations that impact the integrity of the Fund's portfolio as a whole.

As to the second LP purchase, the record before the Court does not support summary judgment for the trustees. Trustee Grau could not recall any discussions on the effect of the second LP purchase on the Country Run Loan. Trustee Moore claims to have discussed the reduction in collateral with the investment staff, but determined that the accumulation of additional LP shares at a discount outweighed the costs. In deciding that the second LP purchase was a good investment, the trustees relied heavily on a status report compiled by Terry McAuliffe. Mr. McAuliffe is a major shareholder of ACMC, the seller. "The most basic of ERISA's investment fiduciary duties [is] the [*17] duty to conduct an independent investigation into the merits of a particular investment." In re Unisys Savings Plan Litig., 74 F.3d at 435. "ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance, and to supplement it where necessary." Id. When asked why did the Fund make the $ 2 million purchase, Moore responded [McAuliffe and Swann] requested the money and we, at the time, thought we were getting - - making a good investment." (Moore Dep. at 208.) A reasonable finder of fact could decide that the trustees passively relied on McAuliffe's representations without further inquiry in deciding that a 15% discount was a bargain. Cf. Dimond v. Retirement Plan for Employees of Michael Baker Corp., 582 F. Supp. 892, 898 (W.D. Pa. 1983) (holding trustees' belief that stock purchase was a wise investment insufficient under prudent man standard). Given McAuliffe's personal interest in the matter, the court cannot say that, as a matter of law, such reliance would be justified under the circumstances. Furthermore, the trustees failed to inform the Weitzman group of either LP purchase. With this [*18] knowledge, one cannot say that, as a matter of law, it was prudent of the trustees to continue to rely on the recommendations and analysis contained therein as to the suitability of the loan in light of the LP purchases. See Donovan v. Cunningham, 716 F.2d 1455, 1474 (5th Cir. 1983) (holding fiduciaries, who had information available to them indicating that assumptions underlying an expert's appraisal were no longer valid, breached their duties under ERISA by not analyzing the effect of changes in those assumptions).

Defendants strenuously emphasize that the security interest at issue was merely secondary collateral for the Country Run Loan. According to the Defendants, the LP purchases had no impact on the primary collateral secured under the loan (the mortgage on the property) and, thus, any diminution in merely secondary collateral cannot give rise to a breach of a fiduciary duty. One court has stated that "under-collateralization of a loan does not, by itself, establish a breach of the fiduciary duty to invest prudently." Davidson v. Cook, 567 F. Supp. 225, 236 (E.D. Va. 1983), aff'd, 734 F.2d 10 (4th Cir. 1984). Finding [*19] a breach on such grounds alone would improperly focus on the results rather than the process of arriving at the investment decision. See Roth I, 16 F.3d at 915 ("Whether a trustee is liable for breach of duty here does not depend on whether the security he provided ultimately proved to be inadequate.").

Here, viewing the evidence and drawing all justifiable inferences in the light most favorable to the nonmoving party, the record indicates that, with little to no independent investigation, the trustees took affirmative acts that they knew or should have known would imperil the security for a $ 10 million dollar loan issued by the Fund. According to the Secretary's expert, the Country Run Loan was not only high-risk, but also highly unusual due to the borrower's minimal cash investment. Trustee Moore knew the first LP purchase provided the funds necessary for that cash investment which in turn reduced the Fund's available recourse on the Country Run Loan. By the time of the last LP purchase, the borrower had breached the terms of the loan by allowing the balance to exceed the $ 6 million balance limit and unpaid interest had accrued to $ 720,000. While the trustees [*20] characterize the $ 396,000 overage as slight, the significance of the borrower's non-compliance with the terms of the loan gives rise to genuine issues of material fact that should not be resolved on a motion for summary judgment. Under these circumstances, the Court cannot find that, as a matter of law, the trustees' conduct satisfied the prudent investor standard.

D. Losses to Fund under 29 U.S.C. § 1109(a)

Defendants maintain that, even if the Secretary could establish that the trustees acted imprudently, she cannot prove that the Fund suffered any losses as a result of the asserted breaches. The Defendants argue that any asserted losses can only be measured from the effect of the reduction in the secondary collateral on the Fund. The

2001 U.S. Dist. LEXIS 9012, *20; 26 Employee Benefits Cas. (BNA) 2033
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

trustees emphasize that the reduction in the secondary collateral had no economic effect on the Country Run Loan as the property was ultimately sold without the need for foreclosure proceedings. Therefore, according to the trustees, the Secretary has no grounds for monetary relief under 29 U.S.C. § 1109(a). [1] By contrast, the Secretary asserts that the additional LP purchases were eventually sold [*21] at a loss and that the Fund sustained lost opportunity costs as a result of the alleged imprudent investments.

> 1    Section 409(a) of ERISA provides that "any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a).

"To establish a claimed breach of fiduciary duty, an ERISA plaintiff must prove a breach of a fiduciary duty and a prima facie case of loss to the plan." McDonald v. Provident Indem. Life Ins. Co., 60 F.3d 234, 237 (5th Cir. 1995). "If trustees act imprudently, but not [*22] dishonestly, they should not have to pay a monetary penalty for their imprudent judgment so long as it does not result in a loss to the Fund." Brock v. Robbins, 830 F.2d 640, 647 (7th Cir. 1987). The trustees correctly state that the method for ascertaining a loss to the plan should be tailored to the type of breach claimed. See Roth v. Sawyer-Cleator Lumber Co., 61 F.3d 599, 602 (8th Cir. 1995) (hereinafter Roth II) (finding "snapshot" approach of comparing plan's assets immediately before and after alleged breach appropriate in cases of overpayment by the plan or price manipulation schemes, but inappropriate for failure to provide adequate security); Leigh v. Engle, 858 F.2d 361, 366-67 (7th Cir. 1988) (placing burden on trustee who breached duty of loyalty to disprove damages). However, the trustees propose a myopic view that focuses on only one adverse side effect of their alleged imprudence. Courts have frowned upon like narrow assessments to obscure losses to plans. See Dardaganis v. Grace Capital, 889 F.2d 1237, 1243 (2d Cir. 1989) (rejecting trustees' argument that court's inquiry is limited to specific [*23] investment decisions and losses should be ascertained only from those particular decisions). In enacting ERISA, "the crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and . . . ERISA was designed to prevent these abuses in the future." Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 140 n.8, 105 S. Ct. 3085, 3089 n.8, 87 L. Ed. 2d 96 (1985). This concern incorporates the general rule under trust law that "a beneficiary is entitled to recover damages for the improper management of the trust's investment assets." Confederated Tribes of Warm Springs Reservation v. United States, 248 F.3d 1365, 1371 (2001).

The record reveals a genuine dispute as to whether the LP shares were sold at a loss to the plan. "To the extent that there are ambiguities in determining loss, [courts] resolve them against the trustee in breach." Roth II, 61 F.3d at 602. For purposes of summary judgment, there is a sufficient causal link that, but for the additional acquisitions, the Fund would not have suffered such a loss. Additionally, "comparing the return on the improper investment with that of [*24] a reasonably prudent alternative investment" represents an appropriate means of assessing damages under 29 U.S.C. § 1109. Leigh v. Engle, 858 F.2d 361, 367 (7th Cir. 1988). See Harley v. Minnesota Mining and Mfg. Co., 42 F. Supp. 2d 898, 912 (D. Minn. 1999) (finding, for imprudent investment, the loss is the difference between the plan's actual profits and the profits it would have achieved had there been no breach). Viewing the record and drawing all justifiable inferences in the light most favorable to the nonmoving party, the Court finds that the Secretary has presented genuine issues of material fact as to whether the Fund suffered a loss as a result of the alleged fiduciary breaches. "Once the plaintiff has satisfied these burdens, 'the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by . . . the breach of duty.'" McDonald, 60 F.3d at 237 (quoting Roth I, 16 F.3d at 917). As discussed above, the Court is not convinced that the trustees have demonstrated the absence of a genuine issue of material fact on this issue.

## III. CONCLUSION

For the [*25] reasons stated above, the Court will deny Defendants' motion for partial summary judgment. An Order consistent with this Opinion will follow.

June 15, 2001

2001 U.S. Dist. LEXIS 9012, *25; 26 Employee Benefits Cas. (BNA) 2033
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

Date

    Alexander Williams, Jr.

    United States District Judge

**ORDER**

    For the reasons stated in the accompanying Memorandum Opinion dated June 15, 2001, IT IS this 15th day of June, 2001 by the United States District Court for the District of Maryland, hereby **ORDERED**:

1. That Defendants' Motion for Partial Summary Judgment [45-1] BE, and the same hereby IS, **DENIED**; and

2. That the Clerk of the Court mail copies of this order to all counsel of record.

    Alexander Williams, Jr.

    United States District Judge

# **EXHIBIT 45**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Southern Division)

| | |
|---|---|
| PLASTERERS' LOCAL UNION NO. 96 PENSION PLAN, *et al.*, )<br>)<br>) | |
| Plaintiffs, ) )<br>) | C.A. No. PJM 06 CV 158 |
| v. )<br>) | |
| HAROLD PERRY, *et al.*, )<br>) | |
| Defendants. )<br>) | |

## **EXPERT REPORT OF NORMAN STEIN**

I, Norman Stein, do hereby depose as follows:

1.  I am the Douglas Arant Professor of Law at the University of Alabama School of Law and was Director of the University of Alabama Pension Counseling Clinic from 1995 through 2004. I joined the University of Alabama School of Law faculty in 1984. I have been a visiting professor at several other universities since 1987, including the University of Texas at Austin, Indiana University (Bloomington), Vermont Law School, and the University of California at Davis. In the Fall 2007 semester I will be a visiting professor at Columbus Law School at Catholic University.

2.  I received my B.A. in English in 1973 from New College in Sarasota, Florida, and my J.D. in 1978 from Duke University, where I was elected to the Order of the Coif. Following law school, I was an associate with the Washington, D.C. firm of Arnold & Porter until 1980. From 1980 to 1981, I was a law clerk for the Honorable Gerald Bard Tjoflat of the United States Court of Appeals for the Fifth Circuit. After my clerkship, I

practiced law in Atlanta until 1984.

    3.  I have regularly taught J.D. classes in federal income tax, labor, business, and employees benefits, including Federal Taxation I and II; Employee Benefits; Employee Benefits Clinic though the Pension Counseling Clinic; Corporate Tax; Business Organizations; and Labor Law. I also have taught classes in deferred compensation and tax accounting in the University's LL.M. program in taxation.

**ERISA Related Experience**

    4.  While a lawyer in private practice, I specialized in the area of employee benefits, and worked with numerous plans, both single-employer and multi-employer, and helped provide guidance to pension plan fiduciaries. I also spent two summers in law school working for one of the largest multi-employer pension plans in the nation. I currently write a newsletter on employee benefits for Adams and Reese, a large regional Southern law firm. Some of the newsletters have focused on fiduciary issues of interest to fiduciaries who are responsible for the administration of pension plans.

    5. I am a member of the advisory panel of the BNA Pension Reporter, have served as counsel to the American Association of Retired Persons in pension cases, was a consultant to the General Accounting Office, taught in the IRS General Counsel's continuing education program, and have been chair of the Employee Benefit Section of the Association of American Law Schools and the Teaching Employee Benefits Subcommittee of the American Bar Association, and co-chair of the ABA TIPS Employee Benefits Committee. I am a charter Fellow of the American College of Employee Benefits Counsel and was elected as a fellow of the National Academy of Social Insurance.

6. I currently serve as a member of the General Accounting Office Panel of Experts on retirement security issues. I have formerly been a member of the United States Congress Joint Committee on Taxation's Academic Tax Force on Tax Simplification, where I advised on various employee benefits issues. I have also previously served as a member of the Department of Labor's Advisory Counsel on Employee Welfare and Employee Pension Plans (generally referred to as the ERISA Advisory Counsel, to which I was appointed to a three-year term by former Secretary of Labor Alexis Hermann. While on the Advisory Counsel I was the principal author of a report to Secretary of Labor Elaine Chao on fiduciary education.

7. In addition, I have testified before Congress and administrative agencies on pension issues on several occasions, including:

Testimony before ERISA Advisory Council, United States Department of Labor, on subject of Mutual Fund Fees in 401(k) Plans, September 14, 2004.

Testimony before Senate Governmental Operations Committee, on the Pension Benefit Guaranty Corporation, May, 2004.

Testimony before the House Ways and Means Committee, on pension funding crisis, February, 2004.

Testimony Before Senate Health, Education, Labor and Pensions Committee, on "Pension Policy and Enron," February 20, 2002.

Testimony Before House Committee on Education and the Workforce, Subcommittee on Employer-Employee Relations, "Hearings on Enron and Beyond: Enhancing Worker Retirement Security," February 13, 2002.

Testimony Before ERISA Advisory Council, United States Department of Labor, on subject of Phased Retirement, August 15, 2000.

Testimony Before ERISA Advisory Council, United States Department of Labor, on subject of Cash Balance and other Hybrid Pension Plans, July 14, 1999.

Testimony Before the Ways & Means Subcommittee on Oversight, House of Representatives, on subject of pension reform, March 23, 1999.

Testimony Before United States Department of Labor, on Proposed Regulations on Claims Procedures for Employee Benefit Plans, February 18, 1999.

Testimony before ERISA Advisory Council, United States Department of Labor, on subject of Section 401(k) Plans and Investment in Employer Stock, September 15, 1997.

Testimony before Senate Banking Committee, on subject of Cannon Mills Pension Plan Termination, July 25, 1991 (field hearing in Kannapolis, North Carolina).

Testimony before House Select Committee on Aging, Subcommittee on Retirement Income and Employment, on subject of Pension Annuity Protection and the Failure of Executive Life, June 25, 1991.

Testimony before ERISA Advisory Council, United States Department of Labor, on subject of Relationship of Pension Plan Purchase of Commercial Annuity Contract Purchases and Participant Benefit Security, September 4, 1990.

Testimony before Senate Subcommittee on Labor, on subject of Terminating Pension Plans and Junk Annuity Contracts, February 12, 1990.

Testimony before House Committee on Ways and Means, Subcommittee on Oversight, on subject of Pension Benefit Guaranty Corporation's Proposal to Adopt a Variable Rate Premium, April 9, 1987.

Testimony before ERISA Advisory Council, United States Department of Labor, on subject of Pension Plan Reversions, June 12, 1986 (on behalf of Reversion Study Group, an ad hoc group of representatives of the American Association of Retired Persons, the AFL–CIO, the United Auto Workers of America, the Pension Rights Center, and others).

8.  I have published numerous articles, books, book supplements, and book chapters on ERISA and related topics.  I also have been a lecturer, moderator, and on panels throughout the country to discuss ERISA related topics sponsored by a myriad of organizations, including the Ford Foundation, American Law Institute, Ohio State University, St. John's University, Washington and Lee College of Law, the American Bar Association, Kellogg Foundation, Pension Rights Center, Society of Actuaries, the United States Department of Labor, Pension Benefit Guaranty Corporation, and Administration on Aging.

4

9.  I have been a media guest on national radio and television shows to discuss pension issues, including National Public Radio's *Marketplace* and *Morning Edition*, *Sunday Morning with Charles Kuralt* on CBS, and *Good Morning America* on ABC. Similarly, I was a consultant for an NBC documentary on pension plan terminations, entitled *The Pension Cookie Jar*. I also have been quoted in magazine and newspaper articles on pension and employee benefit matters in, among other publications, the New York Times, Wall Street Journal, Washington Post, Newsweek, USA Today, Christian Science Monitor, National Law Journal, Tax Notes, Newsday, Dallas Daily News, Baltimore Sun, Los Angeles Times, Chicago Tribune, Chicago Sun Times, Raleigh News and Observer, Portland Oregonian, Seattle Times, Hartford Daily Courant, Plan Sponsor Magazine, Pensions and Investments, Modern Maturity, BNA Employee Benefits Reporter, and CFO Magazine.

## Materials Consulted in Preparation of Report

10.  To prepare this report, I read the following documents:  the Complaint in the above styled action; the answers of the various defendants to the Complaint; auditors reports on the pension plan, for the years 1991 through 2004; minutes for the pension and welfare funds, for the years 1991-2002; various letters  between the pension plan administrator, the pension plan's outside counsel, and C.J. Coakley Co., Inc.; agendas for various trustee meetings from 1989 through 1994; an amendment made to the pension plan in 1993.

## Discussion

### a.  Various Fiduciary Breaches by Defendants

11.  It is my opinion that the facts set forth in the materials I reviewed indicate the

occurrence of numerous fiduciary violations between 1994 and 2004, an overview of which follows:

(i) Harold Perry, the Plan Administrator, or Lee Wagner, the assistant to the Plan Administrator[1], or both, violated ERISA's fiduciary obligations in at least each of the following ways:  failed to advise the plan trustees to diversify plan investments, and/or failed to diversify plan investments; failed to advise the plan trustees to determine a prudent investment plan or philosophy for the plan, and/or failed to use prudence in determining an investment plan or philosophy for the plan; failed to advise the plan trustees to design the plan's investment portfolio to accord with the circumstances and proper aims of a retirement plan, and/or failed to design the plan's investment portfolio to accord with the circumstances and proper aims of a retirement plan; invested plan assets exclusively in low-yield fixed-income securities and bank deposits; failed to obtain adequate training in ERISA; failed to hire and/or failed to advise the trustees to hire experienced and qualified counsel to provide advice concerning the requirements of ERISA and the Internal Revenue Code; failed to create and/or maintain adequate records of plan activities; failed to ensure regular meetings of plan trustees;  failed to cause the plan to be amended to comply with changes to the Internal Revenue Code and treasury regulations; permitted the plan to "refund" contributions to contributing employers; failed to consider whether to make efforts to recover "refunded" contributions to employers; failed to bring a civil action to recover "refunded" contributions; failed to correct fiduciary failures in a timely fashion; failed to prevent the plan from engaging in prohibited transactions; failed to correct the prohibited transactions.

---

[1]  I assume that former Defendant Wagner is a fiduciary, based on the allegations in the complaint.  Unlike the other defendants, however, former Defendant Wagner's formal position would not necessarily make her a fiduciary.  Rather, her fiduciary status would depend on the scope of her authority and her actions.

(ii) defendants Edgar Pepper, James Lertora, Donald Molnar, and Ronald Beddow violated ERISA's fiduciary obligations at least in each of the following ways: failed to diversify plan investments; failed to determine a prudent investment plan or philosophy for the plan; failed to design the plan's investment portfolio to accord with the circumstances and proper aims of a retirement plan; invested plan assets exclusively in low-yield fixed-income securities and bank deposits; failed to obtain adequate training in ERISA; failed to hire experienced and qualified counsel to provide advice concerning the requirements of ERISA and the Internal Revenue Code; failed to periodically review the performance of defendants Perry, and former defendant Wagner, and Scholar; failed to create and/or maintain adequate records of plan activities; failed to ensure regular meetings of plan trustees;  failed to cause the plan to be amended to comply with changes to the Internal Revenue Code and treasury regulations; permitting the plan to "refund" contributions to contributing employers; failed to consider whether to make efforts to recover "refunded" contributions to employers; failed to bring a civil action to recover "refunded" contributions; failed to correct fiduciary failures in a timely fashion; failed to prevent the plan from engaging in prohibited transactions; failed to correct the prohibited transactions.

**b. Statute of Limitations Issues**

**i.  Statutory Framework**

12.  ERISA includes a statute of limitations on fiduciary violations.  *See* ERISA § 413.  The statute provides an alternative statute of limitations, depending on whether the plaintiff had actual knowledge of the breach.  If the plaintiff had actual knowledge of the breach, the statute of limitations requires that a civil action be commenced within 3 years

of the discovery of the breach or violation.  But with an exception that I will note in a moment, an action must, in any event, be commenced within 6 years of the date of the last action constituting the breach or (if the breach was an omission rather than an affirmative act), of the last date on which the breach could have been cured.  One way of describing the statute then, is that it requires that an action be commenced within six years of the last element of the fiduciary breach, or sometimes earlier if the plaintiff has actual knowledge of the breach before then.

13.  In addition, Section 413 provides a separate rule: in the case of fraud or concealment, the statute of limitations must be commenced within six years of the date of the discovery of the breach.  Courts have generally interpreted the term "fraud or concealment" as referring not to the underlying fiduciary violation, but concealment of the breach itself.

**ii.  Application of Statute of Limitations to Fiduciary Breaches Involving Investment of Plan Assets (*i.e.*, failure to diversify, failure to develop an appropriate investment strategy or philosophy for plan, investment of plan assets exclusively in fixed-income securities).**

**(a)  factual overview of fiduciary breaches**

14.  The plan's investments, since at least 1994, have been made exclusively in fixed-income securities, with a large percentage of the assets in bank accounts and certificates of deposit.

15.  ERISA requires both diversification and prudent management of plan investments, generally in accordance with the precepts of modern portfolio theory.  Based on my experience and knowledge, the most conservative of retirement plans would

generally invest at least 40%, and most retirement plans significantly more than 50%, of plan assets in equities. In my view, the information I have seen regarding the plan's investments reflect a shocking lack of experience and knowledge about appropriate construction of an investment portfolio for a retirement plan. The plan's expected and actual rate of return for the period covered by the allegations of the complaint were substantially lower than they would have been had the investments been adequately diversified and partly invested in equities and more fixed-income securities bearing higher interest rates than certificates of deposit and treasury instruments.

16. The facts suggest that much of the design of the plan's investment portfolio, and the selection of the assets were made by the plan administrator. In order to prudently manage the plan and its investments, the trustees should have determined whether the plan administrator was qualified to design an investment portfolio for the retirement plan and should have monitored the plan administrator's performance. The facts indicate that they did neither of these, causing the plan significant losses.

17. In order to prudently administer the pension plan and its investments, the trustees and administrators also had an obligation to ensure that they had the training and education, and/or experience, needed to comply with ERISA's fiduciary standards. The facts indicate that they did not have the training, education, background, and/or experience to understand ERISA's basic requirements.

18. The trustees and administrators also had an obligation to take action to remedy fiduciary breaches, and that obligation would have continued in each year the breach could have been corrected. Corrective action would include initiating a civil action against a fiduciary that breached its statutory responsibilities, and/or bringing the

breach to the attention of the Department of Labor.

### a. Application of the Limitations Period

19.   Cherrie Pleasant and James Miller filed this civil action on February 10, 2006.   Under the ERISA statute of limitations, this civil action can thus reach fiduciary breaches that occurred at any time on or after February 10, 2000.   The three-year limitations period cannot apply here because neither plaintiff could have had actual knowledge of the breach prior to becoming trustees in 2006 and 2004, which was less than three years after this  civil action was filed.

20.   Prudent management of a pension plan would have required defendant trustees to remedy fiduciary breaches, which would have required them to consider (and in this case initiate) legal action against the plan administrator (to the extent the plan administrator provided investment advice or made plan investments), and the plan administrator similarly should have initiated legal action against the plan trustees for their fiduciary breaches with respect to the plan investments.   The failure to bring such a legal action within the limitations period (under ERISA § 413) was not prudent and a separate breach of each defendant's legal obligations.   Prudent administration of the pension plan would also have required defendants to report possible fiduciary breaches to the Labor Department, which may have taken administrative and judicial actions to address the fiduciary breaches.

21.   As earlier mentioned, the defendants knew, or should have known, that prudent management of the pension plan required them to have some understanding of their obligations under the statutory rules under ERISA, the Internal Revenue Code, and the Labor Management Relations Act.   The facts suggest that they did not have such

knowledge and did not take steps to acquire training or education to provide them with such knowledge. It is my view that under ERISA, each defendant's failure to obtain the training necessary to assess whether plan investments satisfied ERISA's fiduciary requirements was a separate and continuing violation of their duty of prudence.

22. Thus, the current civil action should allow recovery of all damages that would have been recoverable in a civil action brought by defendants within the limitations period for the the current action brought by plaintiffs Pleasant and Miller.

23. Defendants could have filed a lawsuit on February 10, 2000, which could have challenged the composition of the plan's investment portfolio at least three years prior to the initiation of such lawsuit. Thus, at a minimum, damages would include those attributable to the investment portfolio as it existed on February 10, 1997 and thereafter.

24. In addition, there are substantial arguments that such a lawsuit could have recovered damages attributable to the investment portfolio as it existed on February 10, 1994. Under section 413 of ERISA, the statute of limitations permits a civil action to remedy fiduciary violations six years prior to the date of filing, unless the fiduciary had actual knowledge of the breach within three years. ERISA's fiduciary standards required that defendants have adequate preparation and training to at least understand their basic responsibilities under ERISA. In my view, the their failure to have prepared themselves to understand these responsibilities was itself a fiduciary breach under ERISA. Because they apparently lacked an understanding of ERISA's basic fiduciary requirements, they did not have actual knowledge of the breaches their fellow fiduciaries had committed, and the six-year statute should arguably apply.

25. Moreover, there are no facts in the record indicating the Defendant Beddow

attended any trustee meetings and thus may have been unaware of how the plan's assets were invested. Without such awareness, he could not have known that the design of the plan's investment portfolio was inappropriate for a retirement plan and thus would not have had actual knowledge of fiduciary breaches relating to the investment portfolio.

### ii. Application of Statute of Limitations to Fiduciary Breaches Involving "Refunded Contributions".

26.   The plan illegally "refunded" contributions to certain contributing employers starting in or around February 10, 1994. The refund violated ERISA, the terms of the Plan, and the Labor Management Relations Act. Under ERISA and the Internal Revenue Code, the "refunds" were prohibited transactions.

27.   One or more of the defendants could and should have initiated a civil action to recover plan contributions. Such an action could have been brought as late as February 10, 2000 by any defendant who did not have actual prior knowledge of the breach three years earlier than February 10, 1997. The facts that I have reviewed indicate that one or more of the defendants might have lacked knowledge of the breach before then, but it would require more development of the facts of the case to determine that this was the case. In particular, it appears that trustee Beddow had not attended any trustee meetings and may not have had any knowledge of the facts relating to the improper reversions.

28.   The defendants could also have alerted either or both the Department of Labor or the IRS of the prohibited transaction. Either agency could have initiated administrative and/or legal action to force repayment to the plan of the "refunded" contributions. Because neither agency would have had knowledge of the breach prior to

being informed of the breach, the Department of Labor could have filed a law suit as late as February 10, 2000, to recover the "refunded" contributions, and the Internal Revenue Service could have assessed a penalty tax on the employers who received such contributions as late as February 10, 2000.[2]

    29. The failure to alert the Federal agencies in time for them to take actions against the employers who received "refunded" contributions was a separate fiduciary violation.

Norman Stein

---

[2]  The penalty tax would be followed by a 100% penalty tax if the transaction were not corrected, which would have required the return of the contribution.

# EXHIBIT 46

LEXSEE

**ANATOLE G. RICHMAN; EURYDICE RICHMAN, Plaintiffs-Appellants, v.
AETNA LIFE INSURANCE COMPANY, INCORPORATED, Defendant-Appellee.**

**No. 92-1149**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**1992 U.S. App. LEXIS 20949**

**July 8, 1992, Argued
August 31, 1992, Decided**

**NOTICE:** [*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported as Table case at 1992 U.S. App. LEXIS 29659

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CA-91-1115-1)

**COUNSEL:** Argued: Richard Dennis Carter, HUDGINS, CARTER & COLEMAN, Alexandria, Virginia, for Appellants.

Argued: Elliott Bruce Adler, Brett G. Kappell, POWELL, GOLDSTEIN, FRAZER & MURPHY, Washington, D.C., for Appellee.

On Brief: Douglas M. Coleman, Jacqueline E. Bennett, HUDGINS, CARTER & COLEMAN, Alexandria, Virginia, for Appellants.

**JUDGES:** Before ERVIN, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.

**OPINION BY:** PER CURIAM

**OPINION**

OPINION

PER CURIAM:

The present case arises as an appeal of the district court's January 3, 1992 order granting to the appellee, AEtna Insurance Company ("AEtna"), the defendant at trial, its motion for summary judgment in its dispute with Anatole and Eurydice Richman ("the appellants"), the plaintiffs at trial. The appellants filed the complaint, seeking a declaratory judgment, against AEtna on August 14, 1991, alleging violations of state contract and insurance [*2] law, and of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. AEtna, treating the state law claims as preempted by ERISA, [1] filed a motion for dismissal or summary judgment, and the appellants filed a countering motion for summary judgment. The district judge granted AEtna's motion and dismissed the case. The appellants filed a timely notice of appeal.

    1   See Coleman v. Nationwide Life Ins. Co., No. 91-2646 (4th Cir. July 1, 1992), slip op. at 7.

I.

Anatole Richman, one of the appellants, was a partner at the accounting firm of Laventhol and Horwath ("L&H") until his retirement in 1989. As a partner, he was a participant in L&H's Medical Benefits Plan ("the Plan"), and his wife, Eurydice, also an appellant, was a beneficiary of the Plan. The Plan included health benefits coverage, payment for which was extracted periodically from Anatole Richman's retirement checks. The Plan was self-funded by L&H. L&H entered into an Administrative Services Contract ("ASC") with [*3] AEtna on December 1, 1989. Pursuant to the ASC, AEtna agreed to "provide services for the administration and operation of

the plan." [2]

> 2   Services to be provided by AEtna as set out in the ASC included: development and design of the Plan and additions to the Plan, assistance with enrollment of employees, development of record keeping systems, development and installation of a benefit-account structure for the Plan, and preparation of accounting reports. Also, AEtna was provided with the "authority to make determinations on behalf of [L&H] with respect to benefit payments under the Plan and to pay such benefits, subject, however, to [a right of review by L&H]."

The ASC also expressed specific limitations on Aetna's potential liability:

> AEtna shall not be liable or use its funds for the payment of benefits under the Plan . . . and if, in the normal course of business under [the ASC], AEtna, or any other organization with which AEtna has a working arrangement, chooses to advance any funds, [L&H] shall reimburse [*4] AEtna or such other organization for such payment.

Eurydice Richman became ill, and her hospitalization expenses were covered by the Plan beginning in February of 1989.

On November 20, 1990, L&H terminated the Plan. The termination was followed with a memorandum of notice from L&H dated November 27, specifically indicating that the Plan had been terminated on November 20. The appellants claim that the Plan was not effectively terminated until December 7, 1990, when AEtna terminated the ASC with L&H.

On November 21, 1990, L&H filed for Chapter 11 bankruptcy. On February 25, 1991, in response to a letter sent by the appellants requesting information concerning the Plan, AEtna sent a letter referring to the November 27 memorandum in which L&H included an express declaration that the Plan had been terminated as of November 20, 1990.

The appellants have claimed that AEtna was either a fiduciary or co-fiduciary of the L&H Plan as defined by ERISA, that the Plan did not terminate prior to the date of

L&H's bankruptcy, and that AEtna breached its fiduciary duty by failing to notify the appellants of their rights to continuing coverage under the COBRA provisions of ERISA. 29 U.S.C. [*5] §§ 1161(a), 1163(6), and 1165(1). [3]

> 3   In combination, the three provisions provide that: "The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event [including Chapter 11 bankruptcy] is entitled, under the plan, to elect, within the election period [which must be 60 days following the qualifying event], continuation coverage under the plan."

The district court concluded that AEtna was not the sponsor or the administrator of the Plan, and that it was not a fiduciary under the Plan. Consequently, according to the district court, AEtna had no duty to notify the appellants of their rights under the Plan. The court also held that AEtna did not misrepresent any material fact to the appellants. The questions presented on appeal are first, whether the district court erred in concluding that AEtna had no duty to inform appellants of their rights to continuing coverage under the Plan, and [*6] second, whether AEtna violated any other duty assigned by ERISA. In that we conclude that the district court properly determined AEtna's responsibilities to appellant as a matter of law, we are obliged to affirm the grant of summary judgment.

II.

The district court held that AEtna was not a fiduciary of the Plan as defined by ERISA. We need not resolve the issue of AEtna's fiduciary status, however, if it is shown that AEtna, as a fiduciary, had no duty to notify of the continuing coverage set out in COBRA. 29 U.S.C. § 1161 et seq. In that responsibilities under COBRA are expressly assigned to the "plan sponsor" and"administrator," as defined by the act, AEtna's alleged fiduciary status is non-dispositive of the question presented on appeal. The relevant inquiry in regard to the COBRA coverage concerns AEtna's potential status as a plan sponsor or administrator.

29 U.S.C. § 1161(a) states that: "the plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose

coverage under the plan as a result of a qualified event is entitled, under the plan, to elect, within the election period, continuation coverage [*7] under the plan." In the event of bankruptcy, one of the "qualified events" under the provision, "the [plan] administrator" is required to "notify . . . any qualified beneficiary with respect to such event . . . of such beneficiary's right under this subsection." § 1166(4).

ERISA sets out a specific designation of who may be considered the administrator or sponsor of a plan. ERISA provides that "The term 'administrator' means -- the person specifically so designated by the terms of the instrument under which the plan is operated . . ." 29 U.S.C. § 1002(16)(A)(i). The ASC in this case specifically designated L&H as the plan administrator in Section 5(a). The section also defines a "plan sponsor" specifically to include the employer or employers responsible for establishment of the plan, or an employee organization if it is responsible for the establishment. § 1002(16)(B). Even if a fiduciary, AEtna clearly was not designated under the Plan as a plan administrator, and is not the employer or an employee organization, preventing the conclusion that AEtna was a plan sponsor. Accordingly, AEtna had no specific duties to provide an opportunity for, or notify of, continuing coverage rights [*8] under COBRA.

The appellants contend, nevertheless, that although AEtna was not designated as plan administrator or sponsor, its fiduciary relationship created a *"de facto"* administrator connection with the plan, imbuing AEtna with the duty to perform relevant notification duties under COBRA. Appellants base their assertion on *Coleman v. Nationwide Insurance Co.*, 748 F.Supp. 429 (E.D. Va. 1990), an opinion which has been recently reversed. [4] Even prior to its reversal, however, *Nationwide* did not provide direct or even implied support for appellant's claim that the express requirements of COBRA and ERISA should be circumvented once a party, not a sponsor or administrator, is determined to be a fiduciary. Such an assertion would have the effect of reading the specific designation of notice responsibilities under Cobra out of the provision. [5]

[4]   *Coleman v. Nationwide Insurance Co.*, No. 91-2646, 91-2652, F.2d (4th Cir. July 1, 1992).

[5]   Various courts have ruled that a plan

participant may not be imbued with obligations specially assigned to the plan "administrator" if the participant is not designated as such. *Davis v. Liberty Mutual Ins. Co.*, 871 F.2d 1134, 1138 (D.C. Cir. 1989); *Moran v. Aetna Life Insurance Co.*, 872 F.2d 296, 298-300 (9th Cir. 1989).

[*9]   Accordingly, it is clear that, given the appellants' failure to show that AEtna was a plan administrator or sponsor, AEtna is entitled to affirmance of the district court's grant of summary judgment as a matter of law. Assuming that the appellants may have been entitled to continuing coverage under ERISA and COBRA, nevertheless there is no indication in the Plan documents that AEtna was responsible for providing that coverage, or for informing the appellants of the availability of it.

III.

The remaining question presented on appeal is whether there is another basis for determining that AEtna violated a fiduciary or related duty to appellants. The issue concerns appellant's assertion that although AEtna may not have been responsible for notification of continuing coverage, it may be held responsible as a co-fiduciary for L&H's breaches of its duties to appellants. Assuming, arguendo, that AEtna had a fiduciary duty under the Plan, it is again clear that it did not violate any relevant duty owed to appellants.

Appellants contend that AEtna had a co-fiduciary duty obliging it to refrain from giving knowingly false notice regarding the termination of the plan announced by L&H. [*10] 29 U.S.C. § 1105(a) details the circumstances giving rise to liability as a co-fiduciary. A fiduciary of a plan shall be held liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or undertakes knowingly to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(1) [29 U.S.C. § 1104(a)(1)] [6] in the administration of his specific responsibilities which give rise to his status as fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such

1992 U.S. App. LEXIS 20949, *10
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

other fiduciary unless he makes reasonable efforts under the circumstances to remedy the breach.

6    That section provides for a "prudent man standard of care" obligating a fiduciary to provide benefits, and defray reasonable expenses "with care, skill, prudence, and diligence under the circumstances . . . ."

It is clear [*11] from the provision that, if AEtna knew of L&H's breach of an obligation not to terminate the Plan prior to filing bankruptcy, and either failed to take reasonable steps to remedy the breach, or was complicitous in concealing the breach, liability would arise. Appellants contend that AEtna knew, or should have known, of L&H's breach of its obligation to continue coverage under the Plan until it filed for bankruptcy.

Appellants base their claim on a letter which AEtna wrote to Anatole Richman on February 25, 1991, in response to his letter of January 7, 1991, detailing L&H's activities concerning termination of the Plan. It stated in pertinent part:

On November 27, 1990, Laventhol sent a letter to all former Laventhol employees which addressed the termination of the Laventhol plan (a copy of this letter is enclosed for your convenience). The letter confirmed the termination of the Laventhol medical plan on November 20, 1990, and advised all former Laventhol employees to submit any claims that were pending on November 20 to Aetna for processing.

The L&H November 27, 1990 letter, of which AEtna provided a copy, advised all former employees that: "COBRA extension coverage also [*12] ceased on November 20, 1990." In its February 25 letter, AEtna accurately described L&H's activities. L&H did, on November 27, 1990, confirm that the Plan terminated on November 20, 1990. The appellants fault the letter for not volunteering what they claim AEtna must have known when writing, namely, that the Plan could not have terminated prior to the time that L&H filed for bankruptcy. The standard set out in the ERISA provision

governing co-fiduciary liability, however, requires knowing falsity on the part of the co-fiduciary. Appellant failed to present sufficient evidence of AEtna's direct knowledge of the impropriety of L&H's termination of the plan effective November 20, 1990 to support reversal of the district court's factual conclusions as to the extent of AEtna's knowledge. AEtna presents a reasonable argument that L&H was authorized in terminating its plan when it did. 7 It is apparent that AEtna did not knowingly participate in, or conceal, a breach of duty when AEtna acted under the reasonable belief that no breach had occurred.

7    AEtna argued that L&H was authorized in terminating the plan by corporate resolution or other methods. It also cited precedent indicating that "ERISA simply does not prohibit a company from eliminating previously offered benefits which are neither vested nor accrued." *Phillips v. Amoco Oil Co.,* 799 F.2d 1464, 1471 (11th Cir. 1986).

[*13] In addition, appellants allege that since AEtna knew that appellants were seeking continuing coverage, and it knew that its co-fiduciary L&H had failed to provide that coverage, AEtna had an obligation to inform appellants of the breach and/or take steps to correct it. Given our conclusion as to AEtna's relative responsibilities concerning COBRA coverage, appellants' contention does not support reversal of the district court.

Responsibility as a co-fiduciary "must be limited to the scope of the fiduciary's duty." *Pension Fund - Local 701 v. Omni Funding Group,* 731 F.Supp. 161, 176 (D.N.J. 1990). 8 As stated, § 1101(a)(2) provides that a co-fiduciary is liable to the extent of "the administration of his specific responsibilities which give rise to his status as a fiduciary." Appellants' claim for relief rests on their rights to continuing coverage under COBRA. AEtna was not obligated to provide anything to appellants pursuant to COBRA. Assuming that AEtna's discretionary function in making certain eligibility decisions involving the Plan, subject to the final approval by L&H, supports a conclusion of a limited fiduciary status, the aspect of L&H's breach which [*14] involved appellant's COBRA rights, and are not related to eligibility determinations, does not fall within the scope of AEtna's alleged fiduciary duty. 9 AEtna certainly had responsibilities under the Plan, but as defined by the express requirements of COBRA, it had no responsibility

relating to continuing coverage. It involves something of a leap to impose on someone who had no duty to make any notification concerning rights under COBRA not only the obligation to state accurately the factual basis of those rights but also, when doing so, to correct any errors of fact made by the responsible party. L&H, not AEtna, was responsible for any "payment of benefits under the Plan" in the way of COBRA coverage for which the appellants may have qualified. L&H as the plan sponsor and administrator was the sole party responsible for the continuing coverage. Accordingly, any relevant breach concerning rights to continuing coverage was attributable to L&H, not AEtna. [10]

8    Additional regulations support a limitation on the potential liability for a fiduciary who, as AEtna here, was not a named fiduciary:

A fiduciary with respect to the Plan who is not a named fiduciary is a fiduciary only to the extent that he or she performs one or more of the functions described . . . . The personal liability of a fiduciary who is not a named fiduciary is generally limited to the fiduciary functions which he or she performs with respect to the plan.

29 C.F.R. § 2509.75-8.

[*15]

9    Recently, in *Coleman,* No. 91-2646, we evaluated the extent of fiduciary responsibility extended by ERISA. We concluded that" a party is a fiduciary only as to the activities which bring the person within the definition. The statutory language plainly indicates that the fiduciary function is not an indivisible one. In other words, a court must ask whether a person is a fiduciary with respect to the particular activity at issue." Slip op. at p. 12.

10    It is not, in view of the conclusions we have reached, necessary to investigate whether a plan participant may bring suit alleging a fiduciary's duty breach under ERISA and seeking enforcement of the participant's individual rights, or if such a suit may only be brought on behalf of the plan itself. *See Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 140-43 (1985).

It is clear that AEtna did not breach any duty owed to appellants. The summary judgment in favor of AEtna is, accordingly,

*AFFIRMED.*

# EXHIBIT 47

LEXSEE

**ELAINE L. CHAO, Secretary of Labor, U.S. Department of Labor, Plaintiff, v. TERRY RHOADES and WESLEY WALKER, Defendants.**

**1:04CV00854**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

**2006 U.S. Dist. LEXIS 19887**

**April 13, 2006, Decided**

**PRIOR HISTORY:** Chao v. Rhoades, 2006 U.S. Dist. LEXIS 2021 (M.D.N.C., Jan. 10, 2006)

**COUNSEL:** [*1] For ELANIE L. CHAO, Secretary of Labor, United States Department of Labor, Plaintiff: DANE L. STEFFENSON, HOWARD M. RADZELY, STANLEY E. KEEN, U. S. DEPT. OF LABOR OFFICE OF THE SOLICITOR, ATLANTA, GA.

For TERRY RHOADES, Defendant, Pro se, CLEMMONS, NC.

For WESLEY WALKER, Defendant, Pro se, PFAFFTOWN, NC.

**JUDGES:** P. Trevor Sharp, United States Magistrate Judge.

**OPINION BY:** P. Trevor Sharp

**OPINION**

**MEMORANDUM OPINION**

**Sharp, Magistrate Judge**

Plaintiff Elaine L. Chao, Secretary of Labor ("the Secretary"), alleges that Defendants Terry Rhoades and Wesley Walker violated their fiduciary duty to participants in a simple IRA plan ("the Plan") governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). In defense, Walker contends that he is not a "fiduciary" within the meaning of ERISA and therefore cannot be found liable

for the loss sustained by the Plan.

The matter came before the Court on March 21, 2006 for a bench trial. [1] Shortly before trial, Defendant Rhoades stipulated to his liability as a fiduciary, and the Court signed a Consent Order establishing Rhoades' liability in the amount of $ 29,565.25 plus [*2] post-judgment interest. At the close of trial on March 22, 2006, the Court took the matter of Walker's liability under consideration. The Court has now considered all of the trial evidence and, pursuant to Rule 52 of the Federal Rules of Civil Procedure, makes the following findings of fact and conclusions of law.

  1    The parties have consented to the trial jurisdiction of the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**Findings of Fact**

1. WAR Enterprises, Inc. ("WAR") was established in 1998 as a North Carolina corporation with its principal place of business in Winston-Salem, North Carolina. WAR operated under the names Server Solutions and Entegrait.

2. Wesley Walker served, at various times, as the President and Chief Executive Officer of WAR. He was a member of the Board of Directors and an original 50% shareholder.

3. Terry Rhoades served as the Chief Financial Officer of WAR and was a member of the Board of Directors [*3] and an original 50% shareholder.

4. In 1999, Walker, Rhoades, and another board

Page 1

2006 U.S. Dist. LEXIS 19887, *3
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

member, George Lothian, established a simple IRA plan for WAR employees.

5. WAR was the Plan sponsor and the employer of all Plan participants.

6. Terry Rhoades was assigned responsibility for financial matters at WAR, including processing of payroll and administration of the Plan. Walker worked on the "client" and marketing side of the business.

7. Both Walker and Rhoades had authority to sign checks on WAR'S general account, and Walker authorized the use of his electronic signature on checks drawn on WAR'S account.

8. Under the Plan, WAR employees could elect to defer a portion of their wages for contribution into a simple IRA account.

9. The Plan was to be funded by voluntary employee contributions withheld from payroll, as well as certain employer matching contributions.

10. During 1999, WAR'S three board members, Walker, Rhoades and Lothian, were the only participants in the Plan.

11. Beginning in 2000, at least nine other employees elected to participate in the Plan by deferring part of their earnings. Subsequently, additional employees joined the Plan while others withdrew from the Plan.

[*4] 12. Walker never reviewed WAR'S records or his IRA account statements to determine whether employee contributions were being forwarded to the Plan. Walker reasonably believed that all duties regarding administration of the Plan had been delegated to Rhoades. Rhoades fully understood and accepted this delegation.

13. WAR remitted one payment to the custodial trustee of the IRA accounts on behalf of Walker, Rhoades and Lothian on June 21, 1999, totaling $ 345.00.

14. After June 21, 1999, payroll deductions were made but the funds were not segregated from other company assets and were not forwarded to the custodial trustee.

15. Employee contributions were not forwarded to the custodial trustee because Rhoades, without consulting

Walker or the Board, unilaterally decided not to fund the Plan. It was solely his responsibility to make the IRA payments, and he chose not to do so, apparently in view of cash flow problems at WAR.

16. By at least early 2000, WAR was unable to meet all of its financial obligations.

17. Rhoades, as financial officer, created records and balance sheets and took other measures that had the effect of grossly overstating the strength of the company's financial [*5] condition. Neither Walker nor the Board were aware in 2000 or before May 2001 that WAR was in a precarious financial condition or that employee IRA contributions were not being forwarded in accordance with the Plan.

18. On or about May 18, 2001, Walker learned from Rhoades for the first time that the company was delinquent in payroll taxes and that the Plan was at least partially unfunded. Rhoades apologized to Walker and told him that the company was in serious financial trouble, despite his earlier favorable financial reports. The Court credits the testimony of Walker that he had no knowledge before that date of shortfalls in the simple IRA accounts. Rhoades' testimony was consistent with Walker's on most points, but where there was disagreement, the Court credits Walker, not Rhoades.

19. Walker had acted with reasonable diligence in his corporate oversight before May 2001, but inflated reports from his financial officer prevented him from having an accurate understanding of WAR'S financial condition.

20. Immediately after learning in May 2001 of WAR'S financial distress, Walker borrowed approximately $ 36,000 from his father, deposited it in WAR'S bank account, and saw to it [*6] that the delinquent payroll taxes were paid.

21. Between May 18, 2001 and June 28, 2001, when WAR filed for bankruptcy, Walker handled company funds and wrote checks from the company account to pay various creditors. He did not draw a salary. At the same time, he failed to use any of the money in the general account to fund the shortfalls in the Plan.

22. Walker acted in good faith at all relevant times, even after learning of the company's financial problems and that the Plan was underfunded.

2006 U.S. Dist. LEXIS 19887, *6
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

23. The amount of employee contributions withheld by the company but, at Rhoades' instruction, not forwarded to the custodial trustee totals $ 18,710.99.

**Conclusions of Law**

24. This Court has jurisdiction over the subject matter and the parties to this action pursuant to sections 505 and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132 and 1145, and § 301(a) of the Labor Management Relations Act, as amended, 29 U.S.C. § 185(a).

25. The Plan is an employee benefit plan within the meaning of section (3) of ERISA, 29 U.S.C. § 1002(3) [*7] .

26. No part of the Secretary's cause of action is barred by the statute of limitations applicable to claims under ERISA.

27. The withheld employee contributions that remained in WAR's general account between May and July 2001 represented Plan assets within the meaning of ERISA, 29 U.S.C. § 1103(a) and regulations established under ERISA, 29 C.F.R. § 2510.3-102(a). *See also Phelps v. C.T. Enterprises, Inc.,* 394 F.3d 213, 220 (4th Cir. 2005).

28. Prior to May 18, 2001, Terry Rhoades served as the designated fiduciary and was the only individual at WAR who functioned as a fiduciary within the meaning of ERISA.

29. After May 18, 2001, the division of responsibility between Walker and Rhoades was effectively dissolved by Rhoades' admission to Walker that he had provided misleading financial information and that employee contributions were underfunded. Thereafter, Walker acted as a fiduciary as defined by ERISA and by operation of law when he exercised authority and control with respect to the management and disposition of the Plan assets that were commingled in the general corporate account. 29 U.S.C. § 1002(21)(A) [*8] .

30. After May 18, 2001, Walker violated his fiduciary duty of undivided loyalty by failing to segregate past employee contributions from WAR assets, failing to remit employee contributions to the Plan, and using Plan assets for the benefit of WAR as opposed to Plan participants and beneficiaries. 29 U.S.C. §§ 1104(a)(1),

1106(a)(1)(D), 1106(b)(1).

31. Walker is personally liable for $ 18,710.99, representing the amount of contributions withheld from employee earnings but not remitted to the Plan between September 1999 and May 2001. 29 U.S.C. § 1109(a).

32. Plaintiff is not entitled to a permanent injunction prohibiting Walker from serving as a fiduciary or having control over the assets of an employee benefit plan in the future, because Walker did not engage in the type of egregious misconduct or self-dealing that warrants such a remedy. *See Beck v. Levering,* 947 F.2d 639 (2d Cir. 1991). Walker acted with reasonable diligence in his corporate oversight. On May 18, 2001, when the true financial picture of WAR began to be revealed by Rhoades, Walker undertook immediate action [*9] to determine the extent of WAR'S debt and whether bankruptcy could be avoided. He put more money into the company and took none out for salary or other personal use. He soon determined that the company was hopelessly insolvent.

33. The Court, in its discretion, and in light of the unusual circumstances of this case as shown by the Court's findings, declines to award prejudgment interest to Plaintiff. *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1030 (4th Cir. 1993). Postjudgment interest is awarded at the rate specified under 28 U.S.C. § 1961.

**Discussion**

The statutory basis for a suit claiming breach of fiduciary duty under ERISA is 29 U.S.C. § 1109. Section 1109(a) imposes personal liability on any fiduciary who breaches "any of the responsibilities, obligations or duties imposed upon fiduciaries" by ERISA. A civil action may be brought "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief." 29 U.S.C. § 1132(a)(2). Where there is more than one fiduciary, they may be held jointly and severally liable for breaches of the duties imposed by ERISA. [*10] *Id.* § 1109.

The critical question in this case is whether Walker was a fiduciary of the Plan. In order to acquire fiduciary status under ERISA, a party must (1) be named as a fiduciary in the instrument establishing the plan; (2) be named as a fiduciary pursuant to a procedure specified in the plan instrument; or (3) fall within the statutory definition of fiduciary. *See Darcangelo v. Verizon Commc'n, Inc.,* 292 F.3d 181, 192 (4th Cir. 2002). It is

appropriate for a company, regardless of its size, to delegate to a particular individual or individuals the role of plan fiduciary. Indeed, ERISA requires every employee benefit plan to "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

ERISA defines a "named fiduciary" as a fiduciary who is named or identified as a fiduciary by an employer or employee organization with respect to the plan. *Id.* § 1102(a)(2)(A). Walker was not a named fiduciary under the Plan. All financial issues, including payroll and Plan administration, were clearly and fully delegated to [*11] Terry Rhoades. Walker's status as President and CEO, standing alone, does not make him a fiduciary of the Plan. Further, the fact that Walker's name appeared on the company checks and Walker had access to and authority over the company account does not, by itself, create fiduciary status. *See Confer v. Custom Eng'g Co.,* 952 F.2d 34, 37 (3d Cir. 1991); 29 C.F.R. § 2509.75-8.

Nevertheless, even someone who is not a "named" fiduciary may assume fiduciary duties and become exposed to liability for breach of a fiduciary duty under ERISA. An individual may become a fiduciary under ERISA by exercising discretionary authority over plan assets. 29 U.S.C. § 1002(21)(A). Section 1002(21)(A) provides that a person is a fiduciary with respect to a plan to the extent that (1) he exercises any discretionary authority or discretionary control respecting management of the plan or respecting management or disposition of plan assets; (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of such plan or has any authority or responsibility to do so; or (iii) [*12] he has any discretionary authority or responsibility in the administration of the plan. *Id.*

Using plan assets to pay expenses of the company or for other non-plan purposes has been found to represent the exercise of authority and control respecting the management or disposition of plan assets, [2] Applying this standard, the evidence leads to the inescapable conclusion that, after May 18, 2001, Walker acted as a fiduciary of the Plan. As of that date, the prior division of responsibility, under which Rhoades was the sole fiduciary, was dissolved. Walker could no longer reasonably rely on the division of duties made in 1999, and he assumed financial control over the company. After

learning on or about May 18, 2001 that the company had not remitted some withheld contributions to the custodial trustee, Walker placed money into the general account and wrote checks to the Internal Revenue Service and other creditors from that account. In doing so, he spent for the corporation's benefit more than the amount of the Plan assets in the general account.

> 2 It is undisputed that the unremitted employees' contributions were plan assets governed by ERISA. *See* 29 C.F.R. § 2510.3-102(a). Every payroll WAR withheld funds from its employees' earnings, which became Plan assets but remained in the corporate account. The critical issue here is whether Walker acted as a fiduciary when he used Plan assets to pay Company creditors rather than forwarding those assets to the fund.

[*13] The Court finds nothing to indicate that Walker acted with an improper motive or in bad faith. However, the fact that a fiduciary has acted in subjective good faith is not a defense once a breach is established. *See Leigh v. Engle,* 727 F.2d 113 (7th Cir. 1984); *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir. 1983); *Donovan v. Bierwirth,* 680 F.2d 263 (2d Cir. 1982). ERISA casts a very broad net in its functional definition of fiduciary, and Walker's actions after May 18, 2001 place him within that net. The Court notes, however, that this ruling does not extend fiduciary status to every person who exercises mere possession or custody over plan assets, or who has signatory authority over such assets. Walker became more than a mere custodian when the division of duties he had created and observed was destroyed, and when he paid creditors out of the general account without first segregating or remitting to the custodian that part of the account that represented withheld employee contributions.

ERISA places a number of obligations on a fiduciary. First, a fiduciary is required to "discharge his duties with respect to a plan solely [*14] in the interest of the participants and beneficiaries and . . . for the exclusive purpose of. . . (1) providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A). Second, a fiduciary is required to discharge these duties "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B).

2006 U.S. Dist. LEXIS 19887, *14
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

Finally, a fiduciary must not "deal with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b), but rather must take appropriate steps to assure that "the assets of a plan shall never inure to the benefit of any employer." 29 U.S.C. § 1103(c)(1). In drafting ERISA's standards of fiduciary conduct, Congress invoked the common law principle of trust and traditional trust principles. *NLRB v. Amax Coal Co.,* 453 U.S. 322, 332-33, 101 S. Ct. 2789, 69 L. Ed. 2d 672 (1981). These principles include "strict standards of trustee conduct, . . . most prominently, a standard of loyalty and a standard of [*15] care." *Cent. States, S.E. & S.W. Areas Pension Fund v. Cent. Tramp., Inc.,* 472 U.S. 559, 570, 105 S. Ct. 2833, 86 L. Ed. 2d 447 (1985). The Court finds that Walker breached his fiduciary duty after May 18, 2001 by commingling general funds and Plan assets, failing to segregate and pay to the fund Plan assets, and using Plan assets for purposes other than for the exclusive benefit of the Plan participants and beneficiaries.

Plaintiff requests damages representing the loss to the Plan, along with prejudgment interest. Under ERISA, a fiduciary who breaches his duty is personally liable to make good any losses the plan sustains as a result of his breach. It is undisputed that the loss to the Plan includes the $ 18,710.99 in contributions withheld from employee earnings but not remitted to the Plan between September 1999 and May 2001. 29 U.S.C. § 1109(a). Plaintiff also seeks prejudgment and postjudgment interest on that amount.

Awards of prejudgment interest are discretionary under ERISA. *See Quesinberry,* 987 F.2d at 1030; *Kennedy v. Georgia-Pacific Corp.,* 31 F.3d 606, 611 (8th Cir. 1994); *Whitfield v. Lindemann,* 853 F.2d 1298, 1306 (5th Cir. 1988). [*16] Prejudgment interest "is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness." *Blau v. Lehman,* 368 U.S. 403, 414 , 82 S. Ct. 451, 7 L. Ed. 2d 403 (1962) (internal quotations omitted). It is not awarded as a penalty, but as compensation for the use of funds. *Quesinberry,* 987 F.2d at 1031. Plaintiff has not shown how the Plan in this case would have invested the funds or earned any specific rate of interest on its investments. *See Whitfield,* 853 F.2d at 1306-07. Moreover, considerations of fairness in this case do not support imposition of prejudgment interest on Walker. Walker was not a named or designated fiduciary and did not act in a fiduciary capacity prior to May 18,

2001. The loss to the Plan resulted primarily from the improper actions of Terry Rhoades between September 1999 and May 2001. Further, the Plan stands to make a full recovery of its losses plus prejudgment interest by reason of the consent judgment against Terry Rhoades in this action. The Court observes that the Plan and its participants appear to be protected and will be fully reimbursed under the consent judgment, inclusive [*17] of prejudgment interest. Under the unusual circumstances of this case, the Court elects not to impose prejudgment interest upon Defendant Walker.

The court awards judgment against Wesley Walker in the amount of $ 18,710.99, plus postjudgment interest at the rate of 6.00% simple A.P.R., in accordance with 28 U.S.C. § 1961. Each party shall bear its own costs of litigation, including attorney's fees.

Plaintiff also seeks a permanent injunction prohibiting Walker from acting as an ERISA fiduciary in the future. Under ERISA § 1109, the court is authorized to fashion such equitable or remedial relief as it deems appropriate, including those developed under the law of trusts. 29 U.S.C. § 1109; *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101,110-11, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). Permanent injunctions are among the remedies available under the law of trusts. *Id.* Whether a permanent injunction is an appropriate remedy for breach of fiduciary duty depends on the nature of the misconduct. *See Beck v. Levering,* 947 F.2d 639, 641 (2d Cir. 1991). A permanent injunction might be appropriate, for example, where an individual engages [*18] in the type of self-dealing that is likely to be repeated. That is not the case here. While the Court finds that Walker became a fiduciary when the division of responsibilities between Walker and Rhoades was dissolved, and breached his fiduciary duty by using fund assets to pay general creditors. Walker did not act in bad faith or with improper motive. Walker's violation of ERISA has no significant likelihood of being repeated. Plaintiff's request for injunctive relief is denied.

A separate judgment will be entered contemporaneously with this Memorandum Opinion.

/s/ P. Trevor Sharp

United States Magistrate Judge

Date: April 13, 2006

2006 U.S. Dist. LEXIS 19887, *18
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

**JUDGMENT**

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment.

**IT IS ORDERED** that the court awards judgment against Wesley Walker in the amount of $ 18,710.99, plus postjudgment interest at the rate of 6.00% simple A.P.R., in accordance with 28 U.S.C. § 1961. Each party shall bear its own costs of litigation, including attorney's fees.

/s/ P. Trevor Sharp

United States Magistrate Judge

Date: April 13, 2006

# EXHIBIT 48

LEXSEE

**WILLIAM J. ELMORE, and WAYNE COMER, individually and as representatives of a class of Plaintiffs similarly situated, Plaintiffs, v. CONE MILLS CORPORATION, CONE MILLS ACQUISITION CORPORATION, DEWEY L. TROGDON, and LACY G. BAYNES, Defendants**

C/A No.: 6:88-3258-17

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA, GREENVILLE DIVISION

1991 U.S. Dist. LEXIS 13583

September 17, 1991, Decided
September 18, 1991, Filed

**JUDGES:** [*1] Joseph F. Anderson, Jr., United States District Judge.

**OPINION BY:** ANDERSON

**OPINION**

*FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER*

*I. BACKGROUND*

In November 1988, two former employees of Cone Mills Corporation ("Cone") brought this action against Cone and two of Cone's officers, Dewey L. Trogdon ("Trogdon") and Lacy G. Baynes ("Baynes"). The plaintiffs assert a variety of claims arising out of the leveraged buy out ("LBO") of Cone, which took place in early 1984. These claims all center on statements made and actions taken with regard to certain employee benefit plans maintained by Cone. In addition to alleging technical violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, and state and federal proxy laws, the plaintiffs contend that the defendants made certain promises about salaried employees' benefit plans that the defendants did not keep. These alleged promises can be separated into two basic categories:

1. a promise that all of the pension reversion in an

existing Employee Retirement Plan would be converted into a new Employee Stock Ownership Plan ("ESOP") for employees ("Pension Reversion Promise"); and

2. promises that employee retirement benefits, [*2] following the LBO, would be at least as good as they were prior to the LBO ("post-LBO promises").

As originally filed, the complaint contained numerous claims purportedly arising under state law. Following removal to this court on December 9, 1988, *see Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58 (1987), the plaintiffs amended their complaint to include claims arising under ERISA; the federal securities laws, 15 U.S.C. § 78n, 17 C.F.R. § 240.10b-5; and the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961-68.

On May 10, 1990, this court certified a plaintiff class. Following the defendants' motion for summary judgment, the court entered a Memorandum Opinion that significantly narrowed the claims in this case. Memorandum Opinion (Aug. 13, 1990). The court dismissed all of the plaintiffs' state law claims (except those arising under the state securities laws) because those claims all "related to" Cone's benefit plans and were pre-empted by ERISA. *See* 29 U.S.C. § 1144(a). In addition, the court dismissed the plaintiffs' 10b-5 and RICO claims.

The court's summary judgment order left only three claims for trial: the plaintiffs' claims [*3] under ERISA,

1991 U.S. Dist. LEXIS 13583, *3
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

and their federal and state claims for proxy violations. This case was tried in Greenville, South Carolina from February 11 through February 15, 1991. Additional oral argument was heard on July 24, 1991.

After receiving the testimony, carefully considering all the evidence, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this court makes the following Findings of Fact and Conclusions of Law. Fed. R. Civ. P. 52. The court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

## II. FINDINGS OF FACT

### A. Cone Mills and Its Benefit Plans

In 1895, Cone Mills was established in Greensboro, North Carolina. By 1983, it was one of America's largest diversified textile manufacturers with twenty-one plants and 11,000 employees. It was a leading producer of the textile industry's two most important fabrics: denim and corduroy. With more than twenty plants in North and South Carolina, Cone had approximately 1,800 salaried employees. Approximately 400 were [*4] employed in South Carolina.

In 1983, Cone Mills maintained three benefit plans exclusively for its salaried employees: (1) the Employees' Retirement Plan ("ERP"), established in December 1986, "to provide pension benefits to salaried employees;" (2) the Supplemental Contributory Retirement Plan ("SRP"), established in November 1947, "to supplement pension benefits for salaried employees;" and (3) the Employee Stock Ownership Plan ("PAYSOP"), established in January 1978, "for the purpose of providing salaried employees an ownership position in the common stock of Cone Mills Corporation." Cone also maintained a separate pension plan to provide pension benefits to its hourly employees.

### B. Role of Trogdon and Baynes as Officers and Directors of Cone Mills

Trogdon was initially employed with Cone Mills in 1958. He was appointed Executive Vice President in 1978 and was elected President and a member of the Executive Committee on January 1, 1979. He was appointed Chairman of the Board and Chief Executive

Officer effective January 1, 1981.

Baynes began working for Cone Mills in 1963 as a CPA. He served as Assistant Treasurer from May 1980, through August 1981, and was appointed Secretary [*5] of the corporation effective September 1981. As Secretary, Baynes prepared minutes of the Board of Directors meetings and assisted with the proxy statement at issue in this case.

### C. The Role of Trogdon and Baynes in the Administration of Cone Mills' Employee Benefit Plan

Trogdon was appointed to the Investment Committee of the ERP, SRP, and PAYSOP, the Pension Committee of the ERP, and the Advisory Committee of the SRP and PAYSOP, all effective November 9, 1978. Trogdon continued to serve on the Pension Committee for the ERP through 1988, the Advisory Committee for the PAYSOP through 1986, and the Investment Committee for the ERP and SRP through 1989. Trogdon also continued to serve on the Advisory Committee for the SRP through 1989. Trogdon later served on the Advisory Committee for the 1983 ESOP for the year 1984.

Baynes testified that, as Secretary of the corporation, he was responsible for administering or managing all of Cone Mills' qualified retirement plans. He also testified that he was a member of the Advisory Committee that served under all of Cone Mills' defined contribution plans. Baynes was appointed to the Pension Committee of the ERP and the Advisory Committee [*6] of the SRP and PAYSOP, effective September 1, 1981. He continued to serve on the Pension Committee of the ERP through 1989, on the Advisory Committee for the PAYSOP through 1987, and on the Advisory Committee for the SRP through 1989. He served on the Advisory Committee for the 1983 ESOP for the years 1984 through 1988, on the Investment Committee for the year 1986, and became the first "official trustee" of the 1983 ESOP on April 2, 1984. He resigned as ESOP trustee on June 20, 1984, and was replaced by United Virginia Bank. Baynes also served as trustee of the PAYSOP from April 2 through June 20, 1984.

### D. Western Pacific Industries' Hostile Takeover Bid

In October 1983, the largest shareholders of Cone Mills were Ceasar Cone, II (600,000 shares) and Howard A. Newman of Western Pacific Industries ("Western Pacific") (333,000 shares). In the third quarter of 1983,

1991 U.S. Dist. LEXIS 13583, *6
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

Cone Mills' stock had fluctuated from forty to forty-seven dollars per share. On October 31, 1983, Cone's senior management learned that Western Pacific had agreed to purchase Ceasar Cone's 600,000 shares for fifty dollars per share, giving it control of almost seventeen percent of Cone Mills' outstanding common [*7] stock. On November 4, 1983, Western Pacific notified the Securities and Exchange Commission ("SEC") that it proposed to acquire additional shares in the open market and that it intended to acquire control of Cone Mills.

On learning that Western Pacific sought to acquire control of Cone, Trogdon notified Cone Mills' lawyers and financial advisors, and they decided to resist the takeover attempt. Upon authorization by the Executive Committee, Cone filed suit against Western Pacific in the Federal District Court in Greensboro seeking an injunction against Western Pacific's further acquisition of Cone's common stock based on Western Pacific's alleged noncompliance with the Investment Company Act of 1940. In a November 7, 1983, corporate news release, Trogdon stated that "the Company is bringing this legal action and studying other alternatives to protect the interests of all the Company's shareholders and employees." Plaintiffs' Exhibit 44, at 1.

In a November 7, 1983, notice to employees posted on Cone's corporate bulletin boards, Trogdon stated:

I would like to advise you that Cone Mills opposes the action of Western Pacific to acquire control of the company and this morning has filed [*8] suit in federal court to block this move.

We are taking this action and studying other alternatives to protect the interests of all shareholders and employees of Cone Mills. We will keep you informed of further developments as they occur.

Meanwhile, it is important to perform our jobs as usual and continue to meet the high standards of quality and efficiency for which Cone Mills is widely known.

*Id.* at 2. According to Cone's executive, John Bakane ("Bakane") the announcement of Western Pacific's hostile takeover bid left Cone's employees "stunned" and "vulnerable." In an April 26, 1984, speech, he stated:

On the morning and during the early afternoon of November 4, [1983,] most Cone employees were stunned as the news became public. The culture at Cone Mills,

had always been based upon manufacturing, quality and service. As a result, the average employee felt vulnerable to the shrewd financial actions of a New York raider. Although WPI was about one-fourth the size of Cone in terms of sales volume, the $ 140 million of cash on the WPI balance sheet in conjunction with Cone's low levels of debt indicated that Western Pacific had the resources to complete a takeover bid.

[*9] Plaintiffs' Exhibit 144, at 1-2.

*E. Development of Cone Senior Management's LBO Proposal*

On November 8, 1983, a special meeting of the Board of Directors of Cone Mills was called to discuss the attempted hostile takeover by Western Pacific. The Board authorized Chairman Trogdon, in conjunction with other executive management personnel, to evaluate the alternatives available to the company to protect the interests of the company, its shareholders, and Cone's employees. According to Cone's Chief Financial Officer, Bakane, the Cone Mills Board of Directors considered a management-sponsored LBO to be one feasible option:

By the time the Board of Directors met, on November 8, [1983,] to consider alternatives, the leveraged buyout by management was a feasible option. The board instructed management to continue to assess options in order to protect Cone Mills, the interest of all shareholders and the interests of all employees.

Plaintiffs' Exhibit 144, at 5. Other alternatives considered included potential negotiations with Western Pacific, merger with a third party, or a tender offer for the stock of Western Pacific. Negotiations with Western Pacific were ruled out because the [*10] management styles of the two companies were incompatible and potential merger negotiations were unproductive. According to Bakane, after the Board analyzed these alternatives, it became increasingly more apparent that a management-sponsored LBO was the preferred option.

According to the Proxy Statement (Plaintiffs' Exhibit 90), during early November certain members of senior management of Cone, including Trogdon and Joseph F. Bond, Executive Vice President and Treasurer, "determined to explore seriously the feasibility of structuring and proposing a leveraged buyout transaction sponsored by management of Cone." Plaintiffs' Exhibit 90, at 2. According to Bakane, throughout the remainder

Case 8:06-cv-00338-PJM   Document 92-8   Filed 02/29/08   Page 68 of 104

1991 U.S. Dist. LEXIS 13583, *10
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

of November, Trogdon and Bond "concentrated on learning the rules of the leveraged buyout game while simultaneously trying to put the deal financing together." Plaintiffs' Exhibit 144, at 6.

A November 1983, memo from Bond (Plaintiffs' Exhibit 46) outlined a "Management Proposal" involving an LBO with a capitalization of $ 7 million in common stock owned by Cone's senior management, $ 38 million in participating and senior preferred stock owned by "investor/lenders," and an unspecified amount of nonvoting [*11] preferred stock owned by an employee stock ownership plan. According to this management proposal, the capitalization would include $ 14 million in participating preferred stock owned primarily by investor/lenders and $ 24 million of twelve percent senior preferred stock also owned by investor/lenders. Plaintiffs' Exhibit 46, at 2.

A second special meeting of the Cone Mills' Board of Directors was held on November 28, 1983, at which time a proposed "Agreement in Principle" was presented containing an offer by Cone's senior management to acquire all outstanding shares of common stock in Cone Mills Corporation for $ 68 per share. Plaintiffs' Exhibit 48, at 3. The proposed acquisition would be subject to the arrangement of satisfactory financing, "requisite governmental approvals," and approval by Cone Mills' shareholders.

On the recommendation of Trogdon, the Board of Directors appointed a six-member special committee of nonmanagement directors. This committee convened on November 28, 1983, to consider management's LBO proposal. Slightly more than six hours later, the Board of Directors then reconvened at 6:00 p.m. to receive the special committee's report. This special committee emerged [*12] to announce that they had "voted unanimously to recommend that the company accept management's acquisition proposal. . . ." Id. at 4. The Board of Directors then passed a resolution accepting the proposed Agreement in Principle and instructed the special committee to negotiate the terms of "such definitive agreements" that "it may deem necessary and advisable to implement the terms of the agreement in principle." Id. at 5. Other than the $ 68 purchase price, no other terms of this proposed Agreement in Principle were contained in the November 28, 1983, Board of Directors' minutes.

Recognizing that following public announcement of the proposed LBO, third parties would be free to make a more favorable offer, following the November 28, 1983, Board of Directors meeting, the management group raised its offering price to $ 70 per share to increase the probability that the LBO would be successfully consummated. Id.

## F. Cone's Communications to Its Employees

Between November 29, 1983--when the Board's action approving the LBO was made public--and March 26, 1984--when the LBO became final--Cone made an effort to communicate with its employees, both hourly and salaried, to [*13] keep them posted concerning the LBO. Cone sought to explain to all of its employees several basic changes that would be made in their employee benefit plans. Acting primarily through Trogdon, Cone told these employees what the company believed during this period about those plans, in most cases explaining that what was then expected might later change. It is these communications--consisting of letters and newsletters sent to the class-- that the plaintiffs have challenged in this case.

Shortly after the LBO was made public by a press release (Plaintiffs' Exhibit 49), Cone began to address some of the features of the proposed LBO, including the proposed adoption of the 1983 ESOP. A central feature of the proposed ESOP was the "floor offset arrangement" between the 1983 ESOP and the ERP. Upon retirement, the value in a salaried employee's 1983 ESOP account was used to fund that portion of his ERP pension benefit that had accrued after December 31, 1983. If any employee's ESOP account was insufficient to meet this obligation, Cone was required to make up the shortfall by contributing directly to the ERP. If the ESOP account exceeded the ERP obligations, the excess was paid to the employee. Cone [*14] thus designed the 1983 ESOP to be an added benefit to its employees; in no event could employees receive less benefits than those provided by their pension plan, and, potentially, employees could receive more. The 1983 ESOP, in conjunction with the ERP, served as a way to guarantee employees' pension benefits (through the floor offset mechanism), while providing the opportunity for extra benefits for both hourly and salaried employees.

Cone began to write to its employees about the new ESOP and other contemplated changes in its benefit plans in early December 1983, three months before the LBO was accomplished.

On December 12, 1983, Trogdon wrote to all Cone employees (hourly and salaried). This letter contained a basic explanation of the 1983 ESOP and informed employees that their "pension plans will be left in place with [their] existing benefits guaranteed by the Company." Plaintiffs' Exhibit 63, at 1. The letter told employees that "under this structure, [the coordination of the new ESOP and the ERP] you can receive *no less than the full amount* of your pension benefits." Transcript II, at 75 (emphasis added). The letter also contained a statement of the company's *expectation:* [*15] "Together, the ESOP and your pension plan are expected to provide greater financial security than your present retirement benefits." *Id.*

In the December 12, 1983, letter, Trogdon also estimated that over $ 50 million of stock could be contributed to the 1983 ESOP in the first two years:

Currently, it is difficult for me to give details, but subject to legal and tax rulings, it appears that in the first two years (1984-85), over fifty million dollars of stock could be contributed to your ESOP. At this point I am not allowed to legally guarantee that amount, nor will it be the same amount in future years. However, the estimated contribution does give you a good indication that our ESOP will become a very large stockholder of Cone Mills.

Plaintiffs' Exhibit 63, at 2. Shortly after the December 12 letter went out, Trogdon wrote a letter to salaried employees. Transcript II, at 75, 79. In his letter of December 15, 1983, Trogdon first explained that the ERP would "be kept in place in tandem with the ESOP." Plaintiffs' Exhibit 66, at 1. In the third paragraph of the letter, Trogdon discussed the disposition of the pension "surplus":

The third factor for discussion involves disposition [*16] of surplus funds in the Plan due to over-funding by the Company for a period of years. These surplus funds belong to the Company (the current stockholders), or anyone else who would purchase the Company or its stock. You and I as employees are entitled to certain guaranteed benefits from the Plan in accordance with established Plan formulas. We have no title to surplus funds contributed by the Company beyond what it takes to fund our pension benefits.

*If the management and bank proposal to buy the Company is successful, there is agreement among*

*management and the banks that we will contribute the surplus, or its equivalent in Company stock, to the ESOP. When the transaction is executed and the contribution is made, you, I, and all other Cone employees will "take title" to a substantial asset in which we currently have no rights or ownership.*

Plaintiffs' Exhibit 66, at 1 (emphasis added).

After the ESOP was adopted, Cone continued to communicate with its employees about how the ESOP would operate. In February 1984, as it did every year, Cone produced an "in-house" video to report to employees on profits and business conditions, and a segment concerning the ESOP was included [*17] in this presentation. The video was shown to all employees. At the video presentation, a question-and-answer booklet ("Q&A Booklet") (Plaintiffs' Exhibits 88, 89) was handed to employees.

In the video, Trogdon reiterated what he had previously told employees: "At retirement, you will receive at least what your present pension plan provides. . . . And there's a very good chance you will get more because of the 1983 ESOP." Plaintiffs' Exhibit 88, at 2. Trogdon made this statement again because he "wanted to be sure the employees understood what [Cone was] saying and what [they] were not saying." Transcript II, at 83.

During the video, the narrator indicated that Cone planned to "contribute preferred stock [to the ESOP]" for the first two years, and maybe longer. As the narrator explained, Cone chose to contribute preferred stock because "of the need for both safety and minimum fluctuation in the price of [the] stock." Transcript II, at 84; Plaintiffs' Exhibit 88, at 7.

Trogdon testified that he believed, as early as mid-November, preferred stock should be contributed to the new ESOP. Transcript II, at 84. He was concerned that it would not be prudent to put common stock into the ESOP [*18] in its early years, in light of the radical transformation of the capital structure of Cone as a consequence of the LBO. *Id.* As Trogdon testified, Cone was "getting ready to go from one and one-half percent to over ninety percent debt, and from over ninety-eight percent common equity down to one-half percent common equity." Transcript II, at 84-85.

After the video presentation, each personnel manager

1991 U.S. Dist. LEXIS 13583, *18
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

handed out the Q&A Booklet to the employees. The cover letter to the Q&A booklet clearly stated that "the future value of [employees' ESOP] accounts cannot be guaranteed." Plaintiffs' Exhibit 89. The Q&A Booklet also explained that the ESOP could be amended at any time, and that the plan documents--not other communications about benefits--controlled the terms of the employees' actual benefits. Id. In boldface print, the company also stated, "the legal documents control, and if this material differs in any way from the legal documents, the correct source of the information is the legal documents." Id.

After the video presentation and the distribution of the Q&A Booklet, Cone sent salaried employees one more letter, the March 15, 1984, Memorandum to Salaried Employees (Plaintiffs' [*19] Exhibit 94). The first portion of the letter refers to prior events and communications, and indicates, with reference to the ESOP, that "details of the ESOP were not capable of being fully worked out at the time [of the video] so [Cone] guaranteed what [they] could at that time--that no employee would lose any of his retirement benefits." By this statement, Trogdon was referring to prior statements in which he had told employees that Cone's pension benefits would not be affected by the LBO. See Transcript II, at 88; Plaintiffs' Exhibits 9, 15, 23.

Indeed, Trogdon's reference in the March 15 letter to "retirement benefits" could have only meant retirement benefits from the ERP, Cone's salaried pension plan. On December 15, Trogdon advised employees that the PAYSOP stock would likely be sold, and that the proceeds would be distributed to employees. Plaintiffs' Exhibit 66, at 1. He also clearly explained that the company was not going to continue contributions to the SRP. Transcript II, at 88; Plaintiffs' Exhibit 66, at 2. Therefore, the only plans which remained available to provide "retirement" benefits were the ERP/ESOP, working in combination. Because Trogdon indisputably told [*20] employees that there could be no guarantee of any level of ESOP benefits, Plaintiffs' Exhibits 89, 94, that leaves only the ERP.

Trogdon made clear his intent in the March 15 letter. There he said, "we have made a commitment that no other leveraged buyout company has made--we have said that your *pension benefits* will be no less than what you were to receive under plans existing prior to the reorganization." Plaintiffs' Exhibit 94, at 3-4 (emphasis

added). Finally, Elmore testified he himself understood--from this March 15 letter--that the company was not guaranteeing ESOP benefits greater than present pension benefits under the ERP. Transcript I, at 197. Therefore, Trogdon's overall message in these communications was unmistakable: Cone's pension benefits would not change because of the LBO, SRP contributions would cease, and ESOP benefits could not be guaranteed, but were *expected* to provide some additional benefits.

The March 15 letter referred to the "profit sharing potential" of the 1983 ESOP. In so depicting the 1983 ESOP, Trogdon was correct because the ESOP did include a profit-sharing component, and Cone has shared more than $ 35 million of its profits with the ESOP [*21] beneficiaries through dividend payments on the preferred stock contributed to the ESOP. Trogdon emphasized, however, that such profit-sharing simply could not be guaranteed. He specifically stated, "I do not believe it is prudent, presently, to guarantee ESOP contributions above the 1% minimum for years 1985 and forward until we get some practical experience with the workings of our ESOP and gain a clearer focus on the condition of the Company." Plaintiffs' Exhibit 94, at 1.

*G. The February 23, 1984, Proxy*

On February 23, 1984, Cone Mills sent a proxy statement to all of its common shareholders (Plaintiffs' Exhibit 90). Some of the plaintiffs received the proxy because they were beneficial owners of 1.3% of Cone common stock held by the Cone PAYSOP. Plaintiffs' Exhibit 90, at 19, F-3. Although the LBO could not become effective unless and until it was approved by a majority of the outstanding shares of common stock, the proxy did not ask for shareholder approval of any proposed amendments to Cone Mills' employee benefit plans because shareholder approval was not required to effectuate these amendments.

The proxy contained several statements concerning employee benefit plans. [*22] In the summary section of the proxy, Cone stated that "Cone's Supplemental Retirement Plan ('the SRP'), a defined contribution plan, will be continued in its present form after the merger; however salary reduction elections . . . may be suspended." Plaintiffs' Exhibit 90, at iv. The summary section also contained an express warning that shareholders should review the detailed information in the proxy and should not rely on the summary. On this

1991 U.S. Dist. LEXIS 13583, *22
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

point, the detailed section stated that there would be no contributions to the SRP while the company was making substantial contributions to the ESOP. *Id.* at 19.

Relying in part on the above-mentioned statements in the proxy, the plaintiffs have contended that Cone "promised" that the SRP would not be amended, and that the later change to a discretionary contribution formula in 1984 was a breach of that promise. The proxy has been carefully reviewed, however, and this court finds that it does not contain any misrepresentation or omission of material fact. The proxy simply does not contain any promise that the SRP would never be changed; to the contrary, the plaintiffs were clearly told that contributions to the SRP would cease after the [*23] LBO.

Specifically, in addition to discussing the ESOP, Trogdon's December 15, 1983 letter had also explained proposed changes to the SRP. In that letter, Trogdon emphasized that there would be no contributions to the SRP:

3. Supplemental Retirement Plan (Profit Sharing Plan). The SRP will remain in place with your funds invested as before according to the various investment options you elect . . . .

The primary change that will occur under the management purchase proposal is related to Company contributions. As you know, SRP contributions are based on level of profit relative to net worth of the Company. We know now that the Company will not be contributing to the SRP. There are two basic reasons:

1. Under the reorganized Company, we will not be recording profits in the early years due to high debt and interest expense. However, we will be generating very good cash flows that will be utilized to quickly reduce debt and maintain our capital budgets.

2. We will be contributing to the ESOP. Contributions to the ESOP will not be based on reported profits as is the case in the SRP. The ESOP contributions will be related generally to cash flow and tax considerations.

Plaintiffs' [*24] Exhibit 66, at 2 (emphasis in original). This clear, unambiguous, and underlined statement informed salaried employees that Cone Mills would not be contributing to the SRP. The company gave two basic reasons for not contributing--both of which

were accurate. The company acquired a heavy debt and interest expense as a result of the LBO, and cash flow had to be used to pay down debt. Although Cone Mills has reduced its debt obligation, there is a significant amount of debt remaining to be paid. Furthermore, Cone Mills made contributions to the 1983 ESOP on behalf of salaried employees for 1983-1986, and when the ESOP was amended in 1987 to substitute a cash funding system for salaried employees, the SRP was also amended to institute mandatory matching contributions.

### H. The Vote on the LBO

At a special Cone shareholder meeting on March 26, 1984, the LBO transaction was approved by a nearly unanimous vote. Plaintiffs' Exhibit 104.

The LBO was consummated on March 27, 1984, and the common stock, including the shares held by the PAYSOP, was purchased for seventy dollars per share. The adequacy and fairness of this value have not been questioned in this action.

### I. The ESOP Plan [*25] Documents

The court finds that no official plan document was properly adopted and executed by Cone prior to the LBO. The defendants contend that an official plan document was adopted at a December 22, 1983, Board of Directors meeting. The evidence showed otherwise. The court finds that a document entitled "Detailed Plan Description" (Plaintiffs' Exhibit 47) was presented at the December 22, 1983, Board meeting. All details of the ESOP, however, had not been finalized at that time.

The evidence showed that the Detailed Plan Description and the "Original ESOP Document" (Plaintiffs' Exhibit 12) are significantly different. It is also obvious that it was the Detailed Plan Description and *not* the Original ESOP Document that was "adopted" by the Board of Directors on December 22, 1983. The minutes specifically state that a "detailed description" of the Cone Mills 1983 ESOP was "presented" and described in terms identical to those of the Detailed Plan Description. The Board's resolution states that the 1983 ESOP *"as outlined above"* be adopted. The Original ESOP Document was *not* "as outlined above" and, therefore, was *not* adopted by the Board of Directors regardless of [*26] whether Plaintiffs' Exhibit 12 was present at the Board meeting. This conclusion is supported by a bulletin board notice, which Baynes

testified was posted on December 29, 1983. It makes two references to the "Detailed Description of the ESOP," but none to the Original ESOP Document. The bulletin board notice also states that contributions to the ESOP are to be made in company stock, a description which is inconsistent with the provisions of the Original ESOP Document. Under the heading of "ESOP Features," the bulletin board notice reads as follows:

ESOP stands for Employee Stock Ownership Plan. There are really three plans in one: a pension plan, a stock plan and a profit-sharing plan. *These will be explained fully in the Detailed Description of the ESOP,* which will be made available to you. *Contributions to the ESOP are made in company stock.*

Plaintiffs' Exhibit 73 (emphasis added). Because the Detailed Plan Description specifically states on its face that "this description is not the legal plan or trust document," there was no "legal plan or trust document" that had been duly adopted by Cone Mills on December 22, 1983, or at anytime thereafter, until the Original [*27] ESOP Document was finally executed by Baynes on or about April 2, 1984.

*J. Appointment of ESOP Trustee*

The court finds that a trustee for the 1983 ESOP was not properly appointed until April 2, 1984. According to a December 8, 1983, Wachovia Bank and Trust Company ("Wachovia") interoffice memo, Baynes told Wachovia that it "would be considered as the trustee for the new ESOP," Plaintiffs' Exhibit 57, at 1, and if they would not be able to accept, Wachovia needed to tell Baynes. Following this conversation, both Baynes and Trogdon presumed Wachovia was the ESOP trustee. The defendants now concede, however, that Wachovia was never trustee of the ESOP.

On or before March 23, 1984, Wachovia sought legal advice as to whether it should accept the ESOP trusteeship. Its counsel suggested that a question existed as to "whether Wachovia's dual capacity as an Institutional Investor and as a trustee of the ESOP will constitute a breach of fiduciary duty or a prohibited transaction under ERISA." Plaintiffs' Exhibit 101, at 3. Though concluding that acting as trustee "will not necessarily constitute a breach of fiduciary duty or a prohibited transaction," Wachovia's counsel recommended [*28] that "to avoid the appearance of impropriety and to avoid a prohibited transaction . . .

Wachovia should exercise no discretion as ESOP trustee in connection with transactions involving Cone's securities." *Id.* As of this date, Wachovia still hoped to be named the trustee of the ESOP. Following this advice from Wachovia's counsel, a meeting was held between Baynes, Cone's ESOP counsel, Wachovia, and Wachovia's counsel on March 28, 1984. At this meeting, both Baynes and Cone's ESOP counsel "stated they were comfortable with Wachovia serving as trustee of this plan." Plaintiffs' Exhibit 115, at 2. It was further noted that "a decision must be made by Wachovia whether it intends to serve as trustee within the next few days." *Id.* From the evidence, the court finds that Wachovia's decision to decline the trusteeship was made on March 30, 1984.

Because the evidence clearly indicates that Wachovia did not decide to decline the trusteeship until March 30, the court finds as fact that Baynes did not assume the trusteeship until April 2, 1984. Baynes later resigned the trusteeship on June 20, 1984, and was replaced by United Virginia Bank.

*K. The Pension Reversion Promise*

Cone [*29] ultimately received $ 69 million in pension reversion surplus between May and December of 1985. It failed to contribute this amount, or its equivalent, to the 1983 ESOP as promised.

When Cone represented to its salaried employees in December 1983, that there was "agreement among management and the banks that [Cone] will contribute the surplus, or its equivalent in company stock, to the ESOP," the amount of the surplus was uncertain. Plaintiffs' Exhibit 66, at 1. Cone Mills' management knew that the ultimate amount would depend upon a number of factors, including fluctuating interest rates and annuity costs. Although; based on preliminary December 1983, actuarial estimates, it was anticipated to be "in the neighborhood of $ 50 million," but there "wasn't any certain amount." For this reason, in describing the anticipated amount of surplus, Cone and the lending banks used such terms as "approximately $ 50 million," "over $ 50 million," or "$ 50 million or more."

Between December 8, 1983, and March 21, 1984, estimates of the amount of pension surplus escalated from "approximately $ 50 million" to "close to $ 55 million" and ultimately to the "latest estimates" of $ 57 million. This escalation [*30] continued through August 1984,

1991 U.S. Dist. LEXIS 13583, *30
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

when the pension surplus was estimated to be "about $ 63 million" and ultimately reached $ 69 million by December 1985.

Because the reversion created taxable income, Cone management intentionally deferred receipt of the reversion until 1985 so that Cone would be able "to reclaim 1981 taxes paid of just over $ 17 million." In postponing the reversion, Cone management knew, or should have known, that this could materially change the amount of the surplus. Based on the constantly accelerating pension surplus estimates, it was reasonably foreseeable to Cone management that its intentional delay in recapture of these excess pension assets could ultimately increase the amount of pension reversion surplus. By delaying the recapture until 1985, Cone received a material financial benefit through its enhanced tax deduction.

The plaintiffs point to the "third factor for discussion," in Trogdon's December 15, 1983, "Personal Letter to Our Salaried Employees" to support their claim of a promise. In this letter, Trogdon spoke of an agreement between management and the banks. The implementation of the agreement would involve Cone contributing "the" surplus to the ESOP [*31] and the employees "taking title" to a valuable asset.

The plaintiffs also point to similar language in the February 1984, Trogdon video script:

... If the government approves, these surplus funds can be returned to the company to help reduce the debt or meet other business expenses, but *contributions to your ESOP will be greater than the money returned to the company.* This means that employees will effectively gain ownership of these surplus assets in their ESOP accounts . . . .

Plaintiffs' Exhibit 73, at 6 (emphasis added).

Evidence of Cone's intent in making its December 15, 1983, representation that "we will contribute the surplus, or its equivalent in company stock, to the ESOP" is found in a number of trial exhibits. Although Cone argues that when this representation was made it only intended to contribute the estimated amount of surplus "as we knew it at that time," there is considerable evidence to the contrary. The ultimate amount of the surplus in December 1983, was uncertain. In Trogdon's December 12, 1983, letter and in the December 1983,

Cone company newspaper, the anticipated ESOP contribution was simply described as "over $ 50 million."

Evidence of Cone's intent [*32] may be found in "The Cone Reversion Model" which states that "the Cone Mills Corporation's defined-benefit plans will begin the termination process with the goal of recycling the pension surpluses into the Cone ESOP (cash returns to the company, stock contributed to offset income)." Plaintiffs' Exhibit 54, at 4. The use of the terms "recycling" and "offset" certainly at least implies an intent to contribute a "compensating equivalent" amount of company stock to the ESOP.

Also, Cone's tax consultant stated in a "strictly confidential" letter dated December 19, 1983:

4. What is the penalty for failing to fund the 10% money purchase pension portion of the ESOP contribution? . . . As a result of our subsequent discussions with John Bakane, we understand that the present intention is to spread the refund of the excess employer contributions from the pension plan between 1984 and 1985 so that a contribution can be made without generating a loss carryforward.

Plaintiffs' Exhibit 68, at 3. This letter is dated just four days after Trogdon's December 15, 1983, letter to the salaried employees and sets forth Cone's tax consultant's understanding of Cone's "present intention" with respect [*33] to the expected "ESOP contribution" of the anticipated "refund of the excess employer contributions from the pension plan." *Id.*

On this subject, it was certainly Cone's tax consultant's understanding that it was Cone's intention to spread the entire refund between 1984 and 1985. Additionally, it is clear that Cone expected to receive a significant tax advantage by deferring this contribution to avoid a loss carryforward.

On January 18, 1984, Cone's ESOP counsel filed with the IRS a Form 5310 (Plaintiffs' Exhibit 76), giving notice of Cone's intent to terminate the salaried employees' ERP. Attached as Exhibit A to Cone's "Notice of Intent to Terminate" is a list of "Three Alternative Courses of Action" proposed by Cone with respect to the ERP. The third of these alternatives reads in part as follows:

3. The third course of action would involve a transfer

of *an amount that is equal to an amount that would be the employer portion of residual assets . . .* to the Cone Mills Corporation 1983 ESOP . . . .

Plaintiffs' Exhibit 76, at 1. Although this "third course of action" was not ultimately selected by Cone, that in mid-January of 1984, one course of action under consideration [*34] by Cone contained the quoted language is significant evidence of Cone's intent.

On March 15, 1984, the Wyatt Company, Cone's actuary, wrote to Wachovia, as trustee of the ERP and as presumed trustee of the 1983 ESOP, concerning "the effect of the proposed spinoffs of and subsequent asset reversions from" the salaried employees' ERP and the hourly employees' pension plan. In this letter, the Wyatt Company states that "it is the intent of Cone Mills to use the proceeds of subject reversions to provide additional benefits to employees in the form of an Employee Stock Ownership Plan." Plaintiffs' Exhibit 95, at 1. Wyatt's letter expressing "the intent of Cone Mills" on the same day as Trogdon's March 15, 1984, memorandum to salaried employees and just eight days before the PAYSOP proxy vote is highly significant. It also contains a strong implication that it was Cone's intent even at this time to use *all* of the reversion surplus to find the ESOP.

In repeated communications to the salaried employees, Trogdon reassured them that he would keep them fully informed of all "significant developments." The December 15, 1983, Trogdon letter clearly implies that Cone and the banks had agreed [*35] to contribute the entire pension reversion surplus, or its equivalent in company stock, to the ESOP. Any retreat from this position would have been a "significant development." The absence of any subsequent disclosure is evidence that Cone's publicly expressed intention did not change.

The issue of whether the plaintiffs, individually or collectively, reasonably relied upon any of the alleged promises of the defendants has been a much-discussed topic during the three-year history of this litigation. When the court considered the question of class certification, the defendants argued against certification and suggested that, because individual reliance by each of the 1,800 salaried employees would have to be shown for each to recover, the class action vehicle was inappropriate. The plaintiffs responded that certain theories of recovery set out in the complaint did not require a showing of reliance and also argued that if a showing of reliance became necessary, the court could receive testimony on this issue from each class member in the second part of a bifurcated trial. As noted above, the court certified the class.

In a final pretrial conference held on January 17, 1991, the court [*36] raised the reliance issue once again. After a thorough discussion of the issue, it was agreed that the trial would proceed without testimony concerning reliance. The plaintiffs would be allowed to attempt to convince the court that they should recover under theories not requiring reliance, and the defendants would be allowed to attempt to demonstrate that no person could have reasonably relied upon the alleged promises. Testimony on the reliance issue, if it became necessary, would be received at a later hearing. By postponing testimony on the reliance issue until such time as it became necessary, if at all, judicial resources would be conserved. Good faith estimates of the time required for receipt of such testimony ranged from six weeks to six months.

Because the court has concluded that plaintiffs should recover for breach of the Pension Reversion Promise based on a breach of fiduciary duty, the court makes no findings concerning reliance. However, in the event the court is incorrect in awarding damages for breach of fiduciary duty, the plaintiffs may still be entitled to recover under either of two common-law contract theories: equitable estoppel and third-party beneficiary. [*37] *See* pages 42-44, *infra.* Both of these theories include a reliance requirement.

In the event that, after an appeal, it becomes necessary for the court to address the reliance requirement, the necessary reliance could be demonstrated in one of two ways: (1) individual reliance by each salaried employee in voting for the LBO; or (2) group reliance by the salaried employees in enthusiastically supporting the LBO proposal. The testimony at trial demonstrated that the LBO was formulated and executed with remarkable speed. One key component of the entire package was the loan participation and equity participation of the banks. Cone was able to convince the banks to participate, and to push the LBO package along in short order, because of the united support it received from its employees. It could be argued that one essential element of this "house of cards" was the unanimous and unqualified support of the LBO by the salaried employees. Although there was testimony as to this support at trial, the court makes no findings in this regard, because of the pretrial agreement with

counsel that testimony and findings with respect to reliance would be deferred.

In summary, the promise to contribute [*38] "the" pension reversion was clear and unqualified. Unlike the promises of post-LBO benefits, which were generally couched in terms of expectations or predictions, or which were effectively disclaimed, the pension reversion promise was just that--a promise. It was made in writing by Cone's Chief Executive Officer. It was later ratified by the Board of Directors. It speaks of an "agreement" with the banks. It tells the employees they will "'take title' to a substantial asset." Although other correspondence estimated the amount to be in the $ 50 million range, Cone Mills promised to contribute "the" reversion. Had the reversion amount ultimately been an amount substantially less than $ 50 million, the court would not have required $ 50 million to be contributed because of the mistaken assumption that $ 50 million was in the reversion. Likewise, the court is not constrained to limit the pension reversion promise because of the assumption. This unqualified promise gives rise to liability to the plaintiff class for breach of fiduciary duty, and possibly under contract law principles, as discussed in the conclusions of law.

The table below summarizes the undisputed evidence regarding pension [*39] reversion payments received by Cone Mills, subsequent contributions to the 1983 ESOP/Special Retirement Account ("SRA"), and the resulting contribution deficit:

| Date | ESOP/SRA Contribution | Pension Reversion Payments Received | Contribution Deficit |
|---|---|---|---|
| 03/30/84 | 36,023,000 | | (36,023,000) |
| 05/20/85 | | 59,000,000 | 22,977,000 |
| 09/15/85 | 14,824,823 | | 8,152,177 |
| 09/13/85 | 3,948,815 | | 4,203,362 |
| 09/27/85 | | 2,000,000 | 6,203,362 |
| 12/06/85 | | 5,800,000 | 12,003,362 |
| 12/23/85 | | 2,200,000 | 14,203,362 |
| TOTAL: | 54,796,638 | 69,000,000 | |

Based on these figures, the court finds that Cone did not fulfill its commitment to contribute the entire pension reversion surplus to the 1983 ESOP.

Although Cone's commitment to contribute the pension surplus was contained in Trogdon's December 15, 1983, letter sent exclusively to the salaried employees and over eighty percent of the pension [*40] surplus reversion came from the salaried employees' retirement plan, the court recognizes that Trogdon's letter clearly states that the salaried employees and "all other Cone employees" will "take title" to the pension surplus. Consequently, the court concludes, that it was proper for Cone to allocate the surplus to the ESOP based upon the relative percentage of total compensation of both groups.

The plaintiffs did not know that the Pension Reversion Promise had not been fulfilled until immediately before or shortly after this suit was filed. Therefore, the statute of limitations does not bar this action. 29 U.S.C. § 1113.

*L. Value of The Junior Preferred Stock*

In addition to contending that Cone did not contribute the full reversion surplus to the 1983 ESOP, the plaintiffs assert that the junior preferred stock that was eventually contributed was worth less than $ 100 per share, as contended by Cone, thus resulting in an even larger contribution deficit. The court finds that the plaintiffs have failed to meet their burden of proof on this issue.

1991 U.S. Dist. LEXIS 13583, *40
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

In January 1984, several months before the initial contribution to the ESOP was made, various Cone officials, including Baynes, [*41] met with several appraisal companies to select a company to design and value the preferred stock. Transcript III, at 152. Following these meetings, Standard Research Consultants of New York ("Standard Research"), one of the nation's leading appraisal firms, was selected to appraise the junior preferred stock to be contributed to the ESOP. Plaintiffs' Exhibit 85.

Mark Lee, who supervised Standard Research's first appraisal of the junior preferred stock, was a Chartered Financial Analyst with an undergraduate degree in business from the Wharton School of the University of Pennsylvania and an M.B.A. from New York University. Transcript II, at 214. Lee had extensive experience in the appraisal and analysis of securities in general and preferred stocks in particular. Transcript II, at 215. The court finds as a fact that the defendants acted reasonably and prudently in the selection and retention of Standard Research and Lee.

Part of Lee's job was to provide expert advice on the terms and conditions of the junior preferred stock. As Lee testified, it is common practice in the industry for an appraiser both to recommend particular terms for a security and then value the security. Transcript [*42] III, at 33. Lee simply advised Cone officials as to what features the stock needed in order to be valued at par, and Cone complied with that advice.

Lee's appraisal was consistent with recognized practice in the industry. He performed a qualitative and quantitative analysis of Cone's finances; examined preferred dividend coverage and other preferred stock issues; and visited Cone to gather information on its business, outlook, and performance. Transcript II, at 217-19, 222. In contrast to the plaintiffs' expert, who used long-term corporate bonds in his comparison, Lee considered other preferred stocks. Transcript III, at 15-16. Lee's methods were consistent with recognized practice: "In order to determine the appropriate yield, and thus the value of the preferred stock, the ratios determined for the subject company must be compared to similarly calculated ratios for a group of publicly traded preferred stock having the same rights and privileges as the subject company." Transcript II, at 219.

Another factor considered by Lee in his appraisal was the "put" feature of the junior preferred stock.

Transcript III, at 9. Each share of preferred stock contributed to the ESOP by Cone could [*43] be "put" for cash at a participant's retirement or separation. The cash price for the "put" stock was the higher of $ 100 per share or fair market value. Lee testified that a put must be taken into consideration in the valuation of preferred stock. Transcript II, at 220. As he explained, if a preferred stock may be put at par value, it would generally be worth that value at a minimum. *Id.* On this point, Lee read a portion of an authoritative treatise on the valuation of preferred stock:

A common characteristic of closely held preferred stock is a put option on preferred shareholder's behalf. This option allows the shareholder to require the issuing corporation to buy back the stock at some fixed price, usually at par value. When preferred stock can be put to the company at par value, its value usually is, at a minimum, its par value assuming the company has the ability to honor the put.

Transcript III, at 104. In this case, Cone's financial ability to meet the put is evident from the company's redemption at $ 100 per share or higher, of every share put to it by the ESOP, with total payments for redeemed stock now in excess of $ 35 million. In other words, on 350,000 occasions, [*44] Cone has confided the value of the junior preferred stock at $ 100 per share.

Standard Research provided its opinion to Cone Mills in three letters. First, Lee sent Cone an extensive draft report on March 19, 1984 (Defendants' Exhibit 96). This report contained Standard Research's analysis of Cone Mills and the proposed stock, information on comparable stocks, and recommendations for the terms and conditions if the stock was to be valued at $ 100 per share at issuance. In a second letter dated March 30, 1984 (Plaintiffs' Exhibit 122), Standard Research concluded that the value of the junior preferred stock was $ 100 per share. On June 30, 1984, Standard Research sent Cone its final report, confirming its earlier evaluation.

The court finds that Cone Mills, was justified in relying on Standard Research's appraisal of the junior preferred stock. In fact, the plaintiffs have not directly challenged the appraisal of the stock. The only expert witness offered by the plaintiffs, Dr. Oliver Wood, had never done an appraisal of preferred stock, Transcript I, at 121; and he speculated that, in retrospect, the dividend rate on the stock could have been higher. As support for his testimony, [*45] however, the plaintiffs' expert

relied on prevailing rates for seven-year T-notes and twenty-year corporate bonds, neither of which could have been acquired by the ESOP, which was designed to hold qualifying employer securities, and neither of which has the liquidity of the preferred stock, which could be put to the company for a minimum of $ 100.

The plaintiffs' expert was aware of the put at $ 100 per share, Transcript I, at 61, but he testified that because of what he assumed about Cone's capital structure, he questioned the company's ability to meet the put. Transcript I, at 77. In determining the amount of the "equity cushion," however, plaintiffs' expert mistakenly believed that the junior preferred stock ranked below the participating preferred in Cone's capital structure. Id. In fact, the contrary was true. Plaintiffs' Exhibit 90, at A-9. In addition, John Bakane, Cone's Chief Financial Officer, later established in his testimony that Cone's financial ability was sufficient at all times to meet the put, and that the company had borrowing power, as well as assets not reflected on the books, such as the $ 50 million reversion, that the plaintiffs' expert had not considered. [*46] Transcript IV, at 158. Indeed, Wood expressed no opinion on Cone's earning power, and, other than examining historical balance-sheet material, made no evaluation of its financial ability to meet the put.

*M. The Post-LBO Promises*

The court finds, based upon the testimony of Trogdon and Baynes, and after examining the communications to the employees, that, except for the Pension Reversion Promise, there was no "guarantee" to employees that they would receive additional benefits through the 1983 ESOP. The communications to employees were carefully phrased in terms of what the company "expected." Expectations are simply not promises or guarantees, especially when these same communications also told employees that the company could not guarantee the future value of their 1983 ESOP accounts.

Cone Mills' expectations about the 1983 ESOP were based on the fact that contributions to the 1983 ESOP in the first two years were projected to, and did in fact, far exceed the company's pension expenses for the three years prior to the LBO. Baynes credibly testified that he and other Cone officials and advisors expected these large front-end contributions to the 1983 ESOP to "endow" the plan [*47] and provide added benefits. Transcript III, at 144.

In view of the floor offset arrangement, the substantial front-end loading described above, and the information received from its advisors, Cone's management reasonably believed that the post-LBO pension (ERP/ESOP) benefits would be better than pre-LBO benefits. In other words, it was believed that the offset (the 1983 ESOP) would be greater than the floor (the ERP) for retiring employees. For hourly employees (about eighty percent of the workforce) that prediction holds true even today. Transcript II, at 76. The expectation was also correct for at least a year for all salaried employees and even later for a minority of salaried employees. Id. Plaintiff Elmore admitted that the 1983 ESOP provided additional benefits for a time. Transcript I, at 180-81. Plaintiff Comer is an example of a salaried employee who received a substantial additional benefit from the 1983 ESOP. Transcript I, at 215. Moreover, the 1983 ESOP did provide substantial additional termination, death, and disability benefits. For a majority of salaried employees, however, after 1984 the 1983 ESOP did not provide additional pension benefits at retirement. The [*48] basic reason for this was that salaried employees' pensions are more costly than hourly employees' pensions. Transcript III, at 146; Transcript II, at 77.

Because Cone's expectations for the ESOP were not fulfilled for salaried employees Cone amended the 1983 ESOP in late 1987 in an effort to improve its total benefit package. Plaintiffs' Exhibit 303, at 1. A December 1987 Notice to employees stated:

. . . Due to the high cost of our pension plan, salaried employees have been required to use all of their ESOP and Special Retirement Account balances to fund their post 1983 pension. Thus, these plans have provided no surplus or extra benefit to salaried employees in recent years. Consequently, the Board felt it advisable to fund the pension plan with direct cash contributions and provide salaried employees with an extra cash benefit through the Supplemental Retirement Plan.

Plaintiffs' Exhibit 306, at 2. This notice also explained that the amendment would vest all salaried employees (including plaintiff Comer) in their 1983 ESOP account balances without regard to the ten-year vesting rule. Id. at 2. Because of this amendment, a group of salaried employees, including plaintiff [*49] Comer, obtained a substantial additional benefit from the 1983 ESOP. There was no breach of the post-LBO promises.

1991 U.S. Dist. LEXIS 13583, *49
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

## III. CONCLUSIONS OF LAW

In ruling that the plaintiffs' claims could proceed to trial under ERISA, the court relied on two factors, each critical to the plaintiffs' basic legal theory. First, the court noted that Cone sent two of its communications prior to the adoption of the ESOP (Trogdon's December 12 and December 15 letters), so that an employee could not compare these statements with the actual provisions of any plan. Memorandum Opinion, at 7-9 (Aug. 13, 1991). Second, the court held that there was an issue for trial whether Cone had limited its right to amend its plans by allegedly telling the plaintiffs that Cone would amend its current plans only if adverse business conditions necessitated.

When the court allowed the plaintiffs' claims to proceed to trial, the court was required to apply, and did apply, the standard of Rule 56 to the evidence of record. Accordingly, the court resolved any material factual disputes at that stage in the plaintiffs' favor. By contrast, having now evaluated all of the evidence at a full trial on the merits, the court has applied [*50] herein the familiar principle that the plaintiffs bear the burden of proof on each claim they advance.

Having now had a full trial and having examined all of the defendants' communications in their proper context, the court concludes that the plaintiffs should recover on their claim regarding the Pension Reversion Promise. The Plaintiffs' ERISA claim for the post-LBO benefits, however, must fail because Cone's expression of its expectations cannot provide the basis for an enforceable promise.

Accordingly, the legal analysis below will address only the Pension Reversion Promise, the proxy claims, and the technical violations claims. All claims based upon the alleged post-LBO promises are dismissed.

### A. Plaintiffs' ERISA Claims

This case involves issues under ERISA's Subtitle B, Parts 1 and 4. Part 1 provides detailed rules outlining the duty of disclosure and the preparation and filing of plan descriptions, summary plan descriptions, and annual reports. ERISA's provisions governing fiduciaries "apply to any employee benefit plan described in section 4(a)." 29 U.S.C. § 1101(a). ERISA § 4(a) mandates coverage under ERISA for any "employee benefit plan" maintained by employers [*51] or employee organizations who engage in or affect commerce. 29 U.S.C. § 1003(a). An employee benefit plan is defined to include both "employee welfare benefit plans" and "employee pension benefit plans." Id. § 1002(3). Employee pension benefit plan

means any plan, fund, or *program* which was heretofore or is hereafter established or maintained by an employer . . . to the extent that *by its express terms or as a result of surrounding circumstances* such plan, fund, or program provides retirement income to employees . . . .

Id. § 1002(2)(A) (emphasis added). The defendants' primary position is that "the only obligations undertaken by Cone are reflected in the plan documents." In defendant Trogdon's words, "The plan documents control." In taking this position the defendants contend that the "plaintiffs' claims rest on an allegation that the . . . plans were modified by informal and unauthorized amendment which, as a matter of law, is impermissible," citing *Pizlo v. Bethlehem Steel Corp.*, 884 F.2d 116, 120 (4th Cir. 1989).

This record, however, reflects far different facts from those in *Pizlo* and similar "unauthorized promise" cases. The December [*52] 15, 1983, letter was written by defendant Trogdon who, at the time the letter was written, was Cone's Chief Executive Officer and Chairman of the Board. He accordingly had chief operational responsibility for putting the LBO and the ESOP together. It is not accurate to classify the documents carrying Trogdon's representations to the plaintiffs as "informal" or insignificant communications.

Further separating this case from decisions such as *Pizlo* is the existence of board ratification. There is no *Pizlo*-style ERISA case featuring ratification by the employer's board. Ratification operates to authorize *all* acts, not just favorable ones. The defendants have admitted that on May 15, 1984, the board ratified the actions of the officers and directors taken in connection with the 1983 ESOP.

Clearly, Cone's board could amend either the ERP or the ESOP. Acting on behalf of Cone, it clearly was within the board's power in May of 1984 to ratify Trogdon's prior commitments, the favorable as well as the unfavorable, remedying any lack of legal binding power. Neither *Pizlo* or any case like it involves a factual setting in which the conduct in question was actually ratified by

1991 U.S. Dist. LEXIS 13583, *52
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

the [*53] employer-company's board of directors.

It does not offend the policy underlying ERISA to hold an employer such as Cone accountable for formal and authorized promises made by its Chief Executive Officer in communications sent individually to employees, and intended to induce their reliance. A ruling holding that these communications are immune from judicial scrutiny as a matter of law would transform ERISA into a shield protecting employer fraud. ERISA would become merely a snare, and the employee protection promise held out by Congress would be nothing but an illusion.

ERISA defines a plan "fiduciary" as anyone who

. . . exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). This definition is broad enough to include employers if they exercise the requisite degree of control over the plan. R. Cooke, *ERISA Practice and Procedure* § 6.02, at 6-8 (1991). The following are examples of how an employer could be deemed [*54] a fiduciary: (1) maintaining authority for the selection of other fiduciaries having discretion over the plan, such as administrators; (2) maintaining the power to select and remove trustees; (3) maintaining the power to amend the plan; and (4) determining the amount of the employer's contributions to the plan. *Id.* Thus, the employer can be a fiduciary--even if it does not maintain direct discretion over the plan--if it maintains discretion over one who does exercise direct discretion.

Recently, the Fourth Circuit stated,

Removing and replacing trustees is a manifestation of such an exercise of discretionary authority in the administration of the plan. Therefore, "to the extent" the [defendants have] authority to appoint trustees (concededly the issue on the merits of the case) it is a fiduciary.

*Licensed Division District No. 1 MEBA/NMV v. Defries,* CA 91-310-WN (4th Cir. Aug. 26, 1991). This broad definition of fiduciary is understandable given ERISA's remedial purpose. Consequently, Cone is a

fiduciary under ERISA.

Officers and directors of an employer are fiduciaries to the extent they exercise discretion over the plan. *Id.* at 6-5. Additionally, Trogdon and Baynes [*55] served on the advisory committees to the various plans, including the 1983 ESOP. Consequently, Trogdon end Baynes are also fiduciaries to the plan as defined by ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

Although "a person may be a fiduciary for some purposes, but not for others," Cone, Trogdon, and Baynes are all fiduciaries within the scope of the issues raised in this case. R. Cooke, *ERISA Practice and Procedure* § 6.02, at 6-10 (1991). This is true because they actually exercised discretion over the plan affecting the issues raised here. *See* 29 C.F.R. § 2509.75-8.

ERISA fiduciaries are subject to a harsh civil liability provision. ERISA § 409 provides that a plan fiduciary who

breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which shall have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109. [*56] ERISA § 502 allows plan beneficiaries or participants, who have standing, to sue for violations of § 409. 29 U.S.C. § 1132. There is no lack of standing in this case.

The defendants assert their compliance with the applicable statutory and regulatory rules and that their communications were only informal communications not subject to judicial scrutiny in an ERISA lawsuit. On the other hand, the plaintiffs assert that Congress, in enacting ERISA, did not intend to immunize communications like those in this record, and that they must be reviewed and approved or disapproved with ERISA's protective principles in mind. According to ERISA § 404, fiduciaries are required to

. . . discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and--

1991 U.S. Dist. LEXIS 13583, *56
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

(A) *for the exclusive purpose of*

(i) *providing benefits to participants. . . .*

(B) with the care, skill, prudence and diligence under the circumstances then prevailing of a *prudent man* acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . .

(D) in accordance with the documents and instruments governing [*57] the plan *insofar as such documents and instruments are consistent with the provisions of this title or Title IV.*

29 U.S.C. § 1104 (emphasis added).

*1. Failure to Appoint An ESOP Trustee*

Initially, no trustee was appointed to protect the employees' interests until Baynes became the Trustee on April 2, 1984. Citing *Eaves v. Penn*, 587 F.2d 453, 459 (10th Cir. 1978), the plaintiffs argue that an ESOP trustee cannot be a "wooden Indian" or a "gloried custodian." The plaintiffs contend that Cone had a fiduciary duty to appoint a "totally independent trustee" who would exercise independent judgment to insure that the proposed investment of the ESOP's assets was prudent under the circumstances and solely in the best interests of the plan and its beneficiaries.

The defendants take the following positions in the alternative: first, that it was not legally necessary to have a trustee; second, that there was a "retroactive trusteeship"; and third, that Cone Mills Corporation was trustee by operation of law under 8.01(d) of the ESOP plan.

Even if failure to timely appoint a trustee constitutes a violation of fiduciary duty under ERISA, this violation caused no [*58] injury to the plaintiffs. There was nothing a trustee could have done to "manage and control" the plan assets in dispute here. The pension reversion withdrawal occurred over a seven month period beginning on June 20, 1985. As noted above, the appointment of Baynes as trustee occurred on April 2, 1984. This was well before Cone Mills reneged on its promise to contribute the pension reversion to the 1983 ESOP.

*2. Breach of The Pension Reversion Promise*

The defendants answer the plaintiffs' charges of ESOP underfunding by making three arguments. First, Cone contends that its only duties are those created by the plan documents and that nothing in any plan document requires Cone to confer benefits on the plaintiffs regarding the pension reversion. The court has previously rejected this argument.

The second Cone argument is that a limited promise regarding the reversion was made. The defendants contend that the amount they agreed to contribute was the amount Cone projected on December 15, 1983 ($ 50-51 million), not the amount it actually turned out to be ($ 69 million). Under this scenario, the defendants' obligation was satisfied upon the contributions of roughly $ 51 million [*59] in 1984 and 1985, leaving the plaintiffs with no right to complain about the other $ 18 million. Trogdon testified at trial that he did intend to make a binding commitment to give the ESOP a large amount of the pension surplus, but that the contribution amount promised was capped at the amount envisioned in December 1983, an amount totalling about $ 50 million. The clear weight of the evidence, however, is that the stock contribution commitment was not for a portion of the surplus, but for "a like amount" equal to what Cone received and, in turn, used to pay the bank revolver debt. The defendants' second justification simply disregards the unqualified terms of the surplus agreement as it was represented to Cone's salaried employees.

The defendants' third and final argument is that even if the court were to decide that the defendants had an obligation to turn over the full $ 69 million to the plaintiffs, the plaintiffs would not be entitled to recover because the aggregate contributions, plus stock dividends paid, plus some money paid to Cone's master trust, plus stock dividends "accrued" (but neither declared or paid) on the preferred stock as of September 15, 1986, all added together, [*60] exceed the amount of the reversion received by Cone at least nine months earlier. In other words, Cone's final argument is that it actually overpaid on its surplus promise. Cone says it received $ 69 million by December of 1985, yet paid out over $ 70 million, as of September 15, 1986. The court rejects this position for several reasons.

First, it was never envisioned that dividends would count toward the amount contributed. Trogdon promised in December 1983, that the Cone employees would "take title" to the surplus. He did not promise that Cone

Case 8:06-cv-00338-PJM   Document 92-8   Filed 02/29/08   Page 81 of 104

1991 U.S. Dist. LEXIS 13583, *60
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

employees would "take title" to a portion or part of the surplus which, when added to earnings derived thereon would at some future date equal the surplus. The class was promised that the surplus, a principal sum in their pension fund, would be transferred as an infusion of principal funds into the ESOP. If Cone had meant to say that the surplus sum merely was going to be slowly dribbled into the ESOP as years passed, it would have been easy to say so.

A second reason for rejecting the defendants' "overpayment" position is that the defendants' own "Summary of ESOP/SRA Contributions," shows only $ 54,796,638 in "contributions" (the defendants' [*61] word), through 1985, versus $ 69 million in reversion funds admittedly raised at that point. A third reason for rejecting the overpayment position is that the defendants' $ 70,129,700 figure is inflated by counting in it sums not properly accrued, nor actually received in September 1985, and sums not even paid to the ESOP.

The fourth and final reason for rejecting the overpayment position is that the defendants ask the court to ignore the time value of money. A sum of $ 69 million in hand and eligible for investment in December 1985, is obviously worth more than $ 70 million purportedly received more than eight months later.

As noted above, although ERISA pre-empts state common law causes of action, many authorities have held that courts may look to the common law of trusts and contracts for guidance in creating federal common law. *Central States, S.E. & S.W. Areas Pension Fund v. Central Transp., Inc.,* 472 U.S. 559, 569, *reh'g denied,* 473 U.S. 926 (1985); *Holland v. Burlington Indus., Inc.,* 772 F.2d 1140, 1147 n.5 (4th Cir. 1985), *aff'd sub nom. Brooks v. Burlington Indus.,* 477 U.S. 901 (1986). Looking, [*62] then, to the principles of the common law of contracts to determine the proper construction of Cone's promise to contribute "the surplus, or its equivalent in company stock, to the ESOP," a standard principle of contract construction is that any ambiguities in contract documents are to be construed against the drafter. Because Trogdon, as chief spokesman for the Cone management group, was the instigator and author of this representation, under standard rules of contract construction, any ambiguity in its terms should be construed against the defendants. The same rules of construction would apply under principles of trust law because Trogdon served as a fiduciary of the ERP in his capacity as a member of the pension and investment committees and because he was admittedly "acting in trust" to create the ESOP. In addition, it would be both equitable and reasonable to construe any ambiguities in this promise against the management group based upon the "environment of trust" which they so carefully created by their repeated assurances that they were acting to protect the employees' interests.

ERISA does not contain a body of contract law to govern the interpretation and enforcement of [*63] employee benefit plans. Instead, Congress intended for the courts, borrowing state law when appropriate, and guided by the policies expressed in ERISA and other federal labor laws, to fashion a body of federal common law to govern ERISA suits.

*Holland v. Burlington Indus., Inc.,* 772 F.2d 1140, 1147 n.5 (4th Cir. 1985), *aff'd sub nom. Brooks v. Burlington Indus.,* 477 U.S. 901 (1986).

The court concludes that the plaintiffs are entitled to recover from the defendants for breach of the pension reversion promise under three legal theories.

*a. Theories of Recovery*

*1. Breach of Fiduciary Duty*

The court finds that the defendants breached their fiduciary duties in three ways. First, the defendants have violated the "exclusive purpose" requirement of ERISA. ERISA requires fiduciaries to discharge their duties to the plan for the exclusive purposes of providing benefits to participants and beneficiaries and defraying the reasonable administrative costs of the plan. 29 U.S.C. § 1104(a)(1)(A). By refusing to pay the full amount of the pension reversion into the 1983 ESOP, the defendants have acted in the interest of Cone Mills and not the [*64] plan.

Second, ERISA requires fiduciaries to act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). "Documents" and "instruments" are not limited to the documents officially creating and administering the plan, but also include other communications by those with authority to make such communications. *Clarke v. Bank of N.Y.,* 687 F. Supp. 863, 868 (S.D.N.Y. 1988) (holding a memo was sufficient to be a plan document). Trogdon's communications clearly said that "the reversion" would

be transferred to the 1983 ESOP. The entire reversion was not transferred. Thus, the defendants did not act in accordance with the plan documents and have breached their fiduciary duty.

Finally, the defendants have violated the prohibited transaction rules. The amount of the reversion that was not contributed equitably belonged to the 1983 ESOP. The defendants, in effect, transferred this excess reversion from the 1983 ESOP to Cone Mills. ERISA prohibits the transfer of any asset to a party in interest. 29 U.S.C. 1106(a)(1)(D). Cone is a party in interest because it is an employer of participants covered by the plan. 29 U.S.C. § 1102(14)(D). [*65] Consequently, the defendants have violated a prohibited transaction rule by transferring a plan asset to a party in interest. *See Marshall v. Kelly,* 465 F. Supp. 341 (W.D. Okla. 1978).

In addition to breach of fiduciary duty, the court concludes that the plaintiffs may recover on two contract theories, if they are able to demonstrate reliance, which is an element of both of these theories. As noted on pages 24-26, *supra,* the court has deferred receiving testimony on the reliance issue. To conserve trial and appellate judicial resources, the court will enter judgment in favor of the plaintiffs on their claim for breach of fiduciary duty and will express its legal conclusion that equitable estoppel and third-party beneficiary theories apply to this case. The court will then certify its conclusion on these two contract law theories of recovery for an interlocutory appeal, pursuant to 18 U.S.C. § 1292(b). The court's discussion on these two contract theories, as applicable to this ease, follows.

### 2. Equitable Estoppel

ERISA § 502(a)(3)(B) specifically grants the federal courts "equitable" powers in ERISA cases. 29 U.S.C § 1132(a)(3)(B). Accordingly "estoppel [*66] is an appropriate theory for recovery of benefits relating to ERISA employee benefit plans. *Vogel v. Independence Fed. Sav. Bank,* 692 F. Supp. 587 (D.Md. 1988).

"The trend among courts has been reversed to allow the use of estoppel." *Black v. TIC Invs. Corp.,* 900 F.2d 112, 114 (7th Cir. 1990). *But see Nachwalter v. Christie,* 805 F.2d 956 (11th Cir. 1986). An overwhelming majority of the circuit courts have explored the use of "equitable estoppel" and have held it should be allowed in the proper circumstances. *See Kane v. Aetna Life Ins.,* 893 F.2d 1283, 1285 (11th Cir.), *cert. denied,* 112 L. Ed.

2d 192 (1990); *Black v. TIC Invs. Corp.,* 900 F.2d 112 (7th Cir. 1990); *Cleary v. Graphic Communications Int'l Union Supplemental Retirement & Disability Fund,* 841 F.2d 444, 447-49 (1st Cir. 1988); *Apponi v. Sunshine Biscuits, Inc.,* 809 F.2d 1210, 1217 (6th Cir. 1987), *cert. denied,* 484 U.S. 820 (1987); *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1096 (9th Cir. 1985); *Rosen v. Hotel & Restaurant Employees & Bartenders Union of Philadelphia, Bucks, Montgomery & Delaware Counties,* 637 F.2d 592, 597 [*67] (3rd Cir.), *cert. denied,* 454 U.S. 898 (1981); *Haeberle v. Board of Trustees of Buffalo Carpenters,* 624 F.2d 1132, 1139 (2d Cir. 1980); *Landro v. Glendenning Motorways, Inc.,* 625 F.2d 1344, 1355 (8th Cir. 1980).

In allowing the use of "equitable estoppel" the Seventh Circuit said,

The reasons for the general application of estoppel are simple enough--the doctrine prevents a party from benefitting from its own misrepresentations. . . . There is no reason to breach the general rule that misrepresentations can give rise to an estoppel. There is no reason for the employee who reasonably relied to his detriment on his employer's false representations to suffer. *There is no reason for the employer who misled its employee to be allowed to profit from the misrepresentation.*

*Black,* 900 F.2d at 115 (emphasis added). Although the Fourth Circuit has yet to address this important issue, the previously quoted language in *Holland* suggests that the common-law doctrine of equitable estoppel may be appropriate In this case.

At least three district courts have also approved or discussed the use of equitable principles [*68] in ERISA actions. Among these are *Vogel v. Independence Federal Savings Bank,* 692 F. Supp. 587 (D.Md. 1988); *Lockrey v. Leavitt Tube Employees' Profit Sharing Plan,* 748 F. Supp. 662 (N.D. Ill. 1990); and *Lipscomb v. Transac, Inc.,* 749 F. Supp. 1128 (M.D. Ga., 1990). In *Lipscomb* the court said,

. . . While an employer may rely upon a written plan to protect itself from oral modifications and amendment, *its agents may not, before producing a written plan, make false representations to employees with regard to coverage, and only after a claim is filed or relevant event occurs* rely upon a later-composed, conveniently

Case 8:06-cv-00338-PJM   Document 92-8   Filed 02/29/08   Page 83 of 104

1991 U.S. Dist. LEXIS 13583, *68
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

inconsistent version of the "plan" to deny benefits to employees.

749 F. Supp. at 1135 (emphasis added). Consequently, the plaintiffs may invoke the protection of the federal common-law doctrine of equitable estoppel.

In *Lockrey*, after initially dismissing an estoppel claim *sua sponte*, the district court revisited the estoppel issue after the Seventh Circuit's opinion in *Black* was rendered. The *Lockrey* facts are similar to this case. In *Lockrey* the plaintiff was a participant [*69] in a profit sharing plan. He had been told by an "authorized" plan representative that when he reached the age of 59-1/2, he could retire at that point or any time until late December and have his benefits valued based on a September 30, 1987, valuation date. The value of his benefits on September 30th was approximately $ 130,000. At that point the plan specifically provided that the valuation dates were March 31, June 30, September 30, and December 31 of each year.

Based on these statements from a member of the plan committee, the plaintiff elected to wait until later in November to retire. On Black Thursday, October 19, 1987, the "plaintiff's best-laid plans were destroyed when the stock market crashed." *Lockrey*, 748 F. Supp. at 663. In early November he retired. Shortly after his retirement the plan committee elected to establish additional valuation dates for the fourth quarter. These dates included, among others, October 20 and October 31. The plaintiff was informed that his benefits would be valued based on the October 31 (postcrash) valuation date. The resulting value of his benefits is approximately $ 97,500, a loss of more than $ 30,000.

In a well-reasoned [*70] opinion, the *Lockrey* court held that estoppel was an alternative available to the plaintiff. The *Lockrey* defendants, like the defendants here, rested their laurels on the plan documents and claimed that reliance could not be alleged "because the language of the plan made it clear that additional valuation dates could be established." *Id.* at 666. In other words, the defendants' argument was that the plan documents controlled, promises could be ignored, existing rights could be gutted, and fair dealing could not be expected. This did not impress the court. In allowing the estoppel claim to be reinstated in plaintiff's complaint, the court addressed what is really a central issue in this case:

Defendants fail to recognize that the alleged statements went beyond a mere description of the plan as it existed, and included representations to plaintiff as to how his benefits would, in the future be computed if he took certain actions.

*Id.* at 667. Thus, the court in *Lockrey* was not moved by the defendants' "plan documents control" argument.

In this case, as in *Lockrey*, statements involving the pension reversion were made by an authorized [*71] plan representative. Later, as in *Lockrey*, the plan representatives realized they could economize by not honoring their earlier promises. In the case before this court, Cone made authorized promises which, if kept, would yield substantial additional benefits to the Cone salaried employees. Cone, like the *Lockrey* defendants, has attempted to hide behind plan documents which they claim permit them to renege on its promises. Simply stated, the doctrine of estoppel does not allow such behavior.

"An estoppel arises when one party has made misleading statements to another party and the other has reasonably relied to his detriment on that representation." *Black v. TIC Invs. Corp.*, 900 F.2d 112, 115 (7th Cir. 1990). Other definitions are found in the cases cited above. A review of the various authorities reveals that the authority of the person making the representations is a key element in an estoppel claim, and many plaintiffs fail on this point. To succeed on equitable estoppel, "the representations relevant to the estoppel theory must be made by someone with authority or apparent authority to bind the Fund." *Cleary v. Graphic Communications Int'l Union Supplemental Retirement & Disability Fund*, 841 F.2d 444, 447 (1st Cir. 1988). [*72] The court has previously found that Dewey Trogdon had authority to make the written communications.

As noted earlier, the court makes no finding on reliance. However, all of the other elements of equitable estoppel are present here. The court certifies this legal conclusion for interlocutory appeal, pursuant to 18 U.S.C. § 1242(b). If the court is affirmed on this issue, and if it ultimately becomes necessary, testimony will be received on the reliance issue.

### 3. Third-Party Beneficiary

The court finds that the plaintiffs are third-party

1991 U.S. Dist. LEXIS 13583, *72
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

beneficiaries of an agreement between Cone management and the banks to contribute the surplus to the ESOP. Both Cone and the banks were concerned about the surplus reversion. It benefitted Cone by allowing it to reduce its large debt in the post-LBO period. It also benefitted the banks by providing a source of repayment of Cone's loan balance. The banks also served as institutional investors receiving a percentage of the common stock and a significant amount of participating preferred stock convertible to common. Therefore, both Cone and its lenders benefitted from the cash flow created by the favorable tax treatment which resulted from this [*73] "dedicated reversion."

The general rule is that only intended beneficiaries to a contract may be permitted to enforce it. J. Calamari & J. Perillo, *The Law of Contracts* § 244, at 380 (1970) [hereinafter J. Calamari & J. Perillo]. Clearly both parties intended to benefit the 1983 ESOP. Normally, if performance is to run to the third party, the third party is an intended beneficiary. *Id.* 244, at 381. The test is whether it would have been reasonable for the employees to rely on Cone's promise to put the pension reversion into the 1983 ESOP. *Restatement (Second) of Contracts* § 301 comment d (1981). The court finds that any reliance by Cone's employees would have been reasonable and, consequently, that Cone's employees are intended beneficiaries.

In the absence of a term which prevents the modification of the original duty between Cone's management and the banks, Cone and the banks retained the power to modify as discharge the agreement. *Id.* § 311. Thus, Cone contends that even if the plaintiffs were third-party beneficiaries, the agreement was later modified by action of Cone and the banks. This raises the question of when the third party's rights in the contract vest. [*74] The most restrictive test, which the court adopts, is that of the *Restatement (Second)* which requires the third party to materially change position in justifiable reliance on the agreement before learning of the modification *Id.* § 311.

As with equitable estoppel, the court makes no finding concerning reliance. However, all of the other elements necessary to establish vested third-party beneficiary rights are present here. The court certifies this legal conclusion for interlocutory appeal, pursuant to 18 U.S.C. § 1242(b). If the court is affirmed, and if it ultimately becomes necessary, testimony will be received

on the reliance issue.

*b. Damages*

The defendants contend that the plaintiffs have no right to damages. According to the defendants, because the plaintiffs have requested damages as individual plaintiffs and not through the plan, there can be no recovery. This statement is true in part. In *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134 (1985), the Supreme Court held that liability for a breach of fiduciary duty runs to the plan and not to individual participants. In other words, the fiduciary must make amends to the plan [*75] and not to any complaining participants or beneficiaries.

The issue of how an ERISA lawsuit is to be structured is a matter with which courts are wrestling. A number of issues are settled. First, under ERISA § 502(a), 29 U.S.C. § 1132(a)(2), plan participants may bring ERISA § 409 actions. This has been done here. Secondly, a class action brought by plan beneficiaries, which this case is, has been called "the best means for asserting the 'common interest' of the participants or beneficiaries and the best interest of the Plan." *Mertens v. Kaiser Steel Retirement Plan,* 744 F. Supp. 917 (N.D. Cal. 1990). Indeed, the court in Mertens emphasized "the *need* for class action-type protections in section 409 suits." *Id.* at 921.

In light of *Mertens,* the language of ERISA § 409, and the policy underlying ERISA, the court has concluded to award damages through the ESOP plan machinery to all ESOP beneficiaries, even hourly workers and those class members who opted out. The court in *Mertens* viewed an ERISA class action as affording class members protection but without an opt-out right. *Mertens,* 744 F. Supp. at 921. *See also* [*76] *Diduck v. Kaszycki & Sons Contractors, Inc.,* 737 F. Supp. 792 (S.D.N.Y. 1990) (class action alleging breach of fiduciary duty certified under Fed. R. Civ. P. 23(b)(1)(B)). This court concludes that the *Mertens* approach is correct.

Accordingly, in the exercise of its discretion under Rule 23(d), and with specific regard to the pension reversion portion of this case, the court hereby reconstitutes the class action as arising under rule 23(b)(1), with the class consisting of all participants in the 1983 ESOP as of December 23, 1985. Damages on the breached ESOP surplus are fixed at $ 14,203,362,

being the difference between the reversion and the amount of stock Cone contributed to the ESOP as of December 23, 1985, the date the last reversion payment was received by Cone.

### c. Prejudgment Interest

ERISA does not specifically provide for prejudgment interest to be added to an award. Most courts considering the issue have awarded prejudgment interest, concluding that such was necessary in order for participants to obtain "other appropriate equitable relief" under ERISA. *See, e.g., Dependahl v. Falstaff Brewing Corp.,* 496 F. Supp. 215 (E.D. Mo. 1980), [*77] *aff'd,* 653 F.2d 1208 (8th Cir.), *cert. denied,* 454 U.S. 968, *cert. denied,* 454 U.S. 1084 (1981). Awards of prejudgment interest are not, however, automatic. *See, e.g., Shaw v. Internal Ass'n of Machinists and Aerospace Workers Pension Plan,* 750 F.2d 1458 (9th Cir. 1985), *cert. denied,* 471 U.S. 1137 (1985).

In this case, special circumstances make an award of prejudgment interest unjust. Cone Mills continued to make contributions to the ESOP, in stock and cash, through 1990. By 1990, Cone Mills had contributed $ 61,306,915. Defendants' Exhibit 364, at 1. Additionally, Cone Mills made contributions to the Wachovia master trust (to cover annuities and benefits not covered by the ESOP/SRA offset) from 1984 through 1990. These contributions totaled $ 4,792,140. *Id.* at 2. For these reasons, the court declines to award prejudgment interest.

### 3. Plaintiffs' Disgorgement Claim

In the Memorandum Order (Aug. 13, 1990), this court dismissed the plaintiffs' attempt to have defendants "disgorge" "profits" that the defendants allegedly made "unjustly" through the LBO. The plaintiffs, however, [*78] have suggested that there should be a federal common-law ERISA claim to recover for themselves the increase in value in the individual defendants' common stock. This claim has no merit. None of the acts of which the plaintiffs complain (including changes in Cone's benefit plans) have anything to do with the value of the stock purchased by Trogdon and Baynes in the LBO.

In addition, ERISA simply does not provide any remedy for "disgorgement" under the circumstances presented in this case. To be sure, in *Provident Life & Accident Insurance Co. v. Waller,* 906 F.2d 985 (4th Cir.), *cert. denied,* 112 L. Ed. 2d 524 (1990), the Fourth

Circuit held that it was proper to imply a federal common-law remedy under ERISA for an employer to recover erroneous payments to a participant who received those funds in knowing contravention of the plan's provisions. Critically, in *Waller,* the plan documents expressly provided for the repayment of erroneously "advanced monies." *Id.* at 993. In holding that the prevention of such unjust enrichment was consistent with ERISA's policies, the *Waller* Court concluded that, absent such a remedy, employers [*79] would be discouraged from operating such plans. *Id.*

Plaintiffs rely upon the *Waller* decision as supporting their claim for recovering profits the defendants allegedly made on the Cone common stock they purchased in the LBO. The plaintiffs' insistence that this court should revitalize this claim as one "arising under" ERISA is without merit and not supported by the *Waller* decision. *Waller* permits an implied remedy only when the plan itself supports the remedy, and when to do so would be consistent with ERISA's policies, including those which encourage employers to operate and maintain benefit plans. Obviously, no plan provision in this case sets forth a remedy for disgorgement. Moreover, to imply such a remedy--which would both affect the willingness of plan fiduciaries to serve and increase plan administration costs--would conflict with, not support, the policies behind ERISA. The plaintiffs' unjust enrichment claim is therefore dismissed.

### 4. Plaintiffs' Technical Violations Claims

At various times during the course of this case, the plaintiffs have asserted technical allegations concerning the 1983 ESOP. The court concludes that the plaintiffs have not established [*80] any of these claims, but even if they could do so, the plaintiffs would still be unable to show any damages.

First, the plaintiffs cannot obtain any relief based upon a technical violation of ERISA's procedural requirements. *See Crocker v. Southern Bell,* 11 Employee Benefits Gas. (BNA) 1707 (4th Cir. 1989). "As a general rule, procedural violations of ERISA itself or the terms of an individual plan do not entitle an aggrieved employee to a substantive remedy." *Id.* at 1717. *See also Reklau v. Merchants Nat'l Corp.,* 808 F.2d 628 (7th Cir. 1986) (holding that I.R.C. § 401 does not give rise to a private right of action), *cert. denied,* 481 U.S. 1049 (1987).

The plaintiffs complain that the 1983 ESOP was not

properly adopted in 1983, and the court has so found. However, the plan document was signed before any contributions were received by the trustee. The court concludes the defendants have not violated ERISA in the adoption of the 1983 ESOP.

Plaintiffs next challenge the appointment of the 1983 ESOP Advisory Committee, which served as plan administrator. The Advisory Committee was a pre-existing committee in charge of administering Cone's [*81] other defined contribution plan. As the 1983 ESOP came into being, the Advisory Committee took responsibility for the new ESOP as well. ERISA clearly provides that in the event nO administrator is appointed, the plan sponsor is the administrator. 29 U.S.C. § 1002 (16)(a)(ii). Therefore, under both the facts and the law, the 1983 ESOP always had an administrator.

Finally, plaintiffs challenge the timing of Cone's distribution of the initial summary plan description ("SPD") for the 1983 ESOP. Their contentions are without merit; Cone Mills fully complied with ERISA and Department of Labor regulations regarding the distribution of the 1983 ESOP SPD.

ERISA provides that an initial SPD for a plan must be provided to each participant "within 120 days after the plan becomes subject to this part." 29 U.S.C. § 1024. The "part" of the Act referred to is "Part 1--Reporting and Disclosure."

ERISA also gives the Secretary of Labor the power to promulgate administrative regulations "appropriate to carry out the provisions of" ERISA. 29 U.S.C. § 1135. The Labor Department's regulations provide, in effect, that the 120-day period does not begin to run until the IRS approves the plan, if such approval [*82] is a condition precedent or contingency to the effectiveness of the plan. 29 C.F.R. § 2520.104b-2. *See also Kroll, Reporting and Disclosure Under ERISA,* 361-2d Tax Mgmt. (BNA) A-16-17 (1991). This is a logical regulatory position, because it would not be prudent to print and distribute SPDs for a plan which has not been approved by the IRS.

The conditions or contingencies referred to in the Department of Labor regulations were specifically included in § 3.06(b) of the 1983 ESOP. Plaintiffs' Exhibit 15.

Both ERISA and the IRS specifically permit

contingency provisions like the one set forth in the 1983 ESOP. 29 U.S.C. § 1103(c)(2)(B)-(C);Rev. Rul. 77-200, 1977-1 C.B. 99. Therefore, the 120-day SPD period did not begin to run in this case until December 20, 1984, when the IRS sent its first determination letter approving the 1983 ESOP. Plaintiffs' Exhibit 170. The 120th day after December 20, 1984 is April 19, 1985. There is no dispute that Cone Mills distributed its 1983 ESOP SPDs at least by April 1985. Plaintiffs' Exhibit 19. It is evident from the foregoing that the distribution of the SPDs for the 1983 ESOP occurred in a timely manner.

*B. Plaintiffs' [*83] Proxy Violation Claims*

The plaintiffs simply cannot show that any part of Cone's proxy statement--a document sent to shareholders, not employees--was false or misleading. They have attacked only one portion of a statement in the proxy's summary. For the reasons stated earlier, their charge of misrepresentation is simply without merit.

For two additional fundamental reasons, however, this court concludes that the plaintiffs' claims for alleged proxy violations are precluded as a matter of law. First, the statements the plaintiffs attack were not reasonably likely to affect the way a reasonable shareholder would have voted on the merger; they therefore could not be "material" misrepresentations. Second, these plaintiffs cannot show "loss causation" as the applicable case law requires.

The standard for determining the materiality of a misrepresentation under Rule 10b-5 differs only slightly from the standard applicable to Rule 14a-9. Under Rule 10b-5, a particular fact is "material" if there is a "substantial likelihood that a reasonable shareholder would consider it important" in deciding whether to buy or sell at the price in question. *Taylor v. First Union Corp.,* 857 F.2d 240, 244 (4th Cir. 1988), [*84] *cert. denied,* 489 U.S. 1080 (1989) (borrowing standard from that announced by the Supreme Court in connection with a § 14 claim). Under Rule 14a-9, a fact is "material" if there is a "substantial likelihood that a reasonable shareholder would consider it important" in deciding how to vote on the transaction for which his proxy is solicited. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976). When the subject of the proxy concerns whether a shareholder should "sell" stock in a merger transaction--as here--the two standards for materiality converge and become identical. *See, e.g., Pavlidis v. New England Patriots Football Club, Inc.,* 737 F.2d 1227,

1236 (1st Cir. 1984); *SEC v. Parklane Hosiery Co.,* 422 F. Supp. 477, 485 (S.D.N.Y. 1976) (in a § 14(a) action based on proxy statement issued in connection with cash-out merger, test of materiality is whether the particular fact "would have a substantial likelihood of affecting the price" of the minority stock, because "the sole question facing a minority shareholder [is] whether to accept the [preferred] per share price or to pursue his rights as a [*85] dissenting shareholder in an appraisal proceeding"), *aff'd,* 558 F.2d 1083 (2d Cir. 1977).

This court earlier concluded that "misrepresentations about matters unrelated to the value of the stock being traded do not impair the reasonable investor's ability to make an informed investment decision and will not support a Rule 10b-5 action." Memorandum Opinion, at 16-17 (Aug. 13, 1990). "None of the alleged misrepresentations [in this case] relates to the value of the Cone Mills stock." *Id.* The only issue upon which shareholders of Cone Mills voted--and the only issue that was therefore relevant in their deciding how to vote--was whether to accept management's offer to pay them seventy dollars per share for their stock. Because the statements the plaintiffs attack do not relate to the value of that stock, they simply were not "material" to a "reasonable Cone shareholder."

An independent reason why the plaintiffs' proxy claim should be dismissed is that the plaintiffs' alleged losses of retirement benefits were not caused by the merger, which was the corporate transaction authorized by the proxy. The terms of Cone's benefit plans, not the merger, "caused" the "lost [*86] benefits" of which the plaintiffs complain. Because the action taken by Cone in adopting, implementing, and amending the benefit plans at issue did not require shareholder approval, the plaintiffs cannot mount a *proxy* claim in this case for any purpose.

This court recognized in its earlier Memorandum Opinion (Aug. 13, 1990) that the plaintiffs' inability to show "loss causation" rendered their damages claims suspect. The court, nevertheless, noted that proof of a violation might entitle the plaintiffs to attorneys' fees, even if the violation was unrelated to the transaction for which approval was sought. In so holding, the court first cited that portion of *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 (1970), which notes that "where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the

violation and the . . . if he proves that the proxy solicitation . . . was an essential link in the accomplishment of the transaction." *Id.* at 385. (In Mills, the "transaction" was a corporate merger.)

To be sure, the proxy solicitation was an "essential link" in the LBO in this case. Critically, [*87] however, the "transaction" the plaintiffs challenge in this case is *not* the LBO (or the merger as in Mills), but the adoption, implementation, and amendment of Cone's benefit plans. In sharp contrast to Mills, therefore, Cone's proxy statement was *not* an essential link in the transaction that is the subject of this complaint.

Neither *Mills* nor any case decided subsequent to *Mills* allows a cause of action when she statements challenged in the proxy statement do not lead to the injury alleged. As Mills noted, "a cause of action cannot be established by proof of a defect . . . so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a)." *Mills,* 396 U.S. at 384. The reason for this is clear: "If an injury arises from a transaction unrelated to the proxy materials, it makes little sense to use the proxy rules to police that transaction because by hypothesis even perfect information in the proxy materials could not have prevented or modified the challenged transaction." *Rosenbaum v. Klein,* 547 F. Supp. 586, 590 (E.D. Pa. 1982). [*88]

Because there is no connection between the proxy rules and a transaction for which proxies are not needed, virtually every court has dismissed outright a § 14 claim when the injury alleged did not result from the corporate transaction authorized in the proxy. *See, e.g., Cowin v. Bresler,* 741 F.2d 410 (D.C. Cir. 1984) (affirming dismissal of § 14(a) claims because injury not related to proxy violations); *Ash v. GAF Corp.,* 723 F.2d 1090, 1094-95 (3d Cir. 1983) (no proof of injury from corporate transaction approved by proxy; affirming dismissal of complaint); *Gaines v. Haughton,* 645 F.2d 761 (9th Cir. 1981) (affirming dismissal under Fed. R. Civ. P. 12(b)(6) because of lack of causal relationship between proxy violation and alleged injury), *cert. denied,* 454 U.S. 1145 (1982), *overruled on other grounds, In re Complaint of McLinn,* 739 F.2d 1395 (9th Cir. 1984); *Abbey v. Control Data Corp.,* 603 F.2d 724, 732 (8th Cir. 1979) (affirming dismissal of § 14 claim on causation grounds, and noting that claim was "marginally related to" federal policies underlying that section), [*89] *cert. denied,* 444 U.S.

Case 8:06-cv-00338-PJM   Document 92-8   Filed 02/29/08   Page 88 of 104

1991 U.S. Dist. LEXIS 13583, *89
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

1017 (1980); *Murray v. Hospital Corp.*, 682 F. Supp. 343, 349 (M.D. Tenn. 1988) (dismissing § 14 claim in entirety because no economic harm shown as a result of any transactions authorized by the allegedly deceptive proxy solicitation), *aff'd*, 873 F.2d 972 (6th Cir. 1989); *Rosenbaum v. Klein*, 547 F. Supp. 586, 590 (E.D. Pa. 1982) (dismissing § 14(a) claim); *Zilker v. Klein*, 510 F. Supp. 1070, 1074 (N.D. Ill. 1981); *Rediker v. Geon Indus., Inc.*, 464 F, Supp. 73, 81-82 (S.D.N.Y. 1978).

None of these decisions, all decided subsequent to *Mills,* even suggested that the plaintiffs could continue to assert § 14 claim simply for the purpose of recovering attorney's fees. *Cf. Manning v. South Carolina Department of Highway and Public Transportation,* 914 F.2d 44, 48 n.7 (4th Cir. 1990) (rejecting plaintiffs' attempt in § 1983 action to obtain 'declaratory relief' solely for the purposes of recovering attorney's fees).

In this case, the plaintiffs have sought only damages, not injunctive relief, to remedy the alleged securities violations. [*90] The statements they attack had nothing to do with the value of the stock in the merger, the sole matter upon which they cast their votes. The plaintiffs' proxy claims are therefore dismissed in their entirety.

## IV. ORDER

### A. Damages

Having found for the plaintiffs under ERISA for breach of the Pension Reversion Promise, the court determines the following relief to be appropriate: the defendants shall pay to the 1983 ESOP cash or the equivalent in company stock the sum of $ 14,203,362. [1] The sum awarded herein shall inure to the benefit of all ESOP beneficiaries, salaried and nonsalaried, regardless of whether they opted out of this action. Cone's board is ordered to direct the ESOP's trustee to prepare for the court's consideration a plan to allocate and pay retroactive ESOP distributions to all employees who have terminated employment with Cone Mills since the inception of the 1983 ESOP and who would have been entitled to additional ESOP distributions upon termination had the pension reversion promise been kept. Such a plan shall be submitted to the court within thirty days.

1 ERISA liability for breach of fiduciary liability is personal. 29 U.S.C. § 1109(a). Thus, Cone, Trogdon, and Baynes and jointly and severally

liable for the breach of fiduciary duty. *Davidson v. Cook,* 567 F. Supp. 225, 240 (E.D. Va. 1983), *aff'd sub nom. Davidson ex rel Local 666 Benefits Trust Fund v. Cook,* 734 F.2d 10 (4th Cir.), *cert. denied,* 469 U.S. 899 (1984). Although the letter which forms the basis for the Pension Reversion Promise was written by Trogdon, the court finds that Baynes is liable for the breach of his co-fiduciary, Trogdon. 29 U.S.C. § 1105(a)(1),(3). Only Cone is potentially liable for the equitable estoppel and third-party beneficiary claims.

[*91] The award of damages for breach of the Pension Reversion Promise is predicated upon the defendants' breach of their fiduciary duties, as set out on pages 42-44, *supra.* The court also determines that, if the plaintiffs are able to demonstrate reliance, they may recover under federal ERISA common-law theories of equitable estoppel and third-party beneficiary. Judgment shall be entered in favor of the plaintiffs on the breach of fiduciary duty award. As to the two contract law claims, judgment shall not be entered, and the court certifies its conclusion for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). [2] The court determines that the applicability of these two doctrines, under federal common law, involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this portion of the court's order may materially advance the ultimate termination of the litigation. 18 U.S.C. § 1292(b). Judgment shall be entered in favor of the defendants on all other claims. The court's entry of judgment on fewer than all claims asserted is authorized by Fed. R. Civ. P. 54(b). Pursuant to Rule 54(b), the court determines [*92] that there is no just reason for delay in the entry of judgment.

2 If the court is affirmed in imposing liability for breach of the Pension Reversion Promise on the cause of action for breach of fiduciary duty, it would be unnecessary to decide the contract causes of action.

### B. Attorney's Fees

Under ERISA, an award of attorneys fees to the prevailing party is not mandatory. Rather, such an award rests with the sound discretion of the court. *Fase v. Seafarers Welfare & Pension Plan,* 589 F.2d 112 (2d Cir. 1978). In this case, the plaintiffs have prevailed on some, but not all, of their claims. The court wishes to receive input from the parties prior to determining if an award of

1991 U.S. Dist. LEXIS 13583, *92
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

fees is appropriate in this case.

The plaintiffs shall submit a memorandum setting forth their position on attorney's fees within thirty days from the date of this order. The memorandum shall address the relevant criteria set out in *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446 (9th Cir. 1980). The [*93] plaintiffs shall attach to the memorandum an affidavit addressing the factors this court must consider in setting the amount of an attorney's fee award, as ennunciated in

*Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir.), *cert. denied*, 439 U.S. 934 (1978). The defendants shall have twenty days from their receipt of these papers in which to respond.

The clerk shall withhold entry of judgment until a decision has been rendered on attorney's fees.

*IT IS SO ORDERED.*

# **EXHIBIT 49**

LEXSEE

**SUNNY JANI, as Administrator of the Estate of MICHAEL L. WEBSTER, deceased, Plaintiff, v. BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN, et al., Defendants.**

**CIVIL NO.: WDQ-04-1606**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND, NORTHERN DIVISION**

**2005 U.S. Dist. LEXIS 44331**

**November 7, 2005, Decided**

**SUBSEQUENT HISTORY:** Affirmed by Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan, 209 Fed. Appx. 305, 2006 U.S. App. LEXIS 30594 (4th Cir. Md., Dec. 13, 2006)

**PRIOR HISTORY:** Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan, 2005 U.S. Dist. LEXIS 10150 (D. Md., Apr. 26, 2005)

**COUNSEL:** [*1] For Sunny Jani, as Administrator of the Estate of MICHAEL L. WEBSTER, deceased, Plaintiff: Cyril Vincent Smith, III, LEAD ATTORNEY, Sean P Vitrano, Zuckerman Spaeder LLP, Baltimore, MD.; Robert Patrick Fitzsimmons, Fitzsimmons Law Offices, Wheeling, WV.

For The Bert Bell/Pete Rozelle NFL Player Retirement Plan, The NFL Player Supplemental Disability Plan, Defendants: John P McAllister, William F Hanrahan, LEAD ATTORNEYS, Douglas W Ell, Groom Law Group Chartered, Washington, DC.

**JUDGES:** William D. Quarles, Jr., United States District Judge.

**OPINION BY:** William D. Quarles, Jr.

**OPINION**

MEMORANDUM OPINION AND ORDER

Sunny Jani, Administrator of the Estate of Michael Webster (the "Plaintiff"), sued the Bert Bell/Pete Rozell NFL Player Retirement Plan and the NFL Player

Supplemental Disability Plan (collectively, "the Plan") for wrongful denial of benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (2005). On April 26, 2005, the Court granted Plaintiff's motion for summary judgment, Pending Plaintiff's petition for attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1). For the following reasons, [*2] the petition will be granted.

ANALYSIS

ERISA allows the award of "reasonable attorney's fees." 29 U.S.C. § 1132(g)(1).

A. Determining Whether to Award Attorney's Fees

In determining whether to award attorney's fees courts evaluate: 1) the opposing party's culpability or bad faith; 2) its ability to pay; 3) whether awarding attorney's fees would deter others; 4) whether the party requesting attorney's fees sought to benefit all plan participants and beneficiaries or to resolve a significant legal question regarding ERISA; and 5) the relative merits of the parties' positions. *Johannssen v. District No. 1 - Pacific Coast District, MEBA Pension Plan,* 292 F.3d 159, 178-9 (4th Cir. 2002); *Quesinberry v. Life Insurance Company of North America,* 987 F.2d 1017 (4th Cir. 1993). No one factor is determinative, however, these factors are the "nuclei of concerns that a court should address." *Quesinberry,* 987 F.2d 1017, 1029.

1. Degree of Culpability

Culpability connotes wrongful conduct that is not

Page 1

intentional or deliberate. *Clark v. Metropolitan Life Insurance Company,* 384 F. Supp. 2d 894, 2005 WL 1667785, slip [*3] op. (E.D.Va. 2005); *Edmonds v. Hughes Aircraft Co.,* 1998 WL 782016, slip op. (E.D.Va. 1998). Culpability can be found where a plans decision is "discernibly against the weight of the evidence." *Edmonds,* 1998 WL 782016 at *5; *see also Edmonds v. Hughes Aircraft,* 145 F.3D 1324 (4th Cir. 1998).

Bad faith connotes deliberate misconduct to harm another or advance one's self-interest. *Clark,* 384 F. Supp. 2d 894, 2005 WL 1667785 (bad faith found where the plan denied death benefits contrary to the opinion of its own medical expert and after an incomplete investigation); *Cox v. Reliance Standard Life Insurance,* 179 F.Supp.2d 630 (E.D.Va. 2001)(bad faith found where plan denied death benefits after an inadequate investigation and where the plan sought out, but then rejected the opinion of Commonwealth's attorney that it would be impossible to determine whether beneficiary was committing a felony at the time of his death). Not every abuse of discretion constitutes bad faith. *Wheeler v. Dynamic Engineering, Inc.,* 62 F.3d 634 (4th Cir. 1995).

Webster was diagnosed with brain damage and applied for benefits in 1998, [*4] contending that he had been totally disabled since his retirement from football in 1991. Memorandum Opinion, p. 3,4. Webster provided evidence that he had been unable to work after he retired and evaluations from three doctors (including the plan's doctor) opining that Webster was totally disabled by 1991. *Id* at 4-6. Despite this evidence, the Plan found that Webster was not totally disabled until 1996 and therefore was entitled to smaller benefits. *Id* at 6. The Plan ignored its own doctor, relying instead on Webster's oncologist who did not diagnose cognitive impairments until 1996; there was no indication that the oncologist had previously examined Webster's neurological condition. *Id* at 7-9.

The Court held that the decision to deny benefits was an abuse of discretion. Given the overwhelming evidence supporting Webster's claim, the Plan's decision indicates culpable conduct, if not bad faith. Accordingly, this factor favors the Plaintiff.

2. The Ability of the Parties to Pay the Fees

The Plan does not dispute its ability to pay attorney's fees. Accordingly, this factor favors the Plaintiff.

3. Deterrence

An award of attorney's fees would likely deter the [*5] Plan and other benefit plans from future abuses. Therefore, this factor favors the Plaintiff.

4. Benefit to All Participants of ERISA Plans

There is no evidence that the Plaintiff brought this action for the benefit of all ERISA plan participants or to resolve a significant legal question regarding ERISA itself. Therefore, this factor favors the Plan.

5. The Relative Merits of the Parties Positions

As noted above, the Plan's decision to deny Webster's request for larger benefits was an abuse of discretion that constituted culpable, if not bad faith, conduct. Accordingly, this factor favors the Plaintiff.

As the balance of the five factors favors the Plaintiff, attorney's fees should be awarded.

B. Determining Reasonable Attorney's Fees

In calculating an award of attorney's fees, courts multiply the number of reasonable hours expended by a reasonable rate. *Brodziak v. Runyon,* 145 F.3d 194 (4th Cir. 1998). In deciding what constitutes reasonable hours and rates, courts consider: (1) time and labor expended; (2) the novelty and difficulty of the questions raised; (3) skill required; (4) the attorney's opportunity costs in bringing the litigation; (5) [*6] the customary fee for similar work; (6) the attorney's expectations at the start of the litigation; (7) time limitations imposed; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases. *Id, see also EEOC v. Service News Co.,* 898 F.2d 958, 965 (4th Cir.1990); *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 n. 28 (4th Cir. 1978).

Plaintiff initially requested $ 170,516.25 in attorney's fees and $ 11,779.36 in costs. The Plan objected to fees charged during the administrative appeal process and Plaintiff reduced his request to $ 125,016.25 in fees and $ 3,746.69 in expenses. On June 7, 2005 Plaintiff submitted a Second Supplemental Affidavit of Cyril Smith detailing additional fees and expenses for work performed after the Court's grant of summary judgment. As the Plan has not

2005 U.S. Dist. LEXIS 44331, *6
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

responded or objected to this addition, it is incorporated. Accordingly Plaintiff now seeks $ 141,924.75 [*7] in attorney's fees and $ 8,109.25 in expenses. Second Supplemental Affidavit of Cyril V. Smith, Exhibits A,B.

Plaintiff's fee request reflects 425.10 hours of work performed by attorneys Cyril Smith and Sean Vitrano at Zuckerman Spaeder, LLP and Robert Fitzsimmons, a West Virginia plaintiff's lawyer. Mr. Smith, a partner at Zuckerman Spaeder with 19 years experience, charged $ 380.00-$ 400.00 per hour; Mr. Vitrano an associate with 4 years experience, charged $ 250.00-$ 265.00 per hour. Paralegals at Zuckerman Spaeder charged 145.00-160.00 per hour. Mr. Fitzsimmons, who has 27 years experience, charged $ 500.00 per hour.

The Plan argues that fees cannot be recovered for: 1) work performed by Mr. Fitzsimmons; 2) time spent by Mr. Smith on media related activities; 3) fees incurred in Plaintiff's attempt to depose Sarah Gaunt; and 4) expenses incurred.

1. Work Performed by Mr. Fitzsimmons

The Plan argues that Plaintiff cannot recover attorney's fees for the hours charged by Mr. Fitzsimmons because: 1) fees are requested for work performed during the administrative claims process; 2) Mr. Fitzsimmons' work was unnecessary and duplicative; and 3) Mr. Fitzsimmons' fees are excessive.

[*8] a. Work Performed During the Administrative Claims Process

Plaintiff concedes fees cannot be recovered for work performed during the administrative claims process. Accordingly, Plaintiff has amended his request. The $ 141,924.75 in attorney's fees and $ 8,109.25 in expenses Plaintiff requests does not include expenses incurred during the administrative claims process.

b. Work Performed by Mr. Fitzsimmons

The Plan argues that the 18.5 hours of work billed by Mr. Fitzsimmons' work was unnecessary and redundant. Plaintiff contends that Mr. Fitzsimmons provided essential review and guidance of Mr. Smith's work.

As the Plan has noted, Plaintiff may not recover attorney's fees for duplicative work, *Thomas v. Peacock,* 39 F.3d 493 (4th Cir. 1994) *rev'd on other grounds, Peacock v. Thomas,* 516 U.S. 349, 116 S. Ct. 862, 133 L.

Ed. 2d 817 (1996); *Goodwin v. Metts,* 973 F.2d 378 (4th Cir. 1992). Although the majority of Mr. Fitzsimmons billing entries involve the "review" of correspondence, Plaintiff asserts that Mr. Fitzsimmons' participation involved sharing of factual and legal research, development of case strategy and discussions of draft documents. Reply Memorandum, p. [*9] 4. Given Mr. Fitzsimmons knowledge of Mr. Webster and the case, this participation was neither unnecessary nor duplicative. Accordingly, attorney's fees for Mr. Fitzsimmons' work will be awarded.

c. Excessive Fees

The Plan argues that Plaintiff has failed to demonstrate that $ 500.00 per hour is the prevailing rate in the district and, therefore, Mr. Fitzsimmons's rate of $ 500.00 per hour is unreasonable.

According to the evidence provided by Plaintiff, only two law firms (the largest and third largest) in Baltimore charge $ 500.00 per hour for their partners services. Petition for Attorney's Fees, Ex. 6. Only one, the largest firm in the city, charges more than $ 500.00 per hour. *Id.* There is no showing that the two firms that charge $ 500.00 or more per hour do so for ERISA litigation. Although Mr. Fitzsimmons is an experienced attorney, and the Plaintiff prevailed, there is no showing that: 1) the time expended; 2) difficulty of the questions raised; 3) the skill required by the case; 4) opportunity costs incurred; 5) the attorney's expectations at the start of the litigation; or 6) time limitations imposed favor an award of a rate in excess of the local rates.

Accordingly, [*10] the Court will award attorney's fees to Mr. Fitzsimmons at the rate of $ 400.00 per hour, the rate charged by co-counsel Smith. The Plan has not argued that Mr. Smith's rates are unreasonable and $ 400.00 per hour more closely reflects prevailing rates in the District. Therefore, Plaintiff's award of attorney's will be reduced by $ 1,850.00.

2. Time Spent on Media Related Activities

The Plan argues that the Plaintiff cannot, recover attorney's fees for time Mr. Smith engaged in media-related activities. Plaintiff contends that: 1) Mr. Smith was responding to a media campaign initiated by the Plan; and 2) Mr. Smith's communication with the press constituted case investigation.

Courts determining the reasonableness of fees under § 1988 apply the 12 factor test used in ERISA cases. *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169 (4th Cir. 1994). Attorney's fees cannot be recovered for media related activities under the Civil Rights Attorney Fee Act, 42 U.S.C. § 1988. *Id.* Accordingly, the Court will adopt the *Rum Creek* prohibition on the recovery of attorney's fees for media related activities. That Plaintiff initiated the media [*11] campaign is irrelevant. Moreover, Home Box Office's (HBO) independently discovered witness helpful to the Plaintiff does not elevate the Plaintiff's communication with HBO to case investigation. Accordingly, Plaintiff will not be awarded attorney's fees for the 6.95 hours Mr. Smith spent on media related activities. Therefore, Plaintiff's award of attorney's fees will be reduced by $ 2,747.00.

3. Fees Incurred in Plaintiff's Attempt to Depose Sarah Gaunt

The Plan argues that Plaintiff should not recover attorney's fees for Plaintiff's unsuccessful attempt to depose Sarah Gaunt because recovery of fees is limited to claims on which Plaintiff prevailed.

When a case includes different claims based on different facts and legal theories, an unsuccessful claim may be treated as if it had been raised in a separate lawsuit. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). When the claim is unsuccessful, no attorney's fees should be awarded. *Id.* However, when the plaintiff's claims involve a common core of facts or related legal theories, the suit cannot be viewed as a series of discrete claims. *Id.*

As Plaintiff's attempted to depose Gaunt to prove that the Plan abused [*12] its discretion in denying Webster benefits, the attempt was directly related to the claim on which Plaintiff prevailed. Accordingly, Plaintiff can recover attorney's fees for work performed in its attempt to depose Gaunt.

4. Recovery of the Expenses of the Litigation

Plaintiff has submitted a request for expenses totaling $ 8,109.25. The Plan contends that Plaintiff is entitled only to costs provided for under 28 U.S.C. § 1920, the general federal cost statute, and therefore Plaintiff is entitled to $ 200 in costs.

Title 29 U.S.C. § 1132(g) vests discretion to award reasonable attorney's fees and costs in the Court. Plaintiff's costs include photocopying expenses, telephone charges, research expenses, overtime for secretaries and the cost of professional services by Maryland First Financial; these expenses are not unreasonable. Accordingly Plaintiff will be awarded costs.

Conclusion

As the Plaintiff was granted summary judgment, and in light of the Plan's conduct, Plaintiff will be awarded attorney's fees and costs. Reasonable fees and costs equal the requested $ 141,924.75 in attorney's fees and $ 8,109.25 in expenses minus [*13] the $ 4597.00 in fees charged in excess of local rates and for media related activities. Accordingly attorney's fees of $ 137,327.75 and expenses of $ 3,847.00 will be awarded.

November 7, 2005

Date

William D. Quarles, Jr.

United States District Judge

ORDER

For the reasons discussed in the accompanying Memorandum Opinion, it is, this 7<th> day of November 2005, ORDERED that:

1. The Defendant Bert Bell/Pete Rozell NFL Player Retirement Plan BE, and hereby IS, ORDERED to pay Plaintiff Suni Jani as Administrator of the Estate of Michael Webster $ 137,327.75 in attorney's fees and $ 3,847.00 in expenses within twelve (12) months of the date of this order; and

2. The Clerk of the Court shall send copies of this Memorandum Opinion and Order to counsel for the parties.

William D. Quarles, Jr.

United States District Judge

# **<u>EXHIBIT 50</u>**

LEXSEE

**ROY ESSEX, et al. v. DOUGLAS A. RANDALL, et al.**

**Civil Action No. DKC 2003-3276**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

**2005 U.S. Dist. LEXIS 3942; 35 Employee Benefits Cas. (BNA) 1389**

**March 15, 2005, Decided**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Judgment entered by Essex v. Randall, 2006 U.S. Dist. LEXIS 682 (D. Md., Jan. 11, 2006)

**DISPOSITION:** Plaintiffs' motions for default judgment and summary judgment granted in part and denied in part. Judgment entered for plaintiffs. Plaintiffs' request for attorney's fees granted and request for punitive damages denied.

**COUNSEL:** [*1] For Roy Essex, Eric Weiss, Frank Stegman, Ritchie Brooks, William Johnson, John Woodall, as Trustees of the Warehouse Employees Union Local No. 730 Health & Welfare Trust Fund, Plaintiffs: Jeffery Patrick Becherer, Merle M DeLancey, Jr, Dickstein Shapiro Morin and Oshinsky LLP, Washington, DC.

For James F. Farmer, Defendant: John J O'Loughlin, Farmer and Welch PA, Waldorf, MD; Thomas Edward Pyles, Farmer Welch and Alpert PA, Waldorf, MD.

**JUDGES:** DEBORAH K. CHASANOW, United States District Judge.

**OPINION BY:** DEBORAH K. CHASANOW

**OPINION**

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Employment Retirement Income Security Act of 1974 ("ERISA") case are (1) the motion of Plaintiffs Roy Essex, Eric Weiss, Frank Stegman, Ritchie Brooks,

William Johnson, and John Woodall, as Trustees of the Warehouse Employees Union Local No. 730 Health & Welfare Trust Fund ("the Fund"), for default judgment against Defendant Douglas Randall on the original complaint, pursuant to Fed.R.Civ.P. 55(b) (2) (paper no. 19); and (2) the motion of Plaintiffs for summary judgment against Defendants Randall and James F. Farmer on the original and amended complaints, [*2] pursuant to Fed.R.Civ.P. 56 (paper no. 20). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the court grants in part and denies in part the motion for default judgment against Randall, denies without prejudice as moot the motion for summary judgment against Randall, and grants in part and denies in part the motion for summary judgment against Farmer.

**I. Background**

The following facts are undisputed. The Fund is an employee benefits plan that provides health and welfare benefits to its participants and their eligible dependents, subject to the terms of a Plan of Benefits ("the Plan"). The Plan provides benefits to a participant for an injury for which a third party may be liable, but only if the participant agrees to subrogate or assign his right of recovery from the third party to the Fund.

On May 24, 2000, Defendant Randall, a participant in the Fund, was injured in an automobile accident. He required medical treatment and was unable to work for approximately five months.

On August 7, 2000, Randall executed the Fund's Assignment and [*3] Subrogation Agreement ("Agreement"). See paper no. 20, Exh. D. Paragraph 4 of the Agreement provides:

2005 U.S. Dist. LEXIS 3942, *3; 35 Employee Benefits Cas. (BNA) 1389
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

The Claimant, in consideration for the payment by the Fund of . . . benefits arising from his or her injury, which constituted good, valuable and sufficient consideration, does hereby assign, transfer and subrogate to the Fund any and all sums of money received, now due and owing to him or later received from a Third Party. . . . Any sums recovered by the Claimant from the Third Party . . . either by judgment or settlement and regardless of whether such sums are designated as reimbursement for medical expenses incurred or anticipated or past or future wage losses as pain and suffering or as any other form of damages shall be applied first to reimburse the Fund.

Paragraph 7 provides notice to the Fund of payments received by Claimant:

The Claimant agrees to notify the Fund promptly in writing if suit is filed by the Claimant or on Claimant's behalf against any Third Party. . . . The Claimant also agrees to notify the Fund promptly if the Claimant receives any award as a result of litigation or if the Claimant receives payment from any source whatsoever for claims arising [*4] from or related to the injury. . . .

Other pertinent provisions of the Agreement include paragraph 8, which requires that no settlement between the claimant and third party be given "without prior notice to and written consent from the Fund," and paragraph 10, which states that if the claimant "fails to comply with any provision of this Agreement[,] the Claimant shall be responsible for any costs or attorneys' fees incurred by the Fund to enforce this Agreement and further agrees to pay interest on any amounts owed to the Fund. . . ."

Randall's attorney, Defendant Farmer, signed a separate provision that stated: "I acknowledge the terms of the Agreement . . . and agree to be bound by its terms in representing the Claimant in connection with any claim related to or arising out of the injury which is the subject of this Agreement."

After Defendants executed the Agreement, the Fund paid $ 2,532.16 in medical benefits to various medical providers on Randall's behalf and $ 7,114.34 in accident and sickness benefits to Randall for the time he was unable to work as a result of the injuries received from the accident, for *a* total of $ 9,646.50. *See* paper no. 27, Exh. B.

[*5] On or about September 11, 2001, Randall recovered $ 20,000 in a settlement with the third party liability insurer of John Anderson, the other driver involved in the May 24, 2000 accident. Some of that settlement was paid to Farmer as attorney's fees.

Between September 2001 and July 2002, representatives of the Fund repeatedly contacted Farmer and Randall by telephone and in writing to ascertain the status of any lawsuit by Randall in connection with the accident, but received no response to phone messages or written requests for information. In August 2002, the Fund was told by an unrelated party that Randall had received a third party recovery relating to the accident. Between October 2002 and February 2003, representatives of the Fund continued to attempt to contact Farmer and Randall, but, again, received no response.

Farmer finally contacted the Fund by telephone on September 3, 2003, and stated that (1) Randall had received a third-party recovery approximately eighteen months prior; (2) at the time of the recovery, Farmer had "overlooked" the fact that Randall had subrogated his right to recovery to the Fund; and (3) Farmer had not responded to the Fund's requests for. information [*6] because he hoped that the Fund would "simply forget about its lien." *See* paper no. 20, Exhs. J, K. Despite these admissions, to the court's knowledge neither Farmer nor Randall has paid any money to the Fund.

On November 14, 2003, Plaintiffs filed a complaint with this court. Their complaint, as later amended, asserts an equitable lien pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), against both defendants; claims of unjust enrichment against each defendant separately; and claims of conversion, breach of contract, negligence, and fraud against Farmer. Plaintiffs seek (1) imposition of a constructive trust on the escrow account maintained by Farmer containing proceeds from the recovery; (2) a declaratory judgment that the Fund has an equitable lien on any settlement proceeds held by either Randall or Farmer, not to exceed $ 9,646.50; (3) equitable restitution

2005 U.S. Dist. LEXIS 3942, *6; 35 Employee Benefits Cas. (BNA) 1389
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

of $ 9,646.50, plus interest from the date of the third party recovery; (4) a temporary restraining order and preliminary injunction enjoining Defendants from disbursing the Fund's interest in the settlement funds; (5) attorney's fees and costs; and (6) punitive damages of $ 10,000.

Farmer [*7] answered Plaintiffs' complaint, but Randall did not. On July 21, 2004, Plaintiffs moved for default judgment against Randall, and for summary judgment against both Defendants.

## II. Standard of Review

### A. Default Judgment

Entry of default is left to the discretion of the court. *Dow v. Jones*, 232 F. Supp.2d 491, 494 (D.Md. 2002). The Fourth Circuit has a "strong policy" that "cases be decided on their merits," *Dow*, 232 F. Supp. 2d at 494-95 (citing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993)), but default judgment may be appropriate when the adversary process has been halted because of an essentially unresponsive party. *See Jackson v. Beech*, 205 U.S. App. D.C. 84, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 139 U.S. App. D.C. 256, 432 F.2d 689, 691 (D.C. Cir. 1970)).

### B. Summary Judgment

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c) [*8]  ; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1987). The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of South Carolina v. State of S.C.*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972,

122 L. Ed. 2d 785, 113 S. Ct. 1415 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). [*9] A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810, 139 L. Ed. 2d 17, 118 S. Ct. 52 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The inquiry [*10] involved on a summary judgment motion "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson*, 477 U.S. at 252. Where the movant also bears the burden of proof on the claims at trial, as Plaintiff here, he "must do more than put the issue into genuine doubt; indeed, [he] must remove genuine doubt from the issue altogether." *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999) (internal quotation omitted), *cert. denied*, 530 U.S. 1204, 147 L. Ed. 2d 234, 120 S. Ct. 2198 (2000); *see also Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp.2d 820, 822 (D.Md. 1998) (evidentiary showing by movant "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party") (internal quotation and italics omitted). Summary judgment will not be appropriate unless the movant's evidence supporting the motion "demonstrate[s] an absence of a genuine dispute as to every fact material to each element of the movant' s claim and the

non-movant's response fails to raise a genuine issue of material fact as to any one element." *McIntyre v. Robinson*, 126 F. Supp.2d 394, 400 (D.Md. 2000) [*11] (internal citations omitted).

## III. Analysis

### A. Default Judgment Against Defendant Randall

#### 1. Default

Randall has been utterly unresponsive in this action. He did not answer Plaintiffs' complaint, failed to respond when a default was entered against him by the clerk on April 6, 2004, and in fact has not filed any briefs whatsoever in this action. He has had ample notice of impending default judgment, but has taken no action whatsoever. Judgment by default is therefore clearly appropriate. *See Jackson*, 636 F.2d at 836.

#### 2. Liability

Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not. *See Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). Plaintiffs assert two claims against Randall: violation of ERISA and unjust enrichment.

#### a. ERISA Violation

Plaintiffs' pleadings, taken as true, establish Randall's liability as to Plaintiffs' ERISA claim against him. That claim is made pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), which states that [*12] Plaintiffs, as undisputed fiduciaries of the Fund, are entitled to bring a civil action "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." *Id.* Courts addressing the question of whether a fund may maintain such an action to enforce a reimbursement provision after a plan beneficiary has received compensation from a third party have applied a three-part test, asking whether the plan seeks to recover funds (1) that are specifically identifiable, (2) that belong in good conscience to the plan, and (3) that are within the possession and control of the defendant beneficiary. *Admin. Comm. of the Wal-Mart Assocs. Health & Welfare Plan v. Willard*, 393

F.3d 1119, 1122 (10th Cir. 2004); *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough*, 354 F.3d 348, 356 (5th Cir. 2003); *see also Admin. Comm. of Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan v. Varco*, 338 F.3d 680, 687 (7th Cir. 2003); *Mid Atlantic Med. Svcs., Inc. v. Sereboff*, 303 F. Supp.2d 691, 695 (D.Md. 2004) [*13] (citing cases) ("where funds in the actual or constructive possession of a plan beneficiary are traceable to money or property identified as belonging in good conscience to [the ERISA plan], the ERISA fiduciary may bring its claim for reimbursement in federal court under § 502(a)(3). . . .") (brackets in original) (internal quotation marks omitted). Here, the funds are specifically identifiable, namely,$ 9,646.50 of the $ 20,000 paid to Defendants by the insurer of the third party who caused Randall's injuries, in accordance with the settlement that ended Randall's lawsuit seeking recovery for his injuries; the $ 9,646.50 in good conscience belongs to the Plan, by the plain terms of the Plan requiring subrogation, *see* Agreement at P 4; and the funds are within Defendants' possession and control insofar as the funds were paid directly to them. Plaintiffs are therefore entitled to injunctive relief under § 502(a)(3)(A), and to "appropriate equitable relief" under § 502(a)(3)(B)(ii). Furthermore, in addition to violating the reimbursement provision of the Plan, Randall was obligated but failed (1) to notify Plaintiffs when commencing his lawsuit against the third party [*14] insurance carrier, and (2) to obtain Plaintiffs' consent before settling his case with the third party insurance carrier. These additional violations entitle Plaintiffs to "appropriate equitable relief" under § 502(a)(3)(B)(i).

#### b. Unjust Enrichment

Plaintiffs' second claim against Randall is for unjust enrichment. Unjust enrichment claims, like other state common law tort and contract claims, are generally preempted by ERISA. *See* 29 U.S.C. § 1144(a) ("the provisions of [ERISA] shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47-48, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987) (state common law contract and tort claims preempted by ERISA when claims "relate to" an employee benefit plan) ("a state law relate[s] to' a benefit plan in the normal sense of the phrase, if it has a connection with or reference to such a plan.") (citations and internal quotation marks omitted); *Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985, 989-90 (4th

2005 U.S. Dist. LEXIS 3942, *14; 35 Employee Benefits Cas. (BNA) 1389
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

Cir. 1990) (citing *Pilot Life*). Plaintiffs argue that an unjust enrichment claim is authorized [*15] by *Provident*, but the facts of Provident differ materially from the instant case. In *Provident*, the defendant received benefits from an ERISA-governed plan, but, for unknown reasons, never actually signed the plan's reimbursement agreement, so no contract existed with regard to the issue of reimbursement. *Id.* at 986. The court therefore fashioned a federal common law of unjust enrichment under those limited circumstances to avert the patently unjust result of a beneficiary receiving payment from an ERISA-governed plan without being liable to reimburse that plan merely for lack of a signature. *Id.* at 993. Here, Randall's signature on the Agreement subjects him to the terms of the Plan, and thus obviates the need for a quasi-contractual theory of liability. "We are constrained to fashion only those remedies that are appropriate and necessary to effectuate the purposes of ERISA." *Provident*, 906 F.2d at 992 (*quoting U.S. Steel Mining Co. v. Dist. 17, UMW*, 897 F.2d 149, 153 (4th Cir. 1990)). Accordingly, judgment on this claim will be denied, and it will be dismissed.

**B. Summary [*16]   Judgment Against Defendant Randall**

Because the court will enter default judgment against Randall, *see supra* at III.A.1, Plaintiffs' motion for summary judgment against him is denied without prejudice as moot.

**C.   Summary   Judgment   Against   Defendant Farmer**

Plaintiffs allege that Farmer violated section 502(a)(3) of ERISA, and further asserts state law claims of unjust enrichment, conversion, breach of contract, negligence, and fraud.

The court notes initially that, by signing the Agreement, Farmer agreed "to be bound by its terms." Paper no. 20, Exh. D. At least two circuits agree that in ERISA cases, "a subrogation agreement is enforceable against an attorney who agrees with a client and a plan to honor the plan's subrogation right." *So. Council of Indus. Workers v. Ford*, 83 F.3d 966, 969 (8th Cir. 1996) (citing *Hotel Empls. & Restaurant Empls. Int'l Union Welfare Fund v. Gentner*, 50 F.3d 719, 721-22 (9th Cir. 1995) ("[A] beneficiary's attorney is not bound to the terms of a client's subrogation agreement to which he is not a signatory. . . . A subrogation agreement or lien can be

enforced against the attorney only if the attorney [*17] agrees with the client and creditor to protect the lien.").

The court also notes that Farmer concedes much of Plaintiffs' argument: that the Fund paid medical bills and lost wages to Randall; that he and Randall were obligated but failed to notify Plaintiffs when Randall's lawsuit commenced against the third party insurance carrier; that they were obligated but failed to obtain Plaintiffs' consent before settling with the third party insurance carrier; that he and Randall received $ 20,000 in settlement proceeds from the third party insurance carrier; that the monies paid by the Fund for medical expenses and lost wages were and are due to be repaid to the Fund from those settlement proceeds by the terms of the Agreement; that nevertheless, he "overlooked the lien" and has not repaid any monies to the Fund; and that for almost two years he ignored Plaintiffs' repeated attempts to contact him because he hoped Plaintiffs would forget about their lien. *See generally* paper no. 26; paper no. 20, Exh. J, K.

Farmer asserts, incorrectly, that before he is required to fulfill his subrogation obligation, "the Fund has to show that the actual amounts that it paid out were related to this [*18] accident." Paper no. 26, at 10. Neither the Agreement nor the Plan state any such requirement. The crux of Farmer's argument, however, seems to be not that Plaintiffs failed to comply with some imagined requirement, but that he "doubts very seriously as to what portion, if any, of the [$ 9,646.50] in medical and accidental sickness benefits were related to Mr. Randall's accident." *Id.* at 9-10. This allegation is disingenuous at best, as it flies in the face of not only the documentation of payments submitted by Plaintiffs with their reply brief, see paper no. 27, Exh. B, but by the very nature of the Plan: All claims are submitted to the Fund by the participant (or a proxy thereof) as requests for payment of expenses or lost wages relating to an injury suffered. See Paper no. 27, Exh. A ("Claims for Medical, Weekly Accident & Sickness, or Supplement to Workers' Compensation benefits are made by completing a form."). Farmer's bald assertion that the Fund paid Randall for something other than medical expenses and lost wages is neither supported, either by evidence or affidavit, nor colorable.

**1. Equitable Lien Under ERISA**

Applying the three-prong test for § 502(a)(3) violations [*19] enunciated in *Willard* and *Bombardier, see supra* at III.A.2.a, the court finds that Farmer's

Page 5

admissions establish his liability as to Plaintiffs' ERISA claim against him. The funds Plaintiffs seek to recover from Farmer are specifically identifiable (satisfying the first prong of the test) and within his possession and control (satisfying the third prong), as Farmer admits (1) to having received the settlement proceeds, including the $ 9,646.50 owed to the Fund; and (2) to maintaining an escrow account containing at least some of his attorney's fees from Randall's third party recovery. Farmer also admits that the funds are owed to the Plan, thus satisfying the second prong of the test. Plaintiffs are therefore entitled to injunctive relief against Farmer under § 502(a)(3)(A), and to "appropriate equitable relief" under § 502(a)(3)(B)(ii). Farmer was also obligated but failed (1) to notify Plaintiffs when Randall's lawsuit commenced against the third party insurance carrier, and (2) to obtain Plaintiffs' consent before the case settled. These additional violations entitle Plaintiffs to "appropriate equitable relief" against Farmer under § 502(a)(3)(B)(i). The court therefore [*20] grants summary judgment on this claim against Farmer.

## 2. State Law Claims

Plaintiff contends that Farmer's actions amount to unjust enrichment, conversion, breach of contract, negligence, and fraud under Maryland common law. As explained *supra* at III.A.2.b, all of these claims are preempted by ERISA. *See, e.g., Elmore v. Cone Mills Corp.*, 6 F.3d 1028, 1038-39 (4th Cir. 1993) (dismissing breach of contract, fraud, unjust enrichment, and negligence claims on basis of ERISA preemption); *Ferry v. Mutual Life Ins. Co.*, 868 F. Supp. 764, 777 (W.D.Pa. 1994) (dismissing conversion and declining to fashion federal common law conversion claim). Summary judgment is therefore denied on these claims, and they will be dismissed.

## D. Relief

Having established liability under ERISA, Plaintiffs are entitled to injunctive relief and "appropriate equitable relief." § 502(a)(3). Plaintiffs request equitable relief in the form of (1) imposition of a constructive trust on Farmer's escrow account containing proceeds from Randall's third party recovery; (2) declaratory judgment that they have an equitable lien on any settlement proceeds held by either [*21] Randall or Farmer, not to exceed $ 9,646.50; and (3) equitable restitution of $ 9,646.50, plus interest from the date of the third party recovery. Plaintiffs also seek injunctive relief in the form

of a temporary restraining order and preliminary injunction enjoining Defendants from disbursing the Fund's interest in the settlement funds, attorney's fees and costs, and punitive damages of $ 10,000.

## 1. Equitable Relief

In *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 151 L. Ed. 2d 635, 122 S. Ct. 708 (2002), the Supreme Court explained that, by authorizing only injunctive and "appropriate equitable relief," § 502(a)(3), ERISA countenances remedies in equity but not at law. Referring to "the days of the divided bench," the court explained that "in cases in which the plaintiff could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him, the plaintiff had a right to restitution at law. . . ." *Id.* at 213 (internal quotation marks and emphasis omitted). By contrast, "a plaintiff could seek restitution in equity, ordinarily [*22] in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.*

Here, Plaintiffs request a constructive trust on clearly traceable funds belonging in good conscience to them, namely, the funds in Farmer's escrow account, which by his own admission contains $ 1,100 in proceeds from the settlement. A constructive trust is therefore appropriate, and will be granted.

Plaintiffs' request for declaratory judgment that they have an equitable lien on settlement proceeds held by either Defendant, not to exceed $ 9,646.50 is likewise appropriate, because that money belongs in good conscience to them, and can clearly be traced to particular funds, namely, the settlement proceeds. On similar facts, a bankruptcy court's decision to impose an equitable lien, which it characterized as "fully consistent with the express written terms of the plan" was affirmed by the Fourth Circuit. *Wal-Mart Stores, Inc. v. Carpenter (In re Carpenter)*, 245 B.R. 39, 47 (Bankr. E.D.Va. 2000), *aff'd*, 36 Fed. Appx. 80 (4th Cir. 2002). [*23]

Plaintiffs' request for equitable restitution in the form of $ 9,646.50, plus interest from the date of the third party recovery, however, will be denied. Plaintiffs' restitution request does not specify recovery of money

2005 U.S. Dist. LEXIS 3942, *23; 35 Employee Benefits Cas. (BNA) 1389
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

that "could clearly be traced to particular funds or property in the defendant's possession," *id.* 534 U.S. at 213, 151 L. Ed. 2d 635, 122 S. Ct. 708; rather, Plaintiffs request that the court "order Defendants to pay . . . $ 9,646.50, plus interest. . . ." "For restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Knudson*, 534 U.S. at 214. Plaintiffs' request for "equitable" restitution in fact amounts to a request for personal liability, not restoration of "particular funds." It is not, therefore, "equitable relief," and is thus not authorized by § 502(a)(3).

## 2. Preliminary Injunctive Relief

Because the court today enters judgment in favor of Plaintiffs, their request for a temporary restraining order and preliminary injunction enjoining Defendants from disbursing the Fund's interest in the settlement funds is denied as moot.

## [*24] 3. Attorney's Fees and Costs

In a surreply that was filed without permission, Farmer asserts that only Randall is liable for attorney's fees. Farmer, however, agreed to be bound by all the terms in the Agreement, including the provision for Plaintiffs' attorney's fees. *See* paper no. 20, Exh. D. Paragraph 10 of the Agreement states that if the claimant "fails to comply with any provision of this Agreement[,] the Claimant shall be responsible for any costs or attorneys' fees incurred by the Fund to enforce this Agreement and further agrees to pay interest on any amounts owed to the Fund. . . ." As established *supra* at III.A.1 and III.C.1, both Defendants failed to comply with multiple provisions of the Agreement. Both Defendants are therefore liable for attorney's fees under the Agreement.

Moreover, even absent the attorney's fees provision of the Agreement, the court would still award attorney's fees to Plaintiffs pursuant to section 502(g)(1) of ERISA, which states that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). A party who prevails does not, by prevailing [*25] alone, establish a presumption of entitlement to an award of fees. *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 422 (4th Cir. 1993) (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1028-29 (4th Cir. 1993) (*en banc*). In the Fourth

Circuit, a court must consider five factors in determining whether to award attorney's fees in an ERISA case: (1) the degree of opposing parties' culpability or bad faith; (2) the ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions. *Reinking v. Philadelphia Am. Life Ins. Co.*, 910 F.2d 1210, 1217-18 (4th Cir. 1990), *overruled in part by Quesinberry*, 987 F.2d at 1028-30; *Wheeler v. Dynamic Engineering, Inc.*, 62 F.3d 634 (4th Cir. 1995). The factors are guidelines, not a rigid [*26] test, *Wheeler*, 62 F.3d at 641, and no single factor may be decisive, *Quesinberry*, 987 F.2d at 1029.

Here, based on these five factors, an award of attorney's fees is appropriate. Defendants are admittedly culpable, and there is significant evidence of bad faith: Randall has not appeared at all in this case, nor has he made any effort to repay Plaintiffs; and while Farmer protests that he acted in good faith, that assertion is belied by his own admission that he and Randall not only did not repay the Fund as clearly required under the Agreement, but for nearly two years declined to respond to Plaintiffs' repeated attempts to communicate because they "hoped the Fund would simply forget about its lien." Paper no. 20, Exhs. J, K. There is no evidence before the court as to whether Defendants can pay the attorney's fees. An award of attorney's fees in this case would certainly carry deterrent value against other parties considering similar violations, as these violations constituted a bad faith attempt to evade payment, not good faith error. *Compare with, e.g., American Med. Sec., Inc. v. Larsen*, 31 F. Supp.2d 502, 506-07 (attorney's fees [*27] carry no deterrent value against insurance commissioner because commissioner did not "set out to deliberately circumvent ERISA"). Plaintiffs seek "to benefit all participants and beneficiaries of" their Fund, in that the money is owed to the Fund, even though no novel overriding legal issue is involved. Finally, the relative merit of the parties' positions favors an award of attorney's fees, as the court finds today that Defendants' position has no merit at all. Finding four of the five *Reinking* factors to favor Plaintiffs, the court will award a reasonable attorney's fee upon submission by Plaintiffs of a billing declaration.

2005 U.S. Dist. LEXIS 3942, *27; 35 Employee Benefits Cas. (BNA) 1389
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

**4. Punitive Damages**

Section 502(a)(3) of ERISA, the only law under which the court today finds Defendants liable, provides only for injunctive and equitable relief. The Supreme Court in *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 124 L. Ed. 2d 161, 113 S. Ct. 2063 (1993) stated in dicta:

> Money damages are, of course, the classic form of legal relief. *Curtis v. Loether*, 415 U.S. 189, 196, 39 L. Ed. 2d 260, 94 S. Ct. 1005 (1974); *Teamsters v. Terry*, 494 U.S. 558, 570-571, 108 L. Ed. 2d 519, 110 S. Ct. 1339 (1990); D. Dobbs, Remedies [*28] § 1.1, p. 3 (1973). And though we have never interpreted the precise phrase "other appropriate equitable relief,"

> we have construed the similar language of Title VII of the Civil Rights Act of 1964 (before its 1991 amendments) -- "any other equitable relief as the court deems appropriate," 42 U.S.C. § 2000e-5 (g) -- to preclude "awards for compensatory or punitive damages." *United States v. Burke*, 504 U.S. 229, 238, 119 L. Ed. 2d 34, 112 S. Ct. 1867 (1992).

*Id.* at 255. Based on *Mertens* and on traditional notions of equity and law, courts in this district have consistently concluded that ERISA does not permit recovery of punitive damages. *Estate of Mattern v. Honeywell Int'l, Inc.*, 241 F. Supp.2d 540, 544 (D.Md. 2003) (punitive damages based on ERISA violations "are beyond the scope of appropriate equitable relief'"); *Hemelt v. United States*, 951 F. Supp. 562, 567 (D.Md. 1996)(section 502(a) "does not permit recovery of compensatory or punitive damages"), *aff'd*, 122 F.3d 204 (4th Cir. 1997) (citing Mertens);*Vogel v. Independence Federal Sav. Bank*, 692 F. Supp. 587, 596 (D.Md. 1988) [*29] (declining to apply punitive damages); *Trogner v. New York Life Ins. Co.*, 633 F. Supp. 503, 510 (D.Md. 1986) ("punitive damages are not recoverable under ERISA"). Plaintiff's request for punitive damages is therefore denied.

**IV. Conclusion**

For the foregoing reasons, the court will grant in part

and deny in part the motion for default judgment against Randall, deny without prejudice as moot the motion for summary judgment against Randall, and grant in part and deny in part the motion for summary judgment against Farmer. A separate Order will follow.

DEBORAH K. CHASANOW

United States District Judge

March 15, 2005

**ORDER**

For the reasons stated in the foregoing Memorandum Opinion, it is this 15th day of March, 2005, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion of Plaintiffs Roy Essex, Eric Weiss, Frank Stegman, Ritchie Brooks, William Johnson, and John Woodall, as Trustees of the Warehouse Employees Union Local No. 730 Health & Welfare Trust Fund ("the Fund"), for default judgment against Defendant Douglas Randall on the original complaint, pursuant to Fed.R.Civ.P. 55 (b) (2) [*30] (paper no. 19), BE, and the same hereby IS, GRANTED in part as to Count I of the complaint (ERISA violation), and DENIED in part as to Count II (unjust enrichment);

2. The motion of Plaintiffs for summary judgment against Defendants Randall and James F. Farmer, pursuant to Fed.R.Civ.P. 56 (paper no. 20), BE, and the same hereby IS, GRANTED in part as to Count I of the amended complaint against Defendant Farmer, DENIED WITHOUT PREJUDICE AS MOOT in part as to Count I against Defendant Randall, and DENIED as to the remaining counts;

3. Judgment BE, and the same hereby IS, ENTERED in favor of Plaintiffs and against Defendants as follows:

A. IT IS HEREBY DECLARED that the Fund has a valid and enforceable equitable lien on any settlement proceeds held by either Defendant, not to exceed $ 9,646.50;

B. A constructive trust is hereby IMPOSED on the escrow account of Defendant Farmer containing the attorney's fees received as a result of the third party settlement between Defendant Randall and John Anderson consequent to their auto accident of May 24,

2005 U.S. Dist. LEXIS 3942, *30; 35 Employee Benefits Cas. (BNA) 1389
38 Employee Benefits Cas. (BNA) 2127; 98 A.F.T.R.2d (RIA) 5669

2000;

4. Plaintiff's claims in Counts II through VII BE, and the same hereby ARE, DISMISSED;

5. [*31] Plaintiffs' request for attorney's fees pursuant to 29 U.S.C. §§ 1132(g)(1) is hereby GRANTED;

6. Plaintiffs are DIRECTED to submit a declaration of attorney's fees to the court within 14 days; and

7. The Clerk will transmit copies of the Memorandum Opinion and this Order to counsel for the parties, and to Randall at his last known address.

DEBORAH K. CHASANOW

United States District Judge