**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(Southern Division)**

| | |
|---|---|
| **PLASTERERS' LOCAL UNION NO. 96** | ) |
| **PENSION PLAN,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | )   C.A. No. PJM 06 CV 338 |
| | ) |
| **v.** | ) |
| | ) |
| **HAROLD PERRY,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFFS' REPLY TO DEFENDANT TRUSTEES' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs, the Plasterers' Local Union No. 96 Pension Plan (the "Plan"), Cherie Pleasant

and James Miller as trustees, on behalf of the Plan (collectively, the "Plaintiffs"), by and through

undersigned counsel, respectfully submit Plaintiffs' Reply to Defendant Trustees' Opposition to

Plaintiffs' Motion for Partial Summary Judgment.  In their Opposition ("Defendant Trustees'

Opposition") and accompanying Memorandum ("Defendant Trustees' Memorandum") to

Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Motion"), Defendants James

Lertora, Edgar Pepper, Donald Molnar, and Ronald Beddow[1] (collectively, the "Defendant

Trustees") put forth a series of erroneous arguments.  In his own Opposition to Plaintiffs' Motion,

Defendant Harry C. Perry also adopts these erroneous arguments.  See Docket Entry 94.

**I. DEFENDANTS' CLAIMS ARE NOT TIME-BARRED**

**A.      Defendants' Concealed Their Prohibited Transactions**

1.      Plaintiffs' Action for Recovery Is Not Barred by a Statute of Limitations Because
Defendants Concealed Their Prohibited Transactions

---

[1] Defendant Beddow disputes his status as a Trustee during this period.  See Defendant Trustees' Memorandum at p.
2, n. 1.  However, it is clear from the Defendants' 1994 Form 5500 that he was a Trustee during this period.  See
Attachment A, 1994 Annual Return Report of Employee Benefit Plan, at Schedule C, p. 2.

The Defendants have acknowledged that they did not inform Plan participants or, more importantly, new Trustees that they distributed Plan assets to contributing employers.[2]  Section 413 of ERISA provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such  breach or violation."  29 U.S.C. § 1113.  Tolling occurs when fiduciaries "conceal[] information relevant" to their breaches.  Meyer v. Berkshire Life Ins. Co., 128 F. Supp. 2d 831, 836 n. 5 (D. Md. 2001) (hereafter "Meyer I").

2.    Plaintiffs Were Not Required to Expressly Plead Concealment in the Complaint

Defendants argue that "Plaintiffs' complaint does not plead fraud or concealment, and plaintiffs may not now argue such a position."[3]  However, Plaintiffs need not expressly declare in the Complaint that they are alleging concealment.  Instead, the determining factor for whether such a claim has been sufficiently plead is whether or not the Plaintiffs have "alleged sufficient facts to put the [Defendants] on notice as to what they are claiming."  Johnson v. Wheeler, 492 F. Supp. 2d 492, 512 (D. Md. 2007) (Messitte, J., deciding).  Here, there can be no question that the Defendants were put on notice that Plaintiffs were alleging concealment.  In the Complaint, the Plaintiffs sought recovery of breaches which occurred in 1994.[4]  This alone was enough to place Defendants on notice that Plaintiffs were alleging fraud or concealment given that the statute of limitations to ERISA claims is either three or six years absent fraud or concealment.  29 U.S.C. § 1113.  The Plaintiffs' alternate means of recovery based upon Defendants' independent breaches of failing to remedy known breaches cannot be said to have kept the Defendants from being on notice, given that Defendants refer to this as "a novel theory."[5]

---

[2] See Attachment B, the Deposition of Donald A. Molnar ("Molnar Dep."), at pp. 144:19 - 145:9; Attachment C, the Deposition of James S. Lertora ("Lertora Dep."), at p. 220:6-20; Attachment D, Deposition of Keith Hickman ("Hickman Dep."), at pp. 17:6-13, 166:14 - 167:5.
[3] Defendant Trustees Memorandum at p. 4.
[4] See Docket Entry 1, Complaint, at pp. 8, 11-13.
[5] Defendant Trustees Memorandum at p. 9.

Furthermore, Defendants' actions makes clear that they were on notice of a claim of concealment.  In fact, in the very first deposition taken in this case, that of Defendant Perry, his own counsel inquired of him as to whether there was "any effort . . . to in any way conceal the repayment of forfeited amounts to any of the contractors."[6]  Additionally, in each of Defendant Perry's requests for admissions, he sought an admission that he "did not take any action to conceal the repayment of forfeited funds to contractor trustees."[7]  Thus, not only were the Defendants on notice of a concealment claim, but they prepared their defense for such a claim. Therefore, Defendants were plainly on notice that the Plaintiffs were alleging concealment.

    3.    <u>The Reference to Forfeitures on the 1994 Form 5500 Did Not Insulate the Defendants from Their Concealment</u>

Defendants contend that a statement in the second attachment to the Plan's Form 5500 for 1994 that "checks were drawn to fourteen employers" was sufficient to provide notice that the above prohibited transactions had occurred.[8]  As a preliminary matter, the Defendants do not contend that the individual Plaintiffs in this matter received that statement as they were not yet trustees to the Plan.  Additionally, the statement does not make clear the illegality of the prohibited transactions.  Nowhere in the Form 5500 attachment was there a statement that the forfeitures arose because of participants not being vested in the Plan, nor was there anything to indicate what the source of the "employer offset contributions" were that would permit anyone with less than complete information interpretations underlying the distributions to contributing employers that those distributions were, in fact, barred by ERISA.[9]

---

[6] Attachment E, Deposition of Harry C. Perry ("Perry Dep.") at p. 420:9-11.

[7] Attachment F, Defendant Harry C. Perry, Jr.'s Request for Admissions to Plasterers' Local Union No. 96 Pension Plan ("Plaintiff"), at p. 7; Attachment G, Defendant Harry C. Perry, Jr.'s Request for Admissions to James Miller, Trustee ("Plaintiff"), at p. 7; Attachment H, Defendant Harry C. Perry, Jr.'s Request for Admissions to Cherie Pleasant, Trustee ("Plaintiff"), at p. 7.

[8] <u>See</u> Defendant Trustees' Memorandum at pp. 6-7.

[9] <u>See</u> Attachment I, Independent Auditors' Report, dated June 2, 1995.

It is clearly contrary to the weight of the case law to contend that the Plan participants were aware of the prohibited transactions based upon such a vague statement.   In <u>Meyer v. Berkshire Life Ins. Co.</u>, 250 F. Supp. 2d 544, 569 (D. Md. 2003) (hereafter "<u>Meyer II</u>"), this Court held that the plaintiff trustees, two neurosurgeons, did not have actual knowledge of the defendant's breaches for several reasons: the plaintiff neurosurgeons "were not financially astute;" the materials provided to the neurosurgeons "were objectively confusing;" and while the neurosurgeons were actually provided with relevant information in their fiduciary capacity, that information was "infrequent and short in duration" and, therefore, was insufficient to permit the plaintiff neurosurgeons, "being financially inexperienced," to understand the substance thereof.

Under the standards of <u>Meyer II</u>, the inclusion of the attachment to the Form 5500 was plainly insufficient to provide the Plan participants with notice.  These factors establish that more was needed to impute the participants with knowledge of Defendants' prohibited transactions, and, therefore, show that Defendants did not conceal those prohibited transactions.  As neurosurgeons, the plaintiffs in <u>Meyer II</u> were obviously highly educated, whereas the Plan participants here are blue-collar plasterers with drastically lower levels of education.  Thus, they could only be presumed to be far less financially astute than the plaintiff neurosurgeons in <u>Meyer II</u>.  Furthermore, the plaintiff neurosurgeons were trustees and fiduciaries of their plans.  <u>See id</u>. at 549.  As such, they were subject to a duty to act prudently and diligently with respect to the Plan.[10]  The Plan participants here were subject to no such duty.

Additionally, the <u>Meyer II</u> plaintiff neurosurgeons received multiple reports that were specifically intended to be delivered to them.  <u>See Meyer II</u>, 250 F. Supp. 2d at 569.   Here, the

---

[10] <u>See Chao v. Malkani</u>, 216 F. Supp. 2d 505, 512 (D. Md. 2002) (Noting that ERISA imposes on fiduciaries "both a duty to act solely in the interest of the plan's participants and with care, skill, prudence, and diligence. . . . A plan trustee can run afoul of ERISA by failing to act in accordance with this general duty, or by violating more specific separate sections of ERISA.") (internal citations omitted).

attachment was a one-time statement that was designed to be filed with the government, not the Plan participants. There was no statement as to what a forfeiture was or what the source of the funds was. For the Plan participants, this would have far less meaning than the information provided to the <u>Meyer II</u> plaintiff neurosurgeons. Thus, under the <u>Meyer II</u> standards, the Plan participants can not possibly be held to have had notice of Defendants' prohibited transactions.

Nor does the Defendants' argument that the possibility that the individuals hired by Defendants,[11] the employers who benefited from prohibited transactions, or the Defendants themselves were aware of the prohibited transactions insulate the Defendants from a claim of concealment. Each of those parties had an interest in not acting upon such information as the employers were able to retain the forfeited funds, the Defendants did not have to acknowledge their fiduciary breaches, and the parties hired by the Defendants were able to maintain their relationships with the Defendants. Furthermore, neither the employers nor the individuals hired by Defendants would have had standing to bring an action. Such an action could only have been brought "by a participant, beneficiary, or fiduciary." ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

While the Defendants were aware of their own breaches, it is their failure to remedy those breaches that gives rise to an independent fiduciary breach. "It would be astonishing and contrary to the policy underlying ERISA if wrongdoing fiduciaries could diminish or partially bar their liability for their wrongdoing by remaining in their positions and failing to reveal their wrongdoing until a later time."[12] Thus, the possible awareness by a handful of individuals who had an interest in concealing those transactions does not establish lack of concealment.

The filing of the attachment also does not establish lack of concealment based on the knowledge of the governmental entities who received the form. As noted above, nothing in the

---

[11] Specifically, Defendant Perry's assistant Lee Wagner, Plan counsel Sam Scholar, and auditors Bailey & Bailey.
[12] Attachment J, the Expert Report of Henry Rose ("Rose Report"), at ¶ 15.

statement states the illegality of the forfeitures to have put the government on notice.

Furthermore, multiple Form 5500s which detailed the lack of diversification was also filed in the

Meyer cases.  See Meyer I, 128 F. Supp. 2d at 837.  Yet, despite these filings, this Court held the

plaintiffs were not time-barred from bringing their action.  Meyer II, 250 F. Supp. 2d at 568-69.

4.      Defendants' Conduct Rose to the Level of Concealment

The Defendants' contention that their conduct was less than that necessary to be

considered concealment is erroneous.  While the Fourth Circuit has never addressed what

conduct constitutes concealment, a majority of circuits to address the issue have equated this

standard with "fraudulent concealment."  See J. Geils Band Employee Benefit Plan v. Smith

Barney Shearson, Inc., 76 F.3d 1245, 1255 (1st Cir. 1996) ("[W]e have yet to encounter a

convincing argument as to why we should part company from those circuits which have already

addressed this issue and have concluded that Section 1113 indeed incorporates the fraudulent

concealment doctrine.")[13]  District courts in this circuit have reached the same conclusion.[14]

While Defendants would no doubt like to see this Court impose the Third Circuit

standard they cite to,[15] they tacitly acknowledge that the weight of authority favors the fraudulent

concealment standard by putting forth what must be established under that standard.[16]  The

standard Defendants argue for is:

[13] See also Barker v. American Mobil Power Corp., 64 F.3d 1397, 1401-02 (9th Cir. 1995) (adopting the fraudulent concealment standard); Larson v. Northrop Corp., 21 F.3d 1164, 1172-73 (D.C. Cir. 1994) (same); Radiology Ctr., S.C. v. Stifel, Nicolaus & Co., 919 F.2d 1216, 1220 (7th Cir. 1990) (same); Schaefer v. Arkansas Medical Soc'y, 853 F.2d 1487, 1491 (8th Cir. 1988) (same).
[14] See Davis v. Bowman Apple Prods. Co., No. 5:00CV00033, 2002 U.S. Dist. LEXIS 6204, *22 (W.D. Va. Mar. 29, 2002) (concluding that "the plaintiff had knowledge of a possible breach by defendants, *thus precluding any claim of fraudulent concealment*, and bringing the plaintiff's claim within Section 1113's three year statute of limitations which applies when the plaintiff has actual knowledge of the breach.") (emphasis added); Wilson Land Corp. v. Smith Barney, Inc., No. 5:97-CV-519-BR(2), 1999 U.S. Dist. LEXIS 12879, *17-18 (E.D.N.C. May 17, 1999) ("Plaintiffs next contend that . . . the statute of limitations was tolled by 'fraud or concealment.' . . . *If the court were to find fraudulent concealment, all of Plaintiffs' allegations . . . would be timely.*") (emphasis added).
[15] See Defendant Trustees' Memorandum at p. 8.
[16] See id.

-6-

[I]n order to toll the limitations period under Section 1113's fraud or concealment exception, Appellants must demonstrate that (1) defendants engaged in a course of conduct designed to conceal evidence of their alleged wrong-doing and that (2) [the plaintiffs] were not on actual or constructive notice of that evidence, despite (3) their exercise of reasonable diligence.

J. Geils Band, 76 F.3d at 1255 (internal citations omitted).

Defendants argue that "the material facts preclude the application of [ERISA's] tolling provision because they establish notice, not concealment."  However, Defendants in no way examine the J. Geils Band standard to reach this conclusion.  Had Defendants done so, it would be abundantly clear that the Defendants' actions here do, in fact, meet this standard of fraudulent concealment.  The Defendants' engaging in prohibited transactions, including distributing money to entities controlled by the Defendant Trustees, their failure to notify Plan participants and beneficiaries, and their failure to notify new Trustees clearly shows a course of conduct designed to prevent discovery of their breaches.  Given that no individuals with the power to bring an action other than the Defendants themselves were aware of the Defendants' prohibited transactions, the Defendants' failure to notify clearly suffices.  Furthermore, Plaintiffs Miller and Pleasant were plainly without actual or constructive notice given that they had no relationship to the Plan until they became Trustees less than three years prior to the initiation of this litigation. Finally, after becoming trustees, Plaintiffs Miller and Pleasant did act diligently as Defendants' prohibited transactions were discovered as the result of a forensic audit which never occurred while the Defendants were in control of the Plan.[17]  Thus, under the J. Geils Band standard, the Defendants' conduct clearly rose to the level of fraudulent concealment and, therefore, Defendants' contention that they did not conceal their prohibited transaction must be rejected.

**B.**     **Defendants Are Liable for the Damages Arising from the 1994 Prohibited Transactions Based Upon Defendants' Breach in Failing to Remedy Past Breaches**

[17] See Attachment C, Hickman Dep., at pp. 186:11 - 187:5.

Defendants dispute Plaintiffs' ability to reach the damages arising out of Defendants' 1994 prohibited transactions based upon a fundamental misunderstanding of Plaintiffs' claim. Defendants characterize Plaintiffs' claim as an "attempt to skirt the statute of limitations."  In an attempt to support this claim, the Defendants cite to Ranke v. Sanofi-Synthelabo, Inc., 436 F.3d 197 (3d Cir. 2006), in which the court denied the plaintiffs attempts to *extend* the statute of limitations.  Ranke did not involve a claim that the defendants were subject to liability for a separate and independent breach of fiduciary duty.   Defendants read Ranke as relevant to this case because they believe it holds that "[P]laintiffs should not be permitted to reset the clock and thereby circumvent ERISA's statute of limitations."[18]  The Defendants' comparison between Ranke and this case highlights the Defendants' misunderstanding.

Plaintiffs are *not* attempting to reset the statute of limitations clock.  Plaintiffs fully acknowledge there would be no support for an argument that because Defendants did not remedy their earlier breaches, the statute of limitations is merely tolled.  However, as established in the Memorandum in support of Plaintiffs' Motion ("Plaintiffs' Memorandum") and as completely unchallenged by Defendant Trustees' Memorandum, ERISA firmly establishes that the failure to remedy known breaches is an *independent* breach of fiduciary duty.[19]  Had the Defendants fulfilled this duty, they would have brought an action against the contributing employers to whom they distributed Plan assets for recovery of those assets.  The failure to remedy is an independent breach and must be treated as such.  It is not an extension of the statute of limitations, but instead a separate breach subject to its own statute of limitations period.

---

[18] Defendant Trustees' Memorandum at p. 11.

[19] See Plaintiffs' Memorandum at pp. 44-46; Attachment K, Expert Report of Norman Stein ("Stein Report"), at ¶ 18 ("The failure to bring such a legal action within the limitations period (under ERISA § 413) was not prudent *and a separate breach of each defendant's legal obligations*.") (emphasis added); Attachment J, Rose Report, at ¶ 13 ("There is an affirmative obligation on a fiduciary to correct a fiduciary breach and the failure to do so constitutes a *separate fiduciary breach* itself.") (emphasis added).

The closest Defendants come to disputing the existence of the independent breach is their citation to a number of cases in which no such liability was imposed.[20]  However the Defendants' citation to these cases is intellectually dishonest, as in none of these did the courts even *consider* such an argument nor is there any indication that such a claim was raised.  Thus, Defendants have attempted to cite to cases in which the plaintiffs did not succeed on claims they did not raise as evidence that such claims cannot succeed.   This is plainly erroneous.

Rather than truly disputing the undeniable fact that ERISA imposes a separate duty to remedy fiduciary breaches, Defendants argue that granting Plaintiffs' Motion would undermine ERISA's statute of limitations and the underlying goal of ERISA.[21]  However, this clearly is inapposite to Congress' intent in drafting ERISA.  First, had Congress intended that the failure to remedy known breaches not constitute an independent breach with its own limitations period, it would not have made such a failure an independent breach.  The creation of such an independent fiduciary duty is the clearest indication of Congress' intent.  Furthermore, ERISA's express purpose is "to protect . . . the interests of participants in employee benefit plans and their beneficiaries."  ERISA § 2(b), 29 U.S.C. § 1001(b).[22]  There can be no argument that this purpose is better served by obviating the Defendants from liability for the damages caused by their independent breach in failing to remedy.  Thus, the underlying purpose of ERISA is clearly best served and supported by granting summary judgment as to Plaintiffs' claim.

**C.**     **Plaintiffs' Claims Based Upon Defendants' Failure to Diversify Are Not Time Barred Because the Plan is Only Imputed with the Knowledge of the Individual Plaintiffs Bringing Suit on Behalf of the Plan**

---

[20] See Defendant Trustees' Memorandum at p. 11.
[21] See Defendant Trustees' Memorandum at p. 10.
[22] See also Wilmington Shipping Co. v. New Eng. Life Ins. Co., 496 F.3d 326, 338 (4th Cir. 2007) ("ERISA's purpose . . . is to protect the interests of participants in employee benefit plans and their beneficiaries.") (internal citations omitted);  Kress v. Food Emplrs. Labor Rels. Ass'n, 217 F. Supp. 2d 682, 686 (D. Md. 2002) ("The purpose of ERISA is to protect participants in employee benefit plans and their beneficiaries.") (internal citations omitted).

In their Memorandum,[23] the Defendant Trustees adopt the arguments advanced by Defendant Perry in his Motion for Summary Judgment,[24] and the accompanying Memorandum,[25] in which Defendant Perry argues that Maryland agency law principles require imputing the Plan with the knowledge of non-party trustees Keith Hickman and Stephen Stovall.  However, for the reasons set forth in Plaintiffs' Memorandum in Opposition to Defendant Harry C. Perry Jr.'s Motion for Summary Judgment, these arguments must fall as these principles are preempted by ERISA and because case law only permits imputing the Plan with the knowledge of the Plaintiffs who bring the action on behalf of the Plan – in this case, Plaintiffs Miller and Pleasant.[26]

## II. DEFENDANTS DID NOT DIVERSIFY PLAN ASSETS
## AND DID NOT ACT PRUDENTLY AS ERISA REQUIRES

**A.      Summary Judgment is Proper as to Defendants' Failure to Diversify**

Defendants contend that the factors which must be considered in order to determine whether Defendants' failure to diversify Plan assets violated ERISA "necess[arily] precludes a summary judgment."[27]  Defendants make this contention without citing to any authority.  This is not surprising as case law establishes that it is proper to conclude in summary judgment that defendants failed to diversify Plan assets.[28]  Thus, this argument must be rejected.

**B.      Defendants' Investments on Behalf of the Plan Were Not Diversified**

There is no issue of material fact as to whether the Defendants maintained an undiversified portfolio.  As a matter of law, the Defendants' investments were not diversified as

---

[23] See Defendant Trustees' Memorandum at pp. 11-12.

[24] See Docket Entry 87, Defendant Harry C. Perry Jr.'s Motion for Summary Judgment and Adoption of Defendant Trustees Motion for Summary Judgment.

[25] See Docket Entry 88, Memorandum of Points and Authorities in Support of Defendant Perry's Motion for Summary Judgment.

[26] See Docket Entry 95, Plaintiffs' Memorandum in Opposition to Defendant Harry C. Perry Jr.'s Motion for Summary Judgment.

[27] Defendant Trustees' Memorandum at p. 14.

[28] See, e.g., Springate v. Weighmasters Murphy, 217 F. Supp. 2d 1007, 1023-1024 (C.D. Cal. 2002) (granting Plaintiffs' motion for summary judgment as to claim that Defendants failed to diversify Plan assets); Pension Ben. Guar. Corp. v. Greene, 570 F. Supp. 1483, 1498-99 (W.D. Pa. 1983) (same).

Plan assets were placed entirely in conservative investment vehicles.  As the Defendants themselves acknowledge, in 1994, the entirety of Plan assets was invested in bonds and CDs,[29] including an astonishing 92.7% invested in CDs due to mature in 1995.[30]  For 2005, the Defendants state that "the Plan assets were diversified in five separate US Treasury Bills."[31] Diversifying among Treasury bills is plainly not diversification as this Court has interpreted that term.  See Meyer II, 250 F. Supp. 2d at 554 ("[P]lacing approximately 80% of the plans' funds in annuities violates the principle of diversification.")  In Meyer II, this Court defined such an investment strategy as "very conservative[]."  Id. at 552.  That decision was based upon the "the plans . . . not conform[ing] to the 'Modern Portfolio Theory' or reflect[ing] an effort to maintain a diversified portfolio."  Id. at 554.  The same holds true in this case.[32]  Under this standard, the Defendants' portfolio clearly was not diversified.  Indeed, Defendants acknowledge that they maintained "a conservative investment strategy."[33]  They also have recognized that they did *not* diversify.[34]  Thus, their contention that their investments were diversified must be rejected.

**C.    <u>The Defendants Cannot Establish That Not Diversifying Was Prudent</u>**

The Defendants argue their decision to not diversify was prudent based upon their claim that "[t]he Plan assets were deliberately invested pursuant to a conservative investment strategy."[35]  However, at most, the Defendants have only established that they had a strategy. They have put forth absolutely no evidence that such a strategy was *prudent*, as mandated by ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).  Once it is established that the Defendants maintained an undiversified investment strategy, they "bear the 'heavy burden' of showing that

---

[29] See Defendant Trustees' Memorandum at p. 14.
[30] See Attachment A, 1994 Annual Return Report of Employee Benefit Plan, at Financial Schedules attachment.
[31] See Defendant Trustees' Memorandum at p. 14.
[32] See Plaintiffs' Memorandum at pp. 31-33.
[33] Defendant Trustees' Memorandum at p. 14.
[34] See Attachment B, Molnar Dep., at pp. 148:5 - 149:4.
[35] See Defendant Trustees' Memorandum at pp. 14-16.

their decision not to diversify was clearly prudent." Reich v. King, 861 F. Supp. 379, 383 (D.

Md. 1994) (hereafter "King I").  Whether this "heavy burden" has been met "must be measured

by an objective standard--that of a prudent investor similarly situated." Reich v. King, 867 F.

Supp. 341, 343 (D. Md. 1994) (hereafter "King II") (internal citations omitted).

The Defendants' actions here cannot meet this standard as they have put forward

absolutely no evidence which suggests that they considered, in light of ERISA's mandate to

diversify, whether it was prudent to maintain their conservative strategy.  It is only natural that

the Defendants have not met this standard because, as established in Plaintiffs Memorandum,

Defendants did not know that ERISA required fiduciaries to invest in a diversified portfolio and

they did not seek legal advice as to whether their undiversified investment strategy complied

with ERISA.[36]  The Defendants have put forth to show that they weighed maintaining their

undiversified strategy against diversifying.  As established in Plaintiffs Motion, the Defendants

instead simply believed they were supposed to maintain their existing strategy.[37]  Furthermore,

the "expert opinion" upon which Defendants rely was written by Fred Taylor, who at his

deposition, taken months after his report was issued,[38] could only state that he "believe[d], in

general terms" that he was familiar with ERISA's duty to diversify but stated that, in preparation

of his report, he never actually looked at ERISA's requirements.[39]  In fact, Mr. Taylor, fully

acknowledged that his area of expertise was not in the "understanding of ERISA requirements."[40]

Furthermore, Mr. Taylor stated that, based upon his experience serving on the investment

committee of the pension fund of U.S. Trust, the "high side" for a percentage of investments that

---

[36] See Attachment B, Molnar Dep., at pp. 147:11-15, 149:5-15; Attachment C, Lertora Dep., at p. 159:7-17;
Attachment L, Deposition of Edgar Pepper ("Pepper Dep."), at pp. 133:21 - 134:3; Attachment M, Deposition of
Sam D. Scholar ("Scholar Dep."), at pp. 149:1-9, 195:11-16.
[37] See, e.g., Attachment L, Pepper Dep., at pp. 226:19 - 227:5, 239:9 - 240:19
[38] Attachment N, the Report of Fred Taylor ("Taylor Report").
[39] Attachment O, the Deposition of Fred Taylor ("Taylor Dep.") at pp. 130:15 - 131:18.
[40] Id. at p. 131:14-18.

would be invented in cash equivalents such as short-term CDs and Treasury bills such as what the Defendants invested here would be only 20-25% of total Plan assets.[41]  Here, the Defendants invested virtually all Plan assets in such conservative vehicles.[42]  In fact, Mr. Taylor testified that he was "not aware of any other plans" in which the fiduciaries placed virtually all Plan assets in such conservative investments.[43]  The fact that Defendants' own expert had never dealt with a plan in which more than a mere fraction of assets were invested in such conservative vehicles and that he was not even *aware* of another plan using such a strategy further establishes the lack of prudence in that investment "strategy."  Mr. Taylor also noted that while some individual accounts he dealt with did not have a written investment policy, when that occurred, it was "inadequate and insufficient."[44]  Furthermore, he stated that investment policies for institutional accounts "would have always been written down."[45]  Thus, this further establishes that Defendants' failure to maintain an investment strategy is evidence that their "choice" to not diversify was not prudent.

While it is undisputed that Defendant Perry examined various CDs to determine which to select, this simply does not constitute a prudent investment strategy.  This is merely choosing the method of maintaining an undiversified, conservative portfolio.  Defendants, who are subject to a "heavy burden," have put forth absolutely no evidence to establish that, at the time they made their investment decisions, the decision to not diversify – rather than the specifics of how one conservative investment was chosen over another – was prudent.  Thus, as they have failed to establish that it was prudent to not diversify Plan assets despite ERISA's mandate that they

---

[41] Id. at pp. 76:12 - 77:2.
[42] See supra at p. 11.
[43] Attachment O, Taylor Dep., at p. 133:20-24.
[44] Id. at p. 74:7-16.
[45] Id.

diversify – a mandate that they were completely unaware of – they have failed to meet this heavy burden.  Therefore, as a matter of law, Plaintiffs' Motion should be granted on this issue.

**D.**     **Defendant Trustees' Failure to Monitor Mr. Perry and Mr. Scholar Was Imprudent**

The Defendant Trustees attempt to defend their failure to prudently select and monitor Defendant Perry and Mr. Scholar based upon their argument that they "had no reason to believe that [either] had breached any fiduciary duties."[46]  However, their argument underlies their fiduciary breaches.  Assuming *arguendo* Defendants' contention that fiduciaries are not liable for their appointees' breaches absent some reason to suspect that a breach may occur, the Defendant Trustees had a plethora of reasons to closely monitor Defendant Perry and Mr. Scholar.  The primary fact which should have put the Defendant Trustees on notice was the fact that neither Defendant Perry, who administered the ERISA Plan, and Mr. Scholar, who was counsel to the ERISA Plan, had *any* familiarity with ERISA or its requirements.[47]  As established in Plaintiffs Memorandum and as completely unchallenged in Defendant's Opposition, the Defendant Trustees never examined either individual's qualifications to hold their positions, and certainly never checked to see if they had any investment expertise.[48]  Had the Defendant Trustees bothered to have done so, they plainly would have been placed on notice to closely monitor Defendant Perry and Mr. Scholar's conduct.

Furthermore, at least with regards to Defendant Perry, the Defendant Trustees were actually on notice of potential breaches.  In a letter from the Plan's accountants to the Plan's Board of Trustees, dated June 5, 1991, the accountants stated that they had "noted certain matters involving internal control structure and its operation that we consider to be reportable

---

[46] Defendant Trustees' Memorandum at pp. 17, 18.
[47] See Attachment E, Perry Dep., at pp. 19:12 - 21:6, 71:5 - 75:15; Attachment M, Scholar Dep., at pp. 176:1 - 178:15; 232:11-13
[48] See Plaintiffs' Memorandum at pp. 33-34.

conditions."[49]  The accountants warned that Defendant Perry's assistant, Lee Wagner "has the

authority to sign initial certificates of deposit and to redeem certificates of deposit. *This*

*authority should be revoked* so that the separation of duties between the recording of assets and

the safeguarding of assets can be properly maintained."[50]  While Defendant Perry's ignorance

with regard to ERISA was sufficient to place the Defendant Trustees on notice, this warning by

the Plan's independent accountants was a sufficient and independent basis from which it can only

be concluded that the Defendant Trustees were on notice of potential breaches.  Thus, the

Defendant Trustees' failure to monitor Defendant Perry and Mr. Scholar was clearly imprudent.

**E.     The Defendant Trustees' Failure to Ensure that Defendant Perry Maintained
        Fiduciary Insurance Was Clearly Imprudent**

Defendants contend that because nothing in the Complaint expressly alleges that the

Defendant Trustees breached their fiduciary duties by failing to ensure that Defendant Perry

maintained fiduciary insurance, such a claim is waived.[51]  However, as noted above, all that is

required is that the Defendants are put on notice that such a claim is made, not that the claim is

expressly stated.[52]  In the Complaint, Plaintiffs alleged that the "Defendant Trustees failed to

properly oversee the administration of the Plan, inasmuch as Defendant Trustees failed to

investigate the qualifications of Defendant[] Perry . . . to administer the Plan."[53]  One such

qualification was whether Defendant Perry maintained fiduciary insurance, thereby being in a

position to make the Plan whole if Defendant Perry breached his fiduciary duties to the Plan.

Thus, the Defendants were on notice of this claim.  Furthermore, the Defendants' claim that there

is no link between the Defendant Trustees' failure to ensure that Defendant Perry maintained

---

[49] See Attachment P, letter from Bailey & Bailey P.A. to Board of Trustees, Operative Plasterers Local Union No. 96 Welfare Plan, dated June 5, 1991, at p. 1.
[50] Id. (emphasis added).
[51] See Defendant Trustees' Memorandum at 19.
[52] See supra at pp. 2-3.
[53] Docket Entry 1, Complaint, at ¶ 44.

fiduciary insurance and Plan losses.  This is erroneous.  As noted in Plaintiffs' Memorandum, as

a fiduciary, Defendant Perry is jointly and severally liable for the losses caused by Defendants'

breaches.[54]  Thus, the Plan is substantially less likely to recover the full extent of damages

resulting from Defendants' breaches based upon Defendant Perry's failure to maintain insurance.

### III.  THE DEFENDANTS' PROHIBITED TRANSACTIONS CONSISTED OF DISTRIBUTING PLAN ASSETS TO CONTRIBUTING EMPLOYERS IN VIOLATION OF ERISA

**A.**      **The Defendants are Not Insulated From Liability for Their Prohibited Transactions Based Upon The Claim that the Plan Permitted Distributions to Contributing Employers as Defendants Were Required to Operate in Accordance with ERISA**

Defendants attempt to defend their prohibited transactions by arguing that the Plan

permitted the distribution of Plan assets to contributing employers.  Assuming *arguendo* that

Defendants are correct, this in no way insulates the Defendants from liability.  As established in

Plaintiffs' Memorandum, the Defendants' prohibited transactions were made in violation of the

following provisions of ERISA: the anti-inurement provision of § 403(c)(1), 29 U.S.C. §

1103(c)(1); the exclusive purpose provision of § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); the

prohibition against prohibited transactions with parties-in-interest of § 406(a)(1)(D), 29 U.S.C. §

1106(a)(1)(D); and the self-dealing prohibition of § 406(b)(1), 29 U.S.C. § 1106(b)(1).[55]  As

further established in Plaintiffs' Memorandum in Opposition to Defendant Trustees' Motions for

Partial Summary Judgment, when Plan documents conflict with ERISA, those Plan documents

yield and the requirements of ERISA control.[56]  Section 404(a)(1)(D) of ERISA expressly

stipulates that fiduciaries are only to operate the Plan in accordance with its governing

documents "insofar as such documents and instruments are consistent with [ERISA's]

---

[54] See Plaintiffs' Memorandum at pp. 46-47.
[55] See Plaintiffs' Memorandum at pp. 35-39.
[56] See Docket Entry 96, Plaintiffs' Memorandum in Opposition to Defendant Trustees' Motions for Partial Summary Judgment, at pp. 13-15.

provisions." 29 U.S.C. § 1104(a)(1)(D).  Thus, even if the terms of the Plan permitted

Defendants' actions, this would in no way insulate Defendants from liability for their breaches as

they were required to perform their fiduciary duties in accordance with ERISA despite any

conflict with Plan documents.  Therefore, Plaintiffs' Motion should be granted with respect to the

various breaches arising out of Defendants' prohibited transactions.

**B.      The Funds Distributed to Contributing Employers Were Plan Assets**

Defendants also make the ludicrous assertion that the funds which they caused to be

distributed to contributing employers were not Plan assets.[57]  This is based on an erroneous view

of the source of the funds at issue.  The funds which the employers contributed and which were

subsequently returned to the employers were *not* fringe benefits.  They were the actual wages of

the employees which the employees contracted, through the collective bargaining process, to

have a certain portion of placed into the Plan.  As Mr. Scholar wrote to Defendant Perry in 1991,

the Plan "is a multi-employer plan in which the union members have asked the employer to pay a

portion of their wages into a union pension and welfare fund instead of directly to the employee

as wages.  This is not a fringe benefit.  *It is the employee's money that in a sense is put into a

forced savings account.*"[58]  The path the Defendants attempt to take this Court down is no

different than arguing that if an employee ceased to work for an employer, that employer was

entitled to recover a portion of the wages which he had paid to his former employee.

It so happened that a certain number of employees for whom such contributions were

made did not become vested under the Plan.  However, that did not make the contributed funds

unvested.  The Defendants attempt to mislead the Court by equating unvested employees with

the idea that the portion of those employees' wages which the employers were contractually

---

[57] See Defendant Trustees' Memorandum at pp. 22-24.
[58] Attachment Q, Letter from Sam D. Scholar to Defendant Perry, dated February 20, 1991.

-17-

obligated to contribute into the Plan were also unvested.  The funds were immediately Plan

assets and, therefore, subject to the various provisions of ERISA which Defendants violated.

The Ninth Circuit case which Defendants cite to as imposing the test for determining

what is a Plan asset actually serves a much narrower purpose than that claimed by Defendants.[59]

That test is to be used for determining whether assets are Plan assets only for determining

whether the fiduciary has engaged in self-dealing.  The first element of the test is "whether the

item in question may be used to the benefit (financial or otherwise) of the fiduciary."  Kayes v.

Pacific Lumber Co., 51 F.3d 1449, 1467 (9th Cir. 1995).[60]  Not surprisingly Kayes was a case

involving allegations of self-dealing.  Such a consideration clearly is only applicable in

determining whether a fiduciary has engaged in self-dealing.  Such an examination has no

purpose in examining other types of prohibited transactions under ERISA, such as the anti-

inurement provision and the exclusive purpose provision.  If the Defendants' view was adhered

to, funds could be subsequently returned to those employers even after the employees for whom

the funds were contributed became vested so long as those funds were not being used to the

benefit of any fiduciary.  This destroys the entire framework imposed by ERISA in place of a

single analysis – self-dealing.  Plainly this is inapposite to the purpose and plain language

underlying ERISA.  Of course, as noted in Plaintiffs' Memorandum, the Defendants here did

engage in self-dealing, so their conduct qualifies under this Ninth Circuit standard regardless.[61]

Moreover, the Defendants cite to an Eleventh Circuit decision in which the Court held

that "ERISA simply does not prohibit a company from eliminating previously-offered benefits

that are neither vested nor accrued."  Phillips v. Amoco Oil Co., 799 F.2d 1464, 1471 (11th Cir.

---

[59] See Defendant Trustees' Memorandum at p. 23.
[60] Cited in Defendant Trustees' Memorandum at p. 23.
[61] See Plaintiffs' Memorandum at pp. 38-39.

1986).[62] <u>Phillips</u> has absolutely no bearing over this matter.  The Eleventh Circuit went out of its way to "emphasize that the only 'interests' at stake in this case are contingent and non-vested future retirement benefits."  <u>Id</u>.  The funds here were *not* contingent.  As noted above, the employers were contractually-obligated to submit the contributions upon the completion of work by covered employees.  Once contributed, the funds were vested.  Those funds were the assets of the Plan and either were or would have been, but for the Defendants' breaches, immediately payable to Plan participants and beneficiaries who were qualified to receive Plan assets.

It is no defense that the Defendants may have caused the Plan to treat such contributed funds as "forfeitures" or "liabilities," including by amending the Plan itself.  This serves as nothing more than evidence of the Defendants' breaches.  The fact that Defendants so classified the funds shows their blatant disregard for the requirements of ERISA.  This classification does not in any way insulate the Defendants from the fact that distributing these Plan assets based upon their classification as forfeitures and/or liabilities constitutes violations of the various provisions of ERISA noted in Plaintiffs' Memorandum.  Thus, as those funds distributed by the Plan were clearly Plan assets, the Plaintiffs' Motion should be granted with regard to Defendants' prohibited transactions.

### IV. PLAINTIFFS ARE ENTITLED TO RECOVER BASED UPON DEFENDANTS' FAILURES TO MEET WITH REQUISITE FREQUENCY AND TO MAINTAIN A COMPLETE BOARD OF TRUSTEES

### A.   <u>Defendants Were On Notice About Such Claims</u>

As established in Plaintiffs' Memorandum and as unchallenged in Defendant Trustees' Opposition, Defendants breached their duty to act in accordance with the Plan's governing documents by failing to meet with the frequency required by those documents and failing to

---

[62] <u>Cited</u> <u>in</u> Defendant Trustees' Memorandum at p. 23.

maintain a quorum of Trustees.[63]  Defendants allege that Plaintiffs raise this issue for the first

time in their Motion.[64]  However, all Plaintiffs must do is put the Defendants on notice as to the

existence of such claims.[65]  The Plaintiffs plainly met this standard as, in the Complaint, they

alleged that Defendants did not operate in compliance with the terms of the Plan.[66]

**B.**     **Plaintiffs Provide a Link Between These Failures and Plaintiffs' Damages**

          Defendants also allege that Plaintiffs show no causal link between the Defendants' failure

to act in accordance with the Plan and any loss to the Plan.[67]  However, in Plaintiffs'

Memorandum, the Plaintiffs provide just such a link for both the Defendants' failure to meet with

the frequency required by the Plan,[68] and their failure to operate with a quorum of Trustees.[69]

Thus, Plaintiffs have provided a causal link which the Defendants do not factually challenge.

## V. PLAINTIFFS' DAMAGES ARE BASED UPON UNDISPUTED MATERIAL FACTS

**A.**     **An Allocation Mix Based Upon 50% S&P 500 and 50% Lehman Aggregate is a
          Proper Measure for Determining Damages**

          In Meyer II, this Court held that the "proper measure of damages is the difference

between the actual value of the plans and the value prudent investment would bear."  250 F.

Supp. 2d at 572.[70]  Defendants dispute the assertion of Plaintiffs' expert Michael Cairns that:

          The Trustees of the Plasterers' Local Union No. 96 Pension Plan should have used
          prudent diversification of the Plan's assets to eliminate or reduce risk by investing
          in higher yielding asset classes, such as the broad market S&P 500 (stocks) and
          the Lehman Aggregate (bonds), both of which are appropriate asset classes for the

---

[63] See Plaintiffs' Memorandum at pp. 41-42.
[64] See Defendant Trustees' Memorandum at p. 25.
[65] See infra at pp. 2-3.
[66] See Docket Entry 1, Complaint, at pp. 6-7, 8, 11-12, 13.
[67] See Defendant Trustees' Memorandum at p. 25.
[68] See Plaintiffs' Memorandum at pp. 41-42 ("Had the Defendants met with greater regularity, it is possible that the forfeiture distributions could have been reconsidered or that an idea to diversify the Plan's investments could have been raised, and damage to the Plan could have been avoided.")
[69] See id. at p. 42 ("Had the Defendants not breached their duties in this way, they could have ensured additional voices on the Board of Trustees who could have questioned the forfeiture distributions and/or the Plan's investments in an imprudent undiversified portfolio, and therefore avoided further damage to the Plan and its participants.")
[70] Cited in Defendant Trustees' Memorandum at p. 25.

Plasterers' Plan, over the period beginning January 1, 1994 through December 31, 2005.[71]

However, the expert designated by the Defendants concurred with that assessment.[72]  The Defendants attempt to claim that their investment strategy was prudent and appropriate under the circumstances, given the factors they supposedly considered.[73]  However, given that Plaintiffs have established that Defendants' investment decisions were not prudent,[74] the fact that the Defendants have admitted they did not actually maintain an investment strategy,[75] including failing to maintain a statement of investment policy,[76] and the own regard in which the Defendants held their investment knowledge,[77] surely this concurrence between both parties' experts must carry greater weight than the opinions of the Defendants who not only are not experts but also have a personal interest in the matter.

## B.    Mr. Cairns is Clearly Qualified to Testify

Defendants claim that Mr. Cairns is not qualified to determine what the value of the Plan, if prudently invested, would be based upon his not being a "damages expert."[78]  However, Defendants provide no reason to doubt that, in his expertise as an investment consultant, Mr. Cairns is qualified to determine what the value of the Plan would it have been if the Defendants had prudently invested the Plan's assets.  Beyond a blanket statement that Mr. Cairns' assumptions were based upon an alleged omission of certain factors, with only one exception, the Defendants put forth absolutely no material facts to support their unsubstantiated allegations.

---

[71] Attachment R, the Expert Repot of Michael Cairns ("Cairns Report"), at ¶ 9.
[72] See Attachment O, Taylor Dep., at 114:15 - 115:12.
[73] See Defendant Trustees' Memorandum at pp. 25-26.
[74] See infra at pp. 13-15; Plaintiffs' Memorandum at pp. 29-30.
[75] See, e.g., Attachment L, Pepper Dep., at pp. 226:19 - 227:5, 239:9 - 240:19
[76] See id. at pp. 52:17 - 53:4; Attachment B, Molnar Dep., p. 26:3-20; Attachment E, Perry Dep., p. 58:13-20.
[77] See, e.g., Attachment E, Perry Dep., at pp. 58:13-20 (responding to the question of why he did not raise maintaining a statement of investment policy with the Defendant Trustees by stating "I'm not an investment counselor.")
[78] See Defendant Trustees Memorandum at p. 26.

The only point on which the Defendants do attempt to put forward alternate material facts is in regard to the total amount of payments to contributing employers in 1994.  Mr. Cairns assumed that the value of those payments was $120,768.[79]  The Defendants claim that the value of those payments was only $108,693.[80]  However, a review of copies of the actual checks distributed to contributing employers in 1994 establishes that Mr. Cairns' assumption was unquestionably accurate.  The total value of those checks is $120,602.80.[81]  A copy of a single check, made out to Blake Construction Co., Inc. for $165.38, is missing.  However, the 1099-MISC tax form prepared by Defendant Perry for this payment establishes its existence.[82]  When added to the total of the copies of the checks, the total payments to contributing employers was $120,768.18, thereby establishing that Mr. Cairns' factual assumption was absolutely correct.

**C.**      **Plaintiffs' Valuation of Damages Incurred By the Plan for Defendants' Failure to Diversify for the Three-Year Period From January 1, 2003 through December 31, 2005 is Correct**

Defendants argue that Plaintiffs' calculation of the damages incurred by the Defendants' failure to diversify for the three-year period beginning January 1, 2003 is inaccurate because the starting point of $1,674,827 is based upon a chart prepared by Defendant Perry's counsel which "incorporates numerous factors affecting the damages calculations that plaintiffs' own damages expert ignored."[83]  Defendant Trustees also erroneously contend that Mr. Cairns' exclusion of these factors resulted in an overstatement of damages.[84]  Thus, the fact that Plaintiffs base the damages sought in Plaintiffs Motion on a chart which takes those factors into account can only mean that those damages are based upon a calculation favorable to Defendants.

---

[79] See Attachment R, Cairns Rep., at ¶ 10.
[80] See Defendant Trustees' Memorandum at p. 26.
[81] See Attachment S, Copies of checks and 1099-MISC tax forms for 1994 distributions to contributing employers.
[82] See id.
[83] Defendant Trustees' Memorandum at p. 27.
[84] See supra at p. 21.

**D.    Mr. Cairns' Recommended Allocation Mix is Appropriate for the Period Prior to December 31, 2002**

Defendants contend that Plaintiffs have not established that using the 50% S&P 500 and 50% Lehman aggregate mix appropriate for determining the total loss to the Plan by Defendants' prohibited transactions, if the assets lost had been prudently invested, for the period prior to December 31, 2002.[85]  However, Mr. Cairns explicitly stated this mix was appropriate "for the Plasterers' Plan, over the period beginning January 1, 1994 through December 31, 2005."[86] Defendants' own expert agreed with this statement.[87]  In fact, Mr. Taylor agreed with the overwhelming substance of Mr. Cairns' report.[88]  Thus, it is undisputed that this mix is appropriate to determine the total loss to the Plan caused by Defendants' prohibited transactions.

## VI. PLAINTIFFS ARE ENTITLED TO ATTORNEYS' FEES

Defendants argue that the five factors to determine whether it is proper to award attorneys fees is proper caution against awarding such fees.[89]  Defendants are wrong.  As noted in Plaintiffs' Memorandum, the "near-dispositive" factor of Defendants' ability to pay plainly weighs in favor of granting attorneys' fees to the Plaintiffs.[90]  Defendants attempt to distinguish this analysis as only applying to cases where the plaintiffs are employees, based upon the Fourth Circuit in Rodriguez v. MEBA Pension Trust, 956 F.2d 468, 472 (4th Cir. 1992), quoting a Ninth Circuit decision.  However, other than that quote, there is no support for Defendants' position. Of critical importance, immediately after that quote, the Court cited to its own earlier decision to stand for the proposition "that denying fees to a beneficiary who prevails against a large plan would 'significantly undermine the ability of potential beneficiaries to protect their rights in

---

[85] See id.
[86] See Attachment R, Cairns Report, at ¶ 9.
[87] See Attachment O, Taylor Dep., at pp. 114:15 - 115:12.
[88] See generally id. at pp. 106:12 - 146:25.
[89] See Defendant Trustees' Memorandum at pp. 28-30.
[90] See Plaintiffs' Memorandum at p. 48.

federal court.'" Id. at 472 (quoting Reinking v. Phila. Am. Life Ins. Co., 910 F.2d 1210, 1218

(4th Cir. 1990)).  When read in context, it is clear that the Court did not intend the limitation

claimed by Defendants.  Even if Defendants were correct, this would only result in this factor not

being "near-dispositive."  It would still be a factor weighing heavily in favor of granting fees to

Plaintiffs.  Unless the Defendant Trustees are denying to this court that they are covered under an

insurance policy, their ability to pay is an undisputed fact.

Each of the other factors also weighs in favor of granting fees to Plaintiffs.  Defendants

are culpable because, in a more recent decision by this Court than that cited to by Defendants, it

was held that "[c]ulpability connotes wrongful conduct that is *not* intentional or deliberate."  Jani

v. Bell, No. WDQ-04-1606, 2005 U.S. Dist. LEXIS 44331, *2 (D. Md. Nov. 7, 2005).

"Culpability can be found where a plans decision is discernibly against the weight of the

evidence."  Id. (internal citations omitted).  Defendants' conduct clearly satisfies this standard.

Defendants claim deterrence is "closely related" to culpability.[91]  However, Defendants are

culpable under the standards of this Court.  Furthermore, "the negligent enforcement of or the

wilful violation of clear ERISA standards" are examples of the "type of behavior which ERISA's

fee-shifting provisions would logically seek to deter."  American Med. Sec., Inc. v. Larsen, 31 F.

Supp. 2d 502, 507 (D. Md. 1998).  This case satisfies both methods of meeting the fourth factor

by both benefiting all participants and beneficiaries as all participants and beneficiaries would

benefit by having the Plan reimbursed for Defendants' breaches *and* by raising significant ERISA

legal questions given that the Defendants themselves claim that Plaintiffs' claim of Defendants

independent breach of failing to remedy known breaches is "a novel theory."[92]  With regard to

the final factor – the relative merits of the parties' positions – Defendants' conduct makes clear

---

[91] Defendant Trustees' Memorandum at p. 30.
[92] Id. at p. 9.

that "Defendants' position has no merit at all."  Essex v. Randall, No. DKC 2003-3276, 2005

U.S. Dist. LEXIS 3942, *27 (D. Md. Mar. 15, 2005).  Thus, this Court should grant Plaintiffs

their attorneys fees and costs.

### VII. CONCLUSION

For all of the reasons set forth in this Memorandum, Defendants' arguments are erroneous

as a matter of law.  Thus, for all of the reasons noted in Plaintiffs' Memorandum and herein,

Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Partial Summary

Judgment because Defendants breached their fiduciary duties in the following ways: by failing to

diversify the Plan's assets, thereby causing damage to the Plan and plan participants in the

amount of $432,960.62, plus interest, as damages for the three-year period ending December 31,

2005; by improperly distributing Plan assets to contributing employers of the Plan, thereby

causing damages to the Plan and plan participants in the amount of $335,224; and by failing to

act prudently and in accordance with the governing plan documents.  Plaintiffs respectfully

request that this Court further award Plaintiffs their attorneys' fees and costs incurred in bringing

this action to correct Defendants' egregious violations of ERISA.

Respectfully submitted,

Dated: March 31, 2008                   _____/s/_____
                                        Jonathan G. Rose (MD Bar No. 15138)
                                        Sheppard Mullin Richter & Hampton LLP
                                        1300 I Street, NW, 11th Floor East
                                        Washington, DC 20005
                                        Telephone: (202) 772-5390
                                        jrose@sheppardmullin.com
                                        *Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of March, 2008, I caused a copy of the foregoing

Plaintiffs' Reply to Defendant Trustees' Opposition to Plaintiffs' Motion for Partial Summary

Judgment to be filed with the Court, via the Court's ECF system, which will send copies to the

following counsel of record:

John C. Hayes, Esq.
Nixon Peabody LLP
401 Ninth Street, N.W., Suite 900
Washington, D.C. 20004-2128

Peter R. Kolker, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, D.C. 20036-5802



_____/s/_____
Jonathan G. Rose