# ATTACHMENT I

## Independent Auditors' Report

June 2, 1995

Trustees, Operative Plasterers
Local Union No. 96 Pension Plan
1411 K Street, N. W.
Washington, DC  20005

We have audited the accompanying Statements of Net Assets Available for Benefits of the Operative Plasterers Local Union No. 96 Pension Plan as of December 31, 1994 and 1993, and the related Statements of Changes In Net Assets Available For Benefits for the years then ended. These financial statements are the responsibility of the trustees. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly the net assets available for benefits of the Plan as of December 31, 1994 and 1993, and changes in net assets available for benefits for the years then ended in conformity with generally accepted accounting principles.

Our audit was made for the purpose of forming an opinion on the basic financial statements taken as a whole. The schedules of administrative expenses and contractors' contributions are presented for the purposes of additional analysis and are not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Bailey & Bailey,* P. A.

Bailey & Bailey, P. A.
Certified Public Accountants

## Bailey & Bailey PA

CERTIFIED PUBLIC ACCOUNTANTS
COLLEGE PARK, MARYLAND 20740

PerrySecond – 09845

2

OPERATIVE PLASTERERS LOCAL UNION NO. 96 PENSION PLAN

STATEMENTS OF NET ASSETS AVAILABLE FOR BENEFITS

|  | Dec 31, 1994 | Dec 31, 1993 |
|---|---|---|
| **ASSETS:** | | |
| Investments at Fair Value (Note 4) | 72,125 | 101,800 |
| **Receivables:** | | |
| Contractors | 5,107 | 1,609 |
| Interest | 1,413 | 2,190 |
| Federal Income Tax Withheld | 0 | 117 |
| Total Receivables | 6,520 | 3,916 |
| Cash in Bank (Note 3) | 1,106,477 | 1,159,167 |
| Fixed Assets | 836 | 836 |
| Total Assets | 1,185,958 | 1,265,719 |
| **LIABILITIES:** | | |
| Accounts Payable | 45 | 58 |
| Due to Other Funds | 0 | 3,136 |
| Forfeitures Payable | 521 | 109,214 |
| Due to Contractors | 0 | 11,786 |
| Contractors' Security Deposits | 500 | 500 |
| Uncashed Benefit Checks Payable | 1,413 | 1,413 |
| Total Liabilities | 2,479 | 126,107 |
| NET ASSETS AVAILABLE FOR BENEFITS | 1,183,479 | 1,139,612 |

(See Auditors' Report and Notes to Financial Statements)

**Bailey & Bailey** P.A.

CERTIFIED PUBLIC ACCOUNTANTS
COLLEGE PARK, MARYLAND 20740

PerrySecond -- 09846

3

## OPERATIVE PLASTERERS LOCAL UNION NO. 96 PENSION PLAN

### STATEMENTS OF CHANGES IN NET ASSETS AVAILABLE FOR BENEFITS

|  | For the Year Ended | |
|  | Dec 31, 1994 | Dec 31, 1993 |
|---|---|---|
| **ADDITIONS TO NET ASSETS:** | | |
| Investment Income: | | |
| Interest Income | 46,311 | 43,240 |
| Net Increase (Decrease) in Fair Value of Investments | (9,675) | 5,075 |
| Total Investment Income | 36,636 | 48,315 |
| Contractor Contributions | 56,226 | 26,371 |
| Gain (Loss) on Sale of Investments | 0 | 616 |
| Total Additions | 92,862 | 75,302 |
| **DEDUCTIONS FROM NET ASSETS:** | | |
| Benefits Paid to or for Members | 35,360 | 96,040 |
| Forfeitures to be Refunded | 0 | 28,260 |
| Administrative Expenses | 13,635 | 13,362 |
| Total Deductions | 48,995 | 137,662 |
| Net Increase (Decrease) | 43,867 | (62,360) |
| NET ASSETS AVAILABLE FOR BENEFITS-- Beginning of Year | 1,139,612 | 1,201,972 |
| NET ASSETS AVAILABLE FOR BENEFITS-- End of Year | 1,183,479 | 1,139,612 |

(See Auditors' Report and Notes to Financial Statements)



**Bailey & Bailey** P.A.

CERTIFIED PUBLIC ACCOUNTANTS
COLLEGE PARK, MARYLAND 20740

PerrySecond -- 09847

4

OPERATIVE PLASTERERS LOCAL UNION NO. 96 PENSION PLAN

NOTES TO FINANCIAL STATEMENTS

December 31, 1994 and 1993

NOTE 1 - Description of Plan:

The following description of the Operative Plasterers Local Union No. 96 Pension Plan (Plan) provides only general information. Participants should refer to the Plan agreement for a more complete description of the Plan's provisions.

A.  General. The Plan is a defined contribution plan covering members of the Operative Plasterers Local Union No. 96 and is exempt from Federal income tax under the provisions of Section 501(a) of the Internal Revenue Code. The effective date of this plan was January 1, 1987. Prior to that date the members were covered by a defined benefit pension plan. The accrued benefits of all participants of the defined benefit pension plan were 100% vested as of December 31, 1986. These accrued benefits were transferred to individual accounts for the participants under this plan as of December 31, 1986. The Plan has purchased immediate annuities from an insurance company for retired participants who were previously receiving monthly payments from the Plan. In addition, the Plan has purchased deferred annuities from an insurance company for the non-retired participants who were fully vested as of December 31, 1986. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

B.  Contributions. Employers subject to the collective bargaining agreement make monthly contributions to the Plan for a specified amount for each hour worked ($.75 per hour effective September 15, 1977; increased to $2.75 per hour effective May 1, 1994) to provide retirement benefits for union members.

C.  Participant Accounts. Each participant's account is credited with the monthly contribution made by his employer and an allocation of Plan earnings. Allocations are based on the participant's account balance. The benefit to which a participant is entitled is the benefit that can be provided from the participant's account.

D.  Payment of Benefits. The normal form of benefit for a participant who has a spouse shall be an Actuarial Equivalent joint and survivor annuity, with monthly installments payable after the death of the participant to the spouse, if then living, for the life of such spouse in an amount equal to fifty percent (50%) of the benefit paid to the retired employee. In the case of retirement where the participant has no spouse, the normal form of benefit shall be a single life annuity with equal monthly installments payable to the participant during his lifetime with 36 payments guaranteed. In lieu of the normal form of benefit as described above, the participant may elect one of the following Actuarial Equivalent optional forms of benefit: (1) single life annuity payable in equal monthly installments to the retired participant for his life, with 120 monthly payments guaranteed; or (2) a single sum payment in lieu of any other benefits under the Plan in complete discharge of all obligations to the participant under the Plan.

Bailey & Bailey P.A.

CERTIFIED PUBLIC ACCOUNTANTS
COLLEGE PARK, MARYLAND 20740

PerrySecond — 09848

OPERATIVE PLASTERERS LOCAL UNION NO. 96 PENSION PLAN

NOTES TO FINANCIAL STATEMENTS

December 31, 1994 and 1993

NOTE 1 - Description of Plan:

    E.  **Vesting.** Participants are vested in their accounts based on years of continuous service. A participant is 100 percent vested after six years of credited service. In addition, each participant shall be credited with one year of service for each year prior to January 1, 1987 in which he had one year of service to the employer. As of January 1, 1992, the Plan provides for immediate 100% vesting for any employee, with a prior 1,000 hours in one twelve month period after January 1, 1987, who works one hour in covered employment with a contractor making contributions for him. Members who were partially vested prior to 1992, even though they might have 5.75 years of vested service, are still only 80% vested if they do not work in covered employment after 1992.

    F.  **Plan Termination.** Upon termination or partial termination of the plan, the accounts of all affected participants shall be fully vested.

NOTE 2 - Summary of Significant Accounting Policies:

    **Method of Accounting:**
      The financial statements have been prepared using the accrual basis of accounting.

    **Employer Contributions:**
      Contributions due at the end of a year and paid in subsequent months are recorded as contributions receivable.

    **Investments:**
      Investments are carried at fair value which generally represents quoted market price as of the last business day of the period. Fair value of temporary investments is equal to cost.

    **Forfeiture Refunds Payable:**
      During the plan years 1988 to 1992 forfeitures have accumulated in the plan. In accordance with section 4.7 of the plan these forfeitures are to reduce future employer contributions. During the year ended December 31, 1993, one employer offset contributions leaving a liability of $109,214. During the year ended December 31, 1994, checks were drawn to fourteen employers leaving a liability of $521.

NOTE 3 - Cash in Bank:

    Cash in Bank consisted of the following:

| | Dec 31, 1994 | Dec 31, 1993 |
|---|---|---|
| Checking Account | 101,592 | 93,043 |
| Money Market Account | 90,650 | 98,682 |
| Certificates of Deposit | 914,235 | 967,442 |
| Total | 1,106,477 | 1,159,167 |

**Bailey & Bailey** P.A.

CERTIFIED PUBLIC ACCOUNTANTS
COLLEGE PARK, MARYLAND 20740

PerrySecond — 09849

6

OPERATIVE PLASTERERS LOCAL UNION NO. 96 PENSION PLAN

NOTES TO FINANCIAL STATEMENTS

December 31, 1994 and 1993

NOTE 4 - Investments:

The following summary presents amortized cost and fair value for each of the investment categories at December 31, 1994 and 1993. Investments that represent 5% or more of the Fund's total assets are separately identified.

Investments at December 31, 1994

|  | Cost | Fair Value |
|---|---|---|
| Investments at fair market value as determined by quoted market price: | | |
| Corporate bonds | 79,750 | 72,125 |
| Total | 79,750 | 72,125 |

Investments at December 31, 1993

|  | Cost | Fair Value |
|---|---|---|
| Investments at fair market value as determined by quoted market price: | | |
| Corporate bonds | 99,750 | 101,800 |
| Total | 99,750 | 101,800 |

During the year ended December 31, 1994, the Plan's investments in corporate bonds depreciated in value by $9,675. During the year ended December 31, 1993, the Plan's investments in corporate bonds appreciated in value by $5,075.

NOTE 5 - Tax Status:

The Internal Revenue Service has advised that the Fund qualifies under Section 501(c)(9) of the Internal Revenue Code and is, therefore, not subject to tax under present income tax laws. The Pension Fund files IRS form 5500 each year.

NOTE 6 - Withdrawal of Contractor:

During the year ended December 31, 1993, the C. J. Coakley Co., Inc. stopped making payments to the Pension Plan.

Bailey & Bailey P.A.

CERTIFIED PUBLIC ACCOUNTANTS
COLLEGE PARK, MARYLAND 20740

7

OPERATIVE PLASTERERS LOCAL UNION NO. 96 PENSION PLAN

SCHEDULE OF ADMINISTRATIVE EXPENSES

SCHEDULE 1

| | For the Year Ended | |
| --- | --- | --- |
| | Dec 31, 1994 | Dec 31, 1993 |
| Administrative Fee | 7,800 | 7,800 |
| Auditing | 1,750 | 1,600 |
| Insurance Expense | 824 | 1,081 |
| Legal Fees | 1,750 | 1,500 |
| Office Supplies & Expense | 1,511 | 1,381 |
| Total Administrative Expenses | 13,635 | 13,362 |

**Bailey & Bailey** P.A.

CERTIFIED PUBLIC ACCOUNTANTS
COLLEGE PARK, MARYLAND 20740

PerrySecond -- 09851

8

OPERATIVE PLASTERERS LOCAL UNION NO. 96 PENSION PLAN

SCHEDULES OF CONTRACTORS' CONTRIBUTIONS — CASH BASIS

SCHEDULE 2

| | For the Year Ended | |
| --- | --- | --- |
| | Dec 31, 1994 | Dec 31, 1993 |
| A & P Contractors, Inc. | 3,740 | 1,366 |
| C. J. Coakley Co. | 0 | 25,102 |
| John H. Hampshire, Inc. | 27,886 | 12,051 |
| The Keystone Plus Construction | 0 | 282 |
| James S. Lertora, Inc. | 6,553 | 2,548 |
| Operative Plasterers L. U. No. 96 | 3,630 | 1,530 |
| Robert L. Ottey | 0 | 168 |
| Plasterers & Cement Masons Job Corps HBI | 8,028 | 2,856 |
| Prisma Construction & Management Corp. | 0 | 2,019 |
| Robert Sipes | 3,180 | 390 |
| Total Contractors' Contributions | 53,017 | 48,312 |

**Bailey & Bailey** P.A.

CERTIFIED PUBLIC ACCOUNTANTS
COLLEGE PARK, MARYLAND 20740

PerrySecond — 09852

# ATTACHMENT J

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Southern Division)

|  |  |
|---|---|
| PLASTERERS' LOCAL UNION NO. 96<br>PENSION PLAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HAROLD PERRY, et al.,<br><br>Defendants. | C.A. No. PJM 06 CV 158 |

## EXPERT REPORT OF HENRY ROSE

1.     I am an attorney in independent practice specializing in employee benefits law.  From March 1985 through December 1992, I was a partner and chair of the Employee Benefits Department of the law firm of Epstein Becker & Green. From January 1, 1993 to January 31, 1995, I was Of Counsel to that law firm.  Since February 1, 1995, I have been engaged in the independent practice of law.  My practice includes, inter alia, counseling clients and attorneys regarding compliance with the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), particularly on fiduciary issues.  My practice is limited to the specialty of employee benefits law.

2.     I held the position of General Counsel of the Pension Benefit Guaranty Corporation ("PBGC") from its inception on September 2, 1974 through January 4, 1985.  In this position, I was responsible for providing advice to PBGC

January 4, 1985.  In this position, I was responsible for providing advice to PBGC

officials, including in connection with PBGC's fiduciary responsibilities arising from its

trusteeship of hundreds of defined benefit pension plans.  In addition, I managed all legal

matters, including PBGC litigation on fiduciary issues in coordination with the

Department of Labor.  The PBGC is a wholly owned corporation of the United States and

its board of directors consists of the Secretary of Labor as Chairman, the Secretary of the

Treasury and the Secretary of Commerce.   I served as secretary to the Board of directors.

      3.     I held the position of Associate Solicitor for Legislation and Legal

Counsel at the U.S. Department of Labor from 1970 through 1974.  My responsibilities in

this position included being the Labor Department's lead draftsman of Titles I and IV of

ERISA.  Title I includes the statute of limitations provision relating to actions for breach

of fiduciary obligations.  I was also the Department's technical liaison to the relevant

committees of the Congress (House Labor and Education Committee, House Ways and

Means Committee, Senate Labor Committee and Senate Finance Committee) in

connection with the genesis of ERISA.  I had frequent contact with Congressional

committee staff and occasional contact with members of those committees.  I also had

responsibility to oversee testimony of the Secretary of Labor and other officials of the

Department of Labor and attended the Congressional committee hearings at which the

testimony was presented.

4.     A copy of my curriculum vitae is attached to this report and is incorporated herein as attachment A.

5.     I was Chairman of the American Bar Association's Joint Committee on Employee Benefits, 1995-1996.   I am regularly involved in the exchange of information among employee benefits specialists (in private practice and in the Government).  Among the occasions for such exchanges of information are meetings of the following groups of which I am a member:

Employee Benefits Committee,  Section of Tort and Insurance Practice, American Bar Association; Chairman, 1993-1994

Employee Benefits Committee, Section of Labor and Employment Law, American Bar Association;

Employee Benefits Committee, Section of Taxation, American Bar Association;

Employee Benefits Committee, Section of Real Property, Probate and Trust Law, American Bar Association;

Chapter Editor, Employee Benefits Law, ABA Section of Labor and Employment Law (BNA);

ERISA Roundtable, a group of preeminent specialists that meets monthly

6.     I have been retained as an expert witness/consultant in the following matters:

*In re Arbitration between AmEx, Inc. and Homestead Mining Company*, AAA No. 58 199 0001 87.

*In re Arbitration between Chicago Truck Drivers Pension Fund and Louis Zahn Drug Co.*

*In re Masters, Mates and Pilots Pension Plan and IRAP Litigation*, 85 Civ. 9545 (VLB) U.S. Dist. Ct., S.D.N.Y.

*Asher Edelman v. Times Newspapers, Ltd.*, 1989 E No. 760, In the High Court of
        Justice, Queen's Bench Division (Great Britain)

*In re Budd Company Pension Plan Litigation*, No. 91-4082, U.S. Dist. Ct.,  E.D.Pa.

*Reich v. Pacific Lumber Company*, No. C-91-1812 and Related Case C-89-3500, U.S. Dist. Ct., N.D. Cal.

*Maher, et al. v. Strachan Shipping Company, et al.*, No. 92-2834, U.S. Dist. Ct., E.D. La.

*Bussian v. RJR Nabisco, Inc.*, No. H-91-1533, U.S. Dist. Ct., S.D. Texas.

*Calobrace v. American National Can Co.*, No. 93-C-0999, U.S. Dist. Ct., N.D. Ill.

*Reich v. Smith International, Inc.*, No. CV 92-1196, U.S. Dist. Ct., C.D. Cal.

*Maureen Rose v. Cooney, et al. and Xerox Corporation*, No. 5-92-CV-208, U.S. Dist. Ct., D. Conn.

*Hashimoto v. Bank of Hawaii, et al.*, No. 91-00090, U.S. Dist. Ct., D. Hawaii.

*Sheet Metal Workers' International Association v. Carlough, et al.*, No. 93-1593-A, U.S. Dist. Ct., E.D. Va.

*Central Maine Power Company, et al. v. State Street Bank and Trust Company*, No. 94-00150-B, U.S. Dist. Ct. of Maine.

*Averill v. Carullo*, No. 94-753-A, U.S. Dist. Ct., E.D. Va.

*Le Blanc v. Williams*, No. C95-1557-A, U.S. Dist. Ct., E.D. Va.

*In re Arbitration between Safeway, Inc. and Central States Southeast and Southwest Areas Pension Plan*, AAA No. 5-621-297-95

   7. I argued and won two U.S. Supreme Court cases involving complex employee benefit isues: *Nachnan Corporation v. PBGC*, 446 U.S. 359 (1980) and *Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581 (1993).

   8. I served as a Special Master regarding ERISA fiduciary issues in *Rehab Computer, Inc. Restated Employee Money Purchase Trust, et al. v. Kenneth D. White, et al.*, Civil Action No. 84-921-A, U.S. District Court for the Eastern District of Virginia (Report of Special Master is dated April 24, 1985).

   9. I have been retained as an expert witness and consultant on behalf of the Plaintiff in the present action.  My hourly rate in this matter is $350.

   10. I have reviewed the documents listed in attachment B and have been asked to discuss the matters below.

   11. I have been informed of the following:  In early 1994, the trustees and plan administrator of the Plaintiff Plan caused substantial portions of Plan assets to

be improperly transferred to contributing employers of the Plan.  Further, from the inception of the Plan to 2006, the Plan's trustees and plan administrator caused the Plan's assets to be deposited solely in money market accounts or certificates of deposit.

12.    The information above was revealed in late fall 2005 and in 2006 when the Plan retained new counsel, a new auditor, a new plan administrator, and a new investment advisor.

13.    The transfer of Plan assets to employer-contributors violates a number of provisions of ERISA, including Section 403(c) which provides that "the assets of a plan shall never inure to the benefit of any employer"; Section 404(a)(1)(A) which requires that plan fiduciaries use plan assets "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and Section 406(a)(1)(D) which prohibits the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

There is an affirmative obligation on a fiduciary to correct a fiduciary breach and the failure to do so constitutes a separate fiduciary breach itself.  ERISA has a special concern for breaches of fiduciary responsibility by reason of omission.  Among the provisions reflecting this concern is Section 405(a)(3) of ERISA.  That section specifies that a fiduciary "shall be liable for a breach of fiduciary responsibility. . .if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Such reasonable efforts may include

timely filing an action for fiduciary breach and/or reporting the breach to the Department of Labor.  No such efforts were made by defendants in the present case.

14.   The  placement of the Plan's assets solely in money market accounts and certificates of deposit for over a decade is inconsistent  with Section 404(a)(1)(B) which requires plan fiduciaries to exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." It is also inconsistent with Section 404(a)(1)(C)  which requires "diversifying the investments of the plan so as to minimize the risk of large losses" and there were large losses of income by the imprudent placement of plan assets solely in money market accounts and certificates of deposit for more than a decade by the Plan's trustees and plan administrator.  "Comparing the return on the improper investment with that of a reasonably prudent alternative" is an appropriate means of asserting damages. *Leigh v. Engle,* 858 F.2d 361, 367 (7th Cir. 1988).

The duty to adequately examine the merits of an investment is a fundamental duty of a fiduciary at common law and under ERISA.  The Third Circuit Court of Appeals in *Meinhardt v. Unisys Corporation*, 74 F. 3d 420 (3rd Cir. 1996) characterized "the duty to conduct an independent investigation into the merits of a particular investment" as "the most basic of ERISA's investment fiduciary duties." *Id* at 435.  Section 409(a) of ERISA provides that "any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries...shall be personally

liable to make good to such plan any losses to the plan resulting from each such breach..."

     15.    This action is timely. Plan participants and some trustees did not learn of the serious violations of ERISA until late 2005 or in 2006 when new counsel and other new service providers were retained. I am informed that the prior service providers and certain of the trustees concealed or failed to disclose the information relating to the ERISA violations. Apart from the ERISA violations that occurred in 1994, there is a separate ERISA violation by certain trustees and the former plan administrator for failure to take appropriate action to redress the wrongdoing by former fiduciaries and by former service providers to the Plan. Section 413(1)(B) provides that "in the case of an omission" the six year statute of limitations begins to run from "the last date on which the fiduciary could have cured the breach or violation." In such a situation, "the statute of limitations for such a claim starts to run in the last year in which the plan should have taken the action it failed to take." Employee Benefits Law, Second Edition, 2006 Cumulative Supplement, at p. 565. Here, the last year in which the plan should have taken action was 2000 and therefore statute of limitations on the independent fiduciary breach of failure to take action starts to run at that time, and the present action was filed within six years of that independent fiduciary breach.

     Furthermore, "ERISA Section 413 provides that, in the case of 'fraud or concealmemt,' an action may be commenced not later than six years after the date of discovery of the breach or violation." Here, the present action was filed not only within

six years of the date of discovery, but it was filed within three years of the Plaintiffs'
knowledge of the breach.

It would be astonishing and contrary to the policy underlying ERISA if
wrongdoing fiduciaries could diminish or partially bar their liability for their wrongdoing
by remaining in their positions and failing to reveal their wrongdoing until a later time.
In light of my participation in the genesis of ERISA, it would be inconsistent with
Congressional intent to diminish the liability of the wrongdoers in such circumstances.
*See Martin v. Consultants & Administrators, Inc.* 966 F.2d 1078 (7th Cir. 1992) at fn. 12.

Respectfully submitted,

Henry Rose

Dated: June 25, 2007

9

# ATTACHMENT A

# HENRY ROSE

*1627 I Street, N.W.  Suite 900  Washington, D.C. 20006*     **Telephone:  (202) 887-0467**
                                                             **Fax:   (202) 887-6999**

## PROFESSIONAL EXPERIENCE

**Conner & Winters**                           *May 1999 - Sept. 2000*
*Of Counsel*                                   *July 2004 – Present*
                                               *Washington, D.C.*

**Ice Miller**                                 *Oct. 2000 - July 2004*
*Of Counsel*                                   *Washington, D.C*

**Independent Practice of Law**                *Feb. 1995 - April 1999*
                                               *Washington, D.C.*

**Epstein Becker & Green, P.C.**               *Jan. 1993 - Jan. 1995*
*Of Counsel*                                   *Washington, D.C.*

**Epstein Becker & Green, P.C.**               *Mar. 1985 - Dec. 1992*
*Partner and Chairman of Employee Benefits Department*   *Washington, D.C.*

**Pension Benefit Guaranty Corporation (PBGC)**    *Sept. 1974 - Dec. 1984*
*General Counsel*                              *Washington, D.C.*

- Provided legal advice to the Board of Directors, Presidentially-appointed Advisory Committee, PBGC departments and the private sector (employers, union officials, attorneys and others).
- Managed legal department.
- Supervised litigation and participated in U.S. District Courts, Bankruptcy Courts, U.S. Courts of Appeals and U.S. Supreme Court. Negotiated settlements of cases.

**U.S. Department of Labor**                   *1970 - 1974*
*Associate Solicitor for Legislation and Legal Counsel*    Washington, D.C.

- Worked extensively on developing Titles I and IV of ERISA as the lead draftsman and liaison for the Department of Labor in the development of those portions of ERISA.
- Drafted, reviewed and commented on proposed federal legislation.
- Wrote, reviewed and edited testimony of the Secretary of Labor and other Department officials.
- Maintained liaison with Office of Management and Budget, other executive agencies, Congressional staffs and interest groups.

Other positions held at U.S. Department of Labor            *1962 - 1970*

*Deputy Associate Solicitor for Legislation and Legal Counsel*
*Deputy Associate Solicitor for Labor-Management Laws*
*Counsel for Civil Rights*
*Counsel for Pension and Welfare Plans*
*Special Assistant to the Solicitor*

# HENRY ROSE

*1627 I Street, N.W.  Suite 900  Washington, D.C. 20006*          *Telephone:  (202) 887-0467*
                                                                  *Fax:  (202) 887-6999*

## CAREER HIGHLIGHTS

- Drafted Titles I and IV of the Administration's proposed Employee Retirement Income Security Act (ERISA) while Associate Solicitor of the Department of Labor.

- Participated in the shaping of an important new federal termination insurance program and in the shaping of a new federal agency as General Counsel of the PBGC (1974-1984).

- Argued and won two U.S. Supreme Court cases involving complex employee benefit issues:

    *Nachman Corporation v. PBGC,*  446 U.S. 359 (1980)

    *Local 144 Nursing Home Pension Fund v. Demisay,* 508 U.S. 581 (1993)

## RETAINED AS CONSULTANT AND/OR EXPERT WITNESS
## BY OTHER LAW FIRMS, INCLUDING:

| | |
|---|---|
| Kirkland & Ellis | Chicago, IL |
| Holleb & Coff | Chicago, IL |
| Bryan Cave | St. Louis, MO |
| Arent, Fox, Kintner, Plotkin & Kahn | Washington, DC |
| Rose Law Firm | Little Rock, AR |
| Wolf, Block, Schorr  & Solis-Cohen | Philadelphia, PA |
| Morrison & Foerster | San Francisco, CA |
| McCalla, Thompson, Pyburn, Hymowitz | |
| & Shapiro | New Orleans, LA |
| Jones, Day, Reavis & Pogue | Washington, DC |
| Jenner & Block | Chicago, IL |
| Paul, Hastings, Janofsky & Walker | Los Angeles, CA |
| Highsaw, Mahoney & Clarke, P.C. | Washington, DC |
| Nixon, Hargrave, Devans & Doyle | Rochester, NY |
| Goodsill, Anderson, Quinn & Stifel | Honolulu, HI |
| Goodwin, Procter & Hoar | Boston, MA |
| Latham & Watkins | New York, NY & |
| | Chicago, IL |
| Pepper, Hamilton & Scheetz | Philadelphia, PA |
| O'Melveny & Myers | Los Angeles, CA |
| Kansas Public Employees Retirement System Litigation Group | |
| Morgan, Lewis & Bockius | New York, NY |

# HENRY ROSE

*1627 I Street, N.W.  Suite 900  Washington, D.C. 20006*

*Telephone:   (202) 887-0467*
*Fax:   (202) 887-6999*

## BAR ADMISSIONS & OTHER RELEVANT EXPERIENCE

Admitted to Practice Law:
  New York
  District of Columbia
  U.S. Supreme Court
  U.S. Courts of Appeals for the District of Columbia, 2nd, 3rd, 4th, 5th, 6th, 9th and 10th Circuits
  U.S. District Courts for the Western District of New York, Southern District of New York,
    Western District of Tennessee and Central District of Illinois.

Special Master regarding ERISA fiduciary issues, U.S. District Court for the Eastern District of
Virginia, *Rehab Computer, Inc. Restated Employee Money Purchase Trust v. Kenneth D. White,* Civil
Action No. 84-921-A (Report dated April 24, 1985)

Private practice, Buffalo, New York                                          *1953 - 1956*

National Labor Relations Board                                       *July 1952 - Nov. 1953*

Assistant Special Counsel, (part time)
Emergency Crime Committee, Chicago City Council               *Feb. - June 1952*

## PROFESSOR/LECTURER

Guest Lecturer,
Law Schools of Harvard University, American University, Catholic University, Georgetown
University, George Washington University.

Lecturer, part time,                                                         *1968*
University of Virginia Law School

Associate Professor,                                                    *1958 - 1962*
Rutgers University Law School

Associate Professor,                                                    *1957 - 1958*
University of Toledo College of Law

Lecturer, part time,                                                    *1954 - 1956*
University of Buffalo School of Law

Teaching Associate,                                                     *1951 - 1952*
Northwestern University School of Law

# *HENRY ROSE*

*1627 I Street, N.W.  Suite 900  Washington, D.C. 20006*     *Telephone:*  *(202) 887-0467*
                                                                      *Fax:*  *(202) 887-6999*

## EDUCATION

| | |
|---|---|
| Yale University Law School, Sterling Fellow | *1956 - 1957* |
| University of Buffalo Law School, J.D. (cum laude) | *1951* |
| University of Buffalo<br>College of Arts and Science, B.A. (cum laude) | *1950* |

## HONORS

| | |
|---|---|
| Recipient of The Jacob Javits Award for Outstanding Contribution to Retirement Security | *April 2006* |
| Charter Member, American College of Employee Benefits Counsel, American Bar Association | 2000 |
| Distinguished Career Service Award, PBGC | *1978* |
| Secretary of Labor's Career Service Award, Department of Labor | *1971* |
| Academic Visitor, London School of Economics | *1971-1972* |
| Award for Distinguished Achievement, Department of Labor | *1968* |
| Ford Foundation Research Grant | *June - Dec. 1959* |

## PUBLICATIONS & PUBLIC SPEAKING

Chapter Editor, Employee Benefits Law, ABA Section of Labor and Employment Law  (BNA 2000).

Lecture and participate in panel discussions at meetings and seminars of numerous organizations, including: American Bar Association; American Law Institute-American Bar Association; Practicing Law Institute; International Foundation of Employee Benefit Plans; International Meetings of Insolvency Insurers, Helsinki, Finland and Stockholm, Sweden.

"Fiduciary Liability Where You Least Expect It: Liability of Non-Fiduciaries," 16th Annual Joint Mid-Winter Meeting, Life, Health, Public Regulation of Insurance and Employee Benefits Committees, ABA Tort & Insurance Practice Section, January 11, 1990.

# *HENRY ROSE*

*1627 I Street, N.W.  Suite 900  Washington, D.C. 20006*          *Telephone:   (202) 887-0467*
                                                                *Fax:   (202) 887-6999*

With Linda E. Rosenzweig. The Pension Answer Book - 1989 Supplement.  New York: Panel Publishers, 1988;  "Legal Considerations Concerning Post-Retirement Health Benefits."  Topics in Total Compensation: Post Retirement Benefits.  Vol. 3, No. 2, New York: Panel Publishers,

Winter 1988;  "Legal Framework of Post-Employment Health Benefits." Prepared for the First Annual Symposium on Funding Post-Employment Health Care Benefits of the Institute for International Research, September 17-18, 1987;  " Single-Employer Pension Plan Amendments Act of 1986." Pension Briefings.  Washington, D.C.; Federal Publications, Inc., 1986.

Monograph, "Plan Termination Insurance," American Law Institute-American Bar Association Committee on Continuing Professional Education, 1978.

Article, "A Critical Look at the Hatch Act," 75 Harvard Law Review 510 (1962).

"Digest of Umpire Decisions," Chrysler-U.A.W., A.F.L.-C.I.O., 2nd edition, 1958, co-edited with Clyde W. Summers.

## PROFESSIONAL ASSOCIATIONS

American Bar Association:
    Joint Committee on Employee Benefits, Chair                              *1995 - 1996*
    Torts and Insurance Practice Section, Chair, Employee Benefits Committee  *1993 - 1994*
    Section of Labor and Employment Law, Co-Chair,
        Employee Benefits Committee Subcommittee on Plan Termination          *1988 - present*
    Section of Taxation, Employee Benefits Committee
    Section of Real Property, Probate and Trust Law, Employee Benefits Committee

District of Columbia Bar Association

# ATTACHMENT B

The following documents were reviewed by Henry Rose in connection with the preparation of his expert report:

I.    Correspondence Regarding Forfeitures:

      A.    October 16, 1989 letter to Sam Scholar from Harry Perry

      B.    January 2, 1990 letter to Sam Scholar from Harry Perry

      C.    January 10, 1990 letter to Harry Perry from Sam Scholar (with Amendment No. 1 attached)

      D.    January 15, 1990 letter to trustees from Harry Perry

      E.    October 3, 1990 letter to Sam Scholar from Harry Perry

      F.    October 18, 1990 letter to Sam Scholar from Harry Perry

      G.    February 20, 1991 letter to Harry Perry from Sam Scholar

      H.    March 6, 1991 letter to trustees from Harry Perry

      I.    April 8, 1991 letter to Sam Scholar from C.J. Coakley Co, Inc. signed by C.J. Coakley

      J.    May 7, 1991 Meeting Agenda

      K.    May 17, 1991 letter to trustees from C.J. Coakley Co., Inc. signed by Carol Doyle

      L.    May 20, 1991 letter to trustees from Harry Perry

      M.    June 17, 1991 letter to trustees from C.J. Coakley Co., Inc. signed by Carol Doyle

      N.    July 2, 1991 letter to Trustees from Lee Wagner

      O.    July 23, 1991 Meeting Agenda

      P.    November 25, 1991 letter to Sam Scholar from Harry Perry

      Q.    Undated Meeting Agenda

      R.    Undated Meeting Agenda/List of questions

      S.    January 9, 1992 letter to Lee Wagner from Sam Scholar

      T.    March 1, 1993 letter to Contractors from Lee Wagner

      U.    December 21, 1993 letter to Harry Perry from C.J. Coakley Co., Inc. signed by C.J. Coakley

V.    January 25, 1994 Meeting Agenda

W.    March 22, 1994 letter to Sam Scholar from Harry Perry

X.    September 7, 1994 letter to Lee Wagner from Sam Scholar

Y.    March 25, 1997 letter to Sam Scholar from Lee Wagner

Z.    February 4, 2003 letter to Trustees from Lee Wagner

II.   1991 through 2002 Board Meeting Minutes:

A.    July 23, 1991

B.    January 25, 1994

C.    November 9, 1995

D.    January 27, 1998

E.    June 22, 1999

F.    September 19, 2000

G.    January 8, 2002

H.    April 23, 2002

I.    July 23, 2002

# ATTACHMENT K

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| PLASTERERS' LOCAL UNION NO. 96<br>PENSION PLAN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>HAROLD PERRY, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. PJM 06 CV 158 |

## EXPERT REPORT OF NORMAN STEIN

I, Norman Stein, do hereby depose as follows:

1.  I am the Douglas Arant Professor of Law at the University of Alabama School of Law and was Director of the University of Alabama Pension Counseling Clinic from 1995 through 2004. I joined the University of Alabama School of Law faculty in 1984. I have been a visiting professor at several other universities since 1987, including the University of Texas at Austin, Indiana University (Bloomington), Vermont Law School, and the University of California at Davis. In the Fall 2007 semester I will be a visiting professor at Columbus Law School at Catholic University.

2.  I received my B.A. in English in 1973 from New College in Sarasota, Florida, and my J.D. in 1978 from Duke University, where I was elected to the Order of the Coif. Following law school, I was an associate with the Washington, D.C. firm of Arnold & Porter until 1980. From 1980 to 1981, I was a law clerk for the Honorable Gerald Bard Tjoflat of the United States Court of Appeals for the Fifth Circuit. After my clerkship, I

practiced law in Atlanta until 1984.

3.   I have regularly taught J.D. classes in federal income tax, labor, business, and employees benefits, including Federal Taxation I and II; Employee Benefits; Employee Benefits Clinic though the Pension Counseling Clinic; Corporate Tax; Business Organizations; and Labor Law. I also have taught classes in deferred compensation and tax accounting in the University's LL.M. program in taxation.

**ERISA Related Experience**

4.   While a lawyer in private practice, I specialized in the area of employee benefits, and worked with numerous plans, both single-employer and multi-employer, and helped provide guidance to pension plan fiduciaries. I also spent two summers in law school working for one of the largest multi-employer pension plans in the nation. I currently write a newsletter on employee benefits for Adams and Reese, a large regional Southern law firm. Some of the newsletters have focused on fiduciary issues of interest to fiduciaries who are responsible for the administration of pension plans.

5. I am a member of the advisory panel of the BNA Pension Reporter, have served as counsel to the American Association of Retired Persons in pension cases, was a consultant to the General Accounting Office, taught in the IRS General Counsel's continuing education program, and have been chair of the Employee Benefit Section of the Association of American Law Schools and the Teaching Employee Benefits Subcommittee of the American Bar Association, and co-chair of the ABA TIPS Employee Benefits Committee. I am a charter Fellow of the American College of Employee Benefits Counsel and was elected as a fellow of the National Academy of Social Insurance.

6. I currently serve as a member of the General Accounting Office Panel of Experts on retirement security issues. I have formerly been a member of the United States Congress Joint Committee on Taxation's Academic Tax Force on Tax Simplification, where I advised on various employee benefits issues. I have also previously served as a member of the Department of Labor's Advisory Counsel on Employee Welfare and Employee Pension Plans (generally referred to as the ERISA Advisory Counsel, to which I was appointed to a three-year term by former Secretary of Labor Alexis Hermann. While on the Advisory Counsel I was the principal author of a report to Secretary of Labor Elaine Chao on fiduciary education.

7. In addition, I have testified before Congress and administrative agencies on pension issues on several occasions, including:

Testimony before ERISA Advisory Council, United States Department of Labor, on subject of Mutual Fund Fees in 401(k) Plans, September 14, 2004.

Testimony before Senate Governmental Operations Committee, on the Pension Benefit Guaranty Corporation, May, 2004.

Testimony before the House Ways and Means Committee, on pension funding crisis, February, 2004.

Testimony Before Senate Health, Education, Labor and Pensions Committee, on "Pension Policy and Enron," February 20, 2002.

Testimony Before House Committee on Education and the Workforce, Subcommittee on Employer-Employee Relations, "Hearings on Enron and Beyond: Enhancing Worker Retirement Security," February 13, 2002.

Testimony Before ERISA Advisory Council, United States Department of Labor, on subject of Phased Retirement, August 15, 2000.

Testimony Before ERISA Advisory Council, United States Department of Labor, on subject of Cash Balance and other Hybrid Pension Plans, July 14, 1999.

Testimony Before the Ways & Means Subcommittee on Oversight, House of Representatives, on subject of pension reform, March 23, 1999.

Testimony Before United States Department of Labor, on Proposed Regulations on Claims Procedures for Employee Benefit Plans, February 18, 1999.

Testimony before ERISA Advisory Council, United States Department of Labor, on subject of Section 401(k) Plans and Investment in Employer Stock, September 15, 1997.

Testimony before Senate Banking Committee, on subject of Cannon Mills Pension Plan Termination, July 25, 1991 (field hearing in Kannapolis, North Carolina).

Testimony before House Select Committee on Aging, Subcommittee on Retirement Income and Employment, on subject of Pension Annuity Protection and the Failure of Executive Life, June 25, 1991.

Testimony before ERISA Advisory Council, United States Department of Labor, on subject of Relationship of Pension Plan Purchase of Commercial Annuity Contract Purchases and Participant Benefit Security, September 4, 1990.

Testimony before Senate Subcommittee on Labor, on subject of Terminating Pension Plans and Junk Annuity Contracts, February 12, 1990.

Testimony before House Committee on Ways and Means, Subcommittee on Oversight, on subject of Pension Benefit Guaranty Corporation's Proposal to Adopt a Variable Rate Premium, April 9, 1987.

Testimony before ERISA Advisory Council, United States Department of Labor, on subject of Pension Plan Reversions, June 12, 1986 (on behalf of Reversion Study Group, an ad hoc group of representatives of the American Association of Retired Persons, the AFL–CIO, the United Auto Workers of America, the Pension Rights Center, and others).

8.  I have published numerous articles, books, book supplements, and book chapters on ERISA and related topics.  I also have been a lecturer, moderator, and on panels throughout the country to discuss ERISA related topics sponsored by a myriad of organizations, including the Ford Foundation, American Law Institute, Ohio State University, St. John's University, Washington and Lee College of Law, the American Bar Association, Kellogg Foundation, Pension Rights Center, Society of Actuaries, the United States Department of Labor, Pension Benefit Guaranty Corporation, and Administration on Aging.

9.  I have been a media guest on national radio and television shows to discuss pension issues, including National Public Radio's *Marketplace* and *Morning Edition*, *Sunday Morning with Charles Kuralt* on CBS, and *Good Morning America* on ABC. Similarly, I was a consultant for an NBC documentary on pension plan terminations, entitled *The Pension Cookie Jar.* I also have been quoted in magazine and newspaper articles on pension and employee benefit matters in, among other publications, the New York Times, Wall Street Journal, Washington Post, Newsweek, USA Today, Christian Science Monitor, National Law Journal, Tax Notes, Newsday, Dallas Daily News, Baltimore Sun, Los Angeles Times, Chicago Tribune, Chicago Sun Times, Raleigh News and Observer, Portland Oregonian, Seattle Times, Hartford Daily Courant, Plan Sponsor Magazine, Pensions and Investments, Modern Maturity, BNA Employee Benefits Reporter, and CFO Magazine.

**Materials Consulted in Preparation of Report**

10.  To prepare this report, I read the following documents:  the Complaint in the above styled action; the answers of the various defendants to the Complaint; auditors reports on the pension plan, for the years 1991 through 2004; minutes for the pension and welfare funds, for the years 1991-2002; various letters  between the pension plan administrator, the pension plan's outside counsel, and C.J. Coakley Co., Inc.; agendas for various trustee meetings from 1989 through 1994; an amendment made to the pension plan in 1993.

**Discussion**

**a.  Various Fiduciary Breaches by Defendants**

11.  It is my opinion that the facts set forth in the materials I reviewed indicate the

occurrence of numerous fiduciary violations between 1994 and 2004, an overview of which follows:

(i) Harold Perry, the Plan Administrator, or Lee Wagner, the assistant to the Plan Administrator[1], or both, violated ERISA's fiduciary obligations in at least each of the following ways: failed to advise the plan trustees to diversify plan investments, and/or failed to diversify plan investments; failed to advise the plan trustees to determine a prudent investment plan or philosophy for the plan, and/or failed to use prudence in determining an investment plan or philosophy for the plan; failed to advise the plan trustees to design the plan's investment portfolio to accord with the circumstances and proper aims of a retirement plan, and/or failed to design the plan's investment portfolio to accord with the circumstances and proper aims of a retirement plan; invested plan assets exclusively in low-yield fixed-income securities and bank deposits; failed to obtain adequate training in ERISA; failed to hire and/or failed to advise the trustees to hire experienced and qualified counsel to provide advice concerning the requirements of ERISA and the Internal Revenue Code; failed to create and/or maintain adequate records of plan activities; failed to ensure regular meetings of plan trustees; failed to cause the plan to be amended to comply with changes to the Internal Revenue Code and treasury regulations; permitted the plan to "refund" contributions to contributing employers; failed to consider whether to make efforts to recover "refunded" contributions to employers; failed to bring a civil action to recover "refunded" contributions; failed to correct fiduciary failures in a timely fashion; failed to prevent the plan from engaging in prohibited transactions; failed to correct the prohibited transactions.

---

[1]  I assume that former Defendant Wagner is a fiduciary, based on the allegations in the complaint. Unlike the other defendants, however, former Defendant Wagner's formal position would not necessarily make her a fiduciary. Rather, her fiduciary status would depend on the scope of her authority and her actions.

(ii) defendants Edgar Pepper, James Lertora, Donald Molnar, and Ronald Beddow violated ERISA's fiduciary obligations at least in each of the following ways: failed to diversify plan investments; failed to determine a prudent investment plan or philosophy for the plan; failed to design the plan's investment portfolio to accord with the circumstances and proper aims of a retirement plan; invested plan assets exclusively in low-yield fixed-income securities and bank deposits; failed to obtain adequate training in ERISA; failed to hire experienced and qualified counsel to provide advice concerning the requirements of ERISA and the Internal Revenue Code; failed to periodically review the performance of defendants Perry, and former defendant Wagner, and Scholar; failed to create and/or maintain adequate records of plan activities; failed to ensure regular meetings of plan trustees;  failed to cause the plan to be amended to comply with changes to the Internal Revenue Code and treasury regulations; permitting the plan to "refund" contributions to contributing employers; failed to consider whether to make efforts to recover "refunded" contributions to employers; failed to bring a civil action to recover "refunded" contributions; failed to correct fiduciary failures in a timely fashion; failed to prevent the plan from engaging in prohibited transactions; failed to correct the prohibited transactions.

### b. Statute of Limitations Issues

### i. Statutory Framework

12. ERISA includes a statute of limitations on fiduciary violations. *See* ERISA § 413. The statute provides an alternative statute of limitations, depending on whether the plaintiff had actual knowledge of the breach. If the plaintiff had actual knowledge of the breach, the statute of limitations requires that a civil action be commenced within 3 years

of the discovery of the breach or violation.  But with an exception that I will note in a moment, an action must, in any event, be commenced within 6 years of the date of the last action constituting the breach or (if the breach was an omission rather than an affirmative act), of the last date on which the breach could have been cured.  One way of describing the statute then, is that it requires that an action be commenced within six years of the last element of the fiduciary breach, or sometimes earlier if the plaintiff has actual knowledge of the breach before then.

13.  In addition, Section 413 provides a separate rule: in the case of fraud or concealment, the statute of limitations must be commenced within six years of the date of the discovery of the breach.  Courts have generally interpreted the term "fraud or concealment" as referring not to the underlying fiduciary violation, but concealment of the breach itself.

**ii.  Application of Statute of Limitations to Fiduciary Breaches Involving Investment of Plan Assets (*i.e.*, failure to diversify, failure to develop an appropriate investment strategy or philosophy for plan, investment of plan assets exclusively in fixed-income securities).**

**(a)  factual overview of fiduciary breaches**

14.  The plan's investments, since at least 1994, have been made exclusively in fixed-income securities, with a large percentage of the assets in bank accounts and certificates of deposit.

15.  ERISA requires both diversification and prudent management of plan investments, generally in accordance with the precepts of modern portfolio theory.  Based on my experience and knowledge, the most conservative of retirement plans would

generally invest at least 40%, and most retirement plans significantly more than 50%, of plan assets in equities. In my view, the information I have seen regarding the plan's investments reflect a shocking lack of experience and knowledge about appropriate construction of an investment portfolio for a retirement plan. The plan's expected and actual rate of return for the period covered by the allegations of the complaint were substantially lower than they would have been had the investments been adequately diversified and partly invested in equities and more fixed-income securities bearing higher interest rates than certificates of deposit and treasury instruments.

16. The facts suggest that much of the design of the plan's investment portfolio, and the selection of the assets were made by the plan administrator. In order to prudently manage the plan and its investments, the trustees should have determined whether the plan administrator was qualified to design an investment portfolio for the retirement plan and should have monitored the plan administrator's performance. The facts indicate that they did neither of these, causing the plan significant losses.

17. In order to prudently administer the pension plan and its investments, the trustees and administrators also had an obligation to ensure that they had the training and education, and/or experience, needed to comply with ERISA's fiduciary standards. The facts indicate that they did not have the training, education, background, and/or experience to understand ERISA's basic requirements.

18. The trustees and administrators also had an obligation to take action to remedy fiduciary breaches, and that obligation would have continued in each year the breach could have been corrected. Corrective action would include initiating a civil action against a fiduciary that breached its statutory responsibilities, and/or bringing the

breach to the attention of the Department of Labor.

### a. Application of the Limitations Period

19.  Cherrie Pleasant and James Miller filed this civil action on February 10, 2006.  Under the ERISA statute of limitations, this civil action can thus reach fiduciary breaches that occurred at any time on or after February 10, 2000.  The three-year limitations period cannot apply here because neither plaintiff could have had actual knowledge of the breach prior to becoming trustees in 2006 and 2004, which was less than three years after this  civil action was filed.

20.  Prudent management of a pension plan would have required defendant trustees to remedy fiduciary breaches, which would have required them to consider (and in this case initiate) legal action against the plan administrator (to the extent the plan administrator provided investment advice or made plan investments), and the plan administrator similarly should have initiated legal action against the plan trustees for their fiduciary breaches with respect to the plan investments.  The failure to bring such a legal action within the limitations period (under ERISA § 413) was not prudent and a separate breach of each defendant's legal obligations.  Prudent administration of the pension plan would also have required defendants to report possible fiduciary breaches to the Labor Department, which may have taken administrative and judicial actions to address the fiduciary breaches.

21.  As earlier mentioned, the defendants knew, or should have known, that prudent management of the pension plan required them to have some understanding of their obligations under the statutory rules under ERISA, the Internal Revenue Code, and the Labor Management Relations Act.  The facts suggest that they did not have such

knowledge and did not take steps to acquire training or education to provide them with such knowledge. It is my view that under ERISA, each defendant's failure to obtain the training necessary to assess whether plan investments satisfied ERISA's fiduciary requirements was a separate and continuing violation of their duty of prudence.

22. Thus, the current civil action should allow recovery of all damages that would have been recoverable in a civil action brought by defendants within the limitations period for the the current action brought by plaintiffs Pleasant and Miller.

23. Defendants could have filed a lawsuit on February 10, 2000, which could have challenged the composition of the plan's investment portfolio at least three years prior to the initiation of such lawsuit. Thus, at a minimum, damages would include those attributable to the investment portfolio as it existed on February 10, 1997 and thereafter.

24. In addition, there are substantial arguments that such a lawsuit could have recovered damages attributable to the investment portfolio as it existed on February 10, 1994. Under section 413 of ERISA, the statute of limitations permits a civil action to remedy fiduciary violations six years prior to the date of filing, unless the fiduciary had actual knowledge of the breach within three years. ERISA's fiduciary standards required that defendants have adequate preparation and training to at least understand their basic responsibilities under ERISA. In my view, the their failure to have prepared themselves to understand these responsibilities was itself a fiduciary breach under ERISA. Because they apparently lacked an understanding of ERISA's basic fiduciary requirements, they did not have actual knowledge of the breaches their fellow fiduciaries had committed, and the six-year statute should arguably apply.

25. Moreover, there are no facts in the record indicating the Defendant Beddow

attended any trustee meetings and thus may have been unaware of how the plan's assets

were invested. Without such awareness, he could not have known that the design of the

plan's investment portfolio was inappropriate for a retirement plan and thus would not

have had actual knowledge of fiduciary breaches relating to the investment portfolio.

**ii. Application of Statute of Limitations to Fiduciary Breaches Involving "Refunded Contributions".**

26. The plan illegally "refunded" contributions to certain contributing employers

starting in or around February 10, 1994. The refund violated ERISA, the terms of the

Plan, and the Labor Management Relations Act. Under ERISA and the Internal Revenue

Code, the "refunds" were prohibited transactions.

27. One or more of the defendants could and should have initiated a civil action

to recover plan contributions. Such an action could have been brought as late as February

10, 2000 by any defendant who did not have actual prior knowledge of the breach three

years earlier than February 10, 1997. The facts that I have reviewed indicate that one or

more of the defendants might have lacked knowledge of the breach before then, but it

would require more development of the facts of the case to determine that this was the

case. In particular, it appears that trustee Beddow had not attended any trustee meetings

and may not have had any knowledge of the facts relating to the improper reversions.

28. The defendants could also have alerted either or both the Department of

Labor or the IRS of the prohibited transaction. Either agency could have initiated

administrative and/or legal action to force repayment to the plan of the "refunded"

contributions. Because neither agency would have had knowledge of the breach prior to

being informed of the breach, the Department of Labor could have filed a law suit as late as February 10, 2000, to recover the "refunded" contributions, and the Internal Revenue Service could have assessed a penalty tax on the employers who received such contributions as late as February 10, 2000.[2]

29. The failure to alert the Federal agencies in time for them to take actions against the employers who received "refunded" contributions was a separate fiduciary violation.

_Norman Stein_
Norman Stein

---

[2] The penalty tax would be followed by a 100% penalty tax if the transaction were not corrected, which would have required the return of the contribution.

# ATTACHMENT L

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

(Southern Division)


PLASTERERS' LOCAL UNION
NO. 96 PENSION PLAN, et al.,          Civil Action No.
                                      PJM 06 CV 338
            Plaintiff(s),

v.

HAROLD PERRY, et al.,

            Defendant(s).


            DEPOSITION OF EDGAR PEPPER

                  Washington, DC

                September 26, 2007

                   10:00 a.m.


Job No. 1-112182

Pages 1-289

Reported by: Linda S. Kinkade, CSR, RMR, CRR

DEPOSITION OF EDGAR PEPPER

CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 52

1          Q    Do you know --

2          A    No, I don't.

3          Q    Do you know what a record retention policy

4     is?

5          A    No.

6          Q    Do you know whether Hampshire has a record

7     retention policy?

8               MR. KOLKER:  Object to the form, lack of

9     foundation.

10              THE DEPONENT:  I don't know.

11    BY MR. ROSE:

12         Q    Do you recall there ever being any

13    discussion by the Board as to whether or not the

14    plasterers' fund should have a record retention

15    policy?

16         A    I don't recall that, no.

17         Q    Do you remember there ever being any

18    discussion by the Board as to whether or not it would

19    be prudent to have a statement of investment

20    guidelines for the pension fund assets?

21         A    No, I don't recall.

22         Q    Do you recall whether Mr. Perry or Ms.

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 53

1    Wagner ever recommended to the Board that a statement

2    of investment policy guidelines would be a prudent

3    thing for the Board to consider?

4            A    I don't recall that, no.

5            Q    Same question for Mr. Scholar.  Do you

6    recall whether Mr. Scholar ever advised the trustees

7    during your period as a trustee as to whether or not

8    it would be prudent to have a statement of investment

9    policy guidelines for the Board?

10           A    I don't recall that.

11           Q    If Mr. Scholar had, do you think you would

12   remember that?

13           A    I would think so.

14           Q    If Mr. Perry or Ms. Wagner had made such a

15   recommendation, do you think you would remember that?

16           A    I would think so.

17           Q    Did you take notes at any of the Board

18   meetings?

19           A    No.

20           Q    Never?

21           A    Never.

22           Q    Did you retain any records or documents

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 133

1      A    I think they were, yes.

2      Q    Treasury Bills as well?

3      A    Uh-huh.

4      Q    Short-term obligations?

5      A    Yes.

6      Q    And why short-term obligations?

7      A    I don't recall.  I don't know.

8      Q    Do you recall there ever being any

9    discussion as to whether or not short-term obligations

10   were an appropriate investment for the pension fund?

11     A    No, I don't recall that.

12     Q    If there was such a discussion, do you

13   think you would remember?

14     A    I would think so.

15     Q    Do you recall -- did Mr. Scholar ever

16   advise the Board of Trustees that there was a

17   requirement under ERISA to have a diversified

18   portfolio of investments?

19     A    I don't recall hearing that.  I don't

20   recall hearing that.

21     Q    Do you recall Mr. Perry or Ms. Wagner ever

22   informing the trustees that there is a requirement

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 134

1   under ERISA to have a diversified portfolio of

2   investments?

3        A    No.

4        Q    If they had given that advice, do you think

5   you would remember that?

6        A    I would think so.

7        Q    During your approximately 14, 15 years as

8   serving as a trustee on the plasterers' fund, how many

9   times do you recall having discussions with respect to

10  the investment strategy of the pension fund?

11       A    I would say a couple times, that's all.

12       Q    Two times?

13       A    I would say a couple times, that's all.

14       Q    As best you can recall, what were those

15  discussions?  What did they entail?

16       A    By moving it from one to another, you know,

17  keeping it low investments, not going over the hundred

18  thousand.  That's all I was involved in.

19       Q    Talking about in terms of the CD amounts --

20       A    CD --

21       Q    -- to ensure that the FDIC insurance would

22  apply?

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 226

1        MR. KOLKER:  Objection, asked and answered,

2   in essence, before.  Different question, same

3   substance.

4        MR. ROSE:  "In essence"?  That's an

5   interesting objection.

6        MR. KOLKER:  You've asked the same substance

7   now three or four hours ago.  Now you're asking it

8   again with different wording.

9        MR. ROSE:  It's a different question.

10  BY MR. ROSE:

11       Q   Do you know what a statement of investment

12  policy is?

13       MR. KOLKER:  Objection, asked and answered.

14       THE DEPONENT:  No.

15       MR. ROSE:  No, I asked whether they had one.

16  I'm now asking whether he knows what one is.

17       THE DEPONENT:  No, I don't.

18  BY MR. ROSE:

19       Q   How did the trustees determine what

20  specific investments the pension fund would invest in?

21       A   Just by going with what they had been doing

22  for the last 50 years, I guess.  I don't know.  I

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 227

1    really don't know.

2         Q    And, as a trustee, you thought it was your

3    role to simply go with the previous investment

4    strategy?

5         A    Yes.

6              MR. BRAMLETTE:  Objection, argumentative.

7    You can answer.

8              MR. ROSE:  He already did.

9              THE DEPONENT:  Yes.

10   BY MR. ROSE:

11        Q    Were you aware that the health fund held

12   two individual company stocks?

13        A    Stocks?  No, I did not.

14        Q    As in equities in two particular companies.

15   You weren't aware of that?

16        A    No.

17        Q    Have you ever heard of PSEG?

18        A    (Shaking head from side to side.)

19        Q    What about NICOR?

20        A    No.

21        Q    Do you have any understanding as to why the

22   health fund would have two individual company stocks

4b36ec7e-f1a9-4c72-9d12-28316a7d15bd

Page 239

1   certificates of deposit or short-term U.S. Treasury

2   obligations as instructed by the trustees.

3          Do you see that?

4          A   Yes.

5          Q   Is that statement consistent with what your

6   understanding of the investment strategy of the

7   pension plan was?

8          A   Yes.

9          Q   And how often do you recall reviewing with

10  the other trustees whether or not the investment

11  strategy was working or whether or not a change might

12  be in order?

13          MR. KOLKER:  Objection, asked and answered.

14          THE DEPONENT:  The same.  I mean, they were

15  brought up every year for reinvestment, and, like I

16  said before, they didn't want to go into a portfolio

17  of stocks or anything like that.  So they just left

18  them in the CDs.

19  BY MR. ROSE:

20          Q   When you say "they," who are you referring

21  to?

22          A   The trustees.  The trustees.

DEPOSITION OF EDGAR PEPPER
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2007

Page 240

1      Q    You were one of the trustees.

2      A    Yes, I was one of the trustees, and so were

3  the labor trustees that went along with it, too.

4      Q    What was your individual vote with respect

5  to this investment strategy?

6      A    I just brought it up one time, couple

7  times, and they said, no, they didn't want to stick

8  their neck out.

9      Q    But you were okay --

10     A    Yeah.

11     Q    I'm sorry.  You were okay with this

12  investment strategy?

13     A    At the time, yes.

14     Q    Okay.

15     A    Yes.

16     Q    And at some other time did that change?

17     A    No.

18     Q    So you were okay with it all along.

19     A    Right.  Right.

20     Q    Okay.  Are you aware of what this action,

21  this litigation that you are a defendant in, involves

22  or relates to?

# ATTACHMENT M

1

1    IN THE UNITED STATES DISTRICT COURT

2    DISTRICT OF MARYLAND

3    (Southern Division)

4

5    **ORIGINAL**

6    PLASTERERS' LOCAL UNION

NO. 96 PENSION PLAN, et al.    Civil Action No.

7    PJM 06 CV 338

8          Plaintiff(s),

9    v.

10   HAROLD PERRY,  et al.,

11         Defendant(s).

12

13         DEPOSITION OF SAM D. SCHOLAR, ESQUIRE

14         Washington, DC

15         Friday, September 28, 2007

16         11:00 a.m.

17

18   Job No. 1-112168

19   Pages 1-301

20   Reported by: Linda S. Kinkade, CSR, RMR, CRR

21

22


L.A.D
REPORTING &

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com

149

1    Q    Do you recall the trustees ever asking for

2  your advice on any fiduciary obligations that they

3  might have with respect to the investment of plan

4  assets?

5    A    No, I don't recall anyone ever asking me

6  about investment advice.

7    Q    Is that something you think you would

8  recall?

9    A    Yes.

10   Q    Same question for Mr. Perry.  Do you recall

11 Mr. Perry or Ms. Wagner ever contacting you to request

12 a legal opinion on the appropriate matter in which

13 plan assets should be invested under ERISA?

14   A    No.

15   Q    Is that something you would recall?

16   A    Yes.

17        THE DEPONENT:  Could I just have a

18 five-minute break?

19        MR. ROSE:  Of course.  Absolutely.

20   (Brief recess.)

21   (Exhibit No. 13 marked for identification and

22 retained by counsel.)

176

1      Q   As you sit here today, what do you think is

2   permissible or do you think it's permissible to return

3   plan assets to a contributing employer?

4      A   I don't feel I can make an opinion about

5   that.

6      Q   Why is that?

7      A   I don't think I've got the necessary

8   background.  I'm not an ERISA lawyer.

9      Q   If, in fact, the trustees were discussing

10  and considering whether or not they should return plan

11  assets around this time in 1994, is that something you

12  think you were consulted on?

13          MR. PETERSON:  Object to the form.

14          THE DEPONENT:  I don't know.  I might have

15  been.

16  BY MR. ROSE:

17      Q   Do you think that the trustees would have

18  returned plan assets to contributing employers without

19  having first sought your -- seeking your legal opinion

20  as to whether it's permissible?

21      A   I don't know.  A lot of things happened

22  here that I never saw.  I mean, there was a lot of

177

1    communication between the administrator and the

2    trustees, so I don't know what they would do without

3    me.

4          Q    Directing your attention to Exhibit 18, it

5    shows you were in attendance at this Board meeting,

6    correct?

7          A    Yes, sir.

8          Q    Does that indicate to you you were in

9    attendance at that Board meeting?

10         A    Absolutely.

11         Q    Okay.  If the trustees failed to seek your

12   legal advice as to whether or not it was permissible

13   to return plan assets to contributing employers, do

14   you think that would have been prudent?

15              MR. PETERSON:  Object to the form.

16              THE DEPONENT:  I'm not -- I don't have an

17   opinion about what's prudent or what's not prudent

18   under ERISA, if that's your question.  Is that your

19   question?

20         (Record read.)

21              MR. PETERSON:  Object to the form.

22   BY MR. ROSE:

DEPOSITION OF SAM D. SCHOLAR, ESQUIRE
CONDUCTED ON FRIDAY, SEPTEMBER 28, 2007

178

1       Q    Do you understand my question?

2       A    Yes.

3       Q    And your answer?

4       A    I can't make an opinion.

5       Q    Why not?

6       MR. PETERSON:  Object to the form.

7       THE DEPONENT:  Well, as an attorney, I think

8 you're asking me a legal opinion and I don't feel I

9 can make a legal opinion about that.

10 BY MR. ROSE:

11       Q    But you're an attorney, correct?

12       A    Yes.

13       Q    And you're an attorney who represented a

14 qualified ERISA plan for over 20 years, correct?

15       A    Yes.

16       Q    And sitting here today you say you can't

17 even provide any opinion on the question that's been

18 posed?

19       A    I have not been involved at all in this

20 area of practice for at least two years.

21       Q    I'm talking about events that occurred when

22 you were fund counsel.

DEPOSITION OF SAM D. SCHOLAR, ESQUIRE
CONDUCTED ON FRIDAY, SEPTEMBER 28, 2007

195

1      A    Yes.

2      Q    Did you prepare these minutes?

3      A    Yes.

4      Q    Directing your attention to No. 2, it says,

5   the trustees unanimously adopted a resolution to

6   authorize investing the funds in staggered one- and

7   two-year Treasury Bills as well as federally insured

8   certificates of deposit.

9      Do you see that?

10     A    Yes.

11     Q    Do you remember the trustees ever asking

12   for your legal advice as to whether or not that was an

13   appropriate investment strategy?

14     A    I was never asked for legal advice about

15   investment strategies, so I would have remembered if

16   they ever did ask me.

17     Q    Do you have any idea as to whether or not

18   that investment strategy outlined in No. 2 of these

19   minutes was an appropriate investment strategy for an

20   ERISA qualified plan?

21     A    No.

22     Q    Directing your attention back to Exhibit

232

1    shall ever revert to or be used by employer nor shall

2    the trust fund ever be used other than for the

3    exclusive benefit of the participants or their

4    beneficiaries and for the administrative expenses of

5    this plan.

6          Do you see that?

7          A    Yes.

8          Q    Were you familiar with this provision of

9    the plan when you were fund counsel?

10         A    I don't recall.

11         Q    Are you familiar with the anti-inurement

12   provision of ERISA?

13         A    Not specifically.

14         Q    Do you have any understanding as to what

15   the anti-inurement provision of ERISA is?

16         A    Well, generally, that you can't derive a

17   personal benefit from being a trustee of a plan.

18         Q    Generally or always?

19         A    I don't know if it's always or generally.

20   I don't know.

21         Q    Well, looking at that paragraph that we

22   just reviewed, as fund counsel for almost 20 years of

# ATTACHMENT N

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PLASTERERS' LOCAL UNION No. 96 PENSION PLAN, *et al.*,

Plaintiffs,

- vs -

Civil Action No. 06-CV-
338 (PJM)

HAROLD PERRY, *et al.*,

Defendants.

### Report of Fred Taylor

**I.     Retention**

I have been retained by Nixon Peabody LLP on behalf of Defendants Edgar Pepper, James Lertora, Ronald Beddow and Donald Molnar (collectively "Defendant Trustees") in this matter.  Specifically, I have been asked to evaluate the argument that the Plan's assets were not appropriately diversified and were instead improperly invested in conservative assets during the relevant time period.

I graduated with Distinction from Wesleyan University in Middletown Connecticut in 1963 with a B.A. in Economics.  I received an MBA from The Wharton School of the University of Pennsylvania in 1965.

I joined United States Trust Company ("U.S. Trust") in 1966 as an assistant portfolio manager.  U.S. Trust is a leading money management firm, investing for both individuals and institutions.  It was sold to Charles Schwab in 2000 and recently sold to Bank of America.

From 1966 until 1990, I rose through the ranks at U.S. Trust.  In 1990, I was named Vice Chairman, Chief Investment Officer, and member of the Board of U.S. Trust, positions I held until my retirement in June 2004.  In these roles, the investment research department and all portfolio managers reported to me.  At the time of my retirement, U.S. Trust had over $100 billion in assets under management, and actively managed over $80 billion in assets. Approximately 25 percent of these assets was for institutional clients, including pension plans.

From approximately 1986 through 2002, I was the Senior Portfolio Manager for the U.S. Trust Pension Plan, responsible for asset allocation.  I was also chair of the Investment Policy Committee at U.S. Trust from approximately 1986 through early 2006.  The Investment Policy Committee was responsible for determining the investment strategies and asset allocation guidelines for the investment portfolios at U.S. Trust.

10695189.2

Following my retirement in June 2004, I consulted with U.S. Trust for two years. During this time, my work included working with clients who requested that I continue providing them with financial advice.

I am a member of the New York Society of Securities Analysts. I was a trustee at Wesleyan University from July 1, 2001 to July 1, 2007. I have been a member of the endowment investment committee at Wesleyan University since 1996, and am a former chair of the equity subcommittee of endowment investment committee at Wesleyan University.

## II.   Plaintiffs' Claim

The plaintiffs allege that the Defendant Trustees breached their fiduciary duty under the Employee Retirement Income Security Act ("ERISA") of 1974 by failing to make sure that the investment assets of the Plan were appropriately diversified. Specifically, the plaintiffs allege that the Plan assets were invested too conservatively between 1994 and 2006.

## III.   My Opinion

Based upon my experience and knowledge, the investment strategy endorsed by the Defendant Trustees was satisfactory because it properly sought to minimize risk and preserve assets.

The principal purpose of diversification is to minimize risk. While one can claim, with the benefit of hindsight, that a different investment strategy might have resulted in a better rate of return, a trustee is charged with looking forward and implementing the goals of the Plan. Those goals can reasonably include making sure that the Plan does not suffer a significant negative return.

Clients have approached U.S. Trust and advised that their goal was to "lose no money." In those cases, an investment strategy of pure fixed income is perfectly appropriate because it increases the likelihood that the goal is achieved.

This is not a typical case where the plaintiff lost money because of an investment strategy, or excessive concentration in a single stock like Enron or WorldCom. Here, the allegation is that the gain was not enough. This "should have" or "could have" argument is based on hindsight and does not appreciate that the Defendant Trustees were apparently attempting to lose no money.

Moreover, the argument that the Plan should have been exposed to more equities, and that the Defendant Trustees failed to make sure it was properly diversified, ignores the historical return of different classes of assets. Fixed income investments have historically returned between 5-7%, while equities have returned between 9-10%. A 50/50 mix, which one of the plaintiffs' experts advocates, would have historically returned approximately 7-8%. It was reasonable, given their investment outlook and their apparent view of the objectives of the portfolio, for the Defendant Trustees to have determined that the "upside" of a few percentage points in potential gain was not worth the increased downside risk

This is especially important when one considers the relevant time period.  In the mid-to-late 1990's, the stock market enjoyed a surge.  Accordingly, by the late 1990's, many experts, including those at U.S. Trust and me, believed that the market was due for a significant correction, and that equities could under-perform their historical performance in the near future.  It was widely believed that returns of greater than 20% per were highly unlikely to continue.  In fact, this correction began in mid-2000.

It should be noted that, in 2007, the S&P 500 is relatively flat, while fixed income is returning approximately 3%.  Again, performance year-to-date, and the wild swings in the market in the past few weeks, demonstrate why a strategy of an entire fixed income may be suitable for conservative portfolio.

**IV.     Conclusion**

The opinions expressed in this report are based on the material that I have received thus far.  I reserve my right to revise my findings and opinions as additional material becomes available.

Respectfully submitted,

/s/

Fred Taylor