# ATTACHMENT O

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

(Southern Division)

-----------------------------x

PLASTERERS' LOCAL UNION NO. 96

PENSION PLAN, et al.,

         Plaintiff,

     v.    C.A. No. PJM 06 CV 158

HAROLD PERRY,

         Defendants.

-----------------------------x

      FREDERICK BROOKS TAYLOR

       New York, New York

     Thursday, October 11, 2007

Reported by:  Steven Neil Cohen, RPR

1                          Taylor

2     investment guidelines as you understood it?

3          A.    That is such a broad question.  I

4     am not sure where to begin.

5               Let me simply state that every

6     account had investment guidelines.

7          Q.    Written investment guidelines?

8          A.    They should have been written.

9     Guidelines are early in the business.

10    Things evolve.  Things changes.

11              Sometimes they were verbal and in

12    people's minds, and that was simply

13    inadequate and insufficient for individual

14    accounts but for institutional accounts, to

15    my knowledge, they would have always been

16    written down.

17         Q.    Was it important -- or sorry.

18              Strike that.

19              Did you consider during your

20    tenure as a member of the investment

21    committee, did you consider the current cash

22    requirements or needs, liquidity needs, in

23    making your investment decisions?

24              MR. BRAMLETTE:  Objection as to

25         form.

1                          Taylor

2                 THE WITNESS:  And as a function of

3        a deliberate investment move to set

4        monies aside for a particular reason

5        such as, we think the equity market is

6        vastly overpriced, or we think interest

7        rates will rise and we wish to buy bonds

8        later at a better price.

9                 So it would be monies awaiting

10       investment.

11   BY MR. ROSE:

12          Q.    As best as you can recall, during

13      your tenure on the investment committee of

14      the pension fund of U.S. Trust, what do you

15      think the high side of the amount of cash

16      the plan would have held on a percentage

17      basis -- sorry -- cash or cash equivalents,

18      short-term CDs, T bills?

19                 MR. BRAMLETTE:  Objection as to

20        form.

21   BY MR. ROSE:

22          Q.    Do you understand my question?

23          A.    I believe I do.

24                 I believe that a high side would

25      have been order of magnitude 20 to

1                         Taylor

2    25 percent.

3         Q.    If I understood your testimony,

4    that money would have been parked

5    temporarily while waiting for market

6    conditions to emerge to move into a

7    particular asset class that you were

8    planning on purchasing; is that correct?

9              MR. BRAMLETTE:  Objection to the

10        extent it misstates the prior testimony.

11   BY MR. ROSE:

12        Q.    Is that a fair statement of your

13   prior testimony?

14        A.    No.  The -- I mentioned there were

15   two reasons:  One was, monies to pay out and

16   set-asides for that purpose.

17             And the other would be, the ups

18   and downs of setting aside for investment

19   opportunities.

20        Q.    I am going to ask specifically,

21   you just testified that at the high point, a

22   high side estimate during your almost

23   15-year tenure on the investment committee,

24   that short term T bills or CDs would have

25   been held by the plan were somewhere in the

1                       Taylor

2           What did you mean by "these

3    characteristics?"

4           A.     Those were my words.

5           I don't want to characterize

6    precisely counsel's words to me but "these

7    characteristics" simply meant my words,

8    short-term investments.

9           Q.     Okay.

10          A.     There are a variety of short-term

11   investments, that is all.

12          Q.     The second sentence of paragraph

13   5, Mr. Cairns says, "Such an allocation does

14   not constitute a prudently diversified

15   portfolio under the Employee Retirement

16   Income Security Act of 1974."

17          Do you have any reason to believe

18   that that is an untrue statement?

19          A.     I think it is possible that at

20   brief periods of time, as you await

21   investments, you could have all or most of

22   your monies in short-term securities.

23          But other than that, I believe

24   that that statement is an accurate statement

25   or is a good understanding of the Employee

1                    Taylor

2    Retirement Income Security Act.

3         Q.    The requirements for the

4    investments under --

5         A.    Yes.

6         Q.    Were you advised that there was a

7    period between January 1, 1994 and the end

8    of 2005 where the plasterers' funds'

9    trustees contemplated making some sort of

10   different investment move that would warrant

11   placing virtually 100 percent of its assets

12   in short-term fixed instruments?

13        A.    I was not so advised.

14        Q.    If, in fact, there was no such

15   instance, you would agree that would be an

16   imprudent, non-diversified portfolio under

17   ERISA?

18             MR. BRAMLETTE:  Objection as to

19        form.

20   BY MR. ROSE:

21        Q.    Do you understand my question?

22        A.    I believe I understand your

23   question.  Yes.

24        Q.    Thank you.

25             Paragraph number 6, Mr. Cairns

1                          Taylor

2      states, "Diversification is not only

3      mandated by ERISA, it is the best tool for

4      achieving an appropriate balance between

5      investment risk and return."

6                  Would you agree with that

7      statement?

8          A.     I would agree with the statement.

9                  It requires explanation as to

10     beyond just what is contained in one

11     sentence.

12         Q.     We are going to go on.

13         A.     I am sure we are.

14         Q.     Perhaps that is the additional

15     fleshing out that you may be referring to.

16                 The next sentence states,

17     "Diversification is the process of spreading

18     assets among different investments,

19     securities, issuers, maturity dates and

20     localities in order to minimize the

21     portfolio's exposure and to distribute the

22     risk of the portfolio."

23                 Do you see that?

24         A.     I see that.

25         Q.     Do you believe that is an accurate

1              Taylor

2    statement?

3              MR. BRAMLETTE:  Objection as to

4         form.

5              THE WITNESS:  I am not sure I

6         understand your use of the word

7         "accurate."

8    BY MR. ROSE:

9         Q.    Maybe that is inappropriate.

10             Would you generally agree with

11   that statement?

12        A.    Yes.

13        Q.    I think we will move quicker with

14   that question.

15             The next sentence states, "A fund

16   can reduce its risk through diversification

17   simply by holding investment instruments

18   which are not perfectly correlated, in other

19   words, a fund can reduce its exposure to

20   asset class risk by holding a diversified

21   portfolio of asset classes such as stocks,

22   bonds, et cetera."

23             Would you generally agree with

24   that statement?

25        A.    I would generally agree with that

1              Taylor

2    statement.

3        Q.    Directing your attention to

4    paragraph 7, it states, "Diversification of

5    a fund is done through the asset allocation

6    process.  Asset allocation is the primary

7    determinant contributing to the long term

8    success of a fund.  The purpose of asset

9    allocation is to determine the efficient

10   allocation or spreading of asset classes,

11   stocks, bonds, et cetera, and provide a

12   solid foundation for diversifying a fund's

13   investable assets across these asset

14   classes."

15            It goes on to state, "The purpose

16   of diversification is not primarily to

17   increase returns, but to achieve a desired

18   level of return with a lower amount of risk.

19   An appropriate asset mix or allocation is

20   one which offers the high probability of

21   achieving an investment return that is

22   expected to fund the benefit levels promised

23   by a fund and to do so with a high level of

24   diversification and at the lowest possible

25   risk level."

1                           Taylor

2               Do you see that?

3          A.    I see that.

4          Q.    Would you generally agree with

5     that statement?

6          A.    I would generally agree with that

7     statement.

8          Q.    Can you state instances where you

9     would not agree with that statement?

10         A.     In the context of time,

11    diversification, as it was understood in

12    1952, didn't appear to foresee investments

13    in private equity, venture capital, perhaps

14    even international, so the measure of

15    diversification is often determined with

16    hindsight as to various asset classes that

17    are created that didn't even exist.

18              It is a time issue.

19         Q.    Let's focus on the time period

20    January 1, 1994 through 12/31/2005.

21              With respect to that time frame,

22    could you please identify, if any, examples

23    where the statements contained in paragraph

24    7 of Mr. Cairns' expert report you would

25    believe would make the statement not

1                      Taylor

2     accurate?

3               MR. BRAMLETTE:  Objection as to

4          form.

5               You can answer.

6               THE WITNESS:  Again, I don't

7          understand the word "accurate."

8     BY MR. ROSE:

9          Q.    You testified that you generally

10    agree with the statement.

11               Could you please give me examples,

12    if any, of instances where you would not

13    agree with the statement generally, means

14    generally, are there any instances that you

15    can think of where the statement contained

16    in paragraph 7 of Mr. Cairns' report would

17    not be generally true?

18               MR. BRAMLETTE:  Objection.  Asked

19          and answered.

20               You can go ahead.

21               THE WITNESS:  With the benefit of

22          hindsight looking from 2005 back to

23          1994, I believe this statement is

24          correct, works, diversification, et

25          cetera.

1                          Taylor

2    BY MR. ROSE:

3         Q.    What about from 1975 to 1985,

4    would this statement be generally true?

5         A.    I would have to examine returns

6    and so on over that period of time.

7              I think I have already testified

8    this statement is generally true.

9              Your prior question was, are there

10   exceptions where this might not be true.

11   Such exceptions could be generated by the

12   awareness that correlations that seem to be

13   set in stone, in fact, are not.

14             When crises occur, many

15   correlations change and many asset classes

16   act together.

17             International stocks act

18   differently from U.S. stocks but during the

19   great international crisis, whatever it

20   might be, think of the crash of 1987 as an

21   example, they worked together, so

22   diversification is not a predictive tool.

23             You don't know in 1994 what is

24   going happen in 2005 or -- that is my

25   only --

1               Taylor

2          Q.    Generally speaking, the statements

3     contained in paragraph 7, you would agree

4     with, correct?

5          A.    I have already so said.

6          MR. BRAMLETTE:  Objection.

7          You can answer.

8          THE WITNESS:  I have already so

9     testified.

10    BY MR. ROSE:

11         Q.    Paragraph 8, directing your

12    attention to paragraph 8 -- strike that.

13          We have already talked about

14    Mr. Markowitz.

15          Directing your attention to

16    paragraph 9, it says, "The trustees of the

17    plasterers' pension plan should have used

18    prudent diversification of the plan's assets

19    to eliminate or reduce risk by investing in

20    higher yielding asset classes such as the

21    broad market S&P 500 stocks and Lehman

22    aggregate bonds, both of which are

23    appropriate asset classes for the

24    plasterers' plan from the period beginning

25    January 1, 1994 through December 31, 2005."

1                          Taylor

2           Do you see that?

3      A.    I see that.

4      Q.    Would you generally agree with

5  that statement?

6      A.    I believe it is factually correct

7  in that most of the other asset classes had

8  higher returns so, yes.

9      Q.    Let me rephrase my question.

10          Would you agree with that

11  statement contained in paragraph 9?

12     A.    Yes.  Let me qualify that.

13     Q.    Certainly.

14     A.    What is assumed here is all the

15  conclusions, so looking at 2005 backwards, I

16  would agree with it 100 percent.

17          There could be market conditions

18  that would be unique and unusual where the

19  results wouldn't have been as indicated here

20  but these were the results that took place.

21     Q.    Those market conditions wouldn't

22  really be foreseeable, would they?

23  Ordinarily they would not be foreseeable;

24  unusual market conditions are just that,

25  9/11 was an unusual market condition,

1                         Taylor

2    correct?

3              MR. BRAMLETTE:  Objection.  Form

4         and argumentative.

5    BY MR. ROSE:

6         Q.    Do you understand the question?

7         A.    I believe I understand your

8    question.

9              And would respond by saying, all

10   future market conditions are not

11   foreseeable.

12        Q.    Which is why diversified portfolio

13   is a prudent way to invest assets to be able

14   to diversify the risk, correct?

15             MR. BRAMLETTE:  Objection.

16        Argumentative.

17             THE WITNESS:  We already talked

18        about how correlations change under

19        crises and the protection that you think

20        you are buying, you aren't necessarily

21        buying.

22             I recall something called

23        portfolio insurance in 1985 and 1986,

24        which was supposed to protect all

25        investors from downturns beyond a

1                    Taylor

2     certain level.

3          It didn't simply because during a

4     crisis, there was nobody doing any

5     trading.

6          So just like the Nobel laureates

7     we discussed earlier, things usually

8     happen one way but they don't always.

9          MR. ROSE:  Can you read back his

10    answer please?

11         (Record read)

12    BY MR. ROSE:

13         Q.    Would it be fair to say that in

14    investing pension plan assets, that it is

15    more prudent to invest for the long term

16    under a general rule as opposed to trying to

17    time a particular event where the general

18    rule does not apply?

19         MR. BRAMLETTE:  Objection as to

20    form.

21         THE WITNESS:  Yes.

22    BY MR. ROSE:

23         Q.    Directing your attention to

24    paragraph 10.

25         A.    Paragraph --

Page 118

1                        Taylor

2        Q.      Paragraph 10.

3                It says that, "A prudent asset

4    allocation mix of a 50 percent S&P 500 and

5    50 percent Lehman aggregate, which is an

6    appropriate mix of asset classes for the

7    plasterers' plan in which to add income and

8    appreciation while also retaining principal

9    for the period under review ending

10   December 31, 2005, in lieu of cash as the

11   plan was invested in, would have led to an

12   approximate market value of assets on

13   December 31, 2005 of $3,500,159, with a

14   beginning market value at January 1, 1994 of

15   $1.260,967 or $3,835,383 on December 31,

16   2005, assuming the reversions to employers

17   of $120,768 are added to the January 1, 1994

18   beginning market value to equal $1,381,735."

19               Do you see that?

20       A.      I do.

21       Q.      Did you, in preparation of your

22   report, did you go through and check

23   Mr. Cairns' math?

24       A.      I did not.

25               I did note his awkward sentence

1                        Taylor

2    structure, however.

3         Q.    Sometimes that happens with

4    lawyers too.

5              This was his report?

6              MR. BRAMLETTE:  Never, Jonathan.

7              MR. ROSE:  Never.  Yes.

8              THE WITNESS:  Directionally I did

9         not check the math.  Directionally

10        that -- given the assumptions of

11        50 percent S&P 500, 50 percent Lehman

12        aggregate, those numbers appeared

13        directionally correct to me.

14   BY MR. ROSE:

15        Q.    Would you agree that 50/50 S&P,

16   Lehman bond aggregate is a prudent

17   moderately conservative portfolio mix for a

18   pension plan?

19             MR. BRAMLETTE:  Objection to form.

20   BY MR. ROSE:

21        Q.    Do you understand my question?

22        A.    I believe I do.

23             It says here though, "which is an

24   appropriate mix."

25             You changed the phraseology.

Page 120

1                          Taylor

2        Q.    I was asking you a question.  I

3   wasn't asking you tied to the language.

4             MR. ROSE:  If you could repeat the

5        question?

6             (Record read)

7             THE WITNESS:  As a professional, I

8        would be hesitant to answer that

9        question with confidence not knowing

10       more about the plan and its mandates as

11       to why it should be 50/50 versus 60/40,

12       should there be international assets in

13       it and so on.

14            This is an artificial construct

15       that may or may not be appropriate for

16       the plan.

17  BY MR. ROSE:

18       Q.    Having virtually 100 percent of

19   the assets in short-term fixed would not be

20   prudent, correct?

21            MR. BRAMLETTE:  Objection as to

22       form.

23  BY MR. ROSE:

24       Q.    Do you understand my question?

25       A.    I believe we already answered that

Page 121

1                        Taylor

2   affirmatively, that it would not be prudent

3   given history.

4       Q.    When you just referred to the need

5   to have additional information to determine

6   what an appropriate asset mix for the

7   pension plan was, did you ask for that

8   information from Mr. Bramlette or Mr. Hayes

9   whom he works with?

10      A.    I asked about the mandate for the

11  fund.

12      Q.    What is your understanding of the

13  mandate for the fund?

14      A.    I didn't see any mandate for the

15  fund.

16      Q.    Okay.  So I am clear, you asked

17  for it but you never saw it?

18      A.    That is correct.

19      Q.    That would have been helpful?

20      A.    I am not sure I asked for it.

21            I asked what the mandate was and I

22  have not seen what the mandate for the fund

23  was.

24      Q.    Even as of today?

25      A.    I do not believe that I know the

Page 122

1                        Taylor

2    mandate for the fund.

3         Q.    When you say "the mandate for the

4    fund," what exactly do you mean?

5         A.    A written document that would

6    describe the fund, in some detail, what it

7    is attempting to achieve and what they are

8    expecting the investing professionals to do

9    for them.

10        Q.    Would it be fair to say you were

11   never advised there was no written

12   investment strategy guidelines?

13             MR. BRAMLETTE:  Can you repeat

14        that?

15             MR. ROSE:  You can read it.

16             (Record read)

17             MR. ROSE:  I will try over.

18             MR. BRAMLETTE:  I heard it

19        differently from you and him.

20   BY MR. ROSE:

21        Q.    Would it be fair to say that you

22   were not advised that the plasterers'

23   pension plan had no written investment

24   guidelines or policy?

25        A.    You are asking what John Hayes

1                          Taylor

2    said on the telephone and how he responded

3    to my question about investment objectives

4    and mandate?

5              MR. BRAMLETTE:  Insofar as you are

6         asking that, I am going to instruct him

7         not to answer.

8    BY MR. ROSE:

9         Q.    So that I am clear, you asked for

10   information with respect to the pension

11   plan's mandate and you were never provided

12   that information, correct?

13             MR. BRAMLETTE:  Objection.  Asked

14        and answered.

15             You might want to clarify whether

16        you are talking about written

17        information that he did or didn't

18        receive.

19             MR. ROSE:  I was going to go there

20        next.

21             MR. BRAMLETTE:  That is

22        probably -- I think that is the stem of

23        the impasse.

24             MR. ROSE:  Can you re-read my last

25        question please?

Page 124

1                          Taylor

2              (Record read)

3              MR. BRAMLETTE:  Again, I am going

4         to object and say to the extent this

5         asks for attorney-client privileged

6         communications, I am going to instruct

7         him not to answer with regard to those

8         communications.

9    BY MR. ROSE:

10             Q.    It would have been helpful for

11   you, in preparing your expert report, to

12   have seen a written investment policy

13   guideline of the plasterers' fund, correct?

14             A.    Yes.

15             Q.    The fact that you were not able

16   to, you did not see one or advised of its

17   mandate, as you say -- strike that.

18             Did you -- directing your

19   attention to this inartfully drafted

20   paragraph, the lower portion, there is a

21   reference about "reversions to employers of

22   $120,768."

23             Do you see that?

24             A.    Yes.

25             Q.    Do you have an understanding as to

1                         Taylor

2      what that statement refers to?

3           A.     Let me re-read that.

4           Q.     Certainly.

5           THE WITNESS:  I do not understand

6      the reversions to employers of $120,000.

7  BY MR. ROSE:

8           Q.     When you were a fiduciary in the

9      investment committee of U.S. Trust's Pension

10     Plan, did you understand that it was

11     improper under ERISA to revert assets of the

12     plan to the employer?

13          MR. BRAMLETTE:  Objection.

14          Calls for a legal conclusion

15     and --

16          MR. ROSE:  I am asking whether he

17     was advised.

18          MR. BRAMLETTE:  You asked about

19     his understanding, I think.

20          MR. ROSE:  He can read it back.

21          MR. BRAMLETTE:  Are you planning

22     on going down the whole road that we

23     went down before for investment policy,

24     which I understand the relevance of for

25     the other aspect, of which case which we

1                           Taylor

2        know a lot about, with which investment,

3        who is an expert on investment policy?

4               MR. ROSE:  I am trying to figure

5        out how his numbers came up and what his

6        understanding of the numbers that are at

7        issue in terms of the damages that he --

8               MR. BRAMLETTE:  He already

9        testified that he doesn't have an

10       understanding regarding the 120,000 so I

11       have no idea what the relevance or

12       benefit to you, frankly, of asking him

13       about his commensurate experience on

14       something with which he has no

15       familiarity on this case.

16               MR. ROSE:  I appreciate your view.

17               If you have an objection, make it.

18               MR. BRAMLETTE:  I have stated my

19       objection.  I think it is an improper

20       line of questioning.

21               I will leave it as a standing

22       objection until we move to a new topic.

23               MR. ROSE:  Can you find my

24       original question?

25               MR. BRAMLETTE:  He is an

1                          Taylor
2          investment expert.
3                  He is retained simply to discuss
4          the investment policy.
5                  MR. ROSE:  I am referring to his
6          time in the investment committee and I
7          will be tying it back if you give me a
8          chance.
9                  Your objection is noted.
10                 MR. BRAMLETTE:  You are not asking
11         related about his investment experience.
12                 MR. ROSE:  Your objection is
13         noted.
14                 My question is going to be asked
15         and answered and we will get to it and
16         you will be able to move in limine to
17         exclude any statements that you want.
18                 (Record read)
19                 MR. BRAMLETTE:  Did you understand
20         it was improper under ERISA?
21                 In addition to my standing
22         objection it calls for a legal
23         conclusion.
24                 He is not a lawyer.
25                 THE WITNESS:  I did.

1                          Taylor

2     BY MR. ROSE:

3          Q.      How is it that you came to that

4     understanding?

5          A.      I believed, and don't recall my

6     sources, but I believed that the plan of the

7     assets of the pension fund were not -- were

8     totally distinct from the assets of the

9     corporation and never the twain shall meet,

10    and so on.

11         Q.      Would you agree that if

12    fiduciaries to a pension plan returned

13    approximately 10 percent of the assets of

14    the plan to the employer, to the

15    contributing employer, that that would

16    significantly reduce its returns going

17    forward on a compound basis?

18         A.      I have two answers.

19              First, obviously, if you reduce

20    the capital that is invested, you reduce the

21    returns from that capital.

22              But the other answer is that I

23    don't know the reasons for conditions of the

24    return.  Maybe the money was put there

25    inappropriately.

Page 129

1                              Taylor
2              I just don't know any of the facts
3       behind --
4          Q.    I wasn't asking you that question.
5              I was just asking you with respect
6       to the investment of assets of a pension
7       plan, isn't it true you are going to
8       significantly reduce future returns as a
9       result of returning 10 percent of the plan
10      assets to the contributing employer?
11         A.    Less money produces less returns.
12         Q.    Other than your experience serving
13      on the investment committee and advisory
14      committee of the U.S. Trust Pension Fund,
15      have you ever served as a fiduciary to a
16      qualified ERISA plan?
17         A.    No.
18             MR. ROSE:  Will you please mark
19         this as 2?
20             (Report of Fred Taylor was marked
21      Taylor Exhibit 2 for identification)
22      BY MR. ROSE:
23         Q.    Mr. Taylor, I am showing you a
24      document that has been marked Exhibit 2.
25             Is this your expert report?

Page 130

1                          Taylor

2          A.    Yes.

3          Q.    This is the report that you

4    dictated to Mr. Bramlette?

5          A.    Yes.

6          Q.    You had an opportunity to review

7    and revise it before you executed it?

8          A.    Yes.

9          Q.    Actually on that -- I see there is

10   an electronic signature on this.

11                I take it you, in fact, advised

12   Mr. Bramlette that it was okay to put that,

13   affix that?

14         A.    Yes.

15         Q.    In connection with your -- the

16   preparation of your report, did you review

17   any provisions of ERISA?

18         A.    No.

19         Q.    Have you ever seen -- sorry.

20                Prior to the preparation of your

21   report, did you ever look at Section

22   404(a)(1)(C) of ERISA in particular?

23         A.    I do not recall what that section

24   is.

25         Q.    404(a)(1)(C) of ERISA is the

1                          Taylor

2     fiduciary provision of ERISA that requires

3     fiduciaries to invest in a diversified

4     portfolio?

5               MR. BRAMLETTE:  Objection.

6               MR. ROSE:  I wasn't done --

7               MR. BRAMLETTE:  I object anyway.

8               MR. ROSE:  Let me finish.

9     BY MR. ROSE:

10         Q.    Do you believe that would have

11    been helpful to review that provision prior

12    to providing an expert opinion in a case

13    involving ERISA investment of assets?

14         A.    Perhaps, but I believe that my

15    expertise would have been called upon not

16    because of my legal knowledge or

17    understanding of ERISA requirements but,

18    rather, my investment capabilities.

19         Q.    Directing your attention to

20    page -- the second page of your report, it

21    is the first paragraph under Section 3, "My

22    Opinion."

23         A.    Yes.

24         Q.    You state, "Based upon my

25    experience and knowledge, the investment

1                         Taylor
2      strategy endorsed by defendant trustees was
3      satisfactory because it properly sought to
4      minimize risk and preserve assets."
5              Do you see that?
6         A.    I do.
7         Q.    In light of our discussions here
8      today, you still stand by that statement?
9         A.    I stand by the statement that it
10     was -- that it was satisfactory and that it
11     minimized risk in the context -- minimized
12     risk and it did preserve assets.
13        Q.    Sticking money in a hole in your
14     backyard would also preserve assets and
15     minimize risk if it was in a safe spot in
16     your backyard, correct?
17             MR. BRAMLETTE:  Objection.
18     Argumentative.
19             THE WITNESS:  Actually, it
20     wouldn't.
21     BY MR. ROSE:
22        Q.    Why is that?
23        A.    There is no return on monies in a
24     hole in the ground.
25        Q.    Assuming it is in a deep safe in

1                    Taylor
2      your backyard and it is otherwise safe you
3      are not going to lose any assets?
4              MR. BRAMLETTE:  Objection.
5      Argumentative.
6              THE WITNESS:  There is no return
7          was my comment meaning a treasury bill
8          will pay me some interest; a hole in the
9          ground does not.
10  BY MR. ROSE:
11      Q.    Are you -- during your time, your
12  15 or more years as a fiduciary to the U.S.
13  Trust pension plan, were you aware that --
14  ever made aware -- sorry -- that the
15  standard by which fiduciaries are judged is
16  one of similarly situated fiduciaries?  Were
17  you ever made aware of that?
18      A.    In the general context, I would
19  be, I was aware of that.
20      Q.    Okay.  Are you aware of any
21  similarly situated ERISA fiduciaries that
22  invest virtually 100 percent of plan assets
23  in short-term fixed investment vehicles?
24      A.    I am not aware of any other plans.
25      Q.    Directing your attention to the

ab233b05-b848-42f1-837c-6fb45402719d

1                          Taylor
2      third full paragraph under Section 3, my
3      opinion, it states, "Clients have approached
4      U.S. Trust and advised that their goal was
5      to lose no money.  In those cases, an
6      investment strategy of pure fixed income is
7      perfectly appropriate because it increases
8      the likelihood that the goal is achieved."
9                  Do you see that?
10          A.    I see that.
11          Q.    Can you tell me whether or not any
12     one of those clients that you referred to
13     approaching U.S. Trust was a qualified ERISA
14     pension plan?
15          A.    I do not believe so.
16          Q.    You don't believe any of them
17     were, correct?
18          A.    Correct.
19          Q.    What type of clients of U.S. Trust
20     were those that you were referring to, high
21     net worth individuals?
22          A.    High net worth individuals or
23     charitable foundation-type accounts.
24          Q.    That were not subject to ERISA,
25     correct?

1                    Taylor

2      A.    They were not subject to ERISA.  I

3   would have to add though another, excuse me.

4      Q.    Certainly.  Elaborate.

5      A.    That recognizing that we manage

6   portions of ERISA portfolios, I am confident

7   that some of those fixed income portions

8   would have had something approaching a lose

9   no money, so if you are given a mandate to

10  run the short-term investments for the

11  General Motors Pension Fund, the mandate

12  might include, we don't expect to lose any

13  money in this portion.

14     Q.    But as I understood the standard

15  operating procedure from your testimony

16  earlier, U.S. Trust would have been

17  absolutely clear in its investment mandate

18  and would have understood that they were

19  only investing a portion of those assets and

20  was not responsible for the diversification

21  of the entire plan's assets, correct?

22          MR. BRAMLETTE:  Objection as to

23      form.

24          You can answer.

25

1                              Taylor

2    BY MR. ROSE:

3         Q.    Do you understand my question?

4         A.    I understand, yes.  Yes.

5         Q.    Directing your attention to the

6    fifth full paragraph under Section 3,

7    starting, "Moreover," it states, "Moreover,

8    the argument that the plan should have been

9    exposed to more equities and that the

10   defendant trustees failed to make sure it

11   was properly diversified ignores the

12   historical return of different classes of

13   assets."

14        You go on to state, "Fixed income

15   investments have historically returned

16   between 5 and 7 percent while equities have

17   returned between 9 and 10 percent."

18        Over what period of time were you

19   basing these percentages that you state in

20   paragraph -- this paragraph of your expert

21   report?

22        A.    I am attempting to use the

23   Ibbottson and Sinqfield -- don't ask me to

24   spell it --

25        Q.    It won't matter.

Page 137

1                          Taylor

2        A.    -- long-term returns from the

3   various asset classes.

4        Q.    What year does that begin, 1900?

5        A.    Ibbottson and Sinqfield actually

6   begins 1926.

7        Q.    I have seen that before.

8              For the period 1994 through 2005,

9   is that an accurate statement of the returns

10  of fixed assets and equities?

11       A.    It didn't attempt to be a

12  statement for that period so the answer is,

13  no, it would not describe the returns.

14       Q.    Even for --

15       A.    For that period.

16       Q.    Sorry.

17             Even for the period that you were

18  basing those numbers on, from 1926 on, isn't

19  it a fact that that 5 to 7 percent fixed

20  ratio is based on a mix of fixed assets

21  including long-term fixed assets?

22             MR. BRAMLETTE:  Objection.  Form.

23  BY MR. ROSE:

24       Q.    Do you understand my question?

25       A.    I don't understand your term

1                        Taylor
2      assets.
3               I think you mean, fixed income
4      vehicles, correct, for the 5 to 10 percent?
5           Q.    Yes.  I am sorry.  I misstated.
6      Let me try that again.
7               Isn't it a fact that that 5 to
8      7 percent that you estimate to be the
9      historical returns for fixed income vehicles
10     is, in fact, based on a range of fixed
11     income vehicles that would include a good
12     percentage being long term?
13          A.    I would have to go back to my
14     Ibbottson Sinqfield definitions, so I do not
15     know the answer to your question but I
16     believe that it is a -- some sort of medium
17     term bond as opposed to a mix of securities.
18          Q.    Let me ask it a different way.
19              Between 1926 through 2005, do you
20     believe a portfolio invested 100 percent
21     short-term investment vehicles would have
22     had a return of 5 to 7 percent?
23          A.    I don't know the answer.  I would
24     have to do the calculations.
25              You asked, did I believe.  I think

1                           Taylor

2        you are asking me to give a judgment.

3             Q.     He can read back the question.

4        That is what I would like him to do just so

5        it is clear.

6                      I know we are talking about a lot

7        of details here.  I want to make sure the

8        record is clear on this.

9                      (Record read)

10                     THE WITNESS:  I repeat, I would

11                have to do the math and so on.  There

12                is, generally, a positively slope yield

13                curve suggesting that the higher return

14                comes from longer based vehicles.

15       BY MR. ROSE:

16            Q.     There might be little blips,

17       exceptions in time when that is not

18       necessarily true and they might be inverse

19       but the general rule, certainly from the

20       period 1926 through 2005, the general rule

21       is that investors are rewarded for placing

22       their money for longer periods of time with

23       higher investment return rates, isn't that

24       correct?

25                     MR. BRAMLETTE:  Objection to form

1                          Taylor

2              and argumentative.

3                   You can answer.

4     BY MR. ROSE:

5         Q.    Do you understand my question?

6         A.    Not fully.

7         Q.    What part of my question don't you

8     understand?

9         A.    You suggested investing with

10    higher long-term rates.  Rates of what?

11        Q.    Of interest, fixed income.

12        A.    Well --

13        Q.    If you buy a bond for ten years,

14    aren't, generally, the investment --

15    interest rates for the investor more,

16    generally speaking, than short term,

17    short-term fixed vehicles?

18        A.    Risk and return are correlated

19    over the longer term but often if you -- if

20    you simply sought the highest return, you

21    would probably be filling your portfolio

22    with very high risk junk bond type things.

23        Q.    That wouldn't be prudent, would

24    it?

25        A.    That is my answer to your

ab233b05-b848-42f1-837c-6fb45402719d

1                           Taylor

2        question, that you wouldn't seek the highest

3        return.

4            Q.     That is my question, to have a

5        portfolio of high yielding junk bonds

6        virtually 100 percent, that wouldn't be

7        prudent, would it?

8            A.     I would not do it.  I don't think

9        it is prudent.

10           Q.     You wouldn't advise a U.S. Trust

11       client to do it, isn't that a fact?

12           A.     That is true as a fact.

13           Q.     Just so that I am clear, although

14       you understood that the period in question

15       was January 1, 1994 through December 31,

16       2005 you made no effort whatsoever to

17       determine what the actual investment returns

18       would be for short-term fixed instruments

19       and equities over that period of time?

20              MR. BRAMLETTE:  Objection to the

21           extent it misstates the record and

22           misstates the prior testimony.

23              You can answer.

24       BY MR. ROSE:

25           Q.     Do you understand my question?

ab233b05-b848-42f1-837c-6fb45402719d

1                          Taylor

2        A.    I made no effort to precisely

3   determine the returns of those asset classes

4   at that point in time.

5             However, I practiced my profession

6   during that period of time and I believe I

7   am aware what the returns were and we talked

8   about that some time ago, of the different

9   asset classes, returns of the different

10  asset classes.

11       Q.    Just based on your work experience

12  from January 1, 1994 through 12/31/2005,

13  what do you believe short-term investment

14  vehicles yielded over that period of time?

15       A.    The earlier question had to do

16  with order of magnitude.

17       Q.    I have a new question.  He can

18  read it back.

19            MR. ROSE:  Why don't you please?

20            (Record read)

21            THE WITNESS:  4 to 5 percent.

22  BY MR. ROSE:

23       Q.    And equities over the same period

24  of time?

25       A.    12 to 15 percent.

Page 143

1                          Taylor

2       Q.     You have a sentence, I believe the

3   last sentence of this paragraph we have been

4   looking at, it says, "It was reasonable

5   given their investment outlook and their

6   apparent view of the objectives of the

7   portfolio for the defendant trustees to have

8   determined that the upside of a few

9   percentage points in potential gain was not

10  worth an increased downside risk."

11         Do you see that?

12      A.     Yes, I do.

13      Q.     What did you mean by "given their

14  investment outlook"?

15      A.     I am here attempting to deduce

16  their view of the market.  I am deducing it

17  from the conservative nature of the

18  portfolio.

19         My experience is that when you are

20  highly conservative, you choose highly

21  conservative -- when you have a highly

22  conservative or worried view of the market

23  or are highly conservative in terms of the

24  objectives, you turn to more conservative

25  investment vehicles.

1                        Taylor

2        Q.    Would you agree that you could

3   have a highly conservative portfolio that

4   would include equities?

5        A.    Yes.

6        Q.    By investing in Dow Jones

7   companies, for example?

8        A.    No, not necessarily that.

9              But, rather, you can have a highly

10  conservative portfolio that has 5 percent in

11  equities, for example, or 1 percent.  You

12  can have a highly conservative -- it would

13  be --

14       Q.    Could you --

15       A.    It would be more the percentage

16  than the vehicle.

17       Q.    Could you have a conservative

18  portfolio that had 50 percent equities?

19       A.    I believe that that stretches it

20  at U.S. Trust as we define categories of

21  accounts.

22             Conservative would have suggested

23  a lower allocation to equities.

24       Q.    What would the break point be in

25  terms of equities?  Would that be a

1                            Taylor

2      40 percent equity?

3                Would that still be conservative?

4           A.    Well, again, the use of the word

5      conservative would be different.   The

6      definition would be different by different

7      investment institutions as they apply their

8      categories of accounts.

9                For us, the word "conservative"

10     was the most conservative account and there

11     our range might be zero to 30 percent,

12     something like that.

13          Q.    Was there a classification of

14     moderately conservative accounts?

15          A.    Yes.

16          Q.    What was the range of moderately

17     conservative accounts?

18          A.    Again that would change over time

19     but, let's say, 30 to 55, something of that

20     order of magnitude.

21          Q.    Of equities, 30 to 50 percent?

22          A.    Yes.

23          Q.    Directing your attention to the

24     next page, you state in the last paragraph

25     -- strike that.

1                     Taylor

2              I am going to move on.

3              MR. ROSE:  Can you mark -- can you

4       mark this as Exhibit 3 please?

5              (Rebuttal Report of Michael D.

6       Cairns was marked Taylor Exhibit 3 for

7       identification)

8  BY MR. ROSE:

9         Q.    Mr. Taylor, I am showing you a

10      document that has been marked Exhibit 3.

11             This is the expert report of

12      Michael D. Cairns rebutting defendant's Rule

13      26(a)(2) report by yourself, Mr. Fred

14      Taylor.

15             You have seen this document,

16      correct?

17        A.    Yes.

18        Q.    Do you recall what your reaction

19      was after you reviewed this document?

20        A.    Yes.

21        Q.    What was your reaction to this

22      document?

23        A.    I enjoyed -- I don't know

24      Mr. Cairns.  I don't recall his background

25      but I enjoyed his academic precision.

# ATTACHMENT P

# Bailey & Bailey P.A.

## CERTIFIED PUBLIC ACCOUNTANTS

Ralph L. Bailey, CPA (1943-1974)   ▢   Brian H. Bailey, CPA   ▢   John A. Tvelia, CPA   ▢   Joseph L. Usilton, CPA

June 5, 1991

Board of Trustees
Operative Plasterers Local Union
 No. 96 Welfare Plan
1411 K Street, N.W.
Suite 1030
Washington, D.C. 20005

Dear Sirs:

In planning and performing our audit of the financial statements of the Operative
Plasterers Local Union No. 96 Welfare Plan, for the year ended December 31, 1990,
we considered its internal control structure in order to determine our auditing
procedures for the purpose of expressing our opinion on the financial statements
and not to provide assurance on the internal control structure. However, we
noted certain matters involving the internal control structure and its operation
that we consider to be reportable conditions under standards established by the
American Institute of Certified Public Accountants.  Reportable conditions
involve matters coming to our attention relating to significant deficiencies in
the design or operation of the internal control structure that, in our judgment,
could adversely affect the ability of the Welfare Plan to record, process,
summarize and report financial data consistent with the assertions of management
in the financial statements.

> The bookkeeper has the authority to sign initial certificates of deposit
> and to redeem certificates of deposit.  This authority should be revoked
> so that the separation of duties between the recording of assets and the
> safeguarding of assets can be properly maintained.

A material weakness is a reportable condition in which the design or operation
of one or more of the internal control structure elements does not reduce to a
relatively low level the risk that errors or irregularities in amounts that would
be material to the financial statements being audited may occur and not be
detected within a timely period by employees in the normal course of performing
their assigned functions.

EXHIBIT
12
SCHOLAR

SDS-0043

5000 Sunnyside Avenue
Beltsville, Maryland
20705-2377

(301) 595-5600

P.O. Box 507
College Park, Maryland

Board of Trustees
Operative Plasterers Local Union
No. 96 Welfare Plan
June 5, 1991
Page Two

Our consideration of the internal control structure would not necessarily disclose all matters in the internal control structure that might be reportable conditions and, accordingly, would not necessarily disclose all reportable conditions that are also considered to be material weaknesses as defined above. However, the reportable condition described above is not believed to be a material weakness.

The following procedure was noted during our examination.

> The minutes of the Welfare Plan Board of Trustees are not being signed and distributed to the appropriate parties on a timely basis. This procedure should be changed so that the minutes are signed and distributed soon after the meeting is held.

This report is intended solely for the information and use of the Operative Plasterers Local Union No. 96 Welfare Plan, Trustees and others within the organization.

Very truly yours,

*Bailey & Bailey, P.A.*

Bailey & Bailey, P. A.
Certified Public Accountants

SDS-0044

# ATTACHMENT Q

# SAM D. SCHOLAR
### ATTORNEY AT LAW
### 308 HILLWOOD AVENUE
### SUITE 300
### FALLS CHURCH, VIRGINIA 22046-2916

SAM D. SCHOLAR (VA. & D.C.)

**(703) 534-1822**
**Facsimile (703) 536-3970**

DANIEL W. HUMBERT (VA.)
(OF COUNSEL)

February 20, 1991

**HAND-DELIVERED**

Mr. Harry C. Perry, Jr.
Plan Administrator
Plasterers Local Union No. 96
Pension and Welfare Fund
1411 K Street, N.W., Suite 1030
Washington, D.C. 20005

Re: Clarification of Pension Issues

Dear Mr. Perry:

Enclosed is a copy of your inquiries concerning the pension plan. Your questions involve forfeiture and the requirement to pay the forfeited contributions to the employees.

As you know, the IRS pension regulations are written for single employer plans where the employer pays a percentage of the employees wages as a fringe benefit into a pension plan. If the employee works a required number of years, the employee gains a vested ownership interest in the employer's contributions.

The plasterers plan is a multi-employer plan in which the union members have asked the employer to pay a portion of their wages into a union pension and welfare fund instead of directly to the employee as wages. This is not a fringe benefit. It is the employee's money that in a sense is put into a forced savings account.

The best way to insure that the union member does not lose ownership of his wage contributions to these plans is to have immediate 100% vesting in the plan. In this way, the employee would always own the plan contribution. If he leaves employment with a union contractor, he would have the money waiting for him when he retired at age 65. Immediate vesting would eliminate the possibility of forfeiture in the plan.

The plan would need to be amended to carry out this plan. The IRS permits immediate vesting and thus there should be no problems.

Another alternative in the plan would be to lengthen the break-in-service necessary to create a forfeiture. Under the present plan, a one year break-in-service will cause a nonvested account to be forfeited to the employer. This period can be lengthened to five years, avoiding forfeiture in all absences up to 5 years. The problem with this approach is that forfeitures are still possible. Since this is the union member's money and not a fringe benefit from the employer, we should consider eliminating the possibility of forfeiture.



With regard to retirees over 65 who return to work, they would vest immediately under the current plan and be entitled to a lump sum distribution for each year that they worked when they were over 65. Their lump sum distribution amount is determined on the valuation date and can't take into account any work performed after the valuation date. Those funds would be reflected in a lump sum distribution in the following year. In a sense, they are like a new employee every year in their post retirement age period.

Please let me know if you have any questions about any of the above.

With best regards, I am

Very truly yours,

*Sam D. Scholar*

Sam D. Scholar

SDS/har

Enclosures

0204

# ATTACHMENT R

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Southern Division)

| | |
|---|---|
| PLASTERERS' LOCAL UNION NO. 96 PENSION PLAN, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>HAROLD PERRY, *et al.*, )<br><br>Defendants. ) | C.A. No. PJM 06 CV 158 |

**EXPERT REPORT OF MICHAEL D. CAIRNS**

1.  I am employed as the East Coast Taft Hartley Director and Senior Investment Consultant with New England Pension Consultants ("NEPC"). NEPC is an investment consulting firm founded in 1986 which services over 254 retainer clients with $250 billion in assets covering corporate, endowment, public, high net worth and Taft Hartley clients.

2.  I am currently the investment consultant on eight Taft Hartley clients, with thirteen plans (defined benefit, defined contribution, health & welfare and training funds), for NEPC with asset values ranging from $4 million $1.6 billion.  Within those thirteen plans, I currently consult on three defined benefit plans with assets in excess of $1 billion and two defined benefit plans with assets in excess of $600 million.

3.  I have eighteen years of investment and benefits consulting experience as a fiduciary in the Taft-Hartley market.  Prior to joining NEPC, I was a Senior Investment Consultant at The Marco Consulting Group ("MCG") from 2001-2006, the largest investment consulting firm dedicated to the Taft Hartley market with assets under advisement of $80 billion.  While at MCG, I was the lead Investment Consultant on over 20 client relationships which had over $4 billion in total assets.  Prior to joining MCG, I was employed at Milliman & Robertson Inc., a leading actuarial firm, from 1997 to 2001 as a Benefits Consultant on both pension and welfare plans for the Taft-Hartley unit of Milliman & Robertson, Inc.  Prior to Milliman & Robertson Inc., I was spent over five years, 1991 to 1997, as the Regional Manager for Zenith Administrators, Inc., one of the nation's leading third party administrators of Taft-Hartley benefit plans.  Prior to my involvement in the multi-employer (Taft Hartley) arena, I worked in the public accounting field. I am a Certified Employee Benefit Specialist ("CEBS") and I am a member of the International Society of Certified Employee Benefit Specialists ("ISCEBS").

4.  I am a regular speaker at educational conferences covering investment consulting, including the Enhanced Income for Retirement by Education, The Marco Consulting Group's Client Conference, the NEPC Client Conference and the International Foundation of Employee Benefit Plans, covering topics such as international investing, private equity, investing for pension and health & welfare funds and hedge funds.

1

## Summary of Findings

5.  It is my understanding that from at least 1994 through early 2005, the Plasterers' Local Union No. 96 Pension Plan ("Plasterers' Plan") had virtually all of the Plan assets invested in certificates of deposits, money market or cash equivalents. Such an allocation does not constitute a prudently diversified portfolio under the Employees Retirement Income Security Act ("ERISA") of 1974.

6.  Diversification is not only mandated by ERISA, it is the best tool for achieving an appropriate balance between investment risk and return. Diversification is the process of spreading assets among different investments, securities, issuers, maturity dates and localities in order to minimize the portfolio's exposure and to distribute the risk of the portfolio. A fund can reduce its risk through diversification simply by holding investment instruments which are not perfectly correlated. In other words, a fund can reduce its exposure to asset class risk by holding a diversified portfolio of asset classes, such as stocks, bonds, etc. Diversification will allow for the same portfolio return with reduced risk. For diversification to work, the component assets must not be perfectly correlated, which means their return patterns do not move together and would react differently to the same event. A blending of these asset types with different patterns reduces volatility and can increase investment return.

7.  Diversification of a fund is done through the asset allocation process. Asset allocation is the primary determinant contributing to the long term success of a fund. The purpose of asset allocation is to determine the efficient allocation, or spreading, of asset classes (stocks, bonds, etc.) and provide a solid foundation for diversifying a fund's investable assets across these asset classes. The purpose of diversification is not primarily to increase returns, but to achieve a desired level of return with a lower amount of risk. An appropriate asset mix, or allocation, is one which offers the high probability of achieving an investment return that is expected to fund the benefit levels promised by a fund and do so with a high level of diversification and at the lowest possible risk level. This is the ultimate goal of asset allocation.

8.  Much of what we know about asset allocation and diversification is based on the Modern Portfolio Theory ("MPT"), which was developed by Harry Markowitz and published under the title "Portfolio Selection" in the 1952 Journal of Finance. In general, the MPT, which was first developed for a "stock" only portfolio, shows the risk of a diverse portfolio of individual stocks will be less than the inherent risk in holding any single one of the individual stocks. It was later expanded to show how the MPT could be applied to asset allocation as a whole. MPT showed how "unsystematic risk", which common sources are business risk and financial risk, can be

2

diversified away by investing in various asset classes that are not all affected the same way by market events, meaning they are uncorrelated. As described above, this is the basis of diversification.

9. The Trustees of the Plasterers' Local Union No. 96 Pension Plan should have used prudent diversification of the Plan's assets to eliminate or reduce risk by investing in higher yielding asset classes, such as the broad market S&P 500 (stocks) and the Lehman Aggregate (bonds), both of which are appropriate asset classes for the Plasterers' Plan, over the period beginning January 1, 1994 through December 31, 2005.

10. A prudent asset allocation mix of a 50% S&P 500 and 50% Lehman Aggregate, which is an appropriate mix of asset classes for the Plasterers' Plan in which to add income and appreciation while also retaining principal, for the period under review ending December 31, 2005, in lieu of cash, as the Plan was invested in, would have led to an approximate market value of assets on December 31, 2005 of $3,500,159.00, with a beginning market value at January 1, 1994 of $1,260,967.00 or $3,835,383.00 on December 31, 2005, assuming the reversions to employers of $120,768.00 are added to the January 1, 1994 beginning market value to equal $1,381,735.00. These approximations do not take into consideration benefit and administrative payouts.

11. Based on my eighteen years of experience, serving as a fiduciary to Taft Hartley pension plans, it is my opinion that a prudent asset mix for the Plasterers' Plan would have been 50% S&P 500 and 50% Lehman Aggregate. This prudent allocation of the Plasterers' Plan assets would have effectively increased the market value of the assets significantly, as set forth in the attached charts, in order to cover the administrative expenses of the Plasterers' Plan and to provide a reasonable level of benefits for the Plasterers' participants.

Respectfully Submitted,

Michael D. Cairns, CEBS
June 25, 2007

3

# Prudent Asset Allocation – Exhibit A

- On January 1, 1994, the audited statement of market value of assets was $1,260,967

- Prudent asset allocation mix:
  - 50% S&P 500 / 50% LB Aggregate

- Estimated market value of assets for prudently allocated assets (using actual returns):

| Date | 50% S&P 500 / 50% LB Aggregate |
|---|---|
| Jan-94 | $1,260,967 |
| Dec-94 | $1,250,812 |
| Dec-95 | $1,600,478 |
| Dec-96 | $1,814,047 |
| Dec-97 | $2,204,347 |
| Dec-98 | $2,614,969 |
| Dec-99 | $2,879,255 |
| Dec-00 | $2,915,399 |
| Dec-01 | $2,865,058 |
| Dec-02 | $2,695,514 |
| Dec-03 | $3,137,568 |
| Dec-04 | $3,376,109 |
| Dec-05 | $3,500,159 |

| Date | Actual Market Values |
|---|---|
| Jan-94 | $1,260,967 |
| Dec-94 | $1,178,602 |
| Dec-95 | $1,304,938 |
| Dec-96 | $1,398,573 |
| Dec-97 | $1,238,796 |
| Dec-98 | $1,178,578 |
| Dec-99 | $1,319,108 |
| Dec-00 | $1,387,079 |
| Dec-01 | $1,571,668 |
| Dec-02 | $1,665,343 |
| Dec-03 | $1,628,599 |
| Dec-04 | $1,717,595 |
| Dec-05 | $1,929,843 |

| Date | Actual Investment Return |
|---|---|
| Jan-94 | NA |
| Dec-94 | $36,636 |
| Dec-95 | $69,550 |
| Dec-96 | $62,580 |
| Dec-97 | $61,349 |
| Dec-98 | $59,204 |
| Dec-99 | $47,406 |
| Dec-00 | $65,131 |
| Dec-01 | $58,582 |
| Dec-02 | $25,006 |
| Dec-03 | $7,610 |
| Dec-04 | $8,240 |
| Dec-05 | $43,031 |



# Prudent Asset Growth

## Market Value of Assets





# Prudent Asset Allocation – Exhibit B

- On January 1, 1994, the audited statement of market value of assets, assuming forfeitures of $120,768 were added to equal $1,381,735

- Prudent asset allocation mix:
  - 50% S&P 500 / 50% LB Aggregate

- Estimated market value of assets for prudently allocated assets (using actual returns):

| Date | 50% S&P 500 / 50% LB Aggregate |
|------|------|
| Jan-94 | $1,381,735 |
| Dec-94 | $1,370,608 |
| Dec-95 | $1,753,762 |
| Dec-96 | $1,987,786 |
| Dec-97 | $2,415,466 |
| Dec-98 | $2,865,416 |
| Dec-99 | $3,155,013 |
| Dec-00 | $3,194,619 |
| Dec-01 | $3,139,457 |
| Dec-02 | $2,953,675 |
| Dec-03 | $3,438,065 |
| Dec-04 | $3,699,452 |
| Dec-05 | $3,835,383 |

| Date | Actual Market Values |
|------|------|
| Jan-94 | $1,260,967 |
| Dec-94 | $1,178,602 |
| Dec-95 | $1,304,938 |
| Dec-96 | $1,398,573 |
| Dec-97 | $1,238,796 |
| Dec-98 | $1,178,578 |
| Dec-99 | $1,319,108 |
| Dec-00 | $1,387,079 |
| Dec-01 | $1,571,668 |
| Dec-02 | $1,665,343 |
| Dec-03 | $1,628,599 |
| Dec-04 | $1,717,595 |
| Dec-05 | $1,929,843 |

| Date | Actual Investment Return |
|------|------|
| Jan-94 | NA |
| Dec-94 | $36,636 |
| Dec-95 | $69,550 |
| Dec-96 | $62,580 |
| Dec-97 | $61,349 |
| Dec-98 | $59,204 |
| Dec-99 | $47,406 |
| Dec-00 | $65,131 |
| Dec-01 | $58,582 |
| Dec-02 | $25,006 |
| Dec-03 | $7,610 |
| Dec-04 | $8,240 |
| Dec-05 | $43,031 |



# Prudent Asset Growth



## Market Value of Assets



# Appendix

## Actual Calendar Year Returns

| Year | S&P 500 | LB Aggregate |
|------|---------|--------------|
| 1994 | 1.31% | -2.92% |
| 1995 | 37.44% | 18.47% |
| 1996 | 23.07% | 3.62% |
| 1997 | 33.36% | 9.68% |
| 1998 | 28.58% | 8.68% |
| 1999 | 21.05% | -0.83% |
| 2000 | -9.12% | 11.63% |
| 2001 | -11.89% | 8.44% |
| 2002 | -22.11% | 10.27% |
| 2003 | 28.69% | 4.11% |
| 2004 | 10.87% | 4.33% |
| 2005 | 4.92% | 2.43% |

# ATTACHMENT S

OPERATIVE PLASTERERS
LOCAL UNION NO. 96
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C. 20005

7980

15-55/640

PAY
TO THE
ORDER OF.    A & P CONTRACTORS, INC.

FEB 16 1994    19____

$ 913.13

THE Sum 913 DOLS 13 cts                          DOLLARS

AMERICAN SECURITY BANK, N.A.

FOR  REFUND OF CONTRACTOR CONTRIBUTIONS
     ON NON-VESTED MEMBERS (1987-1992)

#00 7980#  .05 .000 55 :13 860 82 328#

COMPTR. JR.  UNION TR.

**OPERATIVE PLASTERERS**
**LOCAL UNION NO. 96**
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C.  20005

8020

15-55/540

December 1                19 94

PAY
TO THE
ORDER OF    JOHN BARIANOS                                              $ 6,369.08

*THE SUM 6369 DOLS 08 CTS*                                            DOLLARS

▥ AMERICAN SECURITY BANK, N.A.
City Office
1202 K Street, N.W.
Washington, D.C. 20005

CONTR. TR. - UNION TR.

Refund of Forfeited Contributions
FOR  for 1987, 1988, 1989

⑈0080 20⑈  ⑈:0540005 51⑈:13⑈860 82 328⑈

PerrySecond -- 22713

PLASTERERS LOCAL UNION No. 96

PENSION FUND        WELFARE FUND

1411 K STREET, N.W.
SUITE 502
WASHINGTON, D.C. 20005

HARRY C. PERRY, JR.
ADMINISTRATOR
•
(202) 347-6503

July 29, 1994

C. J. Coakley Company, Inc.
P O Box 655
Merrifield, Virginia  22116

The enclosed check in amount of $ 3,416.29 represents a refund of contributions made in 1993 for employees who did not have 1,000 hours of prior employment and were not eligible for Pension Fund contributions.

We will issue a Form 1099 to C. J. Coakley Company, Inc. at the end of the year for the full amount of refund.

This money may be refunded to the employees for whom it was paid and listed as 1099 income to them.  We are attaching a list of employees for whom the benefits were paid.

Please do not hesitate to call or write if you have any questions.

Cordially,

Lee P. Wagner

lpw
Enclosure:  Check No. 8007

---

OPERATIVE PLASTERERS
LOCAL UNION NO. 9 6
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C.  20005

8007

16-55/540

JUL 26 1994         19

PAY
TO THE
ORDER OF     C. J. COAKLEY CO., INC.                          $ 3,416.29

THE SUM 3416 DOLS 29 CTS                              DOLLARS

CONTR. TR. - UNION TR.

AMERICAN SECURITY BANK, N.A.
City Office
1411 K Street, N.W.
Washington, D.C. 20005

REFUND OF 1993 CONTRIBUTIONS
FOR  MADE FOR INELIGIBLE EMPLOYEES

⑈008007⑈ ⑆054000551⑆13⑈860 82 328⑈

**OPERATIVE PLASTERERS**
**LOCAL UNION NO. 96**
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C.  20005

7972

15-55/540

FEB 1 0 1994   19___

PAY TO THE ORDER OF   C. J. COAKLEY CO. INC.                                    $ 69,281.78

THE SUM 69281 DOLS 78 CTS                                                 DOLLARS

AMERICAN SECURITY BANK, N.A.
City Office
102 E Street, N.W.
Washington, D.C. 20006

CONTR. TR. - UNION TR.

FOR   RETURN OF FORFEITED CONTRIBUTIONS
(NON-VESTED EMPLOYEES)

⑅007972⑅ ⑉054000551⑈ 13⑇860 82 328⑅

---

**OPERATIVE PLASTERERS**
**LOCAL UNION NO. 96**
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C.  20005

7971

15-55/540

FEB 1 0 1994   19___

PAY TO THE ORDER OF   C. J. COAKLEY CO. INC.                                    $ 6,875.31

THE SUM 6875 DOLS 31 CTS                                                  DOLLARS

AMERICAN SECURITY BANK, N.A.
City Office
102 E Street, N.W.
Washington, D.C. 20006

CONTR. TR. - UNION TR.

FOR   REFUND OF 1992 CONTRIBUTIONS PAID
ON INELIGIBLE EMPLOYEES

⑅007971⑅ ⑉054000551⑈ 13⑇860 82 328⑅

---

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, and 4a & b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write "Return Receipt Requested" on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):
1. ☐ Addressee's Address
2. ☐ Restricted Delivery
Consult postmaster for fee.

3. Article Addressed to:

Mr. C. J. Coakley
C. J. Coakley Co., Inc.
P. O. Box 655
Merrifield, Va.  22116

4a. Article Number
P 235 658 987

4b. Service Type
☐ Registered          ☐ Insured
☑ Certified           ☐ COD
☐ Express Mail        ☐ Return Receipt for Merchandise

7. Date of Delivery
2/08/94

6. Signature (Addressee)

8. Addressee's Address (Only if requested and fee is paid)

5. Signature (Agent)

PS Form 3811, December 1991   ☆ U.S.G.P.O.: 1992-307-530   **DOMESTIC RETURN RECEIPT**

PerrySecond -- 22750

-15-

**OPERATIVE PLASTERERS**
**LOCAL UNION NO. 9 6**
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C.  20005

7984

15-55/540

FEB 2 4 1994   19

PAY
TO THE
ORDER OF    COMMERCIAL INTERIOR BUILDERS                                $ 807.76

THE SUM 807 DOLS 76 CTS                                    DOLLARS

AMERICAN SECURITY BANK, N.A.
City Office
502 E. Street, N.W.
Washington, D.C. 20004

CONTR. TR. - UNION TR.

FOR  REFUND OF FORFEITED CONTRACTOR
CONTRIBUTIONS

⑈007984⑈ ⑈054000551⑈ 13⑈860 82 328⑈

-21-

PerrySecond -- 22761

**OPERATIVE PLASTERERS**
**LOCAL UNION NO. 96**
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C. 20005

8004

16-55/540

JU 19 1994  19

PAY
TO THE
ORDER OF   JOHN H. HAMPSHIRE, INC.                                    $ 294.00

THE SUM 294 DOLS 00 CTS                                              DOLLARS

AMERICAN SECURITY BANK, N.A.
City Office
930 K Street, N.W.
Washington, D.C. 20006

CONTR. TR. - UNION TR.

FOR   REFUND OF 1993 CONTRIBUTIONS
MADE FOR INELIGIBLE EMPLOYEES

⑇008004⑇ ⑆054000551⑆ 13⑇860 82/328⑇

PerrySecond – 22723

**OPERATIVE PLASTERERS
LOCAL UNION NO. 96**
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C.  20005

7982

FEB 24 1994          19____          15-65/540

PAY
TO THE
ORDER OF   JOHN H. HAMPSHIRE, INC.                          $ 9,749.39

*THE SUM 9749 DOLS 39 CTS*                                    DOLLARS

AMERICAN SECURITY BANK, N.A.
City Office
100 S. Broad, N.W.
Washington, D.C. 20005

REFUND OF FORFEITED CONTRACTOR
FOR CONTRIBUTIONS

⑈007982⑈ ⑈054000551⑈ 13⑈860 82 328⑈

CONTR. TR. - UNION TR.

---

**OPERATIVE PLASTERERS
LOCAL UNION NO. 96**
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C.  20005

7983

FEB 24 1994          19____          15-65/540

PAY
TO THE
ORDER OF   JOHN H. HAMPSHIRE, INC.                          $ 1,490.25

*THE SUM 1490 DOLS 25 CTS*                                    DOLLARS

AMERICAN SECURITY BANK, N.A.
City Office
100 S. Broad, N.W.
Washington, D.C. 20005

REFUND OF 1992 CONTRIBUTIONS
FOR MADE ON INELIGIBLE EMPLOYEES

⑈007983⑈ ⑈054000551⑈ 13⑈860 82 328⑈

CONTR. TR. - UNION TR.

PerrySecond -- 22766

**OPERATIVE PLASTERERS**
**LOCAL UNION NO. 9 6**
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C. 20005

7988

15-55/540

March 25   19 94

PAY
TO THE
ORDER OF   RICHARD L. JACKSON, INC.                                $ 846.01

THE SUM 8 46 DOLS 0 1 CTS                                          DOLLARS

AMERICAN SECURITY BANK, N.A.
City Office
1501 K Street, N.W.
Washington, D.C. 20005

CONTR. TR. — UNION TR.

FOR   REFUND OF FORFEITED CONTRACTOR
CONTRIBUTIONS   ⑈007988⑈ ⑊054000551⑊ 13⑈860 82 328⑈   ⑈0000084601⑈



OPERATIVE PLASTERERS
LOCAL UNION NO. 96
PENSION FUND
1611 K ST., N.W.
WASHINGTON, D.C. 20005

7973

15-56/640

FEB 10 1994                19__

PAY
TO THE
ORDER OF    R. FLOYD JENNINGS, JR.                    $ 475.88

THE SUM 475 DOLS 88 CTS                                DOLLARS

AMERICAN SECURITY BANK, N.A.

REFUND OF FORFEITED CONTRIBUTIONS
FOR   (R. FLOYD JENNINGS & SON INC.)

CONTR. JR. - UNION TR.

CONTR. JR. - UNION TR.

⑈007973⑈ ⑈0540005 5⑈: 13⑈860  82 328⑈



OPERATIVE PLASTERERS
LOCAL UNION NO. 96
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C. 20005

7977

FEB 10 1994

$ 193.72

THE SUM 193 DOLS 72 CTS

DOLLARS

PAY TO RICHARD W. BOYLE

AMERICAN SECURITY BANK, N.A.

REFUND OF FORFEITED CONTRACTOR
CONTRIBUTIONS (KRAFFT-MURPHY CO.)

CONTR.-TR.-UNION TR.

PerrySecond – 22785

-42-



OPERATIVE PLASTERERS
LOCAL UNION NO. 96
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C. 20005

7976

16-88/749

PAY
TO THE
ORDER OF    FRANK J. KRAFT

FEB 1 0 1994    19___    $ 236.77

THE SUM 236 DOLS 77 CTS    DOLLARS

🏦 AMERICAN SECURITY BANK, N.A.

COMPTR.    UNION TR.

FOR CONTRIBUTIONS (KRAFT-MURPHY CO.)
REFUND OF FORFEITED CONTRACTOR
CONTRIBUTIONS

⑈007976⑈ ⑆054000055⑈ ⑈3⑈860 82 328⑈



PerrySecond — 22801



OPERATIVE PLASTERERS
LOCAL UNION NO. 96
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C. 20005

7978

FEB 10 1994

PAY TO THE ORDER OF    RAYMAN, MARTIN & FADER, INC.    $ 2,997.72

The Sum 2997 Dols 72 cts    DOLLARS

AMERICAN SECURITY BANK, N.A.

REFUND OF FORFEITED CONTRACTOR
CONTRIBUTIONS

-54-





OPERATIVE PLASTERERS
LOCAL UNION NO. 96
PENSION FUND
1411 K ST., N.W.
WASHINGTON, D.C. 20005

7979

15-55/540

FEB 1 0 1994   19___

$ 1,086.76

PAY TO THE ORDER OF   SOUTHERN INSULATION, INC.

THE SUM 1086 DOLS 76 CTS                                    DOLLARS

AMERICAN SECURITY BANK, N.A.

FOR   REFUND OF FORFEITED CONTRACTOR CONTRIBUTIONS

⑈007979⑈ ⑆054000551⑈ 13⑈860  82  328⑈

Southern Insulation, Inc.
5218 Monroe Place
Hyattsville, MD  20780

PS Form 3811,

RETURN RECEIPT

| | |
|---|---|
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | 100 |
| Return Receipt Showing to Whom, Date, and Address's Address | |
| TOTAL Postage & Fees | $2.29 |
| Postmark or Date | |

PS Form 3800, June 1991

PerrySecond – 22812

☐ VOID   ☐ CORRECTED

| PAYER'S name, street address, city, state, and ZIP code | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| OPERATIVE PLASTERERS LOCAL UNION<br>NO 96 PENSION FUND<br>1411 K STREET, NW # 502<br>WASHINGTON, DC 20005 | | $ | **1994** | **Miscellaneous Income** |
| | | 2 Royalties<br>$ | | |
| | | 3 Other Income<br>$          165.38 | | |
| PAYER'S Federal identification number<br>52-6036660 | RECIPIENT'S identification number<br>53-0185658 | 4 Federal income tax withheld<br>$ | 5 Fishing boat proceeds<br>$ | |
| RECIPIENT'S name, address, and ZIP code<br><br>BLAKE CONSTRUCTION CO., INC.<br><br>1120 CONNECTICUT AVENUE, NW # 1200<br><br>WASHINGTON, DC 20036 | | 6 Medical and health care payments<br>$ | 7 Nonemployee compensation<br>$ | |
| | | 8 Substitute payments in lieu of<br>dividends or interest<br>$ | 9 Payer made direct sales of<br>$5,000 or more of consumer<br>products to a buyer<br>(recipient) for resale ▶ ☐ | **Copy 1**<br>**For State Tax**<br>**Department** |
| | | 10 Crop insurance proceeds<br>$ | 11 State income tax withheld | |
| Account number (optional) | | 12 State/Payer's state number | | |

Form **1099-MISC**                                  Department of the Treasury - Internal Revenue Service

☐ VOID   ☐ CORRECTED

| PAYER'S name, street address, city, state, and ZIP code | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| OPERATIVE PLASTERERS LOCAL UNION<br>NO 96 PENSION FUND<br>1411 K STREET, NW # 502<br>WASHINGTON, DC 20005 | | $ | **1994** | **Miscellaneous Income** |
| | | 2 Royalties<br>$ | | |
| | | 3 Other Income<br>$          913.13 | | |
| PAYER'S Federal identification number<br>52-6036660 | RECIPIENT'S identification number<br>52-0695056 | 4 Federal income tax withheld<br>$ | 5 Fishing boat proceeds<br>$ | |
| RECIPIENT'S name, address, and ZIP code<br><br>A & P CONTRACTORS, INC.<br><br>20516 FREDERICK ROAD<br><br>GERMANTOWN, MD 20876 | | 6 Medical and health care payments<br>$ | 7 Nonemployee compensation<br>$ | |
| | | 8 Substitute payments in lieu of<br>dividends or interest<br>$ | 9 Payer made direct sales of<br>$5,000 or more of consumer<br>products to a buyer<br>(recipient) for resale ▶ ☐ | **Copy 1**<br>**For State Tax**<br>**Department** |
| | | 10 Crop insurance proceeds<br>$ | 11 State income tax withheld | |
| Account number (optional) | | 12 State/Payer's state number | | |

Form **1099-MISC**                                  Department of the Treasury - Internal Revenue Service

☐ VOID   ☐ CORRECTED                              PerrySecond — 22701

| PAYER'S name, street address, city, state, and ZIP code | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| OPERATIVE PLASTERERS LOCAL UNION<br>NO 96 PENSION FUND<br>1411 K STREET, NW # 502<br>WASHINGTON, DC 20005 | | $ | **1994** | **Miscellaneous Income** |
| | | 2 Royalties<br>$ | | |
| | | 3 Other Income<br>$          6369.08 | | |
| PAYER'S Federal identification number<br>52-6036660 | RECIPIENT'S identification number<br>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 | 4 Federal income tax withheld<br>$ | 5 Fishing boat proceeds<br>$ | |
| RECIPIENT'S name, address, and ZIP code<br><br>JOHN BARIANOS<br><br>TILOU 1<br><br>RHODES, GREECE | | 6 Medical and health care payments<br>$ | 7 Nonemployee compensation<br>$ | |
| | | 8 Substitute payments in lieu of<br>dividends or interest<br>$ | 9 Payer made direct sales of<br>$5,000 or more of consumer<br>products to a buyer<br>(recipient) for resale ▶ ☐ | **Copy 1**<br>**For State Tax**<br>**Department** |
| | | 10 Crop insurance proceeds<br>$ | 11 State income tax withheld | |
| Account number (optional) | | 12 State/Payer's state number | | |

Form **1099-MISC**                                  Department of the Treasury - Internal Revenue Service