**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(Southern Division)**

|  |  |  |
|---|---|---|
| **PLASTERERS' LOCAL UNION NO. 96 PENSION PLAN, *et al.*,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | C.A. No. PJM 06 CV 338 |
| **v.** | ) ) ) | |
| **HAROLD PERRY, *et al.*,** | ) ) | |
| **Defendants.** | ) ) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Plasterers' Local Union No. 96 Pension Plan (the "Plan"), Cherie Pleasant and James Miller, as trustees, on behalf of the Plan (collectively, the "Plaintiffs"), by and through undersigned counsel, hereby respectfully submit their Proposed Findings of Fact and Conclusions of Law in the above-captioned case against Harry C. Perry, Jr., James Lertora, and Edgar Pepper (collectively, the "Defendants").

## I. FINDINGS OF FACT

### A. The Structure and Purpose of the Plan

1. The Plan is a "pension plan" as that term is defined under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") § 3(2); 29 U.S.C. § 1002(2). The Plan is organized as a "multiemployer plan" as that term is defined under ERISA § 3(37); 29 U.S.C. § 1002(37). The Plan is subject to the provisions of ERISA pursuant to ERISA § 4; 29 U.S.C. § 1003.

2. The Plan is jointly-administered by a Board of Trustees, consisting of employer-appointed and union-appointed trustees (the "Board of Trustees") who are "fiduciaries" and

"trustees," as those terms are defined under ERISA §§ 3(21)(A), 403(a); 29 U.S.C.

§§ 1002(21)(A), 1103(a).

3.      The Plan is a money purchase pension plan, which is a hybrid plan with

characteristics of a defined benefit plan and a defined contribution plan.

4.      Significantly, the Plan is designed in such a way that participants ***do not have***

***responsibility for selection of investments***.  Instead, responsibility for the selection of investment

is the duty of the Plan's fiduciaries.  As such, ERISA § 404(c)(1), 29 U.S.C. § 1104(c)(1), which

sets forth limitations on liability for fiduciaries of "a pension plan which provides for individual

accounts and permits a participant or beneficiary to exercise control over the assets in his

account" does not apply to the Plan as Plan participants do not exercise any control over the

selection of the Plan's investments.

**B.      The Parties' Roles**

5.      Defendant Perry became administrator to the Plan in 1973.  (Perry Dep. at p.

12:17-22).  Section 11.1(a) of the Plan defines the Plan Administrator as the individual

responsible for "[t]he administration of the Plan."   (Ex. 33, Plasterers' Local Union No. 96

Pension Plan at p. 25).

6.      Defendant Lertora served as a member of the Board of Trustees for many years,

though he does not recall when he started.  Defendant Lertora became a trustee after Defendant

Perry became Plan Administrator.  (Lertora Dep. at pp. 20:6 - 22:22).

7.      Defendant Pepper became a member of the Board of Trustees in approximately

1991.  (Pepper Dep. at p. 27:9-18).

8.      Plaintiff Miller was appointed to the Board of Trustees on July 27, 2004.

9..      Plaintiff Pleasant was appointed to the Board of Trustees in early 2006.

C.    **Failure to Diversify Plan Assets**

10.    The Form 5500 (an annual required filing to the Internal Revenue Service, the Department of Labor, and the Pension Benefit Guaranty Corporation) submitted by Defendant Perry on behalf of the Plan for 1994 shows that 92.7% of Plan assets ($914,235 of $986,235) were invested in CDs due to mature in 1995.  The remaining 7.3% of Plan assets ($72,125) were held in bonds.  (Ex. 35, 1994 Annual Return Report of Employee Benefit Plan at Financial Schedules attachment).

11.    An agenda for a Board of Trustees meeting initially scheduled for September 12, 1995 noted that "it is becoming difficult to find banks in which the Funds do not already have the Federally insured limit."  Based upon this concern, there was a "[s]uggestion that part of this money be invested in staggered one and two year term Treasury bills as certificates mature."  (Ex. 19, Agenda for Joint Meeting of Operative Plasterers Local Union No. 96 Pension and Welfare Fund Trustees:  Proposed Date – September 12, 1995).

12.    Defendant Perry suggested that the Board of Trustees should invest Plan assets in staggered one and two year term Treasury bills as certificates mature.  (Perry Dep. at p. 308:9-20; Molnar Dep. at pp. 119:9 - 120:18).

13.    At a Board of Trustees meeting on November 9, 1995, "[t]he Trustees unanimously adopted a resolution to authorize investing the Funds in staggered one and two year Treasury bills as well as federal insured [sic] certificates of deposit."  Defendants Lertora and Pepper were present at this meeting.  (Ex. 21, Minutes of the Board of Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for November 9, 1995).

14.    A snapshot of the Plan's investments provided by Banc of America, as of September 30, 2005, shows that $1,391,529.18 of the Plan's investments were invested in short-term U.S. Treasury bills.  (Ex. 16, Banc of America Investment Services, Inc. Portfolio Snapshot

for 9/1/05 to 9/30/05).  This constituted 79.6% of the $1,747,611 total value of Plan assets as of

February 1, 2005, and 74.7% of the $1,862,434 total value of Plan assets as of February 1, 2006.

(Ex. 92, Charts showing annual changes to value of Plan assets as actually invested by

Defendants).

  15. The Defendants' own expert, Fred Taylor, testified that he was unaware of any

other plan in which similarly-situated ERISA fiduciaries invested virtually all plan assets in

similar fixed investment vehicles.  Mr. Taylor also testified that, in his experience, a high

percentage of investment in cash and cash equivalents, such as short term certificates of deposit

and Treasury bills, such as that which the Defendants invested in, would be 20-25% of the Plan's

total assets.  (Taylor Dep. pp. 76:12 - 77:2, 133:20-24).

**D.** **Defendants Failed to Consider Alternative Investment Strategies or Perform Any Oversight as Required by ERISA**

  16. Defendant Perry did not know about ERISA after its passage in 1974.  (Perry

Dep. at p. 19:12-19).  Defendant Perry did not know that ERISA imposed requirements on his

responsibilities at Plan Administrator.  (Perry Dep. at pp. 19:20 - 21:6).  When a need arose to

have a portion of the Plan changed or explained, Defendant Perry would task his assistant, Lee

Wagner, with preparing information.  Ms. Wagner did not have any expertise in dealing with

ERISA-covered plans, nor did Defendant Perry suggest that Ms. Wagner attain education or

attend seminars to educate her on ERISA's requirements on in the administration of ERISA-

covered plans.  Defendant Perry did not believe that Ms. Wagner needed any education on

ERISA-covered plans.  (Perry Dep. at pp. 71:5 - 75:15).

  17. Defendant Lertora testified that, based upon the undiversified nature of the

portfolio, had he been aware that ERISA required Plan assets to be diversified, he "would have

been more mouthy about how it was." (Lertora Dep. p. 159:7-17).

18.     Apparently, the Defendant Trustees instead only believed that their role was to maintain the status quo for the Plan's investment strategy.  (Pepper Dep. at pp. 226:19 - 227:5; 239:9 - 240:19).

19.     The Defendants never sought the advice of former Plan counsel, Sam Scholar, with regards to the legal requirements for the Plan's investment strategies or ERISA's requirements relating to fiduciary duties in investing ERISA plan assets. (Scholar Dep. at pp. 195:11-16; 149:1-9).

20.     Defendant Perry and Ms. Wagner would make investment decisions on behalf of the Plan by selecting the banks and Treasury bills in which Plan assets would be invested.  (Perry Dep. at pp. 61:21 - 63:14).  Although Ms. Wagner played an important role in the process, Defendant Perry was ultimately responsible for this as Ms. Wagner was Defendant Perry's assistant, and Ms. Wagner's actions with regard to the investment of Plan assets were made after consultation with Defendant Perry.  (Wagner Dep. at pp. 45:6-17, 55:11 - 56:18, 206:12 - 207:12.)

21.     Perry did not have "specific instructions or approval" from the Trustees before selecting investments for the Plan.  (Perry Dep. at pp. 64:7-18).  The Defendant Trustees did not care what investments Defendant Perry chose so long as he made some type of investment. (Lertora Dep. at p. 95:2-16).

22.     The Defendants also maintained investments on behalf of the Plan without maintaining a written investment policy for the Plan.  (Perry Dep. at p. 58:13-20; Lertora Dep. at pp. 88:5 - 89:9; Pepper Dep. at pp. 52:17 - 53:4).

23.     Defendants have placed great emphasis on a mere sales pitch made by Ed Schultz of Morgan Stanley in 2002.  In actuality, the facts surrounding Mr. Schultz's attempted pitch for

business make clear that the driving force behind the investment strategy actually implemented

on behalf of the Plan were the Defendants, and not non-party trustees Keith Hickman and Steve

Stovall.  Mr. Hickman, who had previously done business with Mr. Schultz for another fund,

requested that Mr. Schultz attend a Plan meeting.  (Hickman Dep. at 88:16 – 92:9).  When Mr.

Schultz attended the meeting, the two employer trustees, specifically Defendants Lertora and

Pepper, did not want to even discuss Mr. Schultz's proposal.  (Hickman Dep. at 96:15 – 101:8).

Messrs. Hickman and Stovall were interested in, at least, having a discussion regarding the

materials from Mr. Schultz.  However, Defendants Lertora and Pepper simply refused to allow

any discussion of any potential modification of the imprudent, undiversified investment strategy

which the Defendants had implemented and maintained since, at least, 1990.  (Hickman Dep. at

94:2 – 101:2).  While Messrs. Hickman and Stovall supported having a discussion on Mr.

Schultz's proposal, there is absolutely no evidence that Messrs. Hickman and Stovall believed

Mr. Schultz's proposal would have been a prudent investment strategy for the Plan, or that it

would have been ratified by the Board of Trustees.

E.      **The Defendants' Numerous Failures to Properly Administer the Plan Under ERISA**

        24.     The Defendant Trustees imprudently maintained Defendant Perry as Plan

Administrator as they never reviewed Defendant Perry's qualifications to be Plan Administrator.

The Defendant Trustees also never investigated whether they were paying fair market value for

Defendant Perry's services..  The Defendant Trustees were not aware that the Plasterers' Funds

were the only employee benefit plans Defendant Perry administered.  (Pepper Dep. at pp. 29:17 -

31:11).  The Defendant Trustees did not want to know whether Defendant Perry administered

other Plans because they "[d]idn't want to get involved."  (Pepper Dep. at pp. 30:14 – 31:4).  The

Defendant Trustees were unaware what Defendant Perry was paid for serving as Plan

Administrator.  The Defendant Trustees were also unaware that Defendant Perry did not have a

written agreement with the Plan.  (Lertora Dep. at pp. 29:5 - 31:19;  Pepper Dep. at pp. 32:9 - 33:17).   The Defendant Trustees did nothing to supervise Defendant Perry's responsibilities as Plan Administrator.  (Perry Dep. at pp. 85:20 - 86:14).   The Defendant Trustees also failed to ensure that Defendant Perry maintained fiduciary insurance.  (Perry Dep. at pp. 344:13 - 345:5; Pepper Dep. at pp. 217:17 - 218:13).

25.     Defendant Perry had no training in administering ERISA plans.  (Perry Dep. at 18:20 - 19:11).  Despite the fact that Defendant Perry was administrator, Ms. Wagner was responsible for actually administering the day-to-day operations of the Plan, including intake of employer contributions, maintaining records, and preparing checks for signature by the trustees. (Perry Dep. at 33:18-34).  Defendant Perry's general involvement on a day-to-day basis was that Ms. Wagner came to him for advice or to let him know what was being done.  (Perry Dep. at 35:10-17).  Defendant Perry would also have Ms. Wagner be the one to go to banks to open up the accounts in which Defendant Perry would invest Plan assets. (Wagner Dep. at 76:9-13).

26.     The Defendants also imprudently retained Mr. Scholar as Plan counsel.  Mr. Scholar became Plan counsel because his predecessor was too busy to continue in that function. (Scholar Dep. at pp. 24:22 - 29:13).  The Defendant Trustees did not review Mr. Scholar's credentials to be counsel.  (Lertora Dep. at pp. 30:8 - 31:4; Pepper Dep. at p. 34:1-11).  The Defendant Trustees did not know that the Plasterers' Funds were the only employee benefit plans to which Mr. Scholar provided legal advice.  The Defendant Trustees never inquired as to Mr. Scholar's qualifications to be legal counsel to the Plan.  (Pepper Dep. at pp. 34:12 - 35:5).  The Defendant Trustees never considered obtaining an independent legal opinion to verify the accuracy of the legal advice that Mr. Scholar provided to the Plan, including that which was conflicting with Mr. Scholar's previous advice.  (Lertora Dep. at p. 32:2-12).  The Defendant

Trustees did not know that Mr. Scholar did not have a written agreement with the Plan or what Mr. Scholar was paid by the Plan for his role as legal counsel. (Lertora Dep. at pp. 31:20 - 32:1, 168:10-20; Pepper Dep. at pp. 43:10 - 44:4).

27.     The Defendants failed to hold meetings with the frequency required by the Plan's governing documents. Pursuant to the Plan's trust agreement, the Board of Trustees were required to "hold an annual meeting each year during the month of January, and bi-monthly meetings thereafter, which shall be deemed regular meetings." (Ex. 32, Agreement and Declaration of Trust for Pension Plan of Plasterers' Local Union No. 96 at p. 14). The time between meetings could exceed two years. For example, the Defendants failed to ensure that the Board of Trustees met between November 1995 and January 1998. (Ex. 21, Minutes of the Board of Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for November 9, 1995; Ex. 23, Minutes of the Board of Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for January 27, 1998). The Defendant Trustees never asked Defendant Perry or Mr. Scholar how frequently the Board of Trustees was required to meet under the terms of the trust agreement. (Lertora Dep. at p. 223:9-22). The Board of Trustees never met at the required frequency during at least Defendant Pepper's tenure on the Board of Trustees. (Pepper Dep. at pp. 48:12 - 49:5). Defendant Perry never advised the Trustees that fiduciaries of ERISA benefit plans are required to administer the Plan in accordance with its governing documents or that they could amend the trust agreement to provide for less frequent meetings. (Pepper Dep. at p. 184:8-17). Defendant Perry never considered alternatives to ensure that the trustees met as frequently as required by the Plan's documents, including the possibility of having telephonic board meetings. Mr. Scholar never told Defendant Perry that it would be impermissible to have telephonic meetings. (Perry Dep. at pp. 325:5 - 327:4).

28.     The Defendants also allowed the Plan to be administered by less than a quorum of trustees.  At a meeting held on January 27, 1998, the Board met and conducted business despite only consisting of four trustees.  (Ex. 23, Minutes of the Board of Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for January 27, 1998).  Defendant Perry knew that the Plan was operating with less than a quorum but did not attempt to remedy this because he believed that the trustee had to be an employing contractor and "there were no other employing contractors who were available."  (Perry Dep. at pp. 37:17 - 40:9).  Defendant Lertora personally made it impossible for the Plan to reach a quorum when he resigned as a trustee without appointing a replacement, given that he was chair of the plasterers' employers' association.

29.     Despite the legal requirement to do so, following the drafting of the Plan in 1989, Defendants never amended the Plan to conform with Congress' numerous amendments to ERISA.  (Scholar Dep. at pp. 242:19 – 243:4) As a result of this enormous failure by Defendants to ensure that the Plan document and administrative practices complied with ERISA's requirements, the Plan was not in compliance with ERISA.  This could have resulted in catastrophic consequences for the Plan, its contributing employers, and most importantly the participants if the Plan was disqualified.

30.     The Defendants also allowed Plan assets to be distributed to contributing employers in 1994.  The Plan only permitted contributions to be returned to employers only "in the event [an] Employer makes a contribution to the Trust Fund as a result of a *mistake of fact*, such contribution shall be returned to [the] Employer within one year after it was made, upon [the] Employer's written request to the Trustee."  (Ex. 33, Plasterers' Local Union No. 96 Pension Plan at p. 29) (emphasis added).   At a Board of Trustees meeting on January 25, 1994,

"[t]he Trustees unanimously approved the disposition of funds as outlined in worksheets provided by the Administrator."  The Defendant Trustees were present for this meeting. (Ex. 15, Minutes of the Board of  Trustees of the Plasterers Local Union No. 96 Pension and Welfare Funds for January 25, 1994).  One week later, Defendant Perry wrote to certain contributing employers to advise them that "[i]t has been determined that certain contributions made by you to the Plasterer's Pension Plan cannot be credited to the plan participants because of inelility [sic] and, in line with Internal Revenue Service plan guidelines such funds are required to be returned to the contributing contractor."  (Ex. 36, Documents Related to the 1994 Distribution of Plan Assets to Contributing Employers).  Beginning on or after February 10, 1994, the Defendants caused the Plan to send checks to contributing employers.  The checks were made out to the employer-contractors and were signed by Defendant Lertora and former Defendant Molnar.  (Ex. 36, Documents Related to the 1994 Distribution of Plan Assets to Contributing Employers).

31.     Among the recipients of the 1994 distributions of Plan Assets were Defendant Lertora, who personally signed a check to his company, James S. Lertora, Inc.. (Ex. 36, Documents Related to the 1994 Distribution of Plan Assets to Contributing Employers).   Checks were also sent to Defendant Pepper, on behalf of his employer John H. Hampshire, Inc. (Ex. 36, Documents Related to the 1994 Distribution of Plan Assets to Contributing Employers).

32.     Defendant Perry never advised the Trustees that this return of assets to contributing employers constituted a prohibited transaction under ERISA or that it was directly contrary to the terms of the Plan documents.  (Pepper Dep. at pp. 207:10 - 208:1). Approximately $121,000, which amounted to approximately 11% of the Plan's overall value as

of December 31, 1993, was returned to contractors during 1994.  (Ex. 67, Independent Auditors'

Report dated June 2, 1995).

33.     The issue of returning Plan assets to employers had arisen in 1991 when the

Plan's largest contributing employer, and a trustee, C.J. Coakley had threatened to withdraw

from the Plan unless Plan assets were returned to him.  (Ex. 7, Letter to S. Scholar from C.

Coakley dated April 8, 1991).  Coakley followed through and unilaterally withheld contributions

from the Plan to appropriate the amounts he deemed due to him.  (Ex. 61, Letter to trustees from

C.J. Coakley Co., Inc., dated May 17, 1991; Ex. 62, Letter to trustees from C.J. Coakley Co.,

Inc., dated June 17, 1991).  The Defendants did nothing to respond to Coakley's actions, and did

not even consider legal action against him for his appropriation of Plan assets.  Instead, the

Defendants illegally acquiesced to Mr. Coakley's demands. (Pepper Dep. at pp. 82:11 - 83:4;

Perry Dep. at pp. 197:18 - 202:10).  This action by Defendants was never mentioned to newly-

appointed trustees.

**F.     Damages Caused By Defendants' Imprudent, Undiversified Investments**

34.     As of February 1, 2003, the Plan assets were valued at $1,684,554.  (Ex. 92,

Charts showing annual changes to value of Plan assets as actually invested by Defendants).

35.     The actual value of the Plan's assets on December 31, 2005 was $1,862,434.  (Ex.

92, Charts showing annual changes to value of Plan assets as actually invested by Defendants).

36.     If $1,684,554 had been invested on February 1, 2003 in a mix of 50% S&P 500

and 50% Barclays Capital Aggregate Bond Index aggregate, then that investment would be

worth $2,378,361 on February 1, 2006, or $515,927 more than the actual value of Plan assets.

(Ex. 92, Charts showing annual changes to value of Plan assets as actually invested by

Defendants; Ex. 93, Charts showing annual changes to value of Plan assets using 50/50

investment mix; Ex. 94, Charts showing monthly changes to value of Plan assets using 50/50

11

investment mix).  Defendants' own expert testified that these were appropriate asset classes for the Plan, while having virtually 100% of Plan assets in fixed assets would not be prudent. (Taylor Dep. at p. 114:15 – 115:8, 120:18 – 121:3).

**G.      The Procedural Course of This Case**

37.      The Court has raised questions of equity regarding whether certain non-party trustees should have been defendants in this action.  The Complaint in this action was filed on the best information available to the trustees at the time, and all actions taken were solely with the best interests of the participants in mind.  For example, the Complaint initially sought to remedy breaches by these Defendants, as well as other parties who have been subsequently dismissed, going back to 1994, for not only the failure to diversify Plan assets, but also for the illegal reversion of Plan assets to contributing employers.  Those claims have been subsequently abandoned for reasons of judicial economy (though, the Defendants' complete lack of prudence in their actions with regards to those claims are clearly relevant for establishing Defendants' lack of prudence with regards to investment of Plan assets and their improper administration of the Plan).

38.      The Defendants have never taken the position that non-party trustees are necessary parties to this action.  The Defendant Trustees filed their Answers on May 31, 2006. Defendant Perry filed his Answer on July 6, 2006.  None of the Defendants asserted the affirmative defense that Plaintiffs had failed to add a necessary party or asserted any equitable defenses.  Under the Scheduling Order, the deadline for adding additional parties was June 10, 2007.  There was absolutely nothing preventing Defendants from seeking to join any non-party trustees as defendants if they had any belief such joinder was appropriate.  No parties were added.  Finally, in the Court's opinion on summary judgment, the Court invited Defendants to move to join those non-party trustees.  Significantly, the Defendants never filed such a motion.

39.     Furthermore, to the extent that Defendants have ever taken the position that the Plan should be imputed with the knowledge of non-party trustees, they have based those arguments on case law, not on equity.  See Memorandum of Points and Authorities in Support of Defendant Perry's Motion for Summary Judgment, Docket Entry #88-3, at pp. 6-8.  While Defendants' arguments relied upon an obvious misinterpretation of ERISA case law and upon Maryland state agency law which is preempted by ERISA, this nonetheless shows that Defendants believe that if the Plan is to be imputed with the knowledge of non-party trustees, the basis of that imputation is law, not equity and the Court has already acknowledged in its summary judgment opinion that all case law on the issue of imputation has unanimously held that the Plan cannot be imputed with the knowledge of anyone other than the named plaintiffs in ERISA breach of fiduciary duty cases.

## II.  CONCLUSIONS OF LAW

### A.      The Defendants Were Unquestionably Fiduciaries Under ERISA

1.     The Defendant Trustees and Defendant Perry were all fiduciaries of the plan.  As such, the Defendants were subject to the fiduciary responsibility of Title IV of ERISA.  ERISA provides that:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A); 29 U.S.C. § 1002(21)(A).

2.     The Defendant Trustees were undisputedly fiduciaries of the Plan.  See Laborers' Dist. Council Health & Welfare Trust Fund No. 2 v. Comet Contr., LLC, No. RWT 03-2196, 2006 U.S. Dist. LEXIS 55968, *5-6, 39 Employee Benefits Cas. (BNA) 1685 (D. Md. July 25,

2006) ("Under ERISA, the Trustees, as fiduciaries, are required to administer the Funds 'solely in the interest of the participants and beneficiaries' and 'in accordance with the documents and instruments governing the [Plan]' and they have brought this action to comply with their fiduciary obligation to ensure that participants receive the contributions to which they were entitled."); NARDA, Inc. v. R.I. Hosp. Trust Nat'l Bank, 744 F. Supp. 685, 690 (D. Md. 1990) ("As the trustee under the [plaintiff] Trust, the [defendant] Bank was a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A)."); Makar v. Health Care Corp., 872 F.2d 80, 83 (4th Cir. 1989) ("ERISA also imposes broad fiduciary responsibilities on plan trustees and extensively regulates their conduct.").

3.      Defendant Perry made investment suggestions to the Board of Trustees and made investment decisions on behalf of the Plan.  Defendant Perry's suggestions were accepted by the Defendant Trustees and formed the basis of the Plan's unwritten investment policy.  As noted above, in order to be a fiduciary under ERISA, an individual's responsibilities need only rise to the level of *any one of the following*:  "exercis[ing] discretionary authority or discretionary control respecting management of [the] plan;" or "exercis[ing] any authority or control respecting management or disposition of [the Plan's] assets;" or "render[ing] investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan;" or "ha[ving] any authority or responsibility to do so;" or "ha[ving] any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A) , 29 U.S.C. § 1002(21)(A).  Based upon his role in recommending and executing the Plan's investment decisions, Defendant Perry's conduct clearly rose to the level of all of these standards.  Obviously, then, his actions were sufficient to meet *at least one* of the above standards which is sufficient to classify him as a fiduciary.

4.      Thus, based upon these investment activities undertaken by Defendant Perry, he

at least qualified as a "functional fiduciary" under ERISA.  ERISA "defines 'fiduciary' not in

terms of formal trusteeship, but in *functional* terms of control and authority over the plan."

Mertens v. Hewitt Assocs., 508 U.S. 248, 262 (1993).  As a result, ERISA "extends fiduciary

liability to functional fiduciaries -- persons who act as fiduciaries (though not explicitly

denominated as such) by performing at least one of several enumerated functions with respect to

a plan."  Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 18 (1st Cir. 1998).  "The key

determinant of whether a person qualifies as a functional fiduciary is whether that person

exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its

administration, or its assets (such as by rendering investment advice)."  Id.; see also Livick v.

Gillette Co., 492 F. Supp. 2d 1, 7 (D. Mass. 2007) ("The fact that [defendant] did not formally

classify [a benefits counselor] as a fiduciary is not controlling. . . . A functional fiduciary is one

that exercises any discretionary authority or discretionary control respecting management of such

plan or has any discretionary authority or discretionary responsibility in the administration of

such plan.") (internal citations omitted); Rogers v. Baxter Int'l Inc., 417 F. Supp. 2d 974, 986

(N.D. Ill. 2006) ("While plan documents are clearly important in determining whether an

individual or entity is a fiduciary, it is not necessary for a plan to contain an express delegation

of fiduciary duty; a person or entity may also become a 'functional fiduciary' simply by

performing fiduciary duties or by exercising discretion of a fiduciary nature."); In re Polaroid

ERISA Litig., 362 F. Supp. 2d 461, 472-473 (S.D.N.Y. 2005) ("An individual may be a fiduciary

for ERISA purposes either because the plan documents explicitly describe fiduciary

responsibilities or because that person functions as a fiduciary. . . . [A]n individual may be a

fiduciary as to plan functions for which the plan affords him no discretionary authority if he

nonetheless 'exercises . . . discretionary authority.'").  Clearly, given the investment decisions he made on behalf of the Plan, Defendant Perry satisfies this standard.

5.      Furthermore, the case law of this Circuit and this District make clear that, based upon nothing more than his position as Plan Administrator, Defendant Perry *inherently* was as an ERISA fiduciary.  See Difelice v. U.S. Airways, Inc., 497 F.3d 410, 423 (4th Cir. 2007) (referring to "the fiduciary duties of a plan administrator."); Provident Life & Accident Ins. Co. v. Cohen, 423 F.3d 413, 424 (4th Cir. 2005) (noting that while, in 1990, "whether a plan administrator was a fiduciary under § 1132(a)(3) was somewhat unclear[,] . . . [i]t is now evident that . . . the benefit plan administrator, is a fiduciary."); Cothran v. Reliance Std. Life Ins. Co., No. 99-1238, 1999 U.S. App. LEXIS 31588, *4 (4th Cir. Dec. 3, 1999) (noting that defendant "acted in a fiduciary capacity as Plan Administrator."); O'Bryhim v. Reliance Std. Life Ins. Co., No. 98-1472, 1999 U.S. App. LEXIS 19232, *17-18 (4th Cir. Aug. 16, 1999) (holding that defendant, "acting as Plan Administrator, was in a fiduciary relationship with the Plan beneficiaries . . . and was obligated to function accordingly in its decisionmaking process."); Chao v. Malkani, 216 F. Supp. 2d 505, 507-08 (D. Md. 2002) ("The Administrator is a named fiduciary for the purposes of Title I of ERISA."); Johannssen v. Dist. No. 1 - Pacific Coast Dist., MEBA Pension Plan, No. AMD 96-2355, 1997 U.S. Dist. LEXIS 14351, *64 (D. Md. Aug. 8, 1997) (referring to "[t]he plan administrator[] as a fiduciary under ERISA"); Adelson v. GTE Corp., 790 F. Supp. 1265, 1270 (D. Md. 1992) ("It must be remembered that the decisions of plan administrators are entitled to deference because the plan administrators are *fiduciaries*") (emphasis in original).  Regulations of the U.S. Department of Labor also make clear that a plan administrator qualifies as a fiduciary of the plan for purposes of ERISA.  See Questions and Answers Relating to Fiduciary Responsibility Under the Employee Retirement Income Security

Act of 1974, 29 CFR 2509.75-8(D-3) ("Some offices or positions of an employee benefit plan by their very nature require persons who hold them to perform one or more of the functions described in section 3(21)(A) of the Act.  For example, a plan administrator or a trustee of a plan must, b[y] the very nature of his position, have 'discretionary authority or discretionary responsibility in the administration' of the plan within the meaning of section 3(21)(A)(iii) of the Act.  Persons who hold such positions will therefore be fiduciaries.") (quoting ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii)).

**B.** **Defendants Breached Their Fiduciary Duties By Failing to Diversify the Plan'ss Assets**

6.      As fiduciaries of the Plan, the Defendants were required to discharge their duties subject to the prudent man standard of care under ERISA § 404(a)(1)(B); 29 U.S.C. § 1104(a)(1)(B).  As part of the overarching duty to act prudently, "ERISA requires a plan fiduciary to make discretionary investment decisions with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use."  Tatum v. R.J. Reynolds Tobacco Co., 392 F.3d 636, 639 (4th Cir. 2004) (internal citations omitted).

7.      Furthermore, as fiduciaries, the Defendants were to diversify Plan assets unless, under the circumstances, it was clearly prudent not to diversify, pursuant to ERISA § 404(a)(1)(C); 29 U.S.C. § 1104(a)(1)(C).  See Difelice, 497 F.3d at 424 (noting that fiduciaries have the duty "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.") (internal citations omitted); Reich v. Walter W. King Plumbing & Heating Contr., 98 F.3d 147, 152 (4th Cir. 1996) (hereafter "King III") ("ERISA requires a plan's fiduciary to diversify the plan's investments unless under the circumstances it is clearly prudent not to do so."); Trustees of Pressmen Local

72 Industry Pension Fund v. Judd & Detweiler, Inc., 736 F. Supp. 1351, 1356 (D. Md. 1988)

("Indeed, unless a plan's particular circumstances so warrant, overcommitment of the plan's

portfolio to bonds (or any other single type of investment) might well constitute a breach of the

trustees' fiduciary duty to maintain a diversified portfolio.")

8.     The purpose for the diversification requirement is obvious.  As the Fourth Circuit

has held, "the portfolio management theory . . . teaches that an investment in a risky security as

part of a diversified portfolio is, in fact, an appropriate means to increase return while

minimizing risk. . . . [M]odern portfolio theory has been adopted in the investment community

and, for the purposes of ERISA, by the Department of Labor. . . . 29 C.F.R. § 2550-404a-1

[directs] plan fiduciaries to consider, *inter alia*, 'the role [an] investment or investment course of

action plays in that portion of the plan's investment portfolio with respect to which the fiduciary

has investment duties.'" Difelice, 497 F.3d at 423 (quoting 29 C.F.R. 550-404a-1) (other internal

citations omitted).

9.     The Defendants failed to diversify Plan assets in violation of both of these

fiduciary standards, thereby breaching their fiduciary duties.  Throughout their tenures, the

Defendants caused the Plan's assets to be placed virtually entirely in conservative investment

vehicles.  At various times, this resulted in the vast majority of the Plan's assets being placed in

either certificates of deposit or Treasury bills.  Plans which demonstrated far greater diversity

than that maintained by the Defendants here have been held to breach ERISA's fiduciary duty to

diversify.  See Meyer v. Berkshire Life Ins. Co., 250 F. Supp. 2d 544, 554 (D. Md. 2003)

(hereafter "Meyer II") ("placing approximately 80% of the plans' funds in [one type of

investment vehicle] violates the principle of diversification.")  In Meyer II, the Court described

such an investment strategy as "very conservative[]."  Id. at 552.  While, as the Meyer II court

18

acknowledged, the "very conservative" investment strategy in that case was so undiversified as to violate ERISA, that strategy was *far more diversified* than that implemented by Defendants in this case.  Here, in 1994, 100% of Plan assets were invested in bonds and CDs.  Of this total investment exclusively placed in bonds and CDs, an astonishing 92.7% was invested in CDs due to mature in 1995.  Furthermore, as of 2005, the Plan assets were virtually entirely invested in short-term Treasury bills.  Given the fact that the Defendants here caused the Plan's assets to be invested virtually entirely in short-term Treasury bills and CDS, in light of <u>Meyer II</u>, there can be no question that Defendants' investment strategies were insufficiently diversified to meet the diversification requirements of ERISA.

10.     Once it is established that Defendants did not diversify the Plan's investments, "the burden thereupon shifts to the defendant[s] to prove that even though not diversified, the allocation was nonetheless prudent."  <u>Meyer II</u>, 250 F. Supp. 2d at 565.  Once it is established that they did not diversify Plan assets, Defendants "bear the 'heavy burden' of showing that their decision not to diversify was clearly prudent."  <u>Reich v. King</u>, 861 F. Supp. 379, 383 (D. Md. 1994) (hereafter "<u>King I</u>").  This heavy burden "is not merely to prove that the investment is prudent, but that there is no risk of large loss resulting from the non-diversification."  <u>Id.</u> (internal citations omitted).  The case law of this District which imposes this heavy burden upon Defendants comports with Congress' intent in passing ERISA.  The House Conference Report made it clear that ERISA was to:

> require[] fiduciaries to diversi[f]y plan assets to minimize the risk of large losses, *unless under the circumstances it is clearly prudent not to do so*. . . . [B]y using this term ['clearly prudent'] is it intended that in an action for plan losses based on breach of the diversification requirement, the plaintiff's initial burden will be to demonstrate that there has been a failure to diversify.  The defendant then is to have the burden of demonstrating that this failure to diversify was prudent.  The [conference version of ERISA] places these relative burdens on the parties in this matter, because *the basic policy is to require diversification, and if diversification*

*on its face does not exist, then the burden of justifying failure to follow this*
*general policy should be on the fiduciary who engages in this conduct*."

H.R. Rep. 93-1280, 93d Cong., 2d Sess. (1974) (Conf. Rep.), <u>reprinted in</u> 1974 U.S.C.C.A.N.

5038, 5084 (emphasis added).

11.     The Defendants cannot possibly meet this "heavy burden" because the facts make

clear that the Defendants simply never considered whether or not, under the circumstances, it

was prudent to not diversify Plan assets.   "A fiduciary's subjective, good faith belief in his

prudence will not insulate him from liability." <u>Reich v. King</u>, 867 F. Supp. 341, 343 (D. Md.

1994) (hereafter "<u>King II</u>"). <u>See also</u> <u>United States v. Mason Tenders Dist. Council</u>, 909 F.

Supp. 882, 888 (S.D.N.Y. 1995) ("Good faith alone is not recognized as a defense to a breach of

fiduciary duties.") (citing <u>King II</u>, 867 F. Supp. at 343).   Rather, a "decision not to diversify must

be measured by an objective standard — that of a prudent investor similarly situated." <u>King II</u>,

867 F. Supp. at 343.   <u>See also</u> <u>Berlin v. Michigan Bell Tel. Co.</u>, 858 F.2d 1154, 1162 (6th Cir.

1988) ("The prudent man standard, combined with the duty of loyalty imposes an unwavering

duty on an ERISA trustee to make decisions with single-minded devotion to a plan's participants

and beneficiaries and, in so doing, to act as a prudent person would act in a similar situation.

These familiar principles evolved from the common law of trusts that Congress codified and

made applicable to ERISA trustees.") (internal citations omitted); <u>Donovan v. Estate of</u>

<u>Fitzsimmons</u>, 778 F.2d 298, 302 (7th Cir. 1985) ("ERISA prescribes . . . that every plan fiduciary

shall discharge his duties with respect to a plan solely in the interest of the participants and

beneficiaries and with the care, skill, prudence and diligence that a prudent person familiar with

such matters would employ if acting under similar circumstances."); <u>Mason Tenders Dist.</u>

<u>Council</u>, 909 F. Supp. at 886 ("ERISA's prudence standard is not that of a prudent lay person but

rather that of a prudent fiduciary with experience dealing with a similar enterprise.").   It is this

standard which has led courts to conclude that "[t]he fiduciary obligations of the trustees to the participants and beneficiaries of the plan are . . . the highest known to the law." Donovan v. Bierwirth, 680 F.2d 263, 272 n. 8 (2d Cir. 1982) (hereafter "Bierwirth I").

12.     At minimum, for a fiduciary to meet the standard of a "prudent investor similarly situated," the fiduciary must have engaged in sufficient investigation to justify his decision. "When deciding whether a plan fiduciary has acted prudently, a court must inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods *to investigate the merits of the investment and to structure the investment*." Difelice, 497 F.3d at 420 (internal citations omitted) (emphasis added). See also Meyer II, 250 F. Supp. 2d at 566 ("[T]he placement of the plans' assets in low-yielding investments and numerous life insurance policies without any independent investigation establishes that [defendants] did not pay 'appropriate consideration' to the investments' opportunity for gain or to the plans' projected returns . . . As such, the court holds that [defendant] breached its fiduciary duty . . . to be prudent in each investment decision.")  In enacting the final, conference version of ERISA, Congress made clear that:

> The degree of investment concentration that would violate this requirement to diversify cannot be stated as a fixed percentage, *because a prudent fiduciary must consider the facts and circumstances of each case.*  The factors to be considered include (1) the purposes of the plan; (2) the amount of the plan assets; (3) financial and industrial conditions; (4) the type of investment, whether mortgages, bonds or shares of stock or otherwise; (5) distribution as to geographical location; (6) distribution as to industries; (7) the dates of maturity.

H.R. Rep. 93-1280, 93d Cong., 2d Sess. (1974) (Conf. Rep.), reprinted in 1974 U.S.C.C.A.N. 5038, 5084 (emphasis added).  Thus, "the duty to conduct an independent investigation into the merits of a particular investment" has been described as "the most basic of ERISA's investment fiduciary duties." In re Unisys Sav. Plan Litig., 74 F.3d 420, 435 (3d Cir. 1996).

13.     A wealth of case law makes clear that, in the absence of proper investigation, a fiduciary cannot establish his conduct as prudent because  "the prudent person standard has been determined by the courts to be an objective standard, requiring the fiduciary to (1) *employ proper methods to investigate, evaluate and structure the investment*; (2) act in a manner as would others who have a capacity and familiarity with such matters; *and* (3) exercise independent judgment when making investment decisions."  King I, 861 F. Supp. at 383-84 (emphasis added) (internal citations omitted).  See also Meyer II, 250 F. Supp. 2d at 565-66 ("A fiduciary's independent investigation of the merits of a particular investment is at the heart of the prudent person standard.") (internal citations omitted); Chao v. Moore, No. AW-99-1283, 2001 U.S. Dist. LEXIS 9012, *9 (D. Md. June 15, 2001) (hereinafter "Moore") ("Under this standard, a fiduciary is obligated to investigate all decisions that will affect the pension plan, and must act in the best interests of the beneficiaries."); GIW Ind., Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc., 895 F.2d 729, 731-32 (11th Cir. 1990) (affirming district court's conclusion that defendant "failed to investigate the particular cash flow requirements of Fund A and therefore did not adequately diversify the investment of Fund A's assets, in breach of its fiduciary duty under ERISA" on the basis that "at no time did [defendant] obtain or read relevant Plan documents or the Plan booklet prior to investing Fund A's assets.  [Defendant also] did not determine the historical cash flow needs or investigate prior or anticipated withdrawal patterns of Fund A."); Donovan v. Cunningham, 716 F.2d 1455, 1467 (7th Cir. 1983) (noting that in evaluating whether a fiduciary has lived up to the prudence standards under ERISA, "courts have focused the inquiry under the 'prudent man' rule on a review of the fiduciary's independent investigation of the merits of a particular investment, rather than on an evaluation of the merits [of the investment] alone."); Springate v. Weighmasters Murphy, Inc. Money Purchase Pension Plan, 217 F. Supp.

2d 1007, 1023 (C.D. Cal. 2002) ("Plaintiff argues that Defendants did not make any effort to

fulfill any of the fiduciary duties ERISA imposed upon them.  Based on the undisputed facts, this

Court agrees. To begin with, Defendants admit that they had no idea what their duties as

fiduciaries were, what assets the Plan owned, what the assets were worth, whether it was prudent

to own the assets, or whether they should own the two stocks which compromised more than

93% of the Plan's assets. . . . Defendants themselves proclaim that they conducted no

investigation.  As such, no inquiry needs to be made whether Defendants conducted a proper

investigation. . . . This Court concludes that such admissions evidence breaches of Defendants'

fiduciary obligations.")

14.     Defendants simply conducted no investigation whatsoever as to the general

prudence of their investments, and it is beyond question that they did not evaluate whether or not

it was "clearly prudent" under the circumstances to choose to not diversify Plan assets in light of

ERISA's mandate to diversify.  This is not surprising because the Defendants could not have

considered whether or not it was prudent to comply with ERISA's diversification requirement,

because Defendants did not know that ERISA required fiduciaries to invest in a diversified

portfolio, and they imprudently failed to seek legal advice as to whether their undiversified

investment strategy complied with ERISA.  Accordingly, as the Defendants cannot meet the

burden on them to establish that it was clearly prudent, under the circumstances, to not diversify

Plan assets notwithstanding ERISA's clear mandate requiring diversification, *ipso facto*, the

Defendants breached their fiduciary duties with respect to their responsibility to the investment

of the Plan's assets.

15.     Also indicative of Defendants' failure to consider whether or not it was "clearly

prudent," under the circumstances to not diversify Plan assets despite ERISA's clear mandate of

diversification is the fact that Defendants failed to maintain investment guidelines for the Plan.

See, e.g., Liss v. Smith, 991 F. Supp. 278, 296 (S.D.N.Y. 1998) (finding that while "ERISA does

not contain a specific requirement that a written investment policy be maintained by the

trustees[,] . . . such a policy is necessary to insure that the plan investments are performing

adequately and meeting the actuarial, liquidity and other needs of the Funds.")  In Liss, the court

concluded that trustees had breached their fiduciary duties because they had:

> fail[ed] to adopt any investment policy or guidelines, to investigate proposed
> investments, to apprise themselves of the commissions paid to their broker, to
> solicit and consider competitive bids from other service providers, [and] to
> monitor the pension fund's solvency and take action to correct its growing
> problems

Id. at 313.  The court concluded that these deficiencies "all constituted breaches of their most

basic obligations as fiduciaries."  Id.  The Defendants' failure to maintain written investment

policy also violated Department of Labor regulations which provide that:

> The maintenance by an employee benefit plan of a statement of investment policy
> designed to further the purposes of the plan and its funding policy is consistent
> with the fiduciary obligations set forth in ERISA section 404(a)(1)(A) and
> (B). . . . For purposes of this [regulation], the term 'statement of investment
> policy' means a written statement that provides the fiduciaries who are
> responsible for plan investments with guidelines or general instructions
> concerning various types or categories of investment management decisions.

Interpretive Bulletin Relating to Written Statements of Investment Policy, Including Proxy

Voting Policy or Guidelines, 29 CFR 2509.94-2(2).

**C.**     **Plaintiffs' Action Was Timely Filed**

16.     The statute of limitations period for actions brought for breaches of fiduciary

duties is:

> the earlier of -- (1) six years after (A) the date of the last action which constituted
> a part of the breach or violation, or (B) in the case of an omission the latest date
> on which the fiduciary could have cured the breach or violation, or (2) three years
> after the earliest date on which the plaintiff had actual knowledge of the breach or
> violation.

ERISA § 413; 29 U.S.C. § 1113.

17.     As Defendant Perry remained Plan administrator until late in 2005 and Defendant Pepper remained a trustee until after the Complaint was filed in this case in 2006, and as it was into 2006 before the Defendants' undiversified investment strategy could be unraveled and cured, this action clearly satisfies ERISA § 413(1).

18.     With regards to ERISA § 413(2), Plaintiffs Miller and Pleasant, who bring this action on behalf of the Plan, became members of the Board of Trustees in 2004 and 2006, respectively.  This action was filed on February 9, 2006.  Accordingly, as Plaintiffs Miller and Pleasant brought this action within three years of learning of the Defendants' breaches, it was timely filed as the Plan can only be imputed with the knowledge of the named plaintiff fiduciaries who bring an action on behalf of the Plan (in this case, Plaintiffs Miller and Pleasant). See CB Richard Ellis Investors, L.L.C. v. Sonnenblick, 45 Fed. Appx. 680, 681 (9th Cir. 2002) ("The plaintiff in an action under ERISA for engaging in prohibited transactions is the fiduciary, beneficiary, or participant bringing suit. . . . *That other fiduciaries knew of the violations does not set the limitations period running.*") (emphasis added); Crimi v. PAS Industries, Inc., No. 93 Civ. 6394, 1995 WL 272580, *3 (S.D.N.Y. May 9, 1995) ("In the context of what constitutes actual knowledge, courts have construed the "actual knowledge" provision narrowly. . . . [W]here one or more trustees have failed to pursue an ERISA claim (whether or not such failure amounts to a fiduciary violation), another trustee who has no actual knowledge of the underlying facts -- even a successor -- should not be unduly restricted from pursuing claims to protect the integrity of plan assets. . . . Since each trustee has an obligation to protect the plan assets, each has an obligation to seek enforcement and to be such a plaintiff where necessary.  Because the enforcement statute allows any fiduciary to sue, *it would be inconsistent to provide a shorter*

*limitations period for a plaintiff trustee due to the actual knowledge of another trustee, whether or not a co-plaintiff*.") (emphasis added); <u>Mason Tenders Dist. Council Pension Fund v. Messera</u>, 958 F. Supp. 869, 882 (S.D.N.Y. 1997) ("Actual knowledge is measured from the standpoint of the trustees who commenced the lawsuit and *cannot be attributed to them by the knowledge of prior trustees or other current trustees*.") (emphasis added); <u>Landwehr v. Dupree</u>, 72 F.3d 726, 732 (9th Cir. 1995) ("[T]he limitations period begins to run on the date that *the person bringing suit on behalf of the plan* learned of the breach or violation.") (emphasis added); <u>Useden v. Acker</u>, 734 F. Supp. 978, 980 (S.D. Fla. 1989) (holding that it is "[t]he knowledge of the actual plaintiff," and not that of non-party trustees which "will determine whether to apply the three-year or the six-year limitation period.").  As the <u>Useden</u> Court noted, "[a] fiduciary who violates the trust placed in him by the Plan will not easily find protection from a time bar."  <u>Id.</u>

19.     Nothing in the record provides any support to the proposition that any non-party trustees, other than those which have been dismissed as defendants, committed any acts which would support a conclusion that those non-party trustees breached their fiduciary duties. However, even if it were the case that such a breach had occurred by the non-party trustees, that would in no way bar Plaintiffs from recovery.  In <u>Meyer v. Berkshire Life Ins. Co.</u>, 128 F. Supp. 2d 831, 840-41 (D. Md. 2001) (hereinafter "<u>Meyer I</u>"), the *named plaintiff trustees* acknowledged that they had breached their fiduciary duties to the plan at issue.  However, the Court denied the defendants' attempt to bar the plaintiffs from recovery, because defendants "provided no precedent supporting the proposition that a breach by the suing fiduciary precludes such a claim," and because "[e]ven if the [named plaintiff trustees] also have some liability for any damages to the plans, that argument does not" bar plaintiffs from recovery.  <u>Id.</u> at 841.

Certainly then, as the law of this District makes clear, if the knowledge of a *named plaintiff trustee* cannot bar recovery, then certainly that of a non-party trustee cannot bar recovery.

20.     Furthermore, while imputing the Plan with the knowledge of non-party trustees would not only be anathema to the entirety of ERISA case law, it would also defeat the entire purpose of ERISA by protecting the interests of the Defendant fiduciaries at the expense of the Plan's participants and beneficiaries.  This is contrary to ERISA's purpose which "is to protect the interests of participants in employee benefit plans and their beneficiaries." <u>Wilmington Shipping Co. v. New England Life Ins. Co.</u>, 496 F.3d 326, 338 (4th Cir. 2007).  <u>See also</u> <u>Auslander v. Hefland</u>, 988 F. Supp. 576, 578 (D. Md. 1997) ("[T]he purposes of Congress in enacting ERISA [was,] namely, the protection of plan beneficiaries."); <u>NARDA</u>, 744 F. Supp. at 696 ("An analysis of ERISA reveals an intent to protect participants, beneficiaries and plans, and remedies are provided to fiduciaries only insofar as they advance that purpose."); <u>Vogel v. Independence Fed. Savings Bank</u>, 728 F. Supp. 1210, 1220 (D. Md. 1990) ("The legislative purpose animating ERISA is recited in the opening sections of the law. Section 2 of ERISA, 29 U.S.C. § 1001, entitled 'Congressional findings and declaration of policy,' announced Congress' desire to enact comprehensive legislation to ensure 'the continued well-being and security of millions of employees and their dependents [who] are directly affected by these plans.'  That is, it is both 'employees their beneficiaries' that Congress sought to protect by enacting ERISA.")

21.     Additionally, nothing distinguishes the argument that the Plan should be imputed with the knowledge of non-party trustees from an argument that the Plan could be imputed with the knowledge of the Defendants themselves.  If the Plan can be imputed with the knowledge of trustees who do not bring the action on behalf of the Plan, then there would be nothing to stop the statute of limitations clock from running when the Defendants themselves became aware of

their own wrongdoing.  Indeed, this argument is made all the more obvious in this case where a unanimous Board of Trustees, *including Defendant Pepper*.  ***This means that, like the non-party trustees, Defendant Pepper voted to initiate this litigation***.  Thus, there would be no basis to impute the plan with the knowledge of non-party trustees, but not with the knowledge of Defendant Pepper.  This would lead to the absurd result that by simply maintaining their positions and not suing themselves, the Defendants could run out the statute of limitations clock.  Certainly, allowing such a result to limit the Plan's possibility of recovery would be directly contrary to the Congressional intent behind ERISA of protecting participants and beneficiaries.

22.     Defendants are also bound by their counsel's strategic decisions in not seeking to enjoin any non-party trustees as defendants in this case and/or not asserting any equitable affirmative defense as a basis for imputing the Plan with the knowledge of non-party trustees.  See Reed v. Ross, 468 U.S. 1, 13 (1984) ("[A]bsent exceptional circumstances, a defendant is bound by the tactical decisions of competent counsel."); Sierra Club v. Simkins Industries, Inc., 847 F.2d 1109, 1117 (4th Cir. 1988) ("Ordinarily civil litigants are bound by their lawyers' tactical decisions.")

**D.     Defendants' Breaches of Fiduciary Duties Caused Damage to the Plan Totaling $515,927**

23.     As noted in the findings of fact, the actual value of the Plan as of February 1, 2003 was $1,684,554.  Had this amount been invested as of that date under the prudent investment strategy proposed by Plaintiffs' expert Michael Cairns, using a mix of 50% S&P 500 and 50% Barclays Capital Aggregate Bond Index, then the Plan's assets would have been worth $2,378,361 on February 1, 2006.  Instead, the Plan's actual value on February 1, 2006 was $1,862,434.

24.     Under ERISA § 409(a); 29 U.S.C. § 1109(a), "a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."  See also Meyer II, 250 F. Supp. 2d at 572 ("[T]he proper measure of damages is the difference between the actual value of the plans and the value prudent investments would bear.") (internal citations omitted); Moore, 2001 U.S. Dist. LEXIS 9012, at *23-24 ("[C]omparing the return on the improper investment with that of a reasonably prudent alternative investment represents an appropriate means of assessing damages under 29 U.S.C. § 1109."); Evans v. Akers, 534 F.3d 65, 74 (1st Cir. 2008) ("Losses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio."); Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985) (hereinafter "Bierwirth II") ("In view of the intent expressed by Congress in providing for the recovery of 'losses,' . . . we hold that the measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned on the [challenged] investment with what the Plan would have earned had the funds been available for other Plan purposes.")

25.     Comparing the results which the Defendants actually obtained against a benchmark yield, such as the 50% S&P 500 and 50% Barclays Capital Aggregate Bond Index proposed by Plaintiff's investment expert is an accepted means of determining what a prudent portfolio would bear.  See, e.g., Vaughn v. Bay Envtl. Mgmt., Inc., No. 05-17100, ___ F.3d ___, 2009 WL 1545124 (9th Cir. Jun. 4, 2009) (noting that plaintiff "seeks the difference between the benefit he received and what he would have received if the Plans' assets had been prudently invested.  This amount is ascertainable through expert testimony or other evidence regarding

investment returns during the relevant period."); <u>Cal Ironworkers Field Pension Trust v. Loomis Sayles & Co.</u>, 259 F.3d 1036, 1046-47 (9th Cir. 2001) (noting that the district court "rel[ied] upon the benchmark yield as an approximation of what the improperly invested funds would have earned if properly invested" and concluding that "to the extent that the district court may wish to rely upon the benchmark yield in its recalculation of damages, such reliance would be appropriate."); <u>Alco Indus., Inc. v. Wachovia Corp.</u>, 527 F. Supp. 2d 399, 406 (E.D. Pa. 2007) (holding that an expert's "methodology [for] measuring diversification by comparing a given portfolio to a benchmark portfolio [] appears well-supported in the finance literature.").

26.     Comparing Defendants' actual results against the 50% S&P 500 and 50% Barclays Capital Aggregate Bond Index is also appropriate as "[w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these.  The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty."  <u>Bierwirth II</u>, 754 F.2d at 1056.  <u>See</u> <u>also</u> <u>Graden v. Conexant</u>, 496 F.3d 291, 301 (3d Cir. 2007) (citing favorably to <u>Bierwirth II</u> for the proposition that if plaintiff "succeeds on the merits, the District Court will look to the prudent investment alternatives" and choose the most profitable to determine the appropriate portfolio to determine damages).

27.     Additionally, using the 50% S&P 500 and 50% Barclays Capital Aggregate Bond Index mix proposed by Mr. Cairns is also appropriate as the case law of this district makes clear that such a mix is a prudent investment allocation.  <u>See</u> <u>Meyer II</u>, 250 F. Supp. 2d at 573 ("[C]onclud[ing] that a moderate asset mix consisting of approximately 50% equity and 50% income . . . would have been prudent.").  <u>See</u> <u>also</u> <u>id.</u> at 573-74 (relying upon plaintiffs' brief to

"estimat[e]e the rates of return of the S&P 500 . . . and the Lehman Brothers

Government/Corporate Bond Index.")

28.     Thus, the Defendants are liable to make the Plan whole for their breaches of their

fiduciary duties.  The Plan was damaged by the Defendants, and the Defendants are therefore

liable, for the sum of $515,927, constituting the difference between what the Plan was actually

worth as of February 1, 2006 and what it would have been worth had the Defendants prudently

invested the Plan's assets in accordance with the mix proposed by Mr. Cairns.

**E.      Defendants are Jointly and Severally Liable**

29.     ERISA § 409(a) imposes personal liability on defendants for their breaches of

fiduciary duty.  See 29 U.S.C. § 1109(a) ("Any person who is a fiduciary with respect to a plan

who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this

subchapter shall be personally liable to make good to such plan any losses to the plan resulting

from each such  breach, and to restore to such plan any profits of such fiduciary which have been

made through use of assets of the plan by the fiduciary, and shall be subject to such other

equitable or remedial relief as the court may deem appropriate, including removal of such

fiduciary.")   Accordingly, when, as here, multiple fiduciaries breach their fiduciary duties

causing damage to an ERISA plan, those defendants are jointly and severally liable for the

damage caused.  See, e.g., Chao v. Rhoades, No. 1:04CV00854, 2006 U.S. Dist. LEXIS 19887,

*9 (M.D.N.C. Apr. 13, 2006) ("The statutory basis for a suit claiming breach of fiduciary duty

under ERISA is 29 U.S.C. § 1109.  Section 1109(a) imposes personal liability on any fiduciary

who breaches 'any of the responsibilities, obligations or duties imposed upon fiduciaries' by

ERISA. . . . Where there is more than one fiduciary, they may be held jointly and severally liable

for breaches of the duties imposed by ERISA."); Elmore v. Cone Mills Corp., No. 6:88-3258-17,

1991 U.S. Dist. LEXIS 13583, *90 n. 1 (D.S.C. Sep. 18, 1991) ("ERISA liability for breach of

fiduciary liability is personal. . . . Thus, [the defendants are] severally liable for the breach of fiduciary duty."), rev'd in part on other grounds, 23 F.3d 855 (4th Cir. 1994); Davidson v. Cook, 567 F. Supp. 225, 240 (E.D. Va. 1983) ("Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary is personally liable to the plan for any losses resulting from breaches of the fiduciary's duties and is subject to other equitable or remedial relief, including removal from office.  Under this provision, the . . . Trustees and [the former plan administrator] are jointly and severally liable for the losses.")

## F.   Plaintiffs are Entitled to Recover Prejudgment Interest

30.    A determination as to whether or not to award prejudgment interest in an ERISA case is left to the discretion of the trial court.  See Quesinberry v. Life Ins. Co., 987 F.2d 1017, 1030 (4th Cir. 1993) ("ERISA does not specifically provide for pre-judgment interest, and absent a statutory mandate the award of pre-judgment interest is discretionary with the trial court."). However, it is well-established that an award of prejudgment interest is also necessary to make a Plan whole for the damages which it has incurred and, therefore, interest should be awarded to Plaintiffs in this case to make the Plan whole for the damages caused by Defendants.  See Brink v. DaLesio, 667 F.2d 420, 429 (4th Cir. 1981) ("We think that it was error for the district court not to allow prejudgment interest. ERISA, 29 U.S.C. § 1109, clearly states that a fiduciary who breaches his trust 'shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate' . . . [I]t is a general principle that a fiduciary is liable not only for profits or losses caused by a breach of duty but also for simple interest at the legal rate running from the time of the breach.").  See also Meyer II, 250 F. Supp. 2d at 574-75 ("The court finds that pre-judgment interest is needed to ensure that the plaintiffs are fully compensated for their loss."); Slupinski v. First Unum Life Ins. Co., 554 F.3d 38, 54 (2d Cir. 2009) ("Like an

32

award of attorney's fees for a successful ERISA claim by an employee benefit plan participant, prejudgment interest is an element of the plaintiff's complete compensation.") (internal citations omitted).

G.     **Plaintiffs are Entitled to Recover Their Reasonable Attorneys' Fees and Costs**

31.     Pursuant to ERISA § 502(g)(1), Plaintiffs' reasonable attorneys' fees and costs incurred in bringing this action are recoverable.  See 29 U.S.C. § 1132(g)(1).  In making an attorneys' fees award, the Fourth Circuit instructs district courts to consider the following factors: "(1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing party would deter other persons acting under similar circumstances; (4) whether the party requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions."  Mid Atl. Med. Servs., LLC v. Sereboff, 407 F.3d 212, 221 (4th Cir. 2005). See also Jani v. Bell, No. WDQ-04-1606, 2005 U.S. Dist. LEXIS 44331, *2-5 (D. Md. Nov. 7, 2005).

32.     Here, each of the factors supports granting attorneys' fees to Plaintiffs.  Most importantly, the Defendants have the ability to pay attorneys' fees as the Defendant Trustees who are jointly and severally liable for all damages are covered under an insurance policy.  See Quesinberry, 987 F.2d at 1030 n. 12 (distinguishing cases in which attorneys' fees are paid out of an insurance policy from those cases in which fees would be paid out of plan assets and, therefore, would caution against awarding such fees).  Additionally, the Plaintiffs have significant reason to believe that Defendant Perry possesses substantial assets.  The Fourth Circuit has held that when, as here, the ability to pay exists, such a factor is "neardispositive" as "[b]ased on this factor alone, absent special circumstances, a prevailing ERISA . . . plaintiff

should ordinarily receive attorneys' fees from the defendant." Rodriguez v. MEBA Pension Trust, 956 F.2d 468, 472 (4th Cir. 1992) (internal citations omitted). Thus, this "neardispositive" factor obviously breaks in favor of awarding Plaintiffs attorneys' fees.

33.     The Defendants were clearly sufficiently culpable as to support a finding of attorneys' fees. This Court has noted that "[c]ulpability connotes wrongful conduct that is not intentional or deliberate." Jani, 2005 U.S. Dist. LEXIS 44331 at *2. "Culpability can be found where a plans decision is discernibly against the weight of the evidence." Id. (internal citations omitted). Here, given that the Defendants decisions went against the requirements of ERISA, the requirements of the Plan's governing documents, and a basic understanding of prudent investing, it is clear that those decisions were "discernibly against the weight of the evidence" and, therefore, that Defendants were sufficiently culpable as to award attorneys' fees to the Plaintiffs.

34.     The deterrence factor is plainly met based upon the fact that fiduciaries of other plans would be encouraged to make sure that they prudently invest assets of the plans they represent. This Court has specifically referred to "the negligent enforcement of . . . clear ERISA standards" as an example of the "type of behavior which ERISA's fee-shifting provisions would logically seek to deter." American Med. Sec., Inc. v. Larsen, 31 F. Supp. 2d 502, 507 (D. Md. 1998). Additionally, as the Fourth Circuit has noted that "[w]here, as here, the degree of culpability was such as to constitute a breach of fiduciary duty . . . it is obvious that monetary sanctions may well operate to deter repetitions of the conduct." Rodriguez, 956 F.2d at 472. See also Shade v. Panhandle Motor Serv. Corp., No. 95-1129, 1996 U.S. App. LEXIS 16703, *13 (4th Cir. July 11, 1996) (upholding an award of attorneys' fees on the grounds that the award "would deter other ERISA plan administrators from similar activities.")

35.     The final two factors also plainly fall in favor of awarding attorneys' fees to the

Plaintiffs.  The Plaintiffs seek to have the Plan reimbursed for the damages caused by

Defendants' conduct, thereby "benefit[ing] all participants and beneficiaries of [this] ERISA

plan." Mid Atl. Med. Servs., 407 F.3d at 221.  Finally, the relative merits of the parties'

positions show that fees should be granted because, based upon the Defendants' complete lack of

prudence in their management of the Plan, the "Defendants' position has no merit at all." Essex

v. Randall, No. DKC 2003-3276, 2005 U.S. Dist. LEXIS 3942, *27, 35 Employee Benefits Cas.

(BNA) 1389 (D. Md. Mar. 15, 2005).

Respectfully submitted,


Dated: June 25, 2009                                            /s/
                                        Jonathan G. Rose (Bar No. 15138)
                                        Richard S. Siegel (Bar No. 17318)
                                        Emily N. Seymour (Bar No. 17436)
                                        Sheppard Mullin Richter & Hampton LLP
                                        1300 I Street, NW, 11th Floor East
                                        Washington, DC 20005
                                        Telephone: (202) 218-0000
                                        Facsimile: (202) 218-0020
                                        jrose@sheppardmullin.com
                                        rsiegel@sheppardmullin.com
                                        eseymour@sheppardmullin.com
                                        *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of June, 2009, I caused a copy of the foregoing

Plaintiffs' Proposed Findings of Fact and Conclusions of Law to be filed with the Court, via the

Court's ECF system, which will send copies to the following counsel of record:

> Peter R. Kolker, Esq.
> Zuckerman Spaeder LLP
> 1800 M Street, NW, Suite 1000
> Washington, D.C. 20036-5802
>
> John C. Hayes, Esq.
> Nixon Peabody LLP
> 401 Ninth Street, N.W., Suite 900
> Washington, D.C. 20004-2128

/s/
Jonathan G. Rose